Peter A. Ivanick
Allison H. Weiss
DEWEY & LEBOEUF LLP
1301 Avenue of the Americas
New York, New York 10019
Tel: (212) 259-8000
Fax: (212) 259-6333

- and -

Todd L. Padnos (*pro hac vice* admission pending)
DEWEY & LEBOEUF LLP
1950 University Avenue, Suite 500
East Palo Alto, California 94303
Tel: (650) 845-7000
Fax: (650) 845-7333

*Proposed Attorneys for the Debtor and Debtor in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------x
                                          :
***In re***                               :
                                          :      **Chapter 11**
**AMBAC FINANCIAL GROUP, INC.,**          :
                                          :      **Case No. 10-15973 (SCC)**
         **Debtor.**                      :
                                          :
-------------------------------------------------------------x

### AFFIDAVIT OF DAVID W. WALLIS IN SUPPORT OF DEBTOR'S CHAPTER 11 PETITION AND FIRST DAY MOTIONS AND PURSUANT TO LOCAL RULE 1007-2

STATE OF NEW YORK    )
                     )    ss:
COUNTY OF NEW YORK   )

I, David W. Wallis, hereby declare under penalty of perjury:

1.      I am President and Chief Executive Officer of Ambac Financial Group, Inc.

("AFG" or the "Debtor," and together with its nondebtor affiliates, "Ambac"). On the date

hereof, AFG commenced a voluntary case under chapter 11 of title 11 of the United States Code

(the "<u>Bankruptcy Code</u>").  I have served as President and Chief Executive Officer of AFG since October 21, 2008, having joined Ambac in 1996.  I am familiar with the Debtor's business, financial affairs, and books and records.  I am above 18 years of age, am competent to testify, and am authorized to submit this affidavit (the "<u>Affidavit</u>") on behalf of the Debtor.

2.      I submit this Affidavit pursuant to Rule 1007-2 of the Local Rules for the Southern District of New York (the "<u>Local Rules</u>"), to advise the Court and other parties in interest of the circumstances.  I also submit this Affidavit in support of the first day motions and applications (collectively, the "<u>First Day Pleadings</u>")[1] filed contemporaneously herewith, and additional pleadings (collectively, the "<u>Additional Pleadings</u>") the Debtor intends to file as soon as reasonably practicable hereafter,[2] and by which the Debtor seeks the relief necessary to enable the Debtor and Ambac to operate effectively, minimize certain of the potential adverse effects of

---

[1] The First Day Pleadings are: (i) *Debtor's Motion for Interim and Final Orders Pursuant to Sections 105(a), 362, and 541 of the Bankruptcy Code Establishing Procedures for Certain Trading Activity in Equity Interests in and General Unsecured Claims Against the Debtor and Scheduling a Final Hearing*; (ii) *Debtor's Motion for Interim Order, Pursuant to Sections 105(a), 345, 363, And 364 of the Bankruptcy Code and Bankruptcy Rules 6003 and 6004, (I) Authorizing Debtor To Continue Using Existing Cash Management System and Bank Accounts, Maintain Existing Investment Policy, and Honor Related Prepetition Obligations; and (II) Scheduling a Final Hearing*; (iii) *Debtor's Motion for Order Pursuant to Bankruptcy Rules 2002, 9007, and 9036 and Local Rule 2002-2 Establishing Certain Notice, Case Management, and Administrative Procedures*; (iv) *Debtor's Motion for Order (i) Extending Time to File Schedules and Statement of Financial Affairs, and (ii) Waiving the Requirement to File an Equity List and Serve a Notice of Commencement on Equity Holders*; and (v) *Debtor's Application Pursuant to 28 U.S.C. § 156(c), Bankruptcy Rule 2002 and Local Rule 2002-1(f) for an Order (I) Authorizing the Employment And Retention of Kurtzman Carson Consultants LLC as Claims and Noticing Agent for the Debtor*.

[2] The Additional Pleadings are: (i) *Debtor's Application Pursuant to Sections 327(a) and 328(a) of the Bankruptcy Code for Authorization to Retain and Employ the Blackstone Group L.P. As Financial Advisors for the Debtor Nunc Pro Tunc to the Commencement Date*; (ii) *Debtor's Application Pursuant to Bankruptcy Code Sections 327(a) and 328(a), Bankruptcy Rule 2014(a) and Local Rule 2014-1, for Authorization To Employ and Retain Dewey & LeBoeuf LLP as Attorneys for the Debtor, Nunc Pro Tunc to the Commencement Date*; (iii) *Debtor's Motion Pursuant to Sections 105(a) and 331 of the Bankruptcy Code and Bankruptcy Rule 2016(a) for Authorization to Establish Procedures for Interim Monthly Compensation and Reimbursement of Expenses of Professionals*; (iv) *Debtor's Motion for Order Pursuant to Sections 105(a), 327, 328, and 330 of the Bankruptcy Code for Authorization to Employ Professionals utilized in the Ordinary Course of Business, Nunc Pro Tunc to the Commencement Date*; (v) *Debtor's Motion Pursuant to Sections 105(a), 363(b), and 503(b) of the Bankruptcy Code and Bankruptcy Rules 4001, 6003, and 6004 for Order (I) Authorizing Debtor to Continue Prepetition Insurance Programs, and Pay All Prepetition Obligations in Respect Thereof, (II) Directing Financial Institutions to Honor And Process Related Transfers, and (III) Scheduling a Final Hearing*; and (vi) *Debtor's Motion Pursuant to Sections 105(a), 363(b), and 507(a)(8) of the Bankruptcy Code for Interim Order (I) Authorizing Payment of Prepetition Taxes and Business License Fees, (II) Authorizing Financial Institutions To Honor and Process Related Transfers, and (III) Scheduling a Final Hearing*.

the commencement of the Debtor's chapter 11 case, and preserve and maximize the value of the Debtor's estate.

3.      Except as otherwise indicated, all facts set forth herein are based upon my personal knowledge of the Debtor's business and financial affairs, information learned from my review of relevant documents, and information I have received from other members of the Debtor's management and the Debtor's advisers.  If I were called to testify, I would testify competently to the facts set forth herein on that basis.

4.      In order to familiarize the Court with the Debtor and the First Day Pleadings, this Affidavit is organized as follows:  Part I describes Ambac's business and capital structure; Part II details the circumstances surrounding the commencement of the Debtor's chapter 11 case; Part III sets forth the relevant facts in support of each of the First Day Pleadings; and Part IV provides additional information required by Local Rule 1007-2.

## Part I.

## The Debtor's Business and Capital Structure

**A.      Overview of the Debtor's Business Operations**

5.      The Debtor is a holding company[3] headquartered in New York City.  The Debtor's principal operating subsidiary, Ambac Assurance Corporation ("AAC"), is a Wisconsin-domiciled financial guarantee insurance company whose business includes the issuance of financial guarantee insurance policies to support public finance, structured finance, and international finance transactions.  AAC is subject to the insurance laws and regulations of the State of Wisconsin and is regulated by the Office of the Commissioner of Insurance of the State of Wisconsin ("OCI").  Until 2008, when AAC stopped selling new policies because of its

---

[3] Ambac's corporate organizational chart is attached hereto as Exhibit A.

deteriorating financial condition and lowered credit ratings, AAC offered financial guarantee insurance on investment grade municipal finance and private structured-finance debt obligations, such as municipal bonds and residential mortgage-backed securities ("RMBS").

6.      Financial guarantee insurance provides an unconditional guarantee that protects the holder of a fixed-income obligation against non-payment of principal and interest when due. AAC also guaranteed certain structured-finance debt obligations, whereby a non-insurance, wholly owned Ambac subsidiary would enter into a credit-default swap ("CDS") with a counterparty that protected the counterparty from defaults of the underlying security issuer, and AAC would, in turn, guarantee the financial obligations of its subsidiary.  These structured-finance debt obligations were largely collateralized debt obligations ("CDOs") backed by asset-backed securities ("ABS"), primarily RMBS.

7.      The Debtor, through AAC subsidiaries, also provided financial services, including investment agreements, funding conduits, and interest rate, currency, and total return swaps, principally to the clients of its financial guarantee business. AAC guaranteed its subsidiaries' performance under those agreements.

8.      As more fully described in Part II below, AAC's financial guarantee and financial services businesses were devastated in the financial crisis beginning in 2007.  As a result, AAC only wrote *de minimis* new business since November 2007 and has written no new business since the beginning of 2008.  Consequently, since 2007, OCI has not permitted AAC to pay dividends to the Debtor.  As a holding company, the Debtor is dependent upon dividends from AAC in order to pay principal and interest on its indebtedness and operating expenses.

NY3 3011714.18

**B.      Overview of the Debtor's Capital Structure**

9.      As of the date hereof (the "<u>Commencement Date</u>"), pursuant to the Senior Notes

and the Subordinated Notes (each as defined below), the Debtor has approximately

$1,622,189,000 in outstanding unsecured indebtedness and related obligations.

**1.      The Senior Notes**

10.      The Debtor's Senior Notes rank equally in right of payment with all of the

Debtor's other non-subordinated unsecured debt.  The following describes the Debtor's Senior

Note indebtedness:

(i)      Pursuant to that certain Indenture, dated as of August 1, 1991, between the Debtor and The Bank of New York Mellon (as successor trustee to The Chase Manhattan Bank (National Association)) (the "<u>1991 Indenture</u>"), the Debtor issued $150,000,000 in aggregate principal amount of 9-3/8% debentures due on August 1, 2011 (the "<u>9-3/8% Notes</u>").  In July 2001, the Debtor extinguished $7,500,000 of the 9-3/8% Notes, reducing the principal amount of the outstanding indebtedness to $142,500,000.  As of the Commencement Date, the outstanding indebtedness in respect of the 9-3/8% Notes is approximately $122,189,000.

(ii)      Pursuant to the 1991 Indenture, the Debtor issued $75,000,000 in aggregate principal amount of 7-1/2% debentures due on May 1, 2023 (the "<u>7-1/2% Notes</u>").  As of the Commencement Date, the outstanding indebtedness in respect of the 7-1/2% Notes is approximately $75,000,000.

(iii)      Pursuant to that certain Indenture, dated as of August 24, 2001, between the Debtor and the Bank of New York Mellon (as successor trustee to JP Morgan Chase Bank) (the "<u>2001 Indenture</u>"), the Debtor issued $200,000,000 in aggregate principal amount of 5.95% debentures due on February 28, 2103 (the "<u>5.95% Notes due 2103</u>").  As of the Commencement Date, the outstanding indebtedness in respect of the 5.95% Notes due 2103 is approximately $200,000,000.

(iv)      Pursuant to the 2001 Indenture, the Debtor issued $175,000,000 in aggregate principal amount of 5.875% Notes due on March 24, 2103 (the "<u>5.875% Notes</u>") issued.  As of the Commencement Date, the outstanding indebtedness in respect of the 5.875% Notes is approximately $175,000,000.

(v)      Pursuant to that certain Indenture, dated as of April 22, 2003, between the Debtor and the Bank of New York Mellon (as successor trustee to JP Morgan Chase Bank), the Debtor issued $400,000,000 in aggregate principal amount of 5.95% debentures due on December 5, 2035 (the "5.95% Notes due 2035"). As of the Commencement Date, the outstanding indebtedness in respect of the 5.95% Notes due 2035 is approximately $ 400,000,000.

(vi)      The Debtor issued $250,000,000 in aggregate principal amount of 9.50% senior notes due on February 15, 2021 (the "9.50% Notes," and together with the 9-3/8% Notes, the 7-1/2% Notes, the 5.95% Notes, the 5.875% Notes, and the 5.95% 2035 Notes, the "Senior Notes") pursuant to that certain Indenture, dated as of February 15, 2006, and that certain Supplemental Indenture, dated as of March 12, 2008, both between the Debtor and the Bank of New York Mellon, as trustee. Additionally, the Debtor issued 5,000,000 Equity Units pursuant to that certain Purchase Contract Agreement, dated as of March 12, 2008, between the Debtor and The Bank of New York Mellon, as purchase contract agent. Each Equity Unit (an "Equity Unit") has a stated amount of $50 and initially consisted of a 5% beneficial ownership interest in $1,000 principal amount of the 9.50% Notes and a Purchase Contract requiring the Equity Unit holder to purchase a predetermined number of shares of the Debtor's common stock for $50 in cash on May 17, 2011 (the "Purchase Contract"). Each Equity Unit holder's ownership interest in the 9.50% Notes was initially pledged to The Bank of New York Mellon, as collateral agent, pursuant to that certain Pledge Agreement, dated as of March 12, 2008, between the Debtor and The Bank of New York Mellon, as collateral agent, custodial agent, securities intermediary, and purchase contract agent, to secure such holder's obligations under the Purchase Contract. As of the Commencement Date, the outstanding indebtedness under the 9.50% Notes is approximately $250,000,000.

**2.      The Subordinated Notes**

11.      Pursuant to that certain Junior Subordinated Indenture and First Supplemental Indenture, both dated as of February 12, 2007, between the Debtor and the Bank of New York Mellon, as trustee, the Debtor issued $400,000,000 of 6.15% Directly Issued Subordinated Capital Securities due February 15, 2037 (the "Subordinated Notes"). Pursuant to the terms of such First Supplemental Indenture, the Debtor was permitted to defer interest payments for up to ten years without giving rise to an event of default. Since August 15, 2009, the Debtor has elected to defer interest payments on the Subordinated Notes. As of the Commencement Date,

approximately $ 400,000,000 is outstanding in respect of the Subordinated Notes. The Subordinated Notes rank junior in right of payment to all of the Debtor's existing unsecured debt, including the Senior Notes.

## C. Tax-Sharing Agreement

12.     Since 1991, Ambac has filed a consolidated U.S. federal income tax return. The tax liabilities of individual Ambac entities are governed by a tax sharing agreement among such entities (the "TSA"). On December 16, 2009, the Ambac entities party to the TSA entered into an amendment of the TSA (the "December 2009 Amendment"), which granted to AAC a trust and/or security interest in U.S. federal income tax refunds allocable to net operating loss carryovers (the "NOLs") attributable to losses incurred by AAC.

13.     As a result of adverse developments in the credit markets in 2008, the Debtor adopted a method of accounting for losses on CDS entered by Ambac Credit Products LLP and insured by AAC. Also in 2008, the Debtor changed its method of accounting for CDS income, and filed with the Internal Revenue Service (the "IRS") a Form 3115 (Change of Accounting Methodology Request). CDS losses led to the Debtor's reporting approximately a $33 million taxable loss for 2007 and a $3.2 billion taxable loss for 2008. On September 23, 2008, August 11, 2009, and December 21, 2009, Ambac filed claims with the IRS for tentative carryback adjustments on Form 1139 (Corporate Application for Tentative Refund) as a result of the carryback to prior taxable years of the approximately $33 million and $3.2 billion of NOLs in 2007 and 2008, respectively, reported in Ambac's consolidated federal income tax returns. Based upon these claims, in December, 2008, September, 2009, and February, 2010, the IRS refunded to AFG $11,470,930, $252,704,185 and $443,940,722 (the "Tax Refunds"), respectively, on account of NOLs generated in respect of AAC's CDS. In accordance with the

TSA and the December 2009 Amendment, AFG transferred to AAC its allocable share of Tax Refunds (the "Tax Refund Transfers").

14.     On June 7, 2010, pursuant to the terms of the CDS Settlement Agreement (as defined below), the Ambac entities party to the TSA entered into a subsequent amendment of the TSA (the "June 2010 Amendment", and together with the December 2009 Amendment, the "TSA Amendments").  The June 2010 Amendment, *inter alia*, divided the Ambac consolidated tax group into (i) one subgroup comprised of the Debtor and its non-AAC subsidiaries and (ii) one subgroup comprised of AAC and its subsidiaries (the "AAC Subgroup").  The June 2010 Amendment requires AFG to compensate AAC on a current basis if it uses NOLs attributable to losses incurred by members of the AAC Subgroup to offset income attributable to AFG, except that it is not required to compensate AAC for the Debtor's use of NOLs in connection with cancellation of debt income associated with restructurings of its debt outstanding as of March 15, 2010.

15.     As of September 30, 2010, Ambac has reported NOLs of approximately $7.3 billion, and by the end of its taxable year ending December 31, 2010, expects to have $7.5 billion in reported NOLs.  Because these NOLs represent a significant potential asset for Ambac, filed contemporaneously herewith, the Debtor is filing a motion for entry of Interim and Final Orders Pursuant to Sections 105(a), 362, and 541 of the Bankruptcy Code Establishing Procedures for Certain Trading Activity in Equity Interests in and General Unsecured Claims Against the Debtor and Scheduling a Final Hearing.

NY3 3011714.18

**Part II.**

**Events Leading to the Commencement of the Debtor's Chapter 11 Case**

**A.      The Financial Crisis and the Restructuring of AAC**

16.      The Debtor's financial performance has always been dependent upon the financial strength of its principal operating subsidiary, AAC.  The financial guarantee industry is highly competitive and highly sensitive to market forces.  Changes in the perception of a financial guarantor's ability to fulfill its obligations have a material impact on such guarantor's ability to originate new business.  Further, the recent advent of alternative credit enhancement products in the financial guarantee industry and elsewhere brought increasingly complex financial instruments and structures to the marketplace and resulted in unforeseen effects on worldwide financial systems and institutions.

17.      The deterioration in the U.S. housing and mortgage markets that began in 2007 had a significant adverse impact upon the financial condition of AAC.  Mortgage defaults and foreclosures in the U.S. increased dramatically, thereby causing the ABS CDOs insured by AAC to default.  At the same time, losses increased on AAC-insured, or "wrapped," RMBS transactions.  Consequently, in 2007, 2008, and 2009, AAC both incurred and paid substantial policyholder expenses or claims far in excess of historic levels, causing a sharp decrease in AAC's surplus and contingency reserves in 2008 through the first quarter of 2010.  Since 2008, AAC paid over $2 billion in claims in respect of RMBS securities alone and had to set aside significant reserves for future claims.

18.      As a result, beginning in 2008, credit ratings agencies, including Moody's Investors Services, Inc. and Standard & Poor's Ratings Service, downgraded AAC's credit ratings several times from the highest investment grade ratings, Aaa and AAA, to, as of April, 2010, Caa2 and R, respectively.  Because of these downgrades, as well as significant disruption

in the capital markets, AAC originated only a *de minimis* amount of new business from November 2007 through the end of 2008 and has been unable to originate any new business since 2008. The lack of revenue from writing new policies, combined with payment of policyholder claims well in excess of historic levels, including payment since 2008 of over $2 billion in claims in respect of AAC's RMBS portfolio alone, caused OCI to approach AAC in September, 2008, to discuss possible restructuring scenarios.

19.     AAC's and the Debtor's management worked closely with OCI from September 2008 through March 2010 to analyze all aspects of Ambac's business and the effects of various restructuring scenarios. Such analysis determined that a full rehabilitation of AAC would give rise to an event of default on CDS insured by AAC, including CDS on ABS CDOs discussed below. Such default would give counterparties the right to terminate their swaps and assert against AAC and the AAC subsidiary that issued such swaps billions of dollars in mark-to-market damage claims that would, absent such default, remain notional and would not be capable of assertion against AAC. Additionally, the termination of such CDS would cause the liquidation of the assets backing the underlying transactions, spreading the detrimental effects of termination across many segments of the economy. Thus, because a full AAC rehabilitation would likely cause very significant value destruction at AAC, aside from possible more widespread effects, AAC's and the Debtor's management and OCI attempted to formulate a restructuring scenario that would avoid a full rehabilitation of AAC, with a view towards minimizing the above collateral damage and loss to AAC policyholders, AAC creditors, and the Debtor that would result therefrom.

20.     In the fall of 2009, certain financial institutions which were parties to the CDS on ABS CDOs insured by AAC formed a group to negotiate with AAC a global commutation of

their exposures.  AAC, which had previously negotiated bilateral commutations with some of these entities, engaged in negotiations with these financial institutions (together, the "CDS Counterparties"), to attempt a settlement of AAC's obligations.  In late 2009, OCI joined the negotiations between AAC and the CDS Counterparties and assumed an active role in advocating a global commutation.  On March 24, 2010, AAC reached a non-binding agreement with the CDS Counterparties that would commute approximately $16.5 billion in par amount of ABS CDOs (the "Commuted Obligations").  The CDS Counterparties entered into forbearance agreements with AAC to allow the parties sufficient time to negotiate and execute a settlement agreement.

21.     Also on March 24, 2010, OCI approved the establishment of a segregated account (the "Segregated Account") to segregate certain miscellaneous liabilities and policy liabilities related to certain non-performing segments of AAC's operations (together, the "Segregated Account Policies").  The Segregated Account Policies include, among other things, certain policies insuring or relating to CDS not included in the Commuted Obligations and all RMBS policies.  All policy obligations of AAC not allocated to the Segregated Account remain in the general account of AAC (the "General Account").  The Segregated Account is capitalized by a $2 billion secured note due 2050 issued by AAC (the "Secured Note"), the balance of which, as of June 30, 2010, inclusive of capitalized interest since the date of issuance, was approximately $1.98 billion.  The Segregated Account is also capitalized by an aggregate excess of loss reinsurance agreement provided by AAC.

22.     Further, on March 24, 2010, OCI commenced rehabilitation proceedings with respect to the Segregated Account (the "Segregated Account Rehabilitation Proceedings") in the District Court of Dane County, Wisconsin (the "Rehabilitation Court") to facilitate an orderly

11

run-off and/or settlement of the liabilities in the Segregated Account, including those associated with the Segregated Account Policies. The Rehabilitation Court appointed Sean Dilweg, the Wisconsin Commissioner of Insurance, as rehabilitator of the Segregated Account (the "Rehabilitator"). Obligations under the Segregated Account Policies will be paid with a combination of cash and surplus notes of the Segregated Account (the "Segregated Account Surplus Notes") not to be issued until a plan of rehabilitation is confirmed. Policy obligations in the General Account are not subject to, or directly impacted by, the Segregated Account Rehabilitation Proceedings and AAC itself is not in rehabilitation or any other insolvency proceedings.[4]

23.     On June 7, 2010, AAC entered into a settlement agreement with the CDS Counterparties (the "CDS Settlement Agreement"), pursuant to which, in exchange for the termination of the Commuted Obligations, AAC paid to the CDS Counterparties $2.6 billion in cash and $2 billion of surplus notes of AAC (the "AAC Surplus Notes," and together with the Segregated Account Surplus Notes, the "Surplus Notes"), that have a scheduled maturity of June 7, 2020. All principal and interest payments in respect of the AAC Surplus Notes are subject to OCI's prior approval. Additionally, pursuant to the CDS Settlement Agreement, certain other non-CDO of ABS obligations were commuted and further commutations, also in exchange for cash and surplus notes, are expected to occur over the next year. The CDS Settlement Agreement essentially requires AAC and its subsidiaries to remain in run-off until the AAC Surplus Notes have been redeemed, repurchased, or repaid in full.

_____

[4] In conjunction with the Segregated Account Rehabilitation Proceedings, the Rehabilitation Court issued an order enjoining certain actions by Segregated Account Policyholders and other Segregated Account counterparties, including the assertion of damages or acceleration of losses based on early termination and the loss of control rights in insured transactions (the "Segregated Account Injunction"). On October 26, 2010, the Rehabilitation Court denied the challenges of certain Segregated Account Policyholders and counterparties to the Segregated Account Proceeding and related injunction. These Segregated Account Policyholders and counterparties may appeal the Rehabilitation Court's decision.

24. On October 8, 2010, the Rehabilitator filed a plan of rehabilitation with respect to the Segregated Account (the "Rehabilitation Plan") in the Rehabilitation Court. The Rehabilitation Plan will, if approved, provide, *inter alia*, that holders of Segregated Account Policies shall receive, in respect of allowed claims made thereon, a combination of 25% cash and 75% Segregated Account Surplus Notes. A confirmation hearing in respect of the Rehabilitation Plan is currently scheduled for November 15-19, 2010 in the Rehabilitation Court. Until the Rehabilitation Plan is approved, except as separately approved by the Rehabilitation Court, it is anticipated that no claims will be paid on Segregated Account Policies.

**B. The Debtor's Restructuring Initiatives**

25. Because AAC has been unable to pay dividends to the Debtor for several years, the Debtor has over the past year considered various restructuring initiatives, including third-party investment and, through negotiations with an *ad hoc* committee of AFG's senior noteholders (the "Ad Hoc Committee"), a prepackaged bankruptcy.

**1. Negotiations with Third-Party Investors**

26. The Debtor considered several possible transactions to attract new capital and met with potential investors and received multiple bids. Such bids contemplated different combinations of (i) the acquisition of less than twenty percent of the Debtor's equity interests in AAC, (ii) an equity investment in AFG, and/or (iii) a loan to AFG. None of the bids, however, sufficiently satisfied AFG's liquidity needs and/or the necessary agreements were not reached.

27. In the summer of 2010, AFG's liquidity projections indicated that a near-term bankruptcy filing would be necessary if negotiations with third-party investors did not progress. After disclosing this to OCI, in October 2010, OCI approved a $37 million dividend by Ambac (Bermuda) Ltd. ("Ambac Bermuda") to the Debtor. Following the dividend payment, the Debtor's projections indicated that available cash would remain above $50 million for the

13

remainder of 2010. In October, 2010, negotiations with the remaining third-party investor failed to produce an acceptable transaction that would enable the Debtor to service its debt obligations.

28.     As a result, the Debtor concentrated its efforts on negotiations with the Ad Hoc Committee, in hopes of commencing a prepackaged chapter 11 bankruptcy case.

### 2.     Negotiations with the Ad Hoc Committee

29.     Beginning in September 2010,[5] while simultaneously negotiating with potential third-party investors, the Debtor and the Ad Hoc Committee participated in extensive negotiations in an effort to reach an agreement on a consensual restructuring to be accomplished through a prepackaged bankruptcy plan of reorganization. The Ad Hoc Committee engaged Morrison & Foerster LLP as its counsel and Lazard Frères & Co. LLC as its financial advisors. The Debtor, its counsel, Dewey & LeBoeuf LLP ("D&L"), and its financial advisors, The Blackstone Group LP ("Blackstone"), made every effort to reach a consensual restructuring of the Debtor's balance sheet with the Ad Hoc Committee and its advisors.

30.     Subjects of negotiation between AFG and the Ad Hoc Committee included (i) the TSA Amendments, (ii) the Tax Refund Transfers, (iii) the allocation of NOLs between the AFG Subgroup and the AAC Subgroup and (iv) potential avoidance actions that may be brought on behalf of AFG against AAC. Because settlement of these issues could directly affect AAC, in October 2010, AFG attempted to include OCI in its negotiations with the Ad Hoc Committee.

### 3.     Negotiations with OCI

31.     Because OCI would place the General Account into full rehabilitation should any prepackaged plan agreed upon by AFG and the Ad Hoc Committee negatively impact on AAC's ability to satisfy policyholder claims, thereby eliminating any equity value of AAC to AFG, the

---

[5] Although negotiations began in September, the Ad Hoc Committee was formed and did significant diligence in preparation for such negotiations over the preceding summer.

Debtor and the Ad Hoc Committee sought OCI approval of any prepackaged plan of reorganization which contemplated preservation of AAC's going-concern value. Despite the $37 million dividend received from Ambac Bermuda, however, AFG's liquidity position was deteriorating and it became evident that an agreement among AFG, the Ad Hoc Committee and OCI regarding a prepackaged bankruptcy of AFG would not be reached in the appropriate timeframe. Nonetheless, while AFG prepared to file for chapter 11 protection on November 30, 2010, it continued to negotiate with the Ad Hoc Committee and OCI, and it remained hopeful that an agreement could be reached on a prenegotiated bankruptcy plan.

### 4.    Negotiations with Securities Litigants

32.    Concurrent with pursuing its restructuring initiatives, the Debtor has been in mediation proceedings attempting to settle certain ongoing securities actions which were filed in 2008 and 2009 against the Debtor and certain of its current and former officers and directors (together, the "Class Actions"). Settlement negotiations have been ongoing since July, 2009, among the Debtor, representatives of certain of the Debtor's director and officer liability insurance carriers (the "D&O Carriers"), and the named plaintiffs in the Class Actions.

33.    The salient terms of an anticipated settlement, as articulated in a memorandum of understanding dated as of November 5, 2010, are:

> (i)    A significant contribution by the D&O Carriers to fund the settlement;
>
> (ii)    A contribution of $2.5 million by AFG;
>
> (iii)    A chapter 11 filing of AFG and approval of the settlement of the Class Actions by this Court; and
>
> (iv)    The release of AFG, its current and former officers and directors and the D&O Carriers from claims related to allegations made in the Class Actions (the "Class Action Releases").

34.     The parties are close to executing a memorandum of understanding, and the Debtor is hopeful that a binding global settlement of the Class Actions will soon be reached.  In anticipation of such settlement, the Debtor escrowed $2.5 million, subject to return to the estate if (i) a binding settlement is not reached or (ii) such settlement is not approved by this Court.

## C.     Recent Developments

35.     On October 28, 2010, the IRS sent to AFG an information document request (an "IDR") regarding the Form 3115 filed in 2008 and Ambac's calculation of the Tax Refunds. Additionally, the IRS questioned the loss-accounting methods underlying Ambac's reported consolidated NOLs of approximately $7.3 billion as of September 30, 2010.

36.     On October 29, 2010, AFG's board of directors determined that AFG would not pay the $2.8 million interest payment on the 7-1/2% Notes (the "November 1st Interest Payment").  Pursuant to the 1991 Indenture, an event of default will occur if the November 1st Interest Payment is not paid within 30 days of its scheduled due date, *i.e.*, November 30, 2010. The next scheduled interest payment is November 15, 2010.

37.     In the days following receipt of the IDR, I and other members of the Debtor's management reviewed the potential ramifications of the IDR.  Because (i) the Tax Refunds were transferred to AFG by the IRS pursuant to a Form 1139 (see paragraph 13 hereof) and (ii) AFG is in financial distress, the IRS could assess AFG for a deficiency, and immediately (a) obtain liens and levy upon AFG's cash assets, (b) obtain liens and levy upon AAC's assets, and/or (c) obtain liens and levy upon the assets of any other Ambac entity, all without notice to the Debtor or an opportunity to pay or object to such assessed deficiency.  We determined that, if the IRS were to take such enforcement actions with respect to AAC, there is a real risk that OCI would quickly thereafter commence a rehabilitation of the General Account, which would likely

cause collateral damage as previously described and would also seriously jeopardize or completely destroy AFG's reorganization prospects.

38.     Although most of AAC's exposure to CDS was commuted in connection with the CDS Settlement Agreement, the General Account continues to be exposed to a significant book of CDS of collateralized loan obligations ("CLOs").  As with CDS exposures generally, counterparties on these agreements have a right to assert mark-to-market termination claims in the event of a rehabilitation of AAC.  Although OCI would presumably attempt to enjoin the assertion of such mark-to-market damages, there can be no assurance that such injunctions would ultimately be successful.  We calculate AAC's exposure to such mark-to-market damage claims in respect of the CLO book to be approximately $3 billion.  In the event that OCI fails to restrain the assertion of such damages, this $3 billion in additional policyholder claims would dilute all other policyholder claims significantly and destroy AAC's residual value to AFG

39.     Additionally, the IRS could obtain liens and levy upon (i) Everspan, an insurance company subsidiary of AAC with approximately $160-170 million of surplus, and (ii) two non-insurance subsidiaries of AAC, Ambac Financial Services, LLC ("AFS") and Ambac Capital Funding, Inc. ("ACFI").  AFS engages in swap transactions with clients of AAC and the general marketplace while ACFI has a large book of guaranteed investment contract business.  These businesses could be significantly affected if the liens referenced above were instituted.  If the businesses of AFS and ACFI are destroyed by an IRS lien and/or levy, both AFS and ACFI (all of whose liabilities to third parties are insured by AAC) could generate significant additional liabilities for AAC and further reduce or eliminate AAC's residual value to AFG.

40.     Negotiations amongst the Debtor, the Ad Hoc Committee and OCI continued through this past weekend and culminated in a non-binding term sheet (the "Term Sheet").  A

copy of the Term Sheet is annexed to a letter sent by Sean Dilweg, the Wisconsin Commissioner of Insurance, to AAC's board of directors on November 7, 2010 (the "Dilweg Letter"). A copy of the Dilweg Letter, annexing the Term Sheet, is attached hereto as Exhibit B.

41.    The following summarizes the Term Sheet:

(i)    AFG will retain ownership of AAC.

(ii)    OCI shall not petition for the full rehabilitation of AAC unless warranted by new material developments, as determined by OCI in its sole and absolute discretion.

(iii)    AAC will allocate the following liabilities to the Segregated Account:

i.    Any and all liabilities it has or may have, now or in future, to AFG or any successor to AFG in respect of (i) the TSA, (ii) the Tax Refunds and (iii) any liabilities in respect of any preference or fraudulent conveyance claims pertaining to the AFG Tax Liabilities (collectively, the "Allocated AFG Claims"); *except that* such allocation shall not include any liability to AFG pertaining to any possible misallocation of up to $38,485,850 of the Tax Refund Transfers (the "Misallocation Claim");

ii.    Any and all liabilities it has or may have, now or in future, to the IRS and/or the U.S. Treasury in respect of (i) taxes imposed under the Internal Revenue Code of 1986, as amended, for taxable periods ending on or prior to December 31, 2009, and (ii) the Tax Refunds (the "Tax Liabilities").

(iv)    Until December 31, 2010, the Rehabilitator will not seek an injunction from the Rehabilitation Court enjoining AFG action in respect of the NOLs and AFG will not take any action with regard to allocation of the NOLs between AAC and AFG.

(v)    Until December 31, 2010, the Ad Hoc Committee agrees not to pursue, or support the pursuit of, any preference claim or fraudulent conveyance claim on behalf of AFG pertaining to the Tax Refund Transfers.

(vi)    AAC agrees to negotiate a cost sharing agreement with AFG pursuant to which AAC and AFG will share the fees and expenses incurred by AFG in relation to any litigation in regard to the return of the Tax Refunds, on the basis of 80% to AAC and 20% to AFG. Upon being briefed on the litigation strategy, OCI may, in its sole discretion, increase AAC's share of costs to 85% (or such higher amount as determined by OCI).

(vii)    AAC and the Segregated Account will negotiate in good faith with AFG to modify the TSA and address certain issues including, but not limited to the following:

    i.    The amount of NOLs available for use by AAC, which shall be no greater than $3.5 billion.

    ii.    The amount paid by AAC to AFG for the use of the NOLs.

    iii.    It is understood that AFG shall be able to utilize NOLs equal to (i) $2.5 billion plus (ii) cancellation-of-debt income incurred in exchange with reorganization, (iii) any amounts related to interest deduction recapture, and (iv) any amounts remaining after the AAC NOL allocation set forth above.

(viii)    AAC and the Segregated Account agree in good faith with AFG on the amount of the Misallocation Claim, and subject to the approval of the Rehabilitation Court, AAC shall pay such amount to AFG. If the parties are unable to settle the Misallocation Claim by December 31, 2010, the dispute shall be submitted to binding arbitration.

(ix)    The consummation of all agreements contemplated hereby shall be subject to the approval of the Rehabilitation Court and this Court.

(x)    OCI commits to allow AAC to repurchase the Surplus Notes and preferred stock, subject to OCI's determination in its sole and absolute discretion that such repurchases do not violate the law, are reasonable and fair to the interests of AAC and the Segregated Account, and protect and are equitable to the interests of AAC and Segregated Account policyholders generally.

(xi)    Any bankruptcy plan shall be structured, to the extent practicable, to comply with the CDS Settlement Agreement and the Rehabilitation Plan.

(xii)    Any bankruptcy plan and confirmation order shall include the Class Action Releases.

42.    At meetings convened yesterday evening, the boards of directors of both AFG and AAC passed resolutions authorizing management to continue to pursue negotiations with AFG's senior creditors and OCI with a view to reaching an agreement on a comprehensive restructuring of AFG within the framework of the terms set forth in the Term Sheet. It is hoped, therefore, that the Term Sheet will provide the basis for an eventual agreement on a plan of reorganization for AFG.

43.     This morning, OCI went into the Rehabilitation Court and informed it of the Term Sheet and the allocation of the Tax Liabilities and the Allocated AFG Claims.  The Rehabilitator also sought expansion of the Segregated Account Injunction to prevent the IRS from asserting liens against and levying upon the assets of AAC and its subsidiaries and to prevent AFG or AFG-related parties from pursuing the Allocated AFG Claims against the Segregated Account, the General Account or AAC's subsidiaries.  A copy of the *Order for Temporary Supplemental Injunctive Relief* entered by the Rehabilitation Court is attached hereto as <u>Exhibit C</u>.

44.     Because such action affects AAC's obligations to the IRS, the IRS will receive notice thereof, which increased the level of concern of the Debtor's board of directors that the IRS would pursue the enforcement actions described above.  Because such enforcement actions have the potential to eliminate the Debtor's ability to reorganize and force AFG into liquidation proceedings, the Debtor's board of directors decided to file for chapter 11 protection on an emergency basis and approved resolutions authorizing the commencement of the Debtor's chapter 11 case.

## Part III.

## First Day Pleadings

45.     Concurrently with the filing of its chapter 11 petition, the Debtor has filed the following First Day Pleadings.[6]  In the term, AFG intends to file the Additional Pleadings.  The relief sought in the First Day Pleadings and the Additional Pleadings is critical to enable the Debtor to effectively transition into chapter 11 with minimal disruption, and further, is required in order for the Debtor to remain on good terms with certain third parties whose continued cooperation is the linchpin for maximizing the value of the Debtor's estate.  Unless the relief

---

[6] Capitalized terms used but not defined herein shall have the meanings set forth in the relevant First Day Pleading.

requested by the First Day Pleadings is granted, I believe that the Debtor's business (and Ambac's global businesses generally) will be very significantly impaired. A brief description of the relief requested and the facts supporting each of the First Day Pleadings and First Day Orders is set forth below.

## A.     Operational First Day Motions

### 1.     Debtor's Motion for Interim and Final Orders Pursuant to Sections 105(a), 362, and 541 of the Bankruptcy Code Establishing Procedures for Certain Trading Activity in Equity Interests in and General Unsecured Claims Against the Debtor and Scheduling a Final Hearing

46.     AFG has significant NOLs and other tax attributes (together, the "Tax Attributes") that are valuable to the Debtor's estate. The unrestricted trading of the Debtor's Stock could result in an "ownership change" within the meaning of section 382 of the Internal Revenue Code of 1986 (as amended, the "IRC") and could potentially eliminate the Debtor's ability to utilize its Tax Attributes. Further, the unrestricted trading of Claims against the Debtor could compromise the Debtor's ability to utilize section 382(l)(5) of the IRC (as described in the motion). Accordingly, the Debtor requests entry of interim and final orders which establish the following procedures for trading in Stock and Covered Claims:

(i)     Procedures for Transfers of Ambac Stock. Each "Substantial Equityholder," *i.e.*, an Entity which Beneficially Owns at least 13,500,000 shares of Ambac Stock (including shares that are the subject of any Options) must file with the Court, and serve upon the Debtor and its counsel, a notice of such status on or before the later of twenty (20) business days after the Commencement Date or ten (10) business days after becoming a Substantial Equityholder. Further, at least fifteen (15) business days prior to the consummation of any Ambac Stock transaction which would result in an increase or decrease in the amount of Ambac Stock Beneficially Owned by an Entity that is or subsequently becomes a Substantial Equityholder or would result in an Entity becoming a Substantial Equityholder, such Entity must file with the Court, and serve upon the Debtor and its counsel, advance written notice of the intended Ambac Stock transaction. The Debtor shall have ten (10) business days after receipt of a Proposed Ambac Stock Transaction Notice to file with the Court and serve upon the Entity providing such notice an objection to

any proposed transaction described in the notice on the grounds that such transaction might adversely affect the Debtor's ability to utilize its tax attributes. If the Debtor objects, the transaction described in the Proposed Ambac Stock Transaction Notice shall not be effective unless approved by a final and nonappealable order of the Court. If the Debtor does not object within such ten (10) business day period, the transaction described in the Proposed Ambac Stock Transaction Notice may proceed solely as set forth such notice. Any further Ambac Stock transactions by the Entity providing the Proposed Ambac Stock Transaction Notice shall be the subject of additional notices. Any transfer of Ambac Stock in violation of the Procedures shall be null and void *ab initio* as an act in violation of the automatic stay.

(ii)     <u>Procedures for Transfers of Claims</u>. Once the Debtor files a "Reporting Notice" with the Court and serves such notice in accordance with Section 5(i) of the Interim Order, each "<u>Substantial Claimholder</u>," *i.e.*, an Entity which Beneficially Owns an aggregate amount of Claims that equals or exceeds the "<u>Threshold Amount</u>," *i.e.*, $55,000,000.00, will be required to serve a "<u>Substantial Claimholder Notice</u>" upon the Debtor and its counsel within twenty (20) business days so that the Debtor can assess the feasibility of implementing a 382($l$)(5) Plan and the need for petitioning the Court for a Sell Down Order.

     i.     If the Debtor determines, based upon the Substantial Claimholder Notices received, that a Sell Down Order is required, it may file a motion with the Court for the entry of such an order. The "<u>Sell Down Order</u>" would (1) authorize the Debtor to issue "<u>Sell Down Notices</u>" to Substantial Claimholders ordering such Substantial Claimholder to transfer Beneficial Ownership of certain of their Claims within thirty (30) days and to not subsequently acquire additional Claims and (2) provide that all other Entities which have not received Sell Down Notices shall not be entitled to acquire Beneficial Ownership of more than 4.5 percent of the New Ambac Stock to be issued pursuant to a 382($l$)(5) Plan. Once a Substantial Claimholder has transferred its Claims in accordance with a Sell Down Notice, such Substantial Claimholder shall, by the date that is five (5) days following the latest date for completing such transfer, serve upon the Debtor and its counsel a "<u>Notice of Compliance</u>" that such Substantial Claimholder has complied with the terms of the Sell Down Notice applicable to such Substantial Claimholder.

     ii.     If the Debtor determines, based upon the Substantial Claimholder Notices received, that no Sell Down Notices are necessary to implement a 382($l$)(5) Plan, the Debtor may file a motion with the Court for the entry of a "<u>Claims Acquisition Notice Order</u>." Pursuant to this order,

a. any Entity proposing to acquire Claims in a transaction following which such Entity would have Beneficial Ownership of Claims that, pursuant to the terms of the 382(*l*)(5) Plan, would entitle such Entity to receive New Ambac Stock in excess of the amount of that to which such Entity would have been entitled based upon the holdings reported on such Entity's Substantial Claimholder Notice; and

b. any Entity that would become a "Potential Substantial New Stockholder," *i.e.*, an Entity which holds more than 4.5 percent of the New Ambac Stock, by virtue of a proposed acquisition of Beneficial Ownership of Claims,

will be required, at least fifteen (15) business days prior to the consummation of such transaction, to serve upon the Debtor and its counsel, by overnight mail, advance written notice of the intended Claims acquisition (a "Proposed Claims Acquisition Notice"). The Debtor may determine, in furtherance of the purposes of the Procedures, whether or not to approve a transaction described in a Proposed Claims Acquisition Notice. A transaction described in a Proposed Claims Acquisition Notice that is not approved in writing by the Debtor within ten (10) business days following the Debtor's receipt of such notice shall be deemed rejected. Any further Claims acquisitions by the Entity providing the Proposed Claims Acquisition Notice shall be the subject of additional notices. In addition, the Claims Acquisition Notice Order will require any Entity which has acquired Beneficial Ownership of Claims as to which approval in writing from the Debtor would have been required, but for the fact that such acquisition occurred prior to the entry of the Claims Acquisition Notice Order, to serve notice of such fact on the Debtor and its counsel, by overnight mail, within fifteen (15) days of the entry of the Claims Acquisition Notice Order. If the Debtor determines that the retention by such Entity of such Claims could jeopardize the implementation of the 382(*l*)(5) Plan, the Debtor will serve a Sell Down Notice on such Entity, in which case the Procedures described herein with respect to Sell Down Notices will apply.

If any Entity fails to make a required transfer of Claims, fails to file a required Substantial Claimholder Notice, or acquires Claims in violation of a Sell Down Order or a Claims Acquisition Notice Order, such Entity shall not be entitled to acquire certain amounts of New Ambac Stock, as set forth in the Interim Order.

(iii) Participation Restriction. To permit reliance by the Debtor on Treasury Regulation section 1.382-9(d)(3), any Substantial Claimholder that

participates in formulating any chapter 11 plan of or on behalf of the Debtor shall not disclose (or otherwise make evident) to the Debtor that any Claims of which such Substantial Claimholder has Beneficial Ownership are "Newly Traded Claims," *i.e.*, Claims (a) with respect to which an Entity acquired Beneficial Ownership after the date that was 18 months before the Commencement Date and (b) that are not "ordinary course" claims, within the meaning of Treasury Regulations section 1.382-9(d)(2)(iv), of which the same Entity has always had Beneficial Ownership.

(iv)     <u>Confidentiality</u>.  The Debtor and its counsel shall keep all information provided in notices delivered strictly confidential and shall not disclose the contents thereof to any Entity, except (a) to the extent necessary to demonstrate to the Court the need for the issuance of a Sell Down Notice or otherwise respond to a petition or objection filed with the Court, (b) to the extent otherwise required by law or required in connection with an audit or other investigation by the Internal Revenue Service or other taxing authority, or (c) to the extent that the information contained therein is already public; *provided*, *however*, that the Debtor and its counsel may disclose the contents thereof to its professional financial advisers and counsel and financial advisers for any statutory committee appointed pursuant to section 1102 of the Bankruptcy Code.

These procedures are narrowly tailored and will enable the Debtor to closely monitor and restrict certain transfers of Stock and Claims which could adversely affect the Debtor's ability to utilize its Tax Attributes.  Accordingly, on behalf of the Debtor, I respectfully submit that the relief requested in this motion should be granted.

**2.     Debtor's Motion for Interim Order, Pursuant to Sections 105(a), 345, 363, and 364 of the Bankruptcy Code and Bankruptcy Rules 6003 and 6004, (I) Authorizing Debtor to Continue Using Existing Cash Management System and Bank Accounts, Maintain Existing Investment Policy, and Honor Related Prepetition Obligations; and (II) Scheduling a Final Hearing**

47.     The Debtor requests, pursuant to sections 105(a), 345, 363, and 364 of the Bankruptcy Code and Bankruptcy Rules 6003 and 6004, authority to (i) continue using its Cash Management System, Bank Accounts, and business forms, (ii) maintain its existing Investment Policy, and (iii) honor prepetition obligations relating to the Cash Management System.  In the ordinary course of business, the Debtor uses the Cash Management System in order to efficiently

collect, transfer, disburse, and invest funds. The Cash Management System constitutes an ordinary course, essential business practice providing significant benefits to the Debtor. Any disruption to the Cash Management System will have an adverse impact on the Debtor's reorganization.

48. Additionally, the Debtor's operations could be severely harmed by the disruption, confusion, delay, and cost that would most certainly result if, as of the Commencement Date, AFG's Bank Accounts were closed.

49. The relief requested in this motion is vital to ensuring the Debtor's seamless transition into bankruptcy. Authorizing the Debtor to maintain the Cash Management System, Bank Accounts and Investment Policy will avoid many of the possible disruptions and distractions that could divert the Debtor's attention from more pressing matters during the initial days of the chapter 11 case. I believe that the relief requested in the cash management motion is in the best interests of the Debtor and its estate and is both necessary and appropriate to the efficient administration of this chapter 11 case and the Debtor's reorganization efforts.

**3. Debtor's Motion Pursuant to Sections 105(a), 363(b), and 503(b) of the Bankruptcy Code and Bankruptcy Rules 4001, 6003, and 6004 for an Order (I) Authorizing Debtor to Continue Prepetition Insurance Programs and Pay All Prepetition Obligations in Respect Thereof, (II) Directing Financial Institutions to Honor and Process Related Transfers, and (III) Scheduling a Final Hearing**

50. Shortly hereafter, the Debtor intends to file a motion seeking an order, pursuant to sections 105(a), 363(b), and 503(b) of the Bankruptcy Code, (i) authorizing the Debtor to continue its prepetition insurance programs (the "Insurance Programs"), and pay any prepetition amounts related thereto (the "Insurance Obligations") to the extent the Debtor determines, in its discretion, that such payment is necessary and appropriate, (ii) directing the Debtor's banks and

financial institutions to honor and process related transfers, and (iii) scheduling a final hearing to consider granting the relief requested on a permanent basis.

51.    The Debtor does not anticipate that any amounts are due and owing under the Insurance Programs as of the Commencement Date.  However, to the extent any deductible becomes due and owing at a later date, the Debtor seeks authority to pay such deductible even if it relates to a loss that accrued prepetition.

52.    I believe that granting the authority to pay the insurance programs in accordance with the Debtor's prepetition business practices is in the best interests of the Debtor and its estate.  The nonpayment of any Insurance Obligation could result in insurance carriers declining to renew policies or refusing to enter into new insurance agreements with the Debtor.  If the insurance programs lapse without renewal, the Debtor could be exposed to substantial liability, to the detriment of the Debtor's estate and all parties in interest.  The Debtor would also then be required to obtain replacement policies on an expedited basis at a significant additional cost.

53.    I believe that continuation of the Debtor's insurance programs is in the best interests of the Debtor, its estate, and all parties in interest.

**4.    Debtor's Motion Pursuant to Sections 105(a), 363(b), and 507(a)(8) of the Bankruptcy Code for Interim Order (I) Authorizing Payment of Prepetition Taxes and Business License Fees, (II) Directing Financial Institutions to Honor and Process Related Transfers, and (III) Scheduling a Final Hearing**

54.    Shortly hereafter, the Debtor intends to file a motion seeking an order, pursuant to sections 105(a), 363(b), and 507(a)(8) of the Bankruptcy Code, (i) authorizing the Debtor to pay all prepetition property and use tax obligations, and business license fees, including any penalties and interest thereon (collectively, the "Tax Obligations"), to various federal, state, and local authorities (collectively, the "Taxing Authorities"), including those obligations subsequently determined upon audit or otherwise to be owed for periods prior to the Commencement Date,

and (ii) directing banks and other financial institutions to honor and process related transfers, and (iii) scheduling a final hearing to consider granting the relief requested on a permanent basis. The Tax Obligations include, among others, property taxes, use taxes and business license fees.

55.     Payment of the Tax Obligations is critical to the Debtor's operations.  I am advised that nonpayment of these obligations may also cause the Taxing Authorities to take precipitous action, including, but not limited to, filing liens, preventing the Debtor from conducting business in the applicable jurisdictions, and seeking to lift the automatic stay, all of which would disrupt the Debtor's day-to-day operations.  Failure to pay such Tax Obligations could also trigger unwarranted governmental action in the form of increased audits, which would also be disruptive of the Debtor's operations and detrimental to all parties in interest.  As such, paying the Tax Obligations may reduce the amounts ultimately paid to the Taxing Authorities because penalties and interest will be avoided by prompt payment.

56.     I am further advised that many federal and state statutes hold officers and directors of collecting entities personally liable or criminally responsible for certain taxes and other governmental assessments owed by those entities.  To the extent that certain Tax Obligations remain unpaid by the Debtor, the Debtor's officers and directors may be subject to lawsuits or criminal prosecution during the pendency of this chapter 11 case.  The threat of a lawsuit or criminal prosecution, and any ensuing liability, would distract the Debtor and its personnel from important tasks related to the Debtor's chapter 11 case, to the detriment of all parties in interest.  The dedicated and active participation of the Debtor's directors and officers is essential to the orderly administration of this chapter 11 case.  Thus, I submit that the proposed relief is in the best interests of the Debtor's estate.

NY3 3011714.18

57.     I submit that paying the Tax Obligations is well within the Debtor's sound

business judgment and is in the best interest of the Debtor's estate.

**A.      First Day Motions Seeking Procedural and Administrative Relief**

**1.      Debtor's Motion for Order (i) Extending Time to File Schedules and Statement of Financial Affairs, and (ii) Waiving the Requirement to File an Equity List and Serve a Notice of Commencement on Equity Holders**

58.     Section 521 of the Bankruptcy Code, Bankruptcy Rule 1007, and Local Rule

1007-1 require, unless the Court orders otherwise, the Debtor to file its schedule of assets and

liabilities and its statement of financial affairs (together, the "Schedules") within 14 days after

the Commencement Date.  Additionally, Bankruptcy Rule 1007(a)(3) requires a debtor to file a

list of equity security holders within 14 days after the Commencement Date and Bankruptcy

Rule 2002(d) provides that, unless ordered otherwise by the Court, a debtor shall provide notice

of the commencement of its chapter 11 case to all equity security holders.  By this motion, the

Debtor requests the entry of an order extending the time to file the Schedules for an additional 30

days and waiving the requirements that it file a list of its equity security holders and serve a

notice of commencement on such holders.  Due to the complexity of its business and the

continuing negotiations with the Ad Hoc Committee and OCI, I believe that the Debtor will be

unable to complete its Schedules within the required 14-day period.  Collecting the information

required to complete the Schedules will require the Debtor and its professionals to expend a

significant amount of time and resources.  Likewise, preparing a list of equity security holders

and sending a notice of commencement to all parties on the list will be expensive and time

consuming.  Accordingly, I believe ample cause exists to grant the relief requested in this

motion.

2. **Debtor's Motion for Order Pursuant to Bankruptcy Rules 2002, 9007, and 9036 and Local Rule 2002-2 Establishing Certain Notice, Case Management, and Administrative Procedures**

59. The Debtor requests an order providing for certain notice, case management, and administrative procedures in this chapter 11 case. Given the number of parties in interest, requiring that paper service be made upon each of these parties will be expensive and a waste of the Debtor's resources. Thus, the Debtor believes that requiring paper service of certain pleadings only upon the main parties in interest, as well as authorizing service on all parties via e-mail, will be efficient and save the estate significant time and expense.

60. Additionally, due to the likely volume of motions and other pleadings that will be filed, the Debtor has proposed that special hearing procedures be created, including the creation of regularly scheduled omnibus hearings at which the Court, the Debtor, and other parties in interest can address several motions at once, thereby avoiding the substantial time and expense of scheduling separate hearings on each discrete matter. I believe that the relief requested in the case management motion is in the best interests of the Debtor's estate, creditors, and all parties in interest and will enable the Debtor to continue to operate its business in chapter 11 without disruption. Accordingly, on behalf of the Debtor, I submit that the relief requested in the case management motion should be granted.

B. **Motions Related to the Retention and Payment of Professionals**

1. **Debtor's Motion for Order Pursuant to Sections 105(a), 327, 328, and 330 of the Bankruptcy Code for Authorization to Employ Professionals utilized in the Ordinary Course of Business, *Nunc Pro Tunc* to the Commencement Date**

61. Shortly hereafter, pursuant to sections 105(a), 327, 328, and 330 of the Bankruptcy Code, the Debtor intends to request an order authorizing the retention, *nunc pro tunc* to the Commencement Date, of professionals utilized by the Debtor in the ordinary course of business (the "Ordinary Course Professionals") without the submission of separate employment

applications or retention orders. I believe it is essential that the employment of the Ordinary

Course Professionals, many of whom are already familiar with the Debtor's businesses and

financial affairs, be continued to avoid disruption of the Debtor's normal business operations

during this critical time. The Debtor will propose that it be permitted to pay each Ordinary

Course Professional, without a prior application to the Court by such Ordinary Course

Professional, one hundred percent (100%) of the professional fees and disbursements incurred up

to a specified monthly cap, upon the submission to, and approval by, the Debtor of an

appropriate invoice setting forth, in reasonable detail, the nature of the services rendered and

disbursements actually incurred. I believe the relief the Debtor intends to request will save the

Debtor's estate substantial costs that would arise from preparing separate applications for the

employment of each Ordinary Course Professional. Such relief will also avoid additional fees

relating to the preparation and presentation of voluminous fee applications. Moreover, because

of the additional costs associated with the preparation of multiple employment applications for

the Ordinary Course Professionals who will receive relatively small fees, I submit that it is

impractical and inefficient for the Debtor to submit individual retention applications for each

Ordinary Course Professional. Thus, in my opinion, the employment of the Ordinary Course

Professionals and the payment of monthly compensation to such professionals are in the best

interests of the Debtor, its estate, and all parties in interest.

> **2.** **Debtor's Motion Pursuant to Sections 105(a) and 331 of the Bankruptcy
> Code and Bankruptcy Rule 2016(a) for Authorization to Establish
> Procedures for Interim Monthly Compensation and Reimbursement of
> Expenses of Professionals**

62. Shortly hereafter, pursuant to sections 105(a), and 331 of the Bankruptcy Code,

Bankruptcy Rule 2016(a), and Local Rule 2016-2, the Debtor intends to request an order

establishing an orderly and regular process for the allowance and payment of interim

compensation and reimbursement of expenses for attorneys and other professionals whose services are authorized by this Court pursuant to Bankruptcy Code sections 327 or 1103, and who will be required to file fee applications for allowance of compensation and reimbursement of expenses pursuant to Bankruptcy Code sections 330 and 331. Additionally, the Debtor intends to seek approval of a procedure for reimbursement of reasonable out-of-pocket expenses incurred by members of any statutory committee appointed in these cases. The Debtor proposes that, except as otherwise provided in an order of the Court authorizing the retention of a particular professional, the professionals be permitted to seek interim payment of compensation and reimbursement of expenses in accordance with the General Order M-388, the terms of which will be set forth in the motion.

63.     I believe the implementation of such interim compensation procedures is justified in this case. The Debtor's chapter 11 case presents a number of complex issues that, together with the day-to-day administration of its chapter 11 case, must be addressed by the Debtor's limited staff and resources. It is anticipated that the professionals retained will provide integral advice and services to the Debtor in administering these cases. Absent streamlined compensation procedures, the professional fee application and review process could be exceptionally burdensome on the Debtor, its professionals, and the Court. Interim compensation procedures will enable the Debtor to closely monitor the costs of administering these cases, maintain a level cash flow, and implement efficient cash management procedures. Moreover, such procedures will also allow the Court and key parties in interest to verify the reasonableness and necessity of the compensation and reimbursement sought pursuant by the authorized professionals. In my opinion, therefore, interim compensation procedures are in the best interests of the Debtor, its estate, and all parties in interest.

NY3 3011714.18

**3.** **Debtor's Application Pursuant to Bankruptcy Code Sections 327(a) and 328(a), Bankruptcy Rule 2014(a) and Local Rule 2014-1, for Authorization to Employ and Retain Dewey & LeBoeuf LLP as Attorneys for the Debtor, *Nunc Pro Tunc* to the Commencement Date**

64.     Shortly hereafter, pursuant to Bankruptcy Code sections 327(a) and 328(a), Bankruptcy Rule 2014(a) and Local Rule 2014-1, the Debtor intends to request an order authorizing the employment and retention of D&L, *nunc pro tunc* to the Commencement Date, as its attorneys, to perform the extensive legal services as Debtor's counsel that will be necessary during this chapter 11 case, in accordance with D&L's normal hourly rates and reimbursement policies in effect when services are rendered.

65.     The Debtor has selected D&L as its attorneys because of D&L's knowledge of the Debtor's business and financial affairs, and D&L's extensive experience and knowledge in, among other areas, the insurance business and business reorganizations and restructurings under chapter 11 of the Bankruptcy Code.  D&L and its members currently represent, and have represented, debtors and creditors in multiple large and complex chapter 11 cases.

66.     D&L has represented the Debtor since September 2008 in connection with the Debtor's restructuring efforts.  Since that time, D&L was primarily focused upon devising a solution to the Debtor's liquidity constraints and assisting in the restructuring of its debt. Thereafter, D&L became responsible for the preparation of the chapter 11 petition, initial motions, and applications relating to the commencement of the Debtor's chapter 11 case. Additionally, prior to retaining D&L in connection with its restructuring efforts, the Debtor retained D&L in connection with various other matters, including, but not limited to, preparation of public filings as required of publicly held companies by the Securities and Exchange Commission, issuance of public debt securities, and other financial deals and transactions. During the course of these representations, D&L has become intimately familiar with the

Debtor's business, financial affairs, capital structure, and restructuring alternatives.

Accordingly, I believe D&L has the necessary background to deal effectively with the potential

legal issues and problems that may arise in the context of the Debtor's chapter 11 case and

restructuring efforts. In my opinion, D&L is both well qualified and able to represent the Debtor

in its chapter 11 case.

> **4.** **Debtor's Application Pursuant to Sections 327(a) and 328(a) of the Bankruptcy Code for Authorization to Retain and Employ the Blackstone Group L.P. as Financial Advisors for the Debtor *Nunc Pro Tunc* to the Commencement Date**

67. Shortly hereafter, the Debtor intends to seek to request an order authorizing the

employment and retention of Blackstone as its financial advisor. In preparing for this chapter 11

case, Blackstone has become familiar with the Debtor's business and has played a key role in

negotiations with the Debtor's key creditor constituencies.

68. In my opinion, the resources, capabilities, and experience of Blackstone in

advising the Debtor are crucial to the Debtor's successful restructuring. An experienced

financial advisor such as Blackstone fulfills a critical need that complements the services offered

by the Debtor's other restructuring professionals. Broadly speaking, Blackstone will concentrate

its efforts on formulating restructuring alternatives, negotiating with the Debtor's creditor

constituencies, including the Ad Hoc Committee, and assisting the Debtor in developing and

implementing a viable chapter 11 plan. For these reasons, I believe the Debtor requires the

services of a capable and experienced financial advisory firm such as Blackstone. Blackstone's

professionals have a wealth of experience in providing financial advisory services in

restructurings and reorganizations and enjoy an excellent reputation as a result of their work in

complex chapter 11 cases on behalf of debtors and creditors in the United States.

NY3 3011714.18

69.     I believe that Blackstone is uniquely qualified to address the complex financial issues that the Debtor is likely to confront in this case and respectfully submit that Blackstone's retention application should be approved.

**5.      Debtor's Application for Order, Pursuant to 28 U.S.C. § 156(c), Appointing Kurtzman Carson Consultants LLC as Claims and Noticing Agent for the Debtor**

70.     Pursuant to section 156(c) of title 28 of the United States Code and Rule 5075-1 of the Local Bankruptcy Rules for the Southern District of New York (the "Local Rules"), the Debtor seeks an order appointing Kurtzman Carson Consultants LLC ("KCC") to act as the claims and noticing agent (the "Claims and Noticing Agent") in order to assume full responsibility for the distribution of notices and the maintenance, processing, and docketing of proofs of claim filed in the Debtor's chapter 11 case.

71.     Under to this Court's General Order M-409, a case having one thousand or more creditors and/or equity security holders, retention of a claims and noticing agent is required.  As of November 1, 2010, approximately 302,112,225 shares of the Debtor's common stock were outstanding.  Though the exact number of beneficial holders is unknown, it is almost certainly more than one thousand.  In view of the number of equity security holders and the complexity of the Debtor's business, the Debtor submits that the appointment of a claims and noticing agent is both necessary and in the best interests of both the Debtor's estate and its creditors.

72.     KCC has acted as the claims and noticing agent in numerous cases of comparable size, including several cases which are currently pending in the United States Bankruptcy Court for the Southern District of New York.  By appointing KCC as Claims and Noticing Agent in this chapter 11 case, the distribution of notices and the processing of claims will be expedited, and the clerk's office will be relieved of the administration burden of processing what may be an overwhelming number of claims.

NY3 3011714.18

73. The Debtor's selection of KCC to act as Claims and Noticing Agent has satisfied the Bankruptcy Court's Protocol for the Employment of Claims and Noticing Agents, in that the Debtor has obtained and reviewed engagement proposals from other court-approved claims and noticing agents to ensure selection through a competitive process. I believe, based on all engagement proposals obtained and reviewed, that KCC will provide the most cost-effective and efficient service as a claims and noticing agent for this chapter 11 case and their appointment is in the best interests of the Debtor's estate and parties in interest.

74. The Debtor has been advised that, except as set forth in the *Declaration of Albert Kass in Support of Debtor's Application for Order Appointing Kurtzman Carson Consultants LLC as Claims and Noticing Agent for the Debtor*, based on the results of the search performed by KCC, (i) KCC has no connection with the Debtor, its creditors or other parties in interest in this case, and (ii) KCC does not hold or represent any interest adverse to the Debtor's estate. To the best of my knowledge, therefore, KCC is a "disinterested person" as such term is defined in section 101(14) of the Bankruptcy Code, as modified by section 1107(b) of the Bankruptcy Code.

75. The appointment of KCC as the Court's outside agent will relieve the Court and the Clerk of heavy administrative and other burdens. Additionally, the retention of KCC as the claims and noticing agent will promote the efficient administration of the Debtor's estate.

## Part IV.

## Overview of Local Rule 1007-2 Schedules

76. Local Rule 1007-2 requires that certain information about the Debtor and its operations be provided in this Affidavit. This required information is provided in the schedules

attached to <u>Exhibit D</u> of this Affidavit, which contain the following information with respect to

the Debtor:[7]

    (i)        In accordance with Local Rule 1007-2(a)(3), Schedule 1 provides contact information for legal representatives of the Ad Hoc Committee organized prior to the commencement of the Debtor's chapter 11 case.

    (ii)       In accordance with Local Rule 1007-2(a)(4), Schedule 2 provides information with respect to the holders of the 30 largest unsecured claims against the Debtor.

    (iii)      In accordance with Local Rule 1007-2(a)(5), Schedule 3 provides information with respect to the holders of the five largest secured claims against the Debtor.

    (iv)      In accordance with Local Rule 1007-2(a)(6), Schedule 4 provides a summary of the Debtor's assets and liabilities.

    (v)       In accordance with Local Rule 1007-2(a)(7), Schedule 5 provides information on the Debtor's outstanding publicly held securities.

    (vi)      In accordance with Local Rule 1007-2(a)(8), Schedule 6 provides information on the Debtor's property in the possession or custody of any custodian, public officer, mortgagee, pledge, assignee of rents, secured creditor, or agent for any such entity.

    (vii)     In accordance with Local Rule 1007-2(a)(9), Schedule 7 provides information on the property or premises owned, leased, or held under other arrangement from which the Debtor operates its business.

    (viii)    In accordance with Local Rule 1007-2(a)(10), Schedule 8 lists the locations of the Debtor's substantial assets, the location of their books and records, and the nature, location, and value of any assets held by the Debtor outside the territorial limits of the United States.

    (ix)      In accordance with Local Rule 1007-2(a)(11), Schedule 9 lists the nature and present status of each action or proceeding, pending or threatened against the Debtor or its properties where a judgment against the Debtor or a seizure of its property may be imminent.

---

[7] The information contained in the schedules attached to Exhibit B of this Affidavit shall not constitute an admission of liability by, nor is it binding on, the Debtor. The Debtor reserves all rights to assert that any debt or claim listed herein is a disputed claim or debt, and to challenge the priority, nature, amount, or status of any such claim or debt. Unless otherwise indicated, the financial information contained in the schedules is unaudited. In the event of any inconsistencies between the summaries set forth in the schedules and the respective corporate and legal documents relating to such obligations, the descriptions in the corporate and legal documents shall control. Capitalized terms used in the schedules that are not otherwise defined therein shall have the meanings ascribed to them in the preceding paragraphs of this Affidavit.

(x) In accordance with Local Rule 1007-2(a)(12), Schedule 10 provides the names of the individuals who comprise the Debtor's existing senior management, their tenure with the Debtor, and a brief summary of their relevant responsibilities and experience.

(xi) In accordance with Local Rules 1007-2(b)(1)-(2)(A) and (C), Schedule 11 lists the estimated amount of weekly payroll to the Debtor's employees (not including officers, directors, and stockholders) and the estimated amount to be paid to officers, stockholders, directors, and financial and business consultants retained by the Debtor, for the 30-day period following the filing of this case.

(xii) In accordance with Local Rule 1007-2(b)(3), Schedule 12 provides the Debtor's estimated cash receipts and disbursements for the 30-day period following the filing of this case.

**[Signature Page to Follow]**

NY3 3011714.18

Pursuant to 28 U.S.C. § 1746, I hereby declare, under penalty of perjury, that the foregoing statements included in this Affidavit are true and correct to the best of my knowledge and belief.

Dated: November _8_ , 2010
     New York, New York      By: _____

                                       David W. Wallis
                                       President and Chief Executive Officer


Signed and sworn to before me
this _8th_ day of November, 2010

By: _____

ANNE G. KELLY
Notary Public, State of New York
No. 02G15044534
Qualified in New York County
Commission Expires October 12, 20 _11_

<u>**EXHIBIT A**</u>

**Corporate and Capital Structure**

# Ambac Financial Group, Inc. – Legal Vehicle Chart as of November 1, 2010*



# Notes

**Ambac Financial Group, Inc. and all of its affiliates are Delaware corporations except as follows:  AAC and Everspan are Wisconsin stock insurance corporations; ACP, ACF, AFSLLC and APH are Delaware limited liability corporations; and Ambac UK is a UK company.**

**The address of Ambac UK is Level 7, 6 Broadgate, London EC2M 2QS, England.  The address of all other entities listed is One State Street Plaza, New York, New York 10004.**

1.  Prior to July 11, 1997, Ambac Financial Group, Inc. was called AMBAC Inc.

2.  Prior to July 11, 1997, Ambac Assurance Corporation was called AMBAC Indemnity Corporation.

3.  On June 19, 1997, AMBAC Securities Inc. (*"ASI"*) acquired the assets of Cadre Securities, Inc., a New York corporation (*"Old Cadre Securities"*).  Old Cadre Securities then changed its name to CX, Inc. and ASI changed its name to Cadre Securities, Inc.  On April 1, 2002 Cadre Securities, Inc. changed its name to Ambac Securities, Inc.  On February 13, 2004 PFMAM, Inc. acquired certain assets of Ambac Securities, Inc.

4.  Ambac UK's application to the UK insurance regulators to transact an insurance business (*suretyship, credit and miscellaneous financial*) was granted on February 4, 1997.  Ambac UK is also licensed to offer insurance into thirteen other European countries.  On February 8, 1999, AMBAC Insurance UK Limited changed its name to Ambac Assurance UK Limited.  Per an order of the Financial Services Authority, the regulator of the UK's financial services industry, Ambac UK, although still licensed, is now limited to runoff activities.

5.  On December 18, 1997, AAC acquired, through the merger of AAC's subsidiary, Ambac Merger Sub, Inc., into Construction Loan Insurance Corporation (*"Construction Loan"*), all of the stock of CLIC, Connie Lee Management Services Corporation (*which was dissolved on August 18, 2000*) and Connie Lee Consulting Services, Inc. (*which was dissolved on February 3, 1998*).  Construction Loan was then merged into another AAC subsidiary, CLIC Acquisition Corporation, which became the surviving corporation, and changed its name to Connie Lee Holdings, Inc.  On September 24, 2008, Connie Lee Insurance Company filed with OCI to change its name to Everspan Financial Guarantee, Corp.

6.  On December 30, 2003 Ambac Financial Services, L.P. ("*AFSLP*") changed its name to Ambac Financial Service, L.L.C. ("*AFSLLC*").  AFSLLC is a wholly owned subsidiary of AAC.

7.  Ambac Capital Management, Inc. was merged into ACFI on September 28, 1999.

8.  Ambac Private Holdings, LLC ("*APH*") is a wholly-owned subsidiary of AAC and was formed to make equity investments.  APH is not permitted to issue debt to third parties or affiliates other than AAC.

9.  Ambac Credit Products Limited ("*ACPL*") was authorized to engage in the investment business as a Category A investment firm on February 7, 2001 by the U.K. Securities and Futures Authority Limited.  On May 26, 2009, the Board of Directors of ACPL signed a resolution of formal dissolution.

10. Ambac Capital Services, LLC ("*ACS*") is a limited liability corporation formed on March 5, 2002 and is wholly owned by AAC.  ACS is a provider of total return swaps.  Ambac Japan Co., Limited, a wholly-owned subsidiary of AAC, was created on September 30, 2001 and is a Japanese services company.

11. Ambac Securities Products, Inc. was dissolved on June 2, 2003.

12. Ambac Investment Management Inc. was dissolved on January 27, 2006.

13. Ambac Financial Products, Inc. was dissolved on December 14, 2005.

14. Ambac Financial Services Holdings, Inc. was dissolved on January 7, 2004.

15. On November 12, 2008, Ambac Capital Corporation and its subsidiaries ACFI, ACF, and AAFC were dividended to AAC.  AAC became the 100% sole shareholder of ACC and ACC remained the 100% sole shareholder of those subsidiaries that were carried over.

16. On March 19, 2010, Ambac Conduit Funding LLC, and its subsidiaries, Aleutian Investments, LLC and Juneau Investments, LLC, were dividended to AAC.  AAC became the 100% sole shareholder of ACH.

17. On March 24, 2010,  AAC's limited liability interests in ACP, ACF, Aleutian and Juneau were allocated to the Ambac Assurance Corporation Segregated Account

18. On July 16, 2010 Ambac sold Rangemark Financial Services, Inc. and all its subsidiaries back to Rangemark Management.

## EXHIBIT B

**Dilweg Letter and Term Sheet**



**State of Wisconsin** / OFFICE OF THE COMMISSIONER OF INSURANCE

*Jim Doyle,* Governor
*Sean Dilweg,* Commissioner

**Wisconsin.gov**

125 South Webster Street • P.O. Box 7873
Madison, Wisconsin 53707-7873
Phone: (608) 266-3585 • Fax: (608) 266-9935
E-Mail: ociinformation@wisconsin.gov
Web Address: oci.wi.gov

November 7, 2010


To the Members of the
Board of Directors of Ambac Assurance Corporation
c/o Ambac Assurance Corporation
One State Street Plaza
New York, New York 10004

Ladies and Gentlemen:

As you are aware, in my role as both the Wisconsin Commissioner of Insurance and the court appointed rehabilitator of the Segregated Account of Ambac Assurance Corporation (the "Segregated Account"), I am kept apprised of issues material to both Ambac Assurance Corporation ("AAC") and the Segregated Account. In recent weeks, my attention, as well as the attention of my staff and advisors, has been focused on the negotiations between Ambac Financial Group, Inc. ("AFGI") and the ad hoc committee of certain AFGI debt holders (the "Ad Hoc Committee") concerning the restructuring of AFGI's debt in connection with a potential bankruptcy filing. Recently, at the request of both management and the Ad Hoc Committee, OCI and its advisors became involved in these negotiations, as several key terms in the proposed restructuring have a material impact on AAC and the Segregated Account. Based on these negotiations, we have reached an understanding with the Ad Hoc Committee which is reflected in the attached "Terms of Transaction" outline, which lists the terms and conditions of the restructuring of AFGI which require the approval of OCI, the Rehabilitator or the rehabilitation court, or otherwise have a material impact on AAC or the Segregated Account. I, together with my staff, my counsel and my financial advisors, agree that the terms and conditions reflected in the Terms of Transaction outline preserves claims-paying resources for the benefit of all policyholders and provides fair and equitable treatment of policyholders and creditors under the Wisconsin Insurers Rehabilitation and Liquidation Act.

As contemplated by the Terms of Transaction outline, there are two transactions which require action of the AAC Board of Directors (the "Board") in order to be implemented. First, action of the Board is required in order to allocate to the Segregated Account any liability that AAC may have to the Internal Revenue Service and/or the United States Department of the Treasury in regard to certain tax refunds claimed by AFGI. Such liability could be in excess of $700 million, and in theory, could attach as a lien on the assets of AFGI or any of its subsidiaries, including AAC. Based on the advice of my staff, my counsel and my financial advisors, it is my belief that allocating this potential liability to the Segregated Account is in the best interests of AAC and the Segregated Account.

Second, action of the Board is required in order to allocate to the Segregated Account any liability that may arise from certain claims that may be asserted against AAC by, or on behalf of, AFGI in regard to, or respecting, tax refunds and/or the Tax Sharing Agreement (or amendments thereto) to which AAC, AFGI and their affiliates are party. Such claims against AAC could be in excess of $440 million. Based on the advice of my staff, my counsel and my financial advisors, it is my belief that allocating this potential liability to the Segregated Account is in the best interests of AAC and the Segregated Account.

Therefore, in furtherance of the foregoing, I hereby request that the Board (i) adopt Amendment No. 1 to the Plan of Operations (a copy of which is attached hereto), which amends the Plan of Operation to allocate the liabilities discussed above to the Segregated Account, and (ii) direct the officers of AAC to submit to the OCI a request to approve the same Amendment No. 1 to the Plan of Operations.

In the event that the Plan of Operation is not amended in the manner set forth above, I am prepared to take independent action seeking the full rehabilitation of AAC, as full rehabilitation will put AAC in a favorable position to subordinate the claims discussed above to policyholder claims in the event such liabilities materialize. I urge you to act in the best interest of policyholders and amend the Plan of Operation as I have requested above.

Sincerely,

Sean Dilweg, Wisconsin Commissioner of Insurance

cc:     David W. Wallis, Ambac Assurance Corporation

CONFIDENTIAL MATERIALS PROVIDED SUBJECT TO CONFIDENTIALITY AGREEMENTS AND TO FRE 408 FOR SETTLEMENT PURPOSES; NON-BINDING INDICATION OF TERMS; SUBJECT TO APPROVALS AND DOCUMENTATION

## Terms of Transaction

This outline sets forth those terms and conditions of a possible restructuring of Ambac Financial Group, Inc. ("AFG") in a Chapter 11 proceeding (the "Bankruptcy Case") in which it is anticipated that there will be a debt for equity exchange of AFG's senior bonds, and that impact Ambac Assurance Corporation ("AAC") and the Segregated Account of Ambac Assurance Corporation (the "Segregated Account"), and are therefore relevant to the Wisconsin Office of the Commissioner of Insurance ("OCI") and the court-appointed rehabilitator of the Segregated Account (the "Rehabilitator"). The terms and conditions set forth herein have been prepared in consultation with the ad hoc committee of certain AFG debt holders (the "Ad Hoc Committee").

This term sheet has been prepared for discussion and settlement purposes only and is non-binding, but shall serve as the basis for further negotiations. The terms and conditions set forth herein are subject to negotiation and execution and, where applicable, delivery of definitive documents satisfactory in form and substance to all parties.

1.      AFG retains ownership of AAC.

2.      OCI shall not petition for the full rehabilitation of AAC unless warranted by new material developments, as determined by OCI in its sole and absolute discretion.

3.      AAC allocates the following liabilities to the Segregated Account:

   a.      Any and all liabilities (including contingent liabilities) it has or may have, now or in the future, to its shareholder, AFG, or any successor to AFG, in regard to, or respecting, tax refunds and/or the July 18, 1991 Tax Sharing Agreement, as amended (the "TSA"). This allocation includes, but is not limited to, any preference claim or fraudulent conveyance claim pertaining to the above-referenced subjects brought by, or on behalf of, AFG in any bankruptcy proceeding involving AFG by AFG as debtor-in-possession, or a trustee or committee appointed by a bankruptcy court to pursue any such claim in regard to AFG, or any similar state court action or claim pursued by, or on behalf of any receiver or creditor of AFG. Notwithstanding the foregoing, such allocation shall not include any liability to AFG pertaining to any possible misallocation of up to $38,485,850 of tax refunds received by AAC in September 2009 and February 2010 (the "Misallocation Claim").

   b.      Any and all liabilities (including contingent liabilities) it has or may have, now or in the future, to the IRS and/or the U.S. Treasury in regard to, or in respect of, taxes imposed under the Internal Revenue Code of 1986, as amended ("Federal Taxes"), for taxable periods ending on or prior to December 31, 2009.

   c.      To the extent not described in b. above, any and all liabilities (including contingent liabilities) AAC has or may have, now or in the future, to the IRS and/or the U.S. Treasury in regard to, or respect of, any Federal Tax refunds that were received prior to November 5, 2010 by AAC, AFG or their affiliates.

1

4.   Until December 31, 2010, the Rehabilitator shall not seek an injunction from the rehabilitation court enjoining AFG action in respect of the NOLs, and AFG shall not seek to take any action with regard to the allocation of the NOLs as between AFG and AAC.

5.   Until December 31, 2010, the Ad Hoc Committee shall agree not to pursue, or support the pursuit of, any preference claim or fraudulent conveyance claim on behalf of AFG pertaining to refunds of Federal Taxes received by AAC in September 2009 and February 2010.

6.   AAC agrees to negotiate a cost sharing agreement with AFG pursuant to which AAC and AFG will share the fees and expenses incurred by AFG in relation to any litigation in regard to the return of any Federal Tax refunds, on the basis of 80% to AAC and 20% to AFG.  Upon being briefed on the litigation strategy, OCI may, in its sole discretion, increase AAC's share of costs to 85% (or such higher amount as determined by OCI). Such agreement will include rights for AAC to exercise certain controls over the litigation, such terms to be negotiated among OCI, AAC, AFG and counsel engaged to handle such litigation.  In addition, the cost sharing agreement (or a second cost-sharing agreement) shall be on terms consistent with typical shared services agreements involving insurance companies and their affiliates, and shall address AAC's obligation to reimburse AFG for an agreed-upon percentage of compensation expenses of AFG employees properly allocable to AAC; provided that the allocation of all non-salary compensation (e.g., bonus, retention, and severance payments) shall be subject to prior approval of OCI.  AAC's reimbursement obligation shall extend for a negotiated period of time.  The cost allocation agreement(s) shall be subject to approval as contemplated by Section 8 below to the extent the Agreement(s) involve(s) the Segregated Account.

7.   AAC and the Segregated Account agree to negotiate with AFG in good faith the modification of the TSA to address certain issues including, but not limited to, the following:

     a.   The amount of NOLs available for use by AAC, which shall be no greater than $3.5 billion.

     b.   The amount paid by AAC to AFG for the use of the NOLs.

     c.   It is understood that AFG shall be able to utilize NOLs equal to (a) $2.5bn plus (b) COD income incurred in exchange with reorganization, (c) any amounts related to interest deduction recapture, and (d) any amounts remaining after the AAC NOL allocation set forth above.

8.   AAC shall agree in good faith with AFG on the amount of the Misallocation Claim, and AAC shall pay such amount to AFG.  As contemplated by Section 8 below, the payment of such amount shall be subject to the approval of the rehabilitation court.  In the event the parties are unable to reach agreement on such amount by December 31, 2010, the dispute shall be submitted to binding arbitration under the following terms:

2

    a.       Arbitration shall be governed by the procedures of the Federal Arbitration Act, except as modified by agreement of the parties.

    b.       A single arbitrator shall be chosen by the parties. In the event the parties are unable to agree upon an arbitrator, one shall be appointed by the bankruptcy court overseeing the Bankruptcy Case.

    c.       Arbitration shall be held at a neutral location.

9.     The consummation of all agreements contemplated hereby shall be subject to the approval of the rehabilitation court and the bankruptcy court overseeing the Bankruptcy Case.  Upon the determination of the amount of the Misallocation Claim (whether agreed-upon by the parties or settled through binding arbitration) and the agreement by the parties of the modification of the TSA as contemplated by Section 6, the Rehabilitator shall support such petition for approval of the rehabilitation court, and AFG and the Ad Hoc Committee shall support such application for bankruptcy court approval.

10.    OCI commits to allow AAC to repurchase surplus notes (whether issued by AAC or the Segregated Account) and preferred stock subject to OCI's determination in its sole and absolute discretion that such repurchases do not violate the law, are reasonable and fair to the interests of AAC and the Segregated Account, and protect and are equitable to the interests of AAC and Segregated Account policyholders generally.

11.    Transactions structured, to the extent practicable, to comply with the Bank Settlement Agreement and AAC Plan of Rehabilitation.

12.    Any bankruptcy plan and confirmation order shall include third party releases consistent with those contemplated by the Memorandum of Understanding, dated as of October _, 2010, among (i) AFG, (ii) certain individual defendants named in In re Ambac Financial Group, Inc. Securities Litigation, No. 08-cv-411-NRB (S.D.N.Y.) (consolidated) and Tolin v. Ambac Financial Group, Inc., et al., No. 08-cv-11241-CM (S.D.N.Y.) (collectively, the "Securities Actions"), (iii) certain of AFG's directors and officers liability insurance carriers, and (iv) certain plaintiffs in the Securities Actions.

ny-948685
MILW_10629424.6

# AMENDMENT NO. 1 TO PLAN OF OPERATION FOR THE SEGREGATED ACCOUNT OF AMBAC ASSURANCE CORPORATION

The Plan of Operation for the Segregated Account of Ambac Assurance Corporation, effective March 24, 2010 (the "Plan of Operation"), is hereby amended by this Amendment No. 1 to Plan of Operation for the Segregated Account of Ambac Assurance Corporation as follows:

Effective as of November 7, 2010, the following paragraphs are added to Section IV of the Plan of Operation, "Allocations to Segregated Account":

*Liabilities to Ambac Financial Group, Inc. ("AFGI").* The Company is allocating to the Segregated Account any and all liabilities (including contingent liabilities) it has or may have, now or in the future, to its shareholder, AFGI, or any successor to AFGI, in regard to, or respecting, tax refunds and/or the July 18, 1991 Tax Sharing Agreement, as amended, provided, that such allocation shall not include any liability to AFGI pertaining to any possible misallocation of up to $38,485,850 of tax refunds received by AAC in September 2009 and February 2010. Any such liabilities are disputed. This allocation includes, but is not limited to, any preference claim or fraudulent conveyance claim pertaining to the above-referenced subjects brought by, or on behalf of, AFGI in any bankruptcy proceeding involving AFGI by AFGI as debtor-in-possession, or a trustee or committee appointed by a bankruptcy court to pursue any such claim in regard to AFGI, or any similar state court action or claim pursued by, or on behalf of any receiver or creditor of AFGI.

*Liabilities to the Internal Revenue Service ("IRS") and/or the United States Department of the Treasury ("U.S. Treasury").* The Company is allocating to the Segregated Account: (i) any and all liabilities (including contingent liabilities) it has or may have, now or in the future, to the IRS and/or the U.S. Treasury in regard to, or in respect of, taxes imposed under the Internal Revenue Code of 1986, as amended ("Federal Taxes"), for taxable periods ending on or prior to December 31, 2009; and (ii) to the extent not described in clause (i), any and all liabilities (including contingent liabilities) the Company has or may have, now or in the future, to the IRS and/or the U.S. Treasury in regard to, or respect of, any Federal Tax refunds that were received prior to November 7, 2010 by the Company, AFGI or their affiliates. Any such liabilities are disputed.

In all other respects, the Plan of Operation effective March 24, 2010, shall continue to govern the operation of the Segregated Account of Ambac Assurance Corporation.

<u>**EXHIBIT C**</u>

**Order for Temporary Supplemental Injunctive Relief**

STATE OF WISCONSIN          CIRCUIT COURT          DANE COUNTY

In the Matter of the Rehabilitation of:

Segregated Account of Ambac Assurance Corporation

Case No. 10 CV 1576

## ORDER FOR TEMPORARY SUPPLEMENTAL INJUNCTIVE RELIEF

Based on the Motion for Temporary Supplemental Injunctive Relief filed by the Commissioner of Insurance for the State of Wisconsin, as Rehabilitator (the "Rehabilitator") of the Segregated Account of Ambac Assurance Corporation (the "Segregated Account"), and the pleadings, motions, briefs and exhibits on file in this case, as well as oral argument, this Court finds that the temporary supplemental injunctive relief requested by the Rehabilitator is reasonable and necessary to promote the equitable and orderly rehabilitation of the Segregated Account, a Wisconsin-domiciled insurer under Wis. Stat. § 611.24(3)(e). The Court further finds that the requested injunctive relief relates to, and is necessary for, the regulation of the business of insurance as part of this proceeding and is authorized by Chapter 645 of the Wisconsin Statutes. The Court further finds that this Court has exclusive jurisdiction over matters relating to this rehabilitation proceeding.

NOW THEREFORE, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED that the Rehabilitator's Motion for Temporary Supplemental Injunctive Relief is GRANTED, and the following temporary supplemental injunctions are hereby ENTERED:

> 1. The relief specified in this Order is complementary and supplementary to the relief set forth in the March 24, 2010 Injunction Order entered by this Court in the Segregated Account Proceeding. All provisions of the March 24, 2010

Injunction Order remain in full force and effect as to all policies, contracts, liabilities, and disputed contingent liabilities that have been allocated to the Segregated Account on or before the date of this Order.

2. This Order is made in furtherance of the allocation of disputed contingent liabilities to the Segregated Account, as detailed in Amendment No. 1 to the Plan of Operation filed November 8, 2010 (hereinafter "Allocated Disputed Contingent Liabilities"), as approved in the resolution adopted by the Ambac Assurance Corporation Board of Directors on November 7, 2010.

3. Ambac Financial Group, Inc. ("AFGI"), any successor-in-interest, including any debtor-in-possession, trustee or committee appointed by a bankruptcy court to pursue claims on behalf of or in regard to AFGI, any state court receiver of AFGI, all persons or entities purporting to be creditors of AFGI, the United States Internal Revenue Service, and all other federal and state governmental entities (collectively, the "Enjoined Parties"), are enjoined and restrained from commencing or prosecuting any actions, claims, lawsuits or other formal legal proceedings in regard to the Allocated Disputed Contingent Liabilities in any state, federal or foreign court, administrative body or other tribunal against: (a) the Segregated Account; (b) any subsidiary of Ambac whose stock, limited liability company member interests, or other forms of ownership interests were allocated to the Segregated Account—namely, Ambac Credit Products, LLC, Ambac Conduit Funding, LLC, Juneau Investments, LLC, and Aleutian Investments, LLC (the "Allocated Subsidiaries"); (c) Ambac Assurance Corporation ("Ambac" or the "Ambac General Account") in respect of the Segregated Account or policies

2

(including financial guarantee insurance policies and surety bonds), contracts,
liabilities, or disputed contingent liabilities allocated to the Segregated Account; (d)
any subsidiary of Ambac, including Connie Lee Holdings, Inc.; Everspan Financial
Guarantee Corp.; Ambac Private Holdings, LLC; Ambac Assurance UK Limited;
Ambac Japan Co., Ltd.; Contingent Capital Company, LLC; SP Note Investor I,
LLC; Ambac Capital Services, LLC; SP Aircraft Holdings, LLC; SP Aircraft Owner
I, LLC; SP Aircraft Owner II, LLC; SP Aircraft Owner III, LLC; Ambac Capital
Corporation; Ambac Capital Funding, Inc.; AE Global Holdings, LLC; AE Global
Asset Funding, LLC; AE Global Investments, LLC; Ambac Asset Funding
Corporation; Ambac Investments, Inc.; Ambac AII Corp.; AME Holdings, LLC;
AME Asset Funding, LLC; AME Asset Funding, LLC; and AME Investments, LLC
(collectively, the "Ambac Subsidiaries"), in respect of the Segregated Account or
policies (including financial guarantee insurance policies and surety bonds),
contracts, liabilities, or disputed contingent liabilities allocated to the Segregated
Account; or (e) the Rehabilitator. Wis. Stat. § 645.05(1)(f). This Court has
exclusive jurisdiction over any such actions, claims or lawsuits.

    4. The Enjoined Parties are hereby also enjoined and restrained from taking
any prejudgment or other steps to transfer, foreclose, sell, assign, garnish, levy,
encumber, attach, dispose of, or exercise purported rights in or against any property
or assets of the Segregated Account, Ambac, the Allocated Subsidiaries, or the
Ambac Subsidiaries in respect of the Allocated Disputed Contingent Liabilities.
Wis. Stat. § 645.05(1)(d), (g), (h), (k).

3

5. This Order shall remain effective until further order of the Court. Counsel for the Rehabilitator shall promptly serve copies of this Order on AFGI, the Department of Treasury – Internal Revenue Service, and any other party-in-interest the Rehabilitator believes is directly affected by this Order, including those who have appeared in these rehabilitation proceedings. If any interested parties believe any portion of this Order is unwarranted by the facts or the law, such parties may seek modification or dissolution of part or all of this Order by filing a written motion with this Court no later than 45 days following the issuance of this Order. If one or more such timely motions are received, the Court may set a schedule for responsive briefing and a hearing regarding the modifications or dissolutions sought. The originals of any such motions shall be filed with the Dane County Circuit Court (with courtesy copies mailed to the undersigned, care of the Clerk of the Lafayette County Circuit Court) and served on counsel for the Rehabilitator.

Dated this _____ day of November, 2010.

BY THE COURT:

William D. Johnston
Lafayette County Circuit Court Judge,
Presiding by Judicial Assignment Order

4

**EXHIBIT D**

**Local Rule 1007-2 Schedules**

## <u>SCHEDULE 1</u>[1]

### Ad Hoc Group Organized Prepetition

An ad hoc group of holders of Senior Notes was formed in the summer of 2010, and is represented by Morrison & Foerster LLP, Attn: Anthony Princi, Esq., 1290 Avenue of the Americas, New York, NY 10104, Tel: (212) 468-8000.

---

[1] The Debtor will update and supplement these schedules as necessary during its chapter 11 case.

# SCHEDULE 2

## Unsecured Creditors

Pursuant to Local Rule 1007-2(a)(4), the following is a list of creditors holding, as of November 8, 2010, the 20 largest unsecured claims against the Debtor. This list has been prepared in accordance with Rule 1007(d) of the Federal Rules of Bankruptcy Procedure and does not include (i) persons who fall within the definition of "insider" in section 101(31) of title 11 of the United States Code, or (ii) secured creditors, unless the value of the collateral is such that the unsecured deficiency places the creditor among the holders of the 20 largest unsecured claims. The information herein shall not constitute an admission of liability by, nor is it binding on, the Debtor. The information herein does not constitute a waiver of the Debtor's right to contest the validity, priority, or amount of any claim.

| | Name and mailing address of creditor | Name, telephone number, and mailing address of employee, agent, or department of creditor familiar with claim who may be contacted | Nature of claim (trade debt, bank loan, government contract, etc.) | Indicate if claim is contingent, unliquidated, disputed, or subject to setoff | Estimated amount of claim |
|---|---|---|---|---|---|
| 1 | BNY Mellon, as Trustee of 6.15% Directly-Issued Subordinated Capital Securities due 2087 One Wall Street New York, NY 10004 | BNY Mellon One Wall Street New York, NY 10004 | Unsecured Notes | | $400,000,000 |
| 2 | BNY Mellon, as Trustee of 5.95% Debentures due 2035 One Wall Street New York, NY 10004 | BNY Mellon One Wall Street New York, NY 10004 | Unsecured Notes | | $400,000,000 |
| 3 | BNY Mellon, as Trustee of 9.500% Senior Notes due 2021 One Wall Street New York, NY 10004 | BNY Mellon One Wall Street New York, NY 10004 | Unsecured Notes | | $250,000,000 |
| 4 | BNY Mellon, as Trustee of 5.95% Debentures due 2103 One Wall Street New York, NY 10004 | BNY Mellon One Wall Street New York, NY 10004 Attn: Natalie Crispin Tel: 412.234.7562 | Unsecured Notes | | $200,000,000 |
| 5 | BNY Mellon, as Trustee of 5.875% Debentures due 2103 One Wall Street New York, NY 10004 | BNY Mellon One Wall Street New York, NY 10004 Attn: Natalie Crispin Tel: 412.234.7562 | Unsecured Notes | | $175,000,000 |
| 6 | BNY Mellon, as Trustee of 9-3/8% Debentures due 2011 One Wall Street New York, NY 10004 | BNY Mellon One Wall Street New York, NY 10004 Attn: Natalie Crispin Tel: 412.234.7562 | Unsecured Notes | | $122,189,000 |

| | Name and mailing address of creditor | Name, telephone number, and mailing address of employee, agent, or department of creditor familiar with claim who may be contacted | Nature of claim (trade debt, bank loan, government contract, etc.) | Indicate if claim is contingent, unliquidated, disputed, or subject to setoff | Estimated amount of claim |
|---|---|---|---|---|---|
| 7 | BNY Mellon, as Trustee of 7-1/2 Debentures due 2023 One Wall Street New York, NY 10004 | BNY Mellon One Wall Street New York, NY 10004 Attn: Natalie Crispin Tel: 412.234.7562 | Unsecured Notes | | $75,000,000 |
| 8 | New York City Department of Finance Field Audit Unit 345 Adams Street Brooklyn, NY 11201 | New York City Department of Finance Field Audit Unit 345 Adams Street Brooklyn, NY 11201 Attn: J. Yanqui Zaza Tel: 718.403.4357 | Disputed tax assessment | Contingent, unliquidated | $42,339,397.95 |
| 9 | One State Street Plaza, LLC One State Street Plaza New York, NY 10004 | One State Street Plaza, LLC One State Street Plaza New York, NY 10004 Attn: Goldie Zlotnick Tel: 212.412.9105 | Rent | | $198,110.94 |
| 10 | Algorithmics (US) Inc. One State Street Plaza New York, NY 10004 | Algorithmics (US) Inc. One State Street Plaza New York, NY 10004 Attn: Mark Weinstock Tel: 212.625.5260 | Trade | | $81,656.25 |
| 11 | Intex Solutions, Inc. 110 A. Street Needham, MA 02494-2807 | Intex Solutions, Inc. 110 A. Street Needham, MA 02494-2807 Attn: Accounting Dept. Tel: 781.449.6222 | Trade | | $30,307.17 |
| 12 | Newmark Knight Frank 125 Park Avenue New York, NY 10017 | Newmark Knight Frank 125 Park Avenue New York, NY 10017 Tel: 212.372.2000 Attn: Nikki Van Tel: 212.372.2264 | Lease | | $18,486.51 |
| 13 | RR Donnelley Receivables P.O. Box 13654 Newark, NJ 07188-0001 | RR Donnelley Receivables P.O. Box 13654 Newark, NJ 07188-0001 Attn: Peter Gogolak Tel: 212.341.7432 | Trade | | $14,000.00 |
| 14 | David B. Nemschoff 59 Lehigh Court Rockville Centre, NY 11570 | David B. Nemschoff 59 Lehigh Court Rockville Centre, NY 11570 Tel: 516-639-5752 | Trade | | $12,500.00 |

| | Name and mailing address of creditor | Name, telephone number, and mailing address of employee, agent, or department of creditor familiar with claim who may be contacted | Nature of claim (trade debt, bank loan, government contract, etc.) | Indicate if claim is contingent, unliquidated, disputed, or subject to setoff | Estimated amount of claim |
|---|---|---|---|---|---|
| 15 | Bloomberg L.P.<br>P.O. Box 30244<br>Hartford, CT 06150-0244 | Bloomberg L.P.<br>P.O. Box 30244<br>Hartford, CT 06150-0244<br>Attn: Customer Support<br>Tel: 212.318.2500 | Trade | | $6,602.74 |
| 16 | Intralinks, Inc.<br>P.O. Box 10259<br>New York, NY 10259-0259 | Intralinks, Inc.<br>P.O. Box 10259<br>New York, NY 10259-0259<br>Attn: Billing<br>Tel: 212.342.7676 | Trade | | $4,125.00 |
| 17 | Business Wire<br>Department 34182<br>P.O. Box 39000<br>San Francisco, CA 94139 | Business Wire<br>Department 34182<br>P.O. Box 39000<br>San Francisco, CA 94139<br>Attn: Accounts Receivable Department<br>Tel: 415.986.4422 | Trade | | $1,282.00 |
| 18 | Thomson Financial<br>P.O. Box 5136<br>Carol Stream, IL 60197-5136 | Thomson Financial<br>P.O. Box 5136<br>Carol Stream, IL 60197-5136<br>Attn: Customer Care<br>Tel: 617.856.2900 | Trade | | $798.00 |
| 19 | Westlaw Business Payment Center<br>P.O. Box 6292<br>Carol Stream, IL 60197-6292 | Westlaw Business Payment Center<br>P.O. Box 6292<br>Carol Stream, IL 60197-6292<br>Attn: Accounts Receivable Department<br>Tel: 800.227.3356 | Trade | | $352.62 |
| 20 | Duff & Phelps, LLC<br>12595 Collection Center Drive<br>Chicago, IL 60693 | Duff & Phelps, LLC<br>311 South Wacker Drive<br>Chicago, IL 60606<br>Attn: Jeff Schiedemeyer<br>Tel: 312.697.4600 | Professional Fees | Contingent, Unliquidated, Disputed | Unknown |

## <u>SCHEDULE 3</u>

### Secured Creditors

Pursuant to Local Rule 1007-2(a)(5), which requires the Debtor to list the five largest secured claims against the Debtor, the Debtor submits, based upon a review of its books and records, that it does not have any secured creditors.

## SCHEDULE 4

### Summary of the Debtor's Assets and Liabilities

Pursuant to Local Rule 1007-2(a)(6), this schedule sets forth the Debtor's estimated total assets and liabilities as of September 30, 2010.  The information herein shall not constitute an admission of liability by, nor is it binding on, the Debtor.  The information herein does not constitute a waiver of the Debtor's right to contest the validity, priority, or amount of any claim.

Total Assets:          ($185.5 million)


Total Liabilities:     $1.6866 billion

# SCHEDULE 5

## Debtor's Publicly Held Securities

Pursuant to Local Rule 1007-2(a)(7), the following is a summary of the Debtor's shares of stock, debentures, and other securities that are publicly held and the approximate number of holders thereof.

### Outstanding Common Stock

As of November 1, 2010, approximately 302,112,225 shares of the Debtor's common stock were outstanding net of 5,904,539 treasury shares. The number of beneficial holders of the Debtor's common stock is currently unknown.

### Outstanding Notes

| Class | CUSIP/ISIN | Outstanding Principal Amount |
|---|---|---|
| 9.500% Senior Notes due 2021 | 023139AG3 | $250,000,000 |
| 6.15% Directly-Issued Subordinated Capital Securities due 2087 | 023139AF5 | $400,000,000 |
| 5.95% Debentures due 2035 | 023139AE8 | $400,000,000 |
| 7-1/2 Debentures due 2023 | 023139AB4 | $75,000,000 |
| 9-3/8% Debentures due 2011 | 023139AA6 | $122,189,000 |
| 5.95% Debentures due 2103 | 023139504 | $200,000,000 |
| 5.875% Debentures due 2103 | 023139603 | $175,000,000 |

### Securities Ownership[1]

The table below shows the number of non-derivative securities directly held by officers and directors of AFG, as reflected in their most recent Securities and Exchange Commission Section 16 filings.

| Name of Officer or Director | Total Held | Percentage of Shares Outstanding |
|---|---|---|
| Diana Adams – Senior Managing Director | 18,802 | .006% |
| Michael A. Callen – Chairman | 108,762 | .036% |
| Jill M. Considine – Director | 57,645 | .019% |
| Paul R. Derosa – Director | 78,488 | .026% |
| Kevin J. Doyle – Senior Vice President | 60,439 | .020% |
| Philip N. Duff – Director | 36,531 | .012% |
| Robert Bryan Eisman – Senior Managing Director | 48,137 | .016% |
| Thomas C. Theobald – Director | 61,750 | .020% |

---

[1] Source: http://ir.ambac.com/phoenix.zhtml?c=80774&p=irol-govownership

| Name of Officer or Director | Total Held | Percentage of Shares Outstanding |
|---|---|---|
| David Trick – Senior Managing Director and CFO | 36,608 | .012% |
| Laura S. Unger – Director | 110,574 | .037% |
| Henry D.G. Wallace – Director | 28,313 | .009% |
| David W. Wallis – President and CEO | 429,310 | .142% |

## SCHEDULE 6

### Debtor's Property Held by Third Parties

Pursuant to Local Rule 1007-2(a)(8), the Debtor submits that, as a holding company, it does not have property in the possession or custody of any custodian, public officer, mortgagee, pledge, assignee of rents, secured creditor, or agent for any such entity.

| Account Name | Account Number | Custodian | Balance of Cash | Balance of Securities |
|---|---|---|---|---|
| BNY Mellon - AFG Long Term Assets Account | #3982 | BNY Mellon | 0 | 22,500,000.00 |
| BNY Mellon - Treasury Stock | #Inv ID 125065790926 | BNY Mellon | 0 | 0 |
| BNY Mellon – Long Term Assets Money Market Account | #3982 | BNY Mellon | 40,678,527.17 | 0 |
| BNY Mellon – Operating Money Market Account | #103966 | BNY Mellon | 0 | 0 |

# SCHEDULE 7

## Debtor's Owned and Leased Property

Pursuant to Local Rule 1007-2(a)(9), the Debtor submits as follows:

| SCHEDULE OF LEASED PROPERTY | | | | |
| --- | --- | --- | --- | --- |
| **Location** | **Use of Premises** | **Landlord** | **Address** | **Nature of Debtor's Property Interest** |
| One State Street Plaza New York, NY 10004 | Corporate headquarters | One State Street LLC | One State Street Plaza New York, NY 10004 | Lease expiring September 30, 2019 |
| 701 Grant Avenue Lake Katrine, NY 12449 | Disaster recovery site | Newmark Knight Frank | 110 East 42nd Street, 12th Floor New York, NY 10017 | Lease expiring September 30, 2019 |

# SCHEDULE 8

## Debtor's Books, Records, and Assets

Pursuant to Local Rule 1007-2(a)(10), the following lists the location of the Debtor's books and records, the locations of their substantial assets, and the nature, location, and value of any assets held by the Debtor outside of the territorial limits of the U.S.

(i)     Location of Debtor's Books and Records: The Debtor's books and records are located at its executive office at One State Street Plaza, New York, New York.

(ii)    U.S. Location Substantial Assets: The Debtor maintains bank accounts at various institutions, as described in the Cash Management Motion. Additionally, the Debtor has assets at each of the domestic facilities listed on Schedule 7, which is incorporated herein by reference.

(iii)   Name, Location, and Value of Assets Located Outside of the U.S.: The Debtor has assets at each of the facilities located outside of the U.S. listed on Schedule 7, which is incorporated herein by reference. The Debtor owns a 100% interest in Ambac (Bermuda) Ltd., located at Clarendon House, 2 Church Street, Hamilton, HM11 Bermuda. After a return of capital to AFG of $36.5 million, the approximate current value of Ambac (Bermuda) Ltd. is $312,000.

**SCHEDULE 9**

**Threatened and Pending Litigation Where**
**<u>Judgment or Seizure of Property May Be Imminent</u>**

Pursuant to Local Rule 1007-2(a)(11), to the best of the Debtor's knowledge, belief, and understanding, there are no actions or proceedings pending or threatened against the Debtor or its properties, as of the Commencement Date, where a judgment against the Debtor or a seizure of its property may be imminent.

# SCHEDULE 10

## Senior Management

Pursuant to Local Rule 1007-2(a)(12), the following sets forth the names of the individuals who comprise the Debtor's existing senior management and a brief summary of their relevant responsibilities and experience.

| Name/Position | Experience/Responsibilities |
|---|---|
| Diana Adams – Senior Managing Director | In May 2009, in addition to overseeing Ambac's international offices and government relations, Ms. Adams acquired executive responsibility for Ambac's human resources, corporate communications and marketing, and corporate administration. More recently, Ms. Adams acquired executive responsibility for Ambac's information technology department. In 2008, Ms. Adams became a Senior Managing Director with executive responsibility for AFG's International business and for the Structured Finance business which she wound down in 2009. In December 2008, Ms. Adams also began serving as the Chairman of Ambac Assurance UK Limited, AFG's international financial guarantee subsidiary. Prior to that, Ms. Adams had been Managing Director of Emerging Markets, Structured Insurance, and Student Loans. Ms. Adams joined Ambac in 2000 as the head of its Emerging Markets business. |
| Kevin J. Doyle – Senior Vice President and General Counsel | In January 2005, Mr. Doyle was named Senior Vice President and General Counsel of AFG and AAC. Since January 2000, Mr. Doyle has served as General Counsel of AFG and AAC and as Ambac's Chief Legal Officer. Mr. Doyle also has executive responsibility for internal audit. In January 2000, Mr. Doyle was named Managing Director and General Counsel of AFG and AAC. From January 1996 to January 2000, Mr. Doyle served as the Managing Director and General Counsel of the Specialized Finance Division of AAC. Mr. Doyle served as First Vice President and General Counsel of the Specialized Finance Division of AAC from July 1995 to January 1996. Mr. Doyle joined AAC as a Vice President and Assistant General Counsel in 1991. |
| Robert B. Eisman – Senior Managing Director and Chief Accounting Officer | On January 6, 2010, Mr. Eisman became Senior Managing Director and Chief Accounting Officer of AAC, which includes executive responsibility for managing Ambac's financial reporting and establishing Ambac's GAAP and statutory accounting policies. Mr. Eisman joined AAC in 1995. |
| David Trick – Senior Managing Director, Chief Financial Officer, and Treasurer | On January 6, 2010, Mr. Trick became a Senior Managing Director, Chief Financial Officer, and Treasurer of AFG and AAC, which includes executive responsibility for managing Ambac's Investor and Rating Agency Relations, tax strategy, capital resources, operation (cash, securities, and derivatives), capital markets, conduits, liquidity, bank relationships, and investment portfolios. Since May 2006, he has served as Treasurer of AFG and AAC. Mr. Trick joined Ambac in 2005. |

| Name/Position | Experience/Responsibilities |
|---|---|
| Michael Callen – Executive Chairman | On January 16, 2008, Mr. Callen was appointed Chairman and Interim President and Chief Executive Officer of AFG and AAC.  On October 21, 2008, Mr. Callen stepped down from his position as Interim President and Chief Executive Officer of AFG and AAC, but continues to act as Executive Chairman of Ambac and AAC.  Mr. Callen previously served as President of Avalon Argus Associates, LLC, a financial consulting firm from April 1996 until January 2008. |
| David W. Wallis – President and Chief Executive Officer of Ambac and AAC | On October 21, 2008, Mr. Wallis was appointed President and Chief Executive Officer of AFG and AAC.  From February 2008 until October 2008, Mr. Wallis served as the Chief Risk Officer of Ambac and AAC and had executive responsibility for Credit Risk Management, Capital and Risk Analysis, Risk Transfer, and Portfolio Risk Management.  From July 2005 to January 2008, Mr. Wallis served as a Senior Managing Director and Head of Portfolio and Market Risk Management.  In 2003, he transferred to Ambac's New York headquarters as a Managing Director within the Credit Risk Management team.  He joined Ambac's London Office in 1996 as a First Vice President, where he helped develop and lead the European Structured Finance and Securitization business, becoming a Managing Director in 1999. |

## SCHEDULE 11

### Payroll and Payments for 30-day Period Postpetition

       Pursuant to Local Rule 1007-2(b), the following provides an estimate of the amount of payroll to all employees and financial and business consultants of the Debtor for the 30-day period following the filing of this case.

| Group | Estimated Amount |
|---|---|
| Employees (excluding officers and directors)[1] | $0 |
| Officers and directors[2] | $354,243.03 |
| Financial and business consultants[3] | $537,500 |

---

[1] The Debtor cannot estimate payroll paid to shareholders, as the Debtor's employees may also be shareholders through incentive programs. This amount excludes employer-paid taxes.

[2] This amount excludes employer-paid taxes.

[3] This amount excludes ordinary course professional payments. Due to the bankruptcy process, bankruptcy professionals are not expected to receive payments during the 30 day period following the filing of the chapter 11 petitions.

## SCHEDULE 12

### Estimated Financial Data for 30-Day Postpetition Period

Pursuant to Local Rule 1007-2(b)(3), the following provides, for the 30-day period following the filing of this case, the estimated cash receipts and disbursements, net cash gain or loss, and obligations and receivables expected to accrue that remain unpaid, other than professional fees, for the Debtor.

| Description | Estimated Amount |
|---|---|
| Cash Receipts | $324,796.89 |
| Cash Disbursements | $2,289,622.46 |
| Net Cash Gain | ($1,964,825.57) |
| Unpaid Obligations (excluding professional fees) | $78,364.25 |
| Unpaid Receivables (excluding professional fees) | $0 |