DEWEY & LEBOEUF LLP
1301 Avenue of the Americas
New York, New York 10019
Telephone: 212.259.8000
Facsimile: 212.259.6333
Peter A. Ivanick, Esq.
Martin J. Bienenstock, Esq.
Lawrence M. Hill, Esq.

*Proposed Attorneys for the Debtor and Debtor in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------------x

*In re*

**AMBAC FINANCIAL GROUP, INC.,**

              **Debtor.**

---------------------------------------------------------

**Chapter 11 Case No.**

**10-15973 (SCC)**

---------------------------------------------------------------x

**AMBAC FINANCIAL GROUP, INC.,**

              **Plaintiff,**

     - against -

**UNITED STATES OF AMERICA,**

              **Defendant.**

---------------------------------------------------------------x

**Adversary Proceeding No. 10-_____**

**COMPLAINT FOR INJUNCTIVE RELIEF AND DECLARATORY JUDGMENT DETERMINING AMOUNT OF TAX LIABILITY**

Plaintiff-debtor in possession Ambac Financial Group, Inc. (hereafter, "AFG," "Plaintiff," or "Debtor") alleges upon knowledge with respect to itself and its own acts, and upon information and belief as to all other matters, as follows:

## BACKGROUND

1.  In 2008 and 2009, AFG filed with the Internal Revenue Service (the "IRS") applications for tentative refunds entitling it to receive refunds for the tax years ending 2003 through 2008.  Pursuant to these applications, AFG received approximately $700 million in tax refunds (the "Tax Refunds") from carrying back losses that resulted from its credit default swap ("CDS") contracts.  On October 28, 2010, the IRS issued an information document request (an "IDR") seeking detailed information about the accounting method AFG used for its CDS contracts and the basis for AFG's entitlement to the Tax Refunds it received.  In addition to issuing this IDR, AFG was informed by agents of the IRS that the IRS is examining the propriety of the Tax Refunds and may seek to recoup payment of the Tax Refunds from the Debtor or its nondebtor affiliates in the consolidated tax group.  Should the IRS take steps to seize the Tax Refunds before the adjudication of the IRS' entitlement (or lack of entitlement) thereto AFG's ability to reorganize successfully will be jeopardized or destroyed.

## NATURE OF ACTION

2.  This adversary proceeding seeks the following requests for relief: (i) a declaration, pursuant to 28 U.S.C. § 2201 and Bankruptcy Code section 505, that AFG has no tax liability for tax years 2003 through 2008 and it is entitled to retain the full amount of the Tax Refunds; (ii) a temporary restraining order and preliminary injunction, pursuant to Bankruptcy Code sections 105(a) and 362(a) and Bankruptcy Rule 7065, ordering the IRS to provide five business days' prior written notice (filed with the Court and contemporaneously served by electronic mail on Debtor's counsel) before taking any Enforcement Action (defined below) contrary to the State Court Injunction (defined below), whether or not such injunction remains in effect; and (iii) such other relief for the Debtor's estate as is just.

3. This complaint is supported by (i) the Declaration of David W. Wallis in Support of Debtor's Request for Declaratory Judgment and Injunctive Relief; (ii) the Declaration of Lawrence M. Hill in Support of Debtor's Request for Declaratory Judgment and Injunctive Relief; (iii) the Declaration of R. Wes Kirchhoff in Support of Debtor's Request for Declaratory Judgment and Injunctive Relief; and (iv) the Declaration of Thomas J. Staskowski Support of Debtor's Request for Declaratory Judgment and Injunctive Relief, each of which is hereby incorporated by reference as if fully set forth herein. The complaint is also supported by the Affidavit of David W. Wallis in Support of Debtor's Chapter 11 Petition and First Day Motions, which is hereby incorporated by reference as if fully set forth herein.

## JURISDICTION

4. On the date hereof (the "Commencement Date"), the Debtor commenced with this Court a voluntary case under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"). The Debtor is authorized to operate its businesses and manage its properties as debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

5. This is an adversary proceeding initiated by the Debtor pursuant to 28 U.S.C. § 2201 (the "Declaratory Judgment Act"), Rules 7001(7) (to obtain an injunction or other equitable relief) and 7001(9) (to obtain a declaratory judgment) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Bankruptcy Code sections 505(a) (determination of tax liability), 362(a) (automatic stay) and 105(a) (authority to issue orders to carry out provisions of the Bankruptcy Code). Bankruptcy Rule 7065 provides that a

temporary restraining order or preliminary injunction may be issued by the Court without security.

6.    This Court has subject matter jurisdiction over this adversary proceeding pursuant to 28 U.S.C. § 1334(b) and 28 U.S.C. § 2201.

7.    This adversary proceeding is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2)(A) and (B), and, accordingly, this Court has the power to enter final findings of fact and conclusions of law pursuant to 28 U.S.C. § 157(b)(1).

8.    Venue is proper in this Court pursuant to 28 U.S.C. § 1409(a).

## THE PARTIES

9.    Plaintiff AFG is a holding corporation with its principal place of business in New York, New York.  AFG is a debtor and debtor in possession in this chapter 11 case.

10.    Defendant United States of America ("<u>United States</u>") is the government of the United States of America collecting taxes through the Department of the Treasury and its agency the IRS.

## FACTUAL BACKGROUND

### I.    EVENTS LEADING UP TO CHAPTER 11

11.    The Debtor is a holding company and is headquartered in New York City. The Debtor's principal wholly-owned operating subsidiary, Ambac Assurance Corporation ("<u>AAC</u>"), is a Wisconsin-domiciled financial guaranty insurance company whose business includes the issuance of financial guaranty insurance policies to support public finance, structured finance, and international finance transactions.  AAC is subject to the insurance laws and regulations of the State of Wisconsin and is regulated by the Office of the Commissioner of Insurance of the State of Wisconsin ("<u>OCI</u>").  The Debtor, through its subsidiaries, also provided financial services, including investment agreements, funding

conduits, interest rate, currency, and total return swaps, principally to the clients of its financial guarantee business. As a holding company, the Debtor is dependent upon dividends from AAC to pay its indebtedness and operating expenses. AAC only wrote *de minimis* new business since November 2007 and no new business since 2008.

12. On March 24, 2010, OCI approved the establishment of a segregated account of AAC (the "Segregated Account"), pursuant to Wisc. Stat. § 611.24(2), to segregate certain non-performing segments of AAC's liabilities (together, the "Segregated Account Policies"). All policy obligations of AAC not allocated to the Segregated Account remain in the general account of AAC (the "General Account"). Further, on March 24, 2010, OCI commenced rehabilitation proceedings with respect to the Segregated Account (the "Rehabilitation Proceedings") in the District Court of Dane County, Wisconsin (the "Rehabilitation Court") to facilitate an orderly run-off and/or settlement of the liabilities in the Segregated Account, including those associated with the Segregated Account Policies. Policy obligations in the General Account are not subject to, or directly impacted by, the Rehabilitation Proceedings.

13. On June 7, 2010, AAC entered into a settlement agreement (the "CDS Settlement Agreement") with certain counterparties to credit default swaps (the "CDS Counterparties") in respect of collateralized debt obligations of asset-backed securities ("CDO of ABS") insured by AAC. Pursuant to this agreement, in exchange for the termination of approximately $16.5 billion in par amount of CDO of ABS, AAC paid to the CDS Counterparties $2.6 billion in cash and $2 billion of surplus notes of AAC, which have a scheduled maturity of June 7, 2020. Certain other non-CDO of ABS obligations were also commuted pursuant to the CDS Settlement Agreement.

14.     On October 8, 2010, OCI filed a plan of rehabilitation with respect to the Segregated Account (the "<u>Rehabilitation Plan</u>") in the Rehabilitation Court.     The Rehabilitation Plan will, if approved, provide, *inter alia*, that holders of Segregated Account Policies shall receive, in respect of claims made, a combination of cash and surplus notes of the Segregated Account.  A confirmation hearing in respect of the Rehabilitation Plan is currently scheduled for November 15-19, 2010 in the Rehabilitation Court.   Until the Rehabilitation Plan is approved, it is anticipated that no claims will be paid on Segregated Account Policies, except as approved by the Rehabilitation Court.

15.     Although AAC has been unable to pay dividends to the Debtor for several years and will be unable to pay dividends in 2010 absent special approval from OCI, which is not expected, AAC is nevertheless a valuable asset.  The future value of AAC will primarily depend upon the performance of AAC's insured portfolio (*i.e.*, the ultimate losses therein relative to its claims paying resources), ongoing remediation efforts of AAC with respect to the Segregated Account Policies, and other factors, including AAC's ability to repurchase surplus notes at below face value.  The Debtor's and AAC's success in these endeavors would result in the addition of significant value to the Debtor's estate.

## II.     THE TAX REFUNDS

16.     AAC formed Ambac Credit Products LLC ("<u>ACP</u>") in 1998 as a wholly owned Delaware limited liability company to write credit default swaps ("<u>CDSs</u>") under which ACP was a credit protection seller on municipal and corporate obligations and asset-backed securities (collectively, "<u>Reference Obligations</u>").   In connection with this CDS business, ACP sold credit protection with respect to certain credit events related to a Reference Obligation, including a default by the issuer of the Reference Obligation in

payment of principal or interest when due or the bankruptcy of the issuer. For federal income tax purposes, ACP is treated as a disregarded entity, meaning all of ACP's items of income, deductions, gains, and losses were included with those of AAC for federal income tax purposes. Consequently, AAC is treated as the party to the CDSs for federal income tax purposes. The Debtor is the parent corporation of the consolidated federal income tax group that includes AAC and ACP.

17.    All of the CDS contracts that ACP wrote from 1999 through 2004 (the "Pre-2005 CDS Contracts") were substantially the same in form. The Pre-2005 CDS Contracts initially provided for physical settlement and contract termination upon the occurrence of a credit event, requiring AAC to purchase Reference Obligations for a specified price. Eventually, the Pre-2005 CDS Contracts moved from physical settlement to cash settlement. Based on the nature of these contracts and the rights and obligations arising under them, these CDS contracts were properly characterized as put options for federal income tax purposes. In accordance with this treatment, AAC did not recognize income or loss for federal income tax purposes until a recognition event occurred (*e.g.*, the contract expired unexercised or was otherwise terminated).

18.    The CDS contracts that ACP wrote from 2005 through 2008 (the "Post-2004 CDS Contracts") were all substantially the same in form. The main difference between the Post-2004 CDS Contracts and the Pre-2005 CDS Contracts is in the loss payment provisions. Unlike the Pre-2005 CDS Contracts, the counterparty to the Post-2004 CDS Contracts could not compel ACP to purchase a Reference Obligation following a credit event. The Post-2004 CDS Contracts generally do not require physical or cash settlement and contract termination upon the occurrence of a credit event (that is, a default by the issuer of the Reference

Obligation in payment of principal or interest when due). Rather, the Post-2004 CDS Contracts require ACP to make payments to the counterparty each time the issuer of a Reference Obligation fails to pay either scheduled interest or principal (unless ACP exercises its right to purchase the Reference Obligation). In exchange for the credit protection, the Post-2004 CDS Contracts require the counterparty to pay ACP on fixed payment dates an amount determined by reference to (i) a fixed rate, (ii) a notional amount that varies based on objective financial information about the underlying Reference Obligations, which information is not unique to or within the control of ACP and the counterparty, and (iii) a specified interval. In addition, the counterparty would be required to pay a reimbursement amount to ACP if the counterparty recovered from the issuer of the Reference Obligation a shortfall in principal or interest that triggered the credit event on which ACP made a payment.

19. As noted above, for federal income tax purposes, ACP's items of income, deduction, gains, and losses were included with those of AAC, because ACP was treated as a disregarded entity for such purposes. AAC treated the Pre-2005 CDS Contracts as options for federal income tax purposes.[1] As the IRS has not yet promulgated any guidance with respect to CDS contracts, this treatment did not violate any provision of the Internal Revenue Code, Treasury Regulation thereunder or published IRS pronouncement.

20. At the time it prepared its tax return for 2005, AAC considered whether it should change its federal income tax treatment of the Post-2004 CDS Contracts due to the

---

[1] Although this treatment is consistent with the agreed federal income tax treatment by the parties to the CDS contract, it should be noted that the tax treatment agreed to in the contracts does not bind either party with respect to the IRS.

change in the payment provisions of those contracts as compared with the Pre-2005 CDS Contracts. AAC decided to retain the same income recognition treatment with respect to income it earned on the Post-2004 CDS Contracts until IRS guidance was issued and, consequently, did not recognize income in either 2005 or 2006 because the contracts neither expired nor terminated. AAC disclosed this position in the Debtor's consolidated federal income tax returns for 2005 and 2006.

21.     As a result of adverse developments in the credit markets in 2008, the Debtor reported in its public filings that it had recorded for financial accounting purposes, for the first time, a total of $6 billion and $800 million, respectively, of mark-to-market losses on the Post-2004 CDS Contracts for the year ended December 31, 2007 and the six months ended June 30, 2008. AAC recorded a net impairment for statutory accounting purposes of $757 million and an additional $929 million related to the Post-2004 CDS Contracts for 2007 and the first quarter of 2008, respectively.[2] The impairment amount was determined by changes in the present value of estimated future payments due and to be made under the Post-2004 CDS Contracts, and in accordance with statutory insurance rules that govern an insurance company's preparation of statutory financial statements (which rules differ from financial accounting rules).

22.     As of the end of the second quarter 2008, the Debtor determined, after consultation with its accounting firm, KPMG, that the Post-2004 CDS Contracts should have been treated as notional principal contracts ("NPCs") as defined by Treas. Reg. § 1.446-

---

[2]     AAC must comply with insurance regulations in the states in which it conducts an insurance business and is required to file financial statements governed by statutory insurance rules. The impairment booked for statutory accounting purposes does not necessarily equal the losses booked for financial accounting purposes determined under generally accepted accounting principles.

3(c)(1) for federal income tax purposes, rather than put options, based on the changes in the Post-2004 CDS Contracts. As a result, the rules under Prop. Treas. Reg. § 1.446-3(g)(6) (the "<u>IRS Contingent Swap Rules</u>") applied to income earned by ACP on the Post-2004 CDS Contracts and losses incurred by ACP under the Post-2004 CDS Contracts, which changed the timing of the income or loss recognition, as well as the character of the income or loss (to ordinary from capital). Consistent with the application of the IRS Contingent Swap Rules, AAC intended to apply the impairment method of accounting for federal income tax purposes meaning that changes in impairment are taken into account as taxable income or loss on a quarterly basis.

23.     In April 2008, the Debtor filed an application for a change in accounting method (IRS Form 3115) with respect to the timing of the income received from the Post-2004 CDS Contracts (the "<u>Accounting Method Application</u>"). The Accounting Method Application was later supplemented by letter dated September 2, 2008, which clarified that AAC had not adopted any accounting method with respect to the losses on the Post-2004 CDS Contracts as AAC did not incur any losses with respect to the Post-2004 CDS Contracts until 2007, and that AAC would adopt the impairment accounting method pursuant to the IRS Contingent Swap Rules through the consistent treatment of such losses on the Debtor's originally filed 2007 and 2008 consolidated federal income tax returns.

24.     Pursuant to the IRS Contingent Swap Rules and the impairment method of accounting and starting with the Debtor's 2007 consolidated federal income tax return, AAC accrued losses in respect of Post-2004 CDS Contracts at the time such losses were accrued for statutory accounting purposes in respect of the Reference Obligation and treated as an ordinary loss the amount it estimated it would be required to pay in respect of the CDSs. The

application of the IRS Contingent Swap Rules and the impairment method of accounting to losses incurred under the Post-2004 CDS Contracts for federal tax accounting purposes is similar to the financial and statutory accounting treatment for these losses discussed above.

25.     As a result of the application of the IRS Contingent Swap Rules and the employment of the impairment method of accounting, the Debtor reported approximately a $33 million taxable loss for 2007 and a$3.2 billion taxable loss for 2008. These losses were the basis for the Tax Refunds.

26.     AFG received an opinion from KPMG confirming (i) the IRS Contingent Swap Rules applied to the Post-2004 CDS Contracts, (ii) the impairment method could be used to account for payments to be made by ACP under the Post-2004 CDS Contracts, and (iii) the Debtor had not changed its method of accounting with respect to its payment obligations under the Post-2004 CDS Contracts.

27.     On September 23, 2008, August 11, 2009, and December 21, 2009, AFG filed claims for tentative carryback adjustments on Form 1139 (Corporate Application for Tentative Refund) as a result of the carryback to prior taxable years of the net operating losses reflected on its 2007 and 2008 consolidated federal income tax returns. Based upon these claims, in December 2008, September 2009 and February 2010, the IRS refunded to AFG $11,470,930, $252,704,185 and $443,940,722 in Tax Refunds, respectively.

28.     Tentative carryback adjustments are permitted pursuant to section 6411(a) of the Internal Revenue Code (the "IRC"). Under IRC section 6411(a), a taxpayer may file an application for a tentative adjustment of the tax for a prior taxable year to account for the carryback of net operating losses incurred. The IRS conducts only a limited examination of applications for tentative carryback adjustments, mainly to discover omissions and errors of

computation. The IRS then determines the amount of the decrease in tax attributable to the reported carryback in the application and either (a) applies the reduction against unpaid tax liability owing to the IRS, or, if no such liability is owing (b) provides the taxpayer with a refund of the adjustment amount within 90 days. IRC § 6411(b).

29. As noted above, the IRS approved AFG's tentative carryback adjustment application and refunded AFG approximately $700 million in adjusted taxes for tax years 2007 and 2008 (*i.e.*, the Tax Refunds). Pursuant to a tax sharing agreement dated July 19, 1991, as thereafter amended, between and among AFG and the subsidiaries in its consolidated tax group, including AAC, AFG distributed the Tax Refunds to AAC.

30. On October 28, 2010, the IRS issued its IDR to the Debtor, calling for information about whether AAC received authorization for its method of accounting for its Post-2004 CDS Contracts. Absent such authorization, the IDR requested detailed information on the legal authority AAC relied on in (a) accounting for its CDSs and (b) claiming refunds for its tax years 2003 through 2007. The IRS also indicated to AFG that it was questioning the propriety of the Tax Refunds and was investigating whether to seek to recoup the Tax Refunds.

31. Ordinarily, before assessing a tax liability, the IRS must provide the taxpayer with a notice of deficiency that contains an explanation of the asserted deficiency and a notice of taxpayer's rights. IRC §§ 6212 (a), 6213(a). The taxpayer then has ninety days from the mailing of the notice of deficiency to petition the Tax Court for a redetermination of the deficiency. *Id.* All collection action must be stayed during the ninety-day period or if a petition has been filed with the Tax Court, until the decision of the Tax Court becomes final. IRC § 6213(a).

32.     In the case of a deficiency that arises out of mathematical or clerical errors, the IRS may use the summary assessment procedure by providing the taxpayer with an explanation of the asserted error and a period of sixty days to request that the IRS abate its assessment during which collection is stayed.  *See* IRC §§ 6213(b)(1), (b)(2)(A), (b)(2)(B).

33.     However, the IRS may recover any abatement, credit, refund, or other payment erroneously allowed in connection with a tentative carryback adjustment application pursuant to IRC section 6411 by, among other options, assessing the deficiency attributable to the adjustment as if it was due to a mathematical error without regard to the procedural restrictions on assessment.  *See* IRC §§ 6213(b)(2) and (3); *see also Collegiate Cap & Gown Co. v. Commissioner*, 59 T.C. 449, 454-55 (1972) ("To facilitate the recovery of an adjustment which the respondent later determines to have been erroneous, he may assess a deficiency as if it were due to a mathematical error under section 6213(b)(2) without providing the taxpayer with an opportunity to dispute the assessment.").  In effect, the IRS may make an assessment related to a tentative carryback adjustment without providing the taxpayer with (a) a notice of deficiency or (b) an opportunity to challenge the assessment. *See* IRC § 6213(b)(3).  Moreover, the IRS is not constrained to stay collection for the sixty-day period pursuant to a tentative carryback adjustment assessment and may proceed to collect immediately on the assessment in any manner available under applicable law.  *See id.* The practical effect of this is that, after the assessment, there is a threat that the IRS could immediately place a lien on the taxpayer's assets.  *See id.*

34.     Additionally, the IRS may make a jeopardy assessment if it determines that assessment or collection of a deficiency will be in jeopardy if the normal assessment and collection procedures are followed.  *See* IRS § 6861(a).  Collection of tax is considered to be

in jeopardy when the taxpayer's financial solvency is or appears to be imperiled. Internal Revenue Manual 4.15.6. Therefore, the IRS may make an immediate assessment of tax liability without issuing a prior notice and enforce a collection action without affording a prior judicial review. *See* IRC §§ 6861, 6213(a). Upon making a jeopardy assessment the IRS will provide the taxpayer with a notice of assessment and demand for immediate payment of tax. *See* IRC §§ 6331(a). In jeopardy taxpayer cases, if the taxpayer fails to pay the tax immediately, the IRS may collect levy and seize the property without waiting the statutorily prescribed ten day waiting period. *See id.* Generally, if the collection is in jeopardy, the IRS can make a jeopardy assessment, immediately serve notice and demand on the taxpayer and make a jeopardy levy essentially simultaneously. The lien may be placed and the levy may be imposed upon "all property and rights to property belonging to the taxpayer," which includes any member of the consolidated tax group. *See* IRC §§ 6321, 6331.

## III. EFFECTS OF IRS ENFORCEMENT ACTIONS

35. The Debtor, AAC, and other of the Debtor's nondebtor affiliates are consolidated group members for federal income tax purposes and are severally liable for the entire consolidated tax liability as computed on their consolidated federal income tax return. Treas. Reg. § 1.1502-6(a). Thus, the IRS would be able to levy and attach assets of any or all of the Debtor's nondebtor subsidiaries in the tax sharing group, including AAC, effectively without warning.

36. Should the IRS levy assets of AAC or the other members of the Debtor's tax sharing group for a tax ultimately adjudicated not to be owing, the effect would destroy or seriously jeopardize the Debtor's ability to reorganize. If the IRS takes enforcement actions

against AAC, there is a significant risk OCI would quickly thereafter commence a rehabilitation of AAC's General Account. The rehabilitation of AAC's General Account would result in massive losses of value at AAC, impairing AFG's ability to reorganize AAC's business platforms. For example, with respect to the $20 billion of commercial asset-backed notes insured by AAC, rehabilitation would lead to defaults by the issuers of the notes and result in significantly increased claims against AAC. These defaults would pose a threat to the substantial number of people who depend on the ongoing viability of the issuers to make a living, and AAC would experience claim liability increases of $1 billion or more from issuer defaults.

37. Rehabilitation would also accelerate interest rate and currency swaps issued by AAC's affiliates, all of which are insured by AAC and would subject the General Account to further claims. And rehabilitation would cause detrimental effects to one of AAC's affiliates, which has entered into interest rate swaps with municipalities throughout the United States, all of which would terminate automatically in the event of a General Account rehabilitation. These terminations would subject the cash-strapped municipalities to huge payment exposures they simply could not satisfy and would leave them without replacement coverage to hedge against future interest rate volatility. AAC's affiliate would also suffer losses, as municipal payment shortfalls would cause a mismatch for AAC's affiliate with respect to swaps it entered into with counterparties to hedge its exposure to the municipalities' positions.

38. Further, although most of AAC's exposure to CDS was commuted in connection with the CDS Settlement Agreement, the General Account continues to be exposed to a significant book of CDS of collateralized loan obligations ("CLOs"). As with

CDS exposures generally, counterparties on these agreements have a right to assert mark-to-market termination claims in the event of a rehabilitation of AAC. Although OCI would presumably attempt to enjoin the assertion of such mark-to-market damages, there can be no assurance that such injunctions would ultimately be successful. The Debtor calculates AAC's exposure to such mark-to-market damage claims in respect of the CLO book to be approximately $3 billion. In the event that OCI fails to restrain the assertion of such damages, this $3 billion in additional policyholder claims would dilute all other policyholder claims significantly and destroy AAC's residual value to AFG.

39.     In addition to the damage to AAC discussed above, any IRS actions taken against the other valuable non-debtor subsidiaries of AFG included within its consolidated tax group aimed at recapturing the Tax Refunds could have negative effects on AFG. These subsidiaries include (i) Everspan, an insurance company subsidiary of AAC with approximately $160-170 million of surplus, and (ii) two non-insurance subsidiaries of AAC, Ambac Financial Services, LLC ("AFS") and Ambac Capital Funding, Inc. ("AFCI"). AFS engages in swap transactions with clients of AAC and the general marketplace while ACFI has a large book of guaranteed investment contract business. If the businesses of AFS and ACFI are destroyed by IRS enforcement actions, both AFS and ACFI (all of whose liabilities to third parties are insured by AAC) could generate significant additional liabilities for AAC and further reduce or eliminate AAC's residual value to AFG.

## IV.     TERM SHEET AND EXTENSION OF SEGREGATED ACCOUNT INJUNCTION

40.     In conjunction with the Segregated Account Rehabilitation Proceedings, the Rehabilitation Court issued an order enjoining certain actions by Segregated Account Policyholders and other Segregated Account counterparties, including the assertion of

damages or acceleration of losses based on early termination and the loss of control rights in insured transactions (the "Segregated Account Injunction").

41.     On November 8, 2010, OCI appeared before the Rehabilitation Court and informed it that negotiations regarding unresolved liabilities amongst the Debtor, an *ad hoc* committee of AFG's senior noteholders (the "Ad Hoc Committee") and OCI had recently culminated in a non-binding term sheet (the "Term Sheet").  The Term Sheet contains an agreement to allocate to the Segregated Account (a) any and all liabilities AAC has or may have, now or in future, to AFG or any successor to AFG in respect of (i) the tax sharing agreement, (ii) the Tax Refunds and (iii) any liabilities in respect of any preference or fraudulent conveyance claims pertaining to the AFG's tax liabilities (collectively, the "Allocated AFG Claims") and (b) any and all liabilities AAC has or may have, now or in future, to the IRS and/or the U.S. Treasury in respect of (i) taxes imposed under the Internal Revenue Code of 1986, as amended, for taxable periods ending on or prior to December 31, 2009, and (ii) the Tax Refunds (the "Tax Liabilities").  The Rehabilitator also sought and was granted an expansion of the Segregated Account Injunction (as expanded, the "State Court Injunction") to prevent the IRS from asserting liens against and levying upon the assets of AAC and its subsidiaries and to prevent AFG or AFG-related parties from pursuing the Allocated AFG Claims against the Segregated Account, the General Account or AAC's subsidiaries (collectively, "Enforcement Actions").

# I.

## FIRST CLAIM FOR RELIEF

### (FOR A DECLARATION, PURSUANT TO BANKRUPTCY CODE SECTION 505, THAT AFG HAS NO TAX LIABILITY FOR TAX YEARS 2003 THROUGH 2008)

42.     AFG repeats and realleges each and every allegation contained in the foregoing paragraphs of this Complaint with the same force and effect as though set forth herein.

43.     28 U.S.C. § 2201 provides:

> In a case of actual controversy within its jurisdiction, except with respect to Federal taxes other than … a proceeding under section 505 or 1146 of title 11…, any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought. Any such declaration shall have the force and effect of a final judgment or decree and shall be reviewable as such.

44.     Bankruptcy Code section 505(a) provides, in relevant part:

> (a)(1) Except as provided in paragraph (2) of this subsection, the court may determine the amount or legality of any tax, any fine or penalty relating to a tax, or any addition to tax, whether or not previously assessed, whether or not paid, and whether or not contested before and adjudicated by a judicial or administrative tribunal of competent jurisdiction.

45.     Pursuant to section 505(a)(1), a bankruptcy court has complete discretion to determine a debtor's liability for any tax and nondebtors' liability for such tax. The exceptions to a bankruptcy court's power and authority to determine a debtor's tax liability, enumerated in subsections 505(a)(2)(A)-(C) of the Bankruptcy Code, are inapplicable here. Thus, this Court has the power and authority to determine the amount and legality of the taxes underlying the prepetition Tax Refunds.

46.     This Court's exercise of authority to determine the Debtor's tax liability is warranted under the circumstances.

47.     Here, the Court should exercise its discretion to determine AFG's tax liability under Bankruptcy Code section 505. *First*, resolution of AFG's tax liability as the common parent of its consolidated group will significantly facilitate the administration of AFG's chapter 11 case. If the Court declines to determine AFG's tax liability, the IRS may assess the tax against AFG and the nondebtor subsidiaries in its consolidated tax group and can attach a lien against the assets of AAC, unraveling AFG's reorganization efforts. *Second*, the section 505 proceeding will not unduly burden the Court's docket or require an extraordinary amount of time to determine and render a decision. *Third*, this case is in no way akin to no-asset chapter 7 cases sometimes constituting cause to abstain from exercising section 505 authority. *Finally*, given the very real danger posed to AFG's reorganization prospects if this Court does not determine AFG's tax liability, and the likelihood that the IRS would attempt to deploy self-help in seizing assets of AFG's nondebtor subsidiaries, the prejudice to AFG is incontrovertible.

48.     This case presents the precise scenario section 505 was intended to address. By seeking injunctive relief at the outset of its chapter 11 case, the Debtor hopes to enable this Court to carry out section 505 whose statutory purpose would be frustrated if the IRS enforced rights before obtaining an adjudication that taxes are actually owed by AFG.

49.     Moreover, AFG is entitled to retain the full amount of the Tax Refunds.

50.     First, Post-2004 CDS Contracts are NPCs for federal income tax purposes.

51.     Treas. Reg.. § 1.446-3(c)(1)(i) defines an NPC as "a financial instrument that provides for the payment of amounts by one party to another at specified intervals calculated

by reference to a specified index upon a notional principal amount in exchange for specified consideration or a promise to pay similar amounts." NPCs do not include, however, certain excluded contracts, such as, "[a] contract described in [IRC] section 1256(b), a futures contract, a forward contract, and an option." Treas. Reg. §1.446-3(c)(1)(ii). A debt instrument also does not constitute an NPC. *Id.*

52. The Post-2004 CDS Contracts meet the definition of NPCs in Treas. Reg. § 1.446-3(c)(1)(i) because (i) they require the counterparty to make fixed payments at fixed payment dates; (ii) the payments are calculated by reference to a specified index; (iii) the specified index is multiplied by a notional amount; (iv) ACP is required to provide consideration; and (v) the contracts do not constitute excluded contracts.

53. A NPC must require one party to make fixed payments at fixed payment dates. Here, the Post-2004 CDS Contracts require the counterparty to make payments to ACP at specified intervals (which is a quarterly date).

54. The payments must be calculated by reference to a specified index. Treas. Reg. § 1.446-3(c)(2) define a specified index as, *inter alia*, "[a] fixed rate, price, or amount." Under the Post-2004 CDS Contracts, the counterparty pays a fixed amount based on (i) a single fixed rate that does not vary over the term of the contract; (ii) a notional amount of Reference Obligations; and (iii) a period of time. Thus, the fixed amount is calculated by reference to a "fixed rate, price, or amount" under the definition of a specified index.

55. The specified index must be calculated upon a notional amount. The Treasury Regulations define the term "notional principal amount" as "any specified amount of money or property that, when multiplied by a specified index, measures a party's rights and obligations under the contract, but is not borrowed or loaned between the parties as part of

the contract." Treas. Reg. § 1.446-3(c)(3). Moreover, "[t]he notional principal amount may vary over the term of the contract, provided that it is set in advance or varies based on objective financial information." *Id.* The regulations define "objective financial information" as "any current, objectively determinable financial or economic information that is not within the control of any of the parties to the contract and is not unique to one of the parties' circumstances (such as one party's dividends, profits, or the value of its stock)." Treas. Reg. § 1.446-3(c)(4)(ii).

56. Under the Post-2004 CDS Contracts, the notional amount is a specified amount of money or property that, when multiplied by the fixed rate and the time factor, measures the counterparty's fixed amount. Although the notional amount may vary over the term of a Post-2004 CDS Contract, it will vary based on objective financial information (i.e., the performance of the Reference Obligations) and this objective financial information is not within the control of ACP or the counterparty and is not unique to either party as neither party is an issuer of any of the Reference Obligations or related to an issuer. Moreover, ACP and the counterparty do not loan or borrow the notional amount from each other.

57. The second party to the contract must provide consideration. Here, the counterparty pays the fixed amounts to ACP in exchange for ACP's promise to make payments at specified credit events (or to exercise its right to purchase the Reference Obligation).

58. The contracts must not constitute excluded contracts. The Post-2004 CDS Contracts do not constitute IRC section 1256 contracts, futures contracts, forward contracts, options, or debt.

59.     Because the Post-2004 CDS Contracts meet the criteria in Treas. Reg. § 1.446-3, they are properly characterized as NPCs.

60.     Second, the Debtor's use of the impairment method was proper under the IRS Contingent Swap Rules.

61.     The Post-2004 CDS Contracts require ACP to make payments upon the occurrence of a credit event and require the counterparty to pay fixed amounts to ACP on fixed payment dates.

62.     The Treasury Regulations define a periodic payment as: "payments made or received pursuant to a notional principal contract that are payable at intervals of one year or less during the entire term of the contract…." Treas. Reg. § 1.446-3(e)(1).

63.     The Treasury Regulations define a nonperiodic payment as: "any payment made or received with respect to an NPC that is not a periodic payment (as defined in paragraph (e)(1) of this section) or a termination payment (as defined in paragraph (h) of this section)." Treas. Reg. § 1.446-3(f)(1). Treas. Reg. § 1.446-3(h) defines a termination payment as follows: "A payment made or received to extinguish or assign all or a proportionate part of the remaining rights and obligations of any party under a notional principal contract is a termination payment to the party making the termination payment and the party receiving the payment."

64.     The payments to be made by ACP upon the occurrence of a credit event under the Post-2004 CDS Contracts do not constitute periodic payments, because the payments are not made at intervals of one year or less during the entire term of such contracts (and may not be made at all), and ACP will become obligated to make such payments only if a credit event occurs on a Reference Obligation. Treas. Reg. § 1.446-3(e)(1). Because a payment by ACP

under the Post-2004 CDS Contracts would not extinguish or assign all or a proportionate part of a counterparty's remaining rights and obligations, the payments are not termination payments. Treas. Reg. § 1.446-3(h). Consequently, payments by ACP, if any, under the Post-2004 CDS contracts constitute nonperiodic payments. See Treas. Reg. § 1.446-3(f)(1).

65.     The Treasury Regulations do not distinguish between contingent and noncontingent nonperiodic payments. The IRS Contingent Swap Rules under the 2004 proposed Treasury Regulations define noncontingent nonperiodic payments as a "payment that either is fixed on or before the end of the taxable year in which a contract commences or is equal to the sum of amounts that would be periodic payments if they are paid when they become fixed (including amounts determined as interest accruals)" and contingent nonperiodic payments as "any nonperiodic payment other than a noncontingent nonperiodic payment." Prop. Treas. Reg. § 1.446-3(g)(6)(A), (B). No payment by ACP with respect to a Post-2004 CDS Contract became fixed on or before the end of the taxable year in which the related Post-2004 CDS Contract commenced, and no Post-2004 CDS Contract provides for payments by ACP that are equal to the sum of amounts that would have been periodic payments if they had been paid when they became fixed (including amounts determined as interest accruals). The payments therefore are contingent nonperiodic payments under the 2004 proposed Treasury Regulations.

66.     The Treasury Regulations do not address the timing or inclusion of contingent nonperiodic payments made under NPCs. The IRS Contingent Swap Rules under the 2004 proposed Treasury Regulations provide two methods of accounting for contingent nonperiodic payments under NPCs that Treasury believes are reasonable methods of

accounting for such payments: (i) the noncontingent swap method and (ii) the mark-to-market method.

67.     The Preamble to Proposed Treas. Reg. § 1.446-3 provides, inter alia, that: "With respect to NPCs that provide for contingent nonperiodic payments and that are in effect or entered into on or after 30 days after the date of publication of these proposed regulations in the Federal Register, if a taxpayer has not adopted a method of accounting for these NPCs, the taxpayer must adopt a method that takes contingent nonperiodic payments into account over the life of the contract under a reasonable amortization method, which may be, but need not be, a method that satisfies the specific rules in these proposed regulations.  If a taxpayer has adopted a method of accounting for these NPCs, the Commissioner generally will not require a change in the accounting method earlier than the first year ending on or after 30 days after the date of publication of the final regulations in the Federal Register."  69 Fed. Reg. 8886-01, 2004-1 C.B. 655 (emphasis added).

68.     AAC uses the quarterly changes in the net impairment value of its Post-2004 CDS Contracts as determined under the statutory accounting rules to account for the contingent nonperiodic payments under these contracts (the "Impairment Method").  Under the Impairment Method, AAC accounts for the contingent nonperiodic payments under the Post-2004 CDS Contracts by recording adjustments to the net impairment value of a contract on a quarterly basis.  The Impairment Method reasonably estimates and permits the accrual of contingent nonperiodic payments that AAC expects to make over the life of a Post-2004 CDS Contract.  The estimation is based on objective economic information that reflects the economic substance of AAC's contingent obligation to make payments in specific credit events under these contracts.

69.     The Impairment Method is similar to the mark-to-market method, which the IRS Contingent Swap Rules under the 2004 proposed Treasury Regulations deem to be a reasonable method.  The preamble and the proposed regulation generally appear to rely on four factors in assessing whether the mark-to-market method is a reasonable method of accounting for contingent nonperiodic payments, specifically, whether the method: (i) measures changes in "value;" (ii) is based on the expected value of the future nonperiodic payment; (iii) is based on reliable data; and (iv) is applied consistently.

70.     The mark-to-market method requires the taxpayer to take periodic changes in the "value" of the taxpayer's position in an NPC into account.  Here, AAC will realize for tax purposes the periodic changes in the impairment value of a Post-2004 CDS Contract.  AAC will calculate the impairment under the rules that it applies for statutory accounting purposes, recording changes in the present value of the future payments due under and to be made under the Post-2004 CDS Contracts.  The impairment method is therefore similar to the mark-to-market method in that both methods measure changes in value on a periodic basis.

71.     The mark-to-market method is considered a reasonable method for amortizing the future nonperiodic payment because it factors in the expected value of the future nonperiodic payment.  The impairment method does so as well, reflecting management's determination of the present value of the expected future payments on the Post-2004 CDS Contracts.

72.     The impairment method and the mark-to-market method both use an objective and reliable standard to determine changes in the fair market value of an NPC.  The mark-to-market method generally permits the use of reliable financial statements to determine value.  See Prop. Treas. Reg. § 1.446-3(i)(3)(ii).  Similarly, under the impairment method, AAC's

statutory financial statements provide an objective and reliable standard of determining changes in the fair market value of an NPC.

73.     The proposed regulation requires a taxpayer to apply the mark-to-market method to all NPC positions that a taxpayer holds and to which the method could apply. AAC has applied the Impairment Method to all of its Post-2004 CDS Contracts.  As a result, this aspect of AAC's accounting method is similar to the mark-to-market method approved in the 2004 proposed regulation.

74.     Third, the Debtor's adoption of the impairment method of accounting for losses on the Post-2004 CDS Contracts was not a change in accounting method requiring IRS approval.

75.     Once a taxpayer has adopted a method of accounting for an item, the taxpayer may not change such method of accounting without IRS permission.  Treas. Reg. § 1.446-1(e)(2)(i).   Similarly, a taxpayer may not retroactively change an adopted method of accounting by filing amended income tax returns.

76.     A change in method of accounting occurs when taxable income for a particular year is computed using a different accounting method than in the preceding tax year.  The term "method of accounting" is not specifically defined in the Internal Revenue Code or Treasury Regulations but generally is defined in Treas. Reg. § 1.446-1(e)(2)(ii)(a) of the regulation as any practice involving the treatment of the overall plan of accounting for items—such as the cash or accrual method—or the treatment of any specific material item of income or expense within such an overall plan.  The term thus applies to a taxpayer's overall accounting method and accounting for specific items.  Regulations, IRS rulings, and court cases generally conclude that for the treatment of an item to be deemed a method of

accounting, the method (1) must affect the computation of a material item; (2) must be consistently applied and predicable in its application; and (3) must be "adopted" by the taxpayer. The Treasury Regulations defining what constitutes a change in accounting method provide, inter alia, that: "[A] change in method of accounting does not include adjustment of any item of income or deduction that does not involve the proper time for the inclusion of the item of income or the taking of a deduction." Treas. Reg. § 1.446-1(e)(2)(ii)(b). Thus, a change in the character of an item of income or expense alone, without any accompanying change in the timing of the realization or deduction of the item, does not constitute a change in a method of accounting.

77. The Debtor did not change its accounting method with respect to payments that ACP may be required to make under the Post-2004 CDS Contracts by adopting the impairment accounting method pursuant to the IRS Contingent Swap Rules. First, the Debtor was free to adopt an accounting method for the Post-2004 CDS Contracts different from the method adopted for the Pre-2005 CDS Contracts given their disparate terms. Second, given the Debtor had never recognized losses on the Post-2004 CDS Contracts prior to its adoption of the impairment method, and given losses are items separate from items of income under the Post-2004 CDS Contracts, the Debtor simply had never adopted an accounting method for losses under the Post-2004 CDS Contracts prior to its adoption of the impairment method. Accordingly, the Debtor never established an accounting method for losses on the Post-2004 CDS Contracts, the application of the impairment method was not an accounting method change. Further, although the application of the IRS Contingent Swap Rules changed the character of losses on these contracts from capital to ordinary, a change in character does not constitute an accounting method change.

78.     A case of actual controversy exists as to whether AFG has federal income tax liability for tax years 2003 through 2008. Accordingly, the Debtor is entitled to a declaration, pursuant to Bankruptcy Code section 505, that it has no tax liability for tax years 2003 through 2008 and that it is entitled to retain the full amount of the Tax Refunds.

## II.

## SECOND CLAIM FOR RELIEF

### (FOR INJUNCTIVE RELIEF PURSUANT TO BANKRUPTCY CODE SECTIONS 105(a) AND 362(a))

79.     AFG repeats and realleges each and every allegation contained in the foregoing paragraphs of this Complaint with the same force and effect as though set forth herein.

80.     In the bankruptcy context, preliminary injunctions are issued pursuant to (i) section 105(a) of the Bankruptcy Code, pursuant to which Bankruptcy Courts are empowered to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title," either independently, to protect a debtor's ability to reorganize, or together with other provisions of the Bankruptcy Code, such as section 362(a), to extend the automatic stay, and (ii) Bankruptcy Rule 7065, pursuant to which the Court may grant a preliminary injunction on application of a debtor in possession without the debtor in possession having to comply with the requirement set forth in Rule 65(c) of the Federal Rules of Civil Procedure to post security as a condition to the Court's grant of such relief.

81.     AFG is actively pursuing efforts to reorganize and can effectuate a successful reorganization.

82. The pursuit of the Tax Refunds by the IRS against AAC is likely to cause considerable harm to AFG's operations, destroying or jeopardizing its chances of successful reorganization.

83. Any harm suffered by the United States is vastly outweighed by the harm suffered by the Debtor in the absence of an injunction. To the extent the United States has a valid entitlement to the Tax Refunds, it can be dealt with in the course of AFG's chapter 11 case. In contrast, if the IRS is allowed to make assessments and pursue liens against the Debtor's operating subsidiaries (e.g., AAC), it could cripple the Debtor's operations and jeopardize any meaningful chance it has of a successful reorganization. Moreover, allowing such assessments could place the Debtor and its subsidiaries, as a consolidated tax sharing group, in the position of facing multiple fronts of IRS challenge and potentially inconsistent outcomes. Among other things, by virtue of their status as members of a consolidated group, efforts to assess and collect against AAC would amount to an indirect assessment of, and collection against, the Debtor outside the controls and orderly procedure of the bankruptcy process. Thus, any harm suffered by the Defendants from injunctive relief is vastly outweighed by the harm to the Debtor.

84. It is in the public's interest to preserve the chances of reorganization of a billion dollar enterprise, saving jobs of thousands of individuals employed by the Debtor and maximizing the potential recovery of all of the Debtor's creditors.

85. Accordingly, the Debtor is entitled to a temporary restraining order and preliminary injunction, pursuant to Bankruptcy Code section 105(a) and Bankruptcy Rule 7065, ordering the IRS to provide five business days' prior written notice (filed with the Court and contemporaneously served by electronic mail on Debtor's counsel) before taking

any Enforcement Action contrary to the State Court Injunction, whether or not such injunction remains in effect.

**WHEREFORE** AFG demands judgment as follows:

(1)     On the First Claim for relief, a declaration, pursuant to Bankruptcy Code section 505, that AFG and the members of the consolidated group have no tax liability for tax years 2003 through 2008 and they are entitled to retain the full amount of the Tax Refunds;

(2)     On the Second Claim for relief, a temporary restraining order and preliminary injunction, pursuant to Bankruptcy Code sections 105(a) and 362(a) and Bankruptcy Rule 7065, ordering the IRS to provide five business days' prior written notice (filed with the Court and served contemporaneously by electronic mail on Debtor's counsel) before taking any Enforcement Action contrary to the State Court Injunction, whether or not such injunction remains in effect; and

(3)     Such other relief for the Debtor's estate as is just.

Dated: November 9, 2010

/s/ Peter A. Ivanick

Peter A. Ivanick, Esq.
Martin J. Bienenstock, Esq.
Lawrence M. Hill, Esq.
DEWEY & LEBOEUF LLP
1301 Avenue of the Americas
New York, New York 10019
Tel: (212) 259-8000
Fax: (212) 259-6333

*Proposed Attorneys for the Debtor and Debtor in Possession*