Stephen J. Fearon, Jr.
Caitlin Duffy
Garry T. Stevens, Jr.
SQUITIERI & FEARON, LLP
32 E 57th St., 12th Floor
New York, New York 10022
Tel:     (212) 421-6492
Fax:     (212) 421-6553

*Attorneys for Karthikeyan V. Veera*

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| *In re* | Chapter 11 |
| AMBAC FINANCIAL GROUP, INC., | Case No.: 10-15973 (SCC) |
| Debtor. | |
| KARTHIKEYAN V. VEERA, | |
| Plaintiff, | District Court Case No.: 1:10-CV-4191 (HB) (S.D.N.Y.) |
| v. | |
| AMBAC PLAN ADMINISTRATIVE COMMITTEE, *et al*., | |
| Defendants. | |

**DECLARATION OF STEPHEN J. FEARON, JR. IN FURTHER**
**SUPPORT OF KARTHIKEYAN V. VEERA'S MOTION**

I, Stephen J. Fearon, Jr., being duly sworn, depose and say:

1.       I am a member of Squitieri & Fearon, LLP, which is counsel for Karthikeyan V.

Veera ("Veera") – Plaintiff in the above-captioned District Court action pending in the Southern

District of New York ("Class Action").  I am licensed to practice law in the State of New York

and have been admitted to practice in the Southern District of New York  and other courts.

2. I submit this Declaration in further support of Mr. Veera's Motion [Docket 107] and in conjunction with Mr. Veera's Reply to Debtor's Objection .

3. Attached as Exhibit A is a true and correct copy of an email sent by counsel to the Non-debtor Defendants' in *Veera v. Ambac Plan Administrative Committee et al.*, No. 10-CV-4191, to counsel for Mr. Veera on November 17, 2010.

4. Attached as Exhibit B is an amended draft rider to a subpoena, substantially similar in form and substance to the subpoena Mr. Veera wishes to serve on Ambac with leave from this Court.

5. Attached as Exhibit C is a copy of the amended draft rider [Exhibit B] with notations detailing all changes made to the rider previously submitted to this Court on January 5, 2011 as Exhibit D to Stephen Fearon's Declaration in Support of Mr. Veera's Motion.

6. Attached as Exhibit D is a true and correct copy of the Stipulation Regarding Protocol for Production of Documents and Electronically Stored Information, endorsed by Judge Baer on August 9, 2010.

I declare under penalty of perjury under the laws of the State of New York that the foregoing is true and correct.

Executed this 18th day of January, 2011 at New York, New York.


/s/ Stephen J. Fearon, Jr.
STEPHEN J. FEARON, JR.

Exhibit A

| | |
|---|---|
| **From:** | Kohen, Jamie M. [jkohen@morganlewis.com] |
| **Sent:** | Wednesday, November 17, 2010 11:16 AM |
| **To:** | 'Stephen J Fearon, Jr.'; Garry Stevens; 'Caitlin Duffy' |
| **Cc:** | Braden, Gregory C.; Weals, Christopher Alan |
| **Subject:** | Veera v. Ambac- bankruptcy stay |

Stephen and Garry,

I am writing to follow up on our call Monday concerning the implications of Ambac's bankruptcy on our ERISA case.

As we discussed, Defendants believe that the automatic stay that bankruptcy imposes applies to halt most if not all of the discovery in this litigation. However, we can continue to gather those documents not in the possession or control of Ambac and where it would not create a disruption for Ambac or its employees while in this bankruptcy process. Please let us know if you have further considered your position on a stay of discovery, as we will be filing a Notice with the Court this week.

Additionally, please let us know Plaintiff's position on the notion that regardless of whether discovery is stayed, the Court should resolve the pending Motion to Dismiss. Of course, the Court's resolution of that Motion may moot both the question of how the stay applies to our discovery and the need for discovery in the first instance.

Thanks,
Jamie

**Jamie M. Kohen**
Morgan, Lewis & Bockius LLP
101 Park Avenue | New York, NY 10178-0600
Direct: 212.309.6343 | Main: 212.309.6000 | Fax: 212.309.6001
jkohen@morganlewis.com | www.morganlewis.com
Assistant: Christopher L. Mathias | 212.309.6061 | cmathias@morganlewis.com

DISCLAIMER
This e-mail message is intended only for the personal use
of the recipient(s) named above. This message may be an
attorney-client communication and as such privileged and
confidential and/or it may include attorney work product.
If you are not an intended recipient, you may not review,
copy or distribute this message. If you have received this
communication in error, please notify us immediately by
e-mail and delete the original message.

Exhibit B

# EXHIBIT D

## (Proposed Rider To Subpoena To Ambac)

### I. DEFINITIONS

In the event of any conflict or ambiguity between the definitions listed below, common usage and reference to any cited rules, statutes, or regulations should be used to provide the broadest interpretation of the term in question.

1. "Active File" means any electronic data file that can be used by an electronic data processing system in any manner without modification or reconstruction. An active file is any electronic data file that has not been deleted or otherwise destroyed and/or damaged and which is readily visible to the operating system and/or the software with which it was created.

2. The term "Administrative Committee" means the Ambac Financial Group, Inc. Savings Incentive Plan Administrative Committee and its members or representatives.

3. The terms "Ambac," the "Company," and "You" mean Ambac Financial Group, Inc., its predecessors, successors, parents, subsidiaries (including Ambac Assurance Corporation), divisions, affiliates, or anyone acting or purporting to act on their behalf, including any of their respective directors, officers, managing agents, agents, employees, attorneys, accountants, or other representatives.

4. "And" as well as "or" shall be construed either disjunctively or conjunctively, as necessary, to bring within the scope of the specifications all responses that might otherwise be construed to be outside the scope. "All," such as in "all documents" means each and every. "Each" shall be construed to include the word "any." "Any" shall be construed to include the word "Each." "Any" and "Each" shall be understood to include "all." "Including" shall be construed to include the phrase "without limitation."

5.  "Beneficiary" or "beneficiaries" is defined to be synonymous ins meaning and equal in scope to the usage of this term in ERISA, specifically, ERISA section 3(8), 20 U.S.C. § 1002(8).

6.  The terms "Board of Directors" or "Board" mean the Ambac Board of Directors.

7.  The term "Communications" refers to any oral, written or electronic utterance, notation, or statement of any nature whatsoever, draft or final, potential or actual, by and to whomever made or attempted to be made, including, but not limited to, correspondence, memoranda, conversations, dialogues, discussions, interviews, consultations, agreements, electronic messages (including email, text messages, instant messages, and Company intranet, electronic bulletin board or Internet site posting) and other understandings between two or more Persons. The term "communications" specifically includes, but is not limited to, any exchange of information by an means of transmission, including, but not limited to, face-to-face conversations, mail, email, telegram, overnight delivery, telephone, facsimile or telex.

8.  The term "Compensation Committee" means the Ambac Compensation Committee and its members or representatives.

9.  "Computer" means, but is not limited to, personal computers, laptop computers, portable computers, notebook computers, hand-held computers, mini-computers, smartphones and mainframe computers.

10.  The term "concerning" means relating to, referring to, describing, evidencing, or constituting. Requests for documents "concerning" any subject matter include documents concerning communications regarding that subject matter.

11.  "Configuration," when used in reference to any computer, includes, but is not limited to, the following information: (a) computer type, brand, model and serial number; (b)

brand and version of all software, including operating system, private and custom developed applications, commercial applications, shareware. or work-in-progress; and (c) communications capability, including a synchronous and/or synchronous, and including, but not limited to, terminal to mainframe emulation, data download or upload capability to mainframe, and computer to computer connections via network, modem, or direct connect.

12. "Data" is equivalent to the term "electronic data" as defined herein.

13. The term "Defendants" means each Defendant named in this action, as set forth in pages 8-19 of the Amended Class Action Complaint filed September 7, 2010 and their officers, directors, agents, employees, member, representatives and attorneys.

14. "Deleted file" means any electronic data file that has been deleted or deleted from the electronic media on which it resided, including but not limited to, any file whose File Allocation Table (FAT) entry has been modified to indicate the file as being deleted and/or which is riot readily visible to the operating system and/or the software with which it was produced.

15. The term "Documents" means documents whether fixed in tangible medium or electronically stored on disk or tape. The word "documents" shall include, by way of example and not by way of limitation, all of the following: papers, correspondence, trade letters, envelopes, memoranda, telegrams, cables, notes, messages, electronic-mails ("e-mails"), text messages, instant electronic messages, reports, studies, press releases, comparison, books, accounts, checks, audio and video recordings, pleadings, testimony, articles, bulletins, pamphlets, brochures, magazines, questionnaires, surveys, charts, newspapers, calendars, desk calendars, pocket calendars, lists, logs, publications, notices, diagrams, instructions, diaries, minutes of meetings, corporate minutes, orders, resolutions, agendas, memorials or notes of oral

communications, whether by telephone or face-to-face, contracts, agreements, drafts of or proposed contracts or agreements, memoranda of understanding, letters of intent, deal memoranda, transcriptions of audio or video recordings, computer tapes, computer diskettes or disks, or any other tangible thing on which any handwriting, typing, printing, photostatic, electronic or other form of communication or information is recorded or reproduced, together with all notations on any of the foregoing, all originals, file copies or other unique copies of the foregoing and all versions of drafts thereof, whether used or not.

16. "Electronic Data" means the original (or identical duplicate when the original is not available) and any non-identical copies (whether non-identical because of notes made on copies or attached comments, annotations, marks, transmission notations, or highlighting of any kind) of writings of every kind and description whether inscribed by mechanical, facsimile, electronic, magnetic, digital, or other means. Electronic data includes, by way of example only, computer programs (whether private, commercial or work-in-progress), programming notes or instructions, activity listings of electronic mail receipts or transmittals, output resulting from the use of any software program, including word processing documents, spreadsheets, database files, charts, graphs and outlines, electronic mail, instant messaging, operating systems, source code of all types, peripheral drivers, batch tiles, ASCII files, and any and all miscellaneous files or file fragments, regardless of the media on which they reside and regardless of whether such electronic data consists in an active file, deleted file, or file fragment. Electronic data includes any and all items stored on computer memories, hard disks, floppy disks, CD-ROMs, DVDs, removable media such as Zip disks, Snap servers, Jaz cartridges, and their equivalent, magnetic tapes of all types, microfiche, punched cards, punched tape, computer chips, on or in any other vehicle for digital data storage or transmittal. The term electronic data also includes the file,

folder tabs or containers and labels appended to, or associated with, any physical storage device associated with each original or copy thereof.

17. "Electronic Media" means any magnetic or other storage media device used to record electronic data. Electronic media devices may include, but are not limited to, computer memories, hard disks, floppy disks, Snap servers, DVDs, CD-ROM, and removable media and their equivalent, magnetic tapes of all types, microfiche, punched cards, punched tape, computer chips, or on or in any other vehicle for digital data storage or transmittal.

18. The term "Employee" means, without limitation, current and former officers, directors, executives, managers, supervisors, department heads, sales personnel, secretaries, clerical staff, messengers, agents, attorneys, representatives, or any person acting or authorized to act on behalf of Vanguard.

19. "ERISA" means the Employment Retirement Income Security Act of 1974, as amended, 29 U.S.C. §1001 *et seq.*

20. The term "Fiduciary" refers to any person who exercises, or has authority to exercise, discretion over the administration of the Plan, the Plan's assets, or Plan's investments, who selects, appoints, evaluates, reviews and/or oversees such a person, or who gives investment advice for a fee or other compensation.

21. "File Fragment" means any electronic data file that exists as a subset of an original active file. A file fragment may be active or deleted. The cause of fragmentation can include, but is not limited to, the execution of ordinary file management routines such as the creation of new files over parts of previously deleted files, the creation of files on disks which do not have enough contiguous blocks to write the file from beginning to end, where the file has

been split up between several sections of the disk (each piece a fragment). Other causes include manual intervention, electronic surges, or physical defects on electronic media.

22.     The term "Fund" means the Ambac Financial Group, Inc. Stock Fund.

23.     "Identify" when used with respect to persons means to give, to the extent known, the person's full name, present or last known address, and when referring to a natural person, additionally, the present or last known place of employment. Once a person has been identified in accordance with this subparagraph, only the name of that person need be listed in response to subsequent discovery requesting the identification of that person.

24.     "Identify" when used with respect to documents means to give, to the extent known, the (i) type of document; (ii) general subject matter; (iii) date of the document; and (iv) author(s), addressee(s) and recipient(s).

25.     "Identify" when used in reference to any electronic data, means to state the software or operating system under which the data was created, title and author, the type of data (example: word processing document, spreadsheet, database, application program, etc.), and all other means of identifying that document or information with sufficient particularity to meet the requirements of the Federal Rules of Civil Procedure, and its present or last known location or custodian. If any such electronic data was, or no longer is, in the possession or subject to your control, state what disposition was made of it and the reason for such disposition.

26.     The term "Individual Defendants" means each individual defendant named in this action, including: Thomas J. Gandolfo, William McKinnon, Sean T. Leonard, Douglas C. Renfield-Miller, Gregg L. Bienstock, Diana Adams, Robert Eisman, Timothy Stevens, Anne Gill Kelly, Thomas C. Theobald, Henry D.G. Wallace, Jill M. Considine, Laura S. Unger, and Philip N. Duff.

27.     The term "Investment Committee" means the Plan Investment Committee and its members or representatives.

28.     "KPMG" means KPMG, LLP, its predecessors, successors, parents, subsidiaries, divisions, affiliates, or anyone acting or purporting to act on its behalf, including any of its respective directors, officers, managing agents, agents, employees, attorneys, accountants, or other representatives.

29.     The term "Meeting" means, without limitation, any assembly, convocation, encounter or contemporaneous presence of two or more persons for any purpose, whether planned, arranged, scheduled or not.

30.     "Native format" means the default format of a data file created by its associated software program. For example. Microsoft Excel produces its output as '.xls' files by default, which is the native format of Excel. Microsoft word produces native files with a '.doc' extension, which is the native format of Word.

31.     "Network" means any hardware or software combination that connects two or more computers together and which allows the computers to share or transfer data between them. For the purposes of this definition, the connection between or among the microcomputers need not be either physical or direct (*i.e.*, wireless networks, and sharing or transferring data via indirect routes utilizing modems and phone company facilities). In addition, there need not be a central file or data server nor a central network operating system in place (*i.e.*, peer-to-peer networks and networks utilizing a mainframe host to facilitate data transfer).

32.     The term "Participant" refers to any employee or former employee of Ambac who is or may become entitled to receive a benefit of any time from the Plan, as well as any person

designated by a participant, or by the terms of the Plan, who is or may become entitled to a benefit under the Plan.

33.    The term "Person" means any individual, corporation, partnership, firm, association, government agency or other organization recognizable at law, and its agents and employees.

34.    The term "Plan" means the Ambac Financial Group, Inc. Savings Incentive Plan.

35.    The term "Plan Trustee" or "Trustee" or "Vanguard" refer collectively to Vanguard Fiduciary Trust Company and any other person or entity acting as a trustee on behalf of the Plan, and their predecessors, successors, parents, subsidiaries, divisions, affiliates, or anyone acting or purporting to act on their behalf, including any of their respective directors, officers, managing agents, agents, employees, attorneys, accountants or representatives.

36.    "Policy" means any rule, procedure, practice, or course of conduct, whether formal or informal, written or unwritten, recorded or unrecorded, which was recognized or followed, explicitly or implicitly, by you.

37.    "Produced" with respect to any document, shall include authored, dictated, edited, reviewed; or approved, in whole or in part.

38.    "Rotation" means any plan, policy or scheme that involves the re-use of an electronic media device after it has been used for backup, archival or other electronic data storage purposes, particularly if such re-use results in the alteration and/or destruction of the electronic data residing on the device prior to it being re-used.

39.    "Securities Class Action" means In Re Ambac Financial Group, Inc. Securities Litigation, 08-Civ. 411 (NRB) (S.D.N.Y.).

40.    "Support" means any help or assistance provided to a user of a computer by another individual, whether or not in an official job capacity. Such help or assistance may take the form of, but is not limited to, answering questions, in person or via mechanical means, direct intervention, training, software troubleshooting, hardware troubleshooting, programming, systems consulting, maintenance, repair, or user forums. Providers of support may be employees, contractors, or other third-party providers.

41.    "Telephone records" includes, without limitation, diaries, telephone directories, Rolodexes (electronic or paper), address books, telephone logs, recordings of telephone conversations, and telephone hills (both local and long distance). To the extent that you use Internet telephony in any manner, this definition applies to that type of telephone usage as well.

## II.    INSTRUCTIONS

1.    In responding to these requests, you shall produce all responsive documents that that are in your possession, custody, or control, or the possession, custody, or control of your predecessors, successors, parents, subsidiaries, divisions, or affiliates, or any of their respective officers, managing agents, employees, attorneys, accountants, or other representatives. A document shall be deemed to be within your control if you have the right to secure the document or a copy of the document from another person having possession or custody of the document.

2.    Unless otherwise indicated, the relevant time period ("Relevant Time Period") for each request shall be October 1, 2006 through September 7, 2010. All requests herein refer to the Relevant Period and shall include all documents and information that relate to or were in effect during that period, even though prepared, generated, received, or published outside of that period.

3.     You shall produce copies of electronically stored information ("ESI") responsive to the categories of subpoenaed documents, as they are kept in the usual course of business, including all non-identical copies. Pursuant to Rule 45(a)(1), Plaintiff requests that you produce ESI in the format outlined in Exhibit B, and according to the ESI Guidelines provided.

4.     All documents shall be produced in the order they are kept in the ordinary course of business (including original folders, binders, covers or containers) or shall be organized and labeled to correspond with the categories in these requests.

5.     You shall produce the original of each document described below or, where the original of a document is unavailable, a copy identical to the original shall be produced. A draft or non-identical copy of a document is a separate document as the term is used herein. All attachments and appended or embedded links or files should be produced if any of them is responsive to any of the categories of subpoenaed documents, and attachments should be produced in the format outlined in Exhibit B.

6.     You shall Bates stamp the documents.

7.     If a document exists in electronic or recorded form (whether digital or analog), including tapes or other recordings of conversations involving you or any of your agents or representatives on any subject included within the scope of this Subpoena, you shall produce the document in the format outlined in Exhibit B and according to the ESI guidelines provided. If a document exists in electronic or recorded form as well as other forms (including printouts of electronic data and transcripts of recordings), you shall produce the document in all forms.

8.     Without in any way limiting the definition of "document" contained in the Federal Rules of Civil Procedure or herein, You are specifically instructed to search all document management systems, computer archives, and/or backup tapes or discs for documents responsive

to the following requests, and production of such documents should be made regardless of whether such documents exist in tangible or "hard" copy form. Production is also sought regardless of whether the user purported to "delete" the document, of such document is capable of being retrieved from archives and/or backup tapes or disks.

9.      If the responsive documents are stored electronically or in a computer, please identify the location of each document, the computer program by which the document was created, the computer software program (if any) that compresses the document, and the configuration of the computer on which the document is found.

10.     Whenever a document is not produced in full or is produced in redacted form, so indicate on the document and state with particularity the reason or reasons it is not being produced in full and describe to the best of your knowledge, information and belief, and with as much particularity as possible, those portions of the document which are not being produced.

11.     If any responsive document was at any time, but is no longer, in your possession or subject to your control:

(a)     State whether the document is missing or lost;

(b)     State whether the document has been destroyed;

(c)     State whether the document has been transferred voluntarily or involuntarily to others and, if so at whose request;

(d)     State whether the document has been otherwise disposed of;

(e)     Provide a precise statement of the circumstances surrounding the disposition of the document and the date of its disposition; and

(f)     Identify the name and address of its current or last known custodian and the circumstances surrounding such disposition.

12.    If production of a document is withheld pursuant to a claim of privilege, as to each such withheld document, state the following information:

    (a)    Which privilege is claimed;

    (b)    A precise statement of the facts upon which said claim of privilege is based; and

    (c)    The following information describing each purportedly privileged document:

        (i)    Its nature, *e.g.*, agreement, letter, memorandum, etc.;

        (ii)    The date it was prepared;

        (iii)    The date it bears;

        (iv)    The date it was sent;

        (v)    The date it was received;

        (vi)    The identity of the person preparing it;

        (vii)    The identity of the person sending it;

        (viii)    The identity of each person to whom it was sent or was to have been sent, including all addressees and all recipients of copies; and

        (ix)    A statement as to whom each identified person represented or purported to represent at all relevant times.

    (d)    A precise description of the place where each copy of that document is kept, including the title or description of the file in which said document may be found and the location of such file.

13.     If a portion of any document responsive to this subpoena is withheld under a claim of privilege pursuant to the preceding instruction, any non-privileged portion of such document must be produced with the portion claimed to be privileged redacted.

14.     If a document is responsive to these requests was at any time in your possession, custody or control but now is no longer available for production, as to each such document state the following information:

      (a)     Whether the document is missing or lost;

      (b)     Whether it has been destroyed;

      (c)     Whether the document has been transferred or delivered to another person or entity and, if so, at whose request;

      (d)     Whether the document has been otherwise disposed of;

      (e)     A precise statement of the circumstances surrounding the disposition of the document and the date of the document's disposition; and

      (f)     The name and address of its current or last known custodian.

15.     If any documents or parts of documents called for by this subpoena have been destroyed, discarded, or otherwise disposed of, you should provide a list setting forth as to each such document the following information:

      (a)     The nature of the document, *e.g.*, letter, memorandum, telegram, etc.;

      (b)     The name, address, occupation, title, and business affiliation of each person who prepared, received, viewed, and has or has had possession, custody or control of the document;

      (c)     The date of the document;

      (d)     A description of the subject matter of the document;

(e)     The date of destruction or other disposition;

(f)     A statement of the reasons for destruction or other disposition;

(g)     The name, address, occupation, title, and business affiliation of each person who authorized destruction or other disposition;

(h)     The name, address, occupation, title, and business affiliation of each person who destroyed or disposed of the document; and

(i)     The category or categories to which the document is responsive.

16.     You are to produce each document responsive to this subpoena herein in its entirety, without deletion or excision (except as qualified by instructions 12 through 14), regardless of whether you consider the entire document to be relevant or responsive to this subpoena.

17.     Each of the following categories of subpoenaed documents should be understood to include documents authored by or exchanged with attorneys concerning the management or administration of the Plan, including the management, disposition, or calculation of the assets of the Plan, the benefits accrued for participants in the Plan, the investment of assets of the Plan, or communications with Plan participants and beneficiaries regarding the Plan or their benefits under the Plan, regardless of whether such documents would be privileged if requested by other persons other than participants in or beneficiaries of the Plan.

18.     Unless words or terms have been given a specific definition herein, each word or term used herein shall be given its usual and customary dictionary definition, except where such words have a specific custom and usage definition in your trade or industry, in which case they shall be interpreted in accordance with such usual custom and usage definition of which you are aware. In construing the inquiry and request herein: (a) the singular shall include the plural and

the plural shall include the singular; (b) a masculine, feminine, or neuter pronoun shall not exclude the other genders; (c) the terms "any" and "all" shall be understood to mean "and" and "all;" and (d) the words "and" and "or" shall be read in the conjunctive or disjunctive or both, as the case may be, and to the end that the interpretation applied results in the more expansive production.

19.    The use of a verb in any tense shall be construed as the use of the verb in all other tenses whenever necessary to bring into the scope of the specification all responses that might otherwise be construed to be outside the scope.

20.    Plaintiff's discovery requests are continuing in nature and must be supplemented in accordance with the Federal Rules of Civil Procedure.

**III.**

**<u>DOCUMENTS TO BE PRODUCED</u>**

1.    All documents produced by Ambac to the plaintiffs in the Securities Class Action.

2.    All oral testimony given in the Securities Class Action.

3.    Any oral testimony given in connection with the Wisconsin Rehabilitation Action before the hearing that began on November 15, 2010. Plaintiffs are only seeking testimony that was given before that date in connection with the Wisconsin Rehabilitation Action.

4.    The report of the appraiser referred to on page 21 of Ambac's brief in the Court of Appeals of Wisconsin in the Wisconsin Rehabilitation Action opposing RMBS Investors' renewed emergency motion seeking an injunction pending appeal dated June 1, 2010.

5.    Any subpoenas or request to testify or produce documents served upon Ambac by the United States Securities and Exchange Commission (SEC), the Department of Labor (the "DOL"), the Wisconsin OCI, the Office of Thrift Supervision, the Office of the Secretary of the

Commonwealth of Massachusetts, the Office of the Attorney General of the State of Connecticut, the Financial Crisis Inquiry Commission or any other governmental agency.

6. All documents produced by Ambac to any governmental agency (including the SEC, the DOL, the Office of Thrift Supervision, Wisconsin OCI, or the Financial Crisis Inquiry Commission) concerning Ambac's or Ambac Assurance's financial condition. Plaintiffs are not seeking a copy of any SEC periodic filings by Ambac such as Forms 10-Q, 10-K, or 8-K. Instead Plaintiffs are seeking a copy of the documents that Ambac produced to the government in connection with any investigation or inquiry into Ambac's financial condition or its ability to satisfy claims against it.

7. All communications by any Defendant concerning the Wisconsin OCI investigation of Ambac.

8. All communications between William McKinnon and any Individual Defendant.

9. All communications between Gregg Bienstock and any Individual Defendant.

10. All communications between Gregg Bienstock and Thomas Gandolfo.

11. All e-mail communications between Defendant Bienstock and: David Fourie, Cory Jones, Hyun Seung Kim, or Nadia Matthie (all of KPMG).

12. All e-mail communications between any Individual Defendant and any of the following Vanguard personnel: Sheryl Barbaro, Michelle Bolig, Andrea Heffner, George Herz, Jeffrey Johnson, Martin Kleppe, Cynthia Mangialardi, Robert Maine, Ruth Muthoga, Richard Phelan, Sherryann Plesse, Richard Powers, Brenda Russell, Brian Simpson, John Stapf, or Sheryl Sterling.

13. Ambac's human resources or personnel file concerning each Individual Defendant.

14. All documents concerning any loans taken by any Individual Defendant from the Plan or from the Company during the Relevant Time Period.

15. An example of each types of financial report that was available to any Defendant during the Relevant Time Period to allow that Defendant to monitor Ambac's financial condition, including its exposure to liability on its financial obligations on Residential Mortgage-Backed Securities ("RMBS") or other Collateralized Debt Obligations ("CDOs").

16. All documents concerning meetings of the Ambac Board or the Ambac Assurance Board during the Relevant Time Period together with the minutes and notes of those meetings and documents that were discussed or reviewed at those meetings.

17. Documents identifying the compensation (including fees, payments, and bonuses) to which any Individual Defendants was entitled or could have received, based upon the trading price of Ambac common stock or Ambac's financial performance.

18. Organizational charts and documents sufficient to describe the Company's and Ambac Assurance's organizational structure and management hierarchy.

19. All diaries, appointment books, and desk and pocket calendars, created or maintained by or on behalf of any Individual Defendant, whether computerized or hard copy.

20. Communications by or to any Defendant concerning the resignation or termination of Defendant Sean T. Leonard as Vice President and CFO of the Company.

21. All documents concerning the resignation, termination, removal from office or change in job title of any director or officer of the Company.

22. All documents concerning any communication between any Individual Defendant and any credit reporting agency (*e.g.,* Standard & Poor's or Moody's) concerning a possible downgrade or investigation of the credit rating for Ambac or Ambac Assurance.

23. All communications by or to any Individual Defendant concerning any notice or warning from the New York Stock Exchange regarding the potential delisting of Ambac stock.

24. All communications in which any Individual Defendant was informed that Ambac was exposed or potentially exposed to billions of dollars in losses.

25. All communications in which anyone suggested to any Defendant that Ambac (or Ambac Assurance) had greater financial exposure than had been publicly disclosed.

26. All documents disseminated to Plan Participants concerning the investment options under the Plan or any analysis, review or evaluation of the Plan's investment options during the Relevant Time Period. These documents would include any performance reviews of each individual investment alternative provided under the Plan.

27. Reports concerning the Plan by any consultant, advisor, or investment manager retained by Ambac, any Defendant or any Fiduciary.

28. All minutes, audio-recordings, notes, summaries or other documents concerning any meeting of the Plan Administrative Committee during the Relevant Time Period together with all exhibits, attachments and documents that were discussed or reviewed at those meetings.

29. All minutes, audio-recordings, notes, summaries or other documents concerning any meeting or communications by any of the Individual Defendants during the Relevant Time Period, including discussions concerning the Plan, any amendments to the Plan, the adding or removing any Plan investment option, and any changes to the company match for the Plan,

together with all exhibits, attachments and documents that were discussed or reviewed at those meetings.

30.     All Documents sent or received by any Defendant concerning the Plan during the Relevant Time Period.

31.     All communications concerning modifying any Plan investment option, the possible or actual removal or liquidation of any investment option, or advice concerning the prudence or performance of the Plan's investments.

32.     Communications between or among any Defendants concerning the administration of the Plan, including Plan communications or investment of Plan assets.

33.     All Documents concerning any advice, recommendations, or analysis of the prudence of continued investment in the Fund, including recommendations made by any individual Defendant.

34.     All Documents concerning actual or projected results or investment performance of the Fund during the Relevant Time Period.

35.     Board minutes and documents discussed or reviewed at meetings of the Ambac Board concerning the Plan or the performance of the fiduciaries.

36.     All documents concerning (a) any discussion or decision by Defendants regarding whether to allow Participants to purchase, sell or retain shares of Ambac stock in the Plan; or (b) the modification, liquidation or elimination of any of the Plan's investment options, including the Fund.

37.     All retention agreements, management contracts or other agreements that specify the nature and scope of work to be performed by any firm retained to provide accounting or auditing services on behalf of the Company or the Plan.

38. A representative screen shot or other representation showing the computer screen that a participant would see during the Relevant Time Period if the participant used a computer to access his or her Plan account information.

39. All documents concerning meetings or communications among Defendants and Plan Participants concerning the financial performance of the Fund.

40. All documents, including any insurance policies, concerning the terms under which any Person may be insured or indemnified against liability relating to the administration of the Plan, actions/inactions of Plan Fiduciaries, or the management of Plan assets.

41. Any fidelity bond concerning the Plan, any Defendant or any Plan Fiduciaries and any notice of claim or potential claim under such policy or agreement.

42. All documents which list or describe: (a) the number and identity of persons with accounts in the Plan and (b) the number and identity of persons invested in Company Stock in their Plan account(s) as of December 31, 2005, December 31, 2006, December 31, 2007, December 31, 2008, and December 31, 2009.

43. All Documents concerning Plaintiff's participation in the Plan, including his account statements, work history, reviews, severance agreement or other documentation concerning the terms of his employment (including its cessation).

44. All contracts, agreements or retention letters by which Vanguard provided services concerning the Plan during the Relevant Time Period.

45. All reports prepared by, or for, Vanguard concerning the Plan. Plaintiff excludes from this request any individual account statements for Plan participants.

46. The results of any review, report, investigation or audit of the reasons for Ambac's stock price decline during any portion of the Relevant Time Period.

## PLAINTIFFS' REQUESTED ELECTRONICALLY STORED INFORMATION AND IMAGE PRODUCTION FORMAT

Pursuant to Federal Rule of Civil Procedure 45, Plaintiff may specify the form or forms in which electronically stored information ("ESI") is to be produced. As such, Plaintiff requestd that all ESI and Image productions be produced in an "imaged" file with the corresponding "image load/unitization files," "OCR text files," and the "associated delimited metadata database." Additionally, Plaintiff reserved the right to request select files in their native file format where an imaged file does not adequately represent the files as maintained in the ordinary course (often this relates to spreadsheet files). The key concepts are explained below.

1. **Native**: when selectively requested the file shall be produced in the format which the electronically stored information was originally created (*e.g.*, Microsoft Word, Microsoft Excel, Microsoft PowerPoint, etc.). A file path to the native file shall be provided in the metadata database as described in item 5.

2. **Imaged File**: a TIFF image converted from the native file as it was originally created;

      a. All images shall be group4 black and white TIFF files;

      b. Bates numbers shall be branded to the images so that the numbers print;

      c. Images shall be single page TIFFs (one TIFF file for each page)

3. **Image Load/Unitization Files**: An image load/unitization file is a standard litigation support image load format (*e.g.*, Concordance Image (formerly Opticon) .opt or .log, or IPro .lfp) shall be included which provides:

      a. The document number for each image;

b. The full fath name(s) of each TIFF that represents an image;

c. The document boundaries for each document or family member grouping;

d. The load file shall be in the order that appropriately corresponds with each image file;

e. The following represents the format of a standard Concordance Image .opt or .log image load/unitization file:

Bates,, Volume,PATH_to_image,Document Break,Folder Breat, Box Breat,Total_Pages.

M_0100000,06150101,\06150101,0000,0001.TIF,Y,,,1
M_0100001,06150101,\06150101,0000,0002.TIF,Y,,,1
M_0100002,06150101,\06150101,0000,0003.TIF,Y,,,1
M_0100003,06150101,\06150101,0000,0004.TIF,Y,,,2
M_0100004,06150101,\06150101,0000,0005.TIF,,,,
M_0100005,06150101,\06150101,0000,0006.TIF,Y,,,1
M_0100006,06150101,\06150101,0000,0007.TIF,Y,,,4
M_0100007,06150101,\06150101,0000,0008.TIF,,,,,
M_0100008,06150101,\06150101,0000,0009.TIF,,,,,
M_0100009,06150101,\06150101,0000,0010.TIF,,,,,

4. **OCR/Extracted Text File**: An OCR or extracted text file which corresponds to each imaged document shall be provided as follows:

a. One page level OCR text file for each imaged page located in the same directory as the associated tiff image file;

b. The OCR file name shall be the same as the name of the image file, followed by .txt.

5. **Associated delimited metadata database**: a database shall be provided that extracts metadata into fields in a delimited database load file. The fielded data should include all the below metadata fields for a file in addition to the Unitization (including the production number of the first and last page of each document), Attachments (including information

sufficient to identify the parent and child relationships of all documents and ESI that are or have attachments). The data load file should contain the field headers indicating the contents of each field. Required fields of data are, but are not limited to:

Begin Bates
End Bates
Begin Attachment
End Attachment
Native File Path (for native file productions)
Page Count
Custodian
Date Created (mm/dd/yyyy)
Time Created
Date Sent (mm/dd/yyyy)
Time Sent
Date Received (mm/dd/yyyy)
Time Received
Last Modified (mm/dd/yyy)

Email Subject
From
To
CC
BCC
Email Folder
Email Item Type (Email or Attachment)
File Source Path
File Name
File Type
File Source Extension
File Last Edited
Modified By

6.    **Exception Files**: All files that cannot be produced or imaged due to technical issues shall be identified as exception files and included on a long listing the file's name, custodian, and reason for the exception. Common exception files include, without limitation, corruption, password protection, digital rights management, imaging of container files or database (*e.g.,* .pst, .zip, .mdb, etc.), or proprietary software associated to a file.

# ESI GUIDELINES

These Guidelines are intended solely to facilitate the production of ESI ("electronically stored information") pursuant to the Federal Rules of Civil Procedure, to avoid misunderstanding concerning ESI, and to highlight good-faith disagreements about ESI so that they may be properly resolved. They are not intended to expand (or contract) counsel's obligations under the Federal Rules of Civil Procedure or applicable local rules or court orders.

1. **What ESI is.** ESI includes: email, text messaging (corporate and internet based); voice messaging systems; electronic files stored on servers, desktops, laptops, and other removable media; and electronic data stored in databases.

2. **Email Collection.** During collection of email the complete mailbox should be captured. This includes sent folders, deleted folders, archived folders, and all other folder structures within a mailbox.

3. **Purging Systems.** "Self-purging" or "sweep-and-keep" policies are often implemented on an organization's email system. A self-purging system automatically deletes email messages located in specific folders after a certain number of days. Sweep-and-keep systems collect and retain all incoming or outgoing email, regardless of content. Self-purging systems need not be deactivated, but steps should be taken to ensure that the "swept-and-kept" email is collected as part of the collection of email generally.

4. **Location of ESI.** All network servers, desktops and laptops, removable media (*e.g.*, hand held devices, iPods, thumb or flash drives, external hard drives, tape, CD or DVD) containing ESI should be considered during collection. In addition, counsel should not overlook these locations for ESI:

- **Remote Locations.** Bran, satellite, or subsidiary offices.

- **Internet Websites**. Often organizations implement internal or intranet websites, which, of course, contain ESI.

- **Third Party Storage**. Off-site or third-party data storage either in physical removable media or real-time data hosting/archive (*e.g.*, email archival services provided by SANTAZ, Inc., or Iron Mountain Incorporated).

- **Personal Computers**. Employees' or contratros' personal computers often contain ESI.

- **Former Employees**. ESI from transferred or past employees may have been moved from a shared location to a separate employee archive location.

- **Old Systems**. Decommissioned or old computer systems no longer in use may contain ESI and should also be considered during collection.

Exhibit C

## EXHIBIT D

## (Proposed Rider To Subpoena To Ambac)

### I.    DEFINITIONS

In the event of any conflict or ambiguity between the definitions listed below, common usage and reference to any cited rules, statutes, or regulations should be used to provide the broadest interpretation of the term in question.

1.    "Active File" means any electronic data file that can be used by an electronic data processing system in any manner without modification or reconstruction.  An active file is any electronic data file that has not been deleted or otherwise destroyed and/or damaged and which is readily visible to the operating system and/or the software with which it was created.

2.    The term "Administrative Committee" means the Ambac Financial Group, Inc. Savings Incentive Plan Administrative Committee and its members or representatives.

3.    The terms "Ambac,"  the "Company," and "You" mean Ambac Financial Group, Inc., its predecessors, successors, parents, subsidiaries (including Ambac Assurance Corporation), divisions, affiliates, or anyone acting or purporting to act on their behalf, including any of their respective directors, officers, managing agents, agents, employees, attorneys, accountants, or other representatives.

4.    "And" as well as "or" shall be construed either disjunctively or conjunctively, as necessary, to bring within the scope of the specifications all responses that might otherwise be construed to be outside the scope.  "All," such as in "all documents" means each and every. "Each" shall be construed to include the word "any."  "Any" shall be construed to include the word "Each."  "Any" and "Each" shall be understood to include "all."  "Including" shall be construed to include the phrase "without limitation."

5.   "Beneficiary" or "beneficiaries" is defined to be synonymous ins meaning and equal in scope to the usage of this term in ERISA, specifically, ERISA section 3(8), 20 U.S.C. § 1002(8).

6.   The terms "Board of Directors" or "Board" mean the Ambac Board of Directors.

7.   The term "Communications" refers to any oral, written or electronic utterance, notation, or statement of any nature whatsoever, draft or final, potential or actual, by and to whomever made or attempted to be made, including, but not limited to, correspondence, memoranda, conversations, dialogues, discussions, interviews, consultations, agreements, electronic messages (including email, text messages, instant messages, and Company intranet, electronic bulletin board or Internet site posting) and other understandings between two or more Persons.  The term "communications" specifically includes, but is not limited to, any exchange of information by an means of transmission, including, but not limited to, face-to-face conversations, mail, email, telegram, overnight delivery, telephone, facsimile or telex.

8.   The term "Compensation Committee" means the Ambac Compensation Committee and its members or representatives.

9.   "Computer" means, but is not limited to, personal computers, laptop computers, portable computers, notebook computers, hand-held computers, mini-computers, smartphones and mainframe computers.

10.   The term "concerning" means relating to, referring to, describing, evidencing, or constituting.  Requests for documents "concerning" any subject matter include documents concerning communications regarding that subject matter.

11.   "Configuration," when used in reference to any computer, includes, but is not limited to, the following information: (a) computer type, brand, model and serial number; (b)

2

brand and version of all software, including operating system, private and custom developed applications, commercial applications, shareware. or work-in-progress; and (c) communications capability, including a synchronous and/or synchronous, and including, but not limited to, terminal to mainframe emulation, data download or upload capability to mainframe, and computer to computer connections via network, modem, or direct connect.

12.    "Data" is equivalent to the term "electronic data" as defined herein.

13.    The term "Defendants" means each Defendant named in this action, as set forth in pages 8-19 of the Amended Class Action Complaint filed September 7, 2010 and their officers, directors, agents, employees, member, representatives and attorneys.

14.    "Deleted file" means any electronic data file that has been deleted or deleted from the electronic media on which it resided, including but not limited to, any file whose File Allocation Table (FAT) entry has been modified to indicate the file as being deleted and/or which is riot readily visible to the operating system and/or the software with which it was produced.

15.    The term "Documents" means documents whether fixed in tangible medium or electronically stored on disk or tape.  The word "documents" shall include, by way of example and not by way of limitation, all of the following: papers, correspondence, trade letters, envelopes, memoranda, telegrams, cables, notes, messages, electronic-mails ("e-mails"), text messages, instant electronic messages, reports, studies, press releases, comparison, books, accounts, checks, audio and video recordings, pleadings, testimony, articles, bulletins, pamphlets, brochures, magazines, questionnaires, surveys, charts, newspapers, calendars, desk calendars, pocket calendars, lists, logs, publications, notices, diagrams, instructions, diaries, minutes of meetings, corporate minutes, orders, resolutions, agendas, memorials or notes of oral

communications, whether by telephone or face-to-face, contracts, agreements, drafts of or proposed contracts or agreements, memoranda of understanding, letters of intent, deal memoranda, transcriptions of audio or video recordings, computer tapes, computer diskettes or disks, or any other tangible thing on which any handwriting, typing, printing, photostatic, electronic or other form of communication or information is recorded or reproduced, together with all notations on any of the foregoing, all originals, file copies or other unique copies of the foregoing and all versions of drafts thereof, whether used or not.

16. "Electronic Data" means the original (or identical duplicate when the original is not available) and any non-identical copies (whether non-identical because of notes made on copies or attached comments, annotations, marks, transmission notations, or highlighting of any kind) of writings of every kind and description whether inscribed by mechanical, facsimile, electronic, magnetic, digital, or other means. Electronic data includes, by way of example only, computer programs (whether private, commercial or work-in-progress), programming notes or instructions, activity listings of electronic mail receipts or transmittals, output resulting from the use of any software program, including word processing documents, spreadsheets, database files, charts, graphs and outlines, electronic mail, instant messaging, operating systems, source code of all types, peripheral drivers, batch tiles, ASCII files, and any and all miscellaneous files or file fragments, regardless of the media on which they reside and regardless of whether such electronic data consists in an active file, deleted file, or file fragment. Electronic data includes any and all items stored on computer memories, hard disks, floppy disks, CD-ROMs, DVDs, removable media such as Zip disks, Snap servers, Jaz cartridges, and their equivalent, magnetic tapes of all types, microfiche, punched cards, punched tape, computer chips, on or in any other vehicle for digital data storage or transmittal. The term electronic data also includes the file,

4

folder tabs or containers and labels appended to, or associated with, any physical storage device associated with each original or copy thereof.

17. "Electronic Media" means any magnetic or other storage media device used to record electronic data. Electronic media devices may include, but are not limited to, computer memories, hard disks, floppy disks, Snap servers, DVDs, CD-ROM, and removable media and their equivalent, magnetic tapes of all types, microfiche, punched cards, punched tape, computer chips, or on or in any other vehicle for digital data storage or transmittal.

18. The term "Employee" means, without limitation, current and former officers, directors, executives, managers, supervisors, department heads, sales personnel, secretaries, clerical staff, messengers, agents, attorneys, representatives, or any person acting or authorized to act on behalf of Vanguard.

19. "ERISA" means the Employment Retirement Income Security Act of 1974, as amended, 29 U.S.C. §1001 *et seq.*

20. The term "Fiduciary" refers to any person who exercises, or has authority to exercise, discretion over the administration of the Plan, the Plan's assets, or Plan's investments, who selects, appoints, evaluates, reviews and/or oversees such a person, or who gives investment advice for a fee or other compensation.

21. "File Fragment" means any electronic data file that exists as a subset of an original active file. A file fragment may be active or deleted. The cause of fragmentation can include, but is not limited to, the execution of ordinary file management routines such as the creation of new files over parts of previously deleted files, the creation of files on disks which do not have enough contiguous blocks to write the file from beginning to end, where the file has

5

been split up between several sections of the disk (each piece a fragment). Other causes include manual intervention, electronic surges, or physical defects on electronic media.

22. The term "Fund" means the Ambac Financial Group, Inc. Stock Fund.

23. "Identify" when used with respect to persons means to give, to the extent known, the person's full name, present or last known address, and when referring to a natural person, additionally, the present or last known place of employment. Once a person has been identified in accordance with this subparagraph, only the name of that person need be listed in response to subsequent discovery requesting the identification of that person.

24. "Identify" when used with respect to documents means to give, to the extent known, the (i) type of document; (ii) general subject matter; (iii) date of the document; and (iv) author(s), addressee(s) and recipient(s).

25. "Identify" when used in reference to any electronic data, means to state the software or operating system under which the data was created, title and author, the type of data (example: word processing document, spreadsheet, database, application program, etc.), and all other means of identifying that document or information with sufficient particularity to meet the requirements of the Federal Rules of Civil Procedure, and its present or last known location or custodian. If any such electronic data was, or no longer is, in the possession or subject to your control, state what disposition was made of it and the reason for such disposition.

26. The term "Individual Defendants" means each individual defendant named in this action, including: Thomas J. Gandolfo, William McKinnon, Sean T. Leonard, Douglas C. Renfield-Miller, Gregg L. Bienstock, Diana Adams, Robert Eisman, Timothy Stevens, Anne Gill Kelly, Thomas C. Theobald, Henry D.G. Wallace, Jill M. Considine, Laura S. Unger, and Philip N. Duff.

6

27.     The term "Investment Committee" means the Plan Investment Committee and its members or representatives.

28.     "KPMG" means KPMG, LLP, its predecessors, successors, parents, subsidiaries, divisions, affiliates, or anyone acting or purporting to act on its behalf, including any of its respective directors, officers, managing agents, agents, employees, attorneys, accountants, or other representatives.

29.     The term "Meeting" means, without limitation, any assembly, convocation, encounter or contemporaneous presence of two or more persons for any purpose, whether planned, arranged, scheduled or not.

30.     "Native format" means the default format of a data file created by its associated software program.  For example. Microsoft Excel produces its output as '.xls' files by default, which is the native format of Excel.  Microsoft word produces native files with a '.doc' extension, which is the native format of Word.

31.     "Network" means any hardware or software combination that connects two or more computers together and which allows the computers to share or transfer data between them. For the purposes of this definition, the connection between or among the microcomputers need not be either physical or direct (*i.e.*, wireless networks, and sharing or transferring data via indirect routes utilizing modems and phone company facilities). In addition, there need not be a central file or data server nor a central network operating system in place (*i.e.*, peer-to-peer networks and networks utilizing a mainframe host to facilitate data transfer).

32.     The term "Participant" refers to any employee or former employee of Ambac who is or may become entitled to receive a benefit of any time from the Plan, as well as any person

7

designated by a participant, or by the terms of the Plan, who is or may become entitled to a benefit under the Plan.

33.     The term "Person" means any individual, corporation, partnership, firm, association, government agency or other organization recognizable at law, and its agents and employees.

34.     The term "Plan" means the Ambac Financial Group, Inc. Savings Incentive Plan.

35.     The term "Plan Trustee" or "Trustee" or "Vanguard" refer collectively to Vanguard Fiduciary Trust Company and any other person or entity acting as a trustee on behalf of the Plan, and their predecessors, successors, parents, subsidiaries, divisions, affiliates, or anyone acting or purporting to act on their behalf, including any of their respective directors, officers, managing agents, agents, employees, attorneys, accountants or representatives.

36.     "Policy" means any rule, procedure, practice, or course of conduct, whether formal or informal, written or unwritten, recorded or unrecorded, which was recognized or followed, explicitly or implicitly, by you.

37.     "Produced" with respect to any document, shall include authored, dictated, edited, reviewed; or approved, in whole or in part.

38.     "Rotation" means any plan, policy or scheme that involves the re-use of an electronic media device after it has been used for backup, archival or other electronic data storage purposes, particularly if such re-use results in the alteration and/or destruction of the electronic data residing on the device prior to it being re-used.

39.     "Securities Class Action" means In Re Ambac Financial Group, Inc. Securities Litigation, 08-Civ. 411 (NRB) (S.D.N.Y.).

40.     "Support" means any help or assistance provided to a user of a computer by another individual, whether or not in an official job capacity.  Such help or assistance may take the form of, but is not limited to, answering questions, in person or via mechanical means, direct intervention, training, software troubleshooting, hardware troubleshooting, programming, systems consulting, maintenance, repair, or user forums.  Providers of support may be employees, contractors, or other third-party providers.

41.     "Telephone records" includes, without limitation, diaries, telephone directories, Rolodexes (electronic or paper), address books, telephone logs, recordings of telephone conversations, and telephone hills (both local and long distance).  To the extent that you use Internet telephony in any manner, this definition applies to that type of telephone usage as well.

## II.     INSTRUCTIONS

1.     In responding to these requests, you shall produce all responsive documents that that are in your possession, custody, or control, or the possession, custody, or control of your predecessors, successors, parents, subsidiaries, divisions, or affiliates, or any of their respective officers, managing agents, employees, attorneys, accountants, or other representatives.  A document shall be deemed to be within your control if you have the right to secure the document or a copy of the document from another person having possession or custody of the document.

2.     Unless otherwise indicated, the relevant time period ("Relevant Time Period") for each request shall be October 1, 2006 through September 7, 2010.  All requests herein refer to the Relevant Period and shall include all documents and information that relate to or were in effect during that period, even though prepared, generated, received, or published outside of that period.

9

3.     You shall produce copies of electronically stored information ("ESI") responsive to the categories of subpoenaed documents, as they are kept in the usual course of business, including all non-identical copies. Pursuant to Rule 45(a)(1), Plaintiff requests that you produce ESI in the format outlined in Exhibit B, and according to the ESI Guidelines provided.

4.     All documents shall be produced in the order they are kept in the ordinary course of business (including original folders, binders, covers or containers) or shall be organized and labeled to correspond with the categories in these requests.

5.     You shall produce the original of each document described below or, where the original of a document is unavailable, a copy identical to the original shall be produced. A draft or non-identical copy of a document is a separate document as the term is used herein. All attachments and appended or embedded links or files should be produced if any of them is responsive to any of the categories of subpoenaed documents, and attachments should be produced in the format outlined in Exhibit B.

6.     You shall Bates stamp the documents.

7.     If a document exists in electronic or recorded form (whether digital or analog), including tapes or other recordings of conversations involving you or any of your agents or representatives on any subject included within the scope of this Subpoena, you shall produce the document in the format outlined in Exhibit B and according to the ESI guidelines provided. If a document exists in electronic or recorded form as well as other forms (including printouts of electronic data and transcripts of recordings), you shall produce the document in all forms.

8.     Without in any way limiting the definition of "document" contained in the Federal Rules of Civil Procedure or herein, You are specifically instructed to search all document management systems, computer archives, and/or backup tapes or discs for documents responsive

to the following requests, and production of such documents should be made regardless of whether such documents exist in tangible or "hard" copy form. Production is also sought regardless of whether the user purported to "delete" the document, of such document is capable of being retrieved from archives and/or backup tapes or disks.

9.      If the responsive documents are stored electronically or in a computer, please identify the location of each document, the computer program by which the document was created, the computer software program (if any) that compresses the document, and the configuration of the computer on which the document is found.

10.      Whenever a document is not produced in full or is produced in redacted form, so indicate on the document and state with particularity the reason or reasons it is not being produced in full and describe to the best of your knowledge, information and belief, and with as much particularity as possible, those portions of the document which are not being produced.

11.      If any responsive document was at any time, but is no longer, in your possession or subject to your control:

      (a)      State whether the document is missing or lost;

      (b)      State whether the document has been destroyed;

      (c)      State whether the document has been transferred voluntarily or involuntarily to others and, if so at whose request;

      (d)      State whether the document has been otherwise disposed of;

      (e)      Provide a precise statement of the circumstances surrounding the disposition of the document and the date of its disposition; and

      (f)      Identify the name and address of its current or last known custodian and the circumstances surrounding such disposition.

12. If production of a document is withheld pursuant to a claim of privilege, as to each such withheld document, state the following information:

    (a)    Which privilege is claimed;

    (b)    A precise statement of the facts upon which said claim of privilege is based; and

    (c)    The following information describing each purportedly privileged document:

        (i)    Its nature, *e.g.*, agreement, letter, memorandum, etc.;

        (ii)    The date it was prepared;

        (iii)    The date it bears;

        (iv)    The date it was sent;

        (v)    The date it was received;

        (vi)    The identity of the person preparing it;

        (vii)    The identity of the person sending it;

        (viii)    The identity of each person to whom it was sent or was to have been sent, including all addressees and all recipients of copies; and

        (ix)    A statement as to whom each identified person represented or purported to represent at all relevant times.

    (d)    A precise description of the place where each copy of that document is kept, including the title or description of the file in which said document may be found and the location of such file.

13.     If a portion of any document responsive to this subpoena is withheld under a claim of privilege pursuant to the preceding instruction, any non-privileged portion of such document must be produced with the portion claimed to be privileged redacted.

14.     If a document is responsive to these requests was at any time in your possession, custody or control but now is no longer available for production, as to each such document state the following information:

    (a)     Whether the document is missing or lost;

    (b)     Whether it has been destroyed;

    (c)     Whether the document has been transferred or delivered to another person or entity and, if so, at whose request;

    (d)     Whether the document has been otherwise disposed of;

    (e)     A precise statement of the circumstances surrounding the disposition of the document and the date of the document's disposition; and

    (f)     The name and address of its current or last known custodian.

15.     If any documents or parts of documents called for by this subpoena have been destroyed, discarded, or otherwise disposed of, you should provide a list setting forth as to each such document the following information:

    (a)     The nature of the document, *e.g.*, letter, memorandum, telegram, etc.;

    (b)     The name, address, occupation, title, and business affiliation of each person who prepared, received, viewed, and has or has had possession, custody or control of the document;

    (c)     The date of the document;

    (d)     A description of the subject matter of the document;

    (e)    The date of destruction or other disposition;

    (f)    A statement of the reasons for destruction or other disposition;

    (g)    The name, address, occupation, title, and business affiliation of each person who authorized destruction or other disposition;

    (h)    The name, address, occupation, title, and business affiliation of each person who destroyed or disposed of the document; and

    (i)    The category or categories to which the document is responsive.

16.    You are to produce each document responsive to this subpoena herein in its entirety, without deletion or excision (except as qualified by instructions 12 through 14), regardless of whether you consider the entire document to be relevant or responsive to this subpoena.

17.    Each of the following categories of subpoenaed documents should be understood to include documents authored by or exchanged with attorneys concerning the management or administration of the Plan, including the management, disposition, or calculation of the assets of the Plan, the benefits accrued for participants in the Plan, the investment of assets of the Plan, or communications with Plan participants and beneficiaries regarding the Plan or their benefits under the Plan, regardless of whether such documents would be privileged if requested by other persons other than participants in or beneficiaries of the Plan.

18.    Unless words or terms have been given a specific definition herein, each word or term used herein shall be given its usual and customary dictionary definition, except where such words have a specific custom and usage definition in your trade or industry, in which case they shall be interpreted in accordance with such usual custom and usage definition of which you are aware. In construing the inquiry and request herein: (a) the singular shall include the plural and

the plural shall include the singular; (b) a masculine, feminine, or neuter pronoun shall not exclude the other genders; (c) the terms "any" and "all" shall be understood to mean "and" and "all;" and (d) the words "and" and "or" shall be read in the conjunctive or disjunctive or both, as the case may be, and to the end that the interpretation applied results in the more expansive production.

19.     The use of a verb in any tense shall be construed as the use of the verb in all other tenses whenever necessary to bring into the scope of the specification all responses that might otherwise be construed to be outside the scope.

20.     Plaintiff's discovery requests are continuing in nature and must be supplemented in accordance with the Federal Rules of Civil Procedure.

## III.

## DOCUMENTS TO BE PRODUCED

1.     All documents produced by Ambac to the plaintiffs in the Securities Class Action.

2.     All oral testimony given in the Securities Class Action.

3.     Any oral testimony given in connection with the Wisconsin Rehabilitation Action before the hearing that began on November 15, 2010.  Plaintiffs are only seeking testimony that was given before that date in connection with the Wisconsin Rehabilitation Action.

4.     The report of the appraiser referred to on page 21 of Ambac's brief in the Court of Appeals of Wisconsin in the Wisconsin Rehabilitation Action opposing RMBS Investors' renewed emergency motion seeking an injunction pending appeal dated June 1, 2010.

5.     ~~All communications (including by e-mail) between any Defendants during the Relevant Time Period.~~ Any subpoenas or request to testify or produce documents served upon Ambac by the United States Securities and Exchange Commission (SEC), the Department of

Labor (the "DOL"), the Wisconsin OCI, the Office of Thrift Supervision, the Office of the Secretary of the Commonwealth of Massachusetts, the Office of the Attorney General of the State of Connecticut, the Financial Crisis Inquiry Commission or any other governmental agency.

6.      All documents produced by Ambac to any governmental agency (including the SEC, the DOL, the Office of Thrift Supervision, Wisconsin OCI, or the Financial Crisis Inquiry Commission) concerning Ambac's or Ambac Assurance's financial condition. Plaintiffs are not seeking a copy of any SEC periodic filings by Ambac such as Forms 10-Q, 10-K, or 8-K. Instead Plaintiffs are seeking a copy of the documents that Ambac produced to the government in connection with any investigation or inquiry into Ambac's financial condition or its ability to satisfy claims against it.

~~5.~~

~~6.~~7.    All communications by any Defendant concerning the Wisconsin OCI investigation of Ambac.

7.      ~~All documents concerning Wisconsin OCI's investigation into and monitoring of Ambac and its financial condition.~~

8.      All communications between William McKinnon and any Individual Defendant.

9.      All communications between Gregg Bienstock and any Individual Defendant.

10.    All communications between Gregg Bienstock and Thomas Gandolfo.

11.    ~~Ambac's human resources or personnel file concerning each Individual Defendant.~~ All e-mail communications between Defendant Bienstock and: David Fourie, Cory Jones, Hyun Seung Kim, or Nadia Matthie (all of KPMG).

12.   All e-mail communications between any Individual Defendant and any of the following Vanguard personnel: Sheryl Barbaro, Michelle Bolig, Andrea Heffner, George Herz, Jeffrey Johnson, Martin Kleppe, Cynthia Mangialardi, Robert Maine, Ruth Muthoga, Richard Phelan, Sherryann Plesse, Richard Powers, Brenda Russell, Brian Simpson, John Stapf, or Sheryl Sterling.

13.   Ambac's human resources or personnel file concerning each Individual Defendant.

~~8.~~

**Formatted:** Indent: Left: 0.5", No bullets or numbering

~~9.~~14.   All documents concerning any loans taken by any Individual Defendant from the Plan or from the Company during the Relevant Time Period.

~~10.~~15.   An example of each types of financial report that was available to any Defendant during the Relevant Time Period to allow that Defendant to monitor Ambac's financial condition, including its exposure to liability on its financial obligations on Residential Mortgage-Backed Securities ("RMBS") or other Collateralized Debt Obligations ("CDOs").

~~11.   All documents concerning any analysis or report concerning Ambac's investments in RMBS or CDOs, including any such analysis or report that was provided to any Defendant.~~

~~12.   All documents concerning Ambac stopping (or slowing) its sales of new policies in 2007 or 2008.~~

~~13.   All documents concerning communications between any Defendant and KPMG concerning Ambac, its financial performance, or the Wisconsin Rehabilitation Action.~~

~~14.   All e-mail communications between Defendant Bienstock and: David Fourie, Cory Jones, Hyun Seung Kim, or Nadia Matthie (all of KPMG).~~

15.   ~~All e-mail communications between any Individual Defendant and Vanguard about the Plan offering the Fund, including e-mails to or from the following Vanguard personnel: Sheryl Barbaro, Michelle Bolig, Andrea Heffner, George Herz, Jeffrey Johnson, Martin Kleppe, Cynthia Mangialardi, Robert Maine, Ruth Muthoga, Richard Phelan, Sherryann Plesse, Richard Powers, Brenda Russell, Brian Simpson, John Stapf, or Sheryl Sterling.~~

16.   ~~All documents concerning the Company's risk exposure during the Relevant Time Period as a result of investment in CDOs or RMBS.~~

~~17.~~16.  All documents concerning meetings of the Ambac Board or the Ambac Assurance Board during the Relevant Time Period together with the minutes and notes of those meetings and documents that were discussed or reviewed at those meetings.

18.   ~~All documents concerning any plan that provides for the compensation of any Company officers, directors and/or executives through the issuance of the Company's stock, stock options, stock appreciation rights, or incentive stock rights, including any documents that describe or explain how such plan operates.~~

~~19.~~17.  ~~D~~All documents identifying the compensation (including ~~concerning any~~ fees, payments, and bonuses) ~~or compensation~~ to which any Individual Defendants was entitled ~~to receive,~~ or could have received, based upon the trading price of Ambac common stock ~~and/~~or Ambac's financial performance.

~~20.~~18.  Organizational charts and documents sufficient to describe the Company's and Ambac Assurance's organizational structure and management hierarchy.

~~21.~~19.  All ~~chronological files, correspondence files, personal files,~~ diaries, ~~and~~ appointment books, and desk and pocket calendars, ~~daily files, and inter-office memoranda~~

~~concerning Ambac,~~ created or maintained by or on behalf of any -Individual Defendant, whether computerized or hard copy.

22. ~~All documents concerning communications directed by or to Defendants~~
~~concerning the Company's potential filing for bankruptcy protection.~~

~~23.~~20. C~~All documents (including~~ communications by or to any Defendant~~)~~ concerning the resignation or termination of Defendant Sean T. Leonard as Vice President and CFO of the Company.

~~24.~~21. All documents concerning the resignation, termination, removal from office or change in job title of any director or officer of the Company.

25. ~~Any subpoenas or request to testify or produce documents served upon Ambac by~~
~~the United States Securities and Exchange Commission (SEC), the Department of Labor (the~~
~~"DOL"), the Wisconsin OCI, the Office of Thrift Supervision, the Office of the Secretary of the~~
~~Commonwealth of Massachusetts, the Office of the Attorney General of the State of~~
~~Connecticut, the Financial Crisis Inquiry Commission or any other governmental agency.~~

26. ~~All documents produced by Ambac to any governmental agency (including the~~
~~SEC, the DOL, the Office of Thrift Supervision, Wisconsin OCI, or the Financial Crisis Inquiry~~
~~Commission) concerning Ambac's or Ambac Assurance's financial condition. Plaintiffs are not~~
~~seeking a copy of any SEC periodic filings by Ambac such as Forms 10-Q, 10-K, or 8-K.~~
~~Instead Plaintiffs are seeking a copy of the documents that Ambac produced to the government~~
~~in connection with any investigation or inquiry into Ambac's financial condition or its ability to~~
~~satisfy claims against it.~~

~~27.~~22. All documents concerning any communication between any Individual
Defendant~~Ambac~~ and any credit reporting agency (*e.g.,* Standard & Poor's or Moody's)

concerning a possible downgrade or investigation of the credit rating for Ambac or Ambac Assurance.

28.   All documents concerning any complaints to the Company by investors or shareholders during the Relevant Time Period.

29.   All communications by or to any Defendant about Ambac's stock price.

30.23.  All communications by or to any Individual Defendant concerningdocuments concerning any notice or warning from the New York Stock Eexchangeing regarding the potential delisting of Ambac stock.

31.24.  All communications in which any Individual Defendant was informed that Ambac was exposed or potentially exposed to billions of dollars in losses.

32.   All communications in which any Defendant was informed that Ambac should or may have to mark-to-market any portion of Ambac's portfolio of investments of securities.

33.25.  All communications in which anyone suggested to any Defendant that Ambac (or Ambac Assurance) had greater financial exposure than had been publicly disclosed.

34.26.  All documents disseminated to Plan Participants concerning the investment options under the Plan or any analysis, review or evaluation of the Plan's investment options during the Relevant Time Period.  These documents would include any performance reviews of each individual investment alternative provided under the Plan.

35.27.  Reports concerning the Plan by any consultant, advisor, or investment manager retained by Ambac, any Defendant or any Fiduciary.

36.   All documents which identify persons who participated in the management or administration of the Plan, including: (a) documents identifying the Named Fiduciaries of the Plan; (b) documents identifying members of the Plan Administrative Committee, including

20

~~Committee Chairs and/or secretaries (including documents mandating that members hold specific Offices or positions with the Company); and (e) documents evidencing the identities and terms of service of any other Fiduciary or Plan Trustee.~~

~~37.~~28.  All minutes, audio-recordings, notes, summaries or other documents concerning any meeting of the Plan Administrative Committee during the Relevant Time Period together with all exhibits, attachments and documents that were discussed or reviewed at those meetings.

~~38.~~29.  All minutes, audio-recordings, notes, summaries or other documents concerning any meeting or communications by any of the Individual Defendants during the Relevant Time Period, including discussions concerning the Plan, any amendments to the Plan, the adding or removing any Plan investment option, and any changes to the company match for the Plan, together with all exhibits, attachments and documents that were discussed or reviewed at those meetings.

~~39.~~30.  All Documents sent or received by any Defendant concerning the Plan during the Relevant Time Period.

~~40.~~31.  All communications ~~Documents~~ concerning modifying any Plan investment option, the possible or actual removal or liquidation of any investment option, or~~and~~ advice concerning the prudence or performance of the Plan's investments.

~~41.~~32.  Communications ~~All documents concerning any correspondence~~ between or among any Defendants ~~Fiduciaries of the Plans, the Plan's Sponsor, the Plan's Administrator, any trustee(s) of the Plan, any investment advisor of the Plan, and/or any of the Defendants~~ concerning the administration of the Plan, including Plan communications or investment of Plan assets.

42.33.  All Documents concerning any advice, recommendations, or analysis of the prudence of ~~Participants'~~ continued investment in the Fund, including recommendations made by any individual Defendant.

43.    ~~All Documents concerning the purchase, sale, or retention of Ambac Stock by the Plan.  Plaintiff excludes from this request the individual account statements and confirmation statements of Participants in the Plan.~~

44.34.  All Documents concerning actual or projected results or investment performance of the Fund during the Relevant Time Period.

45.35.  All Documents, ~~including~~ Board minutes and documents discussed or reviewed at meetings of the Ambac Board ~~,~~ concerning the Plan or the performance of the fiduciaries~~Board's review or evaluation of the Plan Administrative Committee's activities in overseeing, administrating or managing the Plan~~.

46.36.  All documents concerning (a) any discussion or decision by Defendants regarding whether to allow Participants to purchase, sell or retain shares of Ambac stock in the Plan; or (b) the modification, liquidation or elimination of any of the Plan's investment options, including the Fund.

47.    ~~All correspondence, memoranda or work papers concerning the audit of the Company's financial statements.~~

48.    ~~All correspondence, memoranda or work papers concerning the audit of the Plan.~~

49.37.  All retention agreements, management contracts or other agreements that specify the nature and scope of work to be performed by any firm retained to provide accounting or auditing services on behalf of the Company or the Plan.

50.38. A representative screen shot or other representation showing the computer screen that a participant would see during the Relevant Time Period if the participant used a computer to access his or her Plan account information.

51.39. All documents concerning meetings or communications among Defendants and Plan Participants concerning the financial performance of the Fund.

52.40. All documents, including any insurance policies, concerning the terms under which any Person may be insured or indemnified against liability relating to the administration of the Plan, actions/inactions of Plan Fiduciaries, or the management of Plan assets.

53.41. Any fidelity bond concerning the Plan, any Defendant or any Plan Fiduciaries and any notice of claim or potential claim under such policy or agreement.

54.42. All documents which list or describe: (a) the number and identity of persons with accounts in the Plan and (b) the number and identity of persons invested in Company Stock in their Plan account(s) as of December 31, 2005, December 31, 2006, December 31, 2007, December 31, 2008, and December 31, 2009.

55. All documents which list the number of Ambac shares held by the Plan at the end of each quarter and year during the Relevant Time Period.

56.43. All Documents concerning Plaintiff's participation in the Plan, including his account statements, work history, reviews, severance agreement or other documentation concerning the terms of his employment (including its cessation).

57.44. All contracts, agreements or retention letters by which Vanguard provided services concerning the Plan during the Relevant Time Period.

58. All documents and communications concerning Vanguard's engagement by Ambac or the Plan.

23

59.    All documents concerning the services provided by Vanguard to Ambac or the Plan during the Relevant Time Period.

60.45.  All reports prepared by, or for, Vanguard concerning the Plan.  Plaintiff excludes from this request any individual account statements for Plan participants.

61.46.  The results of All documents relating to aany review, report, investigation or audit of the reasons for Ambac's stock price decline during any portion of the Relevant Time Period.

62.    All documents concerning revenue and earnings forecasts for Ambac during the Relevant Time Period.

## PLAINTIFFS' REQUESTED ELECTRONICALLY STORED INFORMATION AND IMAGE PRODUCTION FORMAT

Pursuant to Federal Rule of Civil Procedure 45, Plaintiff may specify the form or forms in which electronically stored information ("ESI") is to be produced. As such, Plaintiff requestd that all ESI and Image productions be produced in an "imaged" file with the corresponding "image load/unitization files," "OCR text files," and the "associated delimited metadata database." Additionally, Plaintiff reserved the right to request select files in their native file format where an imaged file does not adequately represent the files as maintained in the ordinary course (often this relates to spreadsheet files). The key concepts are explained below.

1.  **Native**: when selectively requested the file shall be produced in the format which the electronically stored information was originally created (*e.g.*, Microsoft Word, Microsoft Excel, Microsoft PowerPoint, etc.). A file path to the native file shall be provided in the metadata database as described in item 5.

2.  **Imaged File**: a TIFF image converted from the native file as it was originally created;

    a.  All images shall be group4 black and white TIFF files;

    b.  Bates numbers shall be branded to the images so that the numbers print;

    c.  Images shall be single page TIFFs (one TIFF file for each page)

3.  **Image Load/Unitization Files**: An image load/unitization file is a standard litigation support image load format (*e.g.*, Concordance Image (formerly Opticon) .opt or .log, or IPro .lfp) shall be included which provides:

    a.  The document number for each image;

b. The full fath name(s) of each TIFF that represents an image;

c. The document boundaries for each document or family member grouping;

d. The load file shall be in the order that appropriately corresponds with each image file;

e. The following represents the format of a standard Concordance Image .opt or .log image load/unitization file:

Bates,, Volume,PATH_to_image,Document Break,Folder Breat, Box Breat,Total_Pages.

M_0100000,06150101,\06150101,0000,0001.TIF,Y,,,1
M_0100001,06150101,\06150101,0000,0002.TIF,Y,,,1
M_0100002,06150101,\06150101,0000,0003.TIF,Y,,,1
M_0100003,06150101Y,\06150101,0000,0004.TIF,Y,,,2
M_0100004,06150101,\06150101,0000,0005.TIF,,,,
M_0100005,06150101,\06150101,0000,0006.TIF,Y,,,1
M_0100006,06150101,\06150101,0000,0007.TIF,Y,,,4
M_0100007,06150101,\06150101,0000,0008.TIF,,,,,
M_0100008,06150101,\06150101,0000,0009.TIF,,,,,
M_0100009,06150101,\06150101,0000,0010.TIF,,,,,

4. **OCR/Extracted Text File**: An OCR or extracted text file which corresponds to each imaged document shall be provided as follows:

a. One page level OCR text file for each imaged page located in the same directory as the associated tiff image file;

b. The OCR file name shall be the same as the name of the image file, followed by .txt.

5. **Associated delimited metadata database**: a database shall be provided that extracts metadata into fields in a delimited database load file. The fielded data should include all the below metadata fields for a file in addition to the Unitization (including the production number of the first and last page of each document), Attachments (including information

2

sufficient to identify the parent and child relationships of all documents and ESI that are or have attachments). The data load file should contain the field headers indicating the contents of each field. Required fields of data are, but are not limited to:

| | |
|---|---|
| Begin Bates | Email Subject |
| End Bates | From |
| Begin Attachment | To |
| End Attachment | CC |
| Native File Path (for native file | BCC |
| productions) | Email Folder |
| Page Count | Email Item Type (Email or |
| Custodian | Attachment) |
| Date Created (mm/dd/yyyy) | File Source Path |
| Time Created | File Name |
| Date Sent (mm/dd/yyyy) | File Type |
| Time Sent | File Source Extension |
| Date Received (mm/dd/yyyy) | File Last Edited |
| Time Received | Modified By |
| Last Modified (mm/dd/yyy) | |

6.      **Exception Files**: All files that cannot be produced or imaged due to technical issues shall be identified as exception files and included on a long listing the file's name, custodian, and reason for the exception. Common exception files include, without limitation, corruption, password protection, digital rights management, imaging of container files or database (*e.g.,* .pst, .zip, .mdb, etc.), or proprietary software associated to a file.

3

# ESI GUIDELINES

These Guidelines are intended solely to facilitate the production of ESI ("electronically stored information") pursuant to the Federal Rules of Civil Procedure, to avoid misunderstanding concerning ESI, and to highlight good-faith disagreements about ESI so that they may be properly resolved. They are not intended to expand (or contract) counsel's obligations under the Federal Rules of Civil Procedure or applicable local rules or court orders.

1. **What ESI is.** ESI includes: email, text messaging (corporate and internet based); voice messaging systems; electronic files stored on servers, desktops, laptops, and other removable media; and electronic data stored in databases.

2. **Email Collection.** During collection of email the complete mailbox should be captured. This includes sent folders, deleted folders, archived folders, and all other folder structures within a mailbox.

3. **Purging Systems.** "Self-purging" or "sweep-and-keep" policies are often implemented on an organization's email system. A self-purging system automatically deletes email messages located in specific folders after a certain number of days. Sweep-and-keep systems collect and retain all incoming or outgoing email, regardless of content. Self-purging systems need not be deactivated, but steps should be taken to ensure that the "swept-and-kept" email is collected as part of the collection of email generally.

4. **Location of ESI.** All network servers, desktops and laptops, removable media (*e.g.*, hand held devices, iPods, thumb or flash drives, external hard drives, tape, CD or DVD) containing ESI should be considered during collection. In addition, counsel should not overlook these locations for ESI:

   - **Remote Locations.** Bran, satellite, or subsidiary offices.

4

- **Internet Websites**.  Often organizations implement internal or intranet websites, which, of course, contain ESI.

- **Third Party Storage**.  Off-site or third-party data storage either in physical removable media or real-time data hosting/archive (*e.g.*, email archival services provided by SANTAZ, Inc., or Iron Mountain Incorporated).

- **Personal Computers**.  Employees' or contratros' personal computers often contain ESI.

- **Former Employees**.  ESI from transferred or past employees may have been moved from a shared location to a separate employee archive location.

- **Old Systems**.  Decommissioned or old computer systems no longer in use may contain ESI and should also be considered during collection.

Exhibit D

USDS SDNY
DOCUMENT
ELECTRONICALLY FILL.
DOC #: _____
DATE FILED: 8/9/10

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

KARTHIKEYAN V. VEERA,

                Plaintiff,

v.

AMBAC FINANCIAL GROUP, INC.,
AMBAC PLAN ADMINISTRATIVE
COMMITTEE, SEAN T. LEONARD,
GREGG L. BIENSTOCK, DIANA
ADAMS, ROBERT EISMAN, TIMOTHY
STEVENS, ANNE GILL KELLY and
JANE AND JOHN DOES 1 THROUGH
10,

                Defendants.

Case No: 10-cv-4191-HB

---

## STIPULATION REGARDING
## PROTOCOL FOR PRODUCTION OF DOCUMENTS AND ELECTRONICALLY
## STORED INFORMATION

This protocol is intended solely to facilitate the production of ESI ("electronically stored information") in the above-captioned matter pursuant to Federal Rules of Civil Procedure, to avoid misunderstandings concerning ESI and to reduce the cost of litigation and to inform the Court of the areas in which the parties disagree. The protocol is not intended to expand (or contract) each party's obligations under the Federal Rules of Civil Procedure or applicable local rules or any orders by the Court.

-1-

1.    **Scope of Data Subject to Discovery**

(a)    **Timeframe for ESI Discovery**

**Defendants' Position**

Defendants believe the relevant time frame for ESI discovery should be the timeframe used in the Securities Action (Civil Action No. 08-00411-NRB), since discovery in this matter will coordinate with discovery in the Securities Action. Although the timeframe for ESI discovery has not yet been set in the Securities Action, the Securities class period ends April 23, 2008, the last date on which Ambac Financial Group, Inc. is alleged by this and the Securities Action to have made disclosures that negatively impacted its stock value. Accordingly, Defendants urge the Court to delay setting the timeframe for ESI discovery in this matter until one is set in the Securities Action, or until the Court determines the relevant time period for this action in its decision on Defendants' Motion to Dismiss due August 18, 2010, or Plaintiffs' Motion for Class Certification, if any. Alternatively, and at a minimum, Defendants urge the Court to set an appropriate timeframe for ESI discovery that ends no later than April 23, 2008.

**Plaintiff's Position**

Plaintiff suggests that the relevant time frame for ESI discovery should be April 25, 2006 through April 23, 2009. This time frame would start the ESI period six months before the beginning of the Class Period and would end it on the last day of the Class Period. This is a reasonable approach which is similar to ESI protocols entered by other courts. Because the parties are at the initial stage of this litigation, Plaintiff also proposes that either side be able to request the other party to preserve ESI beyond this timeframe upon a good faith need or upon

agreement of the parties.  There is no need to delay setting the ESI time frame because discovery is proceeding now in this Action.

**(b)    Custodians**

The parties agree to meet and confer in good faith to identify the custodians from whom ESI responsive to requests for production shall be collected and whose email accounts shall be searched using the agreed-upon search terms.

**(c)    Search Terms**

The parties agree to meet and confer in good faith to identify the terms to be used when searching for potentially responsive ESI.  Once a final search terms list is agreed to, the proponent of discovery ("Requesting Party") may request additional search terms based on a good faith need or by agreement.  In agreeing upon such terms, the parties in no way agree that any ESI having one or more such terms shall be produced prior to review for responsiveness and privilege.

**(d)    Sources**

The parties agree to search for and produce any relevant records from the custodians identified pursuant to section 1(b) above, regardless of the location of the custodian or equipment, including from the following sources:

      i.     the hard copy files of identified custodians;

      ii.    the active email accounts of identified custodians, as preserved in the vault;

      iii.   the active file server directories used by each identified custodian to store electronic records;

      iv.   the "M" drive directory of each identified custodian;

      v.    removable or portable media (e.g., hand held devices including cell phones, PDAs, BlackBerries, and iPods, thumb or flash drives, external

hard drives, CD or DVD) to the extent interviews with the custodian and/or the FED. R. CIV. P. 30 (b) deposition of the Company's document custodian indicate that such media may contain relevant information; and

vi.     any internal websites.

### (e)     Not reasonably Accessible Data

After receiving requests for document production, the party responding to discovery ("Producing Party") shall disclose to the Requesting Party the existence of ESI that it believes is responsive, including any responsive ESI that may be located in (1) remote locations such as branch, satellite, or subsidiary offices, (2) off-site or third-party data storage either in physical removable media or real-time data hosting/archive or (3) deleted information, back-up and archival data, but that it objects to producing because the information is not reasonably accessible because of undue burden or cost. The disclosure shall include reasonably available information about the format and location of the information claimed not to be reasonably accessible, and why the requested production would impose undue burden or is unreasonably costly.

The Parties will meet and confer concerning such information that has been identified as not reasonably accessible, but a Producing Party shall not have an obligation initially to search or produce from sources of ESI that it discloses as information that is not reasonably accessible because of undue burden or cost, and no such obligation will exist unless and until a motion to compel is filed by the Requesting Party and is ruled upon by the Court. The parties agree that the Producing Party shall pay all costs related to reasonably accessible ESI. Nothing in this protocol, however, should be interpreted to mean that a Producing Party cannot apply to the Court for the cost of retrieving and producing ESI from a source that is not reasonably accessible where substantially the same ESI can be produced from a reasonably accessible source.

### (f)     Privilege Logs

The Producing Party will produce privilege logs in Excel, Word, or a similar electronic format that allows text searching and organization of data. A Producing Party will produce privilege logs within a reasonable time and on a rolling basis as its document productions are made. The production of a privilege log for a custodian will be not less than 14 days prior to a custodian's deposition.

### 2.     Form of Electronic Information Production

### (a)     Structured Data

Before producing ESI from databases, each party shall first produce a list of databases, if any, that are responsive to a request for production. The list should include a general description of the contents/functions of the databases, relevant fields and timeframe. Once the Requesting Party has reviewed this information, it may request relevant data from the database in the form of a query to be run across the relevant database. Nothing in this paragraph shall prevent the Parties from agreeing upon alternative methods for producing data from databases.

### (b)     Unstructured Data

E-mail and user-generated ESI will be produced in single-page Tagged Image File Format ("TIFF") with a load file containing basic metadata and extracted text (one text file per document) as set forth below. For all unstructured data, each party will provide load files in a reasonable, industry-standard format each party may identify later.  Load files will identify source/attachment (parent/child) documents. Redacted files will be produced with searchable text. Excel, Lotus 123 or other spreadsheet programs will be produced in native format from the outset.

The following metadata fields will be produced for each file:

| FIELD NAME | DESCRIPTION |
|---|---|
| BegBates | Beginning Bates number |
| EndBates | Ending Bates number |
| BegAttach | Beginning Attachment number |
| EndAttach | Ending Attachment number |
| DocType | Type of document (e.g., email, attachment, efile) |
| Document extension | E.g. xls, doc, pdf |
| Author | Email author, Efile creator |
| Recipient | |
| cc | |
| bcc | |
| Sent date | |
| Received date | |
| Create Date | |
| Modified Date | |
| Parent Date | |
| Title | Email subject, Efile filename |
| Custodian | |
| Extracted Text | |

If production of a particular type of file in TIFF or native format would be unreasonable or cause undue burden for either the Producing or Requesting party, the parties shall meet and confer to find a workable solution before bringing objections or motions to the Court.

**3.    Duplicates**

A Producing Party may but is not required, to apply universal or global de-duplication to all unstructured data to avoid producing multiple copies of the same document.  For example, an email sent by one employee and received by four other employees may be produced once rather than six times.

**4.    Bates Numbering and Confidentiality Designations**

Each page of a produced image shall have a legible, unique page identifier ("Bates Number") electronically "burned" onto the image at a location that does not unreasonably obliterate or obscure any information from the source document.  No other legend or stamp will be placed on the document image other than confidentiality legends (where applicable), redactions, and any other internal tracking number that the Producing Party may choose to use. Electronic data produced in discovery may be labeled with confidentiality designations.

In the case of TIFF images, confidentiality legends shall be "burned" onto the image at a location that does not unreasonably obliterate or obscure any information from the source document.  For materials produced in native format, the Producing Party shall supply fielded data identifying the confidentiality treatment of each document designated for confidentiality.  A failure to make a designation through fielded data may be corrected in the same manner as inadvertant production of privileged materials or mistaken designations of confidential materials as provided in the STIPULATION AND ORDER GOVERNING THE PRODUCTION AND EXCHANGE OF CONFIDENTIAL MATERIAL.

### 5.    Production Media

A Producing Party shall produce documents that it produces in an electronic image form on CD-ROM, DVD, external hard drive, or such other readily accessible computer or electronic media as the parties may hereafter agree upon (the "Production Media"). The Bates Number range(s) of the materials on the Production Media shall be contained on the Production Media, and where not practicable to do so may be provided in an accompanying letter. If the Producing Party encrypts or "locks" the production, the Producing Party shall include with the production an explanation of how to decrypt the files.

If the Producing Party provides the Production Media directly to the Requesting Party by CD-ROM, DVD, or by external hard drive, as opposed to allowing access by computer or electronic means, the Producing Party, to the extent possible, shall produce all documents in the following format (unless the Requesting Party requests otherwise):

      i.     IMAGES: Single-page TIFF (Tagged Image File Format) files, ideally with filenames matching the Bates number of the page.

      ii.    OCR: Single-page TXT files, one per image, in the same folder as the image it represents and named in the same manner as the image.

      iii.   LOAD FILES: (should be located either at the root of the production volume or in a DATA folder)

           a.   Images and OCR: This must be a Summation .DII file, with the @T identifier token on the first line of each document entry.

           b.   Coding: This should be in comma-delimited format, with fieldnames on the first line.

      iv.   NUMBERING: There can be no spaces in the bates numbers of a Summation database.

### 6.    Exceptions to Protocol

If the forms of production allowed by this protocol present an undue burden or cost for a

Producing Party, the parties shall meet and confer to agree on a reasonable, alternative form of production. Any party may file a motion to seek individual relief from this protocol.

### 7.    On-site Inspections

On-site inspections of electronic media shall only be permitted if agreed to by the parties or if good cause and specific need have been demonstrated.

### 8.    Discovery and Admissibility

Nothing in this protocol shall be construed to affect the admissibility of any document or data. All objections to the admissibility of any document or data, except as to the authenticity of the documents produced by a party as to which that party stipulates, are preserved and may be asserted at any time.

### 9.    Definitions

Except as otherwise defined herein, all terms are defined pursuant to The Sedona Conference Glossary: E Discovery and Digital Information Management (May, 2005 Version) available at http://www.the sedonaconference.org/.

Dated: New York, New York
      July 12, 2010

/s/ Caitlin Duffy
SQUITIERI & FEARON, LLP
Stephen J. Fearon, Jr.
Caitlin Duffy
Garry T. Stevens, Jr.
32 East 57th Street, 12th Floor
New York, New York 10022

*Attorneys for Plaintiff*


/s/ Jamie M. Kohen
MORGAN, LEWIS & BOCKIUS LLP
Jamie M. Kohen (jk0273)
101 Park Avenue
New York, NY 10178-0060
Phone: (212)309-6343
Fax:   (212)309-6001
Email: jkohen@morganlewis.com

*Attorney for Defendants Ambac Financial Group,*
*   Inc., Ambac Plan Administrative Committee, Sean*
*   T. Leonard, Gregg L. Bienstock, Diana Adams,*
*   Robert Eisman, Timothy Stevens, and Anne Gill Kelly*

**IT IS SO ORDERED.**

Dated: 8/9/10

Honorable Harold Baer, Jr.
UNITED STATES DISTRICT COURT JUDGE