Peter A. Ivanick
Martin J. Bienenstock
Allison H. Weiss
DEWEY & LEBOEUF LLP
1301 Avenue of the Americas
New York, New York 10019
Tel: (212) 259-8000
Fax: (212) 259-6333

    - and -

Todd L. Padnos (admitted *pro hac vice*)
DEWEY & LEBOEUF LLP
1950 University Avenue, Suite 500
East Palo Alto, California 94303
Tel: (650) 845-7000
Fax: (650) 845-7333

*Attorneys for the Debtor and Debtor in Possession*

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

```
-------------------------------------------------------------x
                                          :
In re                                     :      Chapter 11 Case No.
                                          :
AMBAC FINANCIAL GROUP, INC.,              :
                                          :      Case No. 10-15973 (SCC)
              Debtor.                     :
                                          :
                                          :
-------------------------------------------------------------x
```

## NOTICE OF DEBTOR'S MOTION PURSUANT TO SECTION 1121(d) OF THE BANKRUPTCY CODE FOR AN ORDER EXTENDING ITS EXCLUSIVE PERIODS TO FILE A CHAPTER 11 PLAN AND SOLICIT ACCEPTANCES THEREOF

      **PLEASE TAKE NOTICE** that a hearing on the annexed motion (the "Motion")

will be held before the Honorable Shelley C. Chapman, United States Bankruptcy Judge, in

Room 610 of the United States Bankruptcy Court, One Bowling Green, New York, New York

10004-1408 on February 16, 2011, at 10:00 a.m. (Eastern Time), or as soon thereafter as counsel

may be heard (the "Hearing").

**PLEASE TAKE FURTHER NOTICE** that objections, if any, to the relief requested in the Motion must comply with the Federal Rules of Bankruptcy Procedure, the Local Rules of the United States Bankruptcy Court for the Southern District of New York and the *Amended Order Pursuant to Bankruptcy Rules 2002, 9007, and 9036, and Local Rule 2002-2, Establishing Certain Notice, Case Management, and Administrative Procedures* entered on December 21, 2010 [Docket No. 75] (the "Case Management Order"), must be set forth in writing describing the basis therefor, and shall be filed electronically with the Court on the docket of *In re Ambac Financial Group, Inc.*, Case No. 10-15973 (SCC), in accordance with General Order M-399, by registered users of the Court's case filing system and by all other parties in interest on a 3.5 inch disk.

**PLEASE TAKE FURTHER NOTICE** that, pursuant to Local Rule 9070-1, (i) at least one hard copy of any objections filed shall be marked "Chambers Copy" and delivered in an unsealed envelope to the chambers of the Honorable Judge Shelley C. Chapman, United States Bankruptcy Court, One Bowling Green, New York, New York 10004, not later than the next business day following the date on which such document is electronically filed, and (ii) copies of any objections filed shall be delivered by first class mail to (a) Dewey & LeBoeuf LLP, 1301 Avenue of the Americas, New York, New York 10019, Attn: Tevia Jeffries, Esq., attorneys for the Debtor; (b) the Office of the United States Trustee for the Southern District of New York, 33 Whitehall Street, 21st Floor, New York, New York 10004, Attn: Brian Masumoto, Esq.; (c) Foley & Lardner LLP, 777 Wisconsin Avenue, Milwaukee, WI 53202, Attn: Frank DiCastri, counsel to Wisconsin Office of the Commissioner of Insurance; (d) Morrison & Foerster LLP, 1290 Avenue of the Americas, New York, New York 10104, Attn: Anthony Princi, Esq., counsel for the statutory committee of creditors; and (e) all parties who have requested notice in this

chapter 11 case, so as to be received no later than February 9, 2011, at 4:00 p.m. (Eastern Time)

(the "Objection Deadline").

PLEASE TAKE FURTHER NOTICE that if an objection to the Motion is not

received by the Objection Deadline, the relief requested shall be deemed unopposed, and the

Bankruptcy Court may enter an order granting the relief sought without a hearing.

Dated: February 2, 2011
      New York, New York

/s/ Allison H. Weiss
Peter A. Ivanick
Martin J. Bienenstock
Allison H. Weiss
DEWEY & LEBOEUF LLP
1301 Avenue of the Americas
New York, New York 10019
Tel: (212) 259-8000
Fax: (212) 259-6333

- and -

Todd L. Padnos (admitted *pro hac vice*)
DEWEY & LEBOEUF LLP
1950 University Avenue, Suite 500
East Palo Alto, California 94303
Tel: (650) 845-7000
Fax: (650) 845-7333

*Attorneys for the Debtor and Debtor in Possession*

Peter A. Ivanick
Allison H. Weiss
DEWEY & LEBOEUF LLP
1301 Avenue of the Americas
New York, New York 10019
Tel: (212) 259-8000
Fax: (212) 259-6333

     - and -

Todd L. Padnos (admitted *pro hac vice*)
DEWEY & LEBOEUF LLP
1950 University Avenue, Suite 500
East Palo Alto, California 94303
Tel: (650) 845-7000
Fax: (650) 845-7333

*Attorneys for the Debtor and Debtor in Possession*

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

```
-----------------------------------------------------------x
                                     :
In re                                :   Chapter 11 Case No.
                                     :
AMBAC FINANCIAL GROUP, INC.,         :
                                     :   Case No. 10-15973 (SCC)
          Debtor.                    :
                                     :
                                     :
-----------------------------------------------------------x
```

**DEBTOR'S MOTION PURSUANT TO SECTION 1121(d) OF THE BANKRUPTCY
CODE FOR AN ORDER EXTENDING ITS EXCLUSIVE PERIODS TO FILE
A CHAPTER 11 PLAN AND SOLICIT ACCEPTANCES THEREOF**

TO THE HONORABLE SHELLY C. CHAPMAN,
UNITED STATES BANKRUPTCY JUDGE:

     Ambac Financial Group, Inc. (the "Debtor"), as debtor and debtor in possession in

the above-captioned chapter 11 case (together with its non-debtor affiliates, "Ambac"), by and

through its undersigned counsel, hereby submits this motion (the "<u>Motion</u>") for an order extending its exclusive periods to file a chapter 11 plan and solicit acceptances thereof. In further support of this Motion, the Debtor respectfully represents:

## Background

1.      On November 8, 2010 (the "<u>Commencement Date</u>"), the Debtor commenced a voluntary case under chapter 11 of title 11 of the United States Code (the "<u>Bankruptcy Code</u>"). The Debtor continues to operate its businesses and manage its properties as debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

2.      On November 17, 2010, the Office of the United States Trustee for the Southern District of New York (the "<u>U.S. Trustee</u>") appointed a statutory committee of creditors (the "<u>Committee</u>") [Docket No. 27]. No trustee or examiner has been appointed in this chapter 11 case.

3.      The Debtor is a Delaware corporation. The Debtor's principal operating subsidiary, Ambac Assurance Corporation ("<u>AAC</u>"), is a Wisconsin-domiciled financial guarantee insurance company whose business includes the issuance of financial guarantee insurance policies to support public finance, structured finance, and international finance transactions.

4.      Additional information regarding the Debtor's capital structure and events leading up to the commencement of the Debtor's chapter 11 case is available in the *Affidavit of David W. Wallis in Support of the Debtor's Chapter 11 Petition and First Day Motions and Pursuant to Local Rule 1007-2*, filed on November 8, 2010 (the "<u>*Wallis Affidavit*</u>") [Docket No. 2].

## Jurisdiction and Venue

5.      This Court has jurisdiction to consider and determine this matter pursuant

to 28 U.S.C. § 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

### Relief Requested

6.     The exclusive periods within which the Debtor may file a chapter 11 plan (the "<u>Exclusive Filing Period</u>") and solicit acceptances thereof (the "<u>Exclusive Solicitation Period</u>," and together with the Exclusive Filing Period, the "<u>Exclusive Periods</u>") currently expire on March 8, 2011 and May 7, 2011, respectively.  Pursuant to section 1121(d) of the Bankruptcy Code, the Debtor requests the entry of an order, substantially in the form attached hereto, extending the Exclusive Filing Period and the Exclusive Solicitation Period by 180 days to and including September 6, 2011[1] and November 3, 2011, respectively, without prejudice to the Debtor's right, should it become necessary, to seek and obtain further extensions of the Exclusive Periods.

### Basis for Relief

7.     Section 1121(b) of the Bankruptcy Code provides for an initial period of 120 days after the commencement of a chapter 11 case during which a debtor has the exclusive right to file a chapter 11 plan.  Section 1121(c) of the Bankruptcy Code provides that, if a debtor files a plan within the 120-day exclusive period, a debtor has an initial period of 180 days after the commencement of a chapter 11 case to solicit acceptances of such plan, during which time competing plans may not be filed.  These exclusive periods are intended to afford a debtor a full and fair opportunity to propose a consensual chapter 11 plan and solicit acceptances thereof without the deterioration and disruption of the debtor's business that is likely to be caused by the filing by non-debtor parties of competing plans.

---

[1] Because 180 days from the expiration of the requested extension of the Exclusive Filing Period, September 4, 2011, is a Sunday and September 5, 2011 is Labor Day (a legal holiday), pursuant to Bankruptcy Rule 9006, the deadline for filing a plan would be the following business day, September 6, 2011.

8.      Where a debtor's initial exclusive periods prove to be an unrealistic time frame, however, section 1121(d)(1) of the Bankruptcy Code allows a bankruptcy court to extend such exclusive periods upon a showing of cause:

> [O]n request of a party in interest made within the respective periods specified in subsections (b) and (c) of this section and after notice and a hearing, the court may for cause reduce or increase the 120-day period or the 180-day period referred to in this section.

11 U.S.C. § 1121(d).  However, the 120-day period "may not be extended beyond a date that is 18 months after the [commencement] date" and the 180-day period "may not be extended beyond a date that is 20 months after the [commencement] date."  11 U.S.C. § 1121(d)(2). Although the Bankruptcy Code does not define the term "cause," the legislative history indicates it is intended to be a flexible standard to balance the competing interests of a debtor and its creditors.  *See* H.R. Rep. No. 95-595, at 231, 232 (1978), *reprinted in* 1978 U.S.C.C.A.N. 5787, 6191 (noting that Congress intended to give bankruptcy courts the flexibility to protect a debtor's interest by allowing unimpeded opportunity to negotiate settlement of debts without interference from other parties in interest).

9.      Courts in the Second Circuit and elsewhere have held that the decision to extend exclusive periods is left to the sound discretion of a bankruptcy court and should be based on the totality of circumstances in each case.  *See, e.g.*, *In re Lionel L.L.C.*, No. 04-17324, 2007 Bankr. LEXIS 2652, at *18 (Bankr. S.D.N.Y. Aug. 3, 2007); *In re Adelphia Commc'ns Corp.*, 352 B.R. 578, 586-587 (Bankr. S.D.N.Y. 2006); *In re McLean Indus., Inc.*, 87 B.R. 830, 834 (Bankr. S.D.N.Y. 1987); *see also In re R.G. Pharm., Inc.*, 374 B.R. 484, 487 (Bankr. D. Conn. 2007); *In re Dow Corning Corp.*, 208 B.R. 661, 664 (Bankr. E.D. Mich. 1997).  Courts have considered the following non-exhaustive factors as relevant in a motion to extend a debtor's exclusive periods:

a.        the size and complexity of the debtor's case;

b.        the necessity of sufficient time to negotiate and prepare adequate information;

c.        the existence of good-faith progress in the case;

d.        whether the debtor is paying its debts as they come due;

e.        whether the debtor has demonstrated reasonable prospects for filing a viable plan;

f.        whether the debtor has made progress in negotiating with creditors;

g.        the length of time the case has been pending;

h.        a finding that the debtor is not seeking to extend exclusivity to pressure creditors to accede to the debtor's reorganization demands; and

i.        whether unresolved contingencies exist.

*See*, *e.g.*, *Cont'l Cas. Co. v. Burns & Roe Enters., Inc.*, 2005 U.S. Dist. LEXIS 26247, at *9-12 (D.N.J. 2005); *In re Adelphia Commc'ns Corp.*, 352 B.R. 578, 587 (Bankr. S.D.N.Y. 2006); *In re McLean Indus., Inc.*, 87 B.R. at 834; and *In re Express One Int'l, Inc.*, 194 B.R. at 100. As illustrated below, an application of the foregoing standards to the facts of this case demonstrates that more than sufficient "cause" exists to grant the Debtor's requested extensions.

### Cause Exists to Warrant
### Extension of the Debtor's Exclusive Periods

**I.**      ***The Debtor's Case is Sufficiently Large and
Complex to Warrant an Extension of the Exclusive Periods***

        **A.**      <u>**The Debtor and Its Business**</u>:

        10.        The Debtor's chapter 11 case is very large and extremely complex. As described more fully in the *Wallis Affidavit*, the Debtor is a holding company headquartered in New York City. The Debtor's principal operating subsidiary, Ambac Assurance Corporation ("<u>AAC</u>"), is a Wisconsin-domiciled financial guarantee insurance company whose business

includes the issuance of financial guarantee insurance policies to support public finance, structured finance, and international finance transactions. AAC is subject to the insurance laws and regulations of the State of Wisconsin and is regulated by the Office of the Commissioner of Insurance of the State of Wisconsin ("OCI"). Until 2008, when AAC stopped selling new policies because of its deteriorating financial condition and lowered credit ratings, AAC offered financial guarantee insurance on investment grade municipal finance and private structured-finance debt obligations, such as municipal bonds and residential mortgage-backed securities ("RMBS").

11.     Financial guarantee insurance provides an unconditional guarantee that protects the holder of a fixed-income obligation against non-payment of principal and interest when due. AAC also guaranteed certain structured-finance debt obligations, whereby a non-insurance, wholly owned Ambac subsidiary would enter into a credit-default swap ("CDS") with a counterparty that protected the counterparty from defaults of the underlying security issuer, and AAC would, in turn, guarantee the financial obligations of its subsidiary. These structured-finance debt obligations were largely collateralized debt obligations ("CDOs") backed by asset-backed securities ("ABS"), primarily RMBS.

12.     The Debtor, through AAC subsidiaries, also provided financial services, including investment agreements, funding conduits, and interest rate, currency, and total return swaps, principally to the clients of its financial guarantee business. AAC guaranteed its subsidiaries' performance under those agreements.

13.     As a result of the financial crisis, AAC's financial guarantee and financial services businesses were devastated. Consequently, since 2007, OCI has not permitted AAC to pay dividends to the Debtor. As a holding company, the Debtor is dependent upon dividends

from AAC in order to pay principal and interest on its indebtedness and operating expenses.

14.    The Debtor has approximately $1.6 billion in outstanding unsecured indebtedness to its bondholders and related obligations that need to be reorganized.

### B.    General Chapter 11 Tasks:

15.    Since the Commencement Date, the Debtor has primarily concentrated on stabilizing its businesses and ensuring a smooth transition into chapter 11, while at the same time, focusing on other time sensitive and complex aspects of this case.  The Debtor has been working diligently to (i) maintain relationships with its vendors, (ii) prepare its Statement of Financial Affairs and Schedules of Assets and Liabilities, (iii) establish a bar date for filing proofs of claim, and (iv) complete other day-to-day chapter 11 tasks, including responding to document and information requests from the Committee.  The Debtor has also spent a considerable amount of time preparing motions for relief, attending omnibus hearings, and preparing monthly operating reports.

16.    Additionally, among other significant tasks, in the first few months of this chapter 11 case, the Debtor has had to expend significant time and effort responding to the motion for relief from the automatic stay (the "Lift Stay Motion"), filed by Karthikeyan V. Veera, the plaintiff in a putative ERISA class action filed against certain committees of the Debtor charged with administering and supervising the Debtor's Savings Incentive Plan and current and former officers and directors of the Debtor who are or were members of such committees.  The Lift Stay Motion, among other things, seeks authority to commence extensive discovery against the Debtor, its affiliates, and their respective employees.  Specifically, on January 12, 2011, the Debtor filed an objection to the Lift Stay Motion, and on January 18, 2011, the Debtor commenced an adversary proceeding against Mr. Veera, entitled *Ambac Financial Group, Inc. v. Karthikeyan V. Veera*, Adv. Pro. No. 11-01265 (SCC).

### C.     <u>Negotiations with OCI and the Committee</u>:

17.     The Debtor also continues to participate in extensive negotiations with OCI and the Committee with a view towards reaching an agreement on a balance-sheet restructuring to be accomplished through a consensual bankruptcy plan of reorganization (a "<u>Plan</u>"). Although December 31, 2010, was the deadline to reach a binding term sheet with respect to a Plan, such deadline has been extended by agreement of the parties until February 28, 2011. The Debtor has responded to ongoing requests for documents from the Committee. It is anticipated that the Debtor will soon begin a large-scale document production in response to the Committee's request, while the parties continue to negotiate the terms of a protective order with respect to sensitive information. Meanwhile, the Debtor, OCI and the Committee continue to negotiate the terms of a Plan, meeting regularly to expeditiously reach a resolution of open issues. The Debtor also continues to make significant progress toward resolution of matters that will have a significant impact on a Plan. Nevertheless, as discussed below, these are complex legal matters that at often times require the Debtor's full attention and energy.

### D.     <u>The IRS Adversary Proceeding</u>:

18.     Following the commencement of the Debtor's chapter 11 case, the Debtor commenced an adversary proceeding, *Ambac Financial Group, Inc. v. United States of America*, Adv. Pro. No. 10-04210 (SCC) (the "<u>IRS Adversary Proceeding</u>"), seeking (a) a declaration that Ambac (i) has no tax liability for tax years 2003 through 2008 and (ii) is entitled to retain certain tax refunds that were issued by the Internal Revenue Service (the "<u>IRS</u>") in respect of those tax years, and (b) injunctions prohibiting the IRS from levying a tax lien on the Debtor or AAC's assets (the "<u>IRS Complaint</u>"). Contemporaneously with filing the IRS Complaint, the Debtor filed a motion requesting a temporary restraining order preliminary injunction and such other relief as sought in the IRS Complaint (the "<u>IRS Motion</u>"). On January 14, 2011, the IRS filed its

answer to the IRS Complaint (the "IRS Answer") and did not assert any counterclaims. Additionally, on January 14, 2011, the IRS filed an opposition to the IRS Motion, and on February 1, 2011, the Debtor filed its reply in support of the IRS Motion.

19.     The IRS Adversary Proceeding stems from three claims filed by the Debtor with the IRS for tentative carryback adjustments on Form 1139 (Corporate Application for Tentative Refund) as a result of the carryback to prior taxable years of approximately $33 million and $3.2 billion of net operating losses ("NOLs") in 2008 and 2009, respectively, reported in the Debtor's consolidated federal income tax returns.  Based upon these claims, in December 2008, September 2009 and February 2010, the IRS refunded to the Debtor $11,470,930, $252,704,185 and $443,940,722 (the "Tax Refunds"), respectively, on account of NOLs generated in respect of AAC's CDSs.  Shortly prior to the Commencement Date, the Debtor received an initial document request from the IRS (the "IDR").  The Debtor determined at that time, that if the IRS were to take enforcement actions based upon the IDR prior to the adjudication of the Debtor's tax liability, there was a real risk that OCI would quickly thereafter commence a rehabilitation of AAC, which would unravel the Rehabilitation Plan (as defined below) and destroy the Debtor's reorganization prospects.  Consequently, at OCI's direction, AAC allocated the potential tax liability to the Segregated Account and the Debtor filed this chapter 11 case and commenced the IRS Adversary Proceeding.

20.     On January 13, 2011, the IRS filed a motion, pursuant to 28 U.S.C. § 157(d), to withdraw the reference (the "Motion to Withdraw") so that the IRS Adversary Proceeding may be heard in the United States District Court for the Southern District of New York (the "District Court").  On February 1, 2011, the Debtor filed an opposition to the Motion to Withdraw.

21.     Notwithstanding that the Motion to Withdraw is now pending in the

District Court, pursuant to Rule 5011(c) of the Federal Rules of Bankruptcy Procedure (the

"Bankruptcy Rules"), the IRS Adversary Proceeding is not stayed.  Rule 5011(c) provides that

"[t]he filing of a motion for withdrawal of a case or proceeding . . . shall not stay the

administration of the case or any proceeding therein before the bankruptcy judge."  The Debtor is

vigorously opposing the Motion to Withdraw, and no return date has been set by the District

Court to hear the motion.  Accordingly, to avoid unnecessary delay while the Motion to

Withdraw is pending, on February 1, 2011, the Debtor filed a motion for an order requiring the

parties or their attorneys to be present at a pretrial conference to be held on February 16, 2011,

and for authorization to implement alternative dispute resolution procedures to resolve the IRS

Adversary Proceeding between the Debtor and the IRS, and such other matters as may aid in the

disposition of the action. *See Debtor's Motion For Pretrial Conference and Pursuant to Section*

*105(A) of The Bankruptcy Code and General Order M-390 For Authorization to Implement*

*Alternative Dispute Resolution Procedures*, dated February 1, 2011, attached hereto as Exhibit

A.

22.     The determination of the Debtor's tax liability is a pivotal issue in this

case.  Because of the profound impact the resolution of the IRS Adversary Proceeding will have

on the structure of a Plan, whether proposed by the Debtor or another party, and the availability

of recoveries pursuant thereto, the management of the IRS Adversary Proceeding, including the

Motion to Withdraw, has been a significant focus of the Debtor's officers, employees and

professionals and has required a great deal of their time and effort.  While the Debtor continues

to negotiate with the Committee and OCI regarding the terms of a Plan, an expedited resolution

of the IRS Adversary Proceeding is in the best interest of all parties.  The Debtor continues to

work towards that goal.

### E.  Wisconsin Rehabilitation of the Segregated Account:

23.      As discussed more fully in the *Wallis Affidavit*, the Debtor's most valuable asset is its interest in its primary operating subsidiary, AAC.  As a result of the financial crunch and credit crisis that began in the summer and fall of 2007, AAC originated only a *de minimis* amount of new business from November 2007 through the end of 2008 and has been unable to originate any new business since 2008.  In September 2008, AAC began to consider possible restructuring scenarios.

24.      On March 24, 2010, OCI approved the establishment of a segregated account (the "Segregated Account") to segregate certain miscellaneous liabilities and policy liabilities related to certain non-performing segments of AAC's operations (together, the "Segregated Account Policies").  The Segregated Account Policies include, among other things, certain policies insuring or relating to certain of the CDS obligations and all RMBS policies. The Segregated Account is capitalized by a $2 billion secured note due 2050 issued by AAC (the "Secured Note"), the balance of which, as of September 30, 2010, inclusive of capitalized interest since the date of issuance, was approximately $1.92 billion.

25.      On March 24, 2010, OCI commenced rehabilitation proceedings with respect to the Segregated Account (the "Rehabilitation Proceedings") in the District Court of Dane County, Wisconsin (the "Rehabilitation Court"), to facilitate an orderly run-off and/or settlement of the liabilities in the Segregated Account, including those associated with the Segregated Account Policies.  The Rehabilitation Court appointed the Wisconsin Commissioner of Insurance as rehabilitator of the Segregated Account (the "Rehabilitator").

26.      In conjunction with the Rehabilitation Proceedings, the Rehabilitation Court issued an order enjoining certain actions by Segregated Account policyholders, other

Segregated Account counterparties and other entities claiming to own securities insured by AAC, including the assertion of damages or acceleration of losses based on early termination and the loss of control rights in the insured transactions (the "<u>Segregated Account Injunction</u>").  Various Segregated Account policyholders, counterparties and other entities claiming to own securities insured by AAC raised objections to the placement of certain policies into the Segregated Account, made motions to intervene and for discovery, sought to invalidate the Segregated Account on constitutional and other grounds, and opposed the Rehabilitation Plan (as defined below).  On October 26, 2010, the Rehabilitation Court denied the challenges of certain Segregated Account policyholders and counterparties to the Rehabilitation Proceedings and related injunction.  Certain appeals have been brought in the Wisconsin Court of Appeals.

27.     On October 8, 2010, the Rehabilitator filed a plan of rehabilitation with respect to the Segregated Account (the "<u>Rehabilitation Plan</u>") in the Rehabilitation Court.  Pursuant to the Rehabilitation Plan, obligations under the Segregated Account Policies will be paid with a combination of cash and surplus notes of the Segregated Account (the "<u>Segregated Account Surplus Notes</u>").  A confirmation hearing in respect of the Rehabilitation Plan was held from November 15-19, and November 30, 2010 in the Rehabilitation Court.  All Segregated Account policyholders, the Segregated Account counterparties, as well as any other person or entity interested in the Rehabilitation Proceeding, were provided with notice of the hearing.

28.     On December 8, 2010, while the Rehabilitation Plan, was *sub judice*, the IRS filed a notice of removal to the United States District Court for the Western District of Wisconsin (the "<u>Wisconsin District Court</u>"), which temporarily halted the Rehabilitation Proceedings.  The basis for the IRS's removal notice is its objection to an injunction issued by

the Rehabilitation Court on November 8, 2010 (the "IRS Injunction"), enjoining the IRS from attaching or levying a lien upon AAC's assets, as more fully described above.

29. On January 14, 2011, the Wisconsin District Court granted the Rehabilitator's motion for remand (attached hereto as Exhibit B, the "Wisconsin Remand Order") and on January 18, 2011, the IRS filed a notice of appeal of the Wisconsin Remand Order, and that appeal remains pending before the United States Court of Appeals for the Seventh Circuit (the "IRS Appeal"). On January 24, 2011, the Rehabilitation Court entered a decision and final order confirming the Rehabilitation Plan (attached hereto as Exhibit C, the "Rehabilitation Plan Confirmation Order"). Entry of the Rehabilitation Plan Confirmation Order is a significant step and will serve as the backdrop for further negotiations towards resolution of the issues between the Debtor, the Committee and OCI in connection with the formulation of a consensual Plan. Nevertheless, significant work is required to effectuate the Rehabilitation Plan and resolve the IRS Appeal.

30. Even under the best of circumstances, the initial 120-day window to develop a Plan would be insufficient in light of the size and complexity of this case. Despite the size and complexity, however, the Debtor continues forward with the process of developing and negotiating a Plan. Accordingly, the Debtor submits that the size and complexity of the Debtor's operations and its chapter 11 case justify the limited extension of the Exclusive Periods sought in this Motion.

***An Extension of Time is Necessary to Negotiate and Prepare Adequate Information***

31. The Debtor has worked expeditiously to address the critical issues discussed above and to move this case forward. To this end, on December 22, 2010, the Debtor filed its Schedules of Assets and Liabilities and Statements of Financial Affairs. Preparation of the Schedules and Statements of Financial Affairs was a large undertaking for the Debtor and

required the time and commitment of many of Ambac's key employees.  The Debtor has also

established March 2, 2011, as the bar date for the submission of proofs of claim, which will

provide an important stepping stone to the development of a Plan.  In light of the size and

complexity of this chapter 11 case and the bar date of March 2, 2011, the Debtor will be unable

to review and analyze the validity, amount and priority of claims that may be filed in time to file

a Plan by March 8, 2011, the current expiration of the Exclusive Filing Period.

        32.     As described above, the Debtor has also devoted substantial time and

resources to negotiations with its major creditor constituencies, including responding to

numerous document requests from the Committee and the IRS.  Because of these ongoing efforts

and the relatively early stage of this chapter 11 case, additional time is needed to develop,

negotiate and prepare the Plan and disclosure statement.

***The Debtor Has Made Good Faith Progress***
***Since the Commencement of this Chapter 11 Case***

        33.     As noted above, the Debtor has made substantial good faith progress in

this chapter 11 case, including, but not limited to, obtaining confirmation of the Rehabilitation

Plan with respect to the Segregated Account, moving forward with the IRS Adversary

Proceeding, notwithstanding the potential delays caused by the Motion to Withdraw, and

continuing negotiations with the Committee and OCI on a regular basis in furtherance of a Plan.

The Debtor is confident that, with the continued cooperation of the Committee and other

stakeholders, the extension sought by the Debtor will enable the parties to continue to make

significant progress towards the development of a Plan in the upcoming months.

***The Debtor Is Paying its Postpetition Debts as They Come Due***

        34.     The Debtor has been paying, and will continue to pay, its postpetition

debts as they become due.  The Debtor has sufficient liquidity to carry on the normal course of

its business during the requested extension of the Exclusive Periods, and providing the Debtor a meaningful opportunity to develop a Plan through the requested extension will not harm or prejudice the Debtor's creditors or other parties in interest.

***The Debtor Has Demonstrated Reasonable Prospects for Filing a Viable Plan***

35. As of November 7, 2010, the Debtor, OCI, and an ad hoc committee of unsecured bondholders reached an agreement on a non-binding term sheet, the framework of which the Debtor hopes will become a Plan. The Debtor is in ongoing discussions with OCI and the Committee towards a binding term sheet, the terms of which should provide a basis for a confirmable Plan. The Debtor believes that significant progress has been made towards this objective. Additionally, the confirmation of the Rehabilitation Plan is a significant step and will serve as the backdrop for further negotiations towards resolution of the issues between the Debtor, the Committee, and OCI in connection with the formulation of a consensual Plan.

***The Debtor Will Use the Extension to Negotiate in Good Faith with Stakeholders and Not to Pressure Creditors to Accede to the Debtor's Demands***

36. The Debtor and its advisors have worked diligently to ensure a continuing dialogue with all of the major constituents in this chapter 11 case, including the Committee, OCI, and the U.S. Trustee. Several negotiation sessions among the Debtor, the Committee and OCI have occurred and negotiations continue, with some narrowing of the "bid/ask spread" between the respective positions of the parties. Additionally, such open communication has enabled the Debtor to ensure that all parties in interest are kept adequately informed of the Debtor's operations and the direction of this chapter 11 case. The Debtor has no intention of changing this course of conduct should this Motion be approved; to the contrary, the Debtor continues to encourage the parties to further the negotiations with respect to the critical elements of a Plan. Furthermore, the Debtor is not seeking an extension of the Exclusive Periods to delay creditors

or force them to accede to the Debtor's demands.

37.     As described above, the Debtor intends to continue working collaboratively with the Committee and all other major constituents in this case to develop a consensual Plan in the coming months.  Nonetheless, the negotiation of a consensual Plan in this case will involve extremely complex, and potentially novel, legal issues that will necessarily require an extensive commitment of time and effort by all constituents.  Additionally, resolution of the different intercreditor issues will require the examination of significant tax, securities, and operational issues.  While the Debtor is attempting to propose a consensual Plan well before September 6, 2011, if the Exclusive Periods were any shorter, the Debtor would be required simply to turn around and begin preparation of another motion further extending exclusivity.  Indeed, imposing unrealistically short time pressures on the parties would not encourage the process, but would likely be counterproductive.

***The Short Tenure of this Case Warrants an Extension of the Exclusive Periods***

38.     The Debtor's case has been pending for just a few months, but as discussed above, the Debtor has accomplished substantial tasks in this short period of time.  It is not uncommon for an extension of the Exclusive Periods to be required in such a large and complex case.  In light of the short duration of this chapter 11 case, the challenges faced by the Debtor and the progress made to date, the Debtor submits that an extension of the Exclusive Periods is warranted.

***Termination of the Debtor's Exclusive Periods Would Adversely Impact this Case***

39.     Termination of the Exclusive Periods at this critical juncture could give rise to the threat of litigation, the filing of multiple plans, and a contentious confirmation process resulting in increased administrative expenses and, consequently, diminishing returns to the

Debtor's creditors. Moreover, it could significantly delay, if not completely undermine, the Debtor's ability to confirm any plan in this case. Accordingly, the Debtor submits that the Court should extend the Exclusive Periods 180 days.

40. The relief requested in this Motion has been frequently granted to debtors in this jurisdiction in other chapter 11 cases. *See, e.g., In re Innkeepers USA Trust*, No. 10-13800 (SCC) (Bankr. S.D.N.Y. Nov. 10, 2010) (exclusivity extended for 120 days); *In re Lehman Bros. Holdings Inc.*, No. 08-13555 (JMP) (Bankr. S.D.N.Y. Jan. 15, 2009) (exclusivity initially extended by approximately six months); *In re Quebecor World (USA) Inc.*, No. 08-10152 (JMP) (Bankr. S.D.N.Y. Apr. 17, 2008) (exclusivity initially extended by approximately four months); *In re Calpine Corp.*, No. 05-60200 (BRL) (Bankr. S.D.N.Y. Apr. 11, 2006) (exclusivity initially extended by approximately eight months); *In re Delphi Corp.*, No. 05-44481 (RDD) (Bankr. S.D.N.Y. Jan. 6, 2006) (exclusivity initially extended by approximately six months); *In re Loral Space Commc'ns Ltd.*, No. 03-41710 (RDD) (Bankr. S.D.N.Y. Nov. 12, 2003) (exclusivity initially extended by approximate four months); *In re NRG Energy, Inc.*, No. 03-13024 (PCB) (Bankr. S.D.N.Y. Sept. 10, 2003) (exclusivity initially extended by approximately four months): *In re Enron Corp.*, No. 01-16034 (AJG) (Bankr. S.D.N.Y. Apr. 24, 2002) (exclusivity initially extended for approximately six months); *In re Adelphia Commc'ns Corp.*, No. 02-41729 (REG) (Bankr. S.D.N.Y. Oct. 25, 2002) (exclusivity initially extended for approximately four months); *In re Bethlehem Steel*, No. 01-15288 (BRL) (Bankr. S.D.N.Y. Feb. 5, 2002) (granting initial extension of five and a half months). The Debtor submits that similar relief is warranted in this chapter 11 case.

41. In sum, the Debtor is proceeding with its chapter 11 case in an orderly and expeditious fashion, and is making every effort to communicate with its stakeholders regarding

(i) developments in its case and (ii) the framework of a viable plan.  Under these circumstances and particularly at this early stage of this case, the intent and purpose of section 1121 of the Bankruptcy Code, as well as applicable authority, clearly support the requested extensions of the Exclusive Periods.

## **Notice**

42.     Notice of this Motion has been provided by facsimile, electronic mail transmission, overnight delivery and/or hand delivery to (i) the U.S. Trustee, (ii) counsel to OCI, (iii) counsel to the Committee, and (iv) those parties who have requested notice pursuant to Rule 2002, as of the date of this Motion.  The Debtor submits that no other or further notice need be provided.

## **No Previous Request**

43.     No previous request for the relief sought herein has been made by the Debtor to this or any other court.

WHEREFORE the Debtor respectfully requests an order (i) extending the

Debtor's Exclusive Periods to file a chapter 11 plan and solicit acceptances thereof; and (ii)

granting such other and further relief as the Court deems just and proper.

Dated: February 2, 2011
      New York, New York

                /s/ Allison H. Weiss_____
                Peter A. Ivanick
                Martin J. Bienenstock
                Allison H. Weiss
                DEWEY & LEBOEUF LLP
                1301 Avenue of the Americas
                New York, New York 10019
                Tel: (212) 259-8000
                Fax: (212) 259-6333

                - and -

                Todd L. Padnos (admitted *pro hac vice*)
                DEWEY & LEBOEUF LLP
                1950 University Avenue, Suite 500
                East Palo Alto, California 94303
                Tel: (650) 845-7000
                Fax: (650) 845-7333

                *Attorneys for the Debtor and Debtor in Possession*

Exhibit A

DEWEY & LEBOUEF LLP
1301 Avenue of the Americas
New York, New York 10019
Tel:  (212) 259-8000
Fax: (212) 259-6333
Peter A. Ivanick, Esq.
Martin J. Bienenstock, Esq.
Lawrence M. Hill, Esq.

*Attorneys for the Debtor and Debtor in Possession*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------------------------x

In Re:

AMBAC FINANCIAL GROUP, INC.,

                        Debtor.

Chapter 11
Bankr. Case No. 10-15973 (SCC)

-----------------------------------------------------------------------x

AMBAC FINANCIAL GROUP, INC.,

                        Plaintiff.

                v.

UNITED STATES OF AMERICA,

                        Defendant.

Adv. Proc. No. 10-4210 (SCC)

-----------------------------------------------------------------------x

NOTICE OF DEBTOR'S MOTION FOR PRETRIAL CONFERENCE
AND PURSUANT TO SECTION 105(A) OF THE BANKRUPTCY CODE AND
GENERAL ORDER M-390 FOR AUTHORIZATION TO IMPLEMENT
ALTERNATIVE DISPUTE RESOLUTION PROCEDURES

      PLEASE TAKE NOTICE that a hearing on the annexed motion of Debtor-plaintiff

Ambac Financial Group, Inc. ("Ambac") in the above-entitled action, pursuant to Rule 9076-1 of

the Local Rules for the United States Bankruptcy Court for the Southern District of New York,

and Federal Rule of Civil Procedure ("FRCP") 16, as incorporated by Federal Rule of Bankruptcy Procedure ("Bankruptcy Rules") 7016, requiring the parties or their attorneys to be present at a pretrial conference, and pursuant to section 105(a) and General Order M-390 for authorization to implement alternative dispute resolution procedures for the adversary proceeding (the "Motion"), will be held before the Honorable Shelley C. Chapman, United States Bankruptcy Judge, at the United States Bankruptcy Court, Alexander Hamilton Customs House, Courtroom 610, One Bowling Green, New York, 10004 (the "Bankruptcy Court"), on **February 16, 2011 at 10:00 a.m. (Prevailing Eastern Time)** (the "Hearing").

PLEASE TAKE FURTHER NOTICE that objections to the Motion, if any, shall be in writing, and shall conform to the Bankruptcy Rules and the Local Rules of the Bankruptcy Court for the Southern District of New York, and be filed with the Bankruptcy Court electronically in accordance with General Order M-242, as amended by General Order M-269, by registered users of the Court's electronic case filing system (the User's manual for the Electronic case Filing System can be found at www.nysb.uscourts.gov, the official website for the Bankruptcy Court), with a hard copy delivered directly to chambers and served in accordance with General Order M-242 upon each of the following: (1) counsel to the Debtors, Dewey & LeBoeuf, LLP, 1301 Avenue of the Americas, New York, New York 10019, Attention: Martin J. Bienenstock, Esq., Peter A. Ivanick, Esq., and Lawrence M. Hill, Esq.; (ii) counsel to the Official Committee of Unsecured Creditors, Anthony Princi, Esq. and Gary S. Lee, Esq., 1290 Avenue of the Americas, New York, New York 10104 and 2000 Pennsylvania Avenue, NW, Suite 6000, Washington, DC 20006-1888, Attention: Edward L. Froelich, Esq.; (iii) the Office of the United States Trustee for the Southern District of New York, 33 Whitehall Street, New York, New York 10004, Attention: Brian S. Masumoto, Esq.; and (iv) counsel to the United States of America, United States

Attorney for the Southern District of New York, 86 Chambers Street – 3rd Floor, New York, New York 10007, Attention: Daniel P. Filor, Esq., Ellen London, Esq. and Preet Bharara, Esq. so as to be received on or before **4:00 p.m. (prevailing Eastern time) on February 9, 2011**.

PLEASE TAKE FURTHER NOTICE that if an objection to the Motion is not received by the Objection Deadline, the relief requested shall be deemed unopposed, and the Bankruptcy Court may enter an order granting the relief sought without a hearing.

PLEASE TAKE FURTHER NOTICE that objecting parties are required to attend the Hearing and failure to appear may result in relief being granted or denied upon default.

Dated: New York, New York
      February 1, 2011

Respectfully submitted,

By: /s/ Peter A. Ivanick
     Peter A. Ivanick, Esq.
     Martin J. Bienenstock, Esq.
     Lawrence M. Hill, Esq.
     DEWEY & LEBOEUF LLP
     1301 Avenue of the Americas
     New York, New York 10019
     Tel: (212) 259-8000
     Fax: (212) 259-6333

     *Attorneys for the Debtor and Debtor in Possession*

NY3 3076849.1

DEWEY & LEBOUEF LLP
1301 Avenue of the Americas
New York, New York 10019
Tel:  (212) 259-8000
Fax: (212) 259-6333
Peter A. Ivanick, Esq.
Martin J. Bienenstock, Esq.
Lawrence M. Hill, Esq.

*Attorneys for the Debtor and Debtor in Possession*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------------x

In Re:

AMBAC FINANCIAL GROUP, INC.,

                  Debtor.

<u>Chapter 11</u>
Bankr. Case No. 10-15973 (SCC)

------------------------------------------------------------------------x

AMBAC FINANCIAL GROUP, INC.,

                  Plaintiff.

          v.

UNITED STATES OF AMERICA,

                  Defendant.

Adv. Proc. No. 10-4210 (SCC)

------------------------------------------------------------------------x

DEBTOR'S MOTION FOR PRETRIAL CONFERENCE AND
PURSUANT TO SECTION 105(A) OF THE BANKRUPTCY CODE AND
GENERAL ORDER M-390 FOR AUTHORIZATION TO IMPLEMENT
<u>ALTERNATIVE DISPUTE RESOLUTION PROCEDURES</u>

TO THE HONORABLE SHELLEY C. CHAPMAN
UNITED STATED BANKRUPTCY JUDGE:

      Debtor-plaintiff Ambac Financial Group, Inc. ("<u>Ambac</u>") in the above-entitled action,

moves the Court pursuant to the Local Rules for the United States Bankruptcy Court for the

Southern District of New York, and Federal Rule of Civil Procedure ("<u>FRCP</u>") 16, as

incorporated by Federal Rule of Bankruptcy Procedure (the "<u>Bankruptcy Rules</u>"), and General

Order M-390, for an order requiring the parties or their attorneys to be present at a pretrial

conference to be held on February 16, 2011 and for authorization to implement alternative

dispute resolution procedures to resolve the adversary proceeding between Ambac and the

United States, and such other matters as may aid in the disposition of the action.  In further

support for the Motion, Ambac respectfully represents:

Background

     1.     On November 8, 2010, Ambac commenced a voluntary case under chapter 11 of

Title 11 of the United States Code, 11 U.S.C § 101 *et seq.* (the "<u>Bankruptcy Code</u>").  Ambac

continues to operate its business and manage its properties as debtor in possession pursuant to

sections 1107 and 1108 of the Bankruptcy Code.

     2.     On November 9, 2010, Ambac commenced this adversary proceeding against the

United States seeking a declaration that it has no tax liability for tax years 2003 through 2008

and that it is entitled to retain tax refunds that were paid to it by the Internal Revenue Service

(the "<u>IRS</u>").  Ambac also is seeking an injunction restraining the IRS from taking any

enforcement action against Ambac's non-debtor subsidiaries without first providing Ambac with

five days' notice of such action.

     3.     The basis of Ambac's case is its claim that its method of accounting for credit

default swaps ("<u>CDSs</u>") — which was the basis for its recovery of tax refunds of over $700

million — was proper.  Substantively, the case raises the issue whether Ambac's method of

accounting for CDSs "clearly reflects income," as required by Section 446 of the Internal

Revenue Code (the "IRC"), and the Treasury regulations thereunder.   In addition, Ambac seeks

an injunction against the IRS preventing the IRS to take any collection actions regarding tax

2

liabilities against Ambac's affiliated companies unless IRS provides Ambac with five days'
notice.

4.    Ambac believes that the issues raised in the adversary proceeding are legal issues
for the Bankruptcy Court to determine, requiring minimal additional fact disclosure. Ambac has
already provided to the United States all discovery requested and there are no outstanding
discovery requests pending. Moreover, Ambac believes that it will seek minimal discovery
against the United States in the context of the adversary proceeding. Thus, discovery in the
adversary proceeding, to the extent it is required, will flow only one-way, to the defendant
United States.

5.    On January 13, 2011, the United States filed a motion, pursuant to 28 U.S.C.
§ 157(d), to withdraw the reference to the United States Bankruptcy Court for the Southern
District of New York to the United States District Court for the Southern District of New York.
The United States' motion has been assigned to United States District Court Judge Paul G.
Gardephe (Case No. 11 Civ. 270). Notwithstanding that a withdrawal motion is now pending in
the district court, the adversary proceeding in the bankruptcy court is not stayed pursuant to Rule
5011(c) of the Bankruptcy Rules. Rule 5011(c) provides that "[t]he filing of a motion for
withdrawal of a case or proceeding . . . shall not stay the administration of the case or any
proceeding therein before the bankruptcy judge." Ambac intends to vigorously oppose the
withdrawal motion, and no return date has been set by the district court to hear the motion. Even
if the district court were to agree to withdraw the reference, it is well within the discretion of the
district court to order that the adversary proceeding remain in the bankruptcy court until such
time as the matter is ready for trial. Accordingly, to avoid unnecessary delay while the

withdrawal motion is pending, it is proper for the administration of the adversary proceeding to proceed in Bankruptcy Court.

6.      On January 14, 2011, the United States answered Ambac's complaint.  No counter-claims were asserted.

Discovery Schedule

7.      The Debtor's proposed scheduling order (the "Scheduling Order") provides for the following:  (i) initial disclosures required pursuant to FRCP 26(a)(1) shall be served by February 25, 2011; (ii) production requests shall be served before March 4, 2011 and responses served by April 4, 2011; (iii) fact depositions shall be completed by April 22, 2011; (iv) Requests for Admissions shall be served by April 29, 2011; (v) a status conference shall take place during April, 2011; (vi) Plaintiff and Defendant's expert disclosures pursuant to FRCP 26(a)(2)(A) and (B) shall be made by May 6, 2011; (vii) rebuttal expert reports shall be served by May 27, 2011, and expert depositions shall be completed by June 17, 2011; (viii) all discovery shall be completed by June 24, 2011; and (ix) all dispositive motions shall be served by July 15, 2011 and notice to be heard on the first available date after August 15, 2011.  Ambac submits that the conditions and deadlines set forth in the Scheduling Order are reasonable and in the best interests of the Debtor's estate to expedite discovery.  Ambac requests that the Court approve the terms set forth in the Scheduling Order.

8.      Pursuant to FRCP 26 and Bankruptcy Rule 7026, Ambac has conferred with the Defendant to coordinate and agree to a discovery scheduling order.  Ambac has been engaged in discussions with Defendant regarding discovery since November, 2010.  On or about November 24, 2010, Ambac responded to Information Document Requests ("IDRs") served on Ambac by the IRS which related to the tax accounting issues.  In addition, at the initial case conference held

on December 21, 2010, Ambac informed the Court that the parties were engaged in informal discovery and that Ambac would provide to Defendant additional discovery. Following the hearing, and pursuant to Defendant's informal request, on December 23, 2010, Ambac produced to Defendant Ambac's tax work papers, contracts and a tax opinion provided by KPMG. Ambac has repeatedly expressed its willingness to provide additional discovery to Defendant and its desire to expedite the resolution of this tax dispute. However, since Ambac's production on December 23, Defendant has not requested any further discovery. Nearly three months have elapsed since Ambac filed its complaint. Ambac is a holding company with limited resources and no additional sources of funding currently available to it. Time is of the essence to proceed with discovery and to resolve this tax dispute. The Official Committee of Unsecured Creditors (the "Creditors' Committee") consents to the granting of this motion and Alternative Dispute Resolution Proceeding Order. Defendant has indicated that it will not consent to the proposed order.[1]

Alternative Dispute Resolution

9. Pursuant to section 105(a) of the Bankruptcy Code, Local Bankruptcy Rule for the Southern District of New York ("LBR") 9019-1 and Rule 1.1 of the Court's General Order M-390, Ambac respectfully moves for assignment of this matter to alternative dispute resolution. Ambac proposes that the alternative dispute resolution will consist of a Settlement Conference

---

[1] Defendant objects to the granting of the motion on the ground that the Defendant has not been given 21 days prior notice to confer with Ambac before the Scheduling conference. In the interests of judicial economy and efficiency, Debtor has noticed the hearing date of this motion for February 16, 2010, only because this court has already scheduled an omnibus hearing for such date. A copy of the proposed Scheduling Order was provided to Defendant on January 31, 2011. Ambac advised Defendant that it is willing to discuss the Scheduling Order up and until the hearing before this Court and attempted to schedule a call to discuss the schedule further on February 1, 2011. In addition, Defendant objects to the Scheduling and Alternative Dispute Resolution Order on the ground that the Debtor's proposed "expedited discovery" schedule with depositions to be completed in less than three months is unreasonable and would undermine the ability of the parties to put forth substantial time and effort evaluating and participating in settlement discussions. Ambac disagrees. Defendant's objections are inconsistent with its prior expression of intent to resolve this matter expeditiously.

(defined below) and mediation.  The mediation will not require Ambac or the United States to settle or compromise any dispute, but each party will be required to (i) engage in settlement discussions, (ii) participate in mediation in good faith, (iii) follow directions of the mediator, and (iv) follow any additional procedures approved by this Court.

10.     Rule 1.1 of General Order M-390 permits the Bankruptcy Court to assign a matter to mediation upon the motion of a party in interest, the U.S. Trustee, or on its own motion. Further, Rule 1.3 of General Order M-390 permits the Court to assign an adversary proceeding, contested matter, or other dispute to mediation.  Moreover, section 105(a) of the Bankruptcy Code grants bankruptcy courts the "equitable power to 'issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title.'" *New Eng. Dairies, Inc v. Dairy Mart Conv. Stores, Inc.* (*In re Dairy Mart Conv. Stores, Inc.*), 351 F.3d 86, 91 (2d Cir. 2003)(quoting 11 U.S.C. § 105(a)).

11.     Thus, General Order M-390 expressly pronounces the intent of the Court to facilitate the use of mediation in all matters.  Consistent with the intent of General Order M-390, Ambac requests that the Court exercise its authority to implement alternative dispute resolution procedures with respect to this adversary proceeding between Ambac and the United States.  The participation of a mediator can help the parties reach an expeditious and appropriate resolution of this adversary proceeding.  Because this proceeding principally involves legal issues in the specialized areas of tax and accounting, and does not involve extensive factual issues, a neutral third party with expertise in these areas can help the parties work out a solution to the controversy.

12.     The litigation of these issues without at least exploring the possibility of whether the parties can reach an early resolution does not serve the interest of Ambac, its estate, or the

economic stakeholders in this case in light of the amount in dispute in the adversary proceeding. Assignment of this case for mediation will also reduce the costs incurred by Debtor-plaintiff Ambac, thereby preserving assets for creditors, as well as costs incurred by the United States. Moreover, a quick resolution of the tax litigation is necessary to allow Ambac to emerge from bankruptcy and avoid the possibility of this case needing to convert to a Chapter 7 proceeding. Prolonged litigation, however, would be costly and slow the administration of the bankruptcy proceeding.

13.     The relief requested in this Motion is substantially similar to the relief that has been granted by this Court in connection with similar motions to implement alternative dispute resolution procedures. *See, e.g.*, *In re Enron Corp., et al.*, Case No. 01-16034 (ALG) (Bankr. S.D.N.Y. March 4, 2003) [Docket No. 9533] and (Bankr. S.D.N.Y. March 20, 2003) [Docket No. 9862] (ordering mediation procedures with respect to adversary proceedings regarding certain trading disputes); *In re Ames Department Stores, Inc., et al.*, Case No. 01-42217 (REG) (Bankr. S.D.N.Y. June 25, 2007) [Docket No. 3195] (ordering mandatory mediation procedures with respect to adversary proceedings that the debtors commenced against various preference defendants).

14.     Ambac proposes that within ten (10) days of the date of the order implementing alternative dispute resolution procedures, Ambac or the United States may request an initial telephonic settlement conference (a "Settlement Conference") (or in person if the parties agree) to be held within five (5) calendar days of the receipt of such request (the "Notice of Settlement Conference").  Upon receipt of the Notice of Settlement Conference, the recipient will be required to respond within two (2) calendar days by either accepting the proposed date and time in the Notice of Settlement Conference or proposing an alternate date and time that is no later

than five (5) calendar days from the date and time in the Notice of Settlement Conference. If the parties are not able to agree on a time and date for the Settlement Conference, the dispute will immediately proceed to mediation (as further described below).

15.    Ambac proposes that the parties will allocate approximately one (1) hour for the initial Settlement Conference and that only Ambac and its representatives, the United States and its representatives and the Creditors' Committee and its representatives will participate. All discussions will be subject to section 408 of the Federal Rules of Evidence and the confidentiality provisions of General Order M-390.

16.    Unless all issues in this adversary proceeding have been settled, mediation will commence thirty (30) days after the date of the order implementing alternative dispute resolution procedures without regard to whether a Settlement Conference has been held or requested or if a conference is still scheduled to occur. If the parties cannot agree upon a mediator within thirty (30) days of the date of the Court's order to mediate, the court shall appoint a mediator and alternate mediator. Ambac and the United States together will contact the mediator to schedule the initial mediation date. Mediation shall be completed no later than thirty (30) days after the close of fact discovery.

17.    The mediator will have the broadest possible discretion as provided under General Order M-390 including the discretion to certify specific legal issues to the Bankruptcy Court for decision.

18.    The mediation proceedings will take place in New York, New York unless agreed to by the parties and the mediator.

19.    Ambac and the United States will have the option of submitting a mediation brief to the mediator, with service upon the other parties to the mediation and the Creditors'

Committee; provided, that the mediator may direct the parties to submit and serve mediation briefs on each other, the mediator, and the Creditors' Committee. In either case, the mediation briefs will be filed at least five (5) days prior to the scheduled mediation proceeding and will not be filed with the Court.

20.    Ambac and the United States will appear in person to the mediation proceeding. The Creditors' Committee may attend and participate in all mediations. Each party must have a principal in attendance having settlement authority. In addition, the parties' counsel may attend the mediation proceeding.

21.    Upon the filing of a notice and a hearing by either Ambac or the United States, the Court may sanction the parties for failing to comply with the mediation procedures. If the mediator reports to the Court that a party subject to the mediation procedures is not cooperating, the Court may, on its own motion, schedule a hearing to consider sanctions ("Sanctions") against that party for its failure to cooperate in good faith. Sanctions as they relate to Ambac may include but are not limited to (i) attorneys' fees, (ii) fees and costs of the mediator, (iii) termination of mediation procedures, and/or (iv) rejection of some or all claims asserted by Ambac in this adversary proceeding. Sanctions as they relate to the United States may include but are not limited to (i) attorneys' fees, (ii) fees and costs of the mediator; and/or (iii) an award of some or all of the amounts and claims at issue in the adversary proceeding. Litigation with respect to the issuance of Sanctions will not delay the commencement of mediation.

22.    All proposed deadlines may be modified by the mutual consent of Ambac and the United States or by the Court for cause shown. All parties will be responsible for their counsel fees and other costs of the mediation. All parties to the mediation will be equally responsible for the fees and expenses of the mediator.

23.     Ambac proposes that the confidentiality provisions of Rule 5.0 of General Order M-390 will be incorporated by reference into an order approving this Motion.  No statements or arguments made or positions taken by the mediator, Ambac, the Creditors' Committee, and the United States during any part of the alternative dispute resolution process, including, the Settlement Conference and mediation may be disclosed for any purpose by the mediator or any such parties or their attorneys or advisors to the Court or any third party.  Similarly, all briefs, records, reports, and other documents received or made by the mediator while serving is such capacity will remain confidential and will not be provided to the Court, unless they would be otherwise admissible.  In addition, the mediator will not be compelled to disclose such records, reports, and other documents in connection with any hearing held by the Court; provided, however, the mediator may report to the Court the status of the mediation efforts but will not disclose the content thereof.

24.     Ambac proposes that Rule 408 of the Federal Rules of Evidence will apply to all aspects of the alternative dispute resolution procedures including the Settlement Conference and mediation.

25.     The fundamental purpose of mediation is to allow an unbiased third party to assist adversaries in reaching resolution of issues upon which they disagree.  Ambac submits that alternative dispute resolution procedures will be a worthwhile process that will enable Ambac to reduce unnecessary administrative expenses, maximize the value of the Ambac's claims in the adversary proceeding, and promote judicial efficiency by consensually resolving these claims.  Based upon the foregoing, Ambac requests that the Court approve the alternative dispute resolution procedures.

26.     No previous request for the relief sought herein has been made by Ambac to this or any other court.

WHEREFORE Ambac respectfully requests that the Court grant the relief requested herein and such other and further relief as it deems just and proper.

Dated:  New York, New York
          February 1, 2011

                              DEWEY & LEBOEUF LLP


                              By: /s/ Peter A. Ivanick_____
                                  Peter A. Ivanick, Esq.
                                  Martin J. Bienenstock, Esq.
                                  Lawrence M. Hill, Esq.
                                  1301 Avenue of the Americas
                                  New York, New York 10019
                                  Tel: (212) 259-8000
                                  Fax: (212) 259-6333

                                  *Attorneys for Debtor and Debtor in Possession*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------x

In Re:
                                                    <u>Chapter 11</u>
AMBAC FINANCIAL GROUP, INC.,                        Bankr. Case No. 10-15973
                                                    (SCC)
                              Debtor.
-----------------------------------------------------------------x
AMBAC FINANCIAL GROUP, INC.,

                              Plaintiff.


             v.                                     Adv. Proc. No. 10-4210 (SCC)

UNITED STATES OF AMERICA,

                              Defendant.
-----------------------------------------------------------------x

**SCHEDULING AND ALTERNATIVE DISPUTE
RESOLUTION PROCEEDING ORDER**


        THIS MATTER having come before the Court during a conference conducted on

February 16, 2011, with counsel for all parties present, and for good cause shown:

        IT IS HEREBY ORDERED that:

        <u>Pretrial Scheduling</u>

1.      Initial disclosures required pursuant to Federal Rule of Civil Procedure ("FRCP")

26(a)(1), as incorporated by Federal Rule of Bankruptcy Procedure ("Bankruptcy Rule") 7026,

shall be served before Friday, February 25, 2011.

2.      Production requests pursuant to FRCP 34, as incorporated by Bankruptcy Rule

7034 (the "<u>Production Requests</u>"), and initial interrogatories pursuant to FRCP 33, as

incorporated by Bankruptcy Rule 7033, and as such initial interrogatories are

circumscribed by Local Bankruptcy Rule for the Southern District of New York

("LBR") 7033-1(a) (the "Initial Interrogatories"), shall be made on or before Friday, March 4, 2011. Subject to the restrictions of LBR 7033(b), subsequent interrogatories and production requests may be served at any time prior to the June 24, 2011 cut-off for discovery.

3.       Responses to Production Requests shall be made and Initial Interrogatories shall be answered on or before Friday, April 4, 2011.

4.       Requests for Admissions pursuant to FRCP 36, as incorporated by Bankruptcy Rule 7036, shall be made on or before Friday, April 29, 2011.

5.       Fact depositions shall be completed on or before Friday, April 22, 2011.

6.       A status conference shall take place during April, 2011.

7.       The Plaintiff and Defendant's expert disclosures pursuant to FRCP 26(a)(2)(A) and (B), as incorporated by Bankruptcy Rule 7026, shall be made on or before Friday, May 6, 2011.

8.       Rebuttal expert reports shall be served by the Parties on or prior to Friday, May 27, 2011.

9.       Expert depositions shall be completed on or before Friday, June 17, 2011.

10.      All discovery shall be completed on or before Monday, June 24, 2011.

11.      All dispositive motions shall be served on or before Monday, July 15, 2011 and noticed to be heard on the first available date after August 5, 2011.

12.      Any of the discovery deadlines imposed herein may be extended upon the consent of all parties or for cause shown.

<u>Alternative Dispute Resolution</u>

13.    <u>General Order M-390</u>.  All provisions of General Order M-390, providing for

Procedures Governing Mediation of Matters and the Use of Early Neutral Evaluation and

Mediation/Voluntary Arbitration in Bankruptcy Cases and Adversary Proceedings in the

Bankruptcy Court for the Southern District of New York and all existing and further

amendments thereto (the "<u>Standing Order</u>") shall apply to the mediations to be conducted

under this Order.

14.    <u>Participation Mandatory</u>.  Unless otherwise provided in a specific order applicable

to this adversary proceeding,

      a.   compliance with the alternative dispute resolution procedures in this Order

          is mandatory in this adversary proceeding for both Ambac and the United

          States; and

      b.   no party is required to settle or compromise any dispute or enter into a

          particular settlement or compromise, but each party must engage in the

          specified communications to discuss settlement, participate in mediation

          in good faith, follow directions of the mediator, and otherwise comply

          with the alternative dispute resolution procedures specified below.

15.    <u>Settlement of Disputes During the Alternative Dispute Resolution Procedures</u>.

Nothing contained herein shall prevent the parties from settling, and the parties are

encouraged to settle, this adversary proceeding at any time before, during, or following

the commencement of alternative dispute resolution procedures by the mutual consent of

the parties, provided that such settlement is approved by specific order of the Court.  Any

settlement discussions between any of the parties and the Official Committee of

Unsecured Creditors (the "Creditors' Committee"), the contents of any papers submitted during the mediation described below, and all discussions in mediation shall remain confidential and privileged and shall not be discoverable or admissible as evidence in any subsequent litigation of this adversary proceeding or elsewhere, except as provided by further order of this Court.

16.     Ambac's Rights As to Proceedings Previously or Hereafter Commenced by the United States.  If the United States previously has commenced, any action or proceeding in any other court or forum, or any action or proceeding in any other court or forum following commencement of alternative dispute resolution procedures, Ambac reserves its right to remove to this Court any such lawsuit, proceeding, or claim and to defend or take action in any such other court or proceeding to protect the estate of Ambac, despite the incomplete status of the steps prescribed under the alternative dispute resolution procedures herein.

17.     Request for Initial Settlement Conference.  Within ten (10) days of the date of this Order, Ambac or the United States may request an initial telephonic settlement conference (a "Settlement Conference") (or in person if the parties agree) by written request, to be held within five (5) calendar days of the receipt of such request.  Within two (2) calendar days of a receipt of such a request, the other party must respond by acceptance of one of the proposed dates and times or by a proposal for an initial settlement call no later than five (5) calendar days from the earliest date set forth in the written request.  If an acceptable date cannot be achieved through this process, the parties shall immediately proceed to mediation.  At least one hour shall be reserved for the initial conference to discuss settlement and only Ambac and its representatives, the United

States and its representatives and the Creditors' Committee and its representative will participate. No mediator or representative of the Court will participate in this but the initial conference call specified in this paragraph, together with any continuations or rescheduled settlement calls or meetings arising from that initial settlement conference, will be covered by Rule 408 of the Federal Rules of Evidence and analogous state evidentiary provisions, the confidentiality provisions of this Order shall apply to this call or series of calls as if a mediator were present. Settlement conferences may be held in person if both parties agree in writing.

18.    <u>Mediation</u>. Unless all issues in this adversary proceeding have been settled, mediation will commence thirty (30) days after the date of this Order without regard to whether a Settlement Conference has been held or requested or if a conference is still scheduled to occur.

      a.   Ambac and the United States together shall contact the mediator to schedule the initial mediation date.

      b.   <u>Powers of Mediator</u>. The mediator shall have the broadest possible discretion consistent with the Standing Order described herein, including the discretion to certify specific legal issues to the Bankruptcy Court for decision.

      c.   <u>Choice of Mediator</u>. If the parties cannot agree upon a mediator within thirty (30) days of the date of the Court's order to mediate, the Court shall appoint a mediator and alternate mediator.

      d.   <u>Mediation Sites</u>. All mediation proceedings will take place in New York, New York, unless agreed to by the parties and the mediator.

     e.   <u>Mediation Briefs</u>.  Both parties to the mediation may submit a mediation brief, with service upon the other party to the mediation and upon the Creditors' Committee; provided, however, the mediator may order that the parties to serve upon each other, the mediator, and the Creditors' Committee a mediation brief.  If a party to the mediation opts to serve a mediation brief upon the other party to the mediation hereunder, such mediation brief shall also be filed with the mediator and the Creditors' Committee.  Any such mediation brief shall be served and filed no later than five (5) days prior to the scheduled mediation proceeding.  No mediation brief shall be filed with the Court.

     f.   <u>Appearance at Mediations</u>.  Unless otherwise ordered by the mediator all participants in the mediation must appear in person with a principal who has settlement authority.  The Creditors' Committee may attend and participate in all mediations hereunder.  Counsel may also be present and participate.

     g.   <u>Mediation Deadline</u>.  Mediation shall be completed no later than thirty (30) days after the close of fact discovery.

19.   <u>Deadlines</u>.  Notwithstanding any of the provisions set forth above, any of the deadlines contained herein may be modified by: (i) the mutual consent of Ambac or the United States or (ii) the Bankruptcy Court, for cause shown.

20.   <u>Sanctions for Parties</u>.  Both Ambac and the United States must participate in good faith in these alternative dispute resolution procedures.  If, after notice and a hearing, the Court determines that Ambac or the United States have not complied with the alternative

dispute resolution procedures in good faith, Ambac or the United States may be subject to such sanctions as the Court deems appropriate (the "Sanctions").  If a mediator reports to the Court that any party subject to this Order is not cooperating in good faith with the mediation procedures, the Court may, without the need for further motion by any party, schedule a hearing and order Sanctions.  Litigation with respect to the issuance of Sanctions shall not delay the commencement of mediation.  Sanctions shall include, but are not limited to:

    a.   Against Ambac: (i) attorneys' fees; (ii) fees and costs of the mediator; (iii) termination of mediation procedures; and/or (iv) rejection of some or all claims asserted by Ambac in this adversary proceeding.

    b.   Against the United States: (i) attorneys' fees; (ii) fees and costs of the mediator; and/or (iii) an award of some or all of the amounts and claims at issue in the adversary proceeding.

21.   Confidentiality.  The confidentiality provisions of Rule 5.0 of the Standing Order are hereby incorporated by reference into this Order.  No statements or arguments made or positions taken by the mediator, Ambac, the Creditors' Committee, and the United States during any part of the alternative dispute resolution process, including, the Settlement Conference and mediation may be disclosed by the mediator or any such parties or their attorneys and advisors to the Court or any third party.  Similarly, all briefs, records, reports, and other documents received or made by the mediator while serving is such capacity shall remain confidential and not be provided to the Court, unless they would be otherwise admissible.  In addition, the mediator shall not be compelled to disclose such records, reports, and other documents in connection with any hearing held

by the Court; provided, however, the mediator may report to the Court the status of the mediation efforts but shall not disclose the content thereof. Rule 408 of the Federal Rules of Evidence shall apply to all aspects of the alternative dispute resolution procedures including the Settlement Conference and mediation.

22.    <u>Fees</u>.  Except as otherwise provided herein, each party to the mediation shall bear its own counsel fees and other costs of the mediation.  All parties to the mediation will be equally responsible for the fees and expenses of the mediator.


**SO ORDERED:**
February __, 2011
New York, New York


_____
HON. SHELLEY C. CHAPMAN
UNITED STATES BANKRUPTCY JUDGE

Exhibit B

IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF WISCONSIN

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

IN THE MATTER OF THE
REHABILITATION OF SEGREGATED
ACCOUNT OF AMBAC ASSURANCE
CORPORATION

_____

THEODORE K. NICKEL, COMMISSIONER
OF INSURANCE OF THE STATE OF
WISCONSIN,[1]

               Petitioner,

       v.

UNITED STATES OF AMERICA,

               Respondent.

OPINION and ORDER

10-cv-778-bbc

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

      This proceeding was removed to this court from the Circuit Court for Dane County,

Wisconsin, by the United States.  It is before the court on two motions:  the Commissioner

of Insurance's motion for remand and the United States' motion to dissolve the order

entered in the state court enjoining the United States from taking certain actions related to

---

     [1] Theodore K. Nickel replaced Sean Dilweg as Commissioner of Insurance for the
State of Wisconsin on January 3, 2011.

the potential tax liability of Ambac Assurance Corporation.  A hearing was held on both motions on January 12, 2011.

This order addresses only the first motion, in which I conclude that the case was removed improperly from the state court.  In particular, I conclude that the United States' removal of the state court injunction matter is preempted under the McCarran-Ferguson Act, which leaves to the states the business of insurance.  Also, I am persuaded that the principles of comity and federalism set forth in <u>Burford v. Sun Oil Co.</u>, 319 U.S. 315 (1943), require abstention in this case.  I will not discuss the United State's motion to dissolve the state court injunction because removal was improper and jurisdiction does not exist to entertain it.

From the record and from the facts adduced at the hearing, I find the following facts solely for the purpose of deciding the pending motions.

FACTS

Ambac is a Wisconsin insurance corporation with headquarters in New York.  For most of the past 30 years, it has been one of the two largest insurers of financial guarantees. It is a "monoline" insurer, providing financial guaranty insurance on financial products such as residential mortgage-backed securities, credit default swaps, commercial asset-backed securities and other substantial financial transactions.

2

Ambac is a wholly-owned subsidiary of Ambac Financial Group Inc., a holding company headquartered in New York City.  Throughout the relevant time period, Ambac Financial filed consolidated federal income tax returns for itself and its subsidiaries, including Ambac.

Ambac's financial condition began to deteriorate in late 2007, when many of the transactions it had insured proved to be worth less than they had been held out to be.  As the company saw the increase of actual and estimated future losses growing over the following two years and the resulting damage to its credit rating, it stopped writing new policies and began a functional run-off of its policies in force.

Concurrently, the Wisconsin Office of the Commissioner of Insurance began increasing its oversight of Ambac and retained advisers with experience in the specialized complex financial transactions of companies.  By early 2010, the office had decided that formal regulatory action was necessary.  Accordingly, it implemented the provisions of Wis. Stat. ch. 645, which applies to the rehabilitation and liquidation of insurance companies operating in Wisconsin.

In light of the complexity of the insured transactions and his concern for minimizing the risks to policyholders, the Commissioner of Insurance decided not to undertake a full rehabilitation of the company, which he feared would cause unnecessary and avoidable losses to policyholders and possibly to the economy.  If, for example, a transaction that was not at

3

risk was included in the rehabilitation process, the lenders behind the risk-free notes might have the right to withhold financing for the payment of the notes, thereby giving the counterparties on the notes the right to accelerate and declare default.  In those instances, the issuers might not be able to make the accelerated damages payments and would turn to Ambac to cover the payments.

To avoid unnecessary risk, the Commissioner took advantage of Wis. Stat. § 611.24(2), which permits an insurer to establish a segregated account for any part of its business, with the Commissioner's approval.  To carry out the segregation, the Commissioner reviewed Ambac's business to evaluate its exposure under its policies.  His staff determined that about 1,000 out of Ambac's 15,000 policies had material projected losses, structural problems with the underlying transactions and contractual triggers that could not be avoided except by court action.  He assigned these to a "segregated account," while keeping the remainder in Ambac's general account, where they would not be subject to acceleration, early termination or other triggers.  All policies with material anticipated losses and all other known, potentially material non-policy liabilities of Ambac's general account are allocated to the segregated account, including the general account's obligations under certain reinsurance contracts and disputed contingent liabilities related to two office leases.  The segregated account has no claim-paying assets of its own, but is capitalized by a two-billion dollar secured note issued by Ambac to the account and an aggregate excess of loss

4

reinsurance agreement provided by Ambac.  Plan of Operation, dkt. #13-3, at 3.  Under the terms of the secured note, dkt. #31-1, and reinsurance agreement, dkt. #23-3, the segregated account may call upon the general account to pay claims allocated to the segregated account, as long as payment of the segregated account claims would not cause Ambac's assets to fall below $100 million, which is less than 2 % of Ambac's claim-paying assets.  In other words, the segregated account has access to 98 % of Ambac's current assets with which to pay claims.  In addition, Ambac may not enter into any transaction involving more than $5 million without the segregated account's prior written consent, with the exception of certain investments and policy claims made in the ordinary course of business.        On March 24, 2010, the Commissioner asked the Circuit Court for Dane County, Wisconsin, to rehabilitate the segregated account.  For the purpose of the rehabilitation, the segregated account is considered a separate insurer from Ambac.  On the same day, as part of the rehabilitation, the Commissioner moved ex parte under Wis. Stat. § 645.05 to obtain "first-day injunctive relief" that barred all persons and entities from commencing or prosecuting any actions against the general account "in respect of the segregated account or policies, contracts, or liabilities allocated to the segregated account."  First-Day Injunction, Dkt. #14, Exh. D, ¶ 1.  Once the injunction was in place, petitioner provided court-approved notice of the rehabilitation and the First-Day Injunction by mail, publication and a posting on a court-approved website, http://ambacpolicyholders.com.  Respondent United States had no

5

advance knowledge of the rehabilitation proceeding or its scope.

The United States' interest in the proceeding grows out of a "tentative" federal tax refund it paid to Ambac Financial from 2008 through 2010, in the amount of approximately $700 million. Ambac Financial allocated the $700 million refund to Ambac. The refund was paid under 26 U.S.C. § 6411, which requires the Internal Revenue Service to provide such refunds within 90 days of an application by a corporate taxpayer asserting that it has overpaid tax because of a net operating loss carryback. The refund is termed tentative, because the IRS retains the right to conduct a more thorough audit of the taxpayer's application later and recapture any funds it has paid erroneously.

On October 28, 2010, the IRS sent Ambac Financial an information document request seeking information related to the basis for the refunds, asking, among other things, whether Ambac Financial had received advance permission from the IRS before changing its accounting method. Within ten days, Ambac Financial filed for Chapter 11 bankruptcy protection in the Southern District of New York and filed an adversary proceeding in the bankruptcy court to determine its tax liability. (Ambac Financial is not in the business of insurance and therefore not entitled to the protections of the rehabilitation proceeding.) The action is pending. On November 7, 2010, Ambac allocated to its segregated account any liabilities it has or may ever have arising from its federal taxes through December 2009 and specifically any liabilities it may have with respect to the tax refund.

6

The Commissioner approved the allocation, filed a "notice" with the Dane County court and served the notice on the United States on or about November 8, 2010, the same day that Ambac Financial filed for bankruptcy.  On the same day, the Commissioner obtained an injunction from the Dane County court enjoining the United States from initiating any type of lawsuit in regard to Ambac's potential federal tax liabilities in any court, administrative body or other tribunal against the segregated account or any subsidiary of Ambac whose stock or other form of ownership interest were allocated to the segregated account, to Ambac, to any subsidiary of Ambac or the rehabilitator.  The order enjoined the United States from taking any prejudgment or other steps to transfer, foreclose or exercise purported rights in or against any property or assets of the segregated account, Ambac or Ambac subsidiaries in relation to any potential future federal tax liabilities of Ambac.  The Commissioner served the United States a copy of the injunction, his motion seeking the injunction and a "Notice of Amendment to Plan of Operation for the Segregated Account."

The United States removed the state court action to this court on December 8, 2010. In its notice of removal, dkt. #1, it specified that it was not removing "issues and/or claims in this rehabilitation action that are unrelated to the Internal Revenue Service, and the Notice, Motion and Order filed on November 8, 2010."

OPINION

The threshold question is whether the United States can remove all or part of the rehabilitation proceeding to this court. If the removal is improper, this court lacks jurisdiction to hear any of the government's challenges to the order entered in the proceeding.

The Commissioner has raised the question by moving for remand. He contends first that the United States is legally incapable of removing the case because it is not a party to the action and the rehabilitation proceeding is not a "civil action" under the applicable removal statute, 28 U.S.C. § 1442. Second, he argues that the McCarran-Ferguson Act "reverse-preempts" federal jurisdictional statutes such as § 1442 that were not enacted specifically to govern or relate to the business of insurance. In other words, the Act is the mirror image of federal laws that preempt state action, effecting preemption with respect to federal laws and actions that bear on state laws governing the business of insurance. Finally, the Commissioner relies on <u>Burford v. Sun Oil Co.</u>, 319 U.S. 315 (1943), to support his argument that federal courts should abstain from interfering with specialized, ongoing state regulatory schemes. Because I find the Commissioner's second and third arguments to be persuasive, I need not address the question whether the United States can satisfy the specific requirements of the federal removal statutes.

8

A. <u>The McCarran-Ferguson Act</u>

It is well established that the business of insurance is left to the states.  In the McCarran-Ferguson Act, 15 U.S.C. §§ 1011-15, passed in 1945, Congress made it clear that "[t]he business of insurance, and every person engaged therein, shall be subject to the laws of the several States which relate to the regulation or taxation of such business."  The Act provided that "[n]o Act of Congress shall be construed to invalidate, impair, or supersede any law enacted by any State for the purpose of regulating the business of insurance, or which imposes a fee or tax upon such business, unless such Act specifically relates to the business of insurance."  15 U.S.C. § 1012.  In <u>United States Department of the Treasury v. Fabe</u>, 508 U.S. 491 (1993), the Supreme Court ruled that the "business of insurance" extended to proceedings to liquidate or rehabilitate an insurance company.

The Commissioner argues that even if this proceeding had been removed properly, the court would have to remand it because neither the federal removal statutes nor the federal laws authorizing the levying and collection of federal taxes can override state law as it relates to the rehabilitation of an insurance company.  The United States disputes this proposition, but not convincingly.  It argues that federal tax powers trump state law as it relates to insurance because the power of the Internal Revenue Service to levy and collect taxes derives directly from Art. I, § 8 of the Constitution.  In fact, those powers belong to the Congress; the IRS derives its authority from Congress.

9

Contrary to the United States' argument, the McCarran-Ferguson Act does not exempt federal tax laws from its prohibition.  It is true that under the Anti-Injunction Act, 26 U.S.C. § 7421(a), no *state* law or *state* court can restrict the assessment or collection of taxes.  Id. ("no suit for the purpose of restraining the assessment or collection of any tax shall be maintained in any court by any person").  However, it does not follow that *federal* law in the form of the McCarran-Ferguson Act cannot override this statute and any others insofar as they threaten to impede or impair the state's regulation of the business of insurance.

As the Court of Appeals for the Seventh Circuit has recognized, the McCarran-Ferguson  Act overturns the ordinary preemptions rules by imposing a rule that state laws enacted for the purpose of regulating the business of insurance do not yield to conflicting federal statutes unless the federal statute specifically provides otherwise.  American Deposit Corp. v. Schacht, 84 F.3d 834, 837-38 (7th Cir. 1996) (citing United States Department of Treasury v. Fabe, 508 U.S. 491, 507 (1993)).  In American Deposit, the conflict arose out of the desire of national banks to sell Retirement CDs as permitted under the National Bank Act but not allowed by the Illinois director of insurance.  Siding with the director, the court of appeals found that the McCarran-Ferguson Act governed the matter.

The United States cites a number of cases in which federal courts have ruled in its favor on questions involving taxation, but these do little to advance its argument.  In Security Industrial Insurance Co. v. United States, 702 F.2d 1234 (5th Cir. 1983); Allied

10

Fidelity Corp. v. Commissioner, 572 F.2d 1190, 1192 (7th Cir. 1978); and Modern Life & Accident Insurance Co. v. Commissioner, 420 F.2d 36 (7th Cir. 1969), the issue was the proper classification for federal tax purposes of an insurance corporation or its subsidiary or the legitimacy of the way in which it had organized itself.  None of these cases implicated the policy behind the McCarran-Ferguson Act because the basis on which the federal government taxes an insurance company did not "impair" or otherwise interfere with state regulations categorizing insurance companies for different purposes.  The United States is correct that in these cases the Act does not constrain the federal government's right to assess and collect federal taxes from insurance companies, but its point is irrelevant.  The Commissioner is not arguing that the United States cannot collect taxes from insurance companies in general or from Ambac in particular or that it can never pursue return of the refund if it determines it was improper; he argues only that under the McCarran-Ferguson Act, the United States must conform its efforts to the restrictions necessary to the effectiveness of the state's rehabilitation proceedings.

Similarly, the McCarran-Ferguson Act can restrict the right of removal to federal court in cases in which a state statute governing insurance sets up a comprehensive framework for state rehabilitation proceedings to be conducted in state court and removal would impair that framework.  E.g., Hudson v. Supreme Enterprises, Inc., 2007 WL 2323380, *6-7 (S.D. Ohio Aug. 9, 2007); In re Amwest Surety Insurance Co., 245 F. Supp. 2d 1038, 1044-45 (D.

11

Neb. 2002); <u>Covington v. Sun Life of Canada (U.S.) Holdings, Inc.</u>, 2000 WL 33964592, *9-10 (S.D. Ohio May 17, 2000); <u>United States Financial Corp. v. Warfield</u>, 839 F. Supp. 684, 688-90 (D. Ariz. 1993). In this case, Wis. Stat. ch. 645 vests jurisdiction in the state rehabilitation court over matters related to the rehabilitation of an insurer. Wis. Stat. § 645.04. The state court has authority to enjoin any action that may interfere with the proceedings or "lessen the value of the insurer's assets or prejudice the rights of policyholders, creditors or shareholders, or the administration of the proceeding." Wis. Stat. § 645.05. These sections of chapter 645 relate specifically to regulating the business of insurance. Application of the federal removal statutes would impair the operation of chapter 645 by depriving the state rehabilitation court of jurisdiction, disrupting the goal of a comprehensive rehabilitation structure and interfering with the orders issued by the state court for the purpose of protecting assets payable to claimants. In sum, the federal removal statutes would "invalidate[], impair[], or supersede[] the state laws at issue in this case." <u>Hudson</u>, 2007 WL 2323380, at *7; <u>see also</u> <u>Munich American Reinsurance Co. v. Crawford</u>, 141 F.3d 585, 595 (5th Cir. 1998) ("Congress has evinced a strong federal policy in favor of deferring to state regulation of insolvent insurance companies as reflected in the McCarran-Ferguson Act and the express exclusion of insurance companies from the federal Bankruptcy Code. These laws symbolize the public interest in having the States continue to serve their traditional roles as the preeminent regulators of insurance in our federal system

12

and indicates the special status of insurance in the realm of state sovereignty.") (citations omitted).

The United States contends that even if removal may be restricted in some cases, the principles of preemption should not apply here because it is challenging the injunction only as it affects property that is not controlled by the rehabilitation court or rehabilitation statutes. However, the United States takes a narrow view of the rehabilitation proceeding, focusing on the fact that the only *res* technically subject to the rehabilitation court's jurisdiction is the segregated account, which contains all of Ambac's questionable assets. It overlooks the lengths to which the Commissioner has gone to control the material risks to the claims-paying resources of Ambac and to treat them in the same way it would treat those risks in a full rehabilitation.

Technically, the rehabilitation proceeding extends only to the segregated account to which certain of the Ambac's liabilities are allocated. In reality, it extends to the general account and to Ambac's affiliates and subsidiaries to the extent that these entities are lenders or insurers of the segregated account. Although the segregated account is deemed to be a separate insurer for purpose of rehabilitation, it is not actually a separate corporation from Ambac. Indeed, the whole point of the rehabilitation is to rehabilitate Ambac Assurance Corporation. The Commissioner and the presiding judge have made the decision that treating the assets and liabilities as they have is best calculated to lead to a successful

13

rehabilitation.  The judge held a five-day hearing on the scope and nature of the proceeding and determined that the relationship between the general account and segregated account is fair and equitable.  Thus, the plan to rehabilitate the segregated account depends in large part on the assets of the general account being protected by the first-day and supplemental injunctions.  Allowing the United States to proceed against Ambac or any of the affiliates and subsidiaries would amount to pulling out the linchpin that secures the entire enterprise. Cf. United States v. Bank of New York & Trust Co., 296 U.S. 463, 477-78 (1936) (in dispute over right to funds belonging to Russian insurance companies that were being held in state court in connection with liquidation and distribution, United States was not entitled to maintain suit in federal court for accounting of funds; such suit was not merely to establish debt or right to share in property but rather, sought control of property and could not be litigated without disturbing control of *res* by state court); Metropolitan Life Insurance Co. v. Board of Directors of Wisconsin Insurance Security Fund, 572 F. Supp. 460, 471 (W.D. Wis. 1983) (noting the "disastrous conflicts that would arise if this court were to issue rulings that reduced the funding in the account [used to provide coverage for policyholder claimants] and thereby defeated that part of the state's liquidation efforts. . . .").

Finally, the United States contends that even if the McCarran-Ferguson Act reverse-preempts removal statutes in some situations, the Act has no effect when the party

14

attempting removal is a government agency asserting a federal claim.  The United States cites Granite Reinsurance Co. v. Frohman, 2009 WL 2601105 (D. Neb. 2009), in which a creditor filed an action against the Federal Crop Insurance Corporation (FCIC) and the liquidated insurance company seeking to collect unpaid premiums on reinsurance policies. The FCIC removed the matter to federal court pursuant to § 1442(a) and the liquidator filed a motion to remand that the federal court denied.  However, the court did not hold that federal agencies possess an unrestricted right to remove, as the United States suggests; rather, the court noted specifically that the FCIC was a "federal agency charged with implementing a federal insurance program."  Id. at *5.  Thus, actions by the FCIC fell into the exception to McCarran-Ferguson for federal statutes relating specifically to insurance.  The IRS is not an agency directed specifically to implement an insurance program and thus, Granite Reinsurance does not help it.

In sum, I conclude the McCarran-Ferguson Act restricts the United States' right to remove this case to federal court, even though the taxing authority of the Internal Revenue service may be implicated by the state rehabilitation court's supplemental injunction.  Even if the United States' right to remove was not preempted, I would remand this case to the state court on the basis of the principles of comity and federalism set forth in Burford v. Sun Oil Co., 319 U.S. 315 (1943).

15

B.  Abstention

In Burford, the United States Supreme Court held that federal courts should abstain from interfering with specialized, ongoing state regulatory schemes.  Abstention under Burford is appropriate in two situations: "First, federal courts should abstain from deciding difficult questions of state law bearing on policy problems of substantial import. . . ." International College of Surgeons v. City of Chicago, 153 F.3d 356, 362 (7th Cir. 1998) (internal quotations omitted).  Second, courts "should also abstain from the exercise of federal review that would be disruptive of state efforts to establish a coherent policy with respect to a matter of substantial public concern."  Id.  The Court of Appeals for the Seventh Circuit has applied the second type of Burford abstention in cases involving state insurance rehabilitation proceedings, noting that states have assumed primary responsibility for regulating the insurance industry.  E.g., Hartford Casualty Insurance Co. v. Borg-Warner Corp., 913 F.2d 419, 425-27 (7th Cir. 1990) (finding Burford abstention appropriate where Illinois had implemented state-court rehabilitation proceeding that would resolve plaintiff's claims); see also Mountain Funding, Inc. v. Frontier Insurance Co., 329 F. Supp. 2d 994, 999 (N.D. Ill. 2004) (abstention appropriate where insurance liquidation proceeding was adjudicating all claims against defendant in detailed and uniform manner); Metropolitan Life Insurance Co., 572 F. Supp. 460 (in case involving challenge to Wisconsin statutes governing operation of Wisconsin Insurance Security Fund, abstention was required under Burford and

16

<u>Colorado River Water Conservation District v. Untied States</u>, 424 U.S. 800, 814 (1976), to avoid conflicts with state's ongoing rehabilitation-liquidation proceeding of insurer). However, abstention is proper under <u>Burford</u> only if the state "offer[s] some forum in which claims may be litigated," and that forum "stand[s] in a special relationship of technical oversight or concentrated review to the evaluation of those claims." <u>Property & Casualty Insurance Ltd. v. Central National Insurance Co. of Omaha</u>, 936 F.2d 319, 323 (7th Cir. 1991).

The United States asserts several reasons why abstention would be inappropriate in this case, including the absence of any unsettled questions of state law, the uniqueness of the circumstances and the unlikelihood of any disruption to Wisconsin's insurance regulatory scheme and the presence of important federal tax issues. In addition, it contends that dissolution of the supplemental injunction would have little affect on the rehabilitation proceedings because the assets covered by the injunction are not covered by the rehabilitation case. None of these arguments are persuasive.

Wisconsin has a great interest in maintaining a uniform insurance rehabilitation process that provides strong protection to policyholders. <u>Property & Casualty Insurance Ltd.</u>, 936 F.2d at 323. To accomplish this, the state has assumed primary responsibility for regulating the insurance industry. <u>In re All-Star Insurance</u>, 484 F. Supp. 623, 626 (W.D. Wis. 1980) ("The regulation and liquidation of state domestic insurance companies is a

matter of substantial public concern, . . . and Ch. 645, Wis. Stats., is a comprehensive state effort to deal with that area of state concern. . . . Thus . . . the strong state interest in orderly liquidation dictates the exercise by the court of its discretionary abstention.") (citations omitted).  The Wisconsin statutes contemplate that rehabilitation proceedings should be conducted almost exclusively in the state rehabilitation court, which has the authority both to enjoin actions that threaten the success of the rehabilitation and to address challenges to the structure of the rehabilitation.  The statutes allow the rehabilitator to segregate accounts in order to achieve greater protection for policyholders.  Ultimately, claims against the segregated account will be collected in the rehabilitation court and paid according to Wisconsin's priority statutes.

Federal court review of the United States' claims would be disruptive of the state's rehabilitation goals and procedures. The rehabilitation proceeding has been in state court for roughly ten months and includes nearly 1,000 financial guaranty insurance policies insuring approximately $60 billion of financial obligations.  Removal of this case to federal court has taken the proceedings out of state court and stalled confirmation of the rehabilitation plan. In addition, it has deprived the state court of the ability to address a direct challenge to the lawfulness of the rehabilitation structure and account allocation and has created the potential for conflicting rulings.

Also, the removal has the potential of interfering with the state's priority statutes and

18

the Commissioner's final rehabilitation plan.  Although the United States removed the case for the purpose of seeking dissolution of the supplemental injunction, it has requested that this court retain jurisdiction over any future issues that might arise related to the Internal Revenue Service's attempts to collect taxes owed by Ambac.  The United States admits that such issues may include whether the IRS may assert priority over other claimants to assets that would otherwise be used to pay claims on the segregated account.  Thus, this case has the potential for disrupting any rehabilitation plan developed by the Commissioner and approved by the state court.  Courts have recognized that under such circumstances, policyholders are best served by avoiding competing actions in federal court.  Blackhawk Heating & Plumbing Co. v. Geeslin, 530 F.2d 154, 159-60 (7th Cir. 1976) ("The liquidation . . . is best left to a proceeding which will settle all of its affairs and dispose of all of its property.  Federal courts should refrain from deciding issues confronting another court in pending proceedings."); Metropolitan Life, 572 F. Supp. at 471.  Under such circumstances, abstention is appropriate.

The United States has not argued that its claims cannot be heard in the rehabilitation proceeding.  The state rehabilitation court has allowed entities with an interest in the rehabilitation an ongoing right to be heard and apply for relief.  In fact, the state court has heard challenges to the lawfulness of the account allocation and structure and the first-day injunction.  As other claimants have done, the United States may present its challenges to

19

the state court, argue its position on the merits and if the result is unsatisfactory, appeal to the Wisconsin Court of Appeals.  Cf. Bank of New York & Trust, 296 U.S. at 481 ("We cannot see that there would be impairment of any rights the United States may possess, or any sacrifice of its proper dignity as a sovereign, if it prosecuted its claim in the appropriate forum where the funds are held.");  United States v. $79,123.49 in United States Cash and Currency, 830 F.2d at 99 ("[T]he United States "is in no position to claim that its interests . . . could not be preserved by a Wisconsin court.").

In many respects, the state rehabilitation proceedings and the supplemental injunction are similar to federal bankruptcy proceedings and the automatic stay that goes into effect in bankruptcy.  Insurance companies are barred from using bankruptcy to reorganize; their only remedy is a state court rehabilitation proceeding.  As in bankruptcy, the efficacy of a rehabilitation proceeding is dependent upon the court's ability to stay actions by creditors that will interfere with the court's ability to manage the proceeding. When a claimant is affected by the stay, the claimant challenges the effect in the bankruptcy court and if the result is unfavorable, it appeals.  The claimant does not file a separate proceeding in a separate court to determine whether the stay should apply, as the United States has done in this case.

Finally, the state rehabilitation court is uniquely qualified to hear these claims.  It has the most familiarity with the rehabilitation proceeding and the applicable state statutes.

20

Thus, the principles of <u>Burford</u> require abstention in this case to permit resolution of the United States' claims through the available mechanisms in the state rehabilitation proceedings.

For the foregoing reasons, I will grant petitioner's motion to remand this case to the Circuit Court for Dane County. Because I conclude that removal was improper, I will not address the United States' motion for dissolution of the supplemental injunction.

ORDER

IT IS ORDERED that petitioner Theodore K. Nickel's motion to remand, dkt. #12, is GRANTED and this case is REMANDED to the Circuit Court of Dane County for lack of subject matter jurisdiction. The clerk of court is directed to transmit the file to the Circuit Court of Dane County.

Entered this 14th day of January, 2011.

BY THE COURT:
/s/
BARBARA B. CRABB
District Judge

21

Exhibit C

STATE OF WISCONSIN        CIRCUIT COURT        DANE COUNTY

---

In the Matter of the Rehabilitation of:

Segregated Account of Ambac Assurance Corporation

Case No. 10 CV 1576 

---

### DECISION AND FINAL ORDER
### CONFIRMING THE REHABILITATOR'S PLAN OF REHABILITATION, WITH
### FINDINGS OF FACT AND CONCLUSIONS OF LAW

---



BY THE COURT:

Honorable William D. Johnston
Lafayette County Circuit Court Judge
Presiding by Judicial Appointment

# TABLE OF CONTENTS

FINDINGS OF FACT SUPPORTING CONFIRMATION ................................................. 2

I.   BACKGROUND AND PROCEEDINGS .................................................................. 2

    A.   The Pre-Confirmation Proceedings.................................................................. 2

    B.   The Plan Confirmation Notices and Hearing.................................................. 3

    C.   The Written Materials Submitted by the Rehabilitator Support Confirmation.......... 4

    D.   The Oral Testimony Supports Confirmation. ................................................. 9

II.  FINDINGS BASED ON SPECIFIC TESTIMONY ............................................... 10

    A.   OCI Background ............................................................................................. 10

    B.   OCI's Increased Monitoring and Outreach .................................................. 12

    C.   OCI's Independent Assessment of Ambac's Financial Condition .............. 15

    D.   Bank Group Settlement .................................................................................. 16

    E.   OCI's Examination of Regulatory Options .................................................. 18

    F.   Allocations to the Segregated Account ......................................................... 23

    G.   Capital Structure of the Segregated Account ............................................... 25

    H.   Pre-Filing Notice............................................................................................ 27

    I.   Continued Supervision and Control Over the General Account................... 27

    J.   AFGI's Bankruptcy........................................................................................ 29

    K.   OCI's Disclosures Regarding the Plan are Sufficient.................................. 31

    L.   The Plan Follows the Priority Structure of Wis. Stat. § 645.68................... 31

    M.   The Initial Cash-Note Split on Policy Claims is Reasonable. ..................... 32

    N.   The Plan's Cash-Note Split is More Favorable to Segregated Account Policyholders than Liquidation. .................................................................... 35

    O.   The Plan's Use of Surplus Notes is Fair. ..................................................... 36

    P.   Ambac's Role in Plan Administration Under the Management Services Agreement....................................................................................................... 38

Q.   Recoveries/Other Plan Issues..................................................................... 41

R.   Alternative Resolutions.......................................................................... 42

S.   The Plan Retains Flexibility to Adjust to Changing Economic Conditions ............ 43

T.   Testimony of James Schacht..................................................................... 43

III.   ADDITIONAL GENERAL FINDINGS ......................................................... 47

A.   The Segregated Account......................................................................... 47

B.   The Permitted Claim Treatments Under the Plan .................................... 48

C.   Adequate Capital Support for the Plan ................................................ 48

D.   The Surplus Notes.................................................................................. 50

E.   The RMBS "Policyholders"..................................................................... 51

F.   Findings Relating to Miscellaneous Other Objections ........................... 51

CONCLUSIONS OF LAW ................................................................................... 53

ORDER ............................................................................................................. 58

STATE OF WISCONSIN        CIRCUIT COURT        DANE COUNTY

In the Matter of the Rehabilitation of:

Segregated Account of Ambac Assurance Corporation

Case No. 10 CV 1576

## DECISION AND FINAL ORDER
## CONFIRMING THE REHABILITATOR'S PLAN OF REHABILITATION, WITH
## FINDINGS OF FACT AND CONCLUSIONS OF LAW

This matter came before the Court on the Motion (the "Motion") of the Wisconsin Commissioner of Insurance, as the Court-appointed Rehabilitator (the "Rehabilitator") for the Segregated Account (the "Segregated Account") of Ambac Assurance Corporation ("Ambac" or the "General Account"), to confirm the Rehabilitator's proposed Plan of Rehabilitation (the "Plan") for the Segregated Account filed on October 8, 2010, pursuant to Wis. Stat. § 645.33(5). Consistent with this Court's Scheduling Order dated October 18, 2010, the confirmation hearing occurred in open court on November 15-19, 2010, with oral arguments following on November 30, 2010. The appearances by the Rehabilitator and the various other parties who asked to be heard at the hearing were as noted on the record.

Based on this Court's review of the Plan and the Rehabilitator's Disclosure Statement (with the attachments, amendments and supplements thereto) and the other submissions filed by the Rehabilitator in support of the Plan, as well as the briefs, affidavits, exhibits, objections and other written materials on file in these proceedings, and the oral testimony and argument presented at the hearing regarding confirmation of the Plan, and for good cause shown, the Rehabilitator's Motion for confirmation is hereby GRANTED and the Plan is hereby CONFIRMED as set forth below.

The Court hereby makes the following Findings of Fact and Conclusions of Law in support of this Order.

## FINDINGS OF FACT SUPPORTING CONFIRMATION

### I.    BACKGROUND AND PROCEEDINGS

#### A.    The Pre-Confirmation Proceedings

1.    On March 24, 2010, this Court granted the Commissioner's Verified Petition for an Order for Rehabilitation of the Segregated Account and an Order for Temporary Injunctive Relief (the "Injunction Order") pursuant to Wis. Stat. § 645.05.

2.    Since March 24, 2010, the Court has received numerous motions, briefs, and other filings on various issues, including:  (1) motions to enjoin consummation of a proposed settlement (the "Bank Settlement") between the General Account and a group of large financial institutions (the "Bank Group") holding credit-default swaps ("CDS") that are insured under financial guarantee policies issued by Ambac; (2) motions to modify or dissolve the Injunction Order on grounds relating to alleged legal deficiencies in the establishment and rehabilitation of the Segregated Account; (3) motions to dissolve or modify specific provisions of the Injunction Order; (4) motions to order the Rehabilitator and/or the Office of the Commissioner of Insurance (collectively, "OCI") to remove specific policies or liabilities from the Segregated Account and return them to the General Account; and (5) requests for formal discovery of OCI and Ambac.

3.    The Court has issued three interim orders addressing and denying these motions by policyholders and other entities with an interest in this rehabilitation:  (1) the May 27, 2010 Findings of Fact and Conclusions of Law addressing the Bank Settlement, the establishment of the Segregated Account, and discovery; (2) a July 16, 2010 Order addressing discovery and the allocation of certain policies to the Segregated Account; and (3) an October 26, 2010 Order addressing the establishment and rehabilitation of the Segregated Account, the

allocations of certain policies thereto, and the propriety of certain provisions of the Injunction Order.

**B.   The Plan Confirmation Notices and Hearing**

4.     On October 8, 2010, the Rehabilitator filed the Plan with this Court pursuant to Wis. Stat. § 645.33(5) and moved for its confirmation. The basic outline of the Plan, and the initial 25/75% cash/note split, is consistent with what the Commissioner projected in his March 24, 2010 Verified Petition.

5.     Although not required to do so by any provision of Chapter 645, the Rehabilitator filed a detailed Disclosure Statement (with attachments, amendments and supplements) with the Plan that summarizes the Rehabilitator's findings and conclusions regarding this rehabilitation, explains the terms and rationale of the Plan, and provides extensive, detailed information regarding the current and projected financial condition of the Segregated Account and the General Account of Ambac.

6.     On October 8, 2010, the Rehabilitator provided written notice to all policyholders and other known parties-in-interest and their counsel about the filing of the Plan, the Disclosure Statement and the Motion for Confirmation, and that the hearing to consider confirmation of the Plan would be scheduled. The notice advised policyholders that the Plan and Disclosure Statement, along with other information relating to the Plan, was available on the Court-approved Web site established by OCI to provide information concerning the rehabilitation of the Segregated Account, ambacpolicyholders.com.

7.     The Scheduling Order setting forth the date, time and place of the Court hearings on confirmation was posted on the Web site with an explanation of the right of all interested parties to attend the Court hearing and to be heard. Written notice regarding the

hearing dates and location was also served by mail on all known interested parties and served electronically on all counsel of record in this proceeding.

        8.    The confirmation hearings were properly scheduled, and adequate notice was provided to all known and affected parties, including all holders of claims. All parties-in-interest were advised of their right to attend the hearings and to participate and be heard in open court.

        9.    All parties-in-interest were allowed to attend the confirmation hearings in open court and to participate and be heard. They also were afforded the alternative option of participating and being heard telephonically at the hearings. There were no improper impediments to the right of any party-in-interest to appear or be heard at the hearings, either in person or telephonically.

        10.    An evidentiary hearing about confirmation of the Rehabilitator's Plan was held in open court the week of November 15-19, 2010, which all policyholders and other parties-in-interest were permitted to attend and at which all such policyholders and other parties-in-interest were afforded the opportunity to be heard, and to call, examine, and cross-examine witnesses. The Court gave all policyholders and other parties-in-interest the opportunity to offer oral argument about confirmation on November 30, 2010.

**C.    The Written Materials Submitted by the Rehabilitator Support Confirmation.**

        11.    The Rehabilitator filed and served the following written materials prior to the confirmation hearings in connection with, and support of, confirmation of his Plan:

    A.    <u>Plan of Rehabilitation, with attached</u>:
- Form of Fiscal Agency Agreement
- Form of Surplus Note
- Form of Proof of Policy Claim Form
- Form of Junior Surplus Note

B.   Disclosure Statement, with attached:
- Corporate Organizational Chart
- Risk Classifications
- Discussion of the Rehabilitator's Projections, Assumptions and Methodologies
- Projected Financial and Operating Results Associated with Scenario One (revised as of Oct. 21, 2010)
- Projected Financial and Operating Results Associated with Scenario Two (revised as of Oct. 21, 2010)
- Projected Financial and Operating Results Associated with Scenario Three (revised as of Oct. 21, 2010)
- Projected Financial and Operating Results Associated with Scenario Four (revised as of Oct. 21, 2010)

C.   Related Filings Linked on Web Site to the Disclosure Statement:
- List of Policy and CUSIP Numbers Allocated to the Segregated Account as of October 8, 2010
- Plan of Operation for the Segregated Account
- Management Services Agreement (Exhibit A to the Plan of Operation)
- Cooperation Agreement (Exhibit B to the Plan of Operation)
- Assumed Reinsurance Agreements Allocated to the Segregated Account (Exhibit F to the Plan of Operation)
- Secured Note (Exhibit G to the Plan of Operation)
- Aggregate Excess Loss of Reinsurance Agreement (Exhibit H to the Plan of Operation)
- Order for Rehabilitation
- Order for Temporary Injunctive Relief
- Quarterly Statement of the Segregated Account as of and for the three months ended March 31, 2010
- Quarterly Statement of the Segregated Account as of and for the six months ended June 30, 2010
- Audited Statutory Financial Statements of AAC as of and for the year ended December 31, 2009
- Annual Statement of AAC as of and for the year ended December 31, 2009
- Quarterly Statement of AAC as of and for the three months ended March 31, 2010
- Quarterly Statement of AAC as of and for the six months ended June 30, 2010

D.   SEC Registration Exemption
- SEC No-Action Letter Request
- SEC No-Action Letter

E. Amendments to Disclosure Statement:
- Amendment One (Nov. 8, 2010)
  - Four Financial Scenarios
- Amendment Two (Nov. 12, 2010)
  - Amplified Liquidation Analysis

F. Rehabilitator's Supplementations in Support of Confirmation – Responses to Objectors' Questions

G. Previously Filed Affidavits
- Four Affidavits of OCI's Roger A. Peterson (filed May 20, June 11, June 15, and Aug. 17, 2010.
- Two Affidavits of Cathleen J. Matanle (filed May 20 and Aug. 17, 2010)

12.     By written stipulation of the Rehabilitator and parties-in-interest Depfa Bank, plc ("Depfa"), Wells Fargo, N.A. (in its capacity as trustee for certain RMBS trusts) ("Wells Fargo"), Bank of America, N.A. (also in its capacity as trustee for certain RMBS trusts) ("Bank of America"), and Lloyds TSB Bank, plc ("Lloyds") (including Access to Loans for Learning Student Loan Corporation ("ALL"), the issuer of the jointly held Depfa/Lloyds policies), the affidavit of Nancy Henderson submitted by Depfa, the affidavit of Charles Brehm submitted by Wells Fargo, the affidavit of Kimberly Jacobs submitted by Bank of America, and the affidavits of Thea Watkins, William Barbagallo and Frederick Bingham submitted by Lloyds were admitted in evidence and constituted part of the record at the confirmation hearings, subject to objections reserved by the Rehabilitator or Ambac. As part of the stipulations pertaining to those affidavits, Depfa, Wells Fargo, Bank of America and Lloyds (including ALL) stipulated that "the Rehabilitator's Disclosure Statement (including written amendments and supplements thereto), and any written responses of the Rehabilitator to written questions filed by interested parties on or about November 8, 2010, and the affidavits previously filed by the Rehabilitator in this proceeding, shall be deemed admitted in evidence and shall constitute part of the record of the Plan Confirmation Hearing."

13. For the reasons stated by the Court at the confirmation hearing, the written materials described above in paragraphs 11 and 12 were admitted into evidence and the record at the confirmation hearings. Objectors' exhibits 1-37, 38-A and 40-70 (which included many of the Rehabilitator's documents described above in Finding No. 11) were also admitted into evidence and the record at the confirmation hearings.

14. The following parties-in-interest filed written objections to confirmation prior to the confirmation hearings: Aurelius Capital Management, LP, Fir Tree, Inc., King Street Capital, L.P., King Street Capital Master Fund, Ltd., Monarch Alternative Capital LP, and Stonehill Capital Management LLC (collectively the "RMBS Funds"); Eaton Vance Management, Nuveen Asset Management, Restoration Capital Management LLC, and Stone Lion Capital Partners L.P. (collectively the "LVM Funds"); Depfa; The Federal Home Loan Mortgage Corporation ("Freddie Mac"); Countrywide Home Loans, Inc. and Countrywide Home Loans Servicing L.P. (collectively "Countrywide"); ALL and Lloyds; One State Street LLC ("One State"); Wilmington Trust Company and Wilmington Trust FSB (collectively "Wilmington"); Federal National Mortgage Association ("Fannie Mae"); Deutsche Bank National Trust Company, Deutsche Bank Trust Company Americas, and U.S. Bank National Association (collectively "Deutsche"); Bank of America; Wells Fargo; Wells Fargo, as trustee for certain LVM bondholders ("Wells Fargo LVM"); The Consumer Asset Protection Company ("CAPCO"); the Bank of New York Mellon ("BNY"); and the Treasurer of the State of Ohio (the "Treasurer"). The Rehabilitator filed written briefs (both an Opening Brief and a Reply Brief regarding confirmation) in advance of the confirmation hearings regarding the points raised in those objections.

15.     The Rehabilitator's written submissions in support of confirmation were thorough, detailed, and well organized, and provided interested parties and the Court with adequate information from which to make a full and fair evaluation of the Plan and its provisions.

16.     The parties-in-interest who objected to the Plan at the confirmation hearings did not call to the Court's attention to any factual errors in the written materials the Rehabilitator submitted in support of confirmation in advance of the confirmation hearing.

17.     At the October 14, 2010 duly noticed hearing to schedule proceedings in regard to confirmation of the Rehabilitator's Plan, there was a recommendation to the Court that it might facilitate a more orderly and efficient presentation of information to the Court and reduce the length of the oral testimony offered by the Rehabilitator if parties-in-interest submitted written factual questions for OCI to consider and respond to before the confirmation hearings. The Court adopted the suggestion as set forth at ¶ 2-c of the Court's Confirmation Scheduling Order.

18.     Consistent with ¶ 2-c of the Court's above-referenced Scheduling Order, various parties-in-interest submitted written factual questions about the Plan to the Rehabilitator. The Rehabilitator provided written responses to all of the approximately 150 fact questions filed by objecting parties and organized the written responses by topic (with an identification of the entity which posed the question). The Rehabilitator filed those responses as a Supplement to his October 8, 2010 Disclosure Statement.

19.     This Court gave weight to the four previous affidavits of Roger A. Peterson and the two previous affidavits of Cathleen J. Matanle, both of whom appeared as testifying witnesses at the Plan confirmation hearings, were cross-examined at length, and

affirmed that the facts stated in their prior affidavits remain true and correct. (*See, e.g.*, 11/16/10 Peterson at 135:4-15.)[1]

20.     The Court also gave weight to OCI's disclosures regarding the Plan, particularly its Disclosure Statement, with two Amendments and the Supplementation. The testimony of the witnesses was consistent with the information contained in those documents. (*See, e.g.*, 11/16/10 Peterson at 166:10-167:7, 167:17-168:5.) The Disclosure Statement's explanation about provisions of the Plan were helpful in understanding those provisions and the rationale for them, and the financial scenarios and projections were well-formulated and useful for illustrating potential outcomes under the Plan.

**D.     The Oral Testimony Supports Confirmation.**

21.     In compliance with this Court's scheduling conference, the Rehabilitator timely identified and called the following four witnesses to testify at the confirmation hearing:

- Sean Dilweg, the Wisconsin Commissioner of Insurance and the Court-appointed Rehabilitator in this proceeding;

- Roger A. Peterson, the Director of the Wisconsin Office of the Commissioner of Insurance Bureau of Financial Analysis and Examinations;

- David Barranco, Ambac Managing Director of Restructuring and Commutations; and

- Cathleen J. Matanle, Ambac Managing Director of Risk Management.

22.     The Court found the testimony of those four witnesses to be highly credible and helpful to the Court in understanding the issues before it. All four of these witnesses called by the Rehabilitator were subjected to extensive cross-examination by the

---

[1] Citations to oral testimony appear as follows: [date of the testimony] [name of testifying witness] at [page and lines of daily transcript (condensed version) at which the relevant testimony appears].

various lawyers representing the objecting parties-in-interest. As this Court noted at the close of their testimony:

> This is an extremely complex and difficult situation. I have watched the testimony of the Commissioner and especially Mr. Peterson over the two days . . . he was on the stand. It was as grilling a series of questionings as I've ever seen any witness undergo in all my years on the bench. There were questions asked by very bright, intelligent counsel, and the answers given, the evaluation shown to be made, the fact[s] gathered, the procedures followed as testified to by Mr. Peterson leads me to believe, as they consistently pointed out, that they were acting in what would be the best interest of policyholders, doing what is fair for them.
>
> I also noticed in the demeanor and approach of the Ambac witnesses . . . who have come to testify here an acceptance, a respect for the authority and the role and understanding of the role of OCI in the management of the affairs of the Segregated Account and their relationship . . . to the General Account. I thought it was a presentation that clearly established that it was fair, it was equitable. It was an extremely well thought-out, well-based decision.
>
> And for the purposes of the Plan it certainly meets the criteria as being a solid exercise of the discretion of the . . . Rehabilitator, of the OCI, certainly it is fair and equitable from what I can see of this.

(11/19/10 Statement of Court at 50:1-51:4.)

## II. FINDINGS BASED ON SPECIFIC TESTIMONY

### A. OCI Background

23. There are approximately 330 insurers domiciled in Wisconsin, making Wisconsin the sixth largest insurance domicile in the United States under various measures. (11/16/10 Peterson at 131:3-6.) OCI has responsibility for regulation of these insurers, with 150 employees who handle all facets of insurance regulation in the state. (11/15/10 Dilweg at 128:15-20.)

24.    The Commissioner of Insurance delegates many of the regulatory responsibilities to OCI staff.  In the case of Ambac, the bulk of those day-to-day responsibilities were delegated to senior OCI staff such as Kimberly Shaul, the Special Deputy Commissioner for the rehabilitation, Fred Nepple, the agency's general counsel, and especially Roger Peterson.  (11/15/10 Dilweg at 192:16-21, 194:4-7, 194:12-19, 201:10-12, 203:21, 210:12-15, 214:22, 217:23-25, 237:23-25, 247:14-15; 11/16/10 Dilweg at 19:12-15, 20:21-23, 33:1-3, 39:24-40:3, 42:5-8, 45:14-17, 46:21-47:1, 68:14-16, 102:22-25.)

25.    Mr. Peterson has more than 20 years experience at OCI.  (11/16/10 Peterson at 129:24-25.)  Mr. Peterson's experience at OCI is focused on financial examinations of insurers, either in field examination or in supervisory roles.  (11/16/10 Peterson at 131:17-132:6.)

26.    Mr. Peterson presently is the Director of OCI's Bureau of Financial Analysis and Examinations, where he is responsible for monitoring the solvency of insurance companies operating in Wisconsin, with particular responsibility for those companies that are domiciled under Wisconsin law.  (11/16/10 Peterson at 130:5-11.)  He has held that position since 2004.  (11/16/10 Peterson at 131:12-13.)

27.    Within the scope of his responsibilities at OCI, Mr. Peterson has had responsibility for examining Ambac's financial condition since the 1990s.  (11/16/10 Peterson at 132:24-133:8, 133:23-134:16.)  Throughout that time frame, Mr. Peterson has had regular, continuous contact with Ambac.  (11/16/10 Peterson at 134:24-135:3.)

28.    Since the beginning of the year, Ambac-related issues have consumed 80 to 90 percent of the available time of Kimberly Shaul (the Court-appointed Special Deputy

Commissioner for the rehabilitation) and Mr. Peterson, and roughly half the time of OCI's general counsel, Mr. Nepple. (11/15/10 Dilweg at 132:9-16.)

**B.    OCI's Increased Monitoring and Outreach**

29.    OCI began having concerns regarding Ambac's financial stability with the exposure of subprime lending practices in the residential housing market in 2007, concerns that were amplified with the resignation of Ambac CEO Robert Genader later that year (11/15/10 Dilweg at 129:15-130:2; 11/16/10 Peterson at 135:21-136:7), as well as Ambac's unsuccessful negotiations with certain counterparties and credit agency warnings of potential credit rating downgrades in early 2008 (11/15/10 Dilweg at 130:8-21).

30.    Ambac's book of business is complex. Its most straightforward policies are those in its core business through the mid-1990s, which was insuring municipal bonds against default. The other types of transactions Ambac began to insure in the late 1990s, such as student loan deals, international finance deals, business securitizations, credit default swaps, and similar structured finance transactions, involved far more complex financial instruments. (11/16/10 Peterson at 144:7-145:8.)

31.    Due to the complexity of Ambac's policies and growing financial challenges, OCI retained qualified outside financial and legal advisors to assist in assessing Ambac's condition and regulatory options for addressing OCI's concerns regarding Ambac's financial condition. (11/15/10 Dilweg at 130:22-131:3.) OCI retained these advisors to help provide it with an independent view of Ambac's financial condition and a fuller understanding of the complex risks associated with Ambac's financial deterioration. (11/15/10 Dilweg at 133:18-134:9; 11/16/10 Peterson at 136:2-18.) Starting in late 2007 and early 2008, there was a significant commitment by OCI to put this independent monitoring structure in place. (11/16/10 Peterson at 139:8-14.)

12

32.     Independent assessment by OCI and its advisors of Ambac's financial condition was important, because evaluation of the risks is subject to substantial judgment. OCI determined that it needed to be in a position where it could use its own judgment, understand the potential variables incorporated into that judgment, and develop its own independent view of Ambac's loss potential rather than relying too heavily on the insurer's assessments. (11/16/10 Peterson at 142:7-14.)

33.     To facilitate this independent evaluation of Ambac's financial condition, OCI's financial advisors worked directly with Ambac to get raw baseline data regarding Ambac's exposures (down to the individual transaction level) in order to recreate Ambac's work and independently develop loss estimates. (11/16/10 Peterson at 140:8-14.) OCI ensured that its advisors had full access to the confidential data and other financial information of Ambac. (11/16/10 Peterson at 139:18-140:7.) This information concerned complex, sensitive transactions; the counterparties to those transactions had a clear interest in keeping that information confidential from third parties. Under its regulatory authority, including Wis. Stat. § 601.465, OCI was able to demand access to this information while maintaining and protecting its confidentiality. (11/16/10 Peterson at 141:12-22, 142:19-24.)

34.     OCI and its advisors also had full access and cooperation from Ambac staff, which enabled it to understand the nature of Ambac's business, the obligations it insures, and its risk evaluation process. (11/16/10 Peterson at 143:4-11.) In early 2008, OCI's financial advisors occupied a conference room at Ambac's headquarters for several weeks while they conducted an extensive analysis of Ambac's business, including numerous meetings with Ambac employees to better understand the transactions Ambac insured and the projected losses associated with them. (11/18/10 Matanle at 208:19-210:17.) Private third parties could not

replicate this information-gathering process due to concerns regarding confidentiality of financial data regarding other private third parties. (11/16/10 Peterson at 142:15-143:3; 11/18/10 Matanle at 210:23-211:21.) Moreover, Ambac's financial documents are created for internal use, and it would require a substantial amount of time for Ambac staff to explain these documents and analyses to third parties. (11/18/10 Matanle at 212:6-213:5.)

35.    OCI also created an Advisory Council consisting of experts from various insurance and financial fields to provide it with independent views about Ambac and regulatory options. The council has met and continues to meet on roughly a monthly basis to advise the Rehabilitator. (11/15/10 Dilweg at 135:17-136:10.)

36.    OCI also met in regard to Ambac with a number of regulators at various state and federal agencies, from fellow insurance regulators to the United States Treasury Department and the New York Federal Reserve. (11/15/10 Dilweg at 144:3-145:3.) New York Federal Reserve officials, with whom the Commissioner has met with eight to ten times regarding Ambac, expressed concerns over the systemic impact of Ambac's deterioration on the broader economy. (11/15/10 Dilweg at 144:24-145:3, 145:11-15.) According to OCI, "In broad terms, the discussions that we had with the New York Fed and others affirmed our perception that systemic risks related to Ambac could exist and that they were worth considering in our overall plan[] development." (11/17/10 Peterson at 33:8-12.)

37.    Mr. Peterson also communicated with fellow regulators in other states. He is the chair of the Financial Analysis Working Group ("FAWG") at the National Association of Insurance Commissioners. (11/16/10 Peterson at 132:11-21.) FAWG is made up of many of the most qualified financial regulators of insurance in the country, and it meets regularly to discuss troubled companies, potential risks, and possible solutions to the complex problems posed by

those risks. (11/16/10 Peterson at 221:8-222:21.) Mr. Peterson regularly reports on Ambac's

situation and discusses the solutions OCI has proposed with the other fellow regulators at FAWG

meetings, and has found those meetings helpful in responding to problems associated with

Ambac. (11/16/10 Peterson at 224:8-225:1.)

### C.    OCI's Independent Assessment of Ambac's Financial Condition

38.    During the several quarters prior to the commencement of this

rehabilitation, OCI's assessment of Ambac's financial situation was less optimistic than Ambac's

assessment. (11/16/10 Peterson at 145:9-146:10.) By the end of 2009, under OCI's mid-case

evaluation of expected losses, OCI determined that Ambac might not have sufficient claims-

paying resources to meet all of its obligations. (11/16/10 Peterson at 147:11-23.)

39.    OCI also monitored Ambac's investment portfolio. Prior to 2008, that

portfolio included primarily safe investments such as municipal bonds and treasury bonds.

Beginning in 2008, the nature of Ambac's investment portfolio shifted as it was forced to post

collateral for obligations of various affiliates in exchange for riskier investments such as

mortgage-related securities. (11/16/10 Peterson at 149:19-151:3.)

40.    OCI approved posting this collateral. Ambac's guaranteed investment

contracts and certain other swap transactions are expected to be profitable over time, but a failure

to provide the collateral called for by those contracts would have resulted in immediate defaults

and immediate cash payouts for those transactions at a substantial loss for Ambac. (11/16/10

Peterson at 151:9-19.) At the same time, however, the collateral posting requirements

necessarily reduced Ambac's available, fairly valued claims-paying resources.

41.    The regulatory oversight of OCI and its advisors continued to increase

throughout 2008 and 2009. (11/16/10 Peterson at 139:15-140:4.) By late 2009, OCI and Ambac

board members were meeting in person roughly three times a month. Throughout those

meetings, OCI repeatedly emphasized the need to focus on addressing the growing risks to policyholders. (11/15/10 Dilweg at 139:8-140:12.) Specifically, OCI expressed concern that increasingly large payments on short-tail claims would destroy Ambac's claims-paying ability for all policyholders. (11/15/10 Dilweg at 139:8-143:3.)

42. During the early months of 2010, Ambac was paying $130 million to $150 million per month on policies insuring residential mortgage-backed securities ("RMBS") alone. (11/16/10 Peterson at 148:2-4.) These payments were significantly draining Ambac's claims-paying resources, particularly its more liquid resources. These losses, combined with OCI's expectations of future losses, led OCI to believe that Ambac would be unable to meet its long-term obligations even in a moderate-case economic scenario. (11/16/10 Peterson at 149:7-14.)

**D.    Bank Group Settlement**

43. By the second half of 2009, it was clear that any solution for Ambac would have to include a resolution of its CDS exposures related to the Bank Group, which constituted Ambac's most problematic and highest-risk book of business. (11/16/10 Peterson at 146:2-10.) The massive expected losses on those exposures and the existence of contractual "triggers" that allowed the Bank Group to terminate their contracts and seek immediate mark-to-market damages (estimated to be $12-13 billion) presented serious obstacles to an orderly and equitable runoff of Ambac's liabilities. (*See generally* 11/15/10 Dilweg at 146:23-148:2.)

44. The CDS contracts were issued by Ambac Credit Products, LLC ("ACP"), a wholly owned Ambac subsidiary. ACP's performance was insured by Ambac financial guarantee insurance policies identical in form to Ambac's other policies, and the CDS counterparties were beneficiaries under the policies. This arrangement allowed swap counterparties to obtain more favorable regulatory and capital treatment than if they obtained a financial guarantee policy directly from Ambac. (11/16/10 Peterson at 152:17-153:14.)

Members of the Bank Group held the underlying securities for those CDS transactions (*see generally* 11/18/10 Barranco at 148:15-153:7), had suffered economic losses, and were projected to suffer substantial additional economic losses (11/18/10 Barranco at 151:11-23). Thus, while OCI recognized that there was some uncertainty regarding the outcome of any litigation regarding the Bank Group's assertion of mark-to-market damages as policy losses, it concluded that, at the least, the Bank Group's regular, course-of-business losses would be treated as insurance policy claims under the CDS structure. (11/17/10 Peterson at 30:6-14.)

45. The Bank Group exposures, if realized, would have wiped out Ambac's claims-paying resources and harmed all other policyholders. (11/15/10 Dilweg at 147:10-14.) Therefore, OCI recognized that the Bank Settlement was a necessary component of any realistic, equitable solution for addressing Ambac's hazardous financial condition. (11/15/10 Dilweg at 149:9-21.)

46. OCI eventually involved itself directly in negotiations concerning the Bank Group liabilities. The talks evolved into a tri-party negotiation among Ambac, the Bank Group, and OCI, with OCI playing the role of referee or facilitator of the negotiations. OCI's involvement was crucial in bringing Ambac and the Bank Group together on a final settlement. (11/16/10 Peterson at 146:14-147:1.)

47. The Bank Group and Ambac reached an agreement in principle on the Bank Settlement shortly before March 24, 2010. Several objectors later moved to enjoin the Bank Settlement, and that motion was denied after a lengthy hearing on May 25, 2010. The Findings of Fact and Conclusions of Law issued by this Court on May 27, 2010, as well as the first affidavits of Roger Peterson and Cathleen Matanle, provide further details about the terms and background of the settlement and its relation to the then-contemplated Plan.

48.     The Bank Settlement was fully consummated on June 7, 2010.  The

settlement commuted the Bank Group's CDS policies in exchange for a capped settlement

payment of $2.6 billion in cash and $2 billion in surplus notes.  The Bank Settlement did not

authorize dividends to Ambac's holding company, Ambac Financial Group, Inc. ("AFGI"), but

capped them, and OCI retains absolute full discretion as to whether, when, and under what

conditions to allow any dividends.  (11/16/10 Peterson at 227:3-19.)

### E.     OCI's Examination of Regulatory Options

49.     In late 2009 and early 2010, OCI's independent analysis of Ambac

showed that, while a successful Bank Settlement was necessary and beneficial to policyholders,

it alone would not resolve the many remaining significant risks for the insurer and its

policyholders.  (11/16/10 Peterson at 147:8-23.)  OCI concluded that regulatory action was

necessary to restrain the increased outflow of claims-paying resources to satisfy short-term

policy claims in order to protect the broader base of policyholders, long-tail as well as short-tail.

(11/18/10 Peterson at 29:23-30:2.)

50.     OCI looked at all regulatory options for Ambac.  (11/15/10 Dilweg at

151:12-21.)  OCI's overarching goal was an orderly runoff of some of the most complicated

financial instruments ever created (11/15/10 Dilweg at 152:25-153:6), in a manner that would be

fair and equitable with the least possible disruption to policyholders (11/15/10 Dilweg at 155:4-

11).  OCI's interests were in protecting policyholders; it had no interest in improving the

financial condition of AFGI, particularly if it came at the expense of policyholders.  (11/15/10

Dilweg at 189:11-16.)

51.     As OCI investigated Ambac's book of business, it became aware of

various default triggers in a large number of its contracts.  A general or full rehabilitation of

Ambac could have triggered costly defaults across many of those contracts and crystallized

substantial losses from a variety of different contractual obligations, which was sometimes referred to in the testimony as "collateral damage." (11/16/10 Peterson at 152:2-12.) In addition, Ambac's municipal book is vast, reaching from major public works projects such as stadiums and public transportation systems to local hospitals, sewerage or sanitary districts. A loss of coverage for these municipalities could have created chaos in the municipal bond markets. (11/15/10 Dilweg at 143:9-22.)

52.     Each of Ambac's policies and sets of policies contained different covenants and triggers, and it may not have been possible to effectively enjoin the exercise of all such triggers. (11/16/10 Dilweg at 71:15-21.) Specifically, OCI found that numerous Ambac policies and transaction documents included "triggers" that could be "pulled" upon being subject to a rehabilitation or liquidation proceeding. (11/16/10 Dilweg at 117:21-118:1.) These obligations include collateralized loan obligations ("CLOs") and commercial asset-backed securities ("Commercial ABS"), which were often negotiated on an individualized basis, resulting in each transaction having its own unique structure and triggers (11/16/10 Peterson at 153:25-155:4.) These categories of transactions also posed a risk of mark-to-market damages. (11/16/10 Peterson at 155:14-16.) In addition, Ambac's swap surety policies also often had contractual triggers associated with them. (11/16/10 Peterson at 156:13-15.)

53.     The Commercial ABS book included the Dunkin' Brands, Sonic Corporation, and Hertz Corporation transactions described in prior affidavits in these proceedings. Those transactions are merely examples of a larger book of Commercial ABS transactions, however. (11/16/10 Peterson at 155:5-9.)

54.     OCI sought an approach that would address up to 40 years of potential policy liabilities in a manner that would not trigger covenants and cause defaults in the thousands

of Ambac policies or throw policyholders back into an uncertain insurance market. (11/15/10 Dilweg at 145:25-146:22.)

55. Although OCI was reluctantly prepared to commence a full rehabilitation of all of Ambac if the Ambac board did not consent to a voluntary, limited rehabilitation of the Segregated Account, OCI much preferred the latter, more surgical option. OCI was concerned regarding the potential adverse effects of a full rehabilitation, including the pulling of default triggers, massive mark-to-market losses, and the loss of durable coverage to policyholders. (11/16/10 Peterson at 161:2-17.) Full rehabilitation could have also resulted in downstream collateral damage to certain issuers and policyholders, such as the Commercial ABS issuers. (11/16/10 Peterson at 161:20-162:18.)

56. OCI also considered and rejected the alternative of a liquidation of Ambac. The decision not to liquidate Ambac was not a difficult one, and did not require extensive study for OCI to conclude that liquidation would result in treating policyholders less favorably than a narrower rehabilitation. (11/16/10 Peterson at 174:16-175:5.)

57. The disadvantages of liquidation were substantial. First, liquidation requires the cancellation of insurance contracts with 15 days notice, leaving all policyholders suddenly without coverage for future losses on obligations up to 40 years in duration. (11/16/10 Peterson at 162:23-163:11.) Second, because replacement coverage is largely unavailable for many Ambac obligations for which losses are expected, OCI reasonably predicted that the massive policy cancellations required by a liquidation would have resulted in policy-by-policy litigation over damages for future anticipated losses, which if allowed would have likely been treated as breach-of-contract claims in the liquidation priority structure of Wis. Stat. § 645.68. (11/16/10 Peterson at 169:12-22, 171:3-11.) Third, liquidation would have caused a number of

costly defaults due to triggers, as well as mark-to-market damage claims in contracts calling for them. (11/16/10 Peterson at 162:23-163:11.) These claims would likely be treated at contractual damages under Wis. Stat. § 645.68, as well, leaving policyholders with projected actual losses to seek distribution at the same class level as policyholders seeking immediate damages related to acceleration and other contractual triggers. (11/16/10 Peterson at 162:23-163:11.) Fourth, all policyholders seeking damages based on future losses or contractual triggers would be left to compete for distributions from a much smaller pool of claims-paying resources, because liquidation as of March 24, 2010 would have required Ambac to return more than $2 billion in unearned premium to policyholders (many of whom hold policies for which losses are not expected) and would eliminate Ambac's right to receive over $1 billion in future premiums. (11/16/10 Peterson at 171:12-172:14; *see also,* Amendment No. 2 to Disclosure Statement at pp. 10-12.)

58.     The liquidation analysis OCI provided in Amendment No. 2 to the Disclosure Statement incorporates and applies financial numbers to the same considerations that initially informed OCI's judgment regarding the disadvantages of liquidation. (11/16/10 Peterson at 174:5-15.) It remains OCI's conclusion that liquidation would have had severe drawbacks and disadvantages to Ambac policyholders. (11/16/10 Peterson at 177:2-4).

59.     OCI could not have liquidated just the Segregated Account, as that action would have automatically triggered the rehabilitation or liquidation of the General Account under Wis. Stat. § 611.24(3)(e). (11/16/10 Peterson at 172:22-173:2.) A rehabilitation of the General Account would have the same adverse effects on those policies as a full rehabilitation of both accounts (*id.*), and it would as a practical matter likely result in the liquidation of both accounts.

60. Recognizing that a full rehabilitation or liquidation would have triggered covenants across almost all policies and caused other adverse consequences and collateral damages, OCI determined that a segregated account approach would have the most beneficial outcome for all policyholders. (11/15/10 Dilweg at 151:12-21.)

61. OCI has previously used the segregated account statute in connection with other insurance delinquency proceedings. It usually has done so by commencing rehabilitation of the insurer as a whole, then creating a segregated account and moving it out of rehabilitation to carry on a part of the insurer's business. (11/16/10 Peterson at 157:19-159:3.) OCI took the opposite approach here—leaving the bulk of the insurer and its assets outside rehabilitation and rehabilitating a segregated account—due to the existence of the triggers in transactions insured by Ambac relating to delinquency proceedings and asset transfers. (11/16/10 Peterson at 159:4-18.) That approach was appropriate here for several reasons, including those outlined above. (11/16/10 Peterson at 167:21-173:2.)

62. Although it is unlikely given Ambac's financial condition, keeping Ambac subsidiary Everspan Financial Guarantee Corporation outside of rehabilitation sustains the possibility of someday writing new, profitable business in the municipal bond sector. (11/17/10 Peterson at 44:20-46:10.) If Everspan can get to a point where it can profitably write business, it would enhance the value for policyholders in the Segregated and General Accounts because all profits of Everspan would inure to Ambac, not AFGI. (11/18/10 Peterson at 98:3-9, 109:2-11.)

63. Policyholders in the General Account and the Segregated Account are advantaged by the Segregated Account rehabilitation approach utilized by OCI here, as compared to the alternatives of full rehabilitation or liquidation of Ambac. (11/16/10 Peterson at 168:10-14.)

**F.     Allocations to the Segregated Account**

64.     A threshold challenge for the Segregated Account/General Account structure was making evaluations as to which policies need to be allocated to the Segregated Account. Mr. Peterson was personally involved in the allocation process. OCI, its financial advisors, and Ambac worked daily for roughly six weeks to divide Ambac's business into categories, to identify and discuss the various contractual triggers and where they existed, and made sure that they understood the risks associated with various books of policies and, in some cases, individual policies (11/16/10 Peterson at 177:17-181:1). They also assessed whether certain performing deals should remain in the General Account. (11/16/10 Peterson at 181:2-23.)

65.     Allocations were based on evaluations of potential losses, credit and collateral deterioration of the underlying deals, risks associated with contractual triggers, risks associated with accelerations of loss, and risks associated with certain deal structures (including increases in interest rates), from certain categories of business down to the individual policy level. (11/17/10 Peterson at 157:19-160:7.) As Mr. Peterson testified, "We didn't put policies in the Segregated Account for the fun of it. There w[ere] risks associated with those policies or groups of policies that we felt it was necessary to protect the overall structure for rehabilitation that we were developing[.]" (11/17/10 Peterson at 158:13-17.)

66.     Ambac's disputed contingent liability to objector One State on the One State Street lease with AFGI was allocated due to the material size of the potential liability, which, if left outside the Segregated Account, would benefit a disputed general contract creditor (One State) at the expense of Segregated Account policyholders. (11/18/10 Peterson at 58:12-59:8; *see also* Fourth Peterson Affidavit ¶¶ 3-4.)

67.     The policies in which objectors Lloyds and Depfa have an interest were allocated because the trust in question is in a negative asset position and is using principal to make current interest payments on the securities. Moreover, there are contractual rights to increase the interest rates, which, if exercised, would lead to further losses of the underlying principal. (11/18/10 Peterson at 116:3-20; 11/18/10 Barranco at 165:3-7.) Further, more detailed explanations of the rationale for the allocation of this policy are provided in certain affidavits of Roger Peterson and Cathleen Matanle. (Fourth Peterson Affidavit ¶¶ 5-6, 10; Second Matanle Affidavit ¶¶ 13-22.)

68.     Because projecting losses on Ambac's student loan policies depended on so many factors unique to each transaction, OCI determined that it needed more time to evaluate most of those policies to determine whether allocation to the Segregated Account was appropriate. (11/16/10 Peterson at 180:3-12.) It therefore called for an assessment period for these policies in the initial Plan of Operation for the Segregated Account, which was filed with this Court on March 24, 2010.

69.     David Barranco was extensively involved in the process for assessing and determining which student loan policies should be allocated to the Segregated Account. (11/18/10 Barranco at 140:21-145:20.) Mr. Barranco's testimony made clear that the process for assessing the student loans was thorough, cautious, and the result of extensive deliberations with OCI. (*Id.*) The process ensured that only those policies with significant current or anticipated future losses were allocated to the Segregated Account. (*Id.*) Although Mr. Barranco and Ambac were involved in the assessment process, it was OCI that ultimately decided which student loan policies should be allocated to the Segregated Account. (11/18/10 Barranco at 200:13-17.)

### G. Capital Structure of the Segregated Account

70. The triggers and covenants in many Ambac policies also required OCI to take care in creating the capital structure for the Segregated Account. Specifically, a number of Ambac's policies and contracts, including the majority of its traditional municipal bond policies, contained provisions restricting Ambac's transfer of assets away from the General Account. Tripping these asset-transfer triggers would have created massive litigation as well as substantial loss to Ambac. (11/16/10 Peterson at 156:16-157:14.)

71. Therefore, rather than allocating hard assets directly to the Segregated Account at its establishment, OCI opted to capitalize the Segregated Account through two instruments from the General Account: a Secured Note for $2 billion and an Excess-of-Loss Reinsurance Agreement, both of which can be drawn upon on demand to cover permitted Segregated Account claims as they arise pursuant to the Plan. (11/16/10 Peterson at 195:21-196:21.)

72. OCI determined that the Secured Note and Reinsurance Agreement provided a permanent funding mechanism that adequately capitalized the Segregated Account. (11/17/10 Peterson at 172:11-21.) Those agreements are expected to exist throughout the life of the Segregated Account to providing the funding necessary to make cash payments and to make payments on the surplus notes. (11/17/10 Peterson at 173:1-8.) Substantially all of the assets that would be available to all policyholders prior to the establishment of the Segregated Account are, in fact, available to the Segregated Account through the Secured Note and Reinsurance Agreement.

73. The Secured Note and Reinsurance Agreement give OCI and the Rehabilitator power to modify those agreements (or to modify the Plan in a manner that affects

payments under them), but Ambac does not have such authority. (11/17/10 Peterson at 181:24-182:21.)

74.     Both the Secured Note and Reinsurance Agreement include provisions stating that the General Account's obligations to make a given payment to the Segregated Account is suspended if that payment would cause the General Account's surplus to fall below $100 million. OCI included this provision to ensure that the General Account would not fall below the minimum surplus requirements established by regulators in other states where it does business. (11/16/10 Peterson at 199:12-15.) OCI does not reasonably anticipate that the $100 million floor will be reached or would limit cash payments on demand to the Segregated Account. (11/16/10 Peterson at 197:19-198:45.) Moreover, the issuance of surplus notes actually adds to the statutory surplus under the accounting applicable to such notes, thus reducing the risk that the $100 million surplus floor will ever be reached. (11/16/10 Peterson at 196:22-197:6.) As a result, the $100 million floor does not effectively subordinate Segregated Account policies. (*See, e.g.*, 11/17/10 Peterson at 202:18-23.)

75.     Thus, subject only to the improbable situation where the $100 million surplus floor is reached, all assets of the General Account are available to pay Segregated Account claims under the Plan. (11/16/10 Peterson at 199:16-23.) Based on the foregoing, as well as the determination that the Secured Note and Reinsurance Agreement were sufficient to meet the cash flow needs of the Segregated Account under the Plan, OCI determined the capitalization of the Segregated Account to be adequate. (11/16/10 Peterson at 199:6-11, 199:24-200:3; 11/18/10 Peterson at 59:13-25.) The Court finds that this determination was and remains reasonable and well-founded.

76.     The Reinsurance Agreement includes a standard "follow-the-fortunes" provision, which is modified only to acknowledge that payments will be made in accordance with the Plan. (11/17/10 Peterson at 185:17-186:6.) The Reinsurance Agreement as a whole, including the follow-the-fortunes provision, amounts to an absolute requirement that Ambac make cash payments and Surplus Note payments consistent with the Plan. (11/17/10 Peterson at 188:21-189:4; 11/18/10 Peterson at 106:8-10, 106:21-24, 108:5-11.)

**H.     Pre-Filing Notice**

77.     On the same day the Secured Note, Reinsurance Agreement, and other initial documents pertaining to the establishment of the Segregated Account were signed, OCI petitioned this Court for rehabilitation of the Segregated Account and entry of the Injunction Order.

78.     Providing advance notice of the establishment of the Segregated Account and the petition for rehabilitation to all policyholders would have jeopardized the rehabilitation, because it would have given policyholders the right to act on their triggers and accelerate damages prior to entry of the Injunction Order preventing such acts. (11/16/10 Peterson at 165:4-12.)

79.     Further, to identify all of the policyholders and underlying beneficiaries and engage in confidential, pre-rehabilitation negotiations with them was impossible given the trading in the underlying securities insured by Ambac. (11/17/10 Peterson at 40:3-13.) For example, OCI had no way of identifying the objecting RMBS Funds as Segregated Account policy beneficiaries prior to their appearance in this Court. (11/18/10 Peterson at 126:1-11.)

**I.     Continued Supervision and Control Over the General Account**

80.     At present, OCI does not project substantial losses on General Account policies, and such losses are expected to be immaterial in comparison to the losses on Segregated

Account policies. While Ambac classifies a limited number of General Account policies as having a significant risk of some future losses, the expected claims on such policies if losses occur are likely to be small, particularly in comparison to policies in the Segregated Account. (11/16/10 Peterson at 191:21-193:21.) There are currently $850 to $900 million in pending loss claims in the Segregated Account that have accumulated since the commencement of this rehabilitation, compared to about $13 million in General Account claims during that same time frame. (11/16/10 Peterson at 192:3-194:3.)

81.     OCI has and will continue to closely monitor economic conditions and their impact on Ambac's financial condition and the Plan. Because this is financial guarantee insurance, as opposed to catastrophe insurance, "losses don't develop overnight" and OCI is confident that it will become aware of any increase in projected material losses in the General Account before such losses occur. (11/17/10 Peterson at 142:7-143:9.)

82.     Given the structure of this rehabilitation and the capitalization of the Segregated Account, OCI is conscious of the risks of unfairness to Segregated Account policyholders—and risks to the Plan as a whole—if financial conditions develop such that policy claims and other liabilities of the General Account develop to the point where they would have a material effect on Ambac's available claims-paying resources. (*See, e.g., id.*)

83.     OCI has retained its authority to take additional regulatory action if policies or other potential liabilities of the General Account threaten the fair and equitable treatment of Segregated Account policyholders under the Plan, including a rehabilitation of the General Account if necessary. (11/17/10 Peterson at 127:16-23.) If losses in the Segregated Account and/or General Account develop to the point where the Plan is endangered or becomes unfair, OCI has the tools to modify the Plan with Court approval, broaden the rehabilitation, or

take other regulatory steps to ensure the fair and equitable treatment of policyholders. (11/16/10 Peterson at 211:3-14.)

84. OCI's witnesses testified at length regarding its commitment to take such actions as necessary to protect policyholders. The General Account remains under the auspices of OCI's supervision, both as a Wisconsin-domiciled insurer subject to OCI's regulatory authority and as a contractual party under the Secured Note and Reinsurance Agreement subject to the Rehabilitator's authority to oversee and enforce contractual obligations. OCI cannot offer guarantees regarding future financial conditions, but it has assured policyholders and this Court that it is not self-interested and will continue to act in the interests of policyholders and the public generally—as opposed to the interests of AFGI or any individual policyholder, to the extent such interests conflict with those of policyholders as a whole—in taking appropriate steps to protect the fairness of the Plan. (11/16/10 Dilweg at 61:14-62:2.)

J. **AFGI's Bankruptcy**

85. OCI's actions in response to learning of AFGI's imminent intent to file for bankruptcy provide an example of the use of the tools available to OCI and the Rehabilitator to protect Segregated Account policyholders and subordinate creditors. OCI acted swiftly to protect the interests of the Segregated Account by demanding allocation of certain potential liabilities that are below policyholder priority status to the Segregated Account, and by negotiating with the Ambac bondholder creditor group to ensure that potentially valuable Net Operating Loss (NOL) credits are not destroyed in bankruptcy by the actions of AFGI's bondholders. (11/15/10 Dilweg at 169:3-170:21.)

86. OCI's arrangement with AFGI's bondholders seeks to protect NOLs against contingencies that are in the control of AFGI and its creditors. Ambac's ability to actually use the NOLs is limited, and therefore OCI is exploring negotiation over a portion of the

29

NOLs that it cannot use to the holding company in exchange for greater certainty that the NOLs it might be able to use will not be destroyed due to certain actions of the holding company's creditors in the AFGI bankruptcy. (11/16/10 Peterson at 229:11-231:4.) The viability of the Plan is not dependent on the continued existence and use of NOLs, and none of the financial Plan scenarios submitted to this Court rely upon the use of NOLs. (11/16/10 Peterson at 231:25-232:7.)

87.     The arrangement also calls for the resolution of a disputed, relatively small $38 million portion of prior tax allocations from AFGI to Ambac that are related to alleged accounting errors. (11/16/10 Peterson at 232:22-233:6.) The rest of the disputed tax allocations, which total approximately $700 million, are subject to the jurisdiction of this Court and the priority structure adopted by the Plan due to the timely, pre-bankruptcy allocation of those disputed liabilities by the Rehabilitator and OCI to the Segregated Account.

88.     OCI's actions to protect the claims-paying assets of the General Account from AFGI's creditors are consistent with its actions to date in protecting policyholders from lower-priority creditors. OCI has not permitted dividends from Ambac to AFGI in over 18 months, and has "absolutely no expectation" that it will permit dividends to the parent company while the Segregated Account remains in rehabilitation. (11/15/10 Dilweg at 220:19-23, 221:24-222:11; 11/16/10 Peterson at 226:4-20.) Due to Ambac's financial condition, any dividend to AFGI would require OCI's advance approval. (11/16/10 Peterson at 227:20-25.)

**K.  OCI's Disclosures Regarding the Plan are Sufficient.**

89.  OCI filed and provided notice of the Plan on October 8, 2010.  OCI also submitted a wealth of information regarding the Plan, which has been described in detail above.

90.  OCI's disclosures were intended to provide as much information as possible given confidentiality concerns and the need to acknowledge retained flexibility in the Plan.  (11/16/10 Peterson at 182:22-183:3.)  The Court finds that the information provided was more than sufficient for the Court and the public to assess the fairness and rational basis of the Plan and its specific provisions.

**L.  The Plan Follows the Priority Structure of Wis. Stat. § 645.68.**

91.  The Plan anticipates claims arising in three classes designated by Wis. Stat. § 645.68:  administrative claims (Class 1); policy claims (Class 3); and general creditor claims (Class 5).  Other claims that fall into other classes are possible—for example, a federal government claim for taxes, or a claim by AFGI's bondholders—and OCI has assured the Court that it will take necessary steps to ensure the appropriate treatment of such claims under Wis. Stat. § 645.68 if and when such liabilities become less speculative.

92.  Under the Plan, allowed administrative claims receive full cash payments as they arise.  Allowed policy claims receive payments part in cash and part in interest-bearing Surplus Notes as they arise.  Allowed general creditor claims receive payments in interest-bearing Junior Surplus Notes (which are subordinate to other Surplus Notes) as they arise.

93.  While the majority of Ambac's CDS exposures were settled in the Bank Settlement, a relatively small amount (which are not expected to generate material losses) are presently in the Segregated Account.  (11/17/10 Peterson at 89:1-15.)  None of the credit default obligations that have been allocated to the Segregated Account are "synthetic" or "naked" swaps; like the Bank Group, the remaining CDS holders own the underlying securities and could incur

actual losses. (11/18/10 Barranco at 195:13-196:12.) The Plan treats any claims under these policies as policy claims, consistent with OCI's past characterization of Ambac's CDS obligations as insurance.

94.     The Plan treats claims under reinsurance agreements as general creditor claims, consistent with the established precedent of other jurisdictions cited in OCI's briefing in support of the Plan and consistent with OCI's past practices in rehabilitations and liquidations under Chapter 645.

95.     The Plan's implementation of the priority structure of Wis. Stat. § 645.68, including its treatment of reinsurance and contract claims, is consistent with OCI's past practices regarding treatment of claims in other rehabilitation and liquidation proceedings. (11/16/10 Peterson at 218:5-219:3.)

## M.     The Initial Cash-Note Split on Policy Claims is Reasonable.

96.     The Plan contemplates payments on Segregated Account policy liabilities through a mix of cash and interest-bearing Surplus Notes. The Plan calls for an initial cash percentage of 25 percent of the allowed claim and a Surplus Note percentage of 75 percent, and OCI intends to begin making claims payments and issuing Surplus Notes as soon as possible following confirmation of the Plan. (11/16/10 Peterson at 215:8-16.). As is clear by the Disclosure Statement and the testimony of OCI witnesses, the initial cash-note split is a rational product of OCI's substantial study of the projected claims and claims-paying resources of Ambac.

97.     As explained by Mr. Peterson, the Disclosure Statement includes an illustration of the sustainability of that cash percentage under four different economic scenarios, which forecast Ambac's future financial condition with reference to a number of variables from economic scenarios developed by Moody's. (11/17/10 Peterson at 132:23-133:23, 135:2-10.)

The stress case scenario utilized in two of the scenarios is derived from an economic model from Moody's described as being worse than 90 percent of the possible outcomes based on existing financial data. (11/17/10 Peterson at 135:14-18.)

98.     The scenarios also include as a variable Ambac's recovery or non-recovery of additional claims-paying resources from defendants in various lawsuits alleging breaches of representations and warranties (the "R&W Litigation"). (11/16/10 Peterson at 204:16-206:4.)

99.     With regard to Ambac's claims-paying resources, the scenarios utilized a 5.1 percent reinvestment rate, which was a blended rate incorporating all of Ambac's investments. (11/17/10 Peterson at 137:11-138:14.) The liquidity of Ambac's claims-paying resources is also incorporated into the Plan's cash-note split determination. (11/16/10 Peterson at 189:23-190:2.) Ambac's claims-paying resources have various levels of liquidity, and therefore OCI classified Ambac's claims-paying resources according to their liquidity in projecting cash flows. The liquidity consideration was important because some of Ambac's less liquid assets are trading below their par value, but are reasonably expected to recover over time. (11/16/10 Peterson at 188:16-189:22.)

100.    Peterson was involved in developing the four scenarios. (11/16/10 Peterson at 201:17-22.) OCI created the scenarios to provide a scope of potential outcomes for payments on the Surplus Notes, as affected by key variables. (11/16/10 Peterson at 202:1-6.)

101.    OCI and its advisors reviewed a number of documents and other information to formulate these loss estimates, including but not limited to cash flow estimates for insured transactions, the structures of the transactions, historical cash flow information, projections of future cash flows, Ambac's loss estimates on General Account policies and its

credit risk processes for making those assessments, and Ambac's past estimates of loss, and actual losses. (11/17/10 Peterson at 115:20-121:15.) OCI's estimates for loss reflected in the Disclosure Statement reflect its independent judgment and differ from Ambac's reported estimates. (11/17/10 Peterson at 58:21-59:19.)

102. Because they are an illustrative effort to show total ultimate recovery, the scenarios do not depict payments on the Surplus Notes and have no direct relevance as to whether or when payments will be made. (11/16/10 Peterson at 205:25-206:14.) The feasibility of payments on the Surplus Notes will be evaluated by OCI on at least an annual basis and more frequently, if necessary and appropriate, and its findings will be reported to the Court. (11/16/10 Peterson at 206:18-25.) OCI intends to make payments as soon as possible, so long as it does not expose the Segregated Account to the possibility of being unable to make cash payments in the future. (11/16/10 Peterson at 207:4-13.)

103. The cash-note split percentage was kept low at the outset to protect against the possibility of Ambac in the future finding itself unable to pay the cash portion. (11/16/10 Peterson at 207:4-10.) The split percentage incorporates a conservative approach to Ambac's claims-paying resources and creates a cushion against worse-than-expected financial outcomes. For that reason, establishing reserves for long-term policies, as requested by the LVM Funds and Wells Fargo LVM, would have been duplicative of OCI's already-conservative approach to claims-paying resources. (11/16/10 Peterson at 208:9-21; 11/18/10 Peterson at 53:3-21.) Even under the worst of the four scenarios presented by OCI, Ambac would still have a sufficient cushion above the 25 percent cash payments with which to pay at least some of the Surplus Note obligations. (11/16/10 Peterson at 209:5-11.)

104.    The initial cash-note split fairly balances the interests of short-tail

policyholders who wish to be paid immediately, and long-tail policyholders concerned about

Ambac having adequate resources to cover their future claims.  (11/17/10 Peterson at 143:15-

144-3.)

N.    **The Plan's Cash-Note Split is More Favorable to Segregated Account Policyholders than Liquidation.**

105.    Certain objectors have argued that the Plan's treatment of policyholders

and general creditors is not demonstrably better for them than the outcome of a liquidation of

Ambac, and that the Plan should include an "opt-out" allowing them to immediately recover the

hypothetical liquidation value of their future claims.  That would be contrary to past practice in

Wisconsin.  OCI's past rehabilitation plans for other insurers have not included a liquidation

value opt-out.  (11/17/10 Peterson at 11:7-13.)  Nor has a Wisconsin rehabilitation court required

OCI to provide a technical analysis comparing the projected outcomes under a rehabilitation plan

to a hypothetical liquidation of the insurer.  (11/17/10 Peterson at 12:25-13:3.)

106.    Nevertheless, to address the objectors' liquidation argument, OCI

provided such an analysis to the Court, which puts specific figures to OCI's prior, reasonable

explanations for why liquidation or a rehabilitation of Ambac as a whole would be less favorable

to policyholders than their anticipated recoveries under the Plan.  *See* Disclosure Statement at

pages 8-9 and Amendment No. 2 to Disclosure Statement at pages 6-9.  This analysis, together

with the prior explanations of the risks and likely outcomes of a liquidation of Ambac or the

Segregated Account and further explication of those consequences by OCI's witnesses, clearly

and convincingly demonstrate that the Plan provides a more favorable outcome for policyholders

than the full rehabilitation or liquidation of Ambac on March 24, 2010 or any time thereafter, or

the liquidation of the Segregated Account with an accompanying rehabilitation or liquidation of the General Account, which would be required under Wis. Stat. § 611.24(3)(e).

107. The Court further finds that liquidation would not have been favorable even for holders of the 63 outstanding policy claims on March 24, 2010 which would likely be paid in full in a liquidation, because those claims were just a part of much larger losses expected in the future for those claimants. (11/17/10 Peterson at 13:8-15:2.)

108. Policyholders would also have a less favorable outcome if the Segregated Account were found to be invalid or illegally established. Under such circumstances, OCI would be obligated to take a different regulatory course—likely full rehabilitation—with accompanying further delays in payment, uncertainty regarding triggers, and greater overall losses, to the detriment of all policyholders. (11/17/10 Peterson at 15:3-16:13.)

109. For example, roughly $3 billion in mark-to-market exposures remain in the General Account, most if not all presently covered by partial forbearance agreements that would not apply if the General Account were placed in full rehabilitation or liquidation. (11/17/10 Peterson at 78:9-79:21.) The actual loss exposure on those policies is nominal, but the mark-to-market exposure is extensive. (11/17/10 Peterson at 130:2-10.) This and other examples provided by OCI illustrate how a rehabilitation or liquidation of the General Account, whether on March 24, 2010 or any subsequent time to date, would substantially add to the overall loss claims without adding any corresponding increase to the claims-paying resources available to satisfy claims of both accounts.

**O.    The Plan's Use of Surplus Notes is Fair.**

110. The form of the surplus notes is based on a template that OCI has approved for issuance of surplus notes by insurers. (11/16/10 Peterson at 184:20-185:4.) Key provisions, such as retaining OCI discretion on timing and amount of payment of interest and

principal, were part of the template. (11/16/10 Peterson at 185:6-10, 185:23-25.) OCI

management staff members are "sticklers about surplus notes being maintained very closely" to

the template, which OCI has deemed to be fair for use with other Wisconsin insurers. (11/16/10

Peterson at 186:1-10.)

111.    OCI intends to ensure that the Surplus Notes issued by the Segregated and

General Accounts will be treated equally. (11/16/10 Peterson at 184:10-19.) There are no

material differences between the Surplus Notes issued by the two accounts. (11/16/10 Peterson

at 185:11-22.)

112.    The June 7, 2020 maturity date appearing on the form of the Surplus Notes

has no particular relevance except to ensure that the Segregated Account Surplus Notes remain

*pari passu* with the General Account Surplus Notes issued as part of the Bank Settlement, which

mature on that date. (11/16/10 Peterson at 209:14-24.) The Plan allows for amendment between

now and 2020 to adjust payments under the Surplus Notes. (11/18/10 Peterson at 22:20-22,

46:23-47:16.) Sometime before the June 2020 maturity date, OCI will assess the need to modify

that date to allow continuation or reissue of Surplus Notes after 2020. (11/16/10 Peterson at

210:3-11.)

113.    Prior to the confirmation hearings, OCI sought and obtained a "no-action

letter" from the Securities and Exchange Commission, stating that the SEC would not take

enforcement action relating to the issuance of the Surplus Notes. The SEC no-action letter adds

value to the notes by making them less susceptible to challenge and more tradable in the market.

(11/16/10 Peterson at 214:8-18.)

114.    OCI has reached out to trustees to coordinate and make the surplus note

administration and delivery process as efficient as possible. (11/17/10 Peterson at 239:4-9;

11/18/10 Peterson at 118:9-119:6; 120:24-121:7.) The only documented, additional administrative cost for the trustees is a $175 or $180 charge related to certain market identifier reports for each policy, which can be reduced by up to 90 percent with an annual subscription. (11/18/10 Peterson at 119:10-17, 120:9-23.) OCI has taken care to work with trustees to avoid imposing unreasonable burdens upon them, and has assured the Court that it will continue to do so as administrative challenges arise. At present, however, the Court finds the additional administrative burdens identified by the trustees in their objections to the Plan to be *de minimis* in the context of the Plan and in light of the scope and magnitude of the amounts at issue in this rehabilitation.

**P.    Ambac's Role in Plan Administration Under the Management Services Agreement**

115.    The Plan contemplates the continuation of the Segregated Account's Management Services Agreement with Ambac, whereby Ambac provides the necessary personnel and expertise to administer, advise, and engage in the day-to-day operations of the Segregated Account. The Management Services Agreement seeks to utilize the extensive experience and accumulated knowledge of Ambac employees for the benefit of the Segregated Account, while OCI retains full control over the relationship. (11/15/10 Dilweg at 157:25-159:4, 161:15-23.)

116.    The management services relationship with Ambac is a "tremendous benefit" to the Segregated Account. (11/16/10 Peterson at 215:20-23.) To adequately administer the business of the Segregated Account, it was essential for OCI to retain qualified Ambac staff with working knowledge of the relevant transactions, established relationships with the counterparties and policyholders, and experience in exercising the control rights and mitigating losses associated with any given policy. OCI could not provide such services on its own.

(11/15/10 Dilweg at 161:2-11.) To replicate this knowledge and experience with a new staff would have been difficult and very inefficient. (11/16/10 Peterson at 215:23-216:13.)

117. As was clear from the testimony of Ambac executives David Barranco and Cathleen Matanle, the Ambac staff providing services under the Management Services Agreement are committed and exceptionally knowledgeable regarding the policies and business at issue. (11/15/10 Dilweg at 162:19-163:15.) The problems at Ambac were not attributable to personnel there, particularly the remaining non-executive personnel, but rather to economic conditions that plagued the financial guarantee industry as a whole. (11/15/10 Dilweg at 164:7-21.) Indeed, all of Ambac's five or six competitors in the financial guarantee insurance industry that had written policies on mortgage exposures and other asset-backed securities have failed or are on the brink of failure. (11/16/10 Peterson at 138:3-8, 21-25.)

118. OCI has effective checks in place to monitor the management services relationship. Mr. Peterson and Ms. Shaul make regular visits to Ambac's New York offices, have developed relationships with the existing staff for the management services provider, and have implemented processes and procedures to maintain control over the day-to-day operations of the Segregated Account and the administration of Segregated Account pursuant to the Management Services Agreement. (11/16/10 Peterson at 216:14-217:24; 11/17/10 Peterson at 196:13-201:19.) The management services relationship has guidelines in place that govern the relationship in the day-to-day management of the Segregated Account and allow for greater role understanding. (11/15/10 Dilweg at 160:14-161:1.)

119. As management services provider, Ambac has established a separate leadership team focusing on the policies in the Segregated Account and has roughly 30 employees devoted to the Segregated Account. (11/18/10 Barranco at 134:18-136:4.) Mr.

Barranco is one of three Ambac employees who serve as the leadership team for Ambac in its role as the management services provider for the Segregated Account. (11/18/10 Barranco at 134:18-135:4.) The other members of the leadership both have at least nine years of experience working at Ambac. (11/18/10 Barranco at 135:18-21.)

120.    The leadership team regularly meets with Ms. Shaul, Mr. Peterson, and OCI's outside legal counsel and financial advisors to discuss all major issues affecting the Segregated Account. (11/18/10 Barranco at 136:8-137:3.) The meetings provide a forum for OCI to ensure that Ambac, as management services provider, is effectively carrying out OCI's plans. (11/18/10 Barranco at 138:4-14.)

121.    OCI representatives also participate in Ambac's day-to-day operational meetings regarding particular insurance policies that are allocated to the Segregated Account, and OCI decides whether to approve Ambac's proposals with respect to those policies. (11/18/10 Barranco at 137:18-138:21.)

122.    OCI may terminate the Management Services Agreement if necessary, with provisions in place to maintain confidentiality of financial information. (11/18/10 Peterson at 117:23-118:2.)

123.    The Plan provisions providing certain civil immunities to those responsible for administering the Plan, including the management services provider, are necessary to facilitate frank and open assessment and advice from individuals charged with administering the Plan, with the assurance that their views and expertise will not lead to civil liability. (11/16/10 Dilweg at 14:1-14.) The Plan provides for judicial review of disputed claims, thus adequately protecting policyholders against unfairness or errors by OCI or Ambac in the claims administration process. (11/18/10 Peterson at 117:2-9.)

**Q.    Recoveries/Other Plan Issues**

124.    The Plan permits the Segregated Account and Ambac to continue their prior practice of mitigating losses through the R&W Litigation and direct recoveries against securities issuers to recoup prior shortfalls in payments due to holders of those obligations.  To the extent those efforts result in cash recoveries to the insurer, those recoveries are added to the General Account rather than the Segregated Account due to the previously discussed triggers requiring assets to remain in the General Account even if they are ultimately used to satisfy Segregated Account liabilities.  (11/16/10 Peterson at 202:5-12.)

125.    The primary relief sought in the R&W Litigation is the "put-back" of certain non-conforming loans by the RMBS originator and the substitution of conforming loans in the RMBS asset pool, which would improve the financial condition of the security and thus reduce projected losses under those policies.  (11/16/10 Peterson at 202:9-24; 11/17/10 Peterson at 63:16-64:1.)  The R&W Litigation also concerns roughly $2 billion in claims payments presented to and paid by Ambac prior to the rehabilitation of the Segregated Account.  (11/18/10 Peterson at 111:24-112:13.)  If there are cash recoveries or cash settlements arising from the R&W Litigation rather than (or in addition to) the put-back remedies, those recoveries will be added to the claims-paying resources of the General Account and be available to fund payments under the Plan.  (11/18/10 Peterson at 111:14-19.)

126.    The "recoveries" problem argued by several RMBS trustees and holders— namely, that Ambac could recover shortfalls from issuers in 100 percent cash despite paying policy claims caused by such shortfalls on a cash-note split basis—assumes that RMBS securities will recover to the point where there will be actual cash flows from which to obtain recoveries, which is not the case now to any material degree.  (11/17/10 Peterson at 231:17-232:21.)  In light of the context of the broader Plan, the minority of deals for which recoveries

might be frequent and obtainable, and the complexity of fashioning individualized, fair solutions for the many unique deals and deal structures, the recovery provisions are fair and equitable to policyholders as a whole. (11/17/10 Peterson at 234:4-236:14.)

127. If any inequitable situations arise in the future with regard to recoveries, it is OCI's intent to work out efficient solutions with policyholder trustees for fair allocation of such recoveries. (11/18/10 Peterson at 123:23-124:12.) Article 3.06 of the Plan provides a mechanism for doing so.

**R.     Alternative Resolutions**

128. Article 3.06 of the Plan also expressly provides for alternative resolutions for policyholders. This provision recognizes that policyholders are in different economic positions in regard to delays and uncertainties in payment on surplus notes, and the Plan encourages such policyholders to engage with OCI regarding a resolution of their claims that better suits their priorities without providing unfair treatment to other policyholders. (11/16/10 Peterson at 211:20-212:20.)

129. OCI supervises and manages the commutation process, while utilizing the policy-level expertise of Ambac as management services provider. (11/18/10 Barranco at 160:16-20.) One objective of OCI and Ambac in the commutation process is to maximize the return on capital for Ambac's reserves (11/18/10 Barranco at 161:4-7, 162:19-163:1), which has the effect of increasing the claims-paying resources available to the Segregated Account (11/18/10 Barranco at 200:4-12).

130. OCI's involvement facilitates mutually beneficial settlement among policyholders and the insurer. If policyholders want to settle, OCI has the authority and leverage as Rehabilitator of the Segregated Account and regulator of the General Account to bring the insurer to the settlement table. (11/16/10 Dilweg at 126:7-127:8.) To date, multiple

policyholders have initiated discussions with OCI and Ambac regarding commutations, settlements, amendments, and other alternative resolutions. (11/16/10 Peterson at 212:2-213:12.)

**S.    The Plan Retains Flexibility to Adjust to Changing Economic Conditions**

131.    The Plan is developed to be flexible to address uncertainties over time, including the ability to amend and adjust the Plan with Court approval. (11/18/10 Peterson at 25:10-12.) OCI will continue to monitor Ambac's financial condition and take reasonable actions if and when they become necessary. (11/18/10 Peterson at 42:2-7.)

132.    The Plan contemplates ongoing review and assessment by OCI, with annual reports to the Court on the financial condition of the Segregated Account, the administration of the Plan, and the propriety of any adjustments to the cash percentage. (11/16/10 Dilweg at 83:18-84:2.)

**T.    Testimony of James Schacht**

133.    The objecting parties offered the live testimony of only one person in opposition to the Plan, a paid expert witness named James Schacht. Although Mr. Schacht was shown to have knowledge about rehabilitations and liquidations generally based on his experience with the Illinois Department of Insurance, the Court did not find Mr. Schacht's testimony in opposition to confirmation to be credible or particularly relevant in the context of this Plan and the Wisconsin rehabilitation proceeding.

(a)    First, while Mr. Schacht offered testimony regarding "national custom and practice in rehabilitations" (11/19/10 Schacht at 106:7-17, 182:8-14), Mr. Schacht offered no opinions regarding the custom and practice in Wisconsin and admitted that the Wisconsin law governing this rehabilitation differed in material respects from the laws of other states from which he derived his opinions. For example, while he faulted OCI's use of the segregated account

structure here as out of line with national custom and practice, he admitted on cross-examination that "[n]o other state . . . has a statute similar to" Wis. Stat. § 611.24(2), the statute under which OCI established the Segregated Account. (11/19/10 Schacht at 192:22-24.) Similarly, Mr. Schacht noted that Wisconsin's Chapter 645 formed the foundation for a model act later promulgated by the National Association of Insurance Commissioners ("NAIC") and adopted in many states (11/19/10 Schacht at 66:14-67:9), but conceded on cross-examination that the model act deleted the important legislative commentary accompanying Wisconsin's Chapter 645 (which this Court has previously cited in its decisions in this proceeding) and curtailed some of the flexibility that Chapter 645 emphasizes (11/19/10 Schacht at 114:4-20, 115:12-116:5).

      (b)    <u>Second</u>, Mr. Schacht derived much of his knowledge about national customs and practices from his work with the NAIC, including the NAIC Financial Analysis Working Group (FAWG). (11/19/10 Schacht at 61:7-62:22.) As he acknowledged, OCI witness Roger Peterson is presently the head of FAWG (11/19/10 Schacht at 61:24-62:4), and Mr. Peterson testified that he is actively engaged with regulators in other states through FAWG and other NAIC activities, including discussions specifically relating to Ambac (11/16/10 Peterson at 224:8-225:1). Therefore, to the extent, if at all, that national customs and practices are relevant to this Wisconsin rehabilitation, the Court finds that Mr. Peterson is at least as qualified as Mr. Schacht regarding those customs, is more qualified to testify as to the application of such national customs to Wisconsin's unique

segregated account and rehabilitation statutes, and has more current regulatory expertise.

(c)     Third, Mr. Schacht testified that financial guaranty insurance is a "very specialized" type of insurance that presents "unique and different problems than traditional personal [or] commercial property casualty business" insurers. (11/19/10 Schacht at 127:10-16, 175:15-24.) Mr. Schacht admitted, however, that financial guarantee insurance was "not his area of expertise" and he has "never had to deal with the[] sorts of instruments" that formed Ambac's insurance business and dictated OCI's course of action in this rehabilitation. (11/19/10 Schacht at 127:13-16, 128:17-25, 175:15-176:3.) Mr. Schacht acknowledged that OCI has more experience in the realm of financial guarantee insurance. (11/19/10 Schacht at 129:3-14.) This is a particularly important point given that much of Mr. Schacht's criticism was based on his own experiences with other types of insurers in very different contexts (*see generally* 11/19/10 Schacht at 72-81), which did not present the same type of complex and difficult challenges posed by Ambac's business and financial condition (*see generally* 11/19/10 Schacht at 152-57).

(d)     Fourth, Mr. Schacht's general criticisms of the Plan ignored or altered the plain language of Wis. Stat. § 645.01(4), which states that the overarching purposes of Chapter 645 proceedings is the "protection of the interests of insureds, creditors, and the public generally, with minimum interference with the normal prerogatives of proprietors" and the "[e]quitable apportionment of any unavoidable loss." Specifically, Mr. Schacht testified that

OCI erred in accounting for the public interest in any respect after the filing of the petition for rehabilitation, and that "equitable apportionment" means "equal apportionment," without reference to whether losses are avoidable or unavoidable. (11/19/10 Schacht at 148:8-149:11, 185:6-10.)

(e)     Fifth, Mr. Schacht's specific criticisms of the Plan and OCI's disclosure documents were speculative and not well-founded. For example, he claimed that the liquidation analysis OCI presented was flawed because it omitted assets that he speculated could exist, but for which there was no evidence of their actual existence or their materiality. (*See generally* 11/19/10 Schacht at 93-95, 161-62.) He also acknowledged that Ambac personnel charged with administering the Segregated Account under the management services agreement were "experienced, talented people, the sort of people you need to do a rehabilitation" and recognized that OCI had control over the Management Services Agreement, but faulted OCI for not including in that Agreement controls over their compensation and benefits. (11/19/10 Schacht at 199:23-200:12.) These are not material or sufficiently supported reasons for this Court to reject or modify the Plan.

(f)     Finally, Mr. Schacht's opinions are premised on the conclusion that a liquidation of Ambac would be more favorable to policyholders than the Plan; if a liquidation is not more favorable, Mr. Schacht admitted that it is appropriate for the Rehabilitator to pursue the Plan. (11/19/10 Schacht at 188:22-190:23.) This Court has concluded that a liquidation of Ambac would not

be more favorable to policyholders, and therefore rejects the fundamental premise of Mr. Schacht's opinion testimony regarding the Plan.

## III.   ADDITIONAL GENERAL FINDINGS

### A.   The Segregated Account

134.   The Court hereby adopts and reincorporates here by reference those portions of its previously entered Findings of Fact and Conclusions of Law dated May 27, 2010 that pertain to the background facts leading up to this proceeding, the formation of the Segregated Account, the allocation of policies and other liabilities and potential liabilities to the Segregated Account and the rational basis underlying OCI's decision to pursue rehabilitation of the Segregated Account rather than liquidation or rehabilitation of the entire company at the time it commenced this proceeding on March 24, 2010. The Court further adopts and reincorporates here by reference its July 16, 2010 Order and October 26, 2010 Order, both of which address the establishment and rehabilitation of the Segregated Account, the allocations of certain policies thereto, and the propriety of the Injunction Order.

135.   The Rehabilitator has determined that (i) the Segregated Account was legally established and adequately capitalized; (ii) the rehabilitation of the Segregated Account is lawful and appropriate; and (iii) the Plan protects the interests of insureds, other creditors of the Segregated Account, and the public generally. This Court finds that those determinations by the Rehabilitator are rational, are based on a well-grounded, detailed investigation and analysis of the relevant facts and circumstances, and are within the Rehabilitator's areas of specialized expertise and discretion.

136.   Based on the evidence and the reasonable inferences arising from it, as informed by this Court's familiarity with the legal and practical considerations pertinent to delinquency proceedings, this Court finds that the Plan is more favorable to policyholders,

creditors, and the public than a liquidation of the Segregated Account and General Account, a liquidation of the Segregated Account and rehabilitation of the General Account, or a full rehabilitation of Ambac.

**B.   The Permitted Claim Treatments Under the Plan**

137.   Consistent with the uniform past practice in Wisconsin rehabilitation proceedings, the Plan treats allowed claims in accordance with the claim priority provisions of Wis. Stat. § 645.68. The Plan provides that holders of permitted claims for fees, costs and expenses of the administration of the Segregated Account will receive cash in the full amount of such claims. Holders of permitted policy claims will receive, in complete satisfaction of such claims, a combination of cash payments and 5.1% interest-bearing, unsecured surplus notes that are scheduled to mature on June 7, 2020 (the "Surplus Notes"). The cash/Surplus Note split will initially be 25% cash and 75% Surplus Notes, but may be adjusted by the Rehabilitator over time to reflect changes in claims projections and/or the availability of claims-paying resources. Holders of all other permitted, more junior claims submitted in compliance with the provisions of the Plan that are not claims for administrative expenses of the Segregated Account or policy claims, will receive, in complete satisfaction of such claims, 5.1% interest-bearing, unsecured junior surplus notes in a principal amount equal to the dollar amount of such claims.

138.   The Plan's treatment of claims is rationally based and approved by the Court as a reasonable, conservative means of promoting the fair and equitable apportionment of unavoidable losses.

**C.   Adequate Capital Support for the Plan**

139.   The written evidence and oral testimony introduced by the Rehabilitator supported and confirmed this Court's prior determinations that the Segregated Account was

formed with adequate capital, and that the Secured Note and Reinsurance Agreement constitute a viable, adequate mechanism for funding the obligations of the Plan.

140. The Secured Note and Reinsurance Agreement constitute absolute, unqualified, commitments by the General Account to fund all permitted claims against the Segregated Account in accordance with the terms of the Plan. As demonstrated on the face of the documents and through the testimony of OCI's Roger Peterson, the Secured Note and Reinsurance Agreement contain standard, appropriate procedures and mechanisms for funding permitted claims against the Segregated Account in accordance with the Plan. Permitted claims against the Segregated Account are treated pursuant to the terms and priorities of the Plan on equal footing with claims against the General Account in regard to the shared claims-paying resources of the two Accounts.

141. The only portion of the claims-paying resources of the General Account not fully committed to cover permitted claims of the Segregated Account pursuant to the Plan is a minimum surplus of $100 million, which needs to be maintained in the General Account for licensing and other regulatory purposes. (11/16/10 Peterson at 199:12-15.) That required minimum does not place permitted claims against the Segregated Account pursuant to the Plan at any actual disadvantage relative to permitted claims against the General Account. OCI would take other regulatory action in regard to the General Account in what is presently viewed by OCI to be the unlikely possibility that the financial condition of the General Account would deteriorate to a point where that minimum surplus requirement was threatened. (11/16/10 Peterson at 197:19-198:5.) Moreover, this Court finds that relative to the total amount of claims-paying resources, that minimum is not material to the Plan requirements.

142.    The Court finds the testimony of Mr. Peterson and the other written evidence submitted by the Rehabilitator regarding the Secured Note and Reinsurance Agreement, and the adequacy of the support for the Plan obligations to be more credible and well-grounded in the information before the Court than the statements in the paid expert witness affidavits of William Barbagallo and Frederick Bingham submitted by Lloyds and ALL.

**D.      The Surplus Notes**

143.    The surplus notes to be issued pursuant to the Plan are in a standard form consistent with the regularly used template maintained by OCI for use in regard to other Wisconsin domiciled insurer's surplus notes.  The same form of Surplus Notes to be issued pursuant to the Plan were previously issued by the General Account.  The material terms of the General Account Surplus Notes and the Surplus Notes to be issued by the Segregated Account under the Plan are identical as to maturity, interest rate and the other main provisions. Additionally, as explained in the Rehabilitator's written disclosures and the testimony of Mr. Peterson, the Surplus Notes of both Accounts are *pari passu*.  The Surplus Notes of each Account may only be paid as allowed by OCI and any and all payments of principal and interest on the Notes approved by OCI shall be on the same terms and conditions regarding the General Account and Segregated Account.

144.    The Surplus Notes are in standard form, are fair, and follow the standard requirements of being unsecured obligations that are subordinate to all other indebtedness and payments on them of either principal or interest may be made only with the prior approval of OCI.  If OCI does not approve the payment of interest on the Surplus Notes, such interest will accrue and compound annually until paid or otherwise.  The manner in which the Surplus Notes will be issued, executed and distributed are as set forth in the Plan and explained in the Disclosure Statement.

145. The Court finds that the terms and conditions of the issuance of the Surplus Notes pursuant to the Plan are procedurally and substantively fair.

**E. The RMBS "Policyholders"**

146. Throughout this rehabilitation proceeding, a group of six entities named Aurelius Capital Management LP, Fir Tree Inc., King Street Capital Master Fund, Ltd., King Street Capital, L.P., Monarch Alternative Capital LP and Stonehill Capital Management LLC have referred to themselves collectively as the "RMBS Policyholders." However, the testimony at the Hearing demonstrated that none of these entities are "policyholders" of Ambac or the Segregated Account. Their description of themselves as "policyholders" in this proceeding is misleading and inaccurate.

147. While the six entities identified in the prior finding have offered to provide the Court information under seal regarding their particular holdings (*see generally* 11/15/10 Statements of Counsel at 116-122), they have never offered or provided proof to the Rehabilitator or this Court as to their standing to assert legal positions in regard to any particular RMBS trust(s), despite repeated inquiries by the Rehabilitator. They have declined to identify the provisions of any particular RMBS trust indenture pursuant to which they claim to have standing to assert positions regarding the interests of a policyholder in this proceeding.

**F. Findings Relating to Miscellaneous Other Objections**

148. The testimony at the hearing demonstrates that the Plan fairly balances and protects between the competing interests of policyholders with "long-tail" interests and those having "short-tail" interests. Certain of the objectors with "short-tail" interests argued that the Plan is too conservative regarding the percentage of cash being distributed in early years; conversely, objectors with "long-tail" interests argued that the Plan distributes cash too rapidly and should contain provisions for paying a certain percentage of each cash payment into a long-

term "reserve." While neither extreme is satisfied by the intermediate balance struck by the Rehabilitator pursuant to the Plan, the Court finds that the balance struck by the Rehabilitator is fair and reasonable under the circumstances.

149.    OCI did not abuse its discretion in approving the allocation of the two Ambac policies insuring the student loan revenue bonds issued by ALL as to which Lloyds and Depfa claim an interest. As reflected in the Fourth Affidavit of Mr. Peterson (at ¶¶ 5-6), the Second Affidavit of Cathleen Matanle (at ¶¶ 13-22) and the testimony of Mr. Peterson and Mr. Barranco at the confirmation hearings, OCI approved the allocation of the two ALL policies because of the high probability that they will result in substantial loss claims due to the structure of the transaction.

150.    The evidence introduced at the Confirmation Hearing demonstrates that OCI did not abuse its discretion in regard to the allocation of the other policies pertaining to student loan-backed bonds that were also allocated to the Segregated Account, including the swap policy (No. SW0240BE), which contains contractual triggers that could result in the issuer—the Treasurer—having to make an immediate termination payment if the policy were not assigned to the Segregated Account and the termination triggers not enjoined.

151.    As this Court previously found in its May 27, 2010 Findings of Fact, and as further supported by the testimony of Mr. Peterson at the confirmation hearing, the policies on the bonds relating to the Las Vegas Monorail ("LVM") also fit OCI's criteria for allocation to the Segregated Account, and OCI acted within its discretion in approving the allocation of the LVM policies to the Segregated Account. The LVM issuer was in a chapter 11 bankruptcy proceeding in Nevada when the allocation decisions were made (and still is in bankruptcy), and the present value of the loss claims expected on those policies were projected to be the single largest deal

losses of any transaction insured by Ambac. (*Id.*; *see also* attachments to the Rehabilitator's Supplementations to October 8, 2010 Disclosure Statement in Support of Confirmation of the Plan, which denote the LVM exposure as the single largest expected loss in the Segregated Account—over twice as large as the next largest exposure.)

152. A number of the objecting parties-in-interest expressed concerns about the unpredictability of future financial events, both generally in the broad economy, and specifically in regard to the claims-paying ability of Ambac to service the requirements of the Plan. The Court finds that the Plan contains adequate flexibility to deal with future changes and challenges within a broad range of reasonably foreseeable possible developments. If future circumstances change beyond what is presently reasonably predictable and foreseeable, the Rehabilitator and OCI have retained broad regulatory powers to return to the Court to implement whatever further plan or regulatory actions may be necessary to protect the interests of policyholders, creditors and the public.

## CONCLUSIONS OF LAW

1. The Rehabilitator lawfully exercised his discretion under Wisconsin law and the prior orders of this Court in preparing and submitting the Plan for approval by this Court.

2. The Plan properly furthers the rehabilitation of the Segregated Account by protecting the interests of policyholders, other creditors of the Segregated Account, and the public generally. The Plan equitably apportions unavoidable losses and prevents avoidable losses that would adversely affect those interests.

3. The Plan's claim payment provisions properly and reasonably utilize the priority structure of Wis. Stat. § 645.68 in furtherance of the equitable apportionment of unavoidable losses. The Plan properly treats reinsurance and general creditor claims as subordinate to policyholder claims.

4.      The satisfaction of permitted policy claims through (i) the payment of 25% of the amount of such permitted policy claim in cash and (ii) the issuance of Surplus Notes in a principal amount equal to 75% of the amount of such permitted policy claim, is substantively fair and equitable to policyholders in light of the financial condition of the Segregated Account, particularly with the annual reporting, assessment, and potential adjustments called for by the Plan.

5.      Policyholders and all other parties-in-interest were afforded fair and reasonable notice and opportunity to be heard concerning confirmation of the Plan and its provisions, including the issuance of Surplus Notes.  Accordingly, the issuance of Surplus Notes is procedurally fair to policyholders.

6.      The Secured Note and Excess of Loss Reinsurance Agreement provide a legally viable and appropriate mechanism for providing adequate capital to support the requirements of the Segregated Account pursuant to the Plan.

7.      The Rehabilitator provided sufficient information to this Court in connection with the confirmation proceedings to determine the value of the claims or interests to be treated pursuant to the Plan and the Surplus Notes to be issued pursuant to the Plan.

8.      The proposed issuance of the Surplus Notes by the Segregated Account pursuant to the Plan is procedurally and substantively fair.  The Rehabilitator has satisfied the requirements for issuance of the Surplus Notes pursuant to the Plan without registration of the Surplus Notes under the Securities Act of 1933, as amended, in reliance on the exemption from the registration requirements from the Securities Act provided by Section 3(a)(10) thereof, as described in the request by the Rehabilitator's counsel dated November 11, 2010 to the Securities & Exchange Commission and the response thereto by the Securities & Exchange

Commission dated November 12, 2010. Both such documents have been filed with the Court and are posted on the Court-approved Web site.

9.     The group consisting of Aurelius Capital Management LP, Fir Tree Inc., King Street Capital Master Fund, Ltd., King Street Capital, L.P., Monarch Alternative Capital LP and Stonehill Capital Management LLC, who have been referred to themselves in this proceeding as the "RMBS Policyholders," are not policyholders in this proceeding. It is further concluded that those entities have not demonstrated the standing to assert positions or arguments as policyholders in this proceeding. They may be heard as parties-in-interest, but not as policyholders.

10.     Notwithstanding the pendency of appeals from prior interim pre-confirmation orders of this Court, this Court has continuing competency to proceed with this rehabilitation proceeding, including competency to conduct the hearings on confirmation of the Plan, to enter this Order confirming the Plan, and to exercise continuing authority over post-confirmation matters as specified in this Order. Moreover, any objection that any present appellants may have had to the competency of this Court to continue to preside over this rehabilitation proceeding and the confirmation process during the pendency of those appeals has been waived. Each of the parties-in-interest which have been pursuing appellate rights to date in this matter have continued to actively participate in this rehabilitation proceeding, including active participation at the confirmation hearings.

11.     There is no constitutional or statutory requirement that the Rehabilitator offer policyholders the right to opt out of the Plan of Rehabilitation in favor of taking a cash payment equaling the liquidation value of their permitted policy claim. Nor is there any such requirement as to subordinate, non-policy permitted claims. Similarly, there is no requirement

that the Rehabilitator proves that his Plan offers any particular policyholder or creditor, or all policyholders and creditors, a more favorable recovery than might be obtained pursuant to a liquidation. Even if, *arguendo*, a liquidation opt-out or analysis were required, the Rehabilitator's Plan here provides all policyholders and creditors a more favorable future outcome in regard to their claims than they would have received had OCI chosen to place Ambac into a general liquidation proceeding under Chapter 645 on March 24, 2010 or any date thereafter instead of pursuing the present rehabilitation proceeding of just the Segregated Account.

12.   The Court concludes that the liquidation analysis set forth in the Rehabilitator's October 6, 2010 Disclosure Statement (at pages 8-9) and in the November 12, 2010 Amendment No. 2 to Disclosure Statement (at § II, pages 6-9), as well as the testimony of Mr. Peterson, fairly and accurately summarize the substantial disadvantages of liquidation over the chosen path of rehabilitating the Segregated Account. The Court similarly concludes that the basis demonstrated by OCI and the Rehabilitator for pursuing the rehabilitation of the Segregated Account rather than a full rehabilitation of all of Ambac and its roughly 15,000 policyholders (as of March 24, 2010) was rational, prudent and in the best interests of all of the policyholders and creditors of Ambac's General and Segregated Accounts and the public generally.

13.   Based on the evidence and testimony, the Court further concludes that the Plan provides all policyholders a more favorable future outcome in regard to their claims than they would have received had OCI chosen to place Ambac in a general liquidation or rehabilitation proceeding on any given date following the commencement of these proceedings.

14.   As discussed at the confirmation hearings by the Rehabilitator's counsel and in the testimony of OCI's Roger Peterson, the Rehabilitator has considered and discussed

certain of the objections by parties-in-interest and, in an effort to mitigate or eliminate certain of those concerns, the Rehabilitator agreed to make certain modifications to specific provisions of the Plan and related documents. In that regard, the Rehabilitator has amended Articles 4.04(h) and 8.01, and added new section 8.02, all as reflected in the attached red-lined copy of the relevant pages of the Plan, and has amended Section 14(a) of the form of Surplus Note attached to the Plan, as also reflected in the attached red-lined copy of the relevant page of that document. The Court concludes that those changes are reasonable and appropriate.

15.    The Plan is feasible and is fair and equitable to policyholders and others with an interest in the Segregated Account. The Plan represents a reasonable response to the financial condition of the Segregated Account and Ambac generally by addressing the serious financial hazards to policyholders, creditors, and the public, maximizing claims-paying resources, and providing flexibility to meet the purposes of rehabilitation on an ongoing basis, with this Court's continued oversight.

## **ORDER**

NOW, THEREFORE, based upon the foregoing Findings of Fact, Conclusions of Law, and the above-described proceedings pertaining to confirmation, and for good cause shown, it is hereby ORDERED as follows:

1. The Rehabilitator's Motion to Confirm the Plan is GRANTED, subject to the above-referenced modifications by the Rehabilitator to Articles 4.04(h), 8.01 and 8.02 of the Plan and Section 14(a) of the form of Surplus Note attached to the Plan, each as reflected in the attached red-lined copy of the relevant pages of the Plan and the form of Surplus Note.

2. The Rehabilitator shall modify the Plan and form of Surplus Note as ordered and promptly file the modified versions of the Plan and Surplus Note with this Court, post them on the Court-approved Web site and serve them on all counsel of record electronically.

3. The Rehabilitator shall have the full powers and authority granted pursuant to Wis. Stat. §§ 645.33 to 645.35 and all other applicable laws as are reasonably necessary to carry out the Plan, including but not limited to the power and authority to interpret the terms and conditions of the Plan and to issue guidelines or further directions to interested persons in order to carry out the purposes and effects of the Plan.

4. In accordance with the provisions of the Plan, the Rehabilitator shall post a notice on the court-approved Web site advising of the Effective Date of the Plan.

5. Each holder or beneficiary of a permitted policy claim, and each party to any instrument or agreement (i) pursuant to which such policy was issued, (ii) which governs the payment of claims under such policy, or (iii) which governs or specifies the subsequent allocation, distribution or disbursement of amounts received pursuant to a policy, including but not limited to any note, indenture, certificate, servicing agreement or other similar instrument or agreement (collectively, "Transaction Documents") shall accept any Surplus Notes delivered to

such holder, beneficiary or other party in accordance with the Plan, together with any cash amount paid to such holder, beneficiary or other party in accordance with the Plan, in full and complete satisfaction of the payment obligation of the Segregated Account for that permitted policy claim, regardless of the existence of any provision in such policy or related Transaction Documents that would otherwise prohibit or restrict such holder, beneficiary or other party from fully discharging the obligations of the Segregated Account.

6.      Each holder or beneficiary acting as a trustee for the beneficial holder(s) of any underlying financial instrument(s) insured by a policy allocated to the Segregated Account shall submit any claim for payment under such policy in accordance with the provisions of the Plan by completing and submitting the Proof of Policy Claim Form in full (in the form approved by the Rehabilitator), including the selection of the delivery method for the payment in Surplus Notes. Actions or omissions taken in compliance with this Order by any such holder or beneficiary acting as a trustee shall not be deemed a violation of any provision in the applicable policy or related Transaction Documents that would otherwise prohibit or restrict such holder or beneficiary from complying with this Order. The Segregated Account shall indemnify all such holders or beneficiaries acting as trustees in the manner and under the conditions specified in Article 8.02 of the Plan.

7.      The Rehabilitator shall obtain the approval of this Court prior to effectuating any Alternative Resolution (as defined in the Plan) that involves the payment of cash by the Segregated Account in excess of $50 million, and prior to adjusting the percentages of the cash and Surplus Notes to be issued in accordance with the terms of the Plan.

8. By no later than June 1 of each year, the Rehabilitator shall file a report with this Court advising on the status of the rehabilitation in accordance with Article 7.01 of the Plan.

9. Consistent with Article 10.02 of the Plan, unless specifically modified by the Plan, the prior orders of this Court shall remain in full force and effect throughout the period of administration of the Plan. Those orders include this Court's March 24, 2010 Orders approving commencement of this proceeding and granting injunctive relief on the terms requested by the Rehabilitator to protect the interests of the Segregated Account. Absent further specific order of this Court to the contrary, the Court's March 24, 2010 Injunction Order shall remain in full force and effect throughout the entire period of administration of the Plan through to termination of the rehabilitation proceeding in accordance with Article 10.05 of the Plan.

10. The Plan (with exhibits) and all other submissions on file relating to it, including the Disclosure Statement (and the attachments, amendments and supplements thereto), and other written materials filed by the Rehabilitator, Ambac, and other parties-in-interest prior to the Plan confirmation hearings were considered by the Court and shall be part of the record for these proceedings.

11. This Court shall retain continuing exclusive jurisdiction and venue over this rehabilitation proceeding and all matters or disputes pertaining to, or arising from, implementation of the Plan or the terms of this Order, including matters and disputes arising out of trustees' compliance with the Plan as described in Article 8.02 of the Plan. Any litigation pertaining to, or arising from, this rehabilitation, the Plan or this Order shall be exclusively venued in this Court.

12.    This Order is a final order, appealable as of right, pursuant to Wis. Stat.

§ 808.03(1).

WHEREFORE, IT IS HEREBY ORDERED that the Motion for Confirmation of

the Rehabilitator's Plan is GRANTED.

Dated: _January 21, 2011_

BY THE COURT

Honorable William D. Johnston
Lafayette County Circuit Court Judge
Presiding by Judicial Appointment

CC: To All Parties
1/25/11

# ATTACHMENT A

Red-Lined Versions of
Revised Articles 4.04(h) & 8.01
of the Plan of Rehabilitation

owed in its capacity as insurer, surety, credit support provider, credit enhancer, credit default swap counterparty or similar capacities, or as assignee or subrogee, under the applicable Policy and any related underlying instrument(s) or contract(s) governing the priority or distribution of cash recoveries or delivery of assets, unless otherwise waived by AAC and the Management Services Provider or the Rehabilitator or approved by AAC and the Management Services Provider or the Rehabilitator.

(h)     **Assignment of Rights.**  Without prejudice to (i) the terms and provisions of the applicable Policy and any related underlying instrument(s) or contract(s) and (ii) any assignment previously executed, whether pursuant to a Proof of Policy Claim Form or otherwise, upon receipt of a payment with respect to a Permitted Policy Claim, each such Holder shall be deemed to have assigned its rights relating to that payment under the underlying instrument(s) or contract(s) to AAC.

4.05    **General Claims.**

(a)     **Submission of General Claims.**  The Holder of a General Claim shall submit its General Claim to the Management Services Provider or, if directed, to the Rehabilitator in the same manner as such Holder would submit such General Claim in the ordinary course of business, and in accordance with, and including such information as is required by, the provisions of the underlying instrument(s) or contract(s) giving rise to or governing the submission of such General Claim, if any.  A Holder shall not submit a General Claim any earlier than permitted under the relevant instrument(s) or contract(s) giving rise to or governing the submission of such General Claim.  Each such General Claim submitted in accordance with this Section shall be referred to as a Pending General Claim.

(d)     provide such other information as is required by law, requested by the Court or deemed appropriate by the Rehabilitator.

**7.02    Amendments to Cash Percentage and Surplus Note Percentage.**    In conjunction with the submission of such annual report, the Rehabilitator may petition the Court to amend this Plan in accordance with Section 10.04 to simultaneously increase the Cash Percentage and decrease the Surplus Note Percentage by corresponding amounts, if, based on the Rehabilitator's analysis of the estimated liabilities and available claims paying resources of the Segregated Account, the Rehabilitator has determined, in his sole and absolute discretion, that such an amendment is equitable to the interests of the Holders of Policy Claims generally.   In determining whether such an amendment is equitable to the interests of the Holders of Policy Claims generally, the Rehabilitator shall consider whether, in conjunction with any such amendment, outstanding Surplus Notes should be partially redeemed, pre-paid, or called.

**ARTICLE 8**
**DISCHARGE, RELEASE AND INJUNCTION**

**8.01    Discharge, Release and Injunction.**    Except as may otherwise be provided herein, the Distributions in respect of a Permitted Claim under this Plan shall be in complete exchange for, and in full and unconditional settlement, satisfaction, discharge and release of such Claim, and shall effect a full and complete release, discharge, and termination of any Liens, or other claims, interests, or encumbrances upon the Segregated Account and AAC with respect to such Claim and only such Claims.   In addition, upon final determination in accordance with this Plan that a Claim is a Disallowed Claim, such determination shall effect a full and complete release, discharge and termination of any Liens, other claims, interests, or encumbrances upon the Segregated Account and AAC with respect to such Claim.   AllOther than as expressly provided for in this Plan, all Holders of Claims are precluded from asserting against the

Segregated Account, the General Account or AAC, or their respective successors or property or any of their respective current or former members, shareholders, affiliates, officers, directors, employees or agents, any Claims, obligations, rights, causes of action or liabilities, based upon any act, omission, transaction, or other activity of any kind or nature, ~~other than as expressly provided for in this Plan~~<u>made in connection with, or arising out of, the Segregated Account, AAC or the General Account with respect to the Segregated Account, the Proceeding, this Plan (and the Confirmation Order related thereto), the consummation of this Plan, or the administration of this Plan or the property to be distributed under this Plan, other than claims of intentional fraud or willful misconduct</u>. Except as otherwise provided in this Plan, and except as otherwise agreed by the Rehabilitator or the Management Services Provider, all Holders of Claims shall be permanently barred and enjoined from asserting against the Segregated Account, the General Account or AAC, or their respective successors or property or any of their respective current or former members, shareholders, affiliates, officers, directors, employees or agents, any of the following actions on account of such Claim: (i) commencing or continuing in any manner any action or other proceeding on account of such Claim, or the property to be distributed under the terms of this Plan, other than to enforce any right to Distribution to such Holders under this Plan; (ii) enforcing, attaching, collecting, or recovering in any manner any judgment, award, decree, or order against the Segregated Account, the General Account or AAC or any of the property to be distributed under the terms of this Plan, other than as permitted under sub-paragraph (i) above; (iii) creating, perfecting, or enforcing any Lien or other encumbrance against property of the Segregated Account, the General Account or AAC, or any property to be Distributed under the terms of this Plan; (iv) asserting any right of setoff, subrogation, or recoupment of any kind, directly or indirectly, against any obligation due to the Segregated

Account, the General Account or AAC, or any property of the Segregated Account, the General Account or AAC, or any direct or indirect transferee of any property of, or successor in interest to, the Segregated Account, the General Account or AAC as prohibited by Wis. Stat. § 645.56; and (v) acting or proceeding in any manner, in any place whatsoever, that does not conform to, or comply with, the provisions of this Plan.

**ARTICLE 9**
**IMMUNITY AND INDEMNIFICATION OF THE REHABILITATOR, EMPLOYEES, AND CONSULTANTS**

**9.01    Beneficiaries of Immunity and Indemnification.**   The following Persons are entitled to protection under this part of this Plan:  OCI, the Rehabilitator, the Special Deputy Commissioner, the Segregated Account, AAC and the General Account, and the Management Services Provider, and each of their respective current and former members, shareholders, affiliates, officers, directors, employees and agents (including any attorneys, financial advisors, investment bankers, consultants and other professionals retained by such Persons, and any other advisors or experts with whom OCI, the Rehabilitator or the Special Deputy Commissioner consults, as contemplated by Wis. Stat. § 645.33(3)).

**9.02    Immunity and Indemnification.**   All Persons identified in Section 9.01 shall have official immunity and shall be immune from suit and liability, both personally and in their official capacities, for any act or omission made in connection with, or arising out of, the Segregated Account, AAC or the General Account with respect to the Segregated Account, the Proceeding, this Plan (and the Confirmation Order related thereto), the consummation of this Plan, or the administration of this Plan or the property to be distributed under this Plan, whether prior to or following the commencement of the Proceeding, with the sole exception of acts or omissions resulting from intentional fraud or willful misconduct as determined by a Final Order

# ATTACHMENT B

New Article 8.02
of the Plan of Rehabilitation

**8.02    Discharge, Release and Injunction With Regard to Holders and Sub-Trustee/Agents.**  Each Holder acting on its own behalf or acting in its capacity as a trustee and/or agent for the beneficial holder(s) of any underlying financial instrument(s) insured by a Policy, and any party to the Transaction Documents assigned or delegated in whole or in part duties relating to submitting or processing payment of Policy Claims under the related Transaction Documents (each a "Sub-Trustee/Agent"), shall submit any claim for payment under such Policy in accordance with the provisions of the Plan by completing and submitting the Proof of Policy Claim Form in full (in the form approved by the Rehabilitator), including the selection of the delivery method for the payment in Surplus Notes. Actions taken in compliance with the Plan by any such Holder or Sub-Trustee/Agent shall not be deemed to be a violation of any provision in, or duty arising out of, the applicable Policy or related Transaction Documents. The Segregated Account shall indemnify any such Holder acting in its capacity as a trustee and/or agent for the beneficial holder(s) of any underlying financial instrument(s) insured by a Policy, and any such Sub-Trustee/Agent (each an "Indemnified Party") for any reasonable and documented out-of-pocket losses and costs, including reasonable attorney fees, incurred in defending any lawsuit, action, or similar formal legal proceeding arising out of their compliance with the Plan (excluding losses and costs resulting from the negligence, gross negligence or other misconduct of such Indemnified Parties, *provided, however*, that for purposes of this indemnity, compliance with the Plan shall not be deemed to constitute negligence, gross negligence, or misconduct) (each a "Third Party Liability"), provided (a) no amounts shall be payable by the Segregated Account to any Indemnified Party to the extent that the same shall be reimbursable to them under or pursuant to the Transaction Documents and (b) any Indemnified Party making a claim for indemnification shall have used its best efforts to cause any such lawsuit, action or

similar formal legal proceeding to be brought before the Dane County Circuit Court as part of this Proceeding.

Any indemnification obligation of the Segregated Account under this provision shall further be subject to the following: promptly upon receipt by any Indemnified Party of notice of any claim or of the commencement or threatened commencement of any action against the Indemnified Party which may constitute a Third-Party Liability, such Indemnified Party will cause notice to be given to the Segregated Account in writing of such claim or such commencement or threatened commencement of action or proceeding, together with a copy of any documents received by the Indemnified Party in connection therewith. In the event that any such claim or action shall be asserted against an Indemnified Party, the Indemnified Party shall consent to the intervention by the Segregated Account in any such suit in order to defend against said claim and/or shall tender to the Segregated Account control of the defense and settlement of such claim or action, and shall cooperate with the Segregated Account in such defense and settlement. The Segregated Account shall at all times have the right to employ counsel to represent both the Indemnified Party and the Segregated Account in any claim or action or proceeding, whether or not the Segregated Account has requested intervention or tender of control; provided that in the event the Segregated Account's counsel or the Indemnified Party's counsel determines that there is a legal conflict of interest between the Segregated Account and such Indemnified Party, and neither the Segregated Account nor such Indemnified Party is willing to waive such conflict, then such Indemnified Party shall be entitled to retain one separate counsel, acceptable to the Segregated Account. Until the Segregated Account requests the control of the defense and settlement of such claim or action or unless the Segregated Account has otherwise employed counsel to represent both the Segregated Account and such

Indemnified Party, such Indemnified Party shall have the right to employ its own counsel with respect to such lawsuit, action or similar formal legal proceeding, whose reasonable fees and expenses shall be Third-Party Liabilities (provided that the Segregated Account shall in no event be liable for the legal fees and expenses of more than one firm). Such Indemnified Party giving notice and, if requested, tendering defense of the lawsuit or action required by this paragraph are conditions to the Segregated Account's indemnification obligations hereunder. Further, the Segregated Account shall have no liability for any settlement of any lawsuit or action for which the Segregated Account otherwise agrees herein to indemnify an Indemnified Party unless written notice of such proposed settlement shall have been furnished to the Segregated Account, and the Segregated Account in its sole discretion shall have consented in writing to such settlement.

All persons and entities are enjoined and restrained from commencing or prosecuting any actions, claims, lawsuits or other formal legal proceedings in any state, federal or foreign court, administrative body or other tribunal other than the Court against: (i) any Holder acting in its capacity as a trustee and/or agent for the beneficial holder(s) of any underlying financial instrument(s) insured by a Policy, in respect of such Holder's compliance with the Plan; and/or (ii) any Sub-Trustee/Agent, in respect of such Sub-Trustee Agent's compliance with the Plan. The Court shall have exclusive jurisdiction over such actions, claims, or lawsuits, which must be raised by motion or other filing in the Proceeding.

3

# ATTACHMENT C

## Red-Lined Version of Revised Section 14(a) of the Form of Surplus Note

modification, amendment, supplement, consent, waiver or other action shall be conclusive and binding on the holder of this Note and on all future holders of this Note and of any Note issued upon the registration of transfer hereof or in exchange heretofore or in lieu hereof, whether or not notation thereof is made upon this Note. The Fiscal Agency Agreement and the terms of the Notes may, with the prior approval of the Commissioner, be modified or amended by the Issuer and the Fiscal Agent, without the consent of any holders of Notes, for the purpose of (a) adding to the covenants of the Issuer for the benefit of the holders of Notes, or (b) surrendering any right or power conferred upon the Issuer, or (c) securing the Notes, or (d) evidencing the succession of another corporation to the Issuer and the assumption by such successor of the covenants and obligations of the Issuer herein and in the Fiscal Agency Agreement as permitted by the Notes and the Fiscal Agency Agreement, or (e) modifying the restrictions on, and procedures for, resale and other transfers of the Notes to the extent required by any change in applicable law or regulation (or the interpretation thereof) or in practices relating to the resale or transfer of restricted securities generally, or (f) accommodating the issuance, if any, of Notes in book-entry or certificated form and matters related thereto which do not adversely affect the interest of any Note holder in any material respect, or (g) curing any ambiguity or correcting or supplementing any defective provision contained herein or in the Fiscal Agency Agreement in a manner which does not adversely affect the interest of any Note holder in any material respect, or (h) effecting any amendment which the Issuer and the Fiscal Agent may determine is necessary or desirable and which shall not adversely affect the interest of any Note holder, to all of which each holder of any Note, by acceptance thereof, consents.

14. _Remedies_. Holders of Notes may enforce the Fiscal Agency Agreement or the Notes only in the manner set forth below.

(a) In the event that any state or federal agency shall obtain an order or grant approval for the rehabilitation, liquidation, conservation or dissolution of the Issuer or Ambac Assurance Corporation (other than an Excluded Order), the Notes will upon the obtaining of such an order or the granting of such approval immediately mature in full without any action on the part of the Fiscal Agent or any holder of the Notes, with payment thereon being subject to the Payment Restrictions, and any restrictions imposed as a consequence of, or pursuant to, such proceedings. Notwithstanding any other provision of this Note or the Fiscal Agency Agreement, in no event shall the Fiscal Agent or any holder of the Notes be entitled to declare the Notes to immediately mature or otherwise be immediately payable.

(b) In the event that the Commissioner approves in whole or in part a payment of any interest on or principal of, or any redemption payment with respect to, any Notes and the Issuer fails to pay the full amount of such approved payment on the date such amount is scheduled to be paid, such approved amount will be immediately payable on such date without any action on the part of the Fiscal Agent or any holder of Notes. In the event that the Issuer fails to perform any of its other obligations hereunder or under the Fiscal Agency Agreement, each holder of the Notes may pursue any available remedy to enforce the performance of any provision of such Notes or the Fiscal Agency Agreement; provided, however, that such remedy shall in no event include the right to

**Proposed Order**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------x
           :

*In re*                             :      **Chapter 11 Case No.**

           :

**AMBAC FINANCIAL GROUP, INC.,**    :

           :      **Case No. 10-15973 (SCC)**

        **Debtor.**         :

           :

           :

---------------------------------------------------------------x

## ORDER EXTENDING DEBTOR'S EXCLUSIVE PERIODS TO FILE
## A CHAPTER 11 PLAN AND SOLICIT ACCEPTANCES THEREOF

Upon the motion dated February 2, 2011 (the "<u>Motion</u>")[1] of Ambac Financial

Group, Inc. (the "<u>Debtor</u>"), as debtor and debtor in possession in the above-captioned chapter 11

case (together with its non-debtor affiliates, "<u>Ambac</u>"), pursuant to section 1121(d) of title 11,

United States Code (the "<u>Bankruptcy Code</u>"), for an order extending the Debtor's exclusive

periods to propose and file a chapter 11 plan (the "<u>Exclusive Filing Period</u>") and solicit

acceptances thereof (the "<u>Exclusive Solicitation Period</u>," and together with the Exclusive Filing

Period, the "<u>Exclusive Periods</u>"), all as more fully described in the Motion; and the Court having

jurisdiction to consider the Motion and the relief requested therein in accordance with 28 U.S.C.

§ 1334; and consideration of the Motion and the relief requested therein being a core proceeding

pursuant to 28 U.S.C. § 157(b); and venue being proper before this Court pursuant to 28 U.S.C.

§§ 1408 and 1409; and due and proper notice of the Motion having been provided to (i) the

Office of the United States Trustee for the Southern District of New York, (ii)  counsel to the

Office of the Commissioner of Insurance of the State of Wisconsin ("<u>OCI</u>"), (iii) counsel to the

Committee, and (iv) those parties who have requested notice pursuant to Rule 2002; and it

---

[1] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Motion.

appearing that no other or further notice need be provided; and the Court having determined that

the relief sought in the Motion is in the best interests of the Debtor, its estate and creditors, and

all parties in interest, and that the legal and factual bases set forth in the Motion establish just

cause for the relief granted herein; and after due deliberation and sufficient cause appearing

therefor, it is:

ORDERED that the Motion is granted; and it is further

ORDERED that, pursuant to section 1121(d) of the Bankruptcy Code, the

Debtor's Exclusive Filing Period is extended 180 days through and including September 6, 2011;

and it is further

ORDERED that, pursuant to section 1121(d) of the Bankruptcy Code, the

Debtor's Exclusive Solicitation Period is extended 180 days through and including November 3,

2011; and it is further

ORDERED that this Order shall be without prejudice to the Debtor's right to seek

additional extensions of the Exclusive Periods; and it is further

ORDERED that this Court shall retain jurisdiction with respect to all matters

arising from or related to the implementation of this Order.

Dated: _____, 2011
      New York, New York

_____
UNITED STATES BANKRUPTCY JUDGE