Martin J. Bienenstock
Peter A. Ivanick
Allison H. Weiss
DEWEY & LEBOEUF LLP
1301 Avenue of the Americas
New York, New York 10019
Tel: (212) 259-8000
Fax: (212) 259-6333

    - and -

Todd L. Padnos (admitted *pro hac vice*)
DEWEY & LEBOEUF LLP
1950 University Avenue, Suite 500
East Palo Alto, California 94303
Tel: (650) 845-7000
Fax: (650) 845-7333

*Attorneys for Debtor and Debtor in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| *In re* | |
| **AMBAC FINANCIAL GROUP, INC.,** | Chapter 11 |
| Debtor. | Case No. 10-15973 (SCC) |

**DEBTOR'S REPLY TO COMMITTEE'S OBJECTION TO DEBTOR'S MOTION PURSUANT TO SECTION 1121(d) OF THE BANKRUPTCY CODE FOR ORDER EXTENDING EXCLUSIVE PERIODS TO FILE CHAPTER 11 PLAN AND SOLICIT ACCEPTANCES THEREOF**

TO THE HONORABLE SHELLEY C. CHAPMAN
UNITED STATES BANKRUPTCY JUDGE:

    Ambac Financial Group, Inc., as debtor and debtor in possession in the above-captioned case (the "Debtor," and together with its nondebtor affiliates, "Ambac"), hereby submits this reply (the "Reply") to the objection (the "Objection") of the statutory committee of creditors (the "Committee") to the Debtor's motion pursuant to section 1121(d) of title 11 of the United States

Code (the "<u>Bankruptcy Code</u>") for an order extending the Debtor's exclusive period to file a chapter 11 plan and solicit acceptances thereof (the "<u>Motion</u>"),[1] and respectfully represents as follows:

## **<u>Preliminary Statement</u>**

1. Sufficient cause exists to extend by 180 days the Debtor's Exclusive Periods. The Objection does not refute the factual bases underlying the Debtor's request for an extension of its Exclusive Periods. Instead, the Objection attempts to confuse the issue by not so subtly attempting to relitigate the Committee's assertions of conflicts in connection with AFG's retention applications. Saying the same thing *ad infinitum*, however, does not make it true or material to exclusivity.

2. Despite the Committee's contrary assertions, no chapter 11 plan exists today that will satisfy the Committee and not inflame OCI, thereby increasing the risk of the loss of all of AAC to rehabilitation proceedings, at a time when the Segregated Account of AAC has successfully confirmed a plan of rehabilitation preserving value for its policyholders and its common shareholder, the Debtor. And, neither the Debtor's management nor its counsel is conflicted, let alone "hopelessly conflicted." Obj. ¶2. As the Debtor's primary operating subsidiary, AAC is the Debtor's most valuable asset, and its management and attorneys are focused on preserving and harvesting AAC's value for the Debtor's creditors. Indeed, without AAC, the Debtor is simply a holding company in debt. The Debtor's value and future viability are directly related to, and dependent upon, the value and future viability of AAC. No matter how often or in how many ways this is explained to the Committee counsel, it defaults to

---

[1] Capitalized terms used but not otherwise defined herein shall have the meaning ascribed to such terms in the Motion.

tantrums if the Debtor does not embrace its proposed chapter 11 plan that targets AAC as the enemy with predictable impacts on OCI and the IRS.

3. Moreover, there is not presently an "impasse" in the negotiations among the Debtor, OCI and the Committee. In fact, the Debtor continues to pursue a negotiated restructuring among the Debtor, the Committee and OCI which, in its view, is likely to be the value-maximizing outcome for the Debtor. To that end, the Debtor expects within the next few days to receive from OCI a revised term sheet and has asked the Committee and its professionals to meet on Tuesday, February 22 and Wednesday, February 23 with OCI and the Debtor.

4. Additionally, the Debtor has not irrevocably ruled out the Committee's plan proposal. It has only determined that nuclear war with OCI and the IRS should be the last resort, not the first. In addition to taking antithetical positions towards OCI, the Committee's plan is premised on the Court rendering orders that would unite OCI and the IRS against the Debtor. Accordingly, the Debtor and its management continue to fulfill their fiduciary obligations to the Debtor's estate and its creditors by (i) analyzing various options and plans and (ii) continuing to attempt to broker a deal among the Committee and the OCI and the IRS.

5. By the Debtor's current estimation, the Committee's "confirmable" plan that the "Debtor could file today" contains serious execution risk, and could result in years of protracted litigation, with OCI (concerning OCI's jurisdiction in connection with a transaction to involuntarily reallocate NOLs from AAC to AFG); and the IRS (concerning the tax efficacy of the proposed transaction). Resolution of the OCI-related issues would require litigation concerning the competing jurisdiction of this Court, the OCI and the State Rehabilitation Court in the context of the McCarran-Ferguson Act's doctrine of "reverse preemption." Additionally, the Debtor is not yet convinced that the Committee's plan works from a tax perspective.

6.      Discounting the likelihood of success of the Committee's "confirmable" plan by its regulatory, tax, and economic execution risks, the Debtor's current view is that such plan is unlikely to maximize value to creditors on a risk adjusted basis. In any event, despite the Committee's allegations to the contrary, the Debtor has not irrevocably refused to file the Committee's plan, nor has it rejected such plan because it does not involve OCI. The Debtor merely continues to pursue and evaluate all of its options, so that when it does file a plan, it is the one that maximizes value to its creditors on a risk-adjusted basis.

7.      The Debtor has met with the Committee's professionals numerous times since filing this case to discuss the terms of a consensual chapter 11 plan between the Debtor, OCI, and the Committee. The Debtor continues to believe that a quadripartite (*i.e.*, involving the Debtor, the Committee, OCI and the IRS), consensual plan is in the best interests of its estate and creditors. If by February 28, however, it becomes apparent to the Debtor that an agreement cannot be reached, it will then determine what alternative plan should be filed. The Debtor will not, however, be bullied into filing the Committee's plan merely because the Committee insists that it do so.

8.      Since filing this case, the Committee has held the Debtor at gunpoint with unfounded allegations of conflict between the Debtor and AAC. The only "hostage" in this case is the Debtor, constantly forced to blunt the Committee's bullets and unjustified threats. As fiduciaries, the Debtor and its management continue to explore every alternative to maximize value for the benefit of the estate. This process, together with the need to make progress on other fronts, *e.g.*, the IRS claim, requires an extension for an additional 180 days of the Exclusive Periods.

**Debtor's Reply**

A. **There Is No Conflict Between the Debtor and AAC**

9. The Committee argues that the Debtor's Exclusive Periods should be terminated because of alleged conflicts between (a) the Debtor and its non-debtor subsidiary, AAC, (b) the Debtor's management acting as joint management for the Debtor and AAC, and (c) the Debtor's attorneys, acting as attorneys for both the Debtor and AAC. The Committee goes so far as to suggest that that these conflicts necessitate the appointment of a chapter 11 trustee, but because of the time and expense of such appointment, termination of the Debtor's Exclusive Periods is appropriate. *See* Obj. ¶34. The Committee's allegations of these conflicts are without merit. Moreover, given that the Committee's argument is that it is entitled to a trustee and should therefore obtain a denial of an exclusivity extension, the Committee has failed to state a claim because it has not alleged the grounds for a trustee, nor can it prove them with clear and convincing evidence.

10. While it is not unusual to have a large holding company acting as a parent entity for various operating subsidiaries, sharing a board, sharing management, and sharing counsel, in this instance, the Debtor and AAC have established extra layers of protection to avoid even the perception of a possible conflict. Specifically:

   a. AAC has board members unaffiliated with the Debtor who (i) have independent counsel, (ii) are completely disinterested in respect of the Debtor, and (iii) have the deciding vote with respect to those transactions that present, or potentially present, a conflict of interest for those directors who are members of the board of directors of each of AAC and the Debtor;

   b. AAC has appointed a member of management, with access to independent counsel, to act solely on behalf of AAC in negotiations with the Debtor; and

   c. the Debtor has retained conflicts counsel to represent the Debtor in any matter in which the Debtor may become adverse to AAC.

5

Additionally, Debtor's management and board of directors understand their fiduciary duties, and AAC's board of directors understands that AAC owes fiduciary duties to the Debtor. Despite these extraordinary measures, the Committee alleges that the Debtor's management is "hopelessly conflicted."

11. The Committee's only support for this meritless allegation is that the Debtor's management received bonuses from AAC in consideration for their work on behalf of AAC. The Committee fails to note in the Objection that, over the past year, AAC's management effected the following settlements and commutations:

      a.      Confirmation of a plan of rehabilitation of the Segregated Account of AAC restructuring AAC's non-performing books of business for 25% in cash and 75% in surplus notes of Segregated Account;

      b.      Commutation with credit-default swap counterparties eliminating approximately $16.5 billion in par value of collateralized debt obligations of asset-backed securities, mainly residential mortgage backed securities, for a combination of $2.6 billion in cash and $2 billion in surplus notes of AAC;

      c.      Settlement of approximately $472 million in exposure on Las Vegas Monorail ("LVM") bonds that, upon approval in the State Rehabilitation Court, will effect (a) a commutation (i) completely release AAC in exchange for $111 million in cash and $90 million in surplus notes of Segregated Account, and (ii) transfer of AAC-owned bonds to the LVM trustee, or (b) a purchase offer alternative in the event that the commutation does not occur in time;

      d.      Settlement with The Weinstein Company, which occurred on July 29, 2010, which relieved the Segregated Account of approximately $450 million of potential liability in exchange for a cash payment of $65 million and a surplus note of $50 million;

      e.      Development of a representation and warranty litigation strategy against Countrywide and Bear Stearns resulting in the elimination of a $2.5 billion item listed as liability on AAC's balance sheet;

      f.      Commutation of all reinsurance liabilities, aggregating $384 million, in respect of the reinsurance agreement between AAC and its subsidiary, Ambac Assurance UK Limited, at no cost; and

> g. Settlement of a substantial reinsurance claim realizing approximately $200 million.

These accomplishments were considered by AAC's board, including the directors unaffiliated with the Debtor and the compensation committee, chaired by one of the unaffiliated directors, when approving the bonuses which recognize the benefits conferred on AAC by these individuals. Such benefits to AAC also benefit the Debtor, which, incidentally, received such benefits without paying any portion of the bonuses awarded by AAC.

12. Moreover, the bonuses were fully disclosed in the Debtor's 8-K filings with the Securities and Exchange Commission and, contrary to the Committee's sinister allegations, there was no attempt by the Debtor or AAC to end-run the Court or the requirements of the Bankruptcy Code. *See* Obj. ¶17. The bonus payments were not made by or on behalf of the Debtor or to the Debtor's management in their roles as management for the Debtor. Moreover, the bonuses and retention payments made by AAC are small in comparison to the value preserved by the efforts of AAC's management, for the ultimate benefit of AFG.

13. The Committee's allegations that the Debtor's management is conflicted and has and will ignore its fiduciary duties in order not to bite "the hand that feeds them" are offensive and untrue. As previously stated, the Debtor has never refused to file the Committee's plan or any other plan. *See* Obj. ¶¶10, 13. Rather, the Debtor has serious questions about the feasibility and execution of the Committee's "confirmable" plan, and the Debtor does not believe that proposing a plan that is likely to be an incendiary device in the eyes of OCI and the IRS is prudent at this juncture. The Debtor's frequent questions to the Committee regarding its concerns about the Committee's plan from various tax, regulatory and economic perspectives have not yet been answered satisfactorily.

14. These allegations are particularly offensive in light of the Committee's own attempts to subvert the Debtor's management's adherence to its fiduciary duties by making clear that it will only support releases of management's potential personal liability with respect to pending securities fraud and derivative actions if the Debtor files a plan that the Committee likes. Despite this temptation, in accordance with its fiduciary duties, the Debtor's management continues to evaluate all plans in an effort to identify the plan that maximizes value to the estate on a risk adjusted basis, rather than any personal benefits to management.

15. To that end, the Debtor's scrutiny of the Committee's proposed plan term sheet is merely an exercise of the Debtor's fiduciary duties and business judgment, in an effort to propose and file a plan that maximizes value to the Debtor's estate and that can be confirmed and successfully consummated. The Debtor has not yet determined what plan maximizes value to the estate on a risk adjusted basis. The Committee's cries of disabling conflicts are mere distractions to this process.

16. The mere existence of intercompany claims does not rise to the level of a conflict of interest nor has the Debtor taken or not taken any action that would pose a conflict of interest. Here, despite the Committee's allegations, the Debtor is attempting to negotiate a consensual resolution of intercompany issues that will maximize value to the AFG estate, always bearing in mind that AAC is the Debtor's estate's largest asset. Moreover, the Committee pretends there is a zero-sum game between AAC and the Debtor. It is not. The $7 billion of NOLs are more than either of AAC and the Debtor can ever use. To the extent AAC uses NOLs, the sheltered income redounds to the benefit of the Debtor.

17. The Committee's suggestion that the appointment of a chapter 11 trustee is appropriate in this case is another empty threat by the Committee to leverage the Debtor into

submission. The appointment of a trustee under section 1104 is an "extraordinary remedy," which requires an evidentiary showing of clear and convincing evidence. *In re Euro-Am. Lodging Corp.*, 365 B.R. 421, 426 (Bankr. S.D.N.Y. 2007).[2] Here, there have been no allegations of fraud, dishonesty, incompetence or gross mismanagement by the Debtor's current management and there are no facts supporting the Committee's conflict allegations.

B.  **"Cause" Exists to Extend the Debtor's Exclusive Periods and the Committee Has Failed to Assert Any Basis for Denying Such Extension**

18. As described more fully in the Motion, the Debtor has sufficient "cause" to justify an 180-day extension of the Debtor's Exclusive Periods. *See* Mot. ¶10 *et seq*. A fundamental right afforded to a debtor under the Bankruptcy Code is the exclusive opportunity to negotiate and propose a chapter 11 plan. As described more fully in the Motion, although not stated in the Bankruptcy Code, "courts have distilled certain factors to consider when tasked with deciding

---

[2] Section 1104(a)(1) of the Bankruptcy Code provides that a court shall order the appointment of a trustee "for cause, including fraud, dishonesty, incompetence, or gross mismanagement of the affairs of the debtor by current management, either before or after the commencement of the case." 11 U.S.C. § 1104(a)(1). Courts in the Second Circuit and elsewhere have held that "gross mismanagement of the affairs of the debtor by current management" includes (i) chronic failure to pay taxes, particularly when the failure results in interest and penalties, (ii) questionable inter-company transfers and self-dealing; (iii) failure to maintain complete and accurate financial records, or failure to substantiate undocumented transactions so that there appears to be a confusion in the debtor's accounting system; and (iv) failure to disclose material and relevant information to the court and creditors. 11 U.S.C. § 1104(a)(1); *see*, *e.g.*, *In re Sharon Steel Corp.*, 871 F.2d 1217, 1221 (3d Cir. 1989); *In re Euro-Am. Lodging Corp.*, 365 B.R. at 426-27; *In re N. Star Contracting Corp.*, 128 B.R. 66, 70 (Bankr. S.D.N.Y. 1991); *In re U.S. Commc'ns of Westchester, Inc.*, 123 B.R. 491, 495-96 (Bankr. S.D.N.Y. 1991*); In re V. Savino Oil & Heating Co.*, 99 B.R. 518, 526 (Bankr. E.D.N.Y. 1989); *In re Colby Constr. Corp.*, 51 B.R. 113, 116 (Bankr. S.D.N.Y. 1985); *In re Sletteland*, 260 B.R. 657, 672 (Bankr. S.D.N.Y. 2001) (recognizing that there is a level of mismanagement in "virtually every insolvency case.").

Section 1104(a)(2) further provides that a court shall order the appointment of a trustee "if such appointment is in the interests of creditors, any equity security holders, and other interests of the estate," creating a "flexible" standard for the appointment of a trustee when "cause" cannot be established under section 1104(a)(1). *See In re Ionosphere Clubs, Inc.*, 113 B.R. 164, 168 (Bankr. S.D.N.Y. 1990). Despite offering separate grounds for the appointment of a trustee, it is rare that a trustee will be appointed under section 1104(a)(2) when there is no "cause" found under section 1104(a)(1). 7 COLLIER ON BANKRUPTCY ¶ 1104.02 (16th ed. 2010) ("Few situations come to mind in which grounds will exist for the appointment of a trustee under subsection (a)(2) when 'cause' for such appointment does not exist … ."). Further, under section 1104(a)(2), there is still a "strong presumption against appointing a trustee." *Official Comm. of Asbestos Claimants v. G-I Holdings, Inc. (In re G-I Holdings, Inc.)*, 385 F.3d 313, 319-21 (3d Cir. 2004). Furthermore, the court can only appoint trustee where "appointment of a trustee would be in the interest of essentially all interested constituencies. . . . Use of the word 'and' [in the text of section 1104(a)(2)] suggests that creditors cannot on their own obtain the appointment of a trustee under the provision in order to disenfranchise equity security holders or other interests. Instead, appointment of a trustee must be in the interest of the estate generally." *In re WorldCom, Inc.*, No. 02-13533, 2003 Bankr. LEXIS 2192, at *19 (Bankr. S.D.N.Y. May 16, 2003) (internal quotations omitted).

whether to on the one hand, extend, or on the other, terminate, a debtor's statutory period of exclusivity." *In re Dow Corning Corp.*, 208 B.R. 661, 664 (Bankr. E.D. Mich. 1997). *See* Mot. at ¶¶7-9. Notably, the Committee's objection has created one more "cause" to extend exclusivity, namely the injury the Debtor would face if the Committee proposed its plan now.

19. Courts have held that creditor dissatisfaction does not constitute "cause" to terminate a debtor's exclusive periods. *See, e.g.*, *Geriatrics Nursing Home v. First Fidelity Bank, N.A. (In re Geriatrics Nursing Home)*, 187 B.R. 128, 134 (D.N.J. 1995) (reversing the bankruptcy court's termination of exclusivity because the district court did not find cause where "one creditor constituency is not happy with the debtor's plan"). "To hold otherwise would permit litigious creditors to manufacture 'cause' to shorten the exclusivity period through their own unilateral actions." *In re Grand Traverse Dev. Co.*, 147 B.R. 418, 421 (Bankr. W.D. Mich. 1992) (denying creditor's motion to terminate exclusivity at the conclusion of the initial 120-day period because cause is not shown when such creditor contests most if not all of the debtor's actions and a successful negotiated reorganization by the debtor is still possible).

20. Disregarding the Committee's unsupported allegations of conflicts, the Committee's sole basis for objecting to the Motion is that the Debtor must be in a position to file a plan immediately if a consensual deal is not reached by February 28, 2011 because the Debtor will run out of cash imminently. *See* Obj. ¶11. As stated by the Debtor's financial advisor in the *Affidavit of Stefan Feuerabendt in Support of Debtor's Reply to Committee's Objection to Debtor's Motion Pursuant to Section 1121(d) of the Bankruptcy Code for Order Extending Its Exclusive Periods to File Chapter 11 Plan and Solicit Acceptances Thereof* (the "Feuerabendt Affidavit"), the Debtor has sufficient liquidity to carry on the normal course of its business during the requested extension of the Exclusive Periods. *See* Feuerabendt Aff. ¶8. Moreover,

10

providing the Debtor a meaningful opportunity to develop a plan through the requested extension will not harm or prejudice the Debtor's creditors or other parties in interest. *See id.* Additionally, despite the Committee's assertion that the Debtor's cash position is quickly deteriorating, there is no indication that the Debtor is going through cash any faster or slower than projected at the commencement of this case or that the Debtor is running out of cash and heading toward conversion to chapter 7. *See id.*

21. Without disclosing details of the Committee's term sheet, the plan proposed therein is premised on raising capital which would require significant marketing, very extensive due diligence, and negotiations with new capital providers, all of which could require considerable time and are far from certain to have the results projected by the Committee's advisors. *See* Feuerabendt Aff. ¶11. This fact is conveniently ignored by the Committee in the Objection.

22. Notwithstanding its "simple capital structure," the Debtor is a holding company with $1.6 billion of unsecured debt and owns AAC, a large and complex financial guarantee insurance company which has outstanding financial guarantee exposures of more than $300 billion. *See* Mot. ¶¶10-13. In order for the Debtor to reorganize successfully, AAC's value must be preserved. The Debtor has therefore had to focus a significant amount of time on the Rehabilitation Proceedings of AAC's Segregated Account in Wisconsin. Entry of the Order Confirming the Rehabilitation Plan of the Segregated Account of AAC is a significant step forward in the process of conserving AAC's value for the benefit of AFG.

23. Additionally, although the Debtor is "only one entity with … minimal trade creditors," it has needed to address complex and time-consuming issues during its short time in bankruptcy. For example, the Debtor's attention over the past three months has also been

focused on the IRS Adversary Proceeding. *See* Mot. ¶¶18-22. As the Committee notes and the Court knows, the Debtor filed a motion in the IRS Adversary Proceeding to establish alternative dispute resolution and discovery procedures in order to ensure that the resolution of the pivotal issue of the Debtor's tax liability does not hold up negotiations with respect to a plan. *See* Mot. ¶21. While the Debtor believes that the Court may be able to estimate the claims of the IRS, it is likely that the IRS will oppose such a request, and the outcome of any request to estimate the IRS' claims is uncertain at this time. Estimation of the IRS's claim and/or resolution of the IRS Adversary Proceeding remain significant contingencies in this case. Moreover, the IRS continues to attempt to frustrate the Debtor's efforts to resolve these issues by, most recently, commencing an action on February 9, 2011, against AAC, among others, in the Western District of Wisconsin.[3] The Debtor believes that the IRS violated the Stipulated Order of this Court entered on November 9, 2010, by failing to give the Debtor required notice. As this Court is aware, on February 15, 2011, the Debtor filed an *Order to Show Cause to Enforce Temporary Restraining Order Pursuant to Sections 105 and 362(a) of the Bankruptcy Code and Rule 7065 of the Bankruptcy Rules* [Adv. Proc. Docket No. 28].

24. Additionally, as described in the Motion, the Debtor and its advisors have worked diligently to ensure a continuing dialogue with all of the major constituents in this chapter 11 case, including the Committee and OCI, and are not merely seeking to extend the Exclusive Periods to delay creditors or force them to accede to the Debtor's demands. *See* Mot. ¶¶36-37.

---

[3] *See United States v. Wisconsin State Circuit Court for Dane County*, No. 11-99 (W.D. Wis. filed Feb. 9, 2011) (complaint seeking, *inter alia*, to enjoin the State Rehabilitation Court, OCI and AAC from taking actions to enforce (i) the injunction issued by the State Rehabilitation Court on November 8, 2010, or (ii) the order confirming the plan of rehabilitation of the Segregated Account of AAC); *see also Dilweg v. United States (In the Matter of the Rehabilitation of the Segregated Account of Ambac Assurance Corp.)*, No. 10-778 (W.D. Wis. filed Dec. 8, 2010) (notice of removal to the United States District Court for the Western District of Wisconsin), and *Ambac Fin'l Group, Inc. v. United States (In re Ambac Fin'l Group, Inc.)*, No. 11-270 (S.D.N.Y. filed Jan. 13, 2011) (motion for an order pursuant to 20 U.S.C. § 157(d) withdrawing the reference from the United States Bankruptcy Court for the Southern District of New York to the United States District Court for the Southern District of New York).

12

The Debtor agrees that filing and confirming a plan as quickly as possible is in the best interests of its estate. To that end, the Debtor (i) has led many negotiation sessions among the Debtor, the Committee and OCI, acting as a broker to narrow the "bid/ask spread" between the respective positions of the parties, (ii) is seeking to resolve the IRS Adversary Proceeding on an expedited basis, and (iii) is doing everything in its power to move towards a consensual plan that maximizes the value of the Debtor's estate.

25. The Committee does not argue that the Debtor has not demonstrated reasonable prospects for filing a viable plan.[4] Rather, the Committee argues that the Debtor will hold off on filing a plan until it has a deal with OCI, a deal that the Committee does not foresee supporting. As previously stated, the Debtor intends to file the plan that maximizes value for the estate on a risk adjusted basis. The best chance for maximizing value is a quadripartite, consensual plan among the Debtor, OCI, the IRS, and the Committee. The next best option is a tripartite, consensual plan among the Debtor, OCI, and the Committee. If no such plan is possible, the Debtor can file a plan supported by the Committee or one supported by OCI and/or the IRS. These options remain open to the Debtor, so long as its Exclusive Periods are extended.

26. In just the three short months in which the Debtor has been in chapter 11, it has had to tackle significant strategic and legal issues, in multiple jurisdictions, venues, courts and proceedings. Even in the best circumstances, in light of the size and complexity of this case, the initial 120-day exclusivity period would be insufficient.

---

[4] The Committee's blanket assertion that a plan may not be confirmable under section 1129(a)(3) of the Bankruptcy Code is unsubstantiated given the absence of any actual conflict and is nevertheless premature because a plan has not been filed.

### C. There Is No Basis for a Limited Extension of the Debtor's Exclusive Periods

27. The Committee requests in the alternative that the Exclusive Periods be extended a maximum of 30 days. *See* Objection ¶48. The absurdity of the Committee's request is belied by its own admission that preparation and confirmation of a plan would take at a minimum three months. *See* Obj. ¶21. While the Debtor hopes to reach the terms of a consensual plan prior to the February 28, 2011 deadline with OCI and the Committee, the Debtor is also realistic about a shortened extension and recognizes that, even under the best circumstances (*i.e.*, getting a plan on file in 30 days), if exclusivity were only extended for 30 days, there would be immediate fire drills to request further extensions or to file tentative, likely unworkable plans, all of which would be wasted time and money.

## Conclusion

28.     For the reasons stated herein, as well as in the Motion, the Objection should be overruled, and the Motion should be granted in its entirety.

Dated: February 17, 2011  
       New York, New York

Respectfully Submitted,

/s/ Allison H. Weiss  
Martin J. Bienenstock  
Peter A. Ivanick  
Allison H. Weiss  
DEWEY & LEBOEUF LLP  
1301 Avenue of the Americas  
New York, New York 10019  
Tel: (212) 259-8000  
Fax: (212) 259-6333

- and -

Todd L. Padnos (admitted *pro hac vice*)  
DEWEY & LEBOEUF LLP  
1950 University Avenue, Suite 500  
East Palo Alto, California 94303  
Tel: (650) 845-7000  
Fax: (650) 845-7333

*Attorneys for the Debtor  
and Debtor in Possession*

NY3 3078032.8