UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

1

2
-------------------------------------------------
*In re:*                                          Case No. 10-15973-scc
3                                                 New York, New York
    AMBAC FINANCIAL GROUP, INC.                   March 4, 2011
4                              *Debtor.*          10:08 a.m. - 11:20 a.m.
-------------------------------------------------

5

6

7   ADVERSARY PROCEEDING: 11-01265-SCC AMBAC FINANCIAL GROUP, INC.
       V. KARTHIKEYAN V. VEERA; PRE-TRIAL CONFERENCE; ADVERSARY
8         PROCEEDING: 11-01265-SCC AMBAC FINANCIAL GROUP, INC. V.
          KARTHIKEYAN V. VEERA; DOC# 5 MOTION FOR SUMMARY JUDGMENT
9      /DEBTOR'S MOTION FOR (I) SUMMARY JUDGMENT DECLARING THAT THE
       PROTECTIONS OFTHE AUTOMATIC STAY APPLY OR SHOULD BE EXTENDED
10  TO THE CLAIMS ASSERTED IN THE ERISA ACTION AND RELATED EFFORTS
        TO OBTAIN DISCOVERY FROM THE DEBTOR (COUNT I) AND/OR (II)
11  INJUNCTIVE RELIEF PURSUANT TO SECTION 105(A) OF THE BANKRUPTCY
        CODE (COUNT II); DOC #7 OPPOSITION TO MOTION FOR SUMMARY
12        JUDGMENT FILED BY STEPHEN 1. FEARON JR. ON BEHALF OF
          KARTHIKEYAN V. VEERA; DOC# 10 RESPONSE /DEBTORS REPLY
13  MEMORANDUM OF LAW IN FURTHER SUPPORT OF ITS MOTION FOR SUMMARY
      JUDGMENT AND INJUNCTIVE RELIEF; 10-15973-SCC AMBAC FINANCIAL
14  GROUP, INC. CH. 11; DOC #107 MOTION FOR RELIEF FROM STAY FILED
      BY STEPHEN 1. FEARON JR. ON BEHALF OF KARTHIKEYAN V VEERA; DOC
15   #114 DEBTOR'S OBJECTION TO KARTHIKEYAN V. VEERAS MOTION FOR
      ORDER SEEKING A DECLARATION THAT THE AUTOMATIC STAY DOES NOT
16  APPLY TO VEERAS SUBPOENA OR GRANTING RELIEF FROM THE AUTOMATIC
         STAY; DOC #115 JOINDER TO THE DEBTOR'S OBJECTION TO
17   KARTHIKEYAN V. VEERA'S MOTION SEEKING A DECLARATION THAT THE
     AUTOMATIC STAY DOES NOT APPLY TO VEERA'S SUBPOENA TO AMBAC OR,
18       IN THE ALTERNATIVE, AN ORDER GRANTING RELIEF FROM THE
          AUTOMATIC STAY FILED BY ANTHONY PRINCI ON BEHALF OF THE
19        OFFICIAL COMMITTEE OF UNSECURED CREDITORS; DOC #119 REPLY
       BRIEF IN SUPPORT OF KARTHIKEYAN VEERA'S MOTION SEEKING A
20  DECLARATION THAT THE AUTOMATIC STAY DOES NOT APPLY TO VEERA'S
     SUBPOENA TO AMBAC OR, IN THE ALTERNATIVE, AN ORDER GRANTING
21   RELIEF FROM THE AUTOMATIC STAY FILED BY STEPHEN J. FEARON JR.
            ON BEHALF OF KARTHIKEYAN V VEERA;
22          BEFORE THE HONORABLE SHELLEY C. CHAPMAN
                UNITED STATES BANKRUPTCY JUDGE
23

24

25

1   A P P E A R A N C E S :

2

3     *For the Debtor:*         RICHARD W. REINTHALER, ESQ.
                                    Dewey & LeBoeuf, LLP

4                                       1301 Avenue of the Americas
                                    New York, New York 10019-6092

5                                       (212) 259-6090; (212) 259-6333 fax

6

7     *For Committee of*     STEPHEN P. KOSHGERIAN, ESQ.
    *Unsecured Creditors:*   Morrison & Foerster LLP

8                                         1290 Avenue of the Americas
                                    New York, New York 10104-0050

9                                       (212) 336-4154; (212) 468-7900 fax

10     *For Mr. Veera:*        GARRY T. STEVENS JR.
                                      STEPHEN J. FEARON, JR., ESQ.

11                                       CAITLIN DUFFY, ESQ.
                                    Squitieri & Fearon, LLP

12                                       32 East 57th Street, 12th Fl.
                                    New York, New York 10022

13                                       (212) 421-6492; (212) 421-6553 fax

14

15     *Transcriber:*          AAA Electronic Sound Reporters
                                    (888) 866-5135; (800) 860-5722 fax

16                                       electronicsound@court-transcipts.net

17

18       *Proceedings recorded by electronic sound recording.*
        *Transcript produced by transcription service.*

19

20

21

22

23

24

25

1             COURTROOM DEPUTY:  All rise. THE COURT:  Good morning.

2    Please be seated.  Good morning.

3             MR. FEARON:  Good morning, Your Honor.

4             THE COURT:  Who would like to start?

5             MR. REINTHALER:  Good morning, Your Honor.  Richard

6    Reinthaler from Dewey & LeBoeuf on behalf of the Debtor.

7             THE COURT:  Okay, Mr. Reinthaler.  Will you be arguing

8    this morning?

9             MR. REINTHALER:  I will be.

10            THE COURT:  All right.  And who do we have for Mr.

11   Veera?

12            MR. FEARON:  Good morning, Your Honor.  I'm Steven

13   Fearon from Squitieri & Fearon on behalf of Mr. Veera.

14            THE COURT:  Okay.  All right, Mr. Fearon.  I have read

15   all of the papers and I'm prepared to hear any additional

16   arguments that you each have.  Mr. Reinthaler, why don't we

17   start with you?

18            MR. REINTHALER:  Thank you, Your Honor.  We have two

19   motions before the Court.  They raise overlapping issues, so I

20   will address them both to save time.

21            THE COURT:  Okay.

22            MR. REINTHALER:  I'd like to begin with Section 362.

23            THE COURT:  All right.

24            MR. REINTHALER:  I don't think there's any escaping

25   the fact based on what's in our papers that the Debtor is a

1   party with perhaps the largest ultimate financial stake in the

2   outcome of the ERISA action.  Although it's true that the

3   automatic stay generally does not apply to suits against non-

4   debtors, the Second Circuit in the _Queenie_ (ph.) held that the

5   automatic stay can apply to non-debtors where the claim against

6   the non-debtors will have an immediate adverse economic

7   consequence for the Debtor's estate.  The Second Circuit in

8   _Queenie_ and citing the Fourth Circuit seminal decision in 1986

9   in _A.H. Robins v. Piccinin_ gave as an example of a case having

10  an immediate adverse effect on the Debtor, one in which there is

11  such an identity between the Debtor and the third-party

12  defendant that the Debtor may be said to be the real party

13  defendant.

14         Now we've cited a number of cases in our briefs, Your

15  Honor, both within this Circuit and outside the Second Circuit

16  that have extended or have cited with approval cases extending

17  the protections of the automatic stay to claims against non-

18  debtor officers and directors whereas here, the individual

19  defendants have an identity of interest with the Debtor because

20  the Debtor is obligated to indemnify them.  And that is --

21         THE COURT:  And then that -- with respect to this

22  particular aspect, you don't make a distinction between current

23  and former individual defendants, I take it.

24         MR. REINTHALER:  We do not with respect to that issue.

25  When you get to burden, distraction, the 105 factors --

1          THE COURT:  Understood.

2          MR. REINTHALER:  -- yes and with regard to the lift

3   stay motion, yes, you can make that distinction.  But for

4   purposes of *Queenie* and purposes of the cases that have extended

5   the automatic stay to non-debtor officer and director

6   defendants, it doesn't matter whether you're current or former.

7          So the analysis begins with *Queenie*, and in *Queenie*

8   although the case there didn't deal with claims against officers

9   and directors, it dealt with claims against a wholly-owned

10  subsidiary of the Debtor, the Second Circuit cited with approval

11  three decisions, two Southern District decisions and one

12  decision in from the California Bankruptcy Court, the *Lomas*

13  case, the *North Star Contracting* case and the *Maxicare Health*

14  *Plans* (ph.) case, in which the Courts did extend the automatic

15  stay to claims against non-debtor, current and former officers

16  and directors in each case due to the presence of indemnity or

17  even potential indemnity claims.

18         We've cited several other cases, the *Philadelphia*

19  *Newspapers* case and the *Robert Plan Corp.* case in the Eastern

20  District of New York, which reached the same conclusion.  We are

21  unaware of any cases in the Second Circuit to the contrary.

22         In response to these cases, our adversary, Mr. Veera,

23  has cited some pre-Queenie decisions and some non-Second Circuit

24  cases that don't really compel a different result.  Some of them

25  involved claims against non-Debtor defendants in which they were

1   alleged to have been joint tortfeasors and the non-debtors were

2   alleged to be independently liable.  In other words, they were

3   claims for which they were not entitled to indemnification from

4   the Debtor.

5          The rest of the cases they cite don't even involve

6   claims of indemnification and I don't think they add anything to

7   the analysis.  They don't cite a single case within this circuit

8   holding that the automatic stay doesn't apply or shouldn't be

9   extended to claims against officers and directors of the Debtor,

10  who have clear cut indemnification rights against the Debtor.

11  So all the cases go one way.

12         We've submitted, Your Honor, on our summary judgment

13  motion, three declarations that attach to them the relevant

14  portions of the Debtor's certification of incorporation, its

15  bylaws and the savings plan, all of which contain

16  indemnification provisions.  Veera has not submitted any

17  declarations or evidence contradicting the facts set forth in

18  those declaration which I submit are unrefuted, although given

19  the choice, Veera has elected not to cross-examine any of these

20  witnesses.  Accordingly, there is no genuine or triable issue of

21  material fact with regard to the terms of the indemnification

22  rights each individual defendant possesses.

23         Now we could sit here and debate whether Section 145

24  of the Delaware General Corporation Law and Article VII of the

25  Certificate of Incorporation and Article VIII of the Bylaws

1    apply to the claims against Ambac's officers and directors

2    acting as ERISA plan fiduciaries.  They clearly do, as we

3    explain in our brief.  But you don't need to even reach that,

4    Your Honor.   Given the broad indemnity rights granted under the

5    clear and unambiguous language of Section 11.16 of the savings

6    plan.  Delaware law in Section 145(f) of the General Corporation

7    Law expressly provides that a corporation made by agreement

8    grant even broader rights of indemnity than those granted under

9    the statute or in the certificate or in the bylaws.

10           And that is exactly what Ambac did in the savings

11   plan.  Section 11.16 of the plan, a copy of which is attached as

12   Exhibit C, both to our objection to the lift stay motion and to

13   the adversary complaint we filed, states that and I quote, "To

14   the maximum extent allowed by law, and to the extent not

15   otherwise indemnified, the employer, which is Ambac, shall

16   indemnify each member and former member of each of the plan

17   administrative committee and plan investment committee, and any

18   other current or former employee, officer or director of Ambac

19   or any of its affiliates, against any and all claims, losses,

20   damages, expenses, including counsel fees, incurred by any such

21   person on account of such person's action or failure to act in

22   connection with the plan, except that no indemnification shall

23   be provided to an indemnitee who personally profited by any act

24   or transaction in respect of which indemnification is sought."

25   That's the only exception.

1        There's no allegation  in the ERISA action of which I

2   am aware claiming that any of the individual defendants

3   personally profited from the decision to keep Ambac common stock

4   as an investment option in the savings plan.  They, like

5   everyone else, lost money on their investments in Ambac stock

6   and were just as much a victim of the recession and the

7   resulting decline in Ambac stock price as the members of the

8   class here.

9        Now Veera does note in its opposition to our motion

10  that two of the defendants sold some Ambac stock during the

11  class period but what they failed to tell you according to the

12  Form 4s on file with the SEC which we've attached to the second

13  Doyle declaration, that the number of shares that these two

14  individuals owned actually increased from the beginning to the

15  end of the class period and the major sales occurred for the

16  most part on days when an equivalent number of shares were

17  purchased, leading one to conclude that they were the result of

18  the exercise of stock options.

19       These two individuals are being sued for continuing to

20  offer the Debtor's common stock as an investment option when it

21  was allegedly no longer prudent to do so.  They're not being

22  sued for violating ERISA by selling a portion of their personal

23  holdings of the Debtor's stock and therefore, they're thus

24  entitled to indemnification to the same extent as everyone else.

25       So I don't think, no matter how you slice it or dice

1   it, I don't think there's any denying the fact that the Debtor

2   has a significant and perhaps the most significant financial

3   stake in the outcome of the ERISA action and the protections of

4   362 ought to apply.

5         Now that brings me to the motion to lift the stay.

6   Once you conclude that Section 362 applies, the next question

7   is whether Veera has demonstrated just cause for relief from the

8   automatic stay.  He hasn't.  Veera cites a number of cases that

9   hold that discovery may be obtained from a Debtor who is not a

10  defendant in the case in which discovery is being sought but

11  none of those cases involved claims against non-debtors holding

12  clear rights of indemnification against the Debtor.

13        Indeed, Veera has not cited a single case in this

14  Circuit and we're not aware of any, Your Honor, in which relief

15  from the automatic stay was granted in the circumstances present

16  here, nor has Veera demonstrated how the continued prosecution

17  of claims against the ERISA defendants would not impose a

18  significant burden and expense on the Debtor and disrupt the

19  Debtor's reorganization efforts.

20        Now this is where Veera has attempted to cloud the

21  issue by voluntarily reducing his discovery requests from his

22  initial sixty-two, then to forty-six, and now they're down to

23  eight requests.  And this is also where Judge Scheindlin in the

24  *Calpine* case began discussing whether it's Section 362(a) or

25  whether it's 105(a) that provides the proper framework for the

1   analysis when you're talking about disruption and delay.

2         But when we began this exercise here, faced with

3   sixty-two of the most broadly worded document request I've ever

4   seen and when we filed our adversary complaint, we still had

5   forty-six incredibly broad requests --

6         THE COURT:  Well I followed the paper trail so-to-

7   speak and I also note, Mr. Fearon I am sure will want to speak

8   to this when he -- when it's his turn, it's also being urged

9   that that track record from sixty-two to, is it forty-eight or

10  sixty-eight to forty-two or --

11        MR. REINTHALER:  Sixty-two to forty-six to eight.

12        THE COURT:  -- sixty-two to forty-six to eight is a

13  good fact, a fact that I should consider as a demonstration of

14  why the litigation ought to be allowed to proceed.  I mean my

15  initial view is that it cuts the other way because it indicates

16  a non-surgical approach to this and really no assurance as to

17  what would happen next.

18        Also, when this litigation started, it was if I am not

19  mistaken, before the bankruptcy case was filed; isn't that

20  correct?

21        MR. REINTHALER:  That is.

22        THE COURT:  And it also was commenced before the

23  Debtor -- before the rehabilitation proceedings in Wisconsin got

24  to a conclusion; correct?

25        MR. REINTHALER:  That is correct.

1           THE COURT:  And it was therefore also before this jet

2      or -- and its Wisconsin subsidiary was litigating in more courts

3      than I can count on one hand.

4           MR. REINTHALER:  That is correct.

5           THE COURT:  The Wisconsin State Court, two attempts in

6      the Wisconsin District Court, now attempting to be consolidated

7      in the Seventh Circuit.

8           MR. REINTHALER:  Correct.

9           THE COURT:  The District Court in the putative class

10     action, my courtroom and you're awaiting a decision from Judge

11     Gardephe on the motion to withdraw the reference with respect to

12     the IRS litigation.

13          MR. REINTHALER:  Correct.

14          THE COURT:  So, I'm just about to go into the second

15     hand.

16          MR. REINTHALER:  Right.  We're facing lots of

17     litigation in lots of different places and we have limited

18     resources to attend to all of those cases.

19          THE COURT:  Well, that's the other factor that's of

20     interest here is that eight of the fourteen individual

21     defendants are still employed by the Debtor and remind me again,

22     what's the total number of employees that the Debtor has?

23          MR. REINTHALER:  Well the Debtor has three employees.

24     The eight current officer-director defendants are for the most

25     part, employees of Ambac Assurance.  And this reorganization

1   will only work for this Debtor if Ambac Assurance is put into a

2   healthy mode and its plan of rehabilitation is approved and its

3   business is run smoothly and efficiently.  And they're expending

4   all of their time and effort keeping that business going.

5          THE COURT:  Well the CEO was here for the better part

6   of a day two weeks ago on the motion to extend exclusivity,

7   giving testimony and he had already been deposed.  So I think

8   I'm permitted to take judicial notice of at least what occurred

9   in my courtroom with respect to how much activity is going on on

10  all those fronts.

11         But let me circle back to the -- to what I now -- to

12  the newly trimmed down eight requests.  And let me ask you if we

13  focus on the issue of burden and I am subject to Mr. Veera's

14  counsel's rights to be heard, I am inclined to believe that the

15  stay clearly applies to the individual defendants in this case,

16  but with respect to the eight requests and focusing in on the

17  first five --

18         MR. REINTHALER:  Right.

19         THE COURT:  -- I'd like you to tell me and I draw a

20  large distinction between the first five and the last three, the

21  last three still to me would implicate probably virtually every

22  e-mail that may have existed during that period of time and also

23  would have implications for many, if not all of the other

24  litigations and sensitive issues that the Debtor is facing and

25  Ambac Assurance.  But with respect to the first five categories,

1  if you could specifically address burden with respect to those

2  and what would be the harm to the Debtor in producing those

3  narrow categories of documents.

4           MR. REINTHALER:  I'm happy to, Your Honor.  If all we

5  were faced with were the first five requests, it would be

6  difficult for me to stand up and say that there would be a

7  undue, unreasonable burden placed on the Debtor.  We have issues

8  of relevance with regard to this.  We have questions about

9  whether there would be a need to redact --

10           THE COURT:  Right.

11           MR. REINTHALER:  -- portions of documents for

12  privilege or other reasons.  We question the utility of

13  producing desk calendars for individuals that are likely to have

14  almost no probative value but in terms of the raw burden and the

15  expense of producing it, it would not be undue.

16           THE COURT:  Okay.  I thought that's what you'd say.

17           MR. REINTHALER:  It's the last three that we have a

18  problem with.

19           THE COURT:  Clearly.

20           MR. REINTHALER:  And there, we have done some

21  preliminary work and as indicated in the second Doyle

22  declaration, the preliminary count is approximately 227,000

23  potentially responsive e-mails that could cost up to two million

24  dollars to review for responsiveness and privilege and produce.

25  You know, those are back of the envelope calculations to

1   counsel.

2           THE COURT:  Right.

3           MR. REINTHALER:  But that's where we are and that's

4   still a burden.  But the point I want to emphasize is that's the

5   tip of the discovery iceberg.

6           THE COURT:  Right.

7           MR. REINTHALER:  We started with sixty-two all-

8   encompassing.  We're now down to eight which appear to be more

9   manageable but still are burdensome to the extent they request

10  e-mails but there's no commitment that there aren't going to be

11  more requests.  There are depositions that we're facing.

12  There's been no agreement or offer on the part of Veera to wait

13  four months or six months till we have a plan, till exclusivity

14  is over, before they start taking depositions of current people.

15  They said they want to take all the current officer and director

16  defendants and some other employees of the company on top of

17  that.

18          So we've got six third-party subpoenas outstanding.

19  For all I know, some of them may claim that they have

20  indemnification rights as well against the company for complying

21  with the request.  So we're not -- it's the entirety of what

22  we're facing in the future --

23          THE COURT:  Right.

24          MR. REINTHALER:  -- that is of great concern to the

25  Debtor.

1          THE COURT:  All right.

2          MR. REINTHALER:  All right?

3          THE COURT:  Thank you.

4          MR. REINTHALER:  Okay.  I can talk about 105 but I

5    don't think I need to at this juncture.

6          THE COURT:  I think that's good for now.

7          MR. REINTHALER:  Okay.

8          THE COURT:  Thank you.

9          MR. REINTHALER:  Thank you.

10         MR. FEARON:  Good morning, Your Honor.

11         THE COURT:  Good morning.

12         MR. FEARON:  I'm Steven Fearon on behalf of Mr. Veera.

13         THE COURT:  Okay.

14         MR. FEARON:  It seems to me like Your Honor latched

15   onto something that I hope is true and that's the first five

16   requests that we made here are reasonable, are straightforward,

17   relatively easy for the Debtor to comply with and would not

18   impose any kind of imminent harm on the Debtor.

19         I want to start off though by saying that when we

20   served our original sixty-two requests and then reduced them to

21   forty-six requests, it was clear to us that the Debtor would

22   refuse and did refuse to produce any documents in response to

23   those.  That wasn't a move that we made in bad faith.  It was a

24   move instead that we made in order to protect the class that we

25   are attempting to represent in the class action that's before

1   Judge Baer.  We have a discovery cutoff there of June 30.

2            THE COURT:  Which was set before this case was filed;

3   correct?

4            MR. FEARON:  Correct.  Correct.

5            THE COURT:  Have you asked for relief from that cutoff

6   date?

7            MR. FEARON:  No, not yet because -- well for a number

8   of reasons; one is we have the date.  Judge Baer cautioned us

9   that we should be reluctant to request extensions.  We should do

10  our best to live up to the deadlines that he has set and that's

11  what we're trying to do.  And that's why initially instead of

12  serving a motion -- a subpoena just on the Debtor, we came to

13  this court first and we asked permission to serve subpoenas.  We

14  wanted to go through this process and we wanted to try to do so

15  quickly and the last time we were before Your Honor, I think

16  Your Honor latched onto that and said that, you too wanted to

17  resolve this quickly.  That's really -- we want to get a better

18  sense --

19           THE COURT:  He wants you to go to trial in --

20           MR. FEARON:  January.

21           THE COURT:  -- January of 2012; right?

22           MR. FEARON:  It's a little unclear whether we'll

23  actually go to trial in January according to the Judge or

24  whether we're just on the January 2012 trial calendar which may

25  be pushed over a little bit.

1      THE COURT:  Okay.  But once again, that schedule was

2   set before this case commenced.

3      MR. FEARON:  It was.  It was.

4      THE COURT:  And it was set before everything that

5   occurred in Wisconsin and in all the other venues really

6   blossomed.

7      MR. FEARON:  That -- I think the Wisconsin proceedings

8   probably had already started.  In fact, we know that the

9   investigation already started and there were actions going on in

10  Wisconsin.

11     THE COURT:  Certainly.  But what I am referring to and

12  it's fresh in my mind because of the proceedings that were had

13  here a couple of weeks ago, I don't know whether anyone from

14  your firm was present, but what you have is the United States

15  fighting as -- with all of its might so-to-speak for a principle

16  that it believes it will take and I was told explicitly, if

17  necessary, all the way to the United States Supreme Court.

18  There were proceedings here during which the Debtor urged me to

19  hold the United States in contempt for violating an injunction.

20  Fortunately, that was resolved.

21      There are issues relating to negotiations with the

22  Office of the Commissioner of Insurance and one thing that Mr.

23  Reinthaler said that is absolutely true is that the recovery in

24  the Ambac case or the survival of Ambac, the Debtor, very much

25  if not entirely depends on the ability of the Ambac Assurance

1  rehabilitation to succeed to withstand a tax by the United

2  States and also to resolve the multi-billion dollar NOL tax

3  issues and the like.

4         In short, this is a very, very unique and intense

5  situation.  And I am very reluctant to layer on more expense and

6  more distraction.  That being said, Mr. Veera's lawsuit does not

7  appear to me to be frivolous and I think it's one of my jobs to

8  do a little bit of balancing here which is why I focused on the

9  five categories.

10         There's a statement that you made -- there's a

11  statement that Mr. Reinthaler made that I want to come back to

12  and he eluded to no offer to await until a plan has been

13  proposed or to some later point in the proceedings when there's

14  more certainty surrounding a number of the moving parts.  For

15  example, I entered an order yesterday directing that the company

16  and the United States engage in mediation on the tax issues.

17  That could result in a resolution.  It may not.

18         So I want to come back to that period of time but I

19  also want to come back to the statement that was in your

20  pleadings at paragraph 39 that said, "He will be more than able"

21  he, Mr. Veera, "will be more than able to proceed with his

22  claims against the Debtor without any discovery from the

23  Debtor."  I didn't understand that statement.

24         MR. FEARON:  It's a -- I apologize.  It's a

25  typographical error.  It should read, and defendants recognized

1  this when they quoted it, although I have a problem with the way

2  they quoted it, they put a (sic) after the Debtor.

3          THE COURT:  Debtor; right.

4          MR. FEARON:  It should have read, "will be able to

5  proceed with his claims against the fiduciary defendants or the

6  defendants," meaning the defendants in the ERISA case.  So that

7  was a typographical error on our part.

8          THE COURT:  Okay.

9          MR. FEARON:  And I apologize for that.

10         THE COURT:  But not -- so that addresses the discovery

11 issue but if I were to extend the stay, then obviously

12 everything stops.  If I were to extent the stay to the

13 individual defendants --

14         MR. FEARON:  Right.

15         THE COURT:  -- then litigation stops --

16         MR. FEARON:  Yeah, I mean the --

17         THE COURT:  -- until further order of me or somebody

18 else.

19         MR. FEARON:  Right.  I imagine our next move would be

20 to go -- not move but our next approach would be go and tell

21 Judge Baer what happened here and then figure out what to do;

22 right?  Going back to this sentence, I --

23         THE COURT:  Okay.  I thought that there was a typo.

24         MR. FEARON:  Yeah, there is.  I mean when defendants

25 quoted it in their papers, I think they recognized the typo but

1   then they left out the part -- they basically tried to say we're

2   conceding we don't need the discovery.  You know, they left out

3   the last part of the sentence which would -- in which we said

4   albeit it at an unfortunate disadvantage.

5          THE COURT:  No, I understand that.

6          MR. FEARON:  Yes.  Your Honor, we need this discovery.

7   We need the discovery from the Debtor.  What we've tried to do

8   here is be very, very reasonable.  We understand they're not

9   going to produce --

10          THE COURT:  Well, you didn't start out reasonable at

11  all.

12          MR. FEARON:  Your Honor, we had -- I apologize if you

13  don't see it that way but we have an obligation to ask for the

14  discovery we need to pursue the class case.  We have an

15  obligation to do that as class counsel.

16          An answer from the Debtor that just says we're not

17  giving it to you, sometimes is something that can help us down

18  the road to represent the class.  And --

19          THE COURT:  How would you be -- I understand your

20  point.  How would you be prejudiced by waiting until -- waiting

21  to renew your motion until the next expiration of exclusivity

22  that the Debtor has which is in the first week of July?

23          MR. FEARON:  Right.  Well, the --

24          THE COURT:  Given that this is largely -- putting

25  aside the first five categories, the electronic discovery and

1    I'm sure we have a representation from the company that those

2    files will be preserved, how would you be prejudiced by waiting

3    until the Debtor is farther into everything else it has on its

4    plate and then renewing and beginning to focus on the litigation

5    then?

6              MR. FEARON:  Well the main thing is we have this

7    deadline set by Judge Baer.

8              THE COURT:  But you haven't asked Judge Baer for

9    relief from the deadline.

10             MR. FEARON:  Because -- I understand but if you said

11   to us that we couldn't have these documents, that you're going

12   to stay the case, we'll go to Judge Baer and we'll tell him

13   what's going on.  But --

14             THE COURT:  And remember, hypothetically if I were to

15   send you away until July --

16             MR. FEARON:  Uh-huh.

17             THE COURT:  -- and we do as Judge Gerber down the hall

18   says, a stop, look and listen in July, to see where things stand

19   with respect to the litigations in the other six courts whether

20   or not there's been a settlement with the IRS, whether or not

21   there's an agreement among all the constituencies in this case

22   on a plan, it may well be that at that point, you could proceed.

23             And that's July, five months until January; it's

24   certainly possible that you could proceed and be able to stick

25   with Judge Baer's timetable for trying the case.  I know it's

1    aggressive.

2            MR. FEARON:  I don't --

3            THE COURT:  But it's possible.

4            MR. FEARON:  I don't see how we possibly could.  You

5    know, I think one of the problems we're having right now is that

6    the  defendants in our case have absolutely refused to sit for

7    depositions until we went and requested discovery from the

8    Debtor; right?  We were willing to go forward without the

9    discovery.  We were willing to go forward without the discovery

10   from the Debtor and we took the bait.

11           We went ahead and we made the motion here.  Now we

12   have a non-party to our case whose now threatening to shut us

13   down and shut down the claim for 450 people who lost their

14   retirement investment by investing in this company's stock.  You

15   know, we fought hard to get this case moving, the ERISA case I'm

16   talking about.  And we fought hard for that trial date in

17   January.  We want to move this case forward.  We want to do

18   something reasonable.  We're not interested in trying to derail

19   the Debtor's reorganization efforts.  We feel that although this

20   Court is making every effort to marshal all the troops here and

21   move forward to a reorganization, we think there's so many

22   impediments to it that there's no guarantee that the --

23           THE COURT:  Well there are no guarantees but your

24   statements just indicate that as the Debtor has urged upon me,

25   it's not just about these documents.  It's about you want these

1  documents and then you want depositions and then there's going

2  to be more documents.  And before you know it, we're going to

3  have a full blown litigation.  So it's not just about these

4  documents and therein lies a significant problem.

5          MR. FEARON:  I understand that.  I also understand

6  that during discussions that we had with the Debtor's counsel, I

7  did offer and I am willing to offer today to work with Debtor's

8  counsel in any way possible to try to reduce the burden, to

9  schedule depositions so that we take former officers and

10  directors of the company first, you know, when it comes time to

11  take their depositions, do --

12          THE COURT:  But the problem that I have is that -- and

13  I am very sympathetic to the individuals that you represent in

14  the class.  This is not a situation that anyone would have

15  wished for.  But the problem is that everything is connected

16  here.  Everything is connected; what happened in the CDO market,

17  what happened with ratings agencies; in my mind at least at a

18  very elemental level, everything is connected.  So it's not just

19  about those depositions going forward because they'll only

20  pertain to what's of interest to you in your case.  The Debtor's

21  going to have to be in an all hands on deck situation when

22  anybody is giving any testimony about events that occurred in

23  your relevant time period.  That's --

24          MR. FEARON:  I respect --

25          THE COURT:  You can disagree.  That's okay.

1        MR. FEARON:  Yeah, I don't see it that way because

2   what we're offering here is to take the former employees early.

3   Counsel can attend those depositions.  I don't want to run their

4   case for them but I don't really see it that way.  This is, for

5   us in the ERISA case, we have a relatively straightforward plan

6   for pursuing these depositions.  First we have to get the

7   documents.

8        You know, I am willing -- my goal here today really is

9   to see if we can get some of the documents, particularly one

10  through five.  Six, seven and eight, I believe we should get

11  those.  After the papers were in this case, we continued to have

12  discussions with Debtor's counsel in which we offered to further

13  reduce what we're looking for and try to streamline even those

14  requests, six, seven and eight.

15       For the requests that ask for information about the

16  resignations of the three of the employees, number seven, I'm

17  definitely interested in getting those as well.  If Your Honor

18  tells me no, you can't have six and you can't have eight, I'll

19  live with that but I mean I am primarily interested in getting

20  one through five and seven.

21       THE COURT:  All right.  Mr. Reinthaler, let me ask you

22  the question about depositions of the former employees.  How

23  many -- Mr. Fearon, how many individuals are in that category?

24  Is that --

25       MR. FEARON:  Of the individual defendants?

1          THE COURT:  Yes.

2          MR. FEARON:  I believe there are eight.

3          THE COURT:  Eight former.

4          MR. FEARON:  Eight defendants in our ERISA case who

5  are former employees.

6          THE COURT:  Who are -- and no longer employed by Ambac

7  Assurance; is that right?

8          MR. FEARON:  Let me just double check because perhaps

9  Debtor's counsel knows better but that's my understanding.

10          MR. REINTHALER:  Your Honor, I thought you hit -- I

11  thought you had the math right at the beginning.

12          THE COURT:  I thought so too.  That's why I am

13  confused.

14          MR. REINTHALER:  I thought you said you were at

15  fourteen defendants.

16          THE COURT:  Right.

17          MR. REINTHALER:  There are eight current officer and

18  directors.

19          THE COURT:  That's what I thought.

20          MR. REINTHALER:  So that would leave six formers.

21          THE COURT:  Six.  That's what I thought.

22          MR. FEARON:  Let me just see.

23          THE COURT:  And by current, we mean current for Ambac

24  and Ambac Assurance.

25          MR. REINTHALER:  Right.

1          THE COURT:  Right.

2          MR. FEARON:  I have, Your Honor, seven formers, eight

3     still at Ambac.  There are five current directors and three

4     current officers or employees.

5          THE COURT:  The math doesn't add up.

6          MR. REINTHALER:  I think there are six.

7          MR. FEARON:  Six?

8          MR. REINTHALER:  Uh-huh.

9          MR. FEARON:  Six formers then.

10          THE COURT:  Okay.  So six formers who are in no way

11     affiliated.  Okay.  And so Mr. Reinthaler, tell me what's your

12     view of what the difficulty would be in having depositions of

13     those individuals, putting aside whether or not I would release

14     any documents.

15          MR. REINTHALER:  Well, Your Honor, because all six of

16     those former officers or directors have rights of

17     indemnification.

18          THE COURT:  Indemnification.

19          MR. REINTHALER:  I mean the Debtor clearly has an

20     interest in what is going on with the litigation --

21          THE COURT:  Right.

22          MR. REINTHALER:  -- will have to monitor it to general

23     counsel and his staff will have to pay close attention to what's

24     going on.  As I said before, you could take individual, you

25     could take a deposition here and a deposition there, and

1   probably rationalize that it doesn't impose an undue burden but

2   the whole purpose of 362 is to give the Debtor the breathing

3   space --

4            THE COURT:  Right.

5            MR. REINTHALER:  -- for all of this until the

6   effective date probably.  We're talking now about -- Your

7   Honor's talking now about until exclusivity ends.

8            THE COURT:  Well, exclusivity I mean and I'm thinking

9   out loud as I tend to do, exclusivity not as a firm commitment

10  to open the farm gate and let everybody run out, but just as it

11  seems like an appropriate point to do another stop, look and

12  listen to where everybody is.

13           MR. REINTHALER:  Okay.

14           THE COURT:  And it may be that we are nowhere and that

15  that we're still -- that the company is still fighting wars on

16  five different fronts in which case that's the situation that we

17  have.  On the other hand, I'm an optimist and perhaps there's a

18  resolution with the United States and perhaps there's a

19  resolution among the creditor body in which case one could make

20  the argument that it would be in the interest of the estate to

21  get these indemnification issues and this other issue resolved.

22           MR. REINTHALER:  Your Honor, I hear you and what I'd

23  like to suggest is that we enforce the automatic stay for the

24  remainder of the 120 days that you've granted and then come back

25  and tell you at that point in time whether or not we believe the

1   automatic stay should remain in effect for some or all of the

2   discovery in the case or whether the case should be allowed to

3   proceed and if so, on what basis.

4           THE COURT:  Okay.  Mr. Fearon -- thank you.  Mr.

5   Fearon, tell me about the six individuals by name and what their

6   roles were and what positions they held.

7           MR. FEARON:  Okay.  Your Honor, may I just have a

8   minute?

9           THE COURT:  Of course.

10          MR. FEARON:  I just want to find my note about that.

11          THE COURT:  Of course.

12          (Pause.)

13          MR. FEARON:  Thank you, Your Honor.

14          THE COURT:  Okay.

15          MR. FEARON:  William McKinnon (ph.).  He was a member

16  of the investment committee.  He was also a senior managing

17  director and served as the company's chief risk officer of both

18  Ambac and Ambac Assurance.

19          THE COURT:  Okay.

20          MR. FEARON:  I think he left the company in 2008.

21          THE COURT:  Okay.

22          MR. FEARON:  Sean Leonard (ph. ).  He was a senior

23  vice president and chief financial officer of the company.

24          THE COURT:  Okay.

25          MR. FEARON:  And he was also a member of the

1   administrative committee.

2           THE COURT:  Okay.  Who are Mr. Callan (ph.), Mr.

3   Genneder (ph.) and Mr. Wallace, I know.

4           MR. FEARON:  Okay.  So Mr. Genneder --

5           THE COURT:  Yes.

6           MR. FEARON:  I apologize, sometimes I am not sure

7   exactly how to say his name.

8           THE COURT:  Okay.

9           MR. FEARON:  He was the former CEO of the company.

10          THE COURT:  Prior to Mr. Wallace?

11          MR. FEARON:  I think prior to Mr. Callan.

12          THE COURT:  Okay.

13          MR. FEARON:  Before Mr. Callan.

14          THE COURT:  So Genneder and Callan were both CEOs.

15          MR. FEARON:  Yeah, and Mr. Genneder resigned, I

16  believe in January of 2008.  And then I believe Mr. Callan came

17  in as CEO.

18          THE COURT:  Okay.  But they're not individual

19  defendants?

20          MR. FEARON:  Mr. Genneder -- Mr. Callan is not and Mr.

21  Genneder is not.  And then you asked for Mr. Wallace.

22          THE COURT:  Yeah, I know who Mr. Wallace is.

23          MR. FEARON:  Oh, okay.

24          THE COURT:  Okay.  So, you were continuing to give me

25  the six.

 1          MR. FEARON:  And then we have the three who are still

 2    employed; Adams, Eisman and Gilkelly (ph.).

 3          THE COURT:  I'm sorry.  I was only interested in

 4    the --

 5          MR. FEARON:  Yeah, I know.

 6          THE COURT:  Okay.

 7          MR. FEARON:  I was just trying to keep track of who is

 8    who.  And then I'm looking for the sixth who I didn't mention.

 9    Let's see.

10          THE COURT:  I'm only up to four formers.

11          MR. FEARON:  Okay.

12          THE COURT:  Genneder, Callan, Leonard and McKinnon.

13          MR. FEARON:  Right.

14          MR. REINTHALER:  Callan and Genneder are not

15    defendants.

16          MR. FEARON:  Right.

17          THE COURT:  Yes.

18          MR. REINTHALER:  Okay.  So we only have two so far.

19          THE COURT:  So I only have two.  Thank you.

20          MR. REINTHALER:  You have McKinnon and Leonard.

21          THE COURT:  So I only have McKinnon and Leonard.

22          MR. FEARON:  Yes, then there's Greg Bienstock (ph.).

23    I think Bienstock was the head -- the chief administrative

24    officer and he was in charge of human resources.  So his name

25    shows up on a lot of the HR-related materials.

1        Douglas Renfield-Miller, R-e-n-f-i-e-l-d - Miller.

2        THE COURT:  You've now given me a name that requires

3   that I make a disclosure.  There's a fallacy that New York is a

4   big city but in fact, it's a very small town.  So let me let you

5   know that I know Douglas Renfield-Miller.  His daughter went to

6   the Brearley School here in New York with my daughters.  So I've

7   met him on occasion.  I probably last saw him at a high school

8   function over six years ago.  I have no personal friendship with

9   him.  I probably was in his apartment in the family apartment

10  once during the time that the girls were in high school.  I ran

11  into his wife randomly on the street probably three years ago.

12  But since you mention his name, I am obligated to make that

13  disclosure.  I was completely unaware until that moment that he

14  had any involvement here.

15        MR. FEARON:  And we understand that and don't have any

16  objection.

17        THE COURT:  I apologize.

18        MR. REINTHALER:  We're fine.

19        THE COURT:  Okay.

20        MR. FEARON:  But he is a named defendant in the ERISA

21  case.  He's a former employee.  He was a member of the

22  investment committee and he was a senior managing director at

23  Ambac.

24        THE COURT:  Okay.  So he's -- all right.  So that's --

25  I'm up to four now.

1    MR. FEARON:  Right.  And then Gandolfo (ph.), I

2  believe is a former as well.  Sorry, Thomas J. Gandolfo.  He's a

3  defendant in the ERISA case.  He's a former employee.  I believe

4  he left in 2008 and he was a member of the investment committee.

5  He had been CFO of the company for a time that predates our

6  class period.  And then he became a senior managing director of

7  the company.

8         And then the last one is a defendant in the ERISA

9  case, Timothy J. Stephens (ph.).  He's a former employee of the

10 company, I believe until -- he was at the company until March of

11 2008 and he was a member of the administrative committee and was

12 a senior managing director of the company.

13    THE COURT:  Okay.  Thank you for that.  I have never

14 really let you make any sort of a argument.  So why don't I give

15 you that opportunity now, Mr. Fearon, if there's anything else

16 that you want to say beyond what I have read in your papers.

17    MR. FEARON:  You know, I just -- I should begin by

18 saying that we're interested in trying to get the discovery we

19 need to proceed on behalf of the 450 or so participants in the

20 plan who are in our proposed class. We're not interested in

21 trying to jeopardize or imperil the Debtor's reorganization

22 efforts.

23         We believe here that the stay should be lifted, should

24 not apply to our action.  The Debtor's counsel cited the *Queenie*

25 case.  There had been cases decided after that that found that

1   in situations like this where there's an independent claim

2   against the officer or director, not in that person's position

3   as an officer or director of the company --

4            THE COURT:  What's the independent claim here?

5            MR. FEARON:  Well the independent claim is that these

6   people, separate and apart from their role as officers or

7   directors of the corporation, the Debtor, they were fiduciaries

8   of the plan.  There was no requirement that the company's

9   officers and directors had to be fiduciaries.  Often you see the

10  fiduciaries are not officers and directors in the plan --

11           THE COURT:  But they were.

12           MR. FEARON:  They happened to be but the claims are

13  totally independent of their -- the claims against them under

14  ERISA are against them because they were fiduciaries of the

15  plan, not because they were officers or directors of the

16  company.  We would have the same exact claims against these

17  people if they were not officers and directors of Ambac.  It's

18  their role as a fiduciary of the company as --

19           THE COURT:  But they were serving in those capacities

20  because they were officers and directors of Ambac.  They were

21  not random individuals off the street and based on that, they

22  are entitled to be -- to assert indemnification rights against

23  Ambac.

24           MR. FEARON:  But my point is that the Courts that have

25  stayed cases against officers and directors of corporations,

1    most of those cases involve situations where the claim is

2    asserted -- the claim is truly against the corporation, not

3    against the officers and directors.  You have a company that

4    manufactures a product that injures people and then the company

5    files for bankruptcy and a plaintiff's lawyer goes and sues the

6    officers and directors of the company; in the --

7             THE COURT:  I am familiar with all those cases.

8             MR. FEARON:  Right.

9             THE COURT:  I understand.

10            MR. FEARON:  Here we have a different situation in our

11   view because we're not suing the officers -- we haven't sued

12   Ambac.  Ambac is not a defendant in the case and Ambac itself

13   made it very clear to us early on in the case that it wasn't a

14   fiduciary.  We only sued the fiduciaries of the case -- of the

15   plan.  And Judge Baer only held in the fiduciaries of the plan.

16   It happens that some of them are officers and directors of the

17   company.

18            We say that the stay of our case would be

19   extraordinary.  It would jeopardize our claims and prevent us

20   from getting what we hope to get which is relatively swift

21   justice.  We've cited in our brief, the law on -- and we've

22   cited some cases which say that the Court should be reluctant to

23   stay claims like this, particularly where the Debtor is not a

24   defendant.  And that's the situation we have here.

25            If the Court does stay our case, we hope that what the

1   Court will do is take an approach that balances our interests
2   against those of the Debtor.  And I think that's what we have
3   tried to do.  You know, defendants in their -- the Debtor in its
4   papers talked about how we blinked or put the brief in terms of
5   gamesmanship, where that they made us blink first.  That's
6   really not what it's about, you know?  We're not here to engage
7   in gamesmanship.  We're here to try to represent the class.
8          THE COURT:  Well, but you hurt your cause because --
9   and you've explained to me a number of times why you started
10  with as broad a request as you did but the filing of the
11  bankruptcy case and the rehabilitation proceedings and
12  everything else that happened, I think should have been
13  recognized by you as somewhat of a game changer and you could
14  have taken a different approach by saying forget those initial
15  requests, let's start small and see what it is that you can give
16  us without imperiling and burdening everything else that's going
17  on.  And you might see it that way, as that's exactly what you
18  did but they don't see it that way.
19         MR. FEARON:  I understand.  And I understand the
20  Court's --
21         THE COURT:  And this pile of briefing which is not
22  even everything doesn't -- isn't consistent with the view that
23  there's been an attempt to have a surgical approach here.
24         MR. FEARON:  Okay.  And our approach initially was we
25  knew that there were other litigations.  We knew, for example,

1  that there was a securities class action that was pending

2  against some of these officers and against -- I think it was

3  against the company, as well.  So one of the first things we did

4  in our initial request was we asked for all the documents that

5  were produced in that securities case, believing that do you

6  know what?  That's going to be a big chunk of material and we'll

7  get that and we'll be able to look at it and it won't be

8  burdensome because it will just be basically punching out an

9  extra copy of whatever was produced there.

10         And the Debtor when it came in before Your Honor made

11  a point of saying oh, this is also burdensome.  And Your Honor

12  latched onto that first request and said that's incredibly

13  broad.  So we went back and we revisited the issue and thought

14  okay, well maybe that is broad.  Let's try to narrow it.  What

15  we didn't know when we were before Your Honor and what we only

16  later found out was a lot of this could have been avoided also

17  because they never told us that they never produced documents in

18  the securities case.  No documents were produced which I find

19  unusual but what we were trying to do is put some requests on

20  there that would minimize the burden on the defendant.  They'd

21  be able to produce this stuff to us and then we'd be on our way.

22         They didn't see it that way.  Apparently Your Honor

23  didn't either but what we are here now on is a request that's

24  eight requests long.  They fit into one page of our brief.  We

25  thought that they were very straightforward.  We understood that

1   they rejected our earlier request and would not produce that

2   stuff.  We understand also that Your Honor wouldn't compel them

3   as we had asked to produce the stuff in the sixty-two and then

4   the forty-six requests.  But now here we are with our eight and

5   we appreciate Your Honor's scheduling this hearing quickly so we

6   could get a resolution.

7            I would propose that if Your Honor's concerned about

8   our interests and the Debtor's reorganization efforts that

9   perhaps we could find some sort of way to accommodate both,

10  allow us to do what we have to do without disrupting the Debtor.

11  For example, if Your Honor sees that seven and eight are too

12  broad and would impose a burden on the Debtor, then have the

13  Debtor produce one through five and seven to us.  And allow us

14  to go forward with some of the depositions or at least some of

15  the document gathering that we're now in the process of doing.

16           Every time we get a response from one of these non-

17  parties, we find out additional information that's going to be

18  helpful to us.  And so, even if Your Honor was to stay the case,

19  let's say until the end of the exclusivity period, we would ask

20  that you not bind our hands totally.  In other words, allow us

21  to do some of this non-party discovery, allow us to do some of

22  the things that we're already in the process of doing now, so

23  that we can get the documents, look at the case, understand it

24  better, so that when that period comes and Your Honor hopefully

25  will lift the stay, we're ready to go.  And we don't have any --

1          THE COURT:  When you say non-party discovery, what do

2    you mean?

3          MR. FEARON:  So, we have certain officers of the

4    company who are former employees.  They're not named defendants

5    in our case.

6          THE COURT:  But there's indemnification issues with

7    them as well.

8          MR. FEARON:  We don't know if there are.  This was the

9    first we heard of it.

10         THE COURT:  Sure there are.  They're former employees

11   and they're going to assert that they're  entitled to

12   indemnification.  Not only that but they may not be defendants

13   now but they may be defendants -- they may become defendants.

14         MR. FEARON:  In the ERISA case?  We don't -- based on

15   the information we have, they weren't fiduciaries in the plan.

16   But there are former employees of the company who we have served

17   with subpoenas.  There are certain accounting firms and

18   consultants who did work for the company or for the board of the

19   company.  They're in the process now of producing information to

20   us.

21         THE COURT:  You know it sounds narrow but it's really

22   not because it really -- it requires that the company be on

23   alert and be vigilant and participate every step of the way.

24   They would -- they really would not be doing their jobs and

25   fulfilling their duties if they didn't. And that's the problem

1    that I have.  It's not -- when you call it non-party, it sounds

2    very attractive.  It sounds oh, it's separate and my Debtor

3    doesn't have to worry about it but they do.  They have to worry

4    about it on the level of indemnification.  They have to worry

5    about it on the level of what is revealed or disclosed and how

6    that has an implication or a bearing for everything else that's

7    going on here.

8            And this is unfortunate for you but you are -- the

9    fate of your clients is inextricably tied into everything that

10   happened to Ambac, I believe.  And therefore, it's very

11   difficult to separate it out and for you to say what you're

12   doing is cordoned off and the company can -- the Debtor can rest

13   easy and not worry about it and not expend resources and not

14   worry about exposure.  And I just -- I can't get there.  I just

15   can't get there.

16           On the other hand, I am trying -- I'm struggling to

17   find a way to not completely have you be dead in the water for

18   an indefinite period of time.  I think you can probably hear

19   that in what my questions are.  So this is where I think I am

20   going.

21           I think as a first matter, I think the Debtor has the

22   better of the argument with respect to the application of the

23   automatic stay.  I think the automatic stay can and should be

24   extended to apply to the individual defendants.  So that's point

25   number one.

1          Point number two, with respect to the cause to lift

2     the stay and the conduct of discovery, I think that six, seven

3     and eight are frankly out of the question at this juncture.  But

4     based on Mr. Reinthaler's responses, I am inclined to order that

5     items one through five be produced with the following exception.

6     With respect to item three, only those calendars for individual

7     defendants who are former employees.  No -- not Mr. Wallace --

8     not Mr. Wallace.

9          So the individual defendants who are former employees

10    and Mr. Callan and Mr. Callan and Mr. Genneder who if I am

11    remembering correctly, are former officers but not currently

12    individual defendants; correct?

13          MR. FEARON:  Correct.

14          THE COURT:  Okay.  So that's point number one.

15          MR. REINTHALER:  Mr. Callan is a current director.

16          THE COURT:  I'm sorry. I wrote down former.  Nobody

17    current or former -- nobody current.

18          MR. FEARON:  Okay.

19          THE COURT:  Okay?

20          MR. FEARON:  No current officer or director.

21          THE COURT:  No current officer or director.

22          MR. FEARON:  Okay.

23          THE COURT:  Okay?  So stated differently, calendars

24    for the individual defendants who are former officers and

25    directors and Mr. Genneder; correct?  Do I have that universe

1  correct?

2          MR. FEARON:  Yes.

3          THE COURT:  You don't -- I mean you're saying yes

4  doesn't agree with -- you don't have to agree with my ruling

5  but --

6          MR. FEARON:  No, I don't and yes, you have it correct.

7          THE COURT:  All right.  So, that's that.  With respect

8  to the depositions, the depositions are much harder because the

9  depositions I think have to be viewed as part and parcel of the

10  whole indemnification issue and I think that to depose all the

11  individuals named would require a substantial effort on the part

12  of the Debtor and open up many issues and open up the

13  indemnification issue.

14          That being said, in the interest of enabling you to do

15  something and to attempt to move forward somewhat, I'll give you

16  one deposition.  If I were you, my pick would be Mr. McKinnon

17  but I'm willing to let you pick among the formers.

18          MR. FEARON:  Among the former officers and directors.

19          THE COURT:  One.

20          MR. FEARON:  Okay.

21          THE COURT:  Mr. Reinthaler?

22          MR. REINTHALER:  Your Honor, may I just be heard on

23  that?

24          THE COURT:  Yes.

25          MR. REINTHALER:  We're at a very delicate stage in a

1  number of different respects here.  We have a securities class

2  action --

3            THE COURT:  Right.

4            MR. REINTHALER:  -- for which there is a tentative

5  settlement that is being considered.

6            THE COURT:  Okay.

7            MR. REINTHALER:  A deposition of Mr. McKinnon is going

8  to go into the issues that would be germane --

9            THE COURT:  That's --

10           MR. REINTHALER:  -- to that and could possibly --

11           THE COURT:  Okay.

12           MR. REINTHALER:  -- upset that apple cart.

13           THE COURT:  All right.

14           MR. REINTHALER:  In addition, because he was the chief

15  risk officer, there is no question in my mind but that any

16  deposition of him is --

17           THE COURT:  So I chose right, in other words?

18           MR. REINTHALER:  -- is going to go into issues that

19  are very sensitive --

20           THE COURT:  All right.

21           MR. REINTHALER:  -- to the negotiations with the IRS

22  and with the litigation with the IRS.

23           THE COURT:  All right.  So let me come at it from a

24  different way.

25           MR. FEARON:  Okay.  Could I just be heard before you

1   do, Your Honor?

2               THE COURT:  Sure;.

3               MR. FEARON:  In the ERISA case, we have a protective

4   order that governs the discovery including depositions in the

5   case.  It limits what we can do with the deposition.  It limits

6   who can see the information from the deposition or from any of

7   the discovery.  All the parties have to do is designate the

8   material including deposition testimony as confidential.

9               THE COURT:  I hear you but let me hear -- who would be

10  your second choice?

11              MR. FEARON:  Can I have one moment?

12              THE COURT:  Of course.

13              MR. REINTHALER:  I could tell you, Your Honor, that

14  we're going to have the same issue with regard to the two former

15  CFOs of the company.

16              THE COURT:  Uh-huh.

17              MR. REINTHALER:  Mr. Leonard and Mr. Gandolfo.

18              THE COURT:  Uh-huh.  How about Mr. Bienstock?  Because

19  if -- I mean I know I've turned this into a bit of a working

20  session but because I am not going to authorize production of

21  seven, which seems to want to get at the circumstances having to

22  do with resignations and terminations, if Mr. Bienstock, my

23  notes indicate was the head of HR, might he not be a source of

24  information on those topics?

25              MR. REINTHALER:  Of the six, Your Honor, he is

1    probably the person most knowledgeable about the savings plan

2    and how it operated.

3              MR. FEARON:  We'll take him.

4              THE COURT:  All right.

5              MR. FEARON:  Your Honor, just so the record's clear --

6              THE COURT:  I know, you're not agreeing with me.

7              MR. FEARON:  Yes, I don't and -- but we'll take Mr.

8    Bienstock.

9              THE COURT:  All right.  But so now let's look at the

10   overall -- so the overall game plan is going to be those first

11   five categories as modified by my statements with respect to

12   three, subject to the usual rules with respect to privilege.

13   Right?  I'm not relieving the parties of any of that.

14             And then I want to hear from Mr. Reinthaler if there's

15   any other protective orders or other measures that might be

16   appropriate to prevent prejudice to the Debtor in other arenas.

17   And you don't -- you can go back.  I apologize for putting

18   everybody on the spot.  You can go back and think about it and

19   attempt to work it out with each other.  I don't want you to

20   have to answer now and then when you're under less pressure,

21   think of something of concern.  But my point is to produce these

22   in a way that's helpful to the plaintiff but causes no harm,

23   zero harm, to the estate and to everything else that's being

24   prosecuted.

25             Now the next prong of this is I want to have the stay

1   extended and everything else stopped until the next -- the

2   expiration of exclusivity at which point I'd like you to come

3   back and we reconsider where we are and whether or not Mr. Veer

4   is entitled to further relief, either a lifting of the stay or

5   relief from the stay to conduct further discovery.  So I am not

6   throwing you out indefinitely.  I am --

7            MR. FEARON:  And the way we understand it, it's 120

8   days from next week.

9            THE COURT:  I think it's July 6 is the date that

10  exclusivity terminates.  Now what will happen of course is it's

11  highly likely that the Debtors are going to ask for a further

12  extension of that period but by that time, I think a lot's going

13  to happen in the case.

14           MR. FEARON:  So, Your Honor, do you envision us then

15  coming back in early July --

16           THE COURT:  Yes.

17           MR. FEARON:  -- regardless of whether the Debtor makes

18  the application to extend the exclusivity?

19           THE COURT:  Well you can come back if you want.  If

20  you don't want to come back, I'm not going to force you to come

21  back.  But I will hear you again at the expiration of

22  exclusivity if you want to be heard again.  If not, I am going

23  to continue -- I'll continue the stay in effect.

24           MR. FEARON:  Okay.

25           THE COURT:  So we can pick a date or you can let us

1    know.

2              MR. FEARON:  Perhaps we can consult with Debtors

3    counsel.

4              THE COURT:  I think that would be --

5              MR. FEARON:  And choose a date that works for

6    everyone.

7              THE COURT:  -- a good idea but I caution you to not --

8    to stick with the letter and the spirit of what I am doing today

9    which is to give you something that I think is meaningful and

10   that gives you something to move the ball forward with without

11   interfering in any significant way with everything that the

12   Debtor has on its plate.  You can choose or not to go to Judge

13   Baer and ask for additional relief.  That's your call.

14             MR. FEARON:  Obviously we want to tell Judge Baer

15   what's happened, so that he knows about it and he's got an order

16   telling us to do certain things by certain dates.

17             THE COURT:  And my ruling means, of course, no

18   disrespect to Judge Baer and I have observed it several times,

19   that his schedule was entered before the bankruptcy proceeding

20   was commenced and before the litigation in all the other arenas

21   really ramped up.  But I think he might be interested in hearing

22   how many different places this is being litigated.  And by this,

23   I mean the Ambac situation generally.

24             MR. FEARON:  Yeah, we obviously have an interest in

25   making sure that Judge Baer knows about it, simply so that we

1  don't find ourselves in a situation on the plaintiff's side

2  where we say to him on June 300 --

3              THE COURT:  Certainly.

4              MR. FEARON:  -- oh, Judge, by the way we never did --

5              THE COURT:  Right.  And I won't consider it a

6  violation of the order that I'll enter on today's proceedings

7  for you to inform Judge Baer as to what's going on.

8              MR. FEARON:  That's what I was going to ask you.

9              THE COURT:  Yeah.

10             MR. FEARON:  All right.

11             THE COURT:  So, can I place on more burden on you to

12 work together on an appropriate order that reflects what we've

13 decided --

14             MR. REINTHALER:  Yes, Your Honor.

15             THE COURT:  -- what I've decided here today?

16             MR. REINTHALER:  I was going to say that we will

17 modify the order that we proposed.

18             THE COURT:  Very well.

19             MR. REINTHALER:  We'll send it to Mr. Fearon for

20 review first and then we'll transmit it to the Court.

21             THE COURT:  Okay.

22             MR. REINTHALER:  All right.

23             MR. FEARON:  Your Honor, is it okay if we do that on

24 Monday --

25             THE COURT:  OF course.

1          MR. FEARON:  -- if we get it to you by Monday?

2          THE COURT:  Absolutely.

3          MR. FEARON:  Okay.

4          THE COURT:  Absolutely.  And if it takes you a day or

5    two, that's fine.  Anything else?

6          MR. REINTHALER:  The only other two minor points I

7    want to make is you did ask if there were going to be any other

8    issues.  The only thing that I want to note is that when we -- I

9    haven't gone through the minutes of all of the board meetings.

10          THE COURT:  Yes, right, right.

11          MR. REINTHALER:  And there may very well be issues

12   that are discussed within the confines of the board that could

13   be sensitive.  And in our view, and we may have a difference of

14   opinion on the relevance of that discussion to the litigation,

15   so there could be issues with regard to board minutes.  I doubt

16   that there will be issues.  I can't -- I don't want to say

17   definitely but I doubt there will be issues on the other

18   requests.

19          THE COURT:  Okay.  All right.  Well that was -- when I

20   said it's subject to the usual privilege and the like --

21          MR. REINTHALER:  Right.  And the final thing, just

22   with regard to Mr. McKinnon because he's going to want to know

23   the answer to this question -- not Mr. McKinnon, Mr. Bienstock,

24   the -- as I understand it, the individual defendants in the

25   ERISA action have not refused to have their depositions taken.

1   What they did is they said they only want to be deposed once.

2   So Mr. Bienstock's going to want to know that if he's going to

3   be deposed now, is he going to get hauled back for further

4   depositions after documents?

5           THE COURT:  Well that's a difficult one because in my

6   attempt to be Solomonic here, we're offering up Mr. Bienstock

7   before the plaintiff has the advantage of having the documents.

8   So I don't think that it -- while I'm sympathetic to the I want

9   to do this once and only once point, I don't think it would be

10  fair to the plaintiff to say that they can't come back again in

11  the event that as and when there's a more fulsome document

12  production if they have questions to ask him.  I would say that

13  he -- they don't get two bites at the apple to ask the same

14  questions but I think it would be unfair to give him an ironclad

15  assurance that he doesn't have to come back again.  I don't know

16  how to get around that.

17          MR. REINTHALER:  I know he would ask the question and

18  we want to be able to answer it.

19          THE COURT:  I can --

20          MR. FEARON:  Your Honor, as I mentioned to Debtor's

21  counsel before and when we talked about the possibility of some

22  depositions, we're not interested in hauling a person in and

23  asking him the same question over and over again.

24          THE COURT:  Well, you won't.  I won't let it --

25          MR. FEARON:  We know that.

1          THE COURT:  I mean in my courtroom, I won't let you do

2     that.

3          MR. FEARON:  We know that.

4          THE COURT:  But if the documents -- as and when the

5     documents are produced, to the extent that there are questions

6     that you would need to ask of him that, for example, maybe he's

7     on a document with other individuals who you've yet to depose

8     and you can get your questions answered through them.

9          My point is, no duplication.  I think he can be

10    assured that he's not going to be subjected to the same set of

11    questions more than once but there may be some matters that he

12    may have to give testimony on after the documents are produced.

13         MR. FEARON:  Your Honor, could I just ask one other

14    question?

15         THE COURT:  Sure.

16         MR. FEARON:  The way we have it now, we had made a

17    motion to serve a proposed subpoena on the Debtor.  We never

18    actually served the subpoena on the Debtor.  Should we do that?

19    Should we modify the subpoena and serve it or is it good enough

20    that we've already submitted the proposal?

21         THE COURT:  I think I am not following the question.

22         MR. FEARON:  We never formally served the subpoena.

23         THE COURT:  You mean for the one through five?

24         MR. FEARON:  Yes.

25         MR. REINTHALER:  I don't --

1          THE COURT:  Do you care?

2          MR. REINTHALER:  I don't think we need to be formally

3  served with a subpoena.

4          THE COURT:  I think --

5          MR. REINTHALER:  And I think the order will clarify --

6          THE COURT:  I think so, too.

7          MR. FEARON:  That's fine.

8          THE COURT:  I would just -- I want to try to keep this

9  easy and as uncomplicated as possible.

10         MR. FEARON:  Okay.  I appreciate that.

11         THE COURT:  All right?

12         MR. FEARON:  Yes.

13         MR. REINTHALER:  Thank you, Your Honor.

14         MR. FEARON:  Thank you, Your Honor.

15         THE COURT:  I think we're done.  I will wait to look

16  at your order and hopefully you can agree on it.  All right?

17         MR. REINTHALER:  Yes.

18         THE COURT:  All right.  Thank you folks.  Have a nice

19  weekend.

20         MR. FEARON:  Thank you.

21         MR. REINTHALER:  Thank you, Your Honor.

22                         - o0o -

23

24

25

CERTIFICATION

I, Linda Ferrara, certify that the foregoing is a
correct transcript from the official electronic sound recording
of the proceedings in the above-entitled matter.

Dated:  March 7, 2011

_____
Signature of Approved Transcriber