MICHAEL A. CARDOZO                    **Hearing Date: July 19, 2011**
Corporation Counsel of the              **Hearing Time: at 10:00 a.m.**
  City of New York
Attorney for the City of New York
  Department of Finance
100 Church Street, 5th Floor
New York, New York 10007
Tel: (212) 788-0704
Fax: (212) 788-0937


UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------X
In re                                                 :
                                                      :                    **Chapter 11**
                                                      :
          AMBAC FINANCIAL GROUP, INC.,                :          Case No. 10-15973 (SCC)
                                                      :
                                                      :
                                          Debtor.  :
------------------------------------------------------------------X


**RESPONSE IN OPPOSITION TO AMBAC FINANCIAL GROUP, INC.'S
OBJECTION AND REQUEST TO DISALLOW THE PROOF OF CLAIM
FILED BY THE CITY OF NEW YORK  DEPARTMENT OF FINANCE__**


TO:     THE HONORABLE SHELLEY C. CHAPMAN
          UNITED STATES BANKRUPTCY JUDGE


        The Department of Finance of the City of New York (the "City"), by and through its

counsel, MICHAEL A. CARDOZO, Corporation Counsel of the City of New York, respectfully

submits this response in opposition to the objection of Ambac Financial Group, Inc. (the

"Debtor"), dated May 23, 2011 [Docket No. 278] (the "Objection"), and its accompanying

request to disallow the City's proof of claim, dated December 14, 2010 [Claim No. 4] (the

"Proof of Claim").  In essence, the Debtor's Objection requests that the Court disallow the City's

claim for unpaid general corporation taxes because the Proof of Claim fails to explain the

methodology employed in arriving at the asserted tax deficiencies, and further, because the Debtor "speculates" that the methodology employed is unfounded.

As a preliminary matter, the Debtor has entirely failed to carry its burden of proof with respect to its Objection and request to disallow and expunge the Proof of Claim. In order to overcome the *prima facie* validity of the City's statutorily-derived tax claim, the Debtor must demonstrate the erroneousness of both the deficiency and the methodology used to calculate it, by clear and convincing evidence. Debtor offers no evidence at all. Moreover, given the Debtor's direct involvement with the City's audit over a period spanning more than six years, the Debtor should be fully aware of the precise factual and legal grounds supporting the tax deficiencies underlying the City's Proof of Claim. Nevertheless, and as is described more fully below, the methodology employed in calculating such deficiencies is rational, reasonable, and fully in accord with applicable City tax law. Accordingly, the relief requested by the Debtor in its Objection must be denied in all respects.

## BACKGROUND

### A. The Audit of the 2000 Through 2002 Tax Years

1.    Following a series of routine requests to extend the time for filing its combined New York City general corporation tax ("GCT") returns, Debtor filed returns for the 2000, 2001, and 2002 tax years on or about January 31, 2002, January 31, 2003, and February 5, 2004, respectively. A copy of the Debtor's 2000 GCT return is annexed hereto as the City's exhibit "A"; a copy of the Debtor's 2001 GCT return is annexed hereto as the City's exhibit "B"; and a copy of the Debtor's 2002 GCT return is annexed hereto as the City's exhibit "C".[1]

---

[1] One component of the Debtor's yearly GCT return is its contemporaneously-filed federal income tax return. Due to their voluminous size, however, the Debtor's federal income tax returns have not been filed electronically as exhibits along with the Debtor's GCT returns. Such federal returns are available upon request, and will also be available at the scheduled hearing date.

2.     Shortly thereafter, the City commenced an audit of the 2000 through 2002 tax years, which were collectively designated as audit case number 010487965-S.  Following an initial review, the City issued a letter to the Debtor highlighting specific issues identified at audit relating to the Debtor's returns.  Copies of the various communications between the City and the Debtor in connection with the audit of the 2000 through 2002 GCT returns, to the extent referenced herein, are indexed chronologically and collectively annexed hereto as the City's exhibit "D".  *See* the City's September 2, 2004 letter, Ex. D at 1.[2]

3.     On or about September 15, 2004, the Debtor executed the first of a series of waivers extending the statute of limitations for the City's assessment of GCT.  These waivers are routinely executed by taxpayers while an audit is still pending in order to allow the City and the taxpayer additional time to continue discussions and the sharing of information, and to prevent the City from issuing a notice of determination on less than complete information.  A notice of determination is the statutory notice that becomes a final tax assessment against a taxpayer if a conciliation conference is not requested with the Department of Finance, or a petition is not filed with the Tax Appeals Tribunal of the City of New York (the "Tribunal") within ninety (90) days of its issuance.  *See* New York City Administrative Code (the "NYC Admin. Code") § 11-672(1), (2).  Once a tax is assessed, it is no longer subject to challenge.  The Debtor's September 15, 2004 waiver extended the statute of limitations for the January 1, 2000 through December 31, 2000 tax period until December 31, 2005.  Copies of the waivers executed by the Debtor during the pendency of the audit of its 2000 through 2002 GCT returns are indexed chronologically and collectively annexed hereto as the City's exhibit "E".  *See* the Debtor's September 15, 2004 waiver, Ex. E at 1.

---

[2] All of the exhibits electronically filed in .PDF format with the Court have been renumbered so that the page numbers referenced in this response correspond to the actual pages of the exhibits, without consideration for any other matter such as cover pages or indexes, where applicable.

4.     On February 7 and 14, 2005, certain discussions were held between the City and the Debtor.  During those discussions, the Debtor agreed to provide a breakdown of its loan and interest expense by March 4, 2005, among other documentation relevant to the City's audit.  The substance of those discussions was thereafter memorialized in a letter to the Debtor, dated March 10, 2005, which also contained a request for information.  *See* the City's March 10, 2005 letter, Ex. D at 3.

5.     Despite the City's requests, information from the Debtor was not forthcoming.  Accordingly, by letter dated May 9, 2005, the City again requested certain information related to its audit of the Debtor's GCT returns.  In addition, the City requested a meeting at the Debtor's offices in New York City in order to review the Debtor's consolidated federal returns, along with any relevant supporting documentation it was able to provide.  *See* the City's May 9, 2005 letter, Ex. D at 7.

6.     As a result of the City's May 9th request, another series of discussions were held between the City and the Debtor from June 22 through 24, 2005.  During those discussions, various audit issues were raised and the Debtor again agreed to provide documentation in support of the positions taken in its GCT returns.  By letter dated July 5, 2005, the City memorialized the substance of the June 2005 discussions, and reiterated its requests for information.  *See* the City's July 5, 2005 letter, Ex. D at 8.

7.     The Debtor again did not respond to the City's requests for information.  So, on or about September 23, 2005, the City sent yet another letter to the Debtor, which, in addition to reiterating its requests for information, also formally invited the Debtor's comments regarding the issues raised in the June 2005 discussions and subsequent July 5, 2005 letter.  *See* the City's September 23, 2005 letter, Ex. D at 10.

8.      On or about November 16, 2005, the Debtor executed a waiver further extending the statute of limitations for assessment, for the 2000 and 2001 tax years, until December 31, 2006.  *See* Ex. E at 2.

9.      Having received no relevant information substantiating the various positions set forth in the Debtor's tax filings, and having received no explanation as to why the City's view of the Debtor's GCT returns was incorrect, on or about April 17, 2006, the City issued a "Notice of Proposed Tax Adjustment(s)" (a "NOPTA") for the 2000 through 2002 tax years reflecting a total additional tax due of $50,834,853.45, including penalties and statutory interest calculated to May 31, 2006.  A notice of proposed tax adjustment is a precursor to the issuance of a notice of determination, and places a taxpayer on notice that absent additional information, it is possible that the City will assess additional taxes in a specified amount, and also sets forth the grounds for any such assessment.  A copy of the April 17, 2006 notice of proposed tax adjustments (the "First NOPTA") is annexed hereto as the City's exhibit "F".  On page three of the First NOPTA, the City clearly articulates the grounds for each of the proposed adjustments, along with the resultant numerical effects on the Debtor's tax liability.  *See* Ex. F at 3.

10.     In response to the City's First NOPTA, as well as the City's communications from March 10, May 9, and July 5, 2005, the Debtor issued a three-page letter, dated May 12, 2006, outlining the nature of its businesses and including various attachments.  *See* the Debtor's May 12, 2006 letter, less attachments, Ex. D at 11.

11.     Shortly thereafter, the Debtor requested an "exit conference" to discuss the results of the City's audit.  In connection with that request, the City sent the Debtor a letter dated May 19, 2006, requesting that certain documentation be provided at the exit conference.  *See* the City's letter dated May 19, 2006, Ex. D at 14.  That exit conference was subsequently held in

abeyance at the Debtor's request in order to provide Grant Thornton LLP ("Grant Thornton"), an accounting firm the Debtor had recently retained, the additional time it needed to review the issues under dispute. *See* a copy of Grant Thornton's request to hold the exit conference in abeyance, dated June 7, 2006, Ex. D at 16.

12. On or about October 18, 2006, the Debtor executed a waiver further extending the statute of limitations for assessment, for the 2000 through 2002 tax years, until December 31, 2007. *See* Ex. E at 3.

13. On December 12, 2006, a meeting was held between the City and the Debtor's representatives at the offices of Grant Thornton. The next day the City again forwarded a request for additional information, and memorialized the substance of the previous day's discussions and the City's view of the tax issues involved. *See* the City's December 13, 2006 letter, Ex. D at 17.

14. On or about February 1, 2007, the City received a letter from Grant Thornton formally protesting the City's First NOPTA, and providing for the first time a discussion of the Debtor's interest expenses along with an attached schedule. Approximately three weeks later, Grant Thornton sent the City an additional letter requesting an exit conference to discuss the audit results. *See* the Grant Thornton letters dated February 1 and 22, 2007, less attachments, Ex. D at 20, 22.

15. Thereafter, by letters dated May 10 and 15, 2007, Grant Thornton issued additional responses to the First NOPTA, setting forth additional attachments, and an explanation of a *pro forma* return filed by one of Debtor's affiliates. *See* the Grant Thornton letters dated May 10 and 15, 2007, less attachments, Ex. D at 23, 28.

16.     On or about October 26, 2007, the Debtor executed separate waivers further extending the statute of limitations for assessment for the 2000 through 2002, and 2003 tax years until December 31, 2008.  *See* Ex. E at 4-5.

17.     Then, on November 7, 2008 and December 11, 2008, the City issued two additional NOPTAs in the amounts of $2,779,013.78 and $1,761,989.21, respectively.  These adjustments to the Debtor's proposed tax deficiencies by notice reflect the evolution of the City's and the Debtor's discussions and the City's receipt and review of certain additional information.  Notices of proposed tax adjustment are not binding on the City and any information reflected in such notices is primarily intended to spur further discussion with the taxpayer, which is precisely what followed here.  Only a notice of determination represents an attempt by the City to actually assess a tax deficiency.  A copy of the November 7, 2008 NOPTA is annexed hereto as the City's exhibit "G".[3]  Again, on page three of the November 7, 2008 NOPTA the City clearly articulated the grounds for each of the proposed adjustments, along with the resultant numerical consequences for the Debtor's tax liability.  *See* Ex. G at 3.  Both of the 2008 NOPTAs were ultimately superseded by a fourth NOPTA, reflecting the City's receipt of additional information, which provided a more complete picture than was provided in late 2008.

18.     In between the City's issuance of the referenced NOPTAs, on or about November 18, 2008, the Debtor executed an additional waiver further extending the statute of limitations for assessment for the 2000 through 2005 tax years until December 31, 2009.  *See* Ex. E at 6.

19.     On or about February 9, 2009, Grant Thornton issued another formal response, this time to the December 11, 2008 NOPTA.  That letter eventually led to a March 26, 2009

---

[3] Although it is irrelevant to the Court's determination of the Debtor's Objection, the December 11, 2008 NOPTA was not included in the City's audit file and therefore could not be included as an exhibit to this response.  The date of the December 11, 2008 NOPTA and the amount set forth therein are confirmed by the February 9, 2009 Grant Thornton letter.  *See* Ex. D at 30.

meeting regarding the Debtor's combined returns and a non-combined subsidiary, Ambac Assurance Corporation ("AAC").  *See* Grant Thornton's February 9, 2009 letter, Ex. D at 30.

20.      On or about July 30, 2009, Grant Thornton LLP provided another letter, attempting to respond to certain of the City's assertions at the March 26, 2009 meeting. Accompanying that letter was a schedule purporting to support Grant Thornton's view of the Debtor's tax position.  The July 30, 2009 letter was then followed up with a September 1, 2009 letter from Grant Thornton, again attempting to address certain positions espoused by the City at audit.  *See* the Grant Thornton July 30, 2009 and September 1, 2009 letters, less attachments, Ex. D at 36, 38.

21.      On or about September 21, 2009, as a direct consequence of additional information provided by the Debtor, the City issued a final NOPTA (the "Final NOPTA") in the total amount of $43,807,163.80, including penalties and interest calculated to October 31, 2009. A copy of the Final NOPTA is annexed hereto as the City's exhibit "H".

22.      On or about October 16, 2009, the Debtor executed an additional waiver extending the statute of limitations for assessment for the 2000 through 2005 tax years until December 31, 2010.  *See* the Debtor's October 16, 2009 waiver, Ex. E at 7.   Since the Debtor filed its Chapter 11 petition on November 8, 2010 (the "Petition Date"), no further waivers were executed.

23.      By letter dated December 21, 2009, Grant Thornton requested an exit conference to further discuss the results of the City's audit.  *See* Grant Thornton's December 21, 2009 letter, less attachments, Ex. E at 42.  That exit conference was thereafter adjourned at Grant Thornton's request, but was eventually held on or about February 11, 2010.  The Debtor's Managing

Director and Director of Tax, R. Wes Kirchhoff, and the Debtor's representative from Grant Thornton, Jack Wong, were both present at that exit conference.

24.     That same day, Grant Thornton issued a letter memorializing the Debtor's position as set forth at the exit conference.  *See* Grant Thornton's February 11, 2010 letter, Ex. D at 43.

25.     On September 9, 2010, the City issued a notice of determination in the total amount of $42,339,397.95 (the "Notice of Determination"), including statutory interest, but not asserting any penalties.  A copy of the City's September 9, 2010 Notice of Determination is annexed hereto as the City's exhibit " I".  Once again, on page three of the Notice of Determination, the City clearly articulated the grounds for each of the asserted adjustments, along with the resultant numerical consequences for the Debtor's tax liability.  *See* Ex. I at 3.  Moreover, the Notice of Determination also included three pages of schedules setting forth the precise calculations underlying the asserted deficiencies, in addition to certain audit case summary report spreadsheets.  *See* Ex. I at 4-6, 8-9.  The issuance of that notice began the running of the 90-day statute of limitations for the Debtor to either request a conciliation conference with the Department of Finance or file a petition with the Tribunal.  *See* Ex. I at 1; *see also* NYC Admin. Code § 11-672(1), (2).

26.     In this instance, the Debtor chose the former option and filed a conciliation conference request with the City on or about October 6, 2010.  A copy of the Debtor's conciliation request is annexed hereto as the City's exhibit "J".  Contrary to the Debtor's claims, however, the noted conciliation conference was in no way the result of "the continued failure of [the City] to explain to the Debtor the basis for the assessment of additional taxes . . . ."  *Compare* Objection ¶ 28; *with* Ex. J at 5-13.  Rather, in light of the detailed, albeit erroneous,

objections to the Notice of Determination set forth in the Debtor's own conciliation request, coupled with the breadth of the Debtor's own involvement in the audit process, the Debtor was, and still is, fully aware of the grounds for the City's attempt to assess additional taxes owed. *See* Ex. J at 5-13; *see also supra* at ¶¶ 3-25. These grounds are described more fully below.

27.     Instead, and as is the case with most taxpayers, the Debtor likely filed a conciliation conference request in order to prevent the 90-day statute of limitations from lapsing, to prevent the Notice of Determination from becoming a final assessment subject to collection, and to allow the Debtor additional time and a different forum in which to try to convince the City of the propriety of its tax position. *See generally* Ex. J.

28.     The automatic stay imposed at the outset of this case prevented that conciliation conference from ever taking place, and instead, the City filed the Proof of Claim at issue.

**B.  The 2003 Through November 8, 2010 Tax Years**

29.     The Debtor filed GCT returns for the January 1, 2003 through December 31, 2008 tax years in accordance with the following schedule:

| Tax Year | GCT Return Filing Date |
|----------|------------------------|
| 2003 | January 7, 2005 |
| 2004 | January 9, 2006 |
| 2005 | January 4, 2007 |
| 2006 | March 14, 2008 |
| 2007 | March 12, 2009 |
| 2008 | March 15, 2010 |

Copies of the Debtor's 2003 through 2008 GCT returns are organized chronologically and annexed hereto as the City's exhibit "K".[4]

---

[4] For ease of reference, each of the individual tax years has been "bookmarked" in the .PDF document electronically filed with the Court. The accompanying Federal income tax returns are available upon request. *See supra* at n.1.

30.     On or about March 15, 2011, following the filing of the City's Proof of Claim in this case, the Debtor delivered a 2009 GCT return to the City.  Contrary to the Debtor's assertion (Objection ¶ 34), its 2009 return was never "properly" filed as Debtor did not also include with it the tax group's form 1120 consolidated federal income tax return.  Moreover, and again, contrary to the Debtor's assertion (*id.*), as of the date of this response the Debtor has never filed a GCT return relating to the 2010 partial tax year.[5]  Rather, with respect to the 2010 partial tax year, the Debtor has only filed an "application for an automatic 6-month extension of time to file" its GCT return.  Copies of the Debtor's 2009 GCT return and 2010 application for an extension of time are organized chronologically and annexed hereto as the City's exhibit "L".[6]  Thus, given that the Debtor's filings are incomplete for the 2009 tax year and 2010 partial tax year, notwithstanding any of the City's substantive arguments as to the remaining eight tax years at issue, it is incongruous for the Debtor to claim that its "records reflect that [the City] is owed nothing."  Objection ¶ 35.

## C.  The City's Proof of Claim

31.     On or about December 14, 2010, the City filed its Proof of Claim in the amount of $116,817,949.00, which encompasses the 2000 tax year through the 2010 partial tax year.  The first component of the Proof of Claim is the audited 2000 through 2002 GCT liabilities as asserted in the Notice of Determination ($42,339,397.95), coupled with additional statutory interest calculated to the Petition Date.  Since the 2003 through 2010 tax years were never audited, however, and since the Debtor's post-2002 returns reflect the same erroneous reporting positions as set forth in the previously-audited returns, only a rough estimate of the 2003 through

---

[5] The 2010 partial tax year encompasses the period from January 1, 2010 through November 8, 2010—the Petition Date.

[6] For ease of reference, each of the individual tax years has been "bookmarked" in the .PDF document electronically filed with the Court.

2010 tax years could be provided to the Court at the time of the filing of the City's Proof of Claim. Those estimates, plus applicable statutory interest calculated to the Petition Date, were added to the figure set forth in the Notice of Determination.

32.     The City has since conducted a general review of the returns filed in connection with the 2003 through 2008 tax years in an effort to formulate a more precise numerical accounting of the Debtor's outstanding tax deficiencies. In doing so, the City employed the same methodology utilized in connection with its audit of the 2000 through 2002 tax years, which is described in greater detail below. As a consequence of that review, the City is now able to assert that the Debtor's outstanding GCT deficiencies for the 2003 through 2008 tax years are as follows, including statutory interest calculated to the Petition Date:

| Tax Year | Adjusted GCT Liability |
|---|---|
| 2003 | $ 4,993,613.97 |
| 2004 | $ 8,709,970.83 |
| 2005 | $11,810,616.34 |
| 2006 | $18,320,574.12 |
| 2007 | $ 8,606,280.09 |
| 2008 | $ 2,975,740.09 |
| **Total:** | **$55,416,795.44** |

Copies of the workpapers setting forth the calculations leading to these revised deficiencies are annexed hereto as the City's exhibit "M".

33.     Given that the City lacks the information it requires in order to apply the same methodology to the 2009 tax year and 2010 partial tax year, insofar as it does not have a complete set of GCT returns for either year, the City maintains the propriety of its initial estimates with the proviso that it is willing to revisit such calculations at such time as the Debtor is able to provide the necessary GCT return information. In the aggregate, however, it is clear that the amount of the City's Proof of Claim is appropriate, and in fact, depending on the results

of the City's review of the 2009 and 2010 tax years, the true amount of taxes due may be even greater than the amount set forth in the Proof of Claim.[7]

34.     Regardless of the amount ultimately allowed in connection with the City's Proof of Claim, it is nevertheless clear that all of the unpaid taxes claimed by the City in this case are entitled to eighth priority treatment pursuant to section 507(a)(8)(A) of title 11 of the Bankruptcy Code (the "Code").  In relevant part, section 507(a)(8)(A) provides:

> (a) The following expenses and claims have priority in the following order:
>
> . . . .
>
> (8) Eighth, allowed unsecured claims of governmental units, only to the extent that such claims are for—
>
>> (A) a tax on or measured by income or gross receipts for a taxable year ending on or before the date of the filing of the petition—
>>
>>> (i) for which a return, if required, is last due, including extensions, after three years before the date of the filing of the petition;
>>>
>>> . . . ; or
>>>
>>> (iii) . . . not assessed before, but assessable, under applicable law or by agreement, after, the commencement of the case;

11 U.S.C. § 507(a)(8)(A).

35.     Generally speaking, the GCT is a tax on entire net income as calculated by the "receipts received in or by reason of any transaction had and consummated in the city . . . ."  *See* NYC Admin. Code § 11-603.  Accordingly, the GCT fits neatly within section 507(a)(8)(A)'s condition that the claim be for "a tax on or measured by income or gross receipts" in order to

---

[7] The outcome of the litigation concerning the Debtor's federal tax liability may also further affect the Debtor's tax liability to the City.

enjoy eighth priority. *See* 11 U.S.C. § 507(a)(8)(A). Moreover, all of the taxes at issue satisfy

the additional requirement that they involve "a taxable year ending on or before the date of the

filing of the petition." *See id.* (The tax liabilities set forth by the Proof of Claim accrued between

January 1, 2000 and November 8, 2010, the Petition Date, and relate only to those pre-petition

tax years).

36.     Code section 507(a)(8)(A)(i) provides eighth priority for tax claims for which a

tax return became due within the three years prior to the filing of the bankruptcy petition.

Accordingly, the City may appropriately claim eighth priority over taxes owed by the Debtor for

the tax years for which returns were last due after November 8, 2007, which, as a result of the

timing of the due dates of the Debtor's returns, encompasses the 2006, 2007, 2008, 2009, and

2010 tax years.[8] *See* 11 U.S.C. § 507(a)(8)(A)(i).

37.     As to the remaining tax years (2000 through 2005), subdivision (iii) of that same

section of the Code provides for priority status over unsecured claims for taxes "not assessed

before, but assessable, under applicable law or by agreement, after, the commencement of the

case." 11 U.S.C. § 507(a)(8)(A)(iii). As was highlighted above, the January 1, 2000 through

December 31, 2005 tax years were held open for assessment until December 31, 2010, after the

Petition Date, pursuant to a series of agreements with the Debtor that waved the applicable

statute of limitations. *See id.*; *see also* Ex. E.

**D.  The Debtor's Objection to the City's Proof of Claim**

38.     On or about May 23, 2011, the Debtor filed an Objection to the City's Proof of

Claim, along with a request that the City's Proof of Claim be disallowed and expunged in its

entirety. The Debtor articulates two reasons for its Objection: (i) that the City's Proof of Claim

---

[8] Debtor's 2006 tax return became due for filing on or before March 17, 2008 as a result of a routine series of
extensions of time requested by and provided to the taxpayer. The returns for all of the subsequent years became
due for filing within the statutory period provided by 11 U.S.C. § 507(a)(8)(A)(i) under similar circumstances.

lacks an explanation as to how the City arrived at its calculation of the Debtor's tax deficiencies and therefore fails to establish a right to payment; and (ii) that the Debtor believes, albeit somewhat incongruously, that the methodology employed by the City in calculating the Debtor's tax deficiencies is erroneous. *See* Objection ¶¶ 2-5. In support of its Objection the Debtor repeatedly claims ignorance of the several problems with its filing position as highlighted at audit, despite the nearly six years during which it directly participated in such audit and despite the clear articulation of the grounds supporting the assertion of the deficiencies at issue both in the City's NOPTAs and ultimately, in the Notice of Determination—all of which were highlighted by the Debtor's own papers. *See id.* ¶¶ 2, 23-28, 30, 36 (where the Debtor claims, "[t]o date, [the City] has failed to explain its calculation of the alleged tax liability asserted in the Claim"). Then, in further support of its Objection, the Debtor offers an overly-simplistic and skewed analysis of the City's position, while not even attempting to demonstrate the impropriety of the City's calculations or the reasonableness of the Debtor's own filing position. *See id.* ¶ 3-4, 12, 22, 31, 37-41. Neither approach has any merit.

39. Given that the burden of proof on an objection to a tax claim is the same as it otherwise is when a Debtor chooses to file a petition with the City Tribunal and challenges its GCT deficiencies in that forum rather than in a bankruptcy court (*see infra*), the Debtor's Objection does nothing at all to vitiate the City's *prima facie* entitlement to payment, and accordingly, the relief requested by the Objection must be denied in its entirety.

## THE BURDEN OF PROOF ON AN OBJECTION TO A TAX CLAIM

40. The City's Proof of Claim is *prima facie* valid. *See* Fed. R. Bankr. P. 3001(f). Rule 3001(f) "commands that a properly filed proof of claim constitutes *prima facie* evidence of the claim's validity." *In re St. Johnsbury Trucking Co.*, 206 B.R. 318, 323 (Bankr. S.D.N.Y.

1997); *see also In re Finova Capital Corp.*, 356 B.R. 609, 623 (Bankr. D.Del. 2006); *In re Pinnacle Brands, Inc.*, 259 B.R. 46, 49-50 (Bankr. D. Del. 2001). Supporting documentation is not required since the City's Proof of Claim is based on a statutory obligation for taxes. *See In re Los Angeles Int'l Airport Hotel Assocs.*, 196 B.R. 134 (9th Cir. BAP 1996) (failure to attach documentation to support a claim based on a statute does not deprive the claim of *prima facie* validity), *aff'd* 106 F.3d 1479 (9th Cir. 1997); *see also U.S. v. Braunstein (In re Pan)*, 209 B.R. 152, 156-57 (D. Mass. 1997) (a properly filed proof of claim constitutes *prima facie* evidence of the government's claim even though no documentary evidence of the claim is provided). Here, there is no dispute that the City's Proof of Claim is a statutorily-derived tax claim, and, therefore, is *prima facie* valid.

41.     Since the City has established its *prima facie* case, the burden going forward shifts to the Debtor to produce evidence sufficient to negate the *prima facie* validity of the filed claim. *See In re Make Meat Corp*, 1999 U.S. Dist. LEXIS 3974 (S.D.N.Y. 1999); *In re Finova Capital Corp.*, 356 B.R. 609, 623 (D. Del. 2006); *In re Mariner Post-Acute Network, Inc.*, 2005 U.S. Dist. LEXIS 13673 at *4-5 (D. Del. 2005); *In re Touch America Holdings, Inc.*, 2007 Bankr. LEXIS 4167 (Bankr. Del. 2007).

42.     The Debtor apparently believes that it has met its burden of negating the validity of the City's Proof of Claim simply by asserting that its books and records do not reflect such liability. *See* Objection ¶ 35. This type of argument, however, has been rejected by courts as insufficient to rebut the presumption of a claim's validity. *See In re Allegheny International, Inc.*, 954 F.2d 167, 173-74 (3rd Cir. 1992) (objector must produce evidence equal in force to the *prima facie* case); *In re King Street Investments, Inc.*, 219 B.R. 848 (9th Cir. BAP 1998) (objector must produce evidence and show facts tending to defeat the claim by probative force

equal to that of the allegations of the proofs of claim themselves); *see also St. Johnsbury*, 206 B.R. at 323 (Bankr. S.D.N.Y. 1997), *aff'd* 221 B.R. 692 (S.D.N.Y. 1998), *aff'd* 173 F.3d 846 (2d Cir. 1999) (where, despite a similar assertion made by the debtors, the trial proved the correctness of the taxing authority's deficiency claim against the debtors).

43.     Indeed, throughout its papers the Debtor silently relies on a "burden shifting" tactic to buttress nearly its entire Objection to the City's Proof of Claim.  Yet at the same time, the Debtor fails to cite any legal authority whatsoever supporting its position that the City's Proof of Claim must be disallowed and expunged.  In fact, the Debtor entirely ignores controlling case law, *Raleigh v. Illinois. Dep't of Revenue*, 530 U.S. 15 (2000), which conclusively resolved a split among the various federal circuits concerning the appropriate allocation of the burden of proof in a bankruptcy tax case.[9]  The Supreme Court in *Raleigh* held that bankruptcy <u>does not alter</u> the burden imposed by the substantive law underlying the tax obligation, which, in the GCT context, places the burden on the taxpayer:

> Creditors' entitlements in bankruptcy arise in the first instance from the underlying substantive law creating the debtor's obligation, subject to any qualifying or contrary provisions of the Bankruptcy Code . . . . "Unless some federal interest requires a different result, there is no reason why [the state] interests should be analyzed differently simply because an interested party is involved in a bankruptcy proceeding."

*Id.* at 20-21, *citing Butner v. U.S.*, 440 U.S. 48, 55 (1978).  Since the City's Administrative Code places the burden of proof on the taxpayer, the Debtor, and not the City, has the burden of providing clear and convincing evidence disproving the amount of the City's presumptively valid Proof of Claim.  *See* NYC Admin Code § 11-680(5) ("[i]n any case before the tax appeals

---

[9] The bankruptcy court in *St. Johnsbury* noted the conflict among circuits regarding the burden of proof in bankruptcy cases but found it "unnecessary to register with either camp."  *St. Johnsbury*, 206 B.R. at 323.  The *St. Johnsbury* decisions preceded *Raleigh*.

tribunal under this subchapter, the burden of proof shall be upon the petitioner . . . ."); *Matter of Raymond and Alice Marquez*, TAT (E) 97-107 (UB), at 18 (NYC Tax Appeals Tribunal, Appeals Division) ("the taxpayer must 'by clear and convincing evidence' establish that the deficiency and the method used to make it are erroneous."), *citing Blodnick v. New York State Tax Commission*, 124 A.D.2d 437, 438 (3d Dept. 1986).

44.     The *Raleigh* Court recognized that the burden of proof is "critical" in tax cases (whether or not in the bankruptcy context) and that there are "powerful justifications" for leaving the burden on the taxpayer, right where the local law places it.  Former Justice Souter stated as follows:

> [T]he burden of proof is an essential element of the claim itself; one who asserts a claim is entitled to the burden of proof that normally comes with it.
>
> Tax law is no candidate for exception from this general rule, for the very fact that the burden of proof has often been placed on the taxpayer indicates how critical the burden rule is, and reflects several compelling rationales: the vital interest of the government in acquiring its lifeblood, revenue; the taxpayer's readier access to the relevant information; and the importance of encouraging voluntary compliance by giving taxpayers incentives to self-report and to keep adequate records in case of dispute . . . These are powerful justifications not to be taken lightly.

*Id.* at 21 (citations omitted).

45.     Post-*Raleigh* decisions in bankruptcy tax cases have all followed the Supreme Court's guidance and placed the burden of proof on a debtor/taxpayer, requiring a debtor to disprove the validity of the governmental tax claims.  *See e.g.*, *Neilson as Ch. 7 Trustee v. United States of America (In re Olshan)*, 356 F.3d 1078 (9th Cir. 2004) (holding that the bankruptcy court erred in shifting the burden of proof and rejecting the IRS's claims, which should have

been presumed correct if supported by a minimal factual foundation); *Moser v. United States of America (In re Moser)*, 2002 U.S. App. Lexis 463, 2002-1 U.S. Tax Cas. (CCH) P50,170 (4th Cir. 2002) (affirming the bankruptcy court's finding that the debtors had failed to produce sufficient evidence to rebut the presumption of correctness that attached to the IRS's proof of claim for deficiencies); *Industrial Commercial Electrical, Inc. v. Official Committee of Unsecured Creditors (In re Industrial Commercial Electrical, Inc.)*, 319 B.R. 35 (D. Mass. 2004) (reversing the bankruptcy court's decision and remanding with direction that the court allow the IRS's administrative claim in the full amount and noting, *inter alia*, that the debtors' tactical choice of placing primary reliance on their argument that the burden of proof rested with the IRS proved incorrect); *In re Dayton Seaside Assocs, #2, L.P.*, 257 B.R. 123 (Bankr. S.D.N.Y. 2000).

46.     Accordingly, the Debtor must provide both legal and factual support for its Objection, and, just as would be the case if the Debtor had challenged its tax deficiencies by filing a petition with the Tribunal, in order to overcome the *prima facie* validity of the City's Proof of Claim the Debtor must also demonstrate the erroneousness of both the deficiency and the methodology used to calculate it, by clear and convincing evidence.  Not only has the Debtor failed to carry its heavy burden in this case, but the Debtor fails to highlight any factual or legal basis whatsoever tending to support its position that the Proof of Claim should be expunged. The City, on the other hand, is only required to provide a rational explanation of the methodology it employed in calculating the Debtor's tax deficiencies, which the City sets forth in full below.  *See, e.g.*, *Neilson as Ch. 7 Trustee*, 356 F.3d 1078 (9th Cir. 2004) (noting that a taxing authority's claims are presumed correct if supported by a minimal factual foundation).  As a consequence, the Debtor's Objection should be denied and the City's Proof of Claim sustained in its entirety.

# DISCUSSION

## A.  Overview

47.      The Notice of Determination and estimates of taxes underlying the Proof of Claim are based on the provisions of the General Corporation Tax Law set forth in Title 11, Chapter 6 of the New York City Administrative Code.  *See* NYC Admin. Code § 11-602 *et seq*.  Section 11-603(1) of the Administrative Code provides that, "[f]or the privilege of doing business, or of employing capital, or of owning or leasing property in the city in a corporate or organized capacity, or of maintaining an office in the city, for all or part of each of its fiscal or calendar years, every domestic or foreign corporation . . . shall annually pay a tax, upon the basis of its entire net income, or upon such other basis as may be applicable as hereinafter provided . . . ."

48.      At audit, the City found three errors in the Debtor's tax reporting.  These errors consist of: (i) the improper attribution of interest expense to the Debtor when it should have been allocated to the Debtor's insurance affiliate; (ii) the failure to include in its property factor rental expense for the Debtor's office space located within the City for purposes of computing the Debtor's Business Allocation Percentage (the "BAP"); and (iii) the improper characterization of certain receipts as investment income, rather than business income, for purposes of determining the receipts factor—also for purposes of determining the Debtor's BAP.

49.      The Debtor's Objection to the City's Proof of Claim demonstrates a complete lack of understanding of these tax issues, despite years of engagement with the City by the Debtor's own tax managers and the Debtor's accounting firm, Grant Thornton, each of which appeared on behalf of the Debtor and its subsidiaries during the City's audit of the 2000 through 2002 GCT returns.  *See supra* at ¶¶ 3-26.

50.     For example, the so-called "fictional bifurcation" (Objection ¶3) referred to by the Debtor is nothing more than a simple recognition by the City (and the Debtor's failure to recognize) that the Debtor's holdings consist of some entities which are subject to the City's GCT and some entities which are not subject to the GCT.  The Debtor's non-insurance affiliates filed a combined GCT return (and not a consolidated return as alleged by the Debtor).  It is these combined returns which were the subject of the City's audit and the City's tax claim in this proceeding.  Companies doing an insurance business are not subject to the GCT.  Consequently, AAC, the Debtor's insurance affiliate, is not subject to the GCT.  As set forth below, it is this split tax personality which gives rise, in part, to the Debtor's tax deficiencies.

51.     Good tax planning by the Debtor would of course seek to direct income to AAC, a nontaxable entity, while simultaneously directing deductible expenses to the taxable combined group.  Indeed, as the Second Circuit has written with respect to the federal income tax, "[t]he legal right of a taxpayer to decrease the amount of what otherwise would be his taxes, or altogether avoid them, by means which the law permits, cannot be doubted."  *Gilbert v. Commissioner*, 248 F.2d 399, 403 (2d Cir. 1957).  The key phrase in the cited passage, however, is "by means which the law permits . . . ."  Here, the Debtor has overstepped the bounds of the law by improperly reducing its taxable income subject to the GCT by deducting interest expense properly allocable to AAC, and by under-allocating income to the City.

52.     To state the issue simply, and as will be discussed futher below, during the tax years at issue the combined group's debt and its related interest expense grew year after year but there was no corresponding increase to the combined group's assets.  At the same time, however, AAC's total assets were growing and yet AAC had no demonstrable ability to purchase those assets.  Despite having been afforded ample opportunity to explain or rebut the City's findings

during and following the City's audit, the Debtor and its subsidiaries failed to provide any evidence of AAC's ability to fund the increase in its assets in the absence of debt-financed cash raised by the combined tax reporting group. As a result, the City allocated a portion of the interest expense claimed by the Debtor to AAC. This had the effect of reducing the combined group's interest expense deduction, thereby increasing its taxable income.

53.     The tax deficiencies asserted in connection with the City's Proof of Claim are valid, constitutional, fully in accord with all applicable provisions of law, and fully supported by the facts as presented to the Commissioner at audit.

**B.  The City's Audit of the Debtor's GCT Returns**

54.     We will use tax year 2000 as an example to demonstrate how the auditor adjusted the combined group's interest expense deduction. In 2000, the Debtor had originally reported $21,008,850 as directly attributable to subsidiary capital (*see* the schedule attached to the Debtor's 2000 GCT return, separately annexed hereto as the City's exhibit "N"), and hence not deductible from the Debtor's entire net income ("ENI"). *See* NYC Admin. Code § 11-602(8)(b)(6). The City accepted this number as reported.

55.     However, the City disallowed $90,544,494 of interest expense deduction because it found that this amount was indirectly attributable to subsidiary capital and therefore not deductible by the Debtor. *See* NYC Admin. Code § 11-602(8)(a)(1), (b)(6); NYC Department of Finance Tax Policy Bulletin 2-84 (April 2, 1984) (a copy of Bulletin 2-84 is annexed hereto as the City's exhibit "O"); *see also* NYS Department of Taxation & Finance, Technical Services Division, Memorandum TSB-M-88(5)C (October 14, 1988) (a copy of Memorandum TSB-M-88(5)C is annexed hereto as the City's exhibit "P") The City found that the consolidated group incurred interest expense to fund AAC's assets. Because AAC is not part of the combined GCT

return, the City disallowed a deduction for a portion of the interest expense which it attributed to subsidiary capital. The City arrived at this conclusion by examining the Debtor's and AAC's financial reports and tax returns. Copies of the workpapers for the 2000 through 2002 tax years are annexed hereto as the City's exhibit "Q".[10]

56.     Additional errors relate to the Debtor's BAP. The BAP is the statutorily prescribed formula by which a taxpayer that does business both in the City and outside the City determines its business income allocable to the City for GCT purposes. *See* NYC Admin. Code § 11-604(3)(a). Here, the auditor found that the Debtor failed to properly report its property and receipts factors.

57.     The BAP is the average of three ratios: (i) property, (ii) receipts; and (iii) payroll. *See id.* The numerator of each ratio is the amount allocable to the City; the denominator is the total 'worldwide' amount of each factor. ENI is multiplied by the BAP to determine the portion of ENI allocable to the City. The property ratio is determined by looking at the value of all real and personal property owned or rented by the Debtor within the City divided by the total worldwide value of those same assets. As is relevant here, annual gross rent for real property is multiplied by eight to determine its value for purposes of the property factor. *See* NYC Admin. Code § 11-604(3)(a)(1); 19 R.C.N.Y. § 11-64(b).

58.     The Debtor reported a "-0-" for the value of its rental property within the City. However, it is not subject to reasonable dispute that the Debtor occupied rented real property in the City at One State Street in Manhattan. As is set forth more fully below, AAC advanced the rent on the Debtor's behalf. The advances by AAC on the Debtor's behalf do not lose their

---

[10]   The City determined the amount of the interest deduction to disallow by multiplying the interest expense by a fraction, the numerator of which was subsidiary capital and the denominator of which was total assets. For ease of reference, each of the individual tax years' workpapers has been "bookmarked" in the .PDF document electronically filed with the Court.

character as rent paid by the Debtor for purposes of determining the Debtor's property factor. Indeed, 19 R.C.N.Y. § 11-64(b)(2) defines gross rents for purposes of the property factor as "the actual sum of money or other consideration payable, <u>directly or indirectly</u>, by the taxpayer <u>or for its benefit</u> for the use or possession of the property . . . ." (emphasis supplied).

59.     According to the transcript of the presentation made by Debtor's counsel to the Court at the November 9, 2010 hearing, AAC pays most of the Debtor's expenses, and is then reimbursed by the Debtor:

> THE COURT:  So money flows from AFG. Does most of it goes [*sic*] through AAC and then out into the system?
>
> MR. PADNOS:  Yes, Your Honor.  It is important to note that by virtue of the nature of the way this corporate group is set up, that AAC pays nearly all expenses on behalf of itself and all of its affiliates. And then the affiliates repay AAC for their proportional share.

Hr'g Tr. at 35, lines 4-10 [Docket No. 17].  Later in that same presentation, counsel to the Debtor confirmed that in the vast majority of cases, AAC paid the Debtor's expenses, and then recouped those amounts from the Debtor:

> But to be clear, the vast majority of the times and the dollars that we're talking about is a scenario in which AAC is making the initial payment and then recouping reimbursement from its affiliates on a proportional basis.

*Id.* at 36, lines 19-22.

60.     The City determined that among those expenses advanced by AAC is the rent for the One State Street property.  Rent for purposes of the property factor does not transmute into something else merely because the Debtor reimburses its affiliate for that expense.  19 R.C.N.Y. § 11-64(b)(2).

61.     The City also recharacterized, for purposes of calculating the Debtor's BAP, certain income as business receipts, rather than investment receipts as was originally reported by the Debtor.  For the year ending December 31, 2000, the City increased both the numerator and the denominator of the receipts factor by $273,034,304.  But the City did not just pull this number out of a hat.  It was the amount reported by the Debtor on a schedule submitted to the New York State Department of Taxation and Finance.  The Debtor identified this amount on its schedule as "Definitely Attributable to Business Income."  A copy of the referenced schedule is annexed hereto as the City's exhibit "R".  The City's recharacterization in this fashion resulted in an increase in the Debtor's receipts factor.

62.     As a result of the City's adjustments to two of the three components of the BAP, the Debtor's BAP increased.  Consequently, the portion of the Debtor's income allocable to the City increased, producing tax deficiencies.

63.     Similar adjustments, based upon actual audits, were made for the 2001 and 2002 tax years.  Analogous adjustments were made for the years 2003 through 2008.  *See generally* Ex. M.

64.     The Debtor failed to file a complete return for 2009, and requested an automatic extension to file its 2010 return.  Consequently, deficiencies for these latter years were estimated for the purposes of the City's Proof of Claim.

## CONCLUSION

WHEREFORE, the Department of Finance of the City of New York respectfully requests that the Court enter an order: (i) denying Debtor's Objection in all respects; (ii) sustaining the

City's Proof of Claim; and (iii) granting such other and further relief as the Court deems just and proper under the circumstances.

Dated:      New York, New York
               July 6, 2011

                                  MICHAEL A. CARDOZO
                                  Corporation Counsel of the
                                    City of New York
                                  Attorney for the City of New York
                                    Department of Finance
                                  100 Church Street, 5th Floor
                                  New York, New York 10007

By:     /s/ Andrew G. Lipkin
             Andrew G. Lipkin
             Senior Counsel
             Tel: (212) 788-0704
             Fax: (212) 788-0937
             alipkin@law.nyc.gov

                  -and-

             Joshua M. Wolf
             Assistant Corporation Counsel
             Tel: (212) 788-1172
             Fax: (212) 788-0937
             jowolf@law.nyc.gov