**THIS PROPOSED DISCLOSURE STATEMENT HAS NOT BEEN APPROVED BY THE BANKRUPTCY COURT AS CONTAINING ADEQUATE INFORMATION UNDER BANKRUPTCY CODE SECTION 1125(b) FOR USE IN THE SOLICITATION OF ACCEPTANCES OR REJECTIONS OF THE CHAPTER 11 PLAN DESCRIBED HEREIN. ACCORDINGLY, THE FILING AND DISSEMINATION OF THIS DISCLOSURE STATEMENT ARE NOT INTENDED TO BE, AND SHOULD NOT IN ANY WAY BE CONSTRUED AS, A SOLICITATION OF VOTES ON THE PLAN, NOR SHOULD THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT BE RELIED ON FOR ANY PURPOSE BEFORE A DETERMINATION BY THE BANKRUPTCY COURT THAT THIS DISCLOSURE STATEMENT CONTAINS ADEQUATE INFORMATION. THE DEBTOR RESERVES THE RIGHT TO AMEND OR SUPPLEMENT THIS PROPOSED DISCLOSURE STATEMENT AT OR BEFORE THE HEARING TO CONSIDER THIS DISCLOSURE STATEMENT.**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------------x

*In re*

**AMBAC FINANCIAL GROUP, INC.,**

      **Debtor.**

---------------------------------------------------------------x

**Chapter 11**

**Case No. 10-15973 (SCC)**

---

## FIRST AMENDED DISCLOSURE STATEMENT
## OF AMBAC FINANCIAL GROUP, INC.

---

Peter A. Ivanick
Allison H. Weiss
DEWEY & LEBOEUF LLP
1301 Avenue of the Americas
New York, New York 10019
Tel: (212) 259-8000
Fax: (212) 259-6333

- and -

Todd L. Padnos (admitted *pro hac vice*)
DEWEY & LEBOEUF LLP
1950 University Avenue, Suite 500
East Palo Alto, California 94303
Tel: (650) 845-7000
Fax: (650) 845-7333

*Attorneys for the Debtor and Debtor in Possession*

Dated: September 21, 2011
      New York, New York

# TABLE OF CONTENTS

**Article I. Introduction** ....................................................................................................**1**

    A.    Purpose and Effect of the Plan ........................................................................2
    B.    Overview of Chapter 11 ...................................................................................4
    C.    Summary of Classification, Treatment, and Voting Rights of Allowed
           Claims and Equity Interests.............................................................................4
    D.    Summary of Solicitation Package and Voting Instructions...............................5
    E.    The Confirmation Hearing................................................................................7
    F.    Confirming and Consummating the Plan .........................................................7
    G.    Rules of Construction ......................................................................................7
    H.    Computation of Time........................................................................................8
    I.    Reference to the Debtor or the Reorganized Debtor ........................................8

**Article II. Background**........................................................................................................**8**

    A.    Overview of AFG's Business .........................................................................8
    B.    AFG's Corporate Structure.............................................................................9
    C.    AFG's Debt Structure .....................................................................................9
           1.    The Senior Notes....................................................................................9
           2.    The Subordinated Notes........................................................................11
    D.    Tax-Sharing Agreement.................................................................................11
    E.    Events leading to the Chapter 11 Case ..........................................................12
           1.    Restructuring of Ambac Assurance Corporation...................................12
           2.    Impact of the CDS Settlement Agreement and the Segregated
                 Account Rehabilitation Proceedings on AFG.........................................16
    F.    Shareholder Litigation ...................................................................................17
    G.    Restructuring Initiatives ................................................................................20
           1.    Negotiations with Third-Party Investors...............................................20
           2.    Negotiations with the Prepetition Ad Hoc Committee ..........................21
           3.    Negotiations with OCI...........................................................................21
    H.    Events Leading Up to the Commencement Date.............................................21

**Article III. The Chapter 11 Case** ...................................................................................**24**

    A.    Overview of the Chapter 11 Case...................................................................24
           1.    Commencement of the Chapter 11 Case and First Day Orders ...............24
           2.    The Trading Order .................................................................................24
           3.    Appointment of Committee ...................................................................25
            4.    Claims ...................................................................................................25
           5.    IRS Adversary Proceeding....................................................................28
           6.    Wisconsin Proceedings ..........................................................................30
           7.    Veera Adversary Proceeding .................................................................32
           8.    Exclusivity ............................................................................................33
           9.    One State Street Settlement ...................................................................33
           10.    Shareholder Litigation Settlement .........................................................34
           11.    NYC Tax Claim Settlement...................................................................37
           12.    Efforts to Finalize Term Sheet..............................................................39

13. The First Proposed Plan of Reorganization .................................................39
B. The Plan ...............................................................................................................41
1. The Amended TSA ...................................................................................41
2. Expense Sharing .......................................................................................49
3. Additional Agreements ............................................................................51
4. The Cash Grant and Junior Surplus Notes ...............................................54
5. Releases ....................................................................................................55
6. Additional Representations ......................................................................56

**Article IV. Summary of the Plan ..........................................................................................58**

A. Administrative Claims and Priority Tax Claims ..................................................59
1. Administrative Claims ..............................................................................59
2. Administrative Claims Bar Date ..............................................................59
3. Accrued Professional Compensation ........................................................59
4. Priority Tax Claims ..................................................................................60
5. U.S. Trustee Fees .....................................................................................60
6. Indenture Trustee Fees and Informal Group Fees .....................................60
B. Classification and Treatment of Classified Claims and Equity Interests .............61
1. Summary Classification of Claims and Equity Interests ...........................61
2. Treatment of Claims and Equity Interests ................................................61
3. Subordinated Claims .................................................................................66
4. Confirmation Pursuant to Bankruptcy Code Section 1129(b) ...................66
5. Elimination of Vacant Classes ..................................................................66
6. Controversy Concerning Impairment .......................................................66
C. Means for Implementation of the Plan .................................................................66
1. Sources of Consideration for Plan Distributions ......................................66
2. New Organizational Documents ...............................................................67
3. Continued Corporate Existence ................................................................67
4. Vesting of Assets in the Reorganized Debtor ...........................................67
5. New Common Stock .................................................................................67
6. Section 1145 Exemption ...........................................................................68
7. Cancellation of Securities and Indentures .................................................68
8. Amended Plan Settlement .........................................................................68
9. Directors and Officers of the Reorganized Debtor ...................................68
10. Corporate Action ......................................................................................69
11. Effectuating Documents; Further Transactions .........................................69
12. Exemption from Certain Taxes and Fees ..................................................69
D. Treatment of Executory Contracts and Unexpired Leases ...................................70
1. Assumption or Rejection of Executory Contracts and Unexpired
   Leases .......................................................................................................70
2. Cure of Defaults for Assumed Executory Contracts and Unexpired
   Leases .......................................................................................................70
3. Claims Based on Rejection of Executory Contracts and Unexpired
   Leases .......................................................................................................71
4. Nonoccurrence of Effective Date ..............................................................71
E. Provisions Governing Distributions .....................................................................71
1. Record Date for Distributions ...................................................................71

|   |   |   |   |
|---|---|---|---|
|   | 2. | Timing and Calculation of Amounts to be Distributed | 71 |
|   | 3. | Disbursing Agent | 72 |
|   | 4. | Rights and Powers of Disbursing Agent | 72 |
|   | 5. | Delivery of Distributions and Undeliverable or Unclaimed Distributions | 72 |
|   | 6. | Compliance with Tax Requirements | 74 |
|   | 7. | Allocations | 75 |
|   | 8. | Setoffs and Recoupment | 75 |
|   | 9. | Claims Paid or Payable by Third Parties | 75 |
| F. | Procedures for Resolving Contingent, Unliquidated, and Disputed Claims | | 75 |
|   | 1. | Resolution of Disputed Claims | 75 |
|   | 2. | Disallowance of Claims | 77 |
|   | 3. | Amendments to Claims | 78 |
| G. | Settlement, Release, Injunction, and Related Provisions | | 78 |
|   | 1. | Discharge of Claims and Termination of Equity Interests | 78 |
|   | 2. | Injunction | 78 |
|   | 3. | Exculpation | 79 |
|   | 4. | General Releases by the Debtor | 79 |
|   | 5. | General Releases by Holders of Claims and Equity Interests | 79 |
|   | 6. | Releases Required Pursuant to the Stipulation of Settlement | 80 |
|   | 7. | Release of Liens | 81 |
| H. | Conditions Precedent to Confirmation and Consummation of the Plan | | 81 |
|   | 1. | Conditions Precedent to Confirmation | 81 |
|   | 2. | Conditions Precedent to Consummation | 81 |
|   | 3. | Waiver of Conditions | 82 |
|   | 4. | Effect of Nonoccurrence of Conditions to Consummation | 82 |
| I. | Modification, Revocation, or Withdrawal of the Plan | | 82 |
|   | 1. | Modification and Amendments | 82 |
|   | 2. | Effect of Confirmation on Modifications | 83 |
|   | 3. | Revocation or Withdrawal of the Plan | 83 |
| J. | Retention of Jurisdiction | | 83 |
| K. | Miscellaneous Provisions | | 85 |
|   | 1. | Immediate Binding Effect | 85 |
|   | 2. | Additional Documents | 85 |
|   | 3. | Payment of Statutory Fees | 86 |
|   | 4. | Dissolution of Committee | 86 |
|   | 5. | Reservation of Rights | 86 |
|   | 6. | Successors and Assigns | 86 |
|   | 7. | Service of Documents | 86 |
|   | 8. | Further Assurances | 87 |
|   | 9. | Term of Injunctions or Stays | 87 |
|   | 10. | Entire Agreement | 88 |
|   | 11. | Exhibits and Related Documents | 88 |
|   | 12. | Severability of Plan Provisions | 88 |
|   | 13. | Closing of Chapter 11 Case | 88 |
|   | 14. | Waiver or Estoppel Conflicts | 88 |

15. Conflicts ......................................................................................... 89

**Article V. Solicitation and Voting Procedures** ............................................... **89**

A. The Solicitation Package ............................................................... 89
B. Voting Deadline ........................................................................... 89
C. Voting Instructions ....................................................................... 90
    1. Beneficial Owners ............................................................ 92
    2. Nominees ......................................................................... 92
D. Voting Tabulation ......................................................................... 93

**Article VI. Valuation Analysis and Financial Projections** ................................ **94**

A. Valuation of the Reorganized Debtor ............................................ 94
    1. Introduction ...................................................................... 94
    2. Valuation .......................................................................... 94
B. Valuation Methodologies .............................................................. 96
    1. Comparable Company Analysis ....................................... 96
    2. Precedent Transactions Analysis ..................................... 96
    3. Discounted Cash Flow Analysis ...................................... 97
    4. NOL Valuation ................................................................ 98
C. Financial Projections ................................................................... 100
    1. Introduction .................................................................... 100
    2. Significant Assumptions ................................................. 101
    3. Financial Projections – Statement of Cash Flows ........... 102

**Article VII. Confirmation Procedures** ........................................................... **105**

A. The Confirmation Hearing ........................................................... 105
B. Statutory Requirements for Confirmation of the Plan .................... 105
    1. Best Interests of Creditors Test/Liquidation Analysis .............. 106
    2. Feasibility ...................................................................... 108
    3. Acceptance by Impaired Classes ................................... 108
    4. Confirmation Without Acceptance by All Impaired Classes .... 108
C. Persons to Contact for More Information ...................................... 109
D. Disclaimer .................................................................................. 110

**Article VIII. Plan-Related Risk Factors and  Alternatives to Confirming the Plan** .... **110**

A. Certain Bankruptcy Law Considerations ...................................... 111
    1. Parties in Interest May Object to the Debtor's Classification of Claims and Equity Interests ................................................. 111
    2. The Debtor May Fail to Satisfy the Vote Requirement ............ 111
    3. The Debtor May Not Be Able to Secure Confirmation of the Plan .... 111
    4. The Debtor May Object to the Amount or Classification of a Claim or Interest ............................................................... 112
    5. Risk of Non-occurrence of the Effective Date .............................. 112
    6. Contingencies Will Not Affect Votes of Impaired Classes to Accept or Reject the Plan ................................................. 112
    7. Liquidation under Chapter 7 ........................................... 113
B. Risks Related to the Plan ............................................................. 113

1.  The Reorganized Debtor May Not Be Able to Realize Residual Value in AAC ...................................................................113

2.  The Rehabilitation Court May Not Approve the Amended Plan Settlement ...............................................................................113

3.  Risks Related to U.S. Federal Tax Characterization of NOLs and the Ambac Consolidated Group Specific to the Amended Plan Settlement ...............................................................................113

4.  The Amount of Any Payments by AAC to the Reorganized Debtor pursuant to the Amended TSA Is Uncertain ...........................116

5.  Actions by the Rehabilitator May Affect the Amount of Any Payments by AAC to the Reorganized Debtor pursuant to the Amended TSA ...........................................................................116

C.  Additional Factors to Be Considered.....................................................116

1.  Business Factors.......................................................................116

2.  Risks Related to AAC, OCI and the Rehabilitation Proceedings .............117

3.  Risk Factors That May Affect the Value of Securities to be Issued Under the Plan and/or Recoveries under the Plan ....................122

4.  Because of the Limitations on Transfer of New Common Stock in the Amended Certificate of Incorporation, the Reorganized Debtor's Ability to Raise Capital Through Equity Investment Is Limited .....................................................................................124

5.  Potential Shareholder Action ...................................................124

6.  Risks Related to U.S. Federal Tax Characterization of NOLs and the Ambac Consolidated Group.................................................124

7.  The Outcome of the IRS Adversary Proceeding May Be Unfavorable to the Debtor .....................................................125

8.  Certain Tax Implications of the Debtor's Reorganization May Increase the Tax Liability of the Reorganized Debtor................126

9.  Certain Regulatory Implications of the Debtor's Reorganization May Affect Distributions of New Common Stock ...................126

D.  Disclosure Statement Disclaimer...........................................................127

1.  The Information Contained Herein Is for Soliciting Votes Only ............127

2.  The Information in this Disclosure Statement May Be Inaccurate...........127

3.  **Financial Projections and Other Forward Looking Statements Are Not Assured**................................................................128

4.  This Disclosure Statement Was Not Approved by the Securities and Exchange Commission .............................................................128

5.  The Debtor Relied upon Certain Exemptions from Registration under the Securities Act...........................................................128

6.  This Disclosure Statement Contains Forward Looking Statements ........129

7.  No Legal or Tax Advice Is Provided to You by this Disclosure Statement .................................................................................129

8.  No Admissions Are Made by this Disclosure Statement.........................129

9.  No Reliance Should be Placed upon any Failure to Identify Litigation Claims or Projected Objections.................................129

|  | 10. | Nothing Herein Constitutes a Waiver of any Right to Object to Claims or Recover Transfers and Assets | 130 |
|  | 11. | The Information Used Herein Was Provided by the Debtor and Was Relied Upon by the Debtor's Advisors | 130 |
|  | 12. | The Potential Exists for Inaccuracies, and the Debtor Has No Duty to Update | 130 |
|  | 13. | No Representations Made Outside this Disclosure Statement Are Authorized | 130 |

**Article IX. Exemptions From Securities Act Registration ............................................130**

| A. | New Common Stock and Warrants | 130 |
| B. | Issuance and Resale of New Common Stock and Warrants under the Plan | 131 |
|  | 1. | Exemption from Registration | 131 |
|  | 2. | Resale of New Common Stock; Definition of Underwriter | 132 |

**Article X. CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ............................................................................................................133**

| A. | Certain U.S. Federal Income Tax Consequences to the Debtor | 135 |
|  | 1. | Cancellation of Indebtedness Income | 135 |
|  | 2. | Annual Section 382 Limitation on Use of NOLs and "Built-In" Losses and Deductions | 136 |
|  | 3. | Alternative Minimum Tax | 139 |
| B. | Certain U.S. Federal Income Tax Consequences to Holders of General Unsecured Claims, Senior Notes Claims and Subordinated Notes Claims | 139 |
|  | 1. | Securities for Tax Purposes | 140 |
|  | 2. | Allowed Claims Constituting Securities | 140 |
|  | 3. | Allowed Claims Not Constituting Securities | 141 |
| C. | Market Discount and Accrued Interest | 142 |
|  | 1. | Market Discount | 142 |
|  | 2. | Accrued Interest | 142 |
| D. | Treatment of the Disputed Claims Reserve | 143 |

**Article XI. Recommendation ................................................................................144**

## <u>Exhibits</u>

<u>Exhibit A</u>: The Plan

    <u>Exhibits to the Plan</u>:

    *Exhibit A to the Plan*: Amended and Restated Tax Sharing Agreement [To Be Provided]

    *Exhibit B to the Plan*: Cooperation Agreement [To Be Provided]

    *Exhibit C to the Plan*: Cost Allocation Agreement [To Be Provided]

    *Exhibit D to the Plan*: Reorganized AFG By-laws [To Be Provided]

    *Exhibit E to the Plan*: Reorganized AFG Certificate of Incorporation [To Be Provided]

    *Exhibit F to the Plan*: Schedule of Assumed Executory Contracts and Unexpired Leases

    *Exhibit G to the Plan*: Warrant Agreement [To Be Provided]

<u>Exhibit B</u>: Mediation Agreement

<u>Exhibit C</u>: Financial Projections

<u>Exhibit D</u>: Liquidation Analysis

# ARTICLE I.
## INTRODUCTION[1]

Ambac Financial Group, Inc. (the "Debtor" or "AFG") is sending you this Disclosure Statement and requests that you vote to approve the proposed *First Amended Plan of Reorganization of Ambac Financial Group, Inc.*, attached hereto as Exhibit A (the "Plan"). This Disclosure Statement describes certain aspects of the Plan, including the treatment of Holders of Claims and Equity Interests pursuant to the Plan, as well as certain aspects of the Debtor's operations, financial projections, and other related matters.

Unless otherwise specified herein, the Debtor is making the statements and providing the financial information contained herein as of the date hereof. Holders of Claims and Equity Interests reviewing this Disclosure Statement should not infer that, at the time of their review, the facts set forth herein have not changed since the date on the cover page of this Disclosure Statement. Holders of Claims entitled to vote to accept the Plan must rely upon their own evaluation of the Debtor and their own analysis of the terms of the Plan, including, but not limited to, any risk factors cited herein, in deciding whether to vote to accept or reject the Plan.

The contents of this Disclosure Statement may not be deemed as providing any legal, financial, securities, tax, or business advice. The Debtor urges each Holder of a Claim or an Equity Interest to consult with its own advisors with respect to any such legal, financial, securities, tax, or business advice in reviewing this Disclosure Statement, the Plan and each of the proposed transactions contemplated thereby. Furthermore, the Bankruptcy Court's approval of the adequacy of information contained in this Disclosure Statement does not constitute the Bankruptcy Court's approval of the merits of the Plan.

Moreover, this Disclosure Statement does not constitute, and may not be construed as, an admission of fact, liability, stipulation, or waiver. Rather, Holders of Claims and Equity Interests should interpret this Disclosure Statement as a statement made in settlement negotiations related to contested matters, adversary proceedings, and other pending or threatened litigation or actions.

Prior to deciding whether to accept or reject the Plan, Holders of General Unsecured Claims, Senior Notes Claims and Subordinated Note Claims are encouraged to consider carefully the entire Disclosure Statement, including the Plan and the matters described under Article VIII hereof, entitled "Plan-Related Risk Factors and Alternatives to Confirming and Consummating the Plan."

Other than that which is contained in this Disclosure Statement, the Debtor has not authorized any party to provide any information regarding the Plan. Additionally, other than as set forth in this Disclosure Statement, the Debtor has not authorized any representations concerning the Debtor or the value of its property. Claimants should not rely upon any

---

[1] This introduction is qualified in its entirety by the more detailed information contained in the Plan and elsewhere in this Disclosure Statement. Capitalized terms used in this Disclosure Statement and not otherwise defined herein shall have the meanings ascribed to them in the Plan.

information, representations, or other inducements given to obtain acceptance of the Plan that are different from, or inconsistent with, the information contained herein and in the Plan.

The Debtor's management has reviewed the financial information provided in this Disclosure Statement. Although the Debtor has used reasonable efforts to ensure the accuracy of this financial information, the financial information contained in, or incorporated by reference into, this Disclosure Statement has not been audited.

The Debtor recommends that potential recipients of New Common Stock and Warrants consult with their own counsel regarding the securities laws consequences related to the transferability of the New Common Stock and the Warrants.

**This Disclosure Statement summarizes certain provisions of the Plan, certain other documents, and certain financial information. The Debtor believes that these summaries are fair and accurate in all material respects; however, you should read the Plan and such other documents in their entirety. In the event of any inconsistency or discrepancy between a description contained in this Disclosure Statement and the terms and provisions of the Plan or the other documents or financial information incorporated herein by reference, the Plan, or such other documents, as applicable, shall govern for all purposes. To the extent that the Stipulation of Settlement or any order of the Bankruptcy Court approving the Stipulation of Settlement is inconsistent with the Plan, the terms of the Stipulation of Settlement or the order of the Bankruptcy Court approving the Stipulation of Settlement shall control.**

The Debtor is providing the information in this Disclosure Statement solely for purposes of soliciting the votes of Holders of Claims entitled to vote to accept or reject the Plan. Nothing in this Disclosure Statement may be used by any person for any other purpose. Further, all exhibits to this Disclosure Statement are incorporated into this Disclosure Statement as if set forth in full herein.

## A.      Purpose and Effect of the Plan

The primary purpose of the Plan is to effectuate the restructuring of the Debtor's capital structure in order to bring it into alignment with its present and future operating prospects and to provide the Debtor with greater liquidity. AFG is an insurance holding company which owns 100% of the voting equity interests of Ambac Assurance Corporation ("AAC," and together with the Debtor and its non-debtor subsidiaries, "Ambac"), a Wisconsin-domiciled financial guaranty insurance company. The Debtor depends upon dividend income from AAC to service its debt obligations. As a result of financial and restructuring events at AAC, discussed in Article II.E, AAC has been unable to pay dividends to the Debtor since 2008 and is unlikely to be able to pay dividends in the near future, which has constrained AFG's ability to pay its operating expenses and debt service obligations.

Pursuant to the Plan, on the Effective Date, or as soon as reasonably practicable thereafter, in full and final satisfaction and discharge of and in exchange for their Claims, (i) each Holder of a Senior Notes Claim shall receive its pro rata share of New Common Stock, (ii) each Holder of a General Unsecured Claim shall receive its pro rata share of New Common

Stock, and, provided that the Class of Senior Notes Claims votes to accept the Plan, Warrants, in the amounts outlined in and subject to certain conditions as set forth in the Plan, and (iii) provided that the Class of Senior Notes Claims votes to accept the Plan, each Holder of a Subordinated Notes Claim shall receive Warrants and, provided that the Class of Subordinated Notes Claims also votes to accept the Plan, New Common Stock, all in the amounts outlined in and subject to certain conditions as set forth in the Plan.

Following months of negotiations among stakeholders, as more fully discussed in Articles II and III, the Debtor and its major creditor constituencies developed a proposed plan settlement (the "Plan Settlement"), as more fully described in Article II, to settle claims and causes of action among the Debtor, AAC, the Segregated Account of AAC (the "Segregated Account"), the Office of the Commissioner of Insurance for the State of Wisconsin, as regulator of AAC, and the Commissioner of Insurance for the State of Wisconsin, as rehabilitator of the Segregated Account (either or both the Office of the Commissioner of Insurance for the State of Wisconsin and the Commissioner of Insurance for the State of Wisconsin, as applicable, shall be referred to herein as "OCI").  Initially, the deadline by which AAC and OCI had to accept the Plan Settlement (the "Plan Settlement Deadline") was July 29, 2011, but was later extended, by agreement of the parties, to August 25, 2011.  On August 16, 2011, the Debtor, the statutory committee of creditors appointed in this chapter 11 case (the "Committee"), AAC and OCI commenced mediation in respect of the Plan Settlement.  After several weeks of mediation, the Debtor, the Committee and OCI agreed to that certain Mediation Agreement, attached hereto as Exhibit B (the "Mediation Agreement"), detailing the terms of a consensual resolution of the parties' issues and upon which an amended Plan could be based (the "Amended Plan Settlement").  The Mediation Agreement remains subject to approval by AAC and its board of directors.  As a result, on September 21, 2011, the Debtor filed this amended Disclosure Statement in connection with the first amended Plan and based upon the Amended Plan Settlement.  The Plan and the Amended Plan Settlement are described in more detail in Article III.B below.

In developing the Plan, in consultation with the Committee and counsel to an informal group of certain unaffiliated Holders of Senior Notes represented by Akin Gump Strauss Hauer & Feld LLP (the "Informal Group"), the Debtor carefully reviewed its business operations and compared the estimated recoveries Holders of Allowed Claims and Equity Interests would receive if it were to continue as an ongoing business enterprise to the estimated recoveries such claimants would receive under various liquidation scenarios.  Based upon this analysis, the Debtor concluded that the recovery for Holders of Allowed Claims and Equity Interests would be maximized by continuing to operate as a going concern.  The Debtor believes that its business and assets have significant potential value that would not be realized in a liquidation under chapter 7 of the Bankruptcy Code.  Moreover, the Debtor believes that any alternative to Confirmation of the Plan, including attempts by another party in interest to file a plan of reorganization, would result in significant delays, litigation, execution risk, and/or additional costs and, ultimately, would lower the recoveries for Holders of Allowed Claims and Equity Interests.  Accordingly, the Debtor strongly recommends that you vote to accept the Plan.

## B. Overview of Chapter 11

Chapter 11 is the principal business reorganization chapter of title 11 of the United States Code (the "Bankruptcy Code").  In addition to permitting debtor reorganization, subject to the priority of distributions prescribed by the Bankruptcy Code, chapter 11 promotes equality of treatment for similarly situated creditors and similarly situated interest holders.  The commencement of a chapter 11 case creates an estate comprising, as of the commencement date, all of the legal and equitable interests of the debtor.  The Bankruptcy Code provides that the debtor may continue to operate its business and remain in possession of its property as a "debtor in possession."

Consummation of a plan is the principal objective of a chapter 11 case.  A bankruptcy court's confirmation of a plan is binding upon the debtor, all persons acquiring property under the plan, all of the debtor's creditors and interest holders, and any other person or entity as may be ordered by the bankruptcy court.  Subject to certain limited exceptions, the order issued by the bankruptcy court confirming a plan provides for the treatment of the debtor's debt in accordance with the terms of the confirmed plan.

## C. Summary of Classification, Treatment, and Voting Rights of Allowed Claims and Equity Interests

Under the provisions of the Bankruptcy Code, not all parties in interest are entitled to vote on a chapter 11 plan.  For example, pursuant to Bankruptcy Code section 1126(f), holders of claims and interests Unimpaired by a plan are deemed to accept such plan and, therefore, are not entitled to vote.  Additionally, pursuant to Bankruptcy Code section 1126(g), holders of claims or interests receiving no distributions under a plan are deemed to have rejected such plan and are not entitled to vote.

The following chart summarizes the classification, treatment, and voting rights of Claims against and Equity Interests in the Debtor and the potential distributions to Holders of Allowed Claims and Equity Interests under the Plan:[2]

| Class | Claims/ Interests | Impairment | Voting Rights | Estimated Recovery |
|-------|-------------------|------------|---------------|--------------------|
| 1 | Priority Non-Tax Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) | 100% |
| 2 | Secured Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) | 100% |

---

[2] This chart is only a summary of the classification and treatment of Allowed Claims and Equity Interests under each Option. Reference should be made to the entire Disclosure Statement and the Plan for a complete description of the classification and treatment of Allowed Claims and Equity Interests.

| Class | Claims/ Interests | Impairment | Voting Rights | Estimated Recovery |
|-------|------------------|-----------|---------------|--------------------|
| 3 | General Unsecured Claims | Impaired | Entitled to Vote | 8.5 - 13.2%[3] |
| 4 | Senior Notes Claims | Impaired | Entitled to Vote | 11.4 - 17.6% |
| 5 | Subordinated Notes Claims | Impaired | Entitled to Vote | 0.5 - 0.8% |
| 6 | Section 510(b) Claims | Impaired | Not Entitled to Vote (Deemed to Reject) | 0% |
| 7 | Inter-company Claims | Impaired | Not Entitled to Vote (Deemed to Reject) | 0% |
| 8 | Equity Interests | Impaired | Not Entitled to Vote (Deemed to Reject) | 0% |

**D.      Summary of Solicitation Package and Voting Instructions**

After the Court has approved the Disclosure Statement as containing adequate information, the Debtor proposes to distribute or cause to be distributed solicitation packages (the "Solicitation Packages") containing the documents described below to all parties entitled to receive notice of the Confirmation Hearing, including the U.S. Trustee, counsel for the Committee, counsel for the Informal Group, counsel for OCI, the Securities and Exchange Commission, all entities which have filed a written request for notice pursuant to Bankruptcy Rule 2002, all creditors listed in the Schedules or which filed a proof of Claim prior to the Solicitation Deadline, and all Holders of Equity Interests.

The Solicitation Packages for Holders of General Unsecured Claims, Senior Notes Claims and Subordinated Notes Claims shall include (i) the Disclosure Statement Order (without exhibits), (ii) the Disclosure Statement, which shall include the Plan as an exhibit thereto, (iii) a customized Ballot (as defined below) and voting instructions (with a pre-addressed, postage prepaid return envelope), and (iv) a notice of the Confirmation Hearing (the "Confirmation Hearing Notice").

Holders of Priority Non-Tax Claims, Secured Claims, Section 510(b) Claims, Intercompany Claims and Equity Interests (the "Non-Voting Classes") shall receive a Confirmation Hearing Notice and a notice of non-voting status.

---

[3] The above recovery percentages assume General Unsecured Claims approximate $14-$15 million. If the General Unsecured Claims were to approximate $50 million, the low end recovery percentage for the Senior Notes Claims and General Unsecured Claims would decline to 11.1% and 8.3%, respectively.

Because of significantly reduced costs and environmental benefits, Holders of General Unsecured Claims, Senior Notes Claims and Subordinated Notes Claims shall be served with Solicitation Packages in a CD-ROM format instead of printed copies; *provided*, *however*, that notwithstanding anything herein to the contrary, printed copies of the Ballot, Master Ballot and Confirmation Hearing Notice shall be distributed to such Holders. Any party who desires a paper copy of these documents may request copies from the Balloting Agent by (i) writing to Kurtzman Carson Consultants LLC, at 599 Lexington Avenue, 39th Floor, New York, NY 10022, or 2335 Alaska Avenue El Segundo, CA 90245, or (ii) calling (877) 660-6619. The Solicitation Package (except the Ballots and Master Ballots) can also be obtained by accessing the Debtor's restructuring website, www.kccllc.net/Ambac. All parties entitled to vote to accept or reject the Plan shall receive a paper copy of each appropriate Ballot or Master Ballot.

Only the Holders of General Unsecured Claims, Senior Notes Claims and Subordinated Notes Claims are entitled to vote on the Plan. To be counted, all votes must be cast by using the ballot enclosed with the Solicitation Package (the "<u>Ballot</u>"), or, in the case of a bank, brokerage firm, or other nominee holding Senior Notes Claims or Subordinated Notes Claims in its own name on behalf of a beneficial owner, or any agent thereof (each, a "<u>Nominee</u>"), the master ballot provided to such Nominee (the "<u>Master Ballot</u>"). The Debtor has fixed October 6, 2011, as the date for the determination of Holders of record of General Unsecured Claims, Senior Notes Claims and Subordinated Notes Claims entitled to receive the Solicitation Package (the "<u>Voting Record Date</u>"). Ballots and Master Ballots must be received by the Balloting Agent by 5:00 p.m. (prevailing Pacific Time) on November 23, 2011 (the "<u>Voting Deadline</u>"). Please see Article V. hereof, entitled "Solicitation and Voting Procedures," for additional information.

Unless the Debtor, in its discretion, decides otherwise, any Ballot or Master Ballot received after the Voting Deadline shall not be counted. The Balloting Agent will process and tabulate Ballots and Master Ballots for each Class entitled to vote to accept or reject the Plan and, prior to the Confirmation Hearing, will file a voting report (the "<u>Voting Report</u>"). For answers to any questions regarding solicitation procedures, parties may contact the Balloting Agent directly, by (i) writing to Kurtzman Carson Consultants LLC, at 599 Lexington Avenue, 39th Floor, New York, NY 10022, or 2335 Alaska Avenue El Segundo, CA 90245, or (ii) calling (877) 660-6619.

**Any Ballot (or Master Ballot in the case of beneficial Holders of Senior Notes Claims and Subordinated Notes Claims voting through a Nominee) that is properly executed by a Holder of a Claim (or Nominee), but fails to indicate clearly an acceptance or rejection of the Plan, or that indicates both an acceptance and a rejection of the Plan, shall not be counted.**

**Each Holder of a General Unsecured Claim, a Senior Notes Claim or a Subordinated Notes Claim must vote all of its respective Claims in one Class either to accept or reject the Plan and may not split its votes within such Class. By signing and returning a Ballot (or Master Ballot in the case of beneficial Holders of Senior Notes Claims and Subordinated Notes Claims voting through a Nominee), each Holder of a Senior Notes Claim or a Subordinated Notes Claim (or its Nominee) will certify to the Bankruptcy Court and the Debtor that no other Ballot or Master Ballot with respect to such Claim has been cast or, if any other Ballots or Master Ballots have been cast, that**

**such other Ballots or Master Ballots are revoked. All Ballots and Master Ballots are accompanied by voting instructions. It is important to follow the specific instructions provided with each Ballot and Master Ballot.**

**The Debtor is relying on section 3(a)(9) of the Securities Act of 1933, as amended (the "**<u>Securities Act</u>**"), and similar state securities laws (the "**<u>Blue Sky Laws</u>**"), as well as, to the extent applicable, the exemption from the Securities Act and equivalent state law registration requirements provided by Bankruptcy Code section 1145(a)(1), to exempt from registration under the Securities Act and the Blue Sky Laws the offer of New Common Stock and Warrants in connection with the Plan.**

## E. The Confirmation Hearing

Bankruptcy Code section 1128(a) requires the Bankruptcy Court, after notice, to hold a hearing on confirmation of the Plan. Bankruptcy Code section 1128(b) provides that any party in interest may object to confirmation of the Plan.

The Debtor is requesting that the Bankruptcy Court fix December 8, 2011, or as soon as practicable thereafter, as the date and time of the Confirmation Hearing and will provide notice of the Confirmation Hearing to all necessary parties. The Confirmation Hearing may be adjourned from time to time without further notice except for an announcement of the adjourned date made at the Confirmation Hearing, whether or not such hearing has already been adjourned.

## F. Confirming and Consummating the Plan

It is a condition to Confirmation of the Plan that the Bankruptcy Court shall have approved this Disclosure Statement as containing "adequate information" and entered the Confirmation Order in form and substance acceptable to the Debtor. Additionally, pursuant to the provisions of Article X of the Plan, certain other conditions contained in the Plan must be satisfied or waived.

Following Confirmation, the Plan will be consummated on the date that is the first Business Day following the Confirmation Date on which the Confirmation Order is a Final Order and all conditions specified in Article X.A of the Plan have been satisfied or waived pursuant to Article X.C of the Plan (the "<u>Effective Date</u>").

## G. Rules of Construction

The following rules for interpretation and construction shall apply to this Disclosure Statement: (i) capitalized terms used in this Disclosure Statement and not otherwise defined herein shall have the meanings ascribed to them in the Plan; (ii) terms and phrases, whether capitalized or not, that are used but not defined herein or in the Plan, but that are defined in the Bankruptcy Code, shall have the meanings ascribed to them in the Bankruptcy Code; (iii) in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender; (iv) any reference herein to an existing document or exhibit having been Filed or to be Filed shall mean that document or exhibit, as it may thereafter be amended, modified, or supplemented; *provided, however*, that the

"Rehabilitation Plan" refers only to the Rehabilitation Plan confirmed by the Rehabilitation Court on January 24, 2011; (v) unless otherwise specified, all references herein to "Articles" are references to Articles hereof; (vi) unless otherwise stated, the words "herein," "hereof," and ''hereto'' refer to this Disclosure Statement in its entirety rather than to a particular portion of this Disclosure Statement; (vii) captions and headings to Articles are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation hereof; (viii) the rules of construction set forth in Bankruptcy Code section 102 shall apply; and (ix) any immaterial effectuating provisions may be interpreted by the Reorganized Debtor in a manner that is consistent with the overall purpose and intent of the Plan and Disclosure Statement, all without further order of the Bankruptcy Court.

## H. Computation of Time

Unless otherwise specified herein, Rule 9006(a) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") shall apply in computing any period of time prescribed or allowed herein.

## I. Reference to the Debtor or the Reorganized Debtor

Except as otherwise provided in this Disclosure Statement or the Plan, references in the Plan to the Debtor or the Reorganized Debtor shall mean the Debtor and the Reorganized Debtor, as applicable, to the extent that the context requires.

## ARTICLE II.
## BACKGROUND

## A. Overview of AFG's Business

The Debtor, headquartered in New York City, is a holding company incorporated in the state of Delaware. The Debtor was incorporated on April 29, 1991. The Debtor's principal operating subsidiary, AAC, is a Wisconsin-domiciled financial guarantee insurer whose financial strength was formerly rated triple-A by each of the major rating agencies and which provided financial guarantees and financial services to clients in both the public and private sectors around the world.

Because of the deterioration of AAC's financial condition resulting from losses in its insured portfolio and the resulting downgrades of AAC's financial strength ratings, AAC originated only a *de minimis* amount of new business from November 2007 through the end of 2008 and has been unable to originate any new business since 2008. AAC's ability to pay dividends, and as a result AFG's liquidity, has been significantly restricted by the deterioration of AAC's financial condition and the rehabilitation of the Segregated Account. In addition, AAC's ability to pay dividends has also been restricted by the terms of a settlement agreement (the "CDS Settlement Agreement") with the counterparties (the "CDS Counterparties") to outstanding credit-default swaps ("CDS") with Ambac Credit Products, LLP ("ACP") that were guaranteed by AAC.

The Debtor's principal business strategy is to reorganize its capital structure and financial obligations through the bankruptcy process and to increase the residual value of AAC's financial

guarantee business for the benefit of the Debtor, as holder of AAC's common equity, by mitigating losses on poorly performing transactions (including through the pursuit of recoveries in respect of paid claims, litigation to recover losses or mitigate future losses, commutations of policies and repurchases of surplus notes issued in respect of claims) and maximizing the return on its investment portfolio. The Debtor is not currently generating any new business through AAC, although the Debtor may acquire, merge with or commence business operations independent of AAC.

**B.    AFG's Corporate Structure**

AFG is a public company. As of April 29, 2011, the Debtor had issued and outstanding approximately 302,428,811 shares of common stock, par value $0.01 per share, net of 5,587,953 treasury shares, and no issued and outstanding shares of preferred stock. As of December 31, 2010, according to reports filed with the SEC, there were no persons known to be direct or indirect owners of more than 5% of the Debtor's common stock.

**C.    AFG's Debt Structure**

As of November 8, 2010 (the "<u>Commencement Date</u>"), pursuant to the Senior Notes and the Subordinated Notes (each as defined below), the Debtor had approximately $1,622,189,000 in outstanding unsecured indebtedness and related obligations.

1.    <u>The Senior Notes</u>

The Debtor's Senior Notes rank equally in right of payment with all of the Debtor's other non-subordinated unsecured debt. The following describes the Debtor's Senior Note indebtedness:

(i)    Pursuant to that certain Indenture, dated as of August 1, 1991, between the Debtor and The Bank of New York Mellon (as successor trustee to The Chase Manhattan Bank (National Association)) (the "<u>1991 Indenture</u>"), the Debtor issued $150,000,000 in aggregate principal amount of 9-3/8% debentures due on August 1, 2011 (the "<u>9-3/8% Debentures Due 2011</u>"). In July 2001, the Debtor extinguished $7,500,000 of the 9-3/8% Debentures Due 2011, reducing the principal amount of the outstanding indebtedness to $142,500,000. In June 2010, the Debtor issued an aggregate of 13,638,482 shares of its common stock in exchange for a further $20,311,000 in aggregate principal amount of the 9-3/8% Debentures Due 2011, reducing the principal amount of the outstanding indebtedness to $122,189,000. As of the Commencement Date, the outstanding aggregate principal amount of indebtedness in respect of the 9-3/8% Debentures Due 2011 was approximately $122,189,000. The aggregate outstanding amount of principal plus interest in respect of the 9-3/8% Debentures Due 2011 is $125,275,545.05.

(ii)    Pursuant to the 1991 Indenture, the Debtor issued $75,000,000 in aggregate principal amount of 7-1/2% debentures due on May 1, 2023 (the "<u>7-1/2% Debentures Due 2023</u>"). As of the Commencement Date, the

outstanding aggregate principal amount of indebtedness in respect of the 7-1/2% Debentures Due 2023 was approximately $75,000,000. The aggregate outstanding amount of principal plus interest in respect of the 7-1/2% Debentures Due 2023 is $77,921,875.00.

(iii) Pursuant to that certain Indenture, dated as of August 24, 2001, between the Debtor and The Bank of New York Mellon (as successor trustee to The Chase Manhattan Bank (National Association)) (the "2001 Indenture"), the Debtor issued $200,000,000 in aggregate principal amount of 5.95% debentures due on February 28, 2103 (the "5.95% Debentures Due 2103"). As of the Commencement Date, the outstanding aggregate principal amount of indebtedness in respect of the 5.95% Debentures Due 2103 was approximately $200,000,000. The aggregate outstanding amount of principal plus interest in respect of the 5.95% Debentures Due 2103 is $201,256,111.11.

(iv) Pursuant to the 2001 Indenture, the Debtor issued $175,000,000 in aggregate principal amount of 5.875% debentures due on March 24, 2103 (the "5.875% Debentures Due 2103"). As of the Commencement Date, the outstanding aggregate principal amount of indebtedness in respect of the 5.875% Debentures Due 2103 was approximately $175,000,000. The aggregate outstanding amount of principal plus interest in respect of the 5.875% Debentures Due 2103 is $176,085,243.06.

(v) Pursuant to that certain Indenture, dated as of April 22, 2003, between the Debtor and The Bank of New York Mellon (as successor trustee to JP Morgan Chase Bank), the Debtor issued $400,000,000 in aggregate principal amount of 5.95% debentures due on December 5, 2035 (the "5.95% Debentures Due 2035"). As of the Commencement Date, the outstanding aggregate principal amount of indebtedness in respect of the 5.95% Debentures Due 2035 was approximately $ 400,000,000. The aggregate outstanding amount of principal plus interest in respect of the 5.95% Debentures Due 2035 is $410,115,000.00.

(vi) The Debtor issued $250,000,000 in aggregate principal amount of 9.50% senior notes due on February 15, 2021 (the "9.50% Senior Notes Due 2021," and together with the 9-3/8% Debentures Due 2011, the 7-1/2% Debentures Due 2023, the 5.95% Debentures Due 2035, the 5.95% Debentures Due 2103, and the 5.875% Debentures Due 2103, the "Senior Notes") pursuant to that certain Indenture, dated as of February 15, 2006, and that certain Supplemental Indenture, dated as of March 12, 2008, both between the Debtor and the Bank of New York Mellon, as trustee. Additionally, the Debtor issued 5,000,000 equity units (the "Equity Units") pursuant to that certain Purchase Contract Agreement, dated as of March 12, 2008, between the Debtor and The Bank of New York Mellon, as purchase contract agent. Each Equity Unit has a stated amount of $50 and initially consisted of a 5% beneficial ownership interest in $1,000

principal amount of the 9.50% Senior Notes Due 2021 and a Purchase Contract requiring the Equity Unit holder to purchase a predetermined number of shares of the Debtor's common stock for $50 in cash on May 17, 2011 (the "Purchase Contract").  Each Equity Unit holder's ownership interest in the 9.50% Senior Notes Due 2021 was initially pledged to The Bank of New York Mellon, as collateral agent, pursuant to that certain Pledge Agreement, dated as of March 12, 2008, between the Debtor and The Bank of New York Mellon, as collateral agent, custodial agent, and securities intermediary, and purchase contract agent, to secure such holder's obligations under the Purchase Contract.    As of the Commencement Date, the outstanding principal indebtedness under the 9.50% Senior Notes Due 2021 was approximately $250,000,000. The aggregate outstanding amount of principal plus interest in respect of the 9.50% Senior Notes Due 2021 is $255,475,694.44.

2.    The Subordinated Notes

Pursuant to that certain Junior Subordinated Indenture and First Supplemental Indenture, both dated as of February 12, 2007, between the Debtor and the Bank of New York Mellon, as trustee (the "First Supplemental Indenture"), the Debtor issued $400,000,000 of 6.15% Directly Issued Subordinated Capital Securities due February 15, 2087 (the "DISCS" or the "Subordinated Notes," and together with the Senior Notes, the "Notes").  Pursuant to the terms of the First Supplemental Indenture, the Debtor was permitted to defer interest payments for up to ten years without giving rise to an event of default.  Since August 15, 2009, the Debtor has elected to defer interest payments on the Subordinated Notes.  As of the Commencement Date, approximately $400,000,000 in principal amount was outstanding in respect of the Subordinated Notes.    The aggregate outstanding amount of principal plus interest in respect of the Subordinated Notes is $444,182,604.08.  The Subordinated Notes rank junior in right of payment to certain of the Debtor's existing unsecured debt, including the Senior Notes.

**D.    Tax-Sharing Agreement**

Since 1991, the Debtor has been the common parent of an affiliated group of corporations that files a single consolidated U.S. federal income tax return (the "Ambac Consolidated Group").  The tax liabilities of individual Ambac Affiliates are governed by that certain Tax-Sharing Agreement, as amended, entered into among such entities on July 18, 1991 (the "TSA").  On December 16, 2009, the Ambac Affiliates party to the TSA entered into an amendment of the TSA (the "December 2009 Amendment"), which, among other things, granted to AAC a trust and/or security interest in U.S. federal income tax refunds allocable to net operating loss ("NOL") carryovers attributable to losses incurred by AAC.

In 2008, the Debtor adopted a method of accounting for losses on CDS entered into by ACP and insured by AAC.  Also in 2008, the Debtor applied for a change in its method of accounting for CDS income, and filed with the Internal Revenue Service (the "IRS") a Form 3115 (Change of Accounting Methodology Request).  CDS losses led to the Debtor's reporting approximately a $33 million taxable loss for 2007 and a $3.2 billion taxable loss for 2008.  On September 23, 2008, August 11, 2009, and December 21, 2009, Ambac filed claims with the IRS

for tentative carryback adjustments on Form 1139 (Corporate Application for Tentative Refund) as a result of the carryback to prior taxable years of approximately $33 million and $3.2 billion of NOLs in 2007 and 2008, respectively, previously reported in the Ambac Consolidated Group's federal income tax returns. Based upon these claims on account of NOLs generated in respect of AAC's CDS, in December 2008, September 2009, and February 2010, the IRS refunded to AFG $11,470,930, $252,704,185 and $443,940,722, respectively (the "Tax Refunds"). In accordance with the TSA and the December 2009 Amendment, AFG transferred to AAC the September 2009 and February 2010 Tax Refunds (the "Tax Refund Transfers").

On June 7, 2010, pursuant to the terms of the CDS Settlement Agreement, the Ambac Affiliates party to the TSA entered into a subsequent amendment of the TSA (the "June 2010 Amendment"). The June 2010 Amendment, among other things, divided the Ambac Consolidated Group into (i) one subgroup comprised of the Debtor and its non-AAC subsidiaries (the "AFG Subgroup") and (ii) one subgroup comprised of AAC and its subsidiaries (the "AAC Subgroup"). The June 2010 Amendment requires the Debtor to compensate AAC on a current basis if it uses NOLs attributable to losses incurred by members of the AAC Subgroup to offset income attributable to the AFG Subgroup, except to the extent the AFG Subgroup uses the AAC Subgroup's NOLs to offset any income (including any increase in income resulting from a disallowance of any deduction, loss or credit) recognized by the AFG Subgroup related to the restructuring, modification, cancellation, settlement or any other similar transaction related to any debt, liability or other obligation outstanding as of March 15, 2010. The potential loss of Ambac interest deductions is more fully described in Article X.C below.

As of June 30, 2011, Ambac had ordinary NOLs of approximately $6.8 billion for federal income tax purposes.

## E.    Events leading to the Chapter 11 Case

### 1.    Restructuring of Ambac Assurance Corporation

The Debtor's financial guarantee business historically was supported by AAC's triple-A ratings as well as investor confidence in AAC's financial strength. The deterioration of AAC's financial condition resulting from losses in its insured portfolio and the resulting downgrades of AAC's financial strength ratings prevented it from being able to write new business, which negatively impacted the Debtor's business, operations and financial results. AAC's present business plan is to run off its insured portfolio with the objective of returning residual value to the Debtor, as holder of AAC's common equity. Further, the Debtor's existing investment agreement and derivative product portfolios are being runoff.

(i)    Negotiation of AAC Restructuring Options with the Wisconsin Office of the Commissioner of Insurance

As a result of downgrades by ratings agencies of AAC's financial strength ratings beginning in 2008, as well as significant disruption in the capital markets, AAC originated only a *de minimis* amount of new business from November 2007 through the end of 2008 and has been unable to originate any new business since 2008. The lack of revenue from writing new policies,

combined with payment of policyholder claims well in excess of historic levels, caused OCI to approach AAC in September 2008, to discuss possible restructuring scenarios.

AAC's and the Debtor's management worked closely with OCI from September 2008 through March 2010 to analyze all aspects of Ambac's business and the effects of various restructuring scenarios, with a view to minimizing the collateral damage and loss resulting from such restructuring scenarios to AAC policyholders, AAC creditors, and AFG. The following restructuring of AAC was developed as the least harmful to AAC and its stakeholders.

(ii)      Segregated Account and Segregated Account Rehabilitation Proceedings

On March 24, 2010, AAC acquiesced to the request of OCI to establish the Segregated Account. Under Wisconsin insurance law, the Segregated Account is a separate insurer from AAC for purposes of the Segregated Account Rehabilitation Proceedings (as defined and described below). The purpose of the Segregated Account is to segregate certain segments of AAC's liabilities. The Segregated Account is operated in accordance with a plan of operation (the "Plan of Operation") and certain operative documents relating thereto. These operative documents provide that the Segregated Account will act exclusively through the Rehabilitator (as defined below). Pursuant to the Plan of Operation, AAC has allocated to the Segregated Account: (1) certain policies insuring or relating to CDS; (2) residential mortgage-backed securities ("RMBS") policies; (3) certain Student Loan Policies; and (4) other policies insuring obligations with substantial projected impairments or relating to transactions which have contractual triggers based upon AAC's financial condition or the commencement of rehabilitation, which triggers are potentially damaging (together, the "Segregated Account Policies"). The policies described in (4) above include (a) certain types of securitizations, including commercial asset-backed transactions, consumer asset-backed transactions and other types of structured transactions; (b) the policies relating to Las Vegas Monorail Company ("LVM"); (c) policies relating to debt securities purchased by, and the debt securities issued by, Juneau Investments, LLC ("Juneau"), and Aleutian Investments, LLC ("Aleutian"), which are both finance companies owned by AAC; (d) policies relating to leveraged lease transactions; and (e) policies relating to interest rate, basis, and/or currency swap or other swap transactions. AAC also allocated the following to the Segregated Account: (i) all remediation claims, defenses, offsets, and/or credits (except with respect to recoveries arising from remediation efforts or reimbursement or collection rights), if any, in respect of the Segregated Account Policies, (ii) AAC's disputed contingent liability under the recently settled long-term lease with One State Street, LLC ("OSS"), and its contingent liability (as guarantor), if any, under the recently terminated Ambac Assurance UK Limited ("Ambac UK") lease with British Land Company PLC, (iii) AAC's limited liability interests in ACP, Ambac Conduit Funding LLC, Aleutian and Juneau, and (iv) all of AAC's liabilities as reinsurer under reinsurance agreements (except for reinsurance assumed from Everspan Financial Guarantee Corp., a wholly-owned Affiliate of the Debtor ("Everspan")).

Net par exposure as of June 30, 2011 for the Segregated Account Policies is $ 40.5 billion.

The Segregated Account is capitalized by a $2 billion secured note due 2050 issued by AAC and an aggregate excess of loss reinsurance agreement provided by AAC.

Additionally, on March 24, 2010, OCI commenced rehabilitation proceedings with respect to the Segregated Account (the "Segregated Account Rehabilitation Proceedings") in the Circuit Court of Dane County, Wisconsin (the "Rehabilitation Court") to permit OCI to facilitate an orderly run-off and/or settlement of the liabilities in the Segregated Account. The Rehabilitation Court appointed Sean Dilweg, the Wisconsin Commissioner of Insurance, as rehabilitator of the Segregated Account (the "Rehabilitator").[4] On March 24, 2010, the Rehabilitation Court also entered a temporary injunction order (the "Temporary Injunction") effective until further order of the court enjoining certain actions by Segregated Account policyholders and other counterparties, including the assertion of damages or acceleration of losses based on early termination and the loss of control rights in insured transactions. Certain Segregated Account policyholders have filed lawsuits challenging the Segregated Account Rehabilitation Proceedings.[5]

(iii)    CDS Settlement Agreement

Pursuant to the terms of the CDS Settlement Agreement, in exchange for the termination of the Commuted CDO of ABS Obligations (as defined below), AAC paid to the CDS Counterparties in the aggregate (i) $2.6 billion in cash and (ii) $ 2 billion in principal amount of newly issued surplus notes of Ambac Assurance (the "AAC Surplus Notes"). In addition, effective June 7, 2010, the outstanding CDS with the CDS Counterparties that remained in the general account of AAC (the "General Account") were amended to remove certain events of default and termination events, as set forth in the CDS Settlement Agreement.

Pursuant to the CDS Settlement Agreement, AAC filed an amendment to its articles of incorporation. Under such amendment, at least one-third (and, in any event, not less than three members) of the board of directors of AAC must be "Unaffiliated Qualified Directors" (as defined in the CDS Settlement Agreement). If at any time AAC does not have the requisite number of Unaffiliated Qualified Directors, AAC has agreed to use its commercially reasonable efforts to find additional Unaffiliated Qualified Directors. AAC is currently in compliance with this provision of its articles of incorporation.

The CDS Settlement Agreement includes covenants that remain in force until the AAC Surplus Notes have been redeemed, repurchased or repaid in full. These covenants generally restrict the operations of AAC and its subsidiaries to runoff activities. Certain of these restrictions may be waived with the approval of a majority of the Unaffiliated Qualified Directors and/or the OCI. However, other restrictions may only be waived with the approval of the holders of a majority of the outstanding AAC Surplus Notes (excluding any notes held by

---

[4] On January 5, 2011, Theodore K. Nickel replaced Sean Dilweg as Commissioner of Insurance, and is now the Rehabilitator.

[5] The Rehabilitation Court further ordered that any interested party could seek modification or dissolution of the injunction, in whole or in part, by filing a written motion by June 22, 2010. On October 26, 2010, the Rehabilitation Court denied the challenges of certain Segregated Account policyholders and counterparties to the Segregated Account Rehabilitation Proceedings and Temporary Injunction. On November 12, 2010, certain of these Segregated Account policyholders and counterparties commenced an appeal of the Rehabilitation Court's decision in the Court of Appeals for the State of Wisconsin. See Article II.A.6 hereof for more detail with respect to such appeals.

AAC or its Affiliates) that cast a ballot and, in certain cases, with the approval of all of the CDS Counterparties.

Pursuant to a commutation agreement entered into with each of the CDS Counterparties that is a party to CDS written by ACP with respect to certain collateralized debt obligations backed by asset-backed securities ("CDO of ABS") and related financial guarantee insurance policies written by AAC with respect to ACP's obligations thereunder, AAC and ACP commuted all of such obligations (the "Commuted CDO of ABS Obligations"), totaling $16.5 billion of par in exchange for $2.6 billion in cash and $2 billion in AAC Surplus Notes,[6] as described above. In addition to the commutation of the Commuted CDO of ABS Obligations, AAC has also commuted for $96.5 million of cash certain additional obligations, including certain non-CDO of ABS obligations, to the CDS Counterparties with par or notional amounting to $1.406 billion. AAC commuted another CDO of ABS transaction in an amount equal to its remaining par value of $90 million. It is expected that, subject to certain conditions, certain other non-CDO of ABS obligations with par amounting to a maximum of approximately $701.8 million will be commuted within the next six months for approximately $44.7 million. Each of the CDS Counterparties, in the aggregate and AAC, ACP and the Debtor, in the aggregate, have released the other party from any claims relating to any CDS or financial guarantee insurance policies commuted pursuant to such commutation agreements. In addition, AAC, ACP and the Debtor, in the aggregate, and a CDS Counterparty have generally released the other parties from any claims relating to actions taken or omitted to be taken prior to June 7, 2010, subject to certain exceptions.

Pursuant to the terms of the CDS Settlement Agreement, on June 7, 2010, the Debtor entered into the June 2010 Amendment with its Affiliates. The TSA can be further amended with the consent of OCI and majority of the Unaffiliated Qualified Directors.

(iv)     Segregated Account Rehabilitation Plan

On October 8, 2010, the Rehabilitator filed a plan of rehabilitation with respect to the Segregated Account (the "Rehabilitation Plan") in the Rehabilitation Court. The Rehabilitation Court confirmed the Rehabilitation Plan on January 24, 2011 (the "Rehabilitation Plan Confirmation Order"). The effective date of the Rehabilitation Plan will be determined by the Rehabilitator. Claims on the Segregated Account Policies remain subject to a payment moratorium until the Rehabilitation Plan becomes effective. Insurance claims presented during the moratorium of approximately $1.77 billion for policies allocated to the Segregated Account have not yet been paid. Under the confirmed Rehabilitation Plan, upon the effective date of the Rehabilitation Plan, holders of Permitted Policy Claims (as defined in the Rehabilitation Plan) will receive 25% of their permitted claims in cash and 75% in surplus notes of the Segregated Account (the "Segregated Account Surplus Notes"), and delivery of such cash and Segregated Account Surplus Notes will constitute satisfaction in full of the Segregated Account's obligations in respect of each claim. The policyholders will not have the option to reject the Segregated Account Surplus Notes as consideration for settling claim liabilities. The Segregated Account

---

[6] $940 million of these AAC Surplus Notes are callable by AAC.

will also issue junior surplus notes (the "<u>Junior Surplus Notes</u>", and together with the AAC Surplus Notes and the Segregated Account Surplus Notes, the "<u>Surplus Notes</u>"), which will be subordinate to the Segregated Account Surplus Notes, in satisfaction of certain obligations that rank below Permitted Policy Claims pursuant to the Rehabilitation Plan. The Rehabilitation Plan also makes permanent the Temporary Injunction, as amended by the Supplemental Injunction.

The issuance of Surplus Notes as contemplated by the Rehabilitation Plan could subject AAC to the risk of deconsolidation from AFG for U.S. federal income tax purposes and of having to recognize significant cancellation of indebtedness income ("<u>CODI</u>"). Deconsolidation or the recognition of substantial CODI would likely have a material adverse effect on the financial condition of AAC and the Segregated Account. Consequently, the Rehabilitator is considering substantial amendments to the Rehabilitation Plan and/or the initiation of rehabilitation proceedings with respect to AAC.

Effective November 7, 2010, the Plan of Operation for the Segregated Account was amended for the purpose of allocating to the Segregated Account (i) any and all liabilities (including contingent liabilities) AAC has or may have, now or in the future, to the Debtor, or any successor to the Debtor, in regard to, or respecting, the Tax Refund Transfers and/or the TSA (other than any liability to the Debtor pertaining to any possible misallocation of up to $38,485,850 of the Tax Refund Transfers (the "<u>Misallocation Claim</u>")), (ii) any and all liabilities (including contingent liabilities) AAC has or may have, now or in the future, to the IRS and/or the United States Department of the Treasury (the "<u>U.S. Treasury</u>") in regard to, or in respect of, taxes imposed under the Internal Revenue Code of 1986, as amended (the "<u>IRC</u>"), for taxable periods ending on or prior to December 31, 2009, and, (iii) to the extent not described in clause (ii), any and all liabilities (including contingent liabilities) AAC has or may have, now or in the future, to the IRS and/or the U.S. Treasury in regard to, or respect of, any federal tax refunds that were received prior to November 7, 2010, by Ambac (each of clauses (i), (ii) and (iii), the "<u>Allocated AFG Liabilities</u>"). In addition, on November 8, 2010, the Rehabilitation Court issued an order amending the Temporary Injunction to include enjoining the Debtor, any successor-in-interest, any state court receiver of the Debtor, all persons purporting to be creditors of the Debtor, the IRS and all other federal and state governmental entities from commencing or prosecuting any actions, claims, lawsuits or other formal legal proceedings relating to the Allocated AFG Liabilities (the "<u>Supplemental Injunction</u>").

2.    <u>Impact of the CDS Settlement Agreement and the Segregated Account Rehabilitation Proceedings on AFG</u>

The aggregate amount of the Surplus Notes, which rank senior to the Debtor's equity investment in AAC, has not yet been determined but will be substantial. There will be residual value to the Debtor in AAC only to the extent that funds remain at AAC after the payment of claims under outstanding financial guaranty policies and the redemption, repurchase or repayment in full of the Surplus Notes and AAC's auction market preferred shares. The value of AFG's equity investment in AAC is difficult to estimate, and will primarily depend upon the performance of AAC's insured portfolio (*i.e.*, the ultimate losses therein relative to its claims paying resources), ongoing remediation efforts of AAC with respect to Segregated Account Policies, and upon other factors, including AAC's ability to repurchase Surplus Notes and auction market preferred shares at less than their face value.

Additionally, the Rehabilitator retains significant decision-making authority with respect to the Segregated Account and has the discretion to oversee and approve certain actions taken by AAC regarding assets and liabilities that remain at AAC. The Rehabilitator will make decisions in respect of oversight and approval of such actions for the benefit of policyholders of AAC and will not take into account the interests of holders of claims against and equity interests in the Debtor. Consequently, actions taken by the Rehabilitator could further reduce the equity value of AAC to the Debtor.

## F.    Shareholder Litigation

### (i)    Description of Certain Shareholder Litigation

The Debtor and certain of its present or former officers or directors have been named in lawsuits that allege violations of the federal securities laws and/or state law, some of which have been styled as putative class action suits. Various putative class action suits alleging violations of the federal securities laws have been filed against the Debtor and certain of its present or former directors and officers. These suits include four class actions filed in January and February of 2008 in the United States District Court for the Southern District of New York (the "District Court") that were consolidated on May 9, 2008, under the caption *In re Ambac Financial Group, Inc. Securities Litigation*, Lead Case No. 08 CV 411 (the "Consolidated Class Action"). On July 25, 2008, another suit, *Painting Industry Insurance and Annuity Funds v. Ambac Assurance Corporation, et al.*, case No. 08 CV 6602, was filed in the District Court. On or about August 22, 2008, a consolidated amended complaint was filed in the consolidated action. The consolidated amended complaint includes the allegations presented by the original four class actions, the allegations presented by the *Painting Industry* action, and additional allegations. The consolidated amended complaint purports to be brought on behalf of purchasers of the Debtor's common stock from October 25, 2006, to April 22, 2008, on behalf of purchasers of DISCS issued in February 2007, and on behalf of purchasers of Equity Units and common stock in AFG's March 2008 offerings. The suit named as defendants the Debtor, the underwriters for the offerings, the Debtor's independent Certified Public Accountants and certain present and former directors and officers of the Debtor. The consolidated amended complaint alleges, among other things, that the defendants issued materially false and misleading statements regarding Ambac's business and financial results and guarantees of collateralized debt obligation and mortgage-backed securities transactions and that the Registration Statements pursuant to which the offerings were made contained material misstatements and omissions in violation of the securities laws. On August 27, 2009, the Debtor and the individual defendants named in the consolidated securities action moved to dismiss the consolidated amended complaint. On February 22, 2010, the District Court dismissed the claims arising out of the Equity Units and the March 2008 common stock offering (resulting in the dismissal of the Debtor's independent Certified Public Accountants from the action), and otherwise denied the motions to dismiss. On April 15, 2010, the District Court ordered a discovery plan and proposed pretrial schedule, pursuant to which discovery was scheduled to commence on May 10, 2010, with dispositive motions due by December 2, 2011.

On December 24, 2008, a complaint in a putative class action entitled *Stanley Tolin et al. v. Ambac Financial Group, Inc. et al.* (the "Tolin Action", and collectively with the Consolidated Class Action, the "Securities Actions"), asserting alleged violations of the federal securities laws

was filed in the District Court against the Debtor, one former officer and director and one former officer, Case No. 08 CV 11241. An amended complaint was subsequently filed on January 20, 2009. This action is brought on behalf of all purchasers of Structured Repackaged Asset-Backed Trust Securities, Callable Class A Certificates, Series 2007-1, STRATS(SM) Trust for Ambac Financial Group, Inc. Securities 2007-1 ("STRATS") from June 29, 2007, through April 22, 2008. The STRATS are asset-backed securities that were allegedly issued by a subsidiary of Wachovia Corporation and are allegedly collateralized solely by the DISCS. The complaint asserts, among other things, that the defendants issued materially false and misleading statements regarding the Debtor's business and financial results and AAC's guarantees of CDO and RMBS transactions, in violation of the securities laws. On April 15, 2009, the Debtor and the individual defendants named in the Tolin Action moved to dismiss the amended complaint. On December 23, 2009, the District Court initially denied defendants' motion to dismiss, but later recalled that decision and requested further briefing from parties in the case before it rendered a decision on the motion to dismiss. The additional briefing was completed on March 5, 2010, and oral argument on the motion to dismiss was heard on August 4, 2010. As of the date hereof, no decision has been rendered.

Various shareholder derivative actions (the "Derivative Actions," and together with the Securities Actions, the "Shareholder Litigation") have been filed against certain present or former officers or directors of the Debtor (together with the individual defendants named in the Securities Actions, the "Individual Defendants"), and against the Debtor as a nominal defendant. These suits, which are brought purportedly on behalf of the Debtor, are in many ways similar and allege violations of law for conduct occurring between October 2005 and the dates of suit regarding, among other things, guarantees of collateralized debt obligation and mortgage-backed securities transactions, the Debtor's public disclosures regarding such guarantees and the Debtor's financial condition, and certain defendants' alleged insider trading on non-public information.

The Derivative Actions include (i) three actions filed in the District Court that have been consolidated under the caption *In re Ambac Financial Group, Inc. Derivative Litigation*, Lead Case No. 08 CV 854 (the "District Court Consolidated Derivative Action"); on June 30, 2008, the plaintiffs filed a consolidated and amended complaint that asserts violations of state and federal law, including breaches of fiduciary duties, waste of corporate assets, unjust enrichment and violations of the federal securities laws; on August 8, 2008, the Debtor and the individual defendants named in the consolidated derivative action in the District Court moved to dismiss that action for want of demand and failure to state a claim upon which relief can be granted; on December 11, 2008, the District Court granted the plaintiffs' motion for leave to amend the complaint and the plaintiffs filed an amended complaint on December 17, 2008; on June 2, 2009, the defendants moved to dismiss the amended complaint; on November 22, 2010, the District Court dismissed the consolidated derivative action without prejudice to its renewal when and if the automatic stay provided by the Bankruptcy Code is lifted; (ii) two actions filed in the Delaware Court of Chancery that have been consolidated under the caption *In re Ambac Financial Group, Inc. Shareholders Derivative Litigation*, Consolidated C.A. No. 3521; on May 7, 2008, the plaintiffs filed a consolidated and amended complaint that asserts claims including breaches of fiduciary duties, waste, reckless and gross mismanagement, and unjust enrichment; on December 30, 2008, the Delaware Court of Chancery granted the defendants' motion to stay the Delaware shareholder derivative action in favor of the District Court Consolidated Derivative

Action; plaintiffs in the Delaware action subsequently moved to intervene in the District Court Consolidated Derivative Action and on May 12, 2009, the motion to intervene was denied; and (iii) two actions filed in the Supreme Court of the State of New York, New York County, that have been consolidated under the caption *In re Ambac Financial Group, Inc. Shareholder Derivative Litigation*, Consolidated Index No. 650050/2008E; on September 22, 2008, the plaintiffs filed a consolidated and amended complaint that asserts claims including breaches of fiduciary duties, gross mismanagement, abuse of control, and waste; on January 5, 2010, the New York Supreme Court granted the defendants motion to stay the New York Supreme Court action in favor of the District Court Consolidated Derivative Action; one of the actions consolidated in the New York Supreme Court actions is currently listed on the Court's docket as dismissed, the other action remains listed as stayed.

On December 14, 2009, a purchaser of the DISCS filed an individual action entitled *Judy Ehrenreich v. Ambac Financial Group, Inc. et al.*, alleging violations of the federal securities laws, in the District Court, against the Debtor and one former officer, Case No. 09 CV 10173 (the "Ehrenreich Action"). The complaint asserts, among other things, that the defendants issued materially false and misleading statements regarding the Debtor's plan to meet certain investment agreement collateral requirements, as well as materially false and misleading statements regarding the Debtor's valuation of certain of its investment securities. On March 9, 2010, the Debtor and the former officer moved to dismiss. On November 10, 2010, the Debtor filed a "Notice of Bankruptcy" in the action, advising the District Court of its position that in light of the Debtor's bankruptcy filing, as of November 8, 2010, any new or further action against the Debtor is stayed pursuant to Bankruptcy Code section 362. On March 28, 2011, the District Court entered an order staying the action pursuant to section 362 of the Bankruptcy Code.

(ii)    Pre-Commencement Date Settlement Negotiations and the Signing of the MOU

In July 2009, the Debtor, the Individual Defendants, representatives of the four insurers that are parties to the MOU (as defined below) that issued specified policies of directors and officers liability insurance for the benefit of the Individual Defendants (the "D&O Insurers"), the underwriters named in the Consolidated Class Action (the "Underwriter Defendants") and the plaintiffs in the Securities Actions and the Derivative Actions met to attempt to negotiate a resolution of certain of the litigations with the assistance of a mediator, retired federal judge Nicholas H. Politan. No settlement was reached at the mediation.

In April 2010, the lead plaintiffs in the Consolidated Class Action, the Public School Teachers' Pension & Retirement Fund of Chicago, Arkansas Teacher Retirement System, and Public Employees' Retirement System of Mississippi, plaintiffs in the Derivative Actions, the Debtor, the Individual Defendants, the Underwriter Defendants, and the D&O Insurers, among others, participated in a second in-person mediation session with Judge Politan. No settlement was reached at the mediation, but the parties agreed that mediation would continue through discussions between and among Judge Politan (the mediator), plaintiffs in the Securities Actions, the Debtor, the Individual Defendants, the D&O Insurers, and the Underwriter Defendants, and such discussions continued through the remainder of 2010, including multiple additional mediation sessions with Judge Politan.

During the course of mediated settlement negotiations following April 2010, the Debtor, the Individual Defendants, the D&O Insurers, the plaintiffs in the Securities Actions, and the Underwriter Defendants were able to reach agreements as to the general terms of settlements of claims asserted in the Securities Actions. Pursuant to a November 4, 2010, escrow agreement between the plaintiffs in the Consolidated Class Action and the Debtor, on November 5, 2010, prior to the Commencement Date, the Debtor paid into escrow (the "Escrow Account") its $2,500,000 contribution to the contemplated settlement fund. On December 8, 2010, after considerable negotiation, the plaintiffs in the Securities Actions, the Individual Defendants, and the D&O Insurers executed a Memorandum of Understanding reflecting an agreement in principle to settle claims in the Consolidated Class Action and Tolin Action against the Debtor, the Individual Defendants, and their related parties (the "MOU"). In the MOU, the parties also contemplated the resolution, release and bar of certain claims that have been or could be brought by the Debtor or any shareholder or creditor of the Debtor (including any claims purportedly brought derivatively on behalf of the Debtor) against any of its current or former officers, directors or employees, including those related to the subject matter of the Securities Actions or the Derivative Actions. Following the signing of the MOU, negotiations of a stipulation of settlement and an insurer agreement commenced, as further described in Article III below. In December 2010, the plaintiffs in the Consolidated Class Action and certain of the Underwriter Defendants entered into a separate settlement pursuant to a separate memorandum of understanding and, thereafter, a separate stipulation of settlement, as further described in Article III below.

## G. Restructuring Initiatives

Because AAC has been unable to pay dividends to the Debtor for several years, over the year preceding its chapter 11 filing, the Debtor considered various restructuring initiatives, including third-party investment and, through negotiations with an ad hoc committee of AFG's senior noteholders (the "Prepetition Ad Hoc Committee"), a prepackaged bankruptcy.

### 1. Negotiations with Third-Party Investors

The Debtor considered several possible transactions to attract new capital, met with potential investors and received multiple bids. Such bids contemplated different combinations of (i) the acquisition of less than twenty (20) percent of the Debtor's equity interests in AAC, (ii) an equity investment in AFG, and/or (iii) a loan to AFG. None of the bids, however, sufficiently satisfied AFG's liquidity needs and/or the necessary agreements were not reached. In late October/early November 2010, negotiations with the remaining third-party investors concluded and failed to produce an acceptable transaction that would enable the Debtor to service its debt obligations. As a result, the Debtor concentrated its efforts on negotiations with the Prepetition Ad Hoc Committee in hopes of commencing a prepackaged chapter 11 bankruptcy case.

2.    Negotiations with the Prepetition Ad Hoc Committee

Beginning in August 2010,[7] while simultaneously negotiating with potential third-party investors, the Debtor and the Prepetition Ad Hoc Committee participated in extensive negotiations in an effort to reach an agreement on a consensual restructuring to be accomplished through a prepackaged bankruptcy plan of reorganization.  The Prepetition Ad Hoc Committee engaged Morrison & Foerster LLP as its counsel and Lazard Frères & Co. LLC as its financial advisors.  AFG, its counsel, Dewey & LeBoeuf LLP, and its financial advisors, Blackstone Advisory Partners LP ("Blackstone"), attempted to reach a consensual restructuring of the Debtor's balance sheet with the Prepetition Ad Hoc Committee and its advisors.

Subjects of negotiation between AFG and the Prepetition Ad Hoc Committee included (i) the December 2009 Amendment and June 2010 Amendment, (ii) the Tax Refund Transfers, (iii) the allocation of NOLs between the AFG Subgroup and the AAC Subgroup, and (iv) potential avoidance actions that may be brought on behalf of AFG against AAC.  Because settlement of these issues would directly affect AAC, in October 2010, AFG attempted to include OCI in its negotiations with the Prepetition Ad Hoc Committee.

3.    Negotiations with OCI

The Debtor concluded that it was possible that, if any prepackaged plan agreed upon by AFG and the Prepetition Ad Hoc Committee were likely to impact negatively AAC's ability to satisfy policyholder claims, OCI may have placed the General Account into full rehabilitation, thereby potentially eliminating any equity value of AAC to AFG.  As a result, the Debtor and the Prepetition Ad Hoc Committee sought OCI consent to any possible prepackaged plan of reorganization which contemplated preservation of AAC's going-concern value.  Despite a $37 million dividend received from Ambac (Bermuda) Ltd., however, AFG's liquidity position was deteriorating and it became evident that an agreement among AFG, the Prepetition Ad Hoc Committee and OCI regarding a prepackaged bankruptcy plan would not be reached in the appropriate timeframe.  Nonetheless, while AFG prepared to file for chapter 11 protection, it continued to negotiate with the Prepetition Ad Hoc Committee and OCI, and it remained hopeful that an agreement could be reached on a prenegotiated bankruptcy plan.

**H.    Events Leading Up to the Commencement Date**

On October 28, 2010, the IRS sent to AFG an information document request (an "IDR") regarding the Form 3115 filed by the Debtor in 2008 and three claims filed by the Debtor with the IRS for tentative carryback adjustments on Form 1139 (Corporate Application for Tentative Refund) on account of which the IRS refunded to the Debtor the Tax Refunds in December 2008, September 2009 and February 2010.  Additionally, the IRS questioned the loss accounting methods underlying Ambac's reported consolidated NOLs on September 30, 2010, of approximately $7.3 billion.

---

[7] Although negotiations began in September, the Prepetition Ad Hoc Committee was formed and did significant diligence in preparation for such negotiations and conducted preliminary negotiations over the preceding summer.

On October 29, 2010, AFG's board of directors determined that AFG would not pay the $2.8 million interest payment on the 7-1/2% Debentures Due 2023 (the "November 1st Interest Payment"). Pursuant to the 1991 Indenture, nonpayment of the November 1st Interest Payment within 30 days of its scheduled due date, *i.e.*, November 30, 2010, would constitute an event of default, giving the Debtor 30 days to decide whether to cure such default or file for chapter 11 protection.

Upon receipt of the IDR, the Debtor's management reviewed the potential ramifications. Because (i) the Tax Refunds were transferred to AFG by the IRS pursuant to a Form 1139 and (ii) AFG is in financial distress, the IRS could assess AFG for a deficiency, and immediately (a) obtain liens and levy upon AFG's cash assets, (b) obtain liens and levy upon AAC's assets, and/or (c) obtain liens and levy upon the assets of any other Ambac Affiliate, all without notice to the Debtor or an opportunity to pay or object to such assessed deficiency.

The Debtor determined that, if the IRS were to take such enforcement actions with respect to AFG, AFG would have been unable to access its cash or other assets. Additionally, if the IRS were to take such enforcement actions with respect to AAC, there was a real risk that OCI would quickly thereafter commence a rehabilitation of AAC, which would likely cause significant value destruction at AAC and seriously jeopardize or completely destroy the Debtor's reorganization prospects. Although most of AAC's exposure to CDS was commuted in connection with the CDS Settlement Agreement, the General Account continues to be exposed to a significant book of CDS of CDOs, collateralized loan obligations and other structured finance obligations. As with CDS exposures generally, counterparties on these agreements have a right to assert mark-to-market termination claims in the event of a rehabilitation of AAC. Although OCI would presumably have attempted to enjoin the assertion of such mark-to-market damages, there could be no assurance that such injunctions would have ultimately been successful. AAC's exposure to such mark-to-market damage claims in respect of the remaining book of CDS in the General Account was estimated to be approximately $1.5 billion. In the event that OCI failed to restrain the assertion of such damages, this $1.5 billion in additional policyholder claims would dilute all other policyholder claims significantly and diminish AAC's residual value (if any) to AFG.

Additionally, irrespective of whether the IRS took enforcement action against AAC, the IRS could have obtained liens and levy upon (i) Everspan, an insurance company subsidiary of AAC with approximately $160-170 million of surplus, and (ii) two non-insurance subsidiaries of AAC, Ambac Financial Services, LLC ("AFS") and Ambac Capital Funding, Inc. ("ACFI"). AFS engages in swap transactions with clients of AAC and the general marketplace while ACFI has a large book of guaranteed investment contract business. These businesses could be significantly affected if the liens referenced above were instituted. If the businesses of AFS and ACFI were destroyed by an IRS lien and/or levy, both AFS and ACFI (all of whose liabilities to third parties are insured by AAC) could generate significant additional liabilities for AAC and further reduce or eliminate AAC's residual value to AFG.

Negotiations among the Debtor, the Prepetition Ad Hoc Committee and OCI continued through November 7, 2010, culminating in a non-binding term sheet (the "Term Sheet"). A copy of the Term Sheet was annexed to a letter sent by Sean Dilweg, the Wisconsin Commissioner of Insurance, to AAC's board of directors on November 7, 2010 (the "Dilweg Letter"), which was

attached as an exhibit to the *Affidavit of David W. Wallis in Support of the Debtor's Chapter 11 Petition and First Day Motions and Pursuant to Local Rule 1007-2*, filed on the Commencement Date [Docket No. 2].

The Term Sheet provided, among other things, that: (i) the Debtor would retain ownership of AAC; (ii) OCI would not petition for the full rehabilitation of AAC unless warranted by new material developments; (iii) AAC would allocate to the Segregated Account the Allocated AFG Liabilities; (iv) until the expiry of the Term Sheet, the Rehabilitator would not seek an injunction from the Rehabilitation Court enjoining AFG action in respect of the NOLs and the Debtor would not take any action with regard to allocation of the NOLs between AAC and AFG; (v) until the expiry of the Term Sheet, the Prepetition Ad Hoc Committee would not to pursue, or support the pursuit of, any preference claim or fraudulent conveyance claim on behalf of AFG pertaining to the Tax Refund Transfers; (vi) the Debtor and AAC would negotiate a cost allocation agreement allocating administrative expenses among Ambac Affiliates and an agreement regarding allocation between AAC and AFG of the fees and expenses incurred by AFG in relation to any litigation in regard to the return of the Tax Refunds; (vii) AAC and the Segregated Account would negotiate in good faith with AFG to modify the TSA and address certain issues including, but not limited to, allocation of the NOLs between AAC and the Debtor (a) the amount of NOLs available for use by AAC, which shall be no greater than $3.5 billion, (b) the amount paid by AAC to AFG for the use of the NOLs; and (viii) AAC and the Segregated Account would negotiate in good faith with AFG on the amount of the Misallocation Claim, and subject to the approval of the Rehabilitation Court, AAC would pay such amount to AFG, and, if the parties are unable to settle the Misallocation Claim by expiry of the Term Sheet, the dispute would be submitted to binding arbitration.

At meetings convened on the evening of November 7, 2010, the boards of directors of both the Debtor and AAC passed resolutions authorizing management to continue to pursue negotiations with the Debtor's senior creditors and OCI with a view to reaching an agreement on a comprehensive restructuring of the Debtor within the framework of the terms set forth in the Term Sheet.

As discussed above in the context of the Segregated Account Rehabilitation Proceedings, on the morning of the Commencement Date, OCI went into the Rehabilitation Court and informed it of the Term Sheet and the allocation of the Allocated AFG Liabilities. The Rehabilitator also sought expansion of the Temporary Injunction to prevent the IRS from asserting liens against and levying upon the assets of AAC and its subsidiaries and to prevent AFG or AFG-related parties from pursuing the Allocated AFG Liabilities against the Segregated Account, the General Account or AAC's subsidiaries, resulting in Rehabilitation Court's entering the Supplemental Injunction.

Because allocation of the Allocated AFG Liabilities and entry of the Supplemental Injunction affected AAC's obligations to the IRS, the IRS received notice thereof, increasing the concern of the Debtor's board of directors that the IRS would pursue the enforcement actions described above. Because such enforcement actions had the potential to eliminate the Debtor's ability to reorganize and force it into liquidation proceedings, the Debtor's board of directors decided to file for chapter 11 protection on an emergency basis and approved resolutions authorizing the commencement of the Debtor's chapter 11 case.

# ARTICLE III.
## THE CHAPTER 11 CASE

## A.    Overview of the Chapter 11 Case

### 1.    Commencement of the Chapter 11 Case and First Day Orders

On the Commencement Date, AFG filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code in the Bankruptcy Court.  The Chapter 11 Case was assigned to the Honorable Shelley C. Chapman, United States Bankruptcy Judge.  At a hearing held on November 9, 2010, the Debtor obtained interim approval to, among other things, continue its use of a centralized Cash management system, restrict certain trading activity in the Debtor's Equity Interests and Claims, and continue its business in the ordinary course during the pendency of the Chapter 11 Case.  At subsequent hearings on November 30 and December 21, 2010, the Bankruptcy Court approved such actions on a final basis, as well as the Debtor's request to honor certain prepetition obligations to employees, taxing authorities and critical service providers.

The Debtor retained the following advisors in the Chapter 11 Case:  Dewey & LeBoeuf LLP as counsel to the Debtor, Togut, Segal & Segal LLP as conflicts counsel to the Debtor, Blackstone Advisory Partners LLP as financial advisor, KPMG LLP as auditors and tax consultants, Kurtzman Carson Consultants LLC as claims and noticing agent, Wachtell, Lipton, Rosen & Katz as special litigation counsel, Cornerstone Partners as litigation consultants, Lathrop & Clark LLP as local Wisconsin counsel, Buttner Hammock & Company, P.A. as a consultant and possible expert witness, and The Brattle Group, Inc. as expert witness.

### 2.    The Trading Order

On November 30, 2010, the Bankruptcy Court entered an order restricting certain transfers of Equity Interests in and Claims against the Debtor [Docket No. 40] (the "Trading Order").  The purpose of the Trading Order is to preserve the Debtor's NOLs.

Under IRC section 382, if a corporation undergoes an "ownership change," the amount of its pre-ownership change NOLs which may be utilized to offset future taxable income generally is subject to an annual limitation.  In general, the amount of this annual limitation is equal to the product of the fair market value of the stock of the corporation (or, in the case of a consolidated group, the stock of the common parent) immediately before the ownership change (with certain adjustments) and the "long-term tax-exempt rate" in effect for the month in which the ownership change occurs, which is generally defined as the highest rate in effect during the three months prior to and including the month in which the ownership change occurs (for example, 4.30% for an ownership change that occurs during July 2011).  An "ownership change" is generally deemed to occur if shareholders owning five percent or more of the corporation's stock increase their ownership by greater than 50 percentage points over a three-year testing period.  Although it is likely that the Debtor will undergo an "ownership change" for purposes of IRC section 382 as a result of the consummation of the Plan, the Debtor intends to qualify under a special exception contained in IRC section 382(l)(5) (the "L5 Exception") excepting the Reorganized Debtor from the annual limitation on use of NOLs.  The Debtor sought entry of the Trading

Order to avoid an "ownership change" prior to consummation of the Plan and to increase the likelihood that the Reorganized Debtor will be able to utilize the L5 Exception.

The Trading Order implements notice and hearing procedures for transfers of Equity Interests by a Person or Entity that beneficially owns more than 13,500,000 shares of the Debtor's stock. Transfers of the Debtor's stock in violation of the Trading Order are void *ab initio*. In addition, the Trading Order generally requires a Person or Entity that beneficially owns a Claim or Claims against the Debtor totaling more than $55,000,000 to agree to "sell down" a portion of its Claim(s) prior to consummation of a plan, such that such Person or Entity would receive less than five percent of the New Common Stock under a plan, thereby increasing the likelihood that the Reorganized Debtor will be able to utilize the L5 Exception. Because the Reorganized Debtor's ability to utilize its NOLs will be substantially impaired if it does not qualify for the L5 Exception, any Holder of a Claim that does not comply with the Trading Order will only receive New Common Stock equal to or less than five percent of total New Common Stock issued under a plan.

3.   Appointment of Committee

Pursuant to Bankruptcy Code section 1102(a)(1), on November 17, 2010, the U.S. Trustee appointed the Committee. The following creditors currently serve on the Committee: (i) Bank of New York Mellon, as Indenture Trustee, (ii) Law Debenture Trust Company of New York, as Indenture Trustee, (iii) Halcyon Master Fund LP, (iv) ValueWorks LLC, and (v) OSS.

The Committee retained the following advisors in the Chapter 11 Case: Morrison & Foerster LLP as counsel to the Committee, Lazard Frères & Co. LLC as financial advisor, and Whyte Hirschboeck Dudek S.C. as Wisconsin local counsel.

4.   Claims

(i)   Schedule of Assets and Liabilities and Statements of Financial Affairs

Pursuant to Bankruptcy Rule 1007(c), a debtor is required to file schedule of assets and liabilities and statements of financial affairs within 14 days after the filing of its bankruptcy petition. On the Commencement Date, the Debtor filed a motion seeking to extend the deadline to file its Schedules to December 22, 2010. On November 9, 2010, the Bankruptcy Court entered an order granting the Debtor's motion. The Debtor filed its Schedules on December 22, 2010.

(ii)   Claims Bar Date and Notice of Bar Date

On January 19, 2011, the Bankruptcy Court entered an order setting deadlines for Filing proofs of Claim and requests for payment in the Chapter 11 Case [Docket No. 127] (the "Bar Date Order"), establishing March 2, 2011, as the deadline by which all Persons and Entities must File proofs of Claim and requests for payment (the "Bar Date"), and May 9, 2011, as the deadline by which all "governmental entities" (as defined in Bankruptcy Code section 101(27)) must File proofs of Claim and requests for payment (the "Governmental Bar Date," and together with the Bar Date, the "Bar Dates"). In accordance with the Bar Date Order, notices informing Creditors of the last date to timely File proofs of Claims were mailed at least 35 days prior to the

Bar Date, along with a customized proof of claim form. Further, the Debtor published notice of the Bar Date in The Wall Street Journal (National Edition) and the New York Times.

Additionally, on March 1, 2011, the Bankruptcy Court entered an order extending the Bar Date to July 2, 2011, for certain former officers and directors of the Debtor who are defendants in the Shareholder Litigation or the ERISA Action in respect of any claims against the Debtor for indemnification, contribution or reimbursement arising from the Shareholder Litigation or the ERISA Action [Docket No. 196]. On June 29, 2011, the Debtor agreed to further extend the Bar Date for such former officers and directors to August 1, 2011 [Docket No. 327]. On August 1, 2011, the Debtor agreed to further extend the Bar Date for such former officers and directors to September 30, 2011 [Docket No. 481]. As of the date hereof, the Debtor has received eight claims from such former officers and directors, seven of which are unliquidated and all of which are contingent.

(iii)     Claims Objections and Settlement

On or before the Bar Dates, more than 3100 proofs of claim asserting Claims against the Debtor were received by the Debtor's Notice and Claims Agent or filed with the Bankruptcy Court. Over 600 proofs of claim were Filed after the applicable Bar Dates. Based upon the Debtor's review of these Claims, the Debtor estimated that over 3700 of these Claims were duplicative, misclassified or otherwise invalid. Additionally, the Debtor has scheduled approximately 44 liquidated, noncontingent and undisputed Claims totaling $1,624,513,560.16, of which $12,403.84 is scheduled as priority Claims. The aggregate amount of proofs of Claim timely filed totals $1,038,686,553.36, including duplication but excluding any estimated amounts for contingent or unliquidated Claims.[8]

On March 24, 2011, the Bankruptcy Court entered an order granting relief from certain limitations of Bankruptcy Rule 3007 and establishing procedures for objecting to Claims [Docket No 225] (the "Claims Objection Procedures Order"). The Claims Objection Procedures Order authorizes the Debtor to: (i) file a single omnibus objection to no more than 300 Claims at a time on certain specified grounds, in addition to those enumerated in Bankruptcy Rule 3007(d); (ii) serve a personalized notice of the Claim objection, rather than the entire omnibus Claim objection, on each of the claimants whose Claims are the subject of the applicable objection; and (iii) file omnibus motions to deem the Schedules amended, but serve a personalized notice on each affected claimant. The Claims Objection Procedures Order streamlines the Claims objection and reconciliation process, and conserves the resources of the Debtor's estate.

On December 14, 2010, the New York City Department of Finance (the "NYCDF") filed a proof of Claim against the Debtor in the amount of $116,817,949.00 (the "NYC Tax Claim"), asserting Priority status. On May 23, 2011, in accordance with the Claims Objection Procedures Order, the Debtor filed an objection and request to disallow the NYC Tax Claim [Docket No. 278] (the "NYC Tax Claim Objection"). On July 6, 2011, the New York City Department of Finance filed a response to the NYC Tax Claim Objection [Docket No. 364] (the "NYC Tax

---

[8] This amount reflects amendments to the Debtor's Schedules and the resolution of certain duplicative Claims.

Claim Response"). On August 15, 2011, the Debtor, the Committee and the NYCDF came to an agreement in principle regarding the resolution of the NYC Tax Claim and related NYC Tax Claim Objection (the "NYC Tax Claim Settlement"). Additional information with respect to the NYC Tax Claim Settlement may be found in Article III.A.11 below.

On May 5, 2011, the IRS filed proofs of Claim against the Debtor in the amount of $807,243,827.91 (the "IRS Claims"), of which $807,242,027.91 is asserted as an unsecured Priority Tax Claim, and $1,800.00 is asserted as a General Unsecured Claim. As discussed in Article III.A.5 below, the Debtor believes these Claims should be valued at $0, and commenced an adversary proceeding seeking a declaratory judgment to that effect (the "IRS Adversary Proceeding"). On June 14, 2011, in accordance with the Claims Objection Procedures Order, the Debtor filed an objection to the IRS Claims [Docket No. 311] (the "IRS Claims Objection"). Additional information with respect to the IRS Claims may be found in Article III.A.5 below.

In accordance with the Claims Objection Procedures Order, on June 14, 2011, the Debtor filed in the Bankruptcy Court sixteen omnibus objections to approximately 3,679 duplicative, unsubstantiated, misclassified and late-Filed Claims, for hearing by the Bankruptcy Court on July 19, 2011. On July 6, 2011, the Debtor filed in the Bankruptcy Court a seventeenth omnibus objection to approximately 45 duplicative, unsubstantiated and late-Filed Claims for hearing by the Bankruptcy Court on August 10, 2011. On July 19, 2011, the Bankruptcy Court entered orders granting the Debtor's first sixteen omnibus objections to Claims, reclassifying two Claims and expunging 3,665 Claims. On August 10, 2011, the Bankruptcy Court entered (i) second orders granting the Debtor's fourth and eleventh omnibus objection to Claims as to objections to specific Claims that had been adjourned from the July 19, 2011, hearing date to the August 10, 2011, hearing date, and (ii) an order granting the Debtor's seventeenth omnibus objections to Claims, expunging 48 Claims. Upon resolution of these Claims objections, approximately 3,713 Claims against the Debtor's estate were expunged.

Contemporaneously herewith, the Debtor is filing in the Bankruptcy Court its eighteenth omnibus objection to approximately 21 Claims for hearing by the Bankruptcy Court on October 26, 2011. Upon granting of the Debtor's requested order, approximately 3,734 Claims will have been expunged.

The Debtor continues to review and evaluate the remaining Filed Claims to determine whether objections seeking the disallowance of certain Claims should be Filed, or whether certain Claims should be resolved in the ordinary course or in a judicial tribunal with appropriate jurisdiction. The Debtor is also reconciling the scheduled Claims with the Claims asserted in proofs of Claim and is continuing to eliminate duplication and other inaccuracies to ensure that only valid Claims are allowed by the Bankruptcy Court. The Debtor anticipates filing additional objections in respect of certain of the remaining Filed proofs of Claim where consensual resolution with the creditors cannot be achieved.

(iv)    Remaining Claims

Provided that the Debtor's eighteenth omnibus objection is granted and the claims subject to such objection are expunged, approximately 51 claims will remain against the Debtor's estate. Of these 51 Claims, six have been or will be expunged pursuant to the Stipulation of Settlement

(as defined in Article III.A.10 below) and the NYC Tax Claim Settlement. The two IRS Claims remain subject to mediation and may be estimated as discussed in Article III.4(v)(a) below. Additionally, pursuant to the Plan, two Claims will be cured by the Debtor's assumption of the executory contracts underlying such Claims. The Debtor also anticipates filing additional Claims objections in respect of a number of the remaining Claims. Upon resolution of such objections, the Debtor expects the total amount of remaining General Unsecured Claims to be below the $50 million cap required in the Plan.

(v)      Claims Estimation

The Debtor has examined the existing Disputed Claims and does not believe that the existence of such unresolved or unliquidated Disputed Claims will impact the feasibility of the Plan. To the extent necessary to demonstrate compliance with Bankruptcy Code section 1129(a)(11), the Debtor will request that the Bankruptcy Court estimate any Disputed Claims at the Confirmation Hearing for the purpose of determining feasibility of the Plan.

(a)      Estimation of IRS Claims

As discussed in Article III.A.5 below, the Debtor, AAC, OCI, the Committee and the IRS are currently engaged in mediation with respect to the IRS Claims. Such mediation has not yet resulted in a consensual resolution of the IRS Dispute, however, further meetings may occur in the near term. If the parties are unable to come to a consensual resolution shortly hereafter, the Debtor will file a motion to request that the Bankruptcy Court estimate the IRS Claims for the purposes of voting on and determining the feasibility of the Plan. The Debtor anticipates that such motion will be heard prior to the Confirmation Hearing.

(b)      Estimation of Claims

Should the Debtor deem it necessary, based upon its review of the proofs of Claim Filed in the Chapter 11 Case, it shall file a motion to estimate certain Claims for the purpose of voting on, or distributions under, the Plan.

5.      <u>IRS Adversary Proceeding</u>

On November 9, 2010, the Debtor filed and served against the IRS a complaint for a declaratory judgment relating to the Tax Refunds, commencing the IRS Adversary Proceeding, and a motion for a preliminary injunction, pursuant to Bankruptcy Code section 105(a), barring assessment and collection of the Tax Refunds by the IRS against the non-debtor Entities in the Ambac Consolidated Group (the "<u>Preliminary Injunction</u>"). On the same date, the Debtor and the IRS agreed to a stipulation on the record of the Bankruptcy Court that provides that the IRS would give notice at least 5 business days prior to taking any action against the Debtor's non-debtor subsidiaries in the Ambac Consolidated Group that would violate the Supplemental Injunction entered by the Rehabilitation Court, whether or not in effect. The stipulation permits the status quo to be maintained from November 9, 2010, until a hearing on the Preliminary Injunction. As of this date, no hearing on the Preliminary Injunction has been scheduled.

On January 13, 2011, the IRS filed a motion in the District Court to withdraw the IRS Adversary Proceeding from the Bankruptcy Court to the District Court. The Debtor opposed such motion. As of the date of filing, no hearing on such motion has been scheduled.

On February 1, 2011, the Debtor filed a motion with the Bankruptcy Court for a pretrial conference and for authorization to implement alternative dispute resolution procedures. On March 2, 2011, the Bankruptcy Court ordered the process of non-binding mediation to begin on or about May 1, 2011, and to conclude no later than on or about September 6, 2011. The Bankruptcy Court also approved a scheduling order which, among other things, ordered (i) fact discovery in the IRS Adversary Proceeding to be completed by August 5, 2011, (ii) dispositive motions to be filed by September 16, 2011, and (iii) trial to be scheduled thereafter, pursuant to further order of the Bankruptcy Court. On May 5, 2011, prior to the Governmental Bar Date, the IRS filed the IRS Claims. On June 15, 2011, the parties agreed to extend the deadlines to (i) complete fact discovery in the IRS Adversary Proceeding to September 9, 2011, and (ii) file dispositive motions to September 23, 2011. On July 28, 2011, the parties agreed to extend the deadline to complete fact discovery to September 23, 2011. On August 30, 2011, the parties agreed to extend the deadlines to (i) serve expert rebuttal reports to September 21, 2011, (ii) serve responses to admissions to September 28, 2011, (iii) complete expert depositions to October 5, 2011, (iv) serve dispositive motions to October 7, 2011, and (v) complete fact discovery to October 7, 2011.

The mediation of the IRS Dispute commenced on July 6, 2011, with the participation of the IRS, the Debtor, AAC, the Committee and OCI. As discussed in more detail in Article III.A.12 below, after several days of mediation with the IRS, the Debtor, the Committee and OCI discussed with the mediator the possibility of mediating issues related to the Plan Settlement, with a view towards agreement on the terms of a consensual Plan, including the resolution of disputes with the IRS.

On September 15, 2011, the IRS released proposed regulations that would add CDS to the list of swaps categorized as notional principal contracts governed by Treasury regulation section 1.446-3. Among other issues involved in the IRS Adversary Proceeding, the Debtor has taken the position that the CDS which resulted in impairment losses are properly characterized as notional principal contracts for federal income tax purposes. The proposed regulations are expected to apply to contracts entered into on or after the date final regulations are published and will not have a dispositive impact on the Debtor's case.

Although progress has been made towards a resolution of the IRS Dispute, a final, binding settlement has not been reached. Further negotiations may occur in the near term. If the parties are unable to come to a consensual resolution shortly hereafter, the Debtor will file a motion to request that the Bankruptcy Court estimate the IRS Claims for the purposes of voting on and determining the feasibility of the Plan to be heard prior to the Confirmation Hearing.

6. Wisconsin Proceedings

(i) Post-Commencement Proceedings in the Rehabilitation Court

On January 24, 2011, the Rehabilitation Court issued the Rehabilitation Plan Confirmation Order. Because the issuance of the Surplus Notes by both AAC and the Segregated Account contemplated by the Rehabilitation Plan could subject AAC to the risk of (a) deconsolidation from the Ambac Consolidated Group for tax purposes or (b) having to recognize significant CODI, which would likely have a material adverse effect on the financial condition of AAC and the Segregated Account, the Rehabilitator is considering substantial amendments to the Rehabilitation Plan and/or the initiation of rehabilitation proceedings with respect to AAC. Such amendments to the Rehabilitation Plan (and, presumably, any rehabilitation plan with respect to AAC) could include the elimination of the issuance of Segregated Account Surplus Notes and/or the imposition of transfer restrictions on any Segregated Account Surplus Notes. Any such amendments to the Rehabilitation Plan could adversely affect the Debtor's interests in AAC.

Interest on any issued Segregated Account Surplus Notes is payable annually in June at the rate of 5.1% on the unpaid principal balance outstanding. All payments of principal and interest on the Segregated Account Surplus Notes are subject to the prior approval of OCI. If OCI does not approve the payment of interest on the Segregated Account Surplus Notes, such interest will accrue and compound annually until paid. The Segregated Account Surplus Notes are issued pursuant to a fiscal agency agreement entered into with The Bank of New York Mellon, as fiscal agent.

On March 3, 2011, the Rehabilitator filed a motion seeking Rehabilitation Court approval of a settlement agreement among the Debtor, AAC, the Segregated Account and OSS as the landlord for the Debtor (the "OSS Settlement Agreement"). The Rehabilitation Court approved this settlement without a hearing on March 21, 2011.

On June 1, 2011, the Rehabilitator filed a Report on the Rehabilitation of the Segregated Account of Ambac Assurance Corporation (the "Rehabilitation Report"). The Rehabilitation Report states that the issuance of the Surplus Notes by AAC and the Segregated Account as contemplated by the Rehabilitation Plan, together with continued deterioration of AAC's financial strength, could subject AAC to the risk of deconsolidation from the Ambac Consolidated Group for U.S. federal income tax purposes. This could require AAC to recognize significant CODI and limit AAC's ability to deduct Surplus Note interest, which may have a material adverse effect on the financial condition of AAC and the Segregated Account, and reduce recoveries to Segregated Account policyholders. The Rehabilitator is evaluating these tax considerations and whether amendments to the Rehabilitation Plan and/or the initiation of rehabilitation proceedings with respect to AAC would eliminate or mitigate such adverse potential tax consequences for the benefit of policyholders. Such amendments to the Rehabilitation Plan could include the elimination of the issuance of Surplus Notes by the Segregated Account and/or the imposition of transfer restrictions on any Surplus Notes issued by the Segregated Account. The Rehabilitator does not have a specific timeline for determining whether to seek amendments to or modifications of the Rehabilitation Plan.

(ii)     IRS Actions in Wisconsin District Court

On December 8, 2010, the IRS removed the Segregated Account Rehabilitation Proceedings to the United States District Court for the Western District of Wisconsin (the "Wisconsin District Court").  On December 17, 2010, the IRS filed a motion in the Wisconsin District Court to dissolve the Supplemental Injunction. The Rehabilitator moved to remand the proceeding back to the Rehabilitation Court, and on January 14, 2011, that motion was granted by the Wisconsin District Court, which found that it lacked subject matter jurisdiction.  The IRS appealed the decision remanding the Segregated Account Rehabilitation Proceedings to the United States Court of Appeals for the Seventh Circuit (the "Seventh Circuit").  On January 20, 2011, the Seventh Circuit *sua sponte* ordered the IRS to show cause why its appeal should not be dismissed for lack of jurisdiction (the "Order to Show Cause"), which led to additional briefing.  On February 9, 2011, the IRS filed an action in the Wisconsin District Court seeking to prevent enforcement of the Supplemental Injunction.  That action was dismissed *sua sponte* by the Wisconsin District Court on February 18, 2011.  The IRS appealed from this dismissal to the Seventh Circuit and moved to consolidate this appeal with its previously filed appeal (the "Motion to Consolidate").  On March 29, 2011, the Seventh Circuit suspended briefing of pending determination of the IRS motion to consolidate its two federal appeals.  On August 22, 2011, the Seventh Circuit entered an order granting the Motion to Consolidate and establishing a briefing schedule, which requires (a) the IRS to file its consolidated brief on or before September 28, 2011, (b) OCI and AAC to file their respective consolidated briefs on or before October 28, 2011, and (c) the IRS to file its consolidated reply brief on or before November 14, 2011.  On September 20, 2011, the IRS moved to extend the briefing schedule by 30 days, which the Seventh Circuit granted that day.

(iii)     Wisconsin Court of Appeals

Various interested parties who opposed the Rehabilitation Plan have appealed from the Rehabilitation Plan Confirmation Order.  On May 3, 2011, the Wisconsin Court of Appeals set a briefing schedule for the various appeals, which it had previously consolidated in an order dated March 16, 2011 (the "Consolidated Appeals").  The Consolidated Appeals are fully briefed and awaiting argument, which is discretionary, and decision by the Wisconsin Court of Appeals.

On March 8, 2011, the IRS filed a notice of appeal from the Rehabilitation Plan Confirmation Order.  On March 25, 2011, the Rehabilitator filed a motion in the Court of Appeals to dismiss the IRS appeal, which was granted on May 3, 2011.

(iv)     Wisconsin Supreme Court

On June 1, 2011, the IRS filed in the Wisconsin Supreme Court a petition to review the dismissal of its appeal by the Wisconsin Court of Appeals, which was granted on August 31, 2011.  The Wisconsin Supreme Court also established a briefing schedule for the IRS' appeal which requires (a) the IRS to file its appellate brief on or before September 30, 2011, (b) OCI and AAC to respond within 20 days, and (c) the IRS to reply within 10 days of OCI and/or AAC's filing.

7. <u>Veera Adversary Proceeding</u>

On or about May 24, 2010, Karthikeyan V. Veera, a former employee and participant in the Ambac Financial Group, Inc. Savings Incentive Plan (the "<u>Savings Plan</u>"), filed the action captioned *Veera v. Ambac Financial Group, Inc. et al.*, Case No. 10 CV 4191, in the District Court, asserting violations of the Employee Retirement Income Security Act of 1974 ("<u>ERISA</u>") and naming as defendants the Debtor's Savings Plan administrative committee, Savings Plan investment committee, compensation committee of the Debtor's Board of Directors, and a number of current and former officers and directors of the Debtor (the "<u>ERISA Action</u>"). This action is purportedly brought on behalf of all persons, excluding defendants and their immediate families, who were participants in the Savings Plan from October 1, 2006, through July 2, 2008, and whose Savings Plan accounts included an investment in the Debtor's stock. Veera's complaint was amended on September 7, 2010 to exclude the Debtor from the list of named defendants in the action. The complaint alleges, among other things, breaches of fiduciary duties by defendants in respect of the continued offering of the Debtor's stock as an investment option for the Savings Plan and the failure to provide complete and accurate information to Savings Plan participants regarding the Debtor's financial condition, and seeks, among other things, compensatory damages, a constructive trust for amounts by which the fiduciaries allegedly benefited as a result of their breaches, and attorneys' fees.

On October 20, 2010, the defendants named in the amended complaint moved to dismiss all of the claims asserted therein. In an opinion and order issued January 6, 2011, the District Court denied the motion to dismiss, but held that the defendants had no "affirmative duty under ERISA to disclose information about the company's financial condition to plan participants."

On January 18, 2011, the Debtor filed an adversary complaint in the Bankruptcy Court against Veera, seeking declaratory relief to confirm the applicability of the automatic stay under Bankruptcy Code section 362(a) to Veera's claims or, alternatively, for injunctive relief under section 105(a) of the Bankruptcy Code to preclude Veera from prosecuting his claims pending the effective date of a chapter 11 plan or further order of the Bankruptcy Court. On February 11, 2011, the Debtor filed a motion in the adversary proceeding for summary judgment declaring that the protections of the automatic stay apply or should be extended to the claims in the ERISA Action and for injunctive relief. Following a hearing on the Debtor's motion on March 4, 2011, the Bankruptcy Court entered an order granting the Debtor's motion, holding that the automatic stay applied to the ERISA Action, but also granted Veera relief from the stay to pursue limited discovery during the extended exclusivity period in the Chapter 11 Case. The Debtor has complied with the Court's discovery order and completed production of documents in the case pending any supplemental requests from Veera or further order from the Bankruptcy Court.

On July 19, 2011, Veera appeared before the Bankruptcy Court to seek relief from the automatic stay to conduct further discovery. The Bankruptcy Court did not grant relief from the automatic stay, but advised that Veera return to the Bankruptcy Court in October 2011 if he wished to renew his request.

8. <u>Exclusivity</u>

On February 28, 2011, the Bankruptcy Court entered an order, pursuant to Bankruptcy Code section 1121(d), granting an extension of the Debtor's exclusive period to file a plan of reorganization through and including July 6, 2011, and solicit acceptances thereof through and including September 6, 2011, without prejudice to the right of the Debtor to seek further extension of such periods.

On July 6, 2011, the Debtor filed the First Proposed Plan, as defined in section 12 below. On August 10, 2011, the Bankruptcy Court entered an order, pursuant to Bankruptcy Code section 1121(d), granting a further extension of the Debtor's exclusive period to solicit acceptances of a plan of reorganization through and including December 5, 2011, without prejudice to the right of the Debtor to seek a further extension.

9. <u>One State Street Settlement</u>

On March 1, 2011, the Debtor, AAC, the Segregated Account and OSS entered into the OSS Settlement Agreement terminating the Debtor's existing headquarters office lease with OSS (the "<u>Existing Lease</u>") and settling all claims among the parties with respect thereto, in each case as of the date on which all conditions to effectiveness specified in the OSS Settlement Agreement were satisfied (the "<u>OSS Settlement Effective Date</u>"). On March 1, 2011, AAC also entered into a new lease (the "<u>New AAC Lease</u>") with OSS for an initial term commencing on the effective date of the New AAC Lease through December 31, 2015. The New AAC Lease provides for the rental of a reduced amount of space at the Debtor's current location, One State Street Plaza. The OSS Settlement Agreement also provides that OSS will have an Allowed General Unsecured Claim in the Chapter 11 Case for the amount that the Debtor would owe OSS under the Bankruptcy Code upon rejection of the existing lease, which amount was determined as of the OSS Settlement Effective Date to be $14,007,368. Pursuant to the OSS Settlement Agreement, the Segregated Account issued to OSS Junior Surplus Notes. Junior Surplus Notes are subordinate to Segregated Account Surplus Notes. The aggregate amount of the Junior Surplus Notes was determined as of the OSS Settlement Effective Date to be $36,081,612. One of the Junior Surplus Notes is subject to reduction in amounts equal to (x) 83.33% of the value of any distribution received by OSS from the Debtor's bankruptcy estate and (y) the net present value (using a 7% discount rate) of rents paid during any extension term of the New AAC Lease.

The Rehabilitation Court and the Bankruptcy Court approved the OSS Settlement Agreement on March 21 and March 24, 2011, respectively. The OSS Settlement Agreement became effective on May 19, 2011.

On August 26, 2011, the Bankruptcy Court entered the *Stipulation and Order Granting a General Unsecured Claim in Favor of OSS Pursuant to the Previously Approved Settlement, Discontinuance and Release Agreement* [Docket No. 532] (the "<u>OSS Stipulation and Order</u>"). Pursuant to the OSS Stipulation and Order, and with the agreement of the Debtor, the Committee and OSS, OSS has an allowed General Unsecured Claim of $14,007,368.

10.     <u>Shareholder Litigation Settlement</u>

On May 4, 2011, the lead plaintiffs in the Securities Actions, the Debtor and the Individual Defendants (the "<u>Settling Defendants</u>") entered into a stipulation of settlement (as such settlement may be subsequently amended, the "<u>Stipulation of Settlement</u>"). On the same day, the Debtor, the Individual Defendants, and the D&O Insurers entered into a related agreement (the "<u>Insurer Agreement</u>"). The Stipulation of Settlement is intended by the Settling Defendants and the plaintiffs in the Securities Actions (the "<u>Settling Parties</u>"), among other things, to fully, finally, and forever resolve, discharge and settle any and all claims, actions, suits, controversies, costs, damages, judgments, and demands whatsoever, known or unknown, suspected or unsuspected, accrued or unaccrued, that were, could have been, or might have been asserted in any of the Securities Actions or the Derivative Actions (the "<u>Settled Claims</u>"). On May 25, 2011, the same respective parties entered into a First Amendment to the Stipulation of Settlement and a First Amendment to the Insurer Agreement. The amendments clarify that the Settled Claims exclude the ERISA claims at issue in the ERISA Action. On July 15, 2011, the same respective parties entered into a Second Amendment to the Stipulation of Settlement and a Second Amendment to the Insurer Agreement. The second amendments clarify that the Injunctions and Releases to be entered by the Bankruptcy Court need not release or bar the ERISA claims at issue in the ERISA Action.

Pursuant to the Stipulation of Settlement, the plaintiffs in the Securities Actions and the Settling Defendants stipulated to certification of a class solely for the purposes of the Settlement, pursuant to Rules 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure, consisting of all persons (the "<u>Settlement Class</u>") who purchased or otherwise acquired any securities issued by the Debtor, including AFG equity or debt securities or options thereon and any STRATS (collectively, "<u>Ambac Securities</u>"), during the period from October 19, 2005, through and including July 18, 2009 (the "<u>Class Period</u>"). *See* Stipulation of Settlement ¶ 3. Excluded from the Settlement Class are defendants in the Securities Actions, members of their immediate families, and their legal representatives, heirs, successors or assigns. Also excluded from the Settlement Class are any persons who exclude themselves by filing a timely and valid request for exclusion in accordance with applicable requirements.

The Stipulation of Settlement provides that, in consideration for the settlement of the Settled Claims, the Debtor and the D&O Insurers shall severally pay to the Settlement Class the total amount of $27,100,000. *See* Stipulation of Settlement ¶ 8. The Stipulation of Settlement further provides that, pursuant to the Insurer Agreement, the D&O Insurers shall be required to pay the amount of $24,600,000 to the Settlement Class, *see* Stipulation of Settlement ¶ 8(a). In addition, and as further described in Article II above, the Stipulation of Settlement specifies that the Debtor, prior to the Commencement Date, paid the amount of $2,500,000 in cash into the Escrow Account in consideration of the settlement and that the Debtor has no responsibility to make any other payments into the Escrow Account under the terms of the Stipulation of Settlement. *See* Stipulation of Settlement ¶ 8(b).

Moreover, the Stipulation of Settlement contemplates that, upon entry of an order by the District Court preliminarily approving the settlement and directing that notice be provided to the Settlement Class, lead counsel for the Settlement Class may pay from the Escrow Account, without further order of the District Court or approval from the Debtor, the Individual

Defendants or the D&O Insurers, all notice and administration costs in an amount not to exceed $500,000. *See* Stipulation of Settlement ¶ 17. The Stipulation of Settlement further provides that, in the event that the settlement is not consummated, all notice and administration costs actually paid or incurred, including related fees, will not be returned or repaid to the Settling Defendants or the D&O Insurers. *See* Stipulation of Settlement ¶ 17.

Consummation of the Stipulation of Settlement is contingent upon, among other things, (1) final approval of the settlement by the District Court following notice to the Settlement Class, as prescribed by Rule 23 of the Federal Rules of Civil Procedure, and the entry of a judgment; and (2) entry of either (i) the Confirmation Order, which contains any necessary approvals related to the Debtor's entry into and performance of any obligations under the Stipulation of Settlement or (ii) an order of the Bankruptcy Court approving the Debtor's entry into and performance of any obligations under the Stipulation of Settlement (either (i) or (ii), the "Bankruptcy Court Approval Order"). *See* Stipulation of Settlement ¶ 35(f).

Specifically, the Stipulation of Settlement requires that the Bankruptcy Court Approval Order be entered, have become final, and include provisions:

(i)     to the fullest extent permitted by applicable law, permanently barring and enjoining all persons or entities, including but not limited to the Debtor and/or the Reorganized Debtor on behalf of the Debtor and any and all of its current and former parents, Affiliates, subsidiaries, predecessors, successors, heirs, estates, administrators, and legal representatives ("Ambac Entities") and any shareholder or creditor of any of the Ambac Entities (including any shareholder or creditor of any of the Ambac Entities or any other person or entity purportedly acting derivatively on behalf of any of the Ambac Entities) from instituting or prosecuting or continuing to prosecute any and all manner of claims, actions, causes of actions, suits, controversies, agreements, costs, damages, judgments, and demands whatsoever, known or unknown, suspected or unsuspected, accrued or unaccrued, arising under the laws, regulations, or common law of the United States of America, any state or political subdivision thereof, or any foreign country or jurisdiction, in law, contract, or in equity, against any or all of the Individual Defendants and any or all of the current or former officers, directors, or employees of any Ambac Entity, (aa) that were, could have been, might have been or might be in the future asserted in any of the Securities Actions or any of the Derivative Actions, or (bb) in connection with, arising out of, related to, or based upon, in whole or in part, directly or indirectly, any action or omission or failure to act within the Class Period or relevant periods specified in any of the Derivative Actions by any of the Individual Defendants or any of the current or former officers, directors, or employees of any Ambac Entity relating to any Ambac Entity or in his or her capacity as an officer, director, or employee of any Ambac Entity, or (cc) that allege, arise out of, or are based upon or attributable to any fact, action, omission or failure to act that is (A) alleged in any of the Securities Actions or the Derivative Actions or (B) related to any fact, action, omission or failure to act alleged in the Securities Actions or the Derivative Actions;

(ii)     providing for full releases by the Debtor, on behalf of itself and (to the fullest extent of the Debtor's power to do so) all Ambac Entities and (to the fullest extent of their power to do so) any shareholder, creditor, or other person or entity purporting to sue on behalf of or in the right of any of the Ambac Entities, of any and all manner of claims, actions, causes of actions, suits, controversies, agreements, costs, damages, judgments, and demands whatsoever, known or unknown, suspected or unsuspected, accrued or unaccrued, arising under the laws, regulations, or common law of the United States of America, any state or political subdivision thereof, or any foreign country or jurisdiction, in law, contract, or in equity, against any or all of the Individual Defendants and any or all of the current or former officers, directors, or employees of any Ambac Entity, (aa) that were, could have been, might have been or might be in the future asserted in any of the Securities Actions or any of the Derivative Actions, or (bb) in connection with, arising out of, related to, or based upon, in whole or in part, directly or indirectly, any action or omission or failure to act within the Class Period or relevant periods specified in any of the Derivative Actions by any of the Individual Defendants or any of the current or former officers, directors, or employees of any Ambac Entity relating to any Ambac Entity or in his or her capacity as an officer, director, or employee of any Ambac Entity, or (cc) that allege, arise out of, or are based upon, or attributable to any fact, action, omission or failure to act that is (A) alleged in any of the Securities Actions or the Derivative Actions or (B) related to any fact, action, omission, or failure to act alleged in the Securities Actions or the Derivative Actions;

(iii)    directing the filing of appropriate applications seeking dismissal of the Derivative Actions (if such Derivative Actions have not previously been dismissed); and

(iv)    approving the Debtor's entry into the Insurer Agreement.

On May 9, 2011, the Debtor filed a notice of presentment of a stipulation and order modifying the automatic stay for the limited purpose of permitting the parties to the Securities Actions to seek and obtain preliminary approval of the Stipulation of Settlement in the District Court [Docket No. 261]. On May 19, 2011, the Bankruptcy Court entered the stipulation and order [Docket No. 271], granting the Settling Parties limited relief from the stay for the sole and limited purpose of permitting the following: (1) the Settling Parties to seek preliminary approval of the settlement by the District Court; (2) entry by the District Court of an order preliminarily approving the Settlement and directing that notice be provided to the Class and payment from the Escrow Account of all reasonable notice and administration costs in an amount not to exceed $500,000; and (3) notice to the Settlement Class. On June 14, 20111, the District Court entered an order preliminarily approving the settlement (the "Preliminary Approval Order"). The District Court also scheduled a final fairness hearing for September 28, 2011.

On June 28, 2011, the Debtor filed a motion in the Bankruptcy Court seeking an order, pursuant to Bankruptcy Code section 105(a) and Bankruptcy Rule 9019, approving the Stipulation of Settlement and the Insurer Agreement [Docket No. 324] (the "Stipulation of Settlement 9019 Approval Motion"). On July 19, 2011, the Bankruptcy Court entered an order approving the Stipulation of Settlement and the Insurer Agreement [Docket No. 435] (as such

settlement may be subsequently amended, the "Stipulation of Settlement 9019 Approval Order"). In accordance with the Preliminary Approval Order, after entry of the Stipulation of Settlement 9019 Approval Order, a notice of the settlement and of the Final Fairness Hearing was mailed to all members of the Settlement Class who could be identified with reasonable effort.

On July 25, 2011, the Debtor filed a notice of presentment of an amended Stipulation of Settlement 9019 Approval Order, which (i) corrected an inadvertent misstatement that the Plaintiffs in the Derivative Actions (the "Derivative Plaintiffs") had been served with notice of the Stipulation of Settlement 9019 Approval Motion and deleted the proofs of claims filed by the Derivative Plaintiffs from the list of Claims disallowed and expunged upon its approval. Certain Derivative Plaintiffs objected to entry of the amended Stipulation of Settlement 9019 Approval Order. As a result, a hearing on the amended Stipulation of Settlement 9019 Approval Order was held on August 10, 2011, during which the Court asked the Debtor to introduce evidence to support the findings necessary for the Court's approval of the amended Stipulation of Settlement 9019 Approval Order, which the Debtor did on September 8 and 9, 2011. The Court entered the amended Stipulation of Settlement 9019 Approval Order on September 13, 2011 [Docket No. 558].

11. NYC Tax Claim Settlement

For the tax years 2000 through and including 2009, the Debtor and certain of its Affiliates filed as a combined tax group for the purpose of filing tax returns with the City of New York (the "NYC Tax Group"). As of the Commencement Date, the liability of the NYC Tax Group was the subject of a pending dispute. On December 14, 2010, the NYCDF filed the NYC Tax Claim in the amount of $116,817,949, consisting of $77,940,995 in principal and $38,876,954 in interest for the tax years commencing on January 1, 2000 through the Commencement Date. The NYCDF contends that each of the members of the NYC Tax Group is severally liable to the NYCDF in the same amount for the same tax period. As discussed above, on May 23, 2011, the Debtor filed the NYC Tax Claim Objection objecting to the NYC Tax Claim, denying liability for additional taxes or interest and requesting that the Bankruptcy Court disallow the NYC Tax Claim in its entirety. On July 6, 2011, the NYCDF filed the NYC Tax Claim Response.

On August 4, 2011, the Debtor, the Committee and the NYCDF met to discuss a resolution of the NYC Tax Claim Objection. On August 15, 2011, the Debtor, the Committee and the NYCDF came to an agreement in principle on the terms of the NYC Tax Claim Settlement. The NYC Tax Claim Settlement resolves any and all tax liability of the Debtor and the NYC Tax Group for the period from January 1, 2000, through and including December 31, 2010 (the "Relevant Tax Period"). The NYC Tax Claim Settlement provides, among other things, that:

  (i)    the NYC Tax Claim shall be allowed as an unsecured priority claim Bankruptcy Code section 507(a)(8) in the amount of $3, 233,611;

  (ii)   the balance of the NYC Tax Claim shall be disallowed with prejudice;

(iii)    In full and final satisfaction of the NYC Tax Claim and all tax liability owed by the Debtor and the NYC Tax Group to the City of New York for the Relevant Tax Period, the NYCDF shall:

    (a)    receive from the Debtor $2 million in Cash (the "Cash Consideration"), and

    (b)    retain the $1,233,611 tax credit resulting from overpayments previously made by the Debtor and the NYC Tax Group to the NYCDF prior to the Commencement Date (the "Credit Consideration" and collectively with the Cash Consideration, the "Settlement Consideration");

(iv)    upon entry of a final non-appealable order (as defined in the NYC Tax Claim Settlement) entered by the Bankruptcy Court authorizing the Debtor to consummate the NYC Tax Claim Settlement,

    (a)    the Debtor will remit the Cash Consideration to the NYCDF and

    (b)    the Debtor and the NYC Tax Group shall be deemed to have surrendered all right, title and interest in and to the Credit Consideration; and

(v)    effective upon the transfer of the Settlement Consideration, the NYCDF shall be deemed to have released the Debtor and each member of the NYC Tax Group from any and all claims and including, without limitation, as defined in Bankruptcy Code section 101(5), defaults, obligations, rights, damages, causes of action, demands, suits, judgments, remedies, setoffs, recoupments, defenses, debts, and liabilities of any kind or nature whatsoever, under any legal theory, including under contract, tort, or otherwise, whether at law, in equity, or otherwise, whether known or unknown, matured or unmatured, fixed or contingent, liquidated or unliquidated, disputed or undisputed, asserted or unasserted, suspected or unsuspected, foreseen or unforeseen, direct or indirect, choate or inchoate, now existing or hereafter arising that the NYCDF may now have, has ever had or may in the future have, against the Debtor or a member of the NYC Tax Group, as a result of any transactions or proceedings occurring, actions taken or omissions to act involving the Debtor or a member of the NYC Tax Group occurring from the beginning of time through and including December 31, 2010.

On August 31, 2011, the Debtor filed in the Bankruptcy Court a motion for approval of the NYC Tax Claim Settlement [Docket No. 543]. On September 21, 2011, the Bankruptcy Court approved the NYC Tax Claim Settlement [Docket No. TBD].

12.     Efforts to Finalize Term Sheet

After the Commencement Date, the Debtor continued to participate in extensive negotiations with OCI and the Committee with a view towards reaching an agreement on a consensual chapter 11 plan based on the Term Sheet. Although December 31, 2010, was the deadline to reach a binding term sheet with respect to a plan, such deadline was extended several times by agreement of the parties. From the Commencement Date to the date hereof, the Debtor met often with the Committee and OCI, in an effort to negotiate a consensual plan based on the Term Sheet. Additionally, in furtherance thereof, the Debtor met with representatives of AAC and its board of directors, including the Unaffiliated Qualified Directors of AAC.

The Debtor, the Committee and OCI circulated many revised term sheets, none of which were agreeable to all parties. After several months of negotiations, it became clear that, given the Debtor's decreasing liquidity, an agreement on a plan satisfactory to the Debtor, the Committee, AAC and OCI could not be reached in time for the Debtor to emerge successfully from chapter 11. The Debtor continued to negotiate with the Committee and OCI separately and together to determine how best to preserve the Debtor's enterprise value for the benefit of its creditors. In June 2011, the Informal Group joined the negotiations. Based upon these negotiations, the Plan Settlement was developed with respect to amending the TSA, settling intercompany claims and allocating costs that the Debtor believed would benefit all parties.

13.     The First Proposed Plan of Reorganization

On July 6, 2011, the Debtor filed a proposed *Plan of Reorganization of Ambac Financial Group, Inc.* [Docket No. 384] (the "First Proposed Plan"), which contemplated a debt for equity exchange and execution of the Plan Settlement by the Debtor, AAC, the Segregated Account and OCI.

The First Proposed Plan provided that, if each of OCI and AAC accepted the Plan Settlement by the Plan Settlement Deadline, (i) the Reorganized Debtor would retain ownership of AAC and would not otherwise take any action that would result in any event that results in neither AAC nor any entity that, pursuant to IRC section 381, succeeds to the tax attributes of AAC described in IRC section 381(b), being characterized as an includible corporation with the affiliated group of corporations of which the Debtor (or any successor thereto) is the common parent, all within the meaning of IRC section 1504 (a "Deconsolidation Event"), (ii) the Debtor would assume the TSA, (ii) the Debtor, AAC, the Segregated Account and OCI would execute one of three amendments to the TSA to govern allocation of and payment by AAC for use of the NOLs, (iii) certain claims between the Debtor and AAC, OCI and the Segregated Account would be settled, (iv) the Reorganized Debtor, AAC and certain other Ambac Affiliates would execute a cost allocation agreement with respect to sharing of expenses, (v) the Debtor and AAC would share expenses incurred in respect of the IRS Dispute (as defined in Article III.B below), and (vi) the First Proposed Plan would contain broad releases of the Debtor, the Reorganized Debtor, AAC, the Segregated Account, OCI, the board of directors and board committees of the Debtor and AAC, all current and former individual directors, officers, or employees of the Debtor and AAC, the Committee and the individual members thereof, the Indenture Trustees, the Informal Group and the individual members thereof, and each of their respective Representatives (each of the foregoing in its individual capacity as such).

The First Proposed Plan further provided that, if each of OCI and AAC did not accept the Plan Settlement by the Plan Settlement Deadline, (i) the Reorganized Debtor would (a) reject the TSA, (b) cause a deconsolidation of the AAC Subgroup from the Ambac Consolidated Group for U.S. federal income tax purposes, and (c) either (1) make an election pursuant to applicable Treasury Regulations to allocate to the Reorganized Debtor the maximum amount of NOLs held by the Ambac Consolidated Group or (2) take a worthless stock loss in respect of its ownership of stock in AAC, (ii) the Debtor would transfer to a litigation trust of any and all Claims and Causes of Action the Debtor has against AAC, the Segregated Account or OCI, and (iii) the First Proposed Plan would include broad releases of the Debtor, the Reorganized Debtor, the board of directors and board committees of the Debtor and AAC, all current and former individual directors, officers, or employees of the Debtor and AAC, the Committee and the individual members thereof, the Indenture Trustees, the Informal Group and the individual members thereof, and each of their respective Representatives (each of the foregoing in its individual capacity as such). The First Proposed Plan further contemplated that, to the extent the Debtor anticipated that any of the steps required to deconsolidate and allocate to itself the NOLs required regulatory approval of OCI that would not be forthcoming, the Debtor retained the possibility that it would convert the Chapter 11 Case into a liquidation under chapter 7 of the Bankruptcy Code.

After several days of mediation of the IRS Dispute, the Debtor, the Committee and OCI discussed with the mediator the possibility of mediating issues related to the Plan Settlement, with a view towards agreement on the terms of a consensual Plan including the resolution of disputes with the IRS. OCI informed the Debtor that it would not be able to participate in such mediation until August, after the initial Plan Settlement Deadline of July 29, 2011. On July 21, 2011, the Debtor, the Committee, AAC and OCI agreed that the Debtor would adjourn the Disclosure Statement Approval Hearing initially scheduled for August 12, 2011, thereby delaying the solicitation process.

Recognizing that the delay in solicitation will result in additional costs to the Debtor's estate, OCI approved a payment to the Debtor in the amount of $2.0 million in cash or cash equivalents (the "Payment") to be made either by AAC or pursuant to the secured note issued by AAC which runs in favor of the Segregated Account. The parties further agreed that if the terms of a consensual Plan are subsequently agreed upon by and among OCI, AAC, the Debtor and the Committee, the Payment shall be credited towards any agreed obligation for AAC to reimburse the Debtor for a percentage share of the fees and disbursements incurred in the IRS Adversary Proceeding. The agreement further provided that it is without prejudice of any kind with respect to the rights, remedies and positions of the Debtor, AAC and OCI under, or pertaining to, any intercompany agreements. Additionally, the Debtor, the Committee, AAC and OCI agreed to commence mediation regarding the Plan Settlement on August 16, 2011. On July 25, 2011, to facilitate continuing negotiations and the upcoming mediation with OCI and the Committee, the Debtor adjourned the Disclosure Statement Approval Hearing to September 8, 2011.

The Debtor, the Committee, AAC and OCI commenced mediation in respect of the Plan Settlement on August 16, 2011. On August 26, 2011, because progress was being made through mediation, the Debtor adjourned the Disclosure Statement Approval Hearing to October 5, 2011, to provide parties in interest with sufficient notice regarding the terms of the Amended Plan Settlement. After several weeks of mediation, the Debtor, the Committee and OCI agreed to the

terms of that certain Mediation Agreement attached hereto as <u>Exhibit B</u> detailing the terms of the Amended Plan Settlement, which formed the basis of this Plan. Approval by AAC and its board of directors of the Amended Plan Settlement remains pending.

## B. The Plan

Pursuant to the Plan, on the Effective Date, or as soon as reasonably practicable thereafter, in full and final satisfaction and discharge of and in exchange for their Claims, (i) each Holder of a Senior Notes Claim shall receive its pro rata share of New Common Stock, (ii) each Holder of a General Unsecured Claim shall receive its pro rata share of New Common Stock, and, provided that the Class of Senior Notes Claims votes to accept the Plan, Warrants, in the amounts outlined in and subject to certain conditions as set forth in the Plan, and (iii) provided that the Class of Senior Notes Claims votes to accept the Plan, each Holder of a Subordinated Notes Claim shall receive Warrants and, provided that the Class of Subordinated Notes Claims also votes to accept the Plan, New Common Stock, all in the amounts outlined in and subject to certain conditions as set forth in the Plan.

Additionally, in accordance with the Amended Plan Settlement, the Reorganized Debtor shall retain ownership of AAC, and except as otherwise approved by the Rehabilitator, the Reorganized Debtor shall use its best efforts to preserve the use of NOLs as contemplated by the Amended Plan Settlement, including but not limited to refraining from taking any action that would result in, and taking such affirmative steps as are appropriate to avoid, any Deconsolidation Event. Additionally, the Amended Plan Settlement contemplates (i) the execution of the Amended TSA, Cost Allocation Agreement and Cooperation Agreement Amendment (ii) the settlement of certain claims among the Debtor and AAC, OCI, the Rehabilitator and the Segregated Account, and (iii) broad releases of the Debtor, the Reorganized Debtor, AAC, the Segregated Account, OCI, the Rehabilitator, the board of directors and board committees of the Debtor and AAC, all current and former individual directors, officers, or employees of the Debtor and AAC, the Committee and the individual members thereof, the Indenture Trustees, the Informal Group and the individual members thereof, and each of their respective Representatives (each of the foregoing in its individual capacity as such).

### 1. The Amended TSA

Because the NOLs of the Ambac Consolidated Group represent a significant potential asset of the Reorganized Debtor, the Debtor seeks to maximize its ability to realize the potential value of these NOLs. Consequently, the parties have developed the Amended Plan Settlement with a view toward preserving the NOLs and maximizing their potential value to the Debtor's creditors and the creditors and policyholders of AAC and the Segregated Account. The Amended Plan Settlement provides that, except as otherwise approved by the Rehabilitator, the Reorganized Debtor shall use its best efforts to preserve the use of NOLs as contemplated by the Amended Plan Settlement, including but not limited to refraining from taking any action that would result in, and taking such affirmative steps as are appropriate to avoid, any Deconsolidation Event. In furtherance of the foregoing, the Debtor shall, effective on the date on which the Mediation Agreement is signed by all the parties (the "<u>Plan Settlement Signing Date</u>"), use its best efforts to obtain a Confirmation Order from the Bankruptcy Court which (i) memorializes the parties' intent to preserve the use of NOLs for the benefit of the AAC

Subgroup and the Reorganized Debtor as contemplated by the Amended Plan Settlement, (ii) approves the adoption by the Reorganized Debtor of an NOL-preservation plan to remain in effect so long as NOLs remain for the benefit of the AAC Subgroup as contemplated by the Amended Plan Settlement and vests continuing jurisdiction in the Bankruptcy Court to enforce restrictions adopted in connection with such plan, and (iii) memorializes the parties' intent that any subsequent bankruptcy filing by the Reorganized Debtor with the sole intent of rejecting the Amended Plan Settlement and/or seeking additional value from AAC for its use of the NOLs is a *per se* bad faith filing.

Further, the Debtor and AAC shall, and shall cause their affiliates to, enter into an amended and restated tax sharing agreement, in substantially the form attached to the Plan as Exhibit A (the "Amended TSA"), which agreement shall become effective upon on the later of (a) the Confirmation Date and (b) the date on which a non-stayed order is entered by the Rehabilitation Court approving the transactions contemplated by this agreement (such date, the "Plan Settlement Effective Date"), except , once the Amended TSA becomes effective, the NOL tolling provisions, which shall have effect as of October 1, 2011 (and the portion of the taxable year beginning on October 1, 2011 and ending on December 31, 2011 shall be considered a separate taxable period for purposes of determining amounts payable pursuant to the Amended TSA).  The Amended TSA shall replace, supersede and nullify in its entirety the existing TSA. The Amended TSA shall address certain issues including, but not limited to, the following:

(a)     Any NOLs generated by the Ambac Consolidated Group on or prior to, and existing on, September 30, 2011 (the "Determination Date"), not taking into account the consequences of any settlement with respect to the IRS Dispute ("Pre-Determination Date NOLs"), shall be available for use by the AAC Subgroup as set forth in the Amended TSA.

(b)     Any NOLs generated by the AAC Subgroup determined on a separate company tax basis after the Determination Date (the "Post-Determination Date NOLs") shall be available for use by the AAC Subgroup at no cost.

(c)     The portion of any NOLs generated by the AAC Subgroup during the taxable year 2011 shall be allocated to either the Pre-Determination Date NOLs or the Post-Determination Date NOLs on the basis of a deemed closing of the books and records of the AAC Subgroup as of the end of the Determination Date.  AAC and the other members of the AAC Subgroup agree not to enter into any transaction resulting in taxable income or loss on or prior to the Determination Date other than in the ordinary course of business and consistent with past practices.  For purposes of determining the amount of any NOLs or taxable income pursuant to the Amended Plan Settlement, (I) the AAC Surplus Notes issued in June 2010 will be considered indebtedness issued by AAC for federal income tax purposes, (II) the aggregate issue price, for federal income tax purposes, of the AAC Surplus Notes issued in

June 2010 and subject to a call option letter agreement shall be treated as equal to $232 million and (III) the aggregate issue price, for federal income tax purposes, of the remaining AAC Surplus Notes issued in June 2010 shall be treated as equal to $1,060 million.

(d)     Unless and until there has been a Deconsolidation Event, the amount of Pre-Determination Date NOLs allocated to, and available for use by, the AAC Subgroup to offset income for federal income tax purposes (the "Allocated NOLs") shall be an amount (such amount being hereinafter referred to as the "Allocated NOL Amount") equal to the lesser of

(1)     $3.8 billion; and

(2)     the total amount of Pre-Determination Date NOLs, MINUS the sum of (I) the amount of cancellation of indebtedness income realized within the meaning of IRC section 108, realized by the Debtor pursuant to the consummation of the Plan, and (II) the amount of interest disallowed pursuant to IRC section 382(l)(5)(B) upon the consummation of the Plan.

Pursuant to the Amended TSA, the AAC Subgroup may utilize the Allocated NOL Amount to offset income for federal income tax purposes in exchange for a payment pursuant to the TSA in an amount determined pursuant to the table attached to the Mediation Agreement as Appendix A, with the applicable percentage for the particular usage tier shown in such table being multiplied by the aggregate amount of the AAC Subgroup's federal income tax liability (for the taxable year in which the NOLs within the respective tier are used) that otherwise would have been paid by the AAC Subgroup if such NOLs within the respective tier were not available for the AAC Subgroup's use.

Any amounts due from AAC to the Reorganized Debtor pursuant to the Amended TSA shall be paid no later than the date on which the applicable tax return is filed provided that any such amounts due and owing prior to the Plan Settlement Closing Date (as defined below) shall be deposited in an escrow account established under section 6 of the Mediation Agreement, which will be transferred to the Reorganized Debtor on the Plan Settlement Closing Date. The parties shall cooperate with each other and, upon reasonable request, provide information with respect to the tax matters set forth in the Amended Plan Settlement. A reduction in the Pre-Determination Date NOLs as a result of a resolution of the IRS Dispute shall be allocated between the Allocated NOLs

and the AFG Allocated NOLs (as defined below) in a manner to be agreed upon by the parties. The same allocation methodology shall be utilized to the greatest extent possible with respect to the Allocated AAC AMT NOL Amount (as defined below).

(e)     Beginning on the fifth anniversary of the Plan Settlement Effective Date, prior to the occurrence of a Deconsolidation Event, and subject to the Reorganized Debtor's consent, not to be unreasonably withheld, the AAC Subgroup may utilize Pre-Determination Date NOLs in excess of the Allocated NOL Amount (the "<u>AFG Allocated NOLs</u>") in exchange for a payment pursuant to the TSA in an amount equal to 25% multiplied by the aggregate amount of the AAC Subgroup's federal income tax liability for the taxable year in which the NOLs are used that otherwise would have been paid by the AAC Subgroup if such NOLs were not available for its use.

(f)     Following the occurrence of a Deconsolidation Event, pursuant to the election set forth in section 2.i of the Mediation Agreement, (1) the amount of Pre-Determination Date NOLs allocated to, and owned by, the AAC Subgroup (the "<u>Post-Deconsolidation Allocated NOLs</u>") shall be an amount (such amount being hereinafter referred to as the "<u>Post-Deconsolidation Allocated NOL Amount</u>") equal to (I) the Allocated NOL Amount less (II) the AAC Pre-Deconsolidation Utilized NOL Amount (as defined below) and (2) all Post-Determination Date NOLs (to the extent not previously utilized by the AAC Subgroup) shall be allocated to, and owned by, the AAC Subgroup. The Reorganized Debtor, in its sole discretion, may allocate incremental NOLs to the AAC Subgroup to increase the Post-Deconsolidation Allocated NOLs. AAC shall compensate the Reorganized Debtor for the use of the Post-Deconsolidation Allocated NOLs to offset income for federal income tax purposes in an amount determined pursuant to the table attached to the Mediation Agreement as Appendix A, with the applicable percentage for the particular usage tier shown in such table being multiplied by the aggregate amount of the AAC Subgroup's federal income tax liability (for the taxable year in which the NOLs within the respective tier are used) that otherwise would have been paid by the AAC Subgroup if such NOLs within the respective tier were not available for the AAC Subgroup's use.

The "<u>AAC Pre-Deconsolidation Utilized NOL Amount</u>" is the portion of the Allocated NOL Amount that, for purposes of section 2.d of the Mediation Agreement, is utilized to offset income for federal income tax purposes as provided in the Amended TSA by AAC following the Determination Date and prior to a Deconsolidation Event.

(g)     To the extent that the AAC Subgroup has any available Post-Determination Date NOLs solely for purposes of determining the amounts payable under the Amended TSA, such Post-Determination Date NOLs shall be treated as being used prior to utilization of any Allocated NOL Amount or Post-Deconsolidation Allocated NOL Amount.

(h)     The Reorganized Debtor shall be able to utilize the AFG Allocated NOLs. Solely for purposes of determining the amounts payable under the Amended Plan Settlement, the Reorganized Debtor shall be treated as using the AFG Allocated NOLs and any NOLs generated by the AFG Subgroup after the Determination Date (determined on a separate company tax basis without inclusion of the AAC Subgroup) prior to utilization of any Allocated NOLs or Post-Determination Date NOLs. If and to the extent that the Reorganized Debtor utilizes (i) any Pre-Determination Date NOLs in excess of the AFG Allocated NOLs or (ii) any Post-Determination Date NOLs, the Reorganized Debtor shall make a payment pursuant to the TSA in an amount equal to 50% of the aggregate amount of the AFG Subgroup's federal income tax liability for the taxable year in which the NOLs are used that otherwise would have been paid by the Reorganized Debtor if such NOLs were not available for its use.

(i)     With respect to any taxable year that includes a Deconsolidation Event, the Reorganized Debtor shall, subject to the prior review and approval of the Rehabilitator, make valid and timely elections pursuant to Treasury Regulation Section 1.1502-36 to the extent permitted thereunder such that (1) the NOLs of the AAC Subgroup that exist immediately following a Deconsolidation Event will be an amount equal to the sum of the Post-Determination Date NOLs existing as of the Deconsolidation Event (to the extent not previously utilized by the AAC Subgroup) and the Post-Deconsolidation Allocated NOL Amount, and (2) no reduction in the tax basis of any asset of the AAC Subgroup will be required pursuant to Treasury Regulation Section 1.1502-36(d)(4)(i)(D), and no reduction in the amount of any deferred deduction will be required pursuant to Treasury Regulation Section 1.1502-36(d)(4)(i)(C). Any such elections approved by the Rehabilitator shall not be revoked or modified, whether by amended return or otherwise, without the consent of the Rehabilitator. With respect to any taxable year that includes any event resulting in the application of Treasury Regulation Section 1.1502-36 to AAC or the AAC Subgroup other than a Deconsolidation Event (an "Adjustment Event"), the Reorganized shall, subject to the prior review and approval of the Rehabilitator, make valid and timely elections pursuant to Treasury Regulation Section 1.1502-36 to the

extent permitted thereunder such that (X) the NOLs of the AAC Subgroup that exist immediately following such Adjustment Event will be an amount equal to the sum of the Post-Determination Date NOLs existing as of the Adjustment Event (to the extent not previously utilized by the AAC Subgroup prior to such Adjustment Event) and the Allocated NOL Amount less the AAC Pre-Deconsolidation Utilized NOL Amount determined as if the date of the Adjustment Event were a Deconsolidation Event, (Y) the AMT NOLs of the AAC Subgroup that exist immediately following such Adjustment Event will be an amount equal to the sum of the Post-Determination Date AMT NOLs (as defined in section 2.m of the Mediation Agreement) existing as of the Adjustment Event (to the extent not previously utilized by the AAC Subgroup prior to such Adjustment Event) and the Allocated AMT NOL Amount (as defined in section 2.m of the Mediation Agreement) less the AAC Pre-Deconsolidation Utilized AMT NOL Amount (as defined in section 2.m of the Mediation Agreement) determined as if the date of the Adjustment Event were a Deconsolidation Event, and (Z) no reduction in the tax basis of any asset of the AAC Subgroup will be required pursuant to Treasury Regulation Section 1.1502-36(d)(4)(i)(D), and no reduction in the amount of any deferred deduction will be required pursuant to Treasury Regulation Section 1.1502-36(d)(4)(i)(C).

(j)     With respect to each taxable year of the Ambac Consolidated Group, if AAC or the Rehabilitator notifies the Reorganized Debtor, at least 30 days before the Ambac Consolidated Group tax return is filed, that AAC or the Rehabilitator has reasonably determined that there exists uncertainty as to whether or not a Deconsolidation Event or Adjustment Event has occurred during such taxable year, AFG shall, subject to the prior approval of the Rehabilitator, make such protective elections or take other similar actions so that if such a Deconsolidation Event or Adjustment Event were determined subsequently to have occurred during such taxable year, the results contemplated by section 2.i of the Mediation Agreement would be achieved to the maximum extent possible.  Any such elections or other actions approved by the Rehabilitator shall not be revoked or modified, whether by amended return or otherwise, without the consent of the Rehabilitator.

(k)     If a Deconsolidation Event occurs on a date other than the last day of a taxable year of AFG, no election under Treasury Regulation Sections 1.1502-76(b)(2)(ii) or (iii) (a so-called "ratable allocation" election) shall be made in connection with determining the allocation of the items of the AAC Subgroup between the portion of such taxable year that ends on the date of the

Deconsolidation Event and the remaining portion of such taxable year.

(l)     Notwithstanding any provision of the Mediation Agreement, the provisions of section 2 thereof shall apply equally and separately with respect to any NOLs that are utilized in any taxable period with respect to the determination of (a) any tax payable pursuant to IRC section 55 or any other similar provision of state or local law ("AMT") by the AAC Subgroup (the "AAC AMT") or (b) any federal income tax payable by the AAC Subgroup as provided herein.   The amount due and payable from AAC to the Reorganized Debtor pursuant to the Amended TSA shall be the sum of (i) the AAC AMT, (ii) any federal income tax owed by the AAC Subgroup as provided in the Amended TSA (the "AAC Federal Tax") (reduced by any available tax credits previously generated by payment of the AAC AMT, including prior to the Effective Date, and not used in any prior taxable year), (iii) the sum of the amounts due and payable under sections 2.d, 2.e and 2.f of the Mediation Agreement  (the "Federal Tax Usage Amount") and (iv) the excess of the AAC AMT Usage Amount determined under section 2.o of the Mediation Agreement over the Federal Tax Usage Amount.  For the avoidance of doubt, amounts shall be due and payable from AAC to the Reorganized Debtor pursuant to clauses (iii) and (iv) of section 2.l of the Mediation Agreement irrespective of whether the Federal Tax Usage Amount or the AAC AMT Usage Amount arises prior or subsequent to a Deconsolidation Event.

(m)    Prior to a Deconsolidation Event and subject to section 2.o of the Mediation Agreement, the AAC Subgroup shall, for purposes of determining the AAC AMT pursuant to section 2.l of the Mediation Agreement, be permitted to utilize (subject to any restrictions imposed under the IRC or the Treasury Regulations promulgated thereunder) the NOLs of the Group available for use to offset AMT ("AMT NOLs") in an aggregate amount (the "Allocated AMT NOL Amount") equal to the product of (i) the AMT NOLs of the Ambac Consolidated Group and (ii) the percentage (expressed as a decimal) determined by dividing (x) the Allocated NOL Amount by (y) the total NOLs of the Group, in each case, such NOLs to be determined as of the Determination Date.   In addition, any AMT NOL generated by the AAC Subgroup determined on a separate company tax basis after the Determination Date (the "Post-Determination Date AMT NOLs") shall be available for use by the AAC Subgroup at no cost. Further, it is understood that to the extent that the AAC Subgroup has any available Post-Determination Date AMT NOLs, solely for purposes of determining the amounts payable under the Amended

Plan Settlement, such Post-Determination Date AMT NOLs shall be treated as being used prior to utilization of any Allocated AMT NOL Amount or any Post-Deconsolidation Allocated AMT NOL Amount.

(n)     Upon a Deconsolidation Event and subject to section 2.o of the Mediation Agreement, the Reorganized Debtor shall take all actions permitted by law necessary to allocate to AAC an amount of AMT NOLs equal to (i) the Allocated AMT NOL Amount MINUS the Pre-Deconsolidation AAC Utilized AMT NOL Amount (as defined below), (the "Post-Deconsolidation Allocated AMT NOL Amount"), and (ii) the Post-Determination Date AMT NOLs existing as of the Deconsolidation Event (to the extent not previously utilized by the AAC Subgroup) and (iii) the amount of any unused AMT credits allocable to any AAC AMT. The "AAC Pre-Deconsolidation Utilized AMT NOL Amount" is the portion of the Allocated AMT NOL Amount that for purposes of section 2.l of the Mediation Agreement were utilized to offset income for AMT purposes by the AAC Subgroup following the Determination Date and prior to a Deconsolidation Event (including any AMT NOLs to the extent that they were not subject to the payment requirement of section 2.l of the Mediation Agreement).

(o)     The AAC Subgroup may utilize (i) prior to a Deconsolidation Event, the Allocated AMT NOL Amount or (ii) following a Deconsolidation event, the Post-Deconsolidation Allocated AMT NOL Amount, in each case, to offset income for AMT purposes (the "AAC AMT NOLs"). The AAC AMT Usage Amount shall be equal to the product of (a) the applicable percentages set forth on the table attached hereto as Appendix A, multiplied by (b) (X) the aggregate amount of the AAC Subgroup's AMT liability for the taxable year that otherwise would have been paid by the AAC Subgroup if such AAC AMT NOLs were not available for its use MINUS (Y) the Annual AMT NOL Usage Credit (as defined below).

(p)     During the taxable year (or portion thereof) beginning January 1, 2011 (the "Initial AMT NOL Period"), the Annual AMT NOL Usage Credit shall be $3 million (the "Initial Period AMT NOL Usage Credit Carry-Over Amount") with the utilization of such Annual AMT NOL Usage Credit not to exceed the amount that reduces the AAC AMT Usage Amount to equal the Federal Tax Usage Amount to the extent sufficient credits are available. During the second through seventh taxable years (or portions thereof), the Annual AMT NOL Usage Credit shall be equal to the sum of (i) $3 million and (ii) the excess of $3 million over the lesser of (A) the portion of the Annual AMT NOL Usage Credit

actually utilized in the immediately prior taxable year (or portion thereof) or (B) $3 million with the utilization of the Annual AMT NOL Usage Credit not to exceed the amount that reduces the AAC AMT Usage Amount to equal the Federal Tax Usage Amount to the extent sufficient credits are available.  During the eighth taxable year beginning after the Initial AMT NOL Period, the Annual AMT NOL Usage Credit shall be equal to the sum of (i) $10 million and (ii) the excess of $3 million over the lesser of (A) the portion of the Annual AMT NOL Usage Credit actually utilized in the immediately prior taxable year (or portion thereof) or (B) $3 million with the utilization of the Annual AMT NOL Usage Credit not to exceed the amount that reduces the AAC AMT Usage Amount to equal the Federal Tax Usage Amount to the extent sufficient credits are available.  During all succeeding taxable years (or portions thereof), the Annual AMT NOL Usage Credit shall be equal to the sum of (i) $10 million and (ii) the excess of $10 million over lesser of (A) the portion of the Annual AMT NOL Usage Credit actually utilized in the immediately prior taxable year (or portion thereof) or (B) $10 million (the "Subsequent Period AMT NOL Usage Credit Carry-Over Amount") with the utilization of the Annual AMT NOL Usage Credit not to exceed the amount that reduces the AAC AMT Usage Amount to equal the Federal Tax Usage Amount to the extent sufficient credits are available.

(q)     Notwithstanding any other provision of this agreement, (i) any AMT NOL carryover amounts described in section 2.p of the Mediation Agreement, attributable to any specific taxable year may only be carried to the next succeeding taxable year and may not be carried into any other taxable year, (ii) the sum of Annual AMT NOL Usage Credits utilized by the AAC Subgroup shall not exceed in the aggregate $60 million throughout the term of the Amended TSA, and (iii) the Annual AMT NOL Usage Credit shall not be utilized in the event that the Federal Tax Usage Amount exceeds the AAC AMT Usage Amount (as calculated before giving effect to such Annual AMT NOL Usage Credit).

2.     Expense Sharing

The Amended Plan Settlement further provides that the Debtor and AAC shall, and shall cause their affiliates to, enter into the expense sharing and cost allocation agreement, substantially in the form attached to the Plan as Exhibit C (the "Cost Allocation Agreement"), which agreement shall become effective on the Plan Settlement Effective Date.  The Cost Allocation Agreement shall provide the following:

(a)     Until (and including) the fifth anniversary of the Plan Settlement Effective Date, AAC shall promptly pay all reasonable AFG

operating expenses annually in arrears, subject to a $5 million per annum cap. Following the fifth anniversary of the Plan Settlement Effective Date, AAC shall, only with the approval of the Rehabilitator, pay all reasonable AFG operating expenses in arrears subject to a $4 million per annum cap. In the event that the Rehabilitator declines to approve AAC's request to pay reasonable AFG operating expenses in any such year, the Reorganized Debtor shall have no further obligations under the Amended Plan Settlement.

(b)     The Reorganized Debtor shall prepare in good faith an annual operating expense budget (based on reasonable assumptions) for the forthcoming fiscal year in a form reasonably satisfactory to the Rehabilitator (each, an "<u>Annual Budget</u>"). As soon as available, and in any event within 30 days prior to the commencement of each calendar year, the Reorganized Debtor shall provide each Annual Budget to the Rehabilitator. Within 45 days after each March 31, June 30 and September 30, the Reorganized Debtor shall provide the Rehabilitator with a comparison (in form reasonably satisfactory to the Rehabilitator) of (i) actual expenses incurred through such date, and expenses expected to be incurred from such date until the end of the then-current fiscal year, to (ii) the projected expenses as set forth on the Annual Budget. The Reorganized Debtor's actual operating expenses shall not exceed the amounts set forth in the Annual Budget unless such excess expenses are reasonable.

(c)     AAC's obligation to reimburse AFG operating expenses shall terminate upon the earlier to occur of the following events: (i) a breach by the Debtor of any material term of the Mediation Agreement (including, but not limited to, filing for a new bankruptcy or taking any action which impairs the ability of AAC and/or the Rehabilitator to continue to use NOLs in accordance with the Amended Plan Settlement); and (ii) the imposition, under IRC section 382(a) of an annual "section 382 limitation" (within the meaning of Section 382(b) of the Code) of $37.5 million or less on the use of NOLs available to the AAC Subgroup under this agreement. In addition, AAC may elect to terminate its obligation to reimburse AFG operating expenses to the extent that none of the NOLs included in the Allocated NOL Amount remains available for use by the AAC Subgroup.

(d)     Until AAC's obligation to reimburse AFG operating expenses shall have terminated as provided in section 3(c) of the Mediation Agreement, the Reorganized Debtor shall not make any cash distributions to Holders of New Common Stock if, following such

distribution, AFG would have total unrestricted cash and other liquid assets of less than $5 million.

Notwithstanding any existing agreement between AAC and the Debtor and subject to the following sentence, effective on the Plan Settlement Signing Date, AAC and the Debtor will share all reasonable litigation fees and expenses incurred by the Debtor on or after the November 1, 2010, in the IRS Dispute, including the IRS Adversary Proceedings and any related proceedings (and any appeals relating to the foregoing), on the basis of 85% to AAC and 15% to the Debtor. Furthermore, AAC agrees to pay the Debtor (a) on the Plan Settlement Signing Date, or as soon as practicable thereafter, an amount equal to 85% of all expenses incurred by the Debtor on or after November 1, 2010, and through the Plan Settlement Signing Date in relation to the IRS Dispute (subject to a $2 million credit for amounts already paid by AAC in connection with the IRS Dispute) and (b) on a monthly basis following the Plan Settlement Signing Date an amount equal to 85% of all reasonable expenses incurred by the Debtor on or after the Plan Settlement Signing Date in relation to the IRS Dispute. The Debtor shall not settle or offer to settle the IRS Dispute, incur any defense costs or otherwise assume any contractual obligation, admit any liability, voluntarily make any payment or otherwise agree to any judgment with respect to the IRS Dispute without the written consent of each of AAC, which shall not be unreasonably withheld, and the Rehabilitator, in its sole and absolute discretion. Each of AAC and the Rehabilitator hereby consents to the defense costs incurred by the Debtor and AAC (i) prior to the Plan Settlement Signing Date with respect to the IRS Dispute, the invoices for which have been provided to AAC and the Rehabilitator, and (ii) in implementing the litigation strategy that the Debtor is currently pursuing in connection with the IRS Dispute. AAC and the Rehabilitator shall be entitled to full cooperation and all information and particulars they or either of them may request from the Debtor in relation to the IRS Dispute and any other issues that AAC may have relative to the IRS, including, without limitation, express authorization to engage with IRS directly on matters arising under the Rehabilitation Plan and any amendment or subsequent iteration thereof (including any efforts to obtain a private letter ruling, pre-filing agreement or other form of guidance or clarification).

3.    Additional Agreements

The Debtor, AAC, the Segregated Account and the Rehabilitator shall enter into an amendment to that certain Cooperation Agreement, dated as of March 24, 2010, by and between the Segregated Account and AAC, substantially in the form attached to the Plan as Exhibit B (the "Cooperation Agreement Amendment"), which shall become effective on the Plan Settlement Effective Date. The Cooperation Agreement shall provide for the following:

(a)    Following each taxable year during any part of which AAC is a member of the Ambac Consolidated Group, the Reorganized Debtor shall, no later than April 1st of such subsequent year, provide the Rehabilitator with a summary of the material provisions of the Reorganized Debtor's expected tax position and the expected differences between AAC's statutory financial statements and the Reorganized Debtor's expected tax positions. The Rehabilitator shall notify the Reorganized Debtor and AAC in writing of any concerns of the Rehabilitator with respect to any

such expected tax positions no later than May 1 of such year. Promptly thereafter, the Reorganized Debtor and AAC shall meet with the Rehabilitator to resolve in good faith such concerns. In the event that the Rehabilitator is unable to resolve a dispute with the Reorganized Debtor and AAC concerning an expected tax position by July 1 of such year, the parties shall immediately submit such dispute to expedited arbitration before a single arbitrator with the requisite tax expertise, whose decision shall be issued no later than August 31 of such year and shall be final and binding upon the parties. The parties shall agree to such further procedures as are necessary and prudent to permit the arbitrator to issue a decision by August 31 of such year. If the expected tax position relates to the AAC Subgroup, the sole issue before the arbitrator shall be whether the tax position advocated by the Rehabilitator is more likely than not to be upheld by a court of competent jurisdiction in a subsequent challenge to such position by the IRS. If the expected tax position does not relate to the AAC Subgroup, the sole issue before the arbitrator shall be whether the tax position advocated by the Reorganized Debtor is more likely than not to be upheld by a court of competent jurisdiction in a subsequent challenge to such position by the IRS. In the event that the arbitrator rules that the tax position advocated by the Rehabilitator (where the expected tax position relates to the AAC Subgroup) or the tax position advocated by the Reorganized Debtor (where the expected tax position does not relate to the AAC Subgroup) is more likely than not to be upheld by a court of competent jurisdiction in a subsequent challenge to such position by the IRS, the Reorganized Debtor shall file its return on the basis of such advocated tax position, which position may be disclosed in such return. In the event that the arbitrator does not rule that the tax position advocated by either the Rehabilitator or the Reorganized Debtor, as the case may be, is more likely than not to be upheld by a court of competent jurisdiction in a subsequent challenge to such position by the IRS, such party shall be precluded from advocating for such tax position in any subsequent year absent any change or changes in facts or circumstances that would support such tax position. The cost of the arbitrator will be split between the Reorganized Debtor and AAC. The Rehabilitator represents that it is not presently aware of any fact, including, without limitation, any plan of rehabilitation for the Segregated Account that is presently being considered, upon which it would seek to change (under section 5.a of the Mediation Agreement) the method of realization or accrual of deductions for interest and original issue discount on the surplus notes issued by AAC in June 2010, including the application of IRC sections 163(e)(5) and 163(i);

(b) AAC shall

(1) provide the Rehabilitator, the opportunity to participate in all meetings with AAC management to discuss loss reserves to be included in any statutory financial report,

(2) provide the Rehabilitator with all reports provided to AAC management (when so provided) concerning the assumptions and vendors utilized or to be utilized in arriving at statutory loss reserves, together with any related reports or materials requested by the Rehabilitator, and

(3) obtain the approval of the Rehabilitator prior to accepting repayment of any intercompany loan in an amount in excess of $50 million per annum or any modification to or deemed repayment of any intercompany loan in an amount that would result in AAC recognizing income or a reduction in issue price in excess of $50 million per annum. No later than February 1 of each year (or more frequently if requested by AAC), if AAC proposes to make any changes in the assumptions or vendors utilized in determining statutory loss reserves from the prior year's statutory loss reserves (or, with respect to 2011, the statutory loss reserves for the period from September 30, 2011, to December 31, 2011), which changes would cause the difference (whether positive or negative) between (w) AAC's statutory reserves determined with such proposed changes and (x) AAC's statutory reserves determined without such proposed changes to exceed the lesser of (y) $200,000,000 or (z) 10% of AAC's statutory reserves determined without such proposed changes, AAC shall seek and obtain the approval of its loss reserves from the Rehabilitator, which approval shall not be unreasonably withheld or delayed.  In the event that the Rehabilitator disputes AAC's loss reserves and does not provide such approval, then, unless OCI prescribes an accounting practice requiring AAC to follow the position of the Rehabilitator, the parties shall (i) immediately submit such dispute to expedited arbitration before a single arbitrator with requisite expertise to decide which of the positions most appropriately reflects expected claim payments or (ii) jointly agree to an alternative method of dispute resolution. The decision of an arbitrator shall be final and binding upon the parties, and shall be rendered in such form and substance as shall be necessary to permit AAC to reasonably rely thereon for purposes of filing its statutory financial statements.  The parties shall agree to such

procedures as are necessary and prudent to permit the arbitrator to issue a decision by no later than ten business days before the date that the annual financial reports are required to be filed (the "Filing Date"). If the differences of the parties are not resolved in a manner described above at least ten business days before the Filing Date, then AAC shall request an extension of the Filing Date from OCI. If OCI agrees to such an extension, it will cooperate with AAC to secure extensions in other jurisdictions as necessary. If such extension (or subsequent extension) is not granted, AAC shall be entitled to file its financial reports on the basis of its own loss reserving positions.

(c) Any changes to AAC's existing "<u>Investment Policy</u>" (dated November 18, 2010) shall be submitted to the Rehabilitator for approval, which approval shall not be unreasonably withheld. The Rehabilitator shall meet with AAC management (including the chief financial officer) semi-annually to discuss the Investment Policy and any changes appropriate thereto. The Rehabilitator may recommend changes to the Investment Policy and AAC shall consider such recommendations in good faith. The Rehabilitator shall also be provided with periodic reports of investment transactions in the ordinary course. Notwithstanding anything to the contrary in the Management Services Agreement or any other agreement, in the event that AAC's rejection of any proposed changes are not reasonable and fair to the interests of AAC and the Segregated Account, or are not protective or equitable to the interests of AAC and the Segregated Account policyholders generally, the Rehabilitator may direct AAC to transfer investment management functions relating to the investment portfolio to a third party jointly chosen by the Rehabilitator and AAC. With respect to any subsequent transfers to third parties of investment management functions relating to the investment portfolio, such third parties shall be jointly chosen by the Rehabilitator and AAC. If the investment management function is transferred in accordance with the foregoing, the parties shall agree to provisions similar to those contained in section 2.05 of the Cooperation Agreement with respect to such replacement investment manager.

4.     <u>The Cash Grant and Junior Surplus Notes</u>

On the Plan Settlement Effective Date, AAC shall transfer to an escrow account $30 million (the "<u>Cash Grant</u>"). On the Plan Settlement Closing Date, the Cash Grant shall be transferred to the Reorganized Debtor. The Amended TSA shall provide that in consideration of AAC's payment of the Cash Grant, to the extent that AAC makes any payments to the Reorganized Debtor for NOL use as set forth in section 2 of the Mediation Agreement and memorialized in the Amended TSA, AAC shall receive a credit against the first $5 million in

payments due under each of NOL Usage Tier A, B, and C shown in the table attached to the Mediation Agreement as Appendix A, provided that the sum of the credits for all tiers shall not exceed $15 million.

Effective as of the Plan Settlement Signing Date, the Rehabilitator shall, in conjunction with its petition to the Rehabilitation Court for prompt approval of the transactions contemplated by the Amended Plan Settlement pursuant to section 11 of the Mediation Agreement, seek an order providing that, in the event that any obligations of AAC under the Amended Plan Settlement become subject to the authority of the Rehabilitation Court or any other court of competent jurisdiction overseeing any delinquency proceeding of AAC or any of its assets or liabilities, the obligations of AAC to (a) make payments to the Reorganized Debtor for NOL use pursuant to the Amended TSA, (b) reimburse reasonable AFG operating expenses pursuant to the Cost Allocation Agreement (as provided in paragraph 3.c of the Mediation Agreement), (iii) pay the Cash Grant (as provided in section 6 of the Mediation Agreement), (iv) make all payments described in section 2.l of the Mediation Agreement, and (v) make all payments described in section 4 of the Mediation Agreement, in each case, shall be provided administrative-expense status in any such insurer delinquency proceeding. The Junior Surplus Notes to be issued pursuant to section 8 of the Mediation Agreement shall not be provided administrative-expense priority. The priority level of any claim by the Reorganized Debtor for damages arising from AAC's breach of any other obligation under the Amended Plan Settlement (including such other obligations as memorialized in the Amended TSA, the Cost Allocation Agreement or the Cooperation Agreement) shall be a matter of further proceedings before the Rehabilitation Court, with each party reserving its rights in that regard. The Rehabilitator, OCI and AAC acknowledge that the phrase "the July 18, 1991 Tax Sharing Agreement, as amended" in the amendment to the Plan of Operation, as submitted to the Rehabilitation Court on November 8, 2010, does not include the Amended TSA and, that the Amended TSA, once executed, will not be allocated to the Segregated Account by operation of such amendment to the Plan of Operation. Other than the foregoing, nothing in the Amended Plan Settlement shall be interpreted to limit the authority of the Rehabilitator over AAC in the event that AAC becomes subject to a delinquency proceeding under Chapter 645 of the Wisconsin Statutes.

Additionally, on the Plan Settlement Closing Date, the Segregated Account shall issue $350 million of Junior Surplus Notes to the Reorganized Debtor, the terms of which shall be mutually agreed and no less favorable to the Debtor than those extended to any other recipient of Junior Surplus Notes as a creditor described by subsections (5) or (6) of Section 645.68 of the Wisconsin Statutes.

5.    Releases

The Plan provides for broad releases of the Debtor, the Reorganized Debtor, AAC, the Segregated Account, OCI, the Rehabilitator, the board of directors and board committees of the Debtor and AAC, all current and former individual directors, officers, or employees of the Debtor and AAC, the Committee and the individual members thereof, the Indenture Trustees, the Informal Group and the individual members thereof, and each of their respective Representatives (each of the foregoing in its individual capacity as such).

Additionally, pursuant to the Amended Plan Settlement, effective as of the Plan Settlement Closing Date, the Debtor and the members of the Committee (the "AFG Interests") shall provide an unconditional, full and complete release of OCI, the Rehabilitator, AAC and the Segregated Account, and each of their respective current and former members, shareholders, affiliates, officers, directors, employees and agents (including any attorneys, financial advisors, investment bankers, consultants and other professionals retained by such persons, and any other advisors or experts with whom OCI, the Rehabilitator, AAC or the Segregated Account consults), from any and all claims or causes of action of any nature whatsoever that the AFG Interests (and/or any person claiming by or through the AFG Interests) ever had, now has or can, shall or may have, by reason of any matter, cause or thing occurring prior to the Plan Settlement Closing Date, including but not limited to (a) any Avoidance Actions or constructive trust claims the Debtor may have against AAC and (b) any liability to the Debtor pertaining to any possible misallocation of up to $38,485,850 of tax refunds received by AAC in September 2009 and February 2010. Effective as of the Plan Settlement Closing Date, AAC, OCI, the Segregated Account, and the Rehabilitator shall provide an unconditional, full and complete release of the Debtor and the members of the Committee, and each of their current and former members, shareholders, affiliates, officers, directors, employees and agents (including any attorneys, financial advisors, investment bankers, consultants and other professionals retained by such persons, and any other advisors or experts with which it consults), from, without limitation, any and all claims or causes of action of any nature whatsoever that such parties (and/or any person claiming by or through such parties) ever had, now has or can, shall or may have, by reason of any matter, cause or thing occurring prior to the Plan Settlement Closing Date.

6.    Additional Representations

Upon the reasonable request of the Reorganized Debtor at any time on or after the Plan Settlement Signing Date, AAC commits to undertake commercially reasonable efforts to transfer to the Reorganized Debtor a more than insignificant amount of an active trade or business, subject to (a) OCI's determination that such a transfer does not violate the law, is reasonable and fair to the interests of AAC and the Segregated Account, and protects and is equitable to the interests of AAC and the Segregated Account policyholders generally, and (b) the Reorganized Debtor's receipt of a tax opinion stating that it is at least more likely than not that such transfer satisfies the requirements of IRC section 269.

The "Plan Settlement Closing Date" means a date that shall occur no later than ten business days following the date on which each of the following conditions has been satisfied or waived by each of the parties to the Amended Plan Settlement:

(i)     entry of a final, non-appealable order by the Rehabilitation Court approving the transactions contemplated by the Amended Plan Settlement, such approval to be sought within 30 days of the date of the filing of the Plan;

(ii)    entry of a final, non-appealable Confirmation Order, including the transactions contemplated by Amended Plan Settlement;

(iii)     resolution of the IRS Dispute, either by settlement as contemplated by section 4 of the Mediation Agreement or by judgment of a court of competent jurisdiction that does not (i) require the AAC Subgroup to make a payment to the IRS of more than $100 million in connection with the IRS's claim for the recovery of certain federal tax refunds that were received prior to November 7, 2010 by the Debtor, AAC or their affiliates or (ii) reduce the Allocated NOL Amount by more than 10%; and

(iv)     the earliest to occur of the following:

(a)     the Bankruptcy Court enters a final, non-appealable order determining that neither an "ownership change" (within the meaning of section 382 of the IRC) (an "<u>Ownership Change</u>") with respect to AAC nor a Deconsolidation Event occurred during the 2010 taxable year, in a form reasonably acceptable to the Rehabilitator with respect to such matters only; or

(b)     the Reorganized Debtor (on behalf of itself, AAC, and the other members of the Ambac Consolidated Group) and the IRS enter into a pre-filing agreement with the IRS, prior to the filing of the Ambac Consolidated Group's 2011 tax return, by which the IRS agrees that no such Deconsolidation Event or Ownership Change occurred during the 2010 taxable year; or

(c)     the Reorganized Debtor (on behalf of itself, AAC, and the other members of the Ambac Consolidated Group) and the IRS enter into a closing agreement, by which the IRS agrees that no such Deconsolidation Event or Ownership Change occurred during the 2010 taxable year.

Promptly following the Plan Settlement Signing Date, the Rehabilitator shall petition the Rehabilitation Court for approval of the transactions contemplated by the Amended Plan Settlement and the Debtor shall petition the Bankruptcy Court for approval of the transactions contemplated by the Amended Plan Settlement. The Debtor and the Rehabilitator shall use their best efforts to ensure that such orders are upheld on any appeal. The Committee shall support the Debtor's application for Bankruptcy Court approval of the Amended Plan Settlement. The approval from the Bankruptcy Court shall memorialize the parties' intent to preserve use of NOLs for the benefit of AAC and the Reorganized Debtor as contemplated by the Amended Plan Settlement. The parties shall use their best efforts to ensure that the order contemplated by subsection (i) of section 11.d of the Mediation Agreement is obtained, and if such an order cannot be obtained, the parties shall use their commercially reasonable efforts to obtain the pre-filing agreement contemplated by subsection (ii) of section 11.d of the Mediation Agreement.

In the event that a condition to the Plan Settlement Closing Date cannot be satisfied, each of the TSA, the Cooperation Agreement Amendment, and the reimbursement of AFG operating expenses set forth in section 3 of the Mediation Agreement shall terminate and be of no further force or effect, the Cash Grant shall be released from escrow to AAC, any other amounts held in

escrow pursuant to section 2.d of the Mediation Agreement shall be released to AAC, and the parties to the Plan Settlement shall have no further obligations thereunder.

Additionally, in accordance with the Amended Plan Settlement, upon the reasonable request of AAC at any time on or after the Plan Settlement Closing Date, OCI commits to allow AAC to repurchase Surplus Notes, preferred stock or other securities or other consideration issued pursuant to the Rehabilitation Plan or any amendment or subsequent iteration thereof (whether issued by AAC or the Segregated Account) subject to OCI's determination in its sole and absolute discretion that such repurchases do not violate the law, are reasonable and fair to the interests of AAC and the Segregated Account, and protect and are equitable to the interests of AAC and the Segregated Account policyholders generally.

In the event that the Reorganized Debtor believes AAC, OCI or the Rehabilitator to be, or in the event that the Rehabilitator believes the Reorganized Debtor to be, in material breach of, or otherwise not complying with their respective material obligations under, the Amended Plan Settlement, such party shall provide the alleged breaching or non-complying party with a written notice (copied to their last known legal counsel) describing, in reasonable detail, the nature of the alleged breach or non-compliance. Following delivery of such written notice, the parties shall attempt, in good faith, to resolve their dispute. The party served with a notice of breach or non-compliance shall have 30 days to cure the alleged breach or non-compliance. In the event that there is no cure and the parties are unable to resolve their dispute, any party alleging such breach or non-compliance may, not less than 45 days following delivery of such written notice, seek a judgment from the Rehabilitation Court that the other party has breached this agreement. Solely for purposes of resolving such dispute, the Reorganized Debtor shall consent to the jurisdiction of the Rehabilitation Court. In the event that the Rehabilitation Court enters a final, non-appealable order in favor of any party alleging such breach or non-compliance, such party may ask the court to grant such further relief as the court deems appropriate in light of the nature and severity of the breach or non-performance, including specific performance, termination of the parties' obligations under the Amended Plan Settlement and/or monetary damages.

Additionally, the agreements, modifications to agreements and other transactions contemplated by the Amended Plan Settlement, including the Plan, the Amended TSA and the Cost Allocation Agreement, shall be structured, to the extent practicable, to comply with the CDS Settlement Agreement and the Rehabilitation Plan.

In the event of any conflict or inconsistency between the Mediation Agreement and the provisions of the Amended TSA, the Cooperation Agreement Amendment or the Cost Allocation Agreement, the provisions of the Amended TSA, the Cooperation Agreement Amendment or the Cost Allocation Agreement, as applicable, shall govern.

The Mediation Agreement shall be governed by the law of the State of New York.

## ARTICLE IV.
## SUMMARY OF THE PLAN

This section provides a summary of the structure and means for implementation of the Plan and the classification and treatment of Claims and Equity Interests under the Plan, and is

qualified in its entirety by reference to the Plan (as well as the exhibits thereto and definitions therein). The statements contained in this Disclosure Statement include summaries of the provisions contained in the Plan and in the documents referred to therein but do not purport to be precise or complete descriptions of all of the terms and provisions of the Plan or documents referred to therein. Reference is made to the Plan and to such documents for the full and complete statement of such terms and provisions of the Plan or documents referred to therein. In the event of any conflict between this Disclosure Statement and the Plan or any other operative document, the terms of the Plan and/or such other operative document shall control.

## A. Administrative Claims and Priority Tax Claims

In accordance with Bankruptcy Code section 1123(a)(1), Administrative Claims, Claims for Accrued Professional Compensation, and Priority Tax Claims have not been classified and, therefore, are excluded from the Classes of Claims and Equity Interests set forth in Article III of the Plan and shall have the following treatment:

### 1. Administrative Claims

Except with respect to Administrative Claims that are Claims for Accrued Professional Compensation and except to the extent that a Holder of an Allowed Administrative Claim agrees to less favorable treatment, each Holder of an Allowed Administrative Claim shall be paid in full, in Cash, on the later of (i) the Effective Date or as soon as practicable thereafter; (ii) the first date such Administrative Claim becomes Allowed or as soon as practicable thereafter; and (iii) the date such Allowed Administrative Claim becomes due and payable by its terms or as soon as practicable thereafter.

### 2. Administrative Claims Bar Date

Requests for the payment of Administrative Claims, other than Claims (i) for Accrued Professional Compensation, (ii) for administrative expenses incurred by the Debtor in the ordinary course of business, and (iii) in respect of any obligations pursuant to the Amended Plan Settlement that come into effect before the Effective Date, must be Filed and served on the Reorganized Debtor pursuant to the procedures specified in the Confirmation Order no later than sixty (60) days after the Effective Date. Holders of Administrative Claims that are required to, but do not, File and serve a request for payment of such Claims by such date shall be forever barred, estopped, and enjoined from asserting such Claims against the Debtor, the Reorganized Debtor, or their assets or properties and such Claims shall be deemed discharged as of the Effective Date. Objections to such requests, if any, must be Filed and served on the Reorganized Debtor and the requesting party no later than ninety (90) days after the Effective Date. Notwithstanding the foregoing, no request for payment of an Administrative Claim need be Filed with respect to an Administrative Claim previously Allowed by Final Order, including all Administrative Claims expressly Allowed under the Plan.

### 3. Accrued Professional Compensation

Professionals asserting a Claim for Accrued Professional Compensation for services rendered before the Effective Date shall (i) File and serve on the Reorganized Debtor and such other Entities who are designated by the Bankruptcy Rules, the Confirmation Order, the Interim

Compensation Order, or other order of the Bankruptcy Court a final application for the allowance of such Claim for Accrued Professional Compensation no later than sixty (60) days after the Effective Date and, (ii) if granted such an award by the Bankruptcy Court, be paid in full in Cash in such amounts as are Allowed by the Bankruptcy Court on the date such Claim for Accrued Professional Compensation becomes Allowed or as soon as practicable thereafter. Holders of Claims for Accrued Professional Compensation that do not File and serve such application by the required deadline shall be forever barred, estopped, and enjoined from asserting such Claims against the Debtor, the Reorganized Debtor, or their assets or properties, and such Claims shall be deemed discharged as of the Effective Date. Objections to Claims for Accrued Professional Compensation shall be Filed no later than ninety (90) days after the Effective Date.

4.    Priority Tax Claims

Except to the extent that a Holder of an Allowed Priority Tax Claim agrees to less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Priority Tax Claim, each Holder of an Allowed Priority Tax Claim due and payable on or before the Effective Date shall receive, at the option of the Debtor, one of the following treatments: (i) Cash, payable by the Debtor on the later of (a) the Effective Date and (b) the date on which such Priority Tax Claim becomes Allowed, or as soon as practicable thereafter, in an amount equal to the amount of such Allowed Priority Tax Claim; or (ii) Cash in an aggregate amount of such Allowed Priority Tax Claim payable in installment payments over a period of time not to exceed five (5) years after the Commencement Date, in accordance with Bankruptcy Code section 1129(a)(9)(C).

5.    U.S. Trustee Fees

On the Effective Date or as soon as practicable thereafter, the Reorganized Debtor shall pay all U.S. Trustee Fees that are due and owing on the Effective Date. For the avoidance of doubt, nothing in the Plan shall release the Reorganized Debtor from its obligation to pay all U.S. Trustee Fees due and owing after the Effective Date before an order or final decree is entered by the Bankruptcy Court concluding or closing the Chapter 11 Case.

6.    Indenture Trustee Fees and Informal Group Fees

On the Effective Date, the Reorganized Debtor shall pay in Cash the Indenture Trustee Fees and the Informal Group Fees, without the need for the Indenture Trustees or the Informal Group to file fee applications with the Bankruptcy Court; *provided*, *however*, that (i) each Indenture Trustee and the Informal Group shall provide the Debtor and the Committee with the invoices for which it seeks payment at least ten (10) days prior to the Effective Date; and (ii) the Debtor and the Committee do not object to the reasonableness of the Indenture Trustee Fees or the Informal Group Fees; *provided further, however,* that notwithstanding the foregoing, the Reorganized Debtor shall not be required to pay any Informal Group Fees unless (x) the Informal Group supports the Plan and (y) members of the Informal Group holding at least sixty-seven percent (67%) of the aggregate holdings of the Informal Group as of July 6, 2011, vote their Claims to accept the Plan. To the extent that the Debtor or the Committee objects to the reasonableness of any portion of the Indenture Trustee Fees or the Informal Group Fees, the

Reorganized Debtor shall not be required to pay such disputed portion until either such objection is resolved or a further order of the Bankruptcy Court is entered providing for payment of such disputed portion. Notwithstanding anything in the Plan to the contrary, each Indenture Trustee's Lien against distributions or property held or collected by it for fees and expenses and priority rights pursuant to the Indentures shall be discharged solely upon payment of its Indenture Trustee Fees in full on the Effective Date and the termination of such Indenture Trustee's duties under the applicable Indenture.

**B.      Classification and Treatment of Classified Claims and Equity Interests**

      1.      <u>Summary Classification of Claims and Equity Interests</u>

All Claims and Equity Interests, except Administrative Claims, Accrued Professional Compensation Claims, Priority Tax Claims, Indenture Trustee Fees, U.S. Trustee Fees and Informal Group Fees, are classified in the Classes set forth in Article III of the Plan. A Claim or Equity Interest is also classified in a particular Class for the purpose of receiving distributions pursuant to the Plan only to the extent that such Claim or Equity Interest is an Allowed Claim or Allowed Equity Interest in that Class and has not been paid, released, or otherwise satisfied prior to the Effective Date.

| Class | Claim/Equity Interest | Impairment | Voting Rights |
|-------|----------------------|------------|---------------|
| 1 | Priority Non-Tax Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| 2 | Secured Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| 3 | General Unsecured Claims | Impaired | Entitled to Vote |
| 4 | Senior Notes Claims | Impaired | Entitled to Vote |
| 5 | Subordinated Notes Claims | Impaired | Entitled to Vote |
| 6 | Section 510(b) Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |
| 7 | Intercompany Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |
| 8 | Equity Interests | Impaired | Not Entitled to Vote (Deemed to Reject) |

      2.      <u>Treatment of Claims and Equity Interests</u>

The following summarizes the treatment of each Class:

      (i)      Class 1 – Priority Non-Tax Claims

        (a)      *Classification*: Class 1 consists of all Priority Non-Tax Claims.

        (b)      *Treatment*: Except to the extent that a Holder of an Allowed

Priority Non-Tax Claim agrees to less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Priority Non-Tax Claim, on the later of (a) the Effective Date and (b) the date on which such Priority Non-Tax Claim becomes Allowed, or as soon as practicable thereafter, each Holder of such Allowed Priority Non-Tax Claim shall be paid in full in Cash.

(c) *Voting*: Class 1 is Unimpaired. Pursuant to Bankruptcy Code section 1126(f), Holders of Allowed Priority Non-Tax Claims are conclusively presumed to accept the Plan.

(ii) Class 2 – Secured Claims

(a) *Classification*: Class 2 consists of all Secured Claims.

(b) *Treatment*: Except to the extent that a Holder of an Allowed Secured Claim agrees to less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Secured Claim, on the later of (a) the Effective Date and (b) the date on which such Secured Claim becomes Allowed, or as soon as practicable thereafter, each Holder of such Allowed Secured Claim shall receive, in the Reorganized Debtor's sole discretion, (1) Cash, including the payment of any interest required to be paid pursuant to Bankruptcy Code section 506(b), in the amount equal to such Allowed Secured Claim, (2) the collateral securing such Allowed Secured Claim, or (3) any other treatment such that the Allowed Secured Claim will be Unimpaired; *provided, however*, that the aggregate amount of Allowed Secured Claims shall not exceed $200,000.00.

(c) *Voting*: Class 2 is Unimpaired. Pursuant to Bankruptcy Code section 1126(f), Holders of Allowed Secured Claims are conclusively presumed to accept the Plan.

(iii) Class 3 – General Unsecured Claims

(a) *Classification*: Class 3 consists of all General Unsecured Claims.

(b) *Treatment*: Except to the extent that a Holder of an Allowed General Unsecured Claim agrees to less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed General Unsecured Claim, on the later of (a) the Effective Date and (b) the date on which such General Unsecured Claim becomes Allowed, or as soon as practicable thereafter, each Holder of such Allowed General Unsecured Claim shall receive (1) its Pro Rata share of the New Common Stock distributed to Holders of Allowed General Unsecured Claims,

Senior Notes Claims and Subordinated Notes Claims pursuant to the Plan and (2), provided that the Class of Senior Notes Claims votes to accept the Plan, the Warrants distributed to Holders of Allowed General Unsecured Claims, which shall be, in the aggregate, an amount equal to the General Unsecured Claims Warrant Amount.

(c) *Voting*: Class 3 is Impaired.  Holders of Allowed General Unsecured Claims are entitled to vote to accept or reject the Plan.

(iv) Class 4 – Senior Notes Claims

(a) *Classification*: Class 4 consists of all Senior Notes Claims.

(b) *Allowance of Senior Notes Claims*: The Senior Notes Claims shall be allowed in the aggregate amount of $1,246,129,468.66, comprised of (a) $410,115,000.00 in respect of the 5.95% Debentures Due 2035, (b) $176,085,243.06 in respect of the 5.875% Debentures Due 2103, (c) $201,256,111.11 in respect of the 5.95% Debentures Due 2103, (d) $77,921,875.00 in respect of the 7-1/2% Debentures Due 2023, (e) $125,275,545.05 in respect of the 9-3/8% Debentures Due 2011, and (f) $255,475,694.44 in respect of the 9.50% Senior Notes Due 2021.  For the avoidance of doubt, the Allowed Senior Notes Claims shall not be subject to any avoidance, reductions, setoff, offset, recharacterization, subordination (equitable or contractual or otherwise), counter-claim, defense, disallowance, impairment, objection or any challenges under applicable law or regulation.

(c) *Treatment*: In full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Senior Notes Claim, on the Effective Date or as soon as practicable thereafter, each Holder of such Allowed Senior Notes Claim shall receive its Pro Rata share of the New Common Stock distributed to Holders of Allowed General Unsecured Claims, Senior Notes Claims, and Subordinated Notes Claims pursuant to the Plan, subject to the condition set forth below.  In addition, the Senior Notes Indenture Trustee shall receive redistributions of New Common Stock and Warrants, in an amount equal to the Subordinated Notes Claims Warrant Amount, from the Subordinated Notes Indenture Trustee in accordance with the subordination provisions of the Indentures; *provided*, *however*, that, if the Class of Senior Notes Claims votes to accept the Plan, (1) the Senior Notes Indenture Trustee shall transfer to the Subordinated Notes Indenture Trustee the Warrants, in an amount equal to the Subordinated Notes Claims Warrant Amount, to distribute on a Pro Rata basis to Holders of Allowed Subordinated Notes Claims, and (2) if the Class of Subordinated

Notes Claims also votes to accept the Plan, prior to distributing any New Common Stock to the Holders of Allowed Senior Notes Claims, the Senior Notes Indenture Trustee shall transfer to the Subordinated Notes Indenture Trustee 1.5% of the New Common Stock that is distributed to creditors pursuant to the Plan, to distribute on a Pro Rata basis to Holders of Allowed Subordinated Notes Claims.

(d)     *Voting*: Class 4 is Impaired.  Holders of Allowed Senior Notes Claims are entitled to vote to accept or reject the Plan.

(v)     Class 5 – Subordinated Notes Claims

(a)     *Classification*: Class 5 consists of all Subordinated Notes Claims.

(b)     *Allowance of Subordinated Notes Claims*: The Subordinated Notes Claims shall be allowed in the aggregate amount of $444,182,604.08.   For the avoidance of doubt, the Allowed Subordinated Notes Claims shall not be subject to any avoidance, reductions, setoff, offset, recharacterization, subordination (equitable or contractual or otherwise), counter-claim, defense, disallowance, impairment, objection or any challenges under applicable law or regulation.

(c)     *Treatment*: In full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Subordinated Notes Claim, on the Effective Date or as soon as practicable thereafter, each Holder of such Allowed Subordinated Notes Claim shall receive (a) its Pro Rata share of the New Common Stock distributed to Holders of Allowed General Unsecured Claims, Senior Notes Claims, and Subordinated Notes Claims pursuant to the Plan, and (b), provided that the Class of Senior Notes Claims vote to accept the Plan, the Warrants distributed to Holders of Subordinated Notes Claims, which shall be an amount equal to the Subordinated Notes Claims Warrant Amount; *provided*, *however*, that any distribution of New Common Stock and Warrants to Holders of Allowed Subordinated Notes Claims shall be redistributed to the Senior Notes Indenture Trustee for the benefit of Holders of Allowed Senior Notes Claims in accordance with the subordination provisions of the Indentures; *provided further, however*, that, if the Class of Senior Notes Claims votes to accept the Plan, (1) the Senior Notes Indenture Trustee shall transfer to the Subordinated Notes Indenture Trustee the Warrants, in an amount equal to the Subordinated Notes Claims Warrant Amount, to distribute on a Pro Rata basis to Holders of Allowed Subordinated Notes Claims, and (2) if the Class of Subordinated Notes Claims also votes to accept the Plan, prior to distributing any

New Common Stock to the Holders of Allowed Senior Notes Claims, the Senior Notes Indenture Trustee shall transfer to the Subordinated Notes Indenture Trustee 1.5% of the New Common Stock that is distributed to creditors pursuant to the Plan, to distribute on a Pro Rata basis to Holders of Allowed Subordinated Notes Claims.

(d) *Voting*: Class 5 is Impaired. Holders of Allowed Subordinated Notes Claims are entitled to vote to accept or reject the Plan.

(vi) Class 6 – Section 510(b) Claims

(a) *Classification*: Class 6 consists of all Section 510(b) Claims.

(b) *Treatment*: On the Effective Date, all Section 510(b) Claims shall be terminated, cancelled, and extinguished and each Holder of an Allowed Section 510(b) Claim shall not be entitled to, and shall not receive or retain, any property or interest in property on account of such Section 510(b) Claim.

(c) *Voting*: Class 6 is Impaired. Pursuant to Bankruptcy Code section 1126(g), Holders of Section 510(b) Claims are conclusively presumed to reject the Plan.

(vii) Class 7 – Intercompany Claims

(a) *Classification*: Class 7 consists of all Intercompany Claims, except any claims AAC may have under the Amended TSA, the Cost Allocation Agreement, the Cooperation Agreement, the Mediation Agreement or any other documents entered into in connection with the Amended Plan Settlement.

(b) *Treatment*: On the Effective Date, except as otherwise provided in the Plan, all Intercompany Claims shall be terminated, cancelled, and extinguished and each Holder of an Intercompany Claim shall not be entitled to, and shall not receive or retain, any property or interest in property on account of such Intercompany Claim.

(c) *Voting*: Class 7 is Impaired. Pursuant to Bankruptcy Code section 1126(g), Holders of Intercompany Claims are conclusively presumed to reject the Plan.

(viii) Class 8 – Equity Interests

(a) *Classification*: Class 8 consists of all Equity Interests.

(b) *Treatment*: On the Effective Date, all Equity Interests shall be terminated, cancelled, and extinguished and each Holder of an

Equity Interest shall not be entitled to, and shall not receive or retain, any property or interest in property on account of such Equity Interest.

(c) *Voting*: Class 8 is Impaired. Pursuant to Bankruptcy Code section 1126(g), Holders of Equity Interests are conclusively presumed to reject the Plan.

3. <u>Subordinated Claims</u>

The allowance, classification, and treatment of all Allowed Claims and Equity Interests and the respective distributions and treatments under the Plan take into account and conform to the relative priority and rights of the Claims and Equity Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, Bankruptcy Code section 510(b), or otherwise. Pursuant to Bankruptcy Code section 510, the Debtor or the Reorganized Debtor, as applicable, reserves the right to re-classify any Allowed Claim or Equity Interest in accordance with any contractual, legal, or equitable subordination relating thereto.

4. <u>Confirmation Pursuant to Bankruptcy Code Section 1129(b)</u>

Because certain Classes are deemed to have rejected the Plan, the Debtor will request confirmation of the Plan pursuant to Bankruptcy Code section 1129(b). The Debtor reserves the right to alter, amend, modify, revoke or withdraw the Plan or any related documents, in order to satisfy the requirements of Bankruptcy Code section 1129(b), if necessary.

5. <u>Elimination of Vacant Classes</u>

Any Class of Claims or Equity Interests that does not have a Holder of an Allowed Claim or Allowed Equity Interest or a Claim or Equity Interest temporarily or finally Allowed by the Bankruptcy Court as of the date of the Confirmation Hearing shall be deemed eliminated from the Plan for purposes of voting to accept or reject the Plan and for purposes of determining acceptance or rejection of the Plan by such Class.

6. <u>Controversy Concerning Impairment</u>

If a controversy arises as to whether any Class of Claims or Equity Interests is Impaired, the Bankruptcy Court shall, after notice and a hearing, determine such controversy on or before the Confirmation Date.

**C. Means for Implementation of the Plan**

1. <u>Sources of Consideration for Plan Distributions</u>

All consideration necessary to make all monetary payments in accordance with the Plan shall be obtained from the Cash of the Debtor or the Reorganized Debtor, as applicable, including the Cash Grant and any payments made pursuant to the Amended TSA or Cost Allocation Agreement.

2.     <u>New Organizational Documents</u>

The Debtor's organizational documents shall be amended as necessary in order to satisfy the provisions of the Plan and the Bankruptcy Code. The New Organizational Documents shall include, among other things, pursuant to Bankruptcy Code section 1123(a)(6), a provision prohibiting the issuance of non-voting equity securities for so long as Bankruptcy Code 1123 is in effect and applicable to the Reorganized Debtor.

The New Certificate of Incorporation of the Reorganized Debtor will, among other things, restrict certain transfers of New Common Stock by persons who are, or may become, holders of five (5) percent or more of the New Common Stock. Transfers of New Common Stock in violation of such provisions will be void *ab initio*. The amendment of the New Certificate of Incorporation will permit the board of directors of the Reorganized Debtor to permit certain transfers in its sole discretion. The restrictions applicable to holders of New Common Stock are more fully described in Article IV.E of the Plan.

3.     <u>Continued Corporate Existence</u>

In accordance with the laws of the State of Delaware and the New Organizational Documents, after the Effective Date, the Reorganized Debtor shall continue to exist as a separate corporate entity.

4.     <u>Vesting of Assets in the Reorganized Debtor</u>

Except as otherwise provided in the Plan, on the Effective Date, all property of the Estate and any property acquired by the Debtor pursuant to the Plan shall vest in the Reorganized Debtor, free and clear of all Liens and Claims. On and after the Effective Date, except as otherwise provided in the Plan, the Reorganized Debtor may operate its business and use, acquire, or dispose of property and compromise or settle any Claims without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

5.     <u>New Common Stock</u>

Pursuant to the terms set forth in the Plan, on the Effective Date, the Reorganized Debtor shall issue shares of New Common Stock for distribution to Holders of Allowed Claims as set forth in Article III.B of the Plan. All of the shares of the New Common Stock issued pursuant to the Plan shall be duly authorized, validly issued, fully paid, and non-assessable. The Reorganized Debtor will use its commercially reasonable best efforts to list the New Common Stock on a national securities exchange. The issuance and allocation of the New Common Stock shall be structured to ensure that such issuance qualifies for the L5 Exception. In addition, the New Common Stock shall be subject to trading restrictions, as necessary, to prevent an "ownership change" within the meaning of IRC section 382, from occurring following the Effective Date.

6.      <u>Section 1145 Exemption</u>

Unless required by provision of applicable law, regulation, order, or rule, as of the Effective Date, the issuance of the New Common Stock and the Warrants in accordance with the Plan shall be authorized under Bankruptcy Code section 1145 without further act or action by any Entity.

7.      <u>Cancellation of Securities and Indentures</u>

On the Surrender Date, except as otherwise provided in the Plan, all notes, stock, instruments, certificates, indentures, guarantees, and other documents or agreements evidencing the Senior Notes Claims, the Subordinated Notes Claims, and Equity Interests, including, without limitation, the Senior Notes, the Subordinated Notes, and the Indentures, shall be deemed automatically cancelled and shall be of no further force or effect, whether surrendered for cancellation or otherwise, and the obligations of the Debtor or the Reorganized Debtor thereunder or in any way related thereto shall be discharged. Notwithstanding the foregoing, the Senior Notes, the Subordinated Notes, and the Indentures shall continue in effect solely for the purposes of: (i) allowing the Indenture Trustees to receive and distribute New Common Stock and the Warrants pursuant to the Plan; (ii) permitting the Indenture Trustees to maintain any Lien or priority rights they may have pursuant to the Indentures against distributions or property held or collected by them for fees and expenses; (iii) permitting, but not requiring, the Indenture Trustees to exercise their rights and obligations relating to the interests of their Holders pursuant to the applicable Indentures; and (iv) permitting the Indenture Trustees to appear in the Chapter 11 Case. The Senior Notes, the Subordinated Notes, and the Indentures shall terminate completely upon completion of the distribution of New Common Stock and the Warrants to the Holders of Senior Notes Claims and Subordinated Notes Claims, as applicable, pursuant to the Plan.

8.      <u>Amended Plan Settlement</u>

Entry of the Confirmation Order shall, subject to the occurrence of the Effective Date and effective as of the Effective Date, constitute an order of the Bankruptcy Court approving the Amended Plan Settlement, including the Debtor's entry into the Cost Allocation Agreement, the Cooperation Agreement Amendment and the Amended TSA. Additionally, entry of the Confirmation Order shall, subject to the occurrence of the Effective Date and effective as of the Effective Date, constitute an order of the Bankruptcy Court approving the unconditional, full, and complete mutual releases by and among the Debtor, the Committee, AAC, the Segregated Account, OCI and the Rehabilitator from any and all Claims and Causes of Action, including Avoidance Actions; *provided, however*, the Confirmation Order shall not release claims arising under the Amended TSA, the Cost Allocation Agreement, the Cooperation Agreement, the Mediation Agreement or any other documents entered into in connection with the Amended Plan Settlement.

9.      <u>Directors and Officers of the Reorganized Debtor</u>

On the Effective Date the term of the current members of the Debtor's board of directors shall expire. On and after the Effective Date, the existing officers of the Debtor shall remain in

place in their current capacities as officers of the Reorganized Debtor, subject to the ordinary rights and powers of the New Board to remove or replace them. The New Board shall consist of the Reorganized Debtor's Chief Executive Officer and four (4) additional directors, all of whom shall serve on an interim basis until such time that the Holders of the New Common Stock elect four new directors. The interim directors shall be appointed as follows: one (1) director shall be appointed by the Informal Group, and three (3) directors shall be appointed by the Committee; *provided, however*, that if members of the Informal Group hold 50% or more of the Senior Notes Claims on the Confirmation Date, the Informal Group shall appoint two (2) directors and the Committee shall appoint two (2) directors. The identity of the members of the New Board and the nature and compensation of each of its members who is an "insider" under Bankruptcy Code section 101(31) shall be disclosed at or prior to the Confirmation Hearing.

10.    Corporate Action

Except as otherwise provided in the Plan, each of the matters provided for by the Plan involving corporate or related actions to be taken by or required of the Reorganized Debtor shall, as of the Effective Date, be deemed to have occurred and be effective as provided in the Plan, and shall be authorized, approved, and, to the extent taken prior to the Effective Date, ratified in all respects without any requirement of further action by Holders of Claims or Equity Interests, directors of the Debtor, or any other Entity. On or prior to the Effective Date, the appropriate officers of the Debtor or the Reorganized Debtor, as applicable, shall be authorized and directed to issue, execute, and deliver the agreements, securities, instruments, or other documents contemplated by the Plan, or necessary or desirable to effect the transactions contemplated by the Plan, in the name of and on behalf of the Reorganized Debtor, including New Organizational Documents and any and all other agreements, securities, instruments, or other documents relating to such documents. Notwithstanding any requirements under nonbankruptcy law, the authorizations and approvals contemplated by this provision shall be effective.

11.    Effectuating Documents; Further Transactions

On and after the Effective Date, the Reorganized Debtor and the officers and members of the New Board are authorized to and may issue, execute, deliver, file, or record such contracts, securities, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of the Plan and the New Common Stock in the name of and on behalf of the Reorganized Debtor, without the need for any approvals, authorization, or consents, except for those expressly required by the Plan.

12.    Exemption from Certain Taxes and Fees

Pursuant to Bankruptcy Code section 1146(a), any transfers of property pursuant to the Plan shall not be subject to any stamp, real estate transfer, mortgage reporting, sales, use tax or other similar tax or governmental assessment in the United States, and the Confirmation Order shall direct and be deemed to direct the appropriate state or local governmental officials or agents to forego the collection of any such tax or governmental assessment and to accept for filing and recordation instruments or other documents pursuant to such transfers of property without the payment of any such tax or governmental assessment.

**D.      Treatment of Executory Contracts and Unexpired Leases**

   1.      Assumption or Rejection of Executory Contracts and Unexpired Leases

Except as otherwise provided in the Plan, each of the Debtor's prepetition executory contracts and unexpired Leases shall be deemed rejected as of the Effective Date, unless such executory contract or unexpired lease (i) was assumed or rejected previously by the Debtor; (ii) previously expired or terminated pursuant to its terms; (iii) is the subject of a motion to assume or reject Filed on or before the Effective Date; or (iv) is identified on the Schedule of Assumed Executory Contracts and Unexpired Leases.  Entry of the Confirmation Order shall, subject to the occurrence of the Effective Date, constitute the approval by the Bankruptcy Court of the assumptions or rejections of prepetition executory contracts and unexpired leases as set forth in the Plan.  Except as otherwise provided in the Plan, all assumptions or rejections of prepetition executory contracts and unexpired leases pursuant to the Plan are effective as of the Effective Date.  Notwithstanding anything to the contrary in the Plan, the Debtor reserves the right to amend, modify, or supplement the Schedule of Assumed Executory Contracts and Unexpired Leases at any time before the Effective Date.  Nothing in Article V of the Plan is intended to modify the obligations under executory contracts or unexpired leases entered into by the Debtor after the Commencement Date.

   2.      Cure of Defaults for Assumed Executory Contracts and Unexpired Leases

Any monetary defaults under each executory contract and unexpired lease to be assumed pursuant to the Plan shall be satisfied, pursuant to Bankruptcy Code section 365(b)(1), by payment of the default amount in Cash on the Effective Date or as soon as practicable thereafter, subject to the limitations described below, or on such other terms as the parties to such executory contracts or unexpired leases may otherwise agree.  At least twenty-one (21) days before the Confirmation Hearing, the Debtor shall distribute, or cause to be distributed, to the appropriate third parties, notices of proposed assumption of executory contracts and unexpired leases and proposed amounts of Cure Claims, which notices shall be in a format reasonably acceptable to the Committee and shall include procedures for objecting to proposed assumptions of executory contracts and unexpired leases and any amounts of Cure Claims to be paid in connection therewith.  Any objection by a counterparty to an executory contract or unexpired lease to a proposed assumption or related cure amount must be Filed, served, and actually received by counsel to the Debtor and the Committee at least seven (7) days before the Confirmation Hearing.  Any counterparty to an executory contract or unexpired lease that fails to object timely to the proposed assumption or cure amount will be deemed to have assented to such assumption and cure amount.  In the event of a dispute regarding (i) the amount of any payments to cure such a default, (ii) the ability of the Reorganized Debtor or any assignee to provide "adequate assurance of future performance," within the meaning of Bankruptcy Code section 365, under the executory contract or unexpired lease to be assumed, or (iii) any other matter pertaining to assumption, the cure payments required by Bankruptcy Code section 365(b)(1) shall be made following the entry of a Final Order or orders resolving the dispute and approving the assumption.  Assumption of any executory contract or unexpired lease pursuant to the Plan or otherwise shall result in the full release and satisfaction of any Claims or defaults, whether monetary or nonmonetary, arising under any assumed executory contract or unexpired lease at any time before the effective date of the assumption.

3. Claims Based on Rejection of Executory Contracts and Unexpired Leases

All Proofs of Claim with respect to Claims arising from the rejection of executory contracts or unexpired leases, including any executory contracts or unexpired leases rejected or deemed rejected under the Plan, must be Filed in accordance with the procedures set forth in the Bar Date Order within thirty (30) days after the date of an order approving such rejection, including the Confirmation Order, is entered. Any Claims arising from the rejection of an executory contract or unexpired lease not Filed within such time will be automatically disallowed, forever barred from assertion, and shall not be enforceable against the Debtor, the Reorganized Debtor, or their assets or properties without the need for any objection by the Reorganized Debtor or further notice to, or action, order, or approval of the Bankruptcy Court. All Allowed Claims arising from the rejection of the Debtor's executory contracts or unexpired leases shall be classified as General Unsecured Claims and shall be treated in accordance with Article III.B.3 of the Plan. The deadline to object to Claims arising from the rejection of executory contracts or unexpired leases, if any, shall be ninety (90) days following the date on which such Proof of Claim was Filed.

4. Nonoccurrence of Effective Date

In the event that the Effective Date does not occur, the Bankruptcy Court shall retain jurisdiction with respect to any consensual request, pursuant to Bankruptcy Code section 365(d)(4), to extend the deadline for assuming or rejecting executory contracts and unexpired leases.

E. **Provisions Governing Distributions**

1. Record Date for Distributions

Except with respect to Allowed Senior Notes Claims and Allowed Subordinated Notes Claims, as of the Distribution Record Date, the transfer registers for each Class of Claims or Equity Interests, as maintained by the Debtor or its agents, shall be deemed closed and there shall be no further changes made to reflect any new record holders of any Claims or Equity Interests. Except with respect to Allowed Senior Notes Claims and Allowed Subordinated Notes Claims, the Debtor shall have no obligation to recognize any transfer of Claims or Equity Interests occurring on or after the Distribution Record Date.

2. Timing and Calculation of Amounts to be Distributed

Except as otherwise provided in the Plan, on the Effective Date or as soon as practicable thereafter (or if a Claim is not an Allowed Claim on the Effective Date, on the date that such a Claim becomes an Allowed Claim), each Holder of an Allowed Claim against the Debtor shall receive the full amount of the distributions that the Plan provides for Allowed Claims in the applicable Class; *provided*, *however*, that any Holder of Allowed Senior Notes Claims or Allowed Subordinated Notes Claims that does not comply with the Trading Order shall only receive distributions of New Common Stock to the extent set forth in the Trading Order. In the event that any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as

of the required date. If and to the extent that there are Disputed Claims, distributions on account of any such Disputed Claims shall be made in accordance with the provisions set forth in Article VII of the Plan. Except as otherwise provided in the Plan, Holders of Claims shall not be entitled to interest, dividends, or accruals on the distributions provided for in the Plan, regardless of whether such distributions are delivered on or at any time after the Effective Date.

3.    Disbursing Agent

On the Effective Date or as soon as practicable thereafter, all distributions under the Plan shall be made by the Reorganized Debtor as Disbursing Agent or such other Entity designated by the Reorganized Debtor as a Disbursing Agent. Except as otherwise ordered by the Bankruptcy Court, a Disbursing Agent shall not be required to give any bond or surety or other security for the performance of its duties.

4.    Rights and Powers of Disbursing Agent

(i)    Powers of the Disbursing Agent

The Disbursing Agent shall be empowered to: (i) effect all actions and execute all agreements, securities, instruments, and other documents necessary to perform its duties under the Plan; (ii) make all distributions contemplated by the Plan; (iii) employ professionals to represent it with respect to its responsibilities; and (iv) exercise such other powers as may be vested in the Disbursing Agent by order of the Bankruptcy Court, pursuant to the Plan, or as deemed by the Disbursing Agent to be necessary and proper to implement the provisions of the Plan.

(ii)    Expenses Incurred on or after the Effective Date

Except as otherwise ordered by the Bankruptcy Court, the amount of any reasonable fees and expenses incurred by the Disbursing Agent on or after the Effective Date (including taxes) and any reasonable compensation and expense reimbursement claims (including reasonable attorney fees and expenses) made by the Disbursing Agent shall be paid in Cash by the Reorganized Debtor.

5.    Delivery of Distributions and Undeliverable or Unclaimed Distributions

(i)    Delivery of Distributions

Except as otherwise provided in the Plan, the Disbursing Agent shall make distributions to Holders of Allowed Claims (except Allowed Senior Notes Claims and Allowed Subordinated Notes Claim as to which distributions shall be treated as set forth in Article VI.E.2 of the Plan) as of the Distribution Record Date at the address for each such Holder as indicated on the Debtor's books and records as of the date of any such distribution or as set forth in any Proof of Claim Filed by such Holder; *provided*, *however*, that the manner of such distributions shall be determined at the discretion of the Disbursing Agent. If a Holder holds more than one Claim in any one Class, all Claims of the Holder will be aggregated into one Claim and one distribution will be made with respect to the aggregated Claim. Distributions to Holders of Senior Notes Claims shall be made to the Senior Notes Indenture Trustee for the benefit of the respective

Holders of Senior Notes Claims, and shall be deemed completed when made to the Senior Notes Indenture Trustee. Distributions to Holders of Subordinated Notes Claims shall be made to the Subordinated Notes Indenture Trustee for the benefit of the respective Holders of Subordinated Notes Claims, and shall be deemed completed when made to the SubordinatedNotes Indenture Trustee.

(ii)     Surrender of Existing Publicly Traded Securities

On the Effective Date, or as soon as reasonably practicable thereafter, each Indenture Trustee, with the cooperation of the Reorganized Debtor, shall cause The Depository Trust Company or other securities depository (each, a "<u>Depository</u>") to surrender the debt securities in respect of the Senior and Subordinated Notes to the applicable Indenture Trustee or the Disbursing Agent. No distributions under the Plan shall be made for or on behalf of a Registered Holder unless and until (i) such debt securities have been received by the applicable Indenture Trustee or the Disbursing Agent or appropriate instructions from the Depository have been received by the applicable Indenture Trustee or the Disbursing Agent; or (ii) the loss, theft, or destruction of such debt securities has been established to the reasonable satisfaction of the applicable Indenture Trustee or the Disbursing Agent, which satisfaction may require such Registered Holder to submit a lost instrument affidavit and an indemnity bond holding the Debtor, the Reorganized Debtor, the Disbursing Agent, and the applicable Indenture Trustee harmless in respect of such debt securities and distributions made in respect thereof. Each Registered Holder shall be deemed to have surrendered such debt securities as of the date it has complied with the foregoing (the "<u>Surrender Date</u>"). On the Surrender Date, Holders of Allowed Senior Notes Claims and Subordinated Notes Claims shall be entitled to receive distributions pursuant to the Plan. Any Registered Holder that fails to surrender such debt securities or satisfactorily explain the loss, theft, or destruction of such debt securities to the applicable Indenture Trustee or Disbursing Agent within one (1) year of the Effective Date shall be deemed to have no further Claim against the Debtor, the Reorganized Debtor, the Disbursing Agent, or the applicable Indenture Trustee in respect of such Claim and shall not be entitled to receive any distribution under the Plan. All property in respect of such forfeited distributions, including interest thereon, shall be promptly returned to the Reorganized Debtor by the applicable Indenture Trustee or the Disbursing Agent and any such debt securities shall be cancelled.

(iii)     Minimum; De Minimis Distributions

The Disbursing Agent shall not be required to make partial distributions or payments of fractions of New Common Stock and such fractions shall be deemed to be zero. The total number of authorized shares of New Common Stock to be distributed pursuant to the Plan shall be adjusted, as necessary, to account for the foregoing. No Cash payment of less than $50 shall be made to a Holder of an Allowed Claim on account of such Allowed Claim.

(iv)     Undeliverable Distributions and Unclaimed Property

(a)     *Failure to Claim Undeliverable Distributions*

In the event that any distribution to any Holder is returned as undeliverable, no distribution to such Holder shall be made unless and until the Disbursing Agent has determined

the then current address of such Holder, at which time such distribution shall be made to such Holder without interest; *provided*, *however*, that such distributions shall be deemed unclaimed property under Bankruptcy Code section 347(b) at the expiration of six (6) months from the Effective Date. After such date, all unclaimed property or interests in property shall revert to the Reorganized Debtor (notwithstanding any applicable federal or state escheat, abandoned, or unclaimed property laws to the contrary), and the Claim of any Holder to such property or interest in property shall be released, settled, compromised, and forever barred.

(b)     *Failure to Present Checks*

Checks issued by the Disbursing Agent on account of Allowed Claims shall be null and void if not negotiated within ninety (90) days after the issuance of such check. Requests for reissuance of any check shall be made directly to the Disbursing Agent by the Holder of the relevant Allowed Claim with respect to which such check originally was issued. Any Holder of an Allowed Claim holding an un-negotiated check that does not request reissuance of such un-negotiated check within ninety (90) days after the issuance of such check shall have its Claim for such un-negotiated check discharged and be discharged and forever barred, estopped, and enjoined from asserting any such Claim against the Debtor, the Reorganized Debtor, or their assets and properties.

6.     <u>Compliance with Tax Requirements</u>

In connection with the Plan, to the extent applicable, the Disbursing Agent shall comply with all tax withholding and reporting requirements imposed upon it by any Governmental Unit, and all distributions pursuant to the Plan shall be subject to such withholding and reporting requirements. Notwithstanding the above, each Holder of an Allowed Claim that is to receive a distribution under the Plan shall have the sole and exclusive responsibility for the satisfaction and payment of any taxes imposed on such holder by any governmental unit, including income, withholding and other tax obligations, on account of such distribution. The Disbursing Agent has the right, but not the obligation, not to make a distribution until such Holder has made arrangements satisfactory to the Disbursing Agent for payment of any such withholding tax obligations and, if the Disbursing Agent fails to withhold with respect to any such Holder's distribution, and is later held liable for the amount of such withholding, the Holder shall reimburse the Disbursing Agent. Notwithstanding any provision in the Plan to the contrary, the Disbursing Agent shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including liquidating a portion of the distribution to be made under the Plan to generate sufficient funds to pay applicable withholding taxes, withholding distributions pending receipt of information necessary to facilitate such distributions, or establishing any other mechanisms it believes are reasonable and appropriate. The Disbursing Agent may require, as a condition to the receipt of a distribution, that the Holder complete the appropriate Form W-8 or Form W-9, as applicable to each Holder. If the Holder fails to comply with such a request within six months, such distribution shall be deemed an unclaimed distribution. Finally, the Disbursing Agent reserves the right to allocate all distributions made under the Plan in compliance with all applicable wage garnishments, alimony, child support, and other spousal awards, Liens, and encumbrances.

7.      Allocations

Distributions in respect of Allowed Claims shall be allocated first to the principal amount (as determined for federal income tax purposes) of such Claims, and then, to the extent the consideration exceeds the principal amount of such Claims, to any portion of such Claims for accrued but unpaid interest.

8.      Setoffs and Recoupment

The Debtor or the Reorganized Debtor may, but shall not be required to, setoff against or recoup from any Claims of any nature whatsoever that the Debtor may have against the claimant, but neither the failure to do so nor the Allowance of any Claim shall constitute a waiver or release by the Debtor or the Reorganized Debtor of any such Claim it may have against the Holder of such Claim.

9.      Claims Paid or Payable by Third Parties

(i)      Claims Paid by Third Parties

The Debtor, on or prior to the Effective Date, or the Reorganized Debtor, after the Effective Date, shall reduce a Claim, and such Claim shall be disallowed without a Claims objection having to be Filed and without any further notice, action, order, or approval of the Bankruptcy Court, to the extent that the Holder of such Claim receives payment on account of such Claim from a party that is not the Debtor or the Reorganized Debtor.  To the extent a Holder of a Claim receives a distribution on account of such Claim and receives payment from a party that is not the Debtor or the Reorganized Debtor on account of such Claim, such Holder shall, within two weeks of receipt thereof, repay or return the distribution to the Reorganized Debtor, to the extent the Holder's total recovery on account of such Claim from the third party and under the Plan exceeds the amount of such Claim.

(ii)      Claims Payable by Third Parties

No distributions under the Plan shall be made on account of an Allowed Claim that is payable pursuant to one of the Debtor's insurance policies until the Holder of such Allowed Claim has exhausted all remedies with respect to such insurance policy.  To the extent that one or more of the Debtor's insurers agrees to satisfy in full a Claim (if and to the extent adjudicated by a court of competent jurisdiction), then immediately upon such insurers' agreement, such Claim may be expunged without an objection to such Claim having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court.

**F.      Procedures for Resolving Contingent, Unliquidated, and Disputed Claims**

1.      Resolution of Disputed Claims

(i)      Allowance of Claims

On or after the Effective Date, the Reorganized Debtor shall have and shall retain any and all rights and defenses that the Debtor had with respect to any Claim, except with respect to any

Claim deemed Allowed as of the Effective Date. Except as otherwise provided in the Plan or in any order entered in the Chapter 11 Case prior to the Effective Date, including, without limitation, the Confirmation Order, no Claim shall become an Allowed Claim unless and until such Claim is deemed Allowed (i) under the Plan or the Bankruptcy Code or (ii) by Final Order of the Bankruptcy Court, including, without limitation, the Confirmation Order.

(ii)     No Distribution Pending Allowance

Except as otherwise provided in the Plan, if any portion of a Claim is a Disputed Claim, no payment or distribution provided under the Plan shall be made on account of such Claim unless and until such Disputed Claim becomes an Allowed Claim. To the extent a Disputed Claim becomes an Allowed Claim, in accordance with the provisions of the Plan, distributions shall be made to the Holder of such Allowed Claim, without interest.

(iii)     Disputed Claims Reserve

(a)     Disputed Claims Reserve

On the Effective Date or as soon as practicable thereafter, the Debtor or the Reorganized Debtor, as applicable, shall deposit into the Disputed Claims Reserve the amount of Cash, New Common Stock and Warrants that would have been distributed to Holders of all Disputed Claims as if such Disputed Claims had been Allowed on the Effective Date, with the amount of such Allowed Claims to be determined, solely for the purpose of establishing reserves and for maximum distribution purposes, to be the lesser of (i) the asserted amount of the Disputed Claim Filed with the Bankruptcy Court, or if no Proof of Claim was Filed, listed by the Debtor in the Schedules, (ii) the amount, if any, estimated by the Bankruptcy Court pursuant to Bankruptcy Code section 502(c), and (iii) the amount otherwise agreed to by the Debtor or the Reorganized Debtor, as applicable, and the Holder of such Disputed Claim for reserve purposes**.**

(b)     Distribution of Excess Amounts in the Disputed Claims Reserve

When all Disputed Claims are resolved and either become Allowed or are disallowed by Final Order, to the extent Cash, New Common Stock and/or Warrants remain in the Disputed Claims Reserve after all Holders of Disputed Claims that have become Allowed have been paid the full amount they are entitled to pursuant to the treatment set forth for the appropriate Class under the Plan, then such remaining Cash, New Common Stock and/or Warrants shall be cancelled or shall vest in the Reorganized Debtor.

(iv)     Prosecution of Objections to Claims

The Debtor, prior to and on the Effective Date, or the Reorganized Debtor, after the Effective Date, shall have the exclusive authority to File objections to Claims or settle, compromise, withdraw or litigate to judgment objections to any and all Claims, regardless of whether such Claims are in a Class or otherwise. From and after the Effective Date, the Reorganized Debtor may settle or compromise any Disputed Claim without any further notice to or action, order or approval of the Bankruptcy Court. From and after the Effective Date, the Reorganized Debtor shall have the sole authority to administer and adjust the Claims Register to

reflect any such settlements or compromises without any further notice, action, order, or approval of the Bankruptcy Court.

(v)     Claims Estimation

The Debtor, prior to and on the Effective Date, or the Reorganized Debtor, after the Effective Date, may request that the Bankruptcy Court estimate any contingent or unliquidated Claim to the extent permitted by Bankruptcy Code section 502(c) regardless of whether the Debtor or the Reorganized Debtor has previously objected to such Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court shall have jurisdiction to estimate any Claim at any time during litigation concerning any objection to such Claim, including during the pendency of any appeal relating to any such objection.

(vi)     Expungement or Adjustment of Claims Without Objection

Any Claim that has been paid, satisfied, or superseded may be expunged on the Claims Register by the Debtor or the Reorganized Debtor, as applicable, and any Claim that has been amended may be adjusted thereon by the Debtor or the Reorganized Debtor, in both cases without a Claims objection having to be Filed and without any further notice to or action, order or approval of the Bankruptcy Court.

(vii)     Deadline to File Claims Objections

Any objections to Claims shall be Filed by no later than the Claims Objection Bar Date.

2.     Disallowance of Claims

Any Claims held by an Entity from which property is recoverable under Bankruptcy Code sections 542, 543, 550, or 553, or that is a transferee of a transfer avoidable under Bankruptcy Code section 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a), shall be deemed disallowed pursuant to Bankruptcy Code section 502(d), and Holders of such Claims may not receive any Distributions on account of such Claims until such time as such Causes of Action against that Entity have been settled or a Final Order with respect thereto has been entered and all sums due, if any, by that Entity have been turned over or paid by such Entity to the Debtor or the Reorganized Debtor.

EXCEPT AS OTHERWISE AGREED BY THE DEBTOR OR THE REORGANIZED DEBTOR, AS APPLICABLE, ANY AND ALL PROOFS OF CLAIM FILED AFTER THE CLAIMS BAR DATE SHALL BE DEEMED DISALLOWED AND EXPUNGED AS OF THE EFFECTIVE DATE WITHOUT ANY FURTHER NOTICE TO OR ACTION, ORDER, OR APPROVAL OF THE BANKRUPTCY COURT, AND HOLDERS OF SUCH CLAIMS MAY NOT RECEIVE ANY DISTRIBUTIONS ON ACCOUNT OF SUCH CLAIMS, UNLESS SUCH LATE PROOF OF CLAIM IS DEEMED TIMELY FILED BY A FINAL ORDER OF THE BANKRUPTCY COURT.

3.      Amendments to Claims

On or after the Effective Date, a Claim may not be Filed or amended without prior authorization of the Bankruptcy Court or the Reorganized Debtor, and any such new or amended Claim Filed without such prior authorization shall be deemed disallowed in full and expunged without any further action.

## G.      Settlement, Release, Injunction, and Related Provisions

1.      Discharge of Claims and Termination of Equity Interests

Pursuant to and to the fullest extent permitted by Bankruptcy Code section 1141(d), and except as otherwise provided in the Plan, the distributions, rights, and treatment that are provided in the Plan shall be in full and final satisfaction, settlement, release, and discharge, effective as of the Effective Date, of all Claims, Equity Interests, and Causes of Action of any nature whatsoever, including any interest accrued on Claims or Equity Interests from and after the Commencement Date, whether known or unknown, against, liabilities of, Liens on, obligations of, rights against, and Equity Interests in the Debtor, the Reorganized Debtor, or their assets or properties, regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims or Equity Interests, including demands, liabilities, and Causes of Action that arose before the Effective Date, any contingent or non-contingent liability on account of representations or warranties issued on or before the Effective Date, and all debts of the kind specified in Bankruptcy Code sections 502(g), 502(h), or 502(i), in each case whether or not: (i) a Proof of Claim or Equity Interest based upon such Claim, debt, right, or Equity Interest is Filed or deemed Filed pursuant to Bankruptcy Code section 501; (ii) a Claim or Equity Interest based upon such Claim, debt, right, or Equity Interest is Allowed pursuant to Bankruptcy Code section 502; or (iii) the Holder of such a Claim or Equity Interest has accepted the Plan. Any default by the Debtor or its Affiliates with respect to any Claim or Equity Interest that existed immediately before or on account of the Filing of the Chapter 11 Case shall be deemed cured on the Effective Date. The Confirmation Order shall be a judicial determination of the discharge of all Claims and Equity Interests subject to the Effective Date occurring.

2.      Injunction

Except as otherwise provided in the Plan and the Amended Plan Settlement, from and after the Effective Date, all Entities that have held, hold, or may hold Claims against or Equity Interests in the Debtor or the Estate are permanently enjoined from taking any of the following actions against the Debtor, the Reorganized Debtor, or the Estate: (i) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims or Equity Interests; (ii) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any such Claims or Equity Interests; (iii) creating, perfecting, or enforcing any Lien of any kind against such Entities or the property or estates of such Entities on account of or in connection with or with respect to any such Claims or Equity Interests; (iv) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such Entities or against the property of such Entities on account of or in connection with or with respect to any such Claims or Equity Interests, unless such Holder has

Filed a motion requesting the right to perform such setoff, subrogation, or recoupment on or before the Confirmation Date, and notwithstanding an indication in a Proof of Claim or otherwise that such Holder asserts, has, or intends to preserve any right of setoff, subrogation, or recoupment pursuant to Bankruptcy Code section 553 or otherwise, *provided*, *however*, that nothing herein shall detract from AAC's ability to exercise its right of offset pursuant to section 7 of the Cost Allocation Agreement without notice or further order of the Bankruptcy Court; and (v) commencing or continuing, in any manner or in any place, any action that does not comply with or is inconsistent with the provisions of the Plan.

3. <u>Exculpation</u>

None of the Released Parties shall have or incur any liability to any holder of any Claim or Equity Interest for any act or omission in connection with or arising out of the Debtor's restructuring, including, without limitation, the negotiation and execution of the Plan, the Chapter 11 Case, the Disclosure Statement, the solicitation of votes for and the pursuit of the Plan, the Consummation of the Plan, or the administration of the Plan or the Cash, New Common Stock and Warrants, if issued, to be distributed under the Plan, and further including, without limitation, all documents ancillary thereto, all decisions, actions, inactions and alleged negligence or misconduct relating thereto, and all prepetition activities leading to the promulgation and confirmation of the Plan; *provided*, *however*, that the foregoing shall not apply to any act which constitutes a bankruptcy crime under title 18 of the United States Code.

4. <u>General Releases by the Debtor</u>

For good and valuable consideration, including the facilitation of the Debtor's expeditious reorganization, on and after the Effective Date, the Released Parties shall be released and discharged by the Debtor, the Reorganized Debtor, and the Estate from any and all Claims and Causes of Action of any nature whatsoever, including any derivative Claims asserted by or on behalf of the Debtor, based upon or relating to any act, omission, transaction, event, or other occurrence taking place on or prior to the Effective Date; *provided*, *however*, that the foregoing shall not apply to any act which constitutes a bankruptcy crime under title 18 of the United States Code or any claims arising under the Amended TSA, the Cost Allocation Agreement, the Cooperation Agreement, the Mediation Agreement or any other documents entered into in connection with the Amended Plan Settlement.

5. <u>General Releases by Holders of Claims and Equity Interests</u>

To the extent permitted by applicable law as of the Effective Date, each Entity that has held, holds, or may hold a Claim or an Equity Interest, as applicable, in consideration for the obligations of the Debtor under the Plan, the Plan distributions, and other agreements, securities, instruments, or other documents executed or delivered in connection with the Plan, shall be deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged the Released Parties from any and all Claims and Causes of Action of any nature whatsoever, including any derivative Claims asserted by or on behalf of the Debtor, that such entity would have been legally entitled to assert based upon or relating to any act, omission, transaction, event, or other occurrence taking place on or prior to the Effective Date; *provided*, *however*, that the foregoing shall not apply to (i) any act which constitutes a bankruptcy crime

under title 18 of the United States Code, (ii) any obligations of the Reorganized Debtor pursuant to the Plan and (iii) any claims arising under the Amended TSA, the Cost Allocation Agreement, the Cooperation Agreement, the Mediation Agreement or any other documents entered into in connection with the Amended Plan Settlement. Notwithstanding anything to the contrary in the Plan, OSS shall continue to be entitled to the benefits set forth in the OSS Settlement Agreement.

6.         <u>Releases Required Pursuant to the Stipulation of Settlement</u>

In accordance with the Stipulation of Settlement, the Plan includes the following releases:

(i)       To the fullest extent permitted by applicable law, on the Effective Date, all Persons or Entities, including, but not limited, to the Ambac Entities and any shareholder or creditor of any of the Ambac Entities (including any other Person or Entity purportedly acting derivatively on behalf of the Ambac Entities) shall be permanently barred and enjoined from instituting, prosecuting, or continuing to prosecute any and all manner of Claims, actions, Causes of Actions, suits, controversies, agreements, costs, damages, judgments, and demands whatsoever, known or Unknown (as defined in the Stipulation of Settlement), suspected or unsuspected, accrued or unaccrued, arising under the laws, regulations, or common law of the United States of America, any state or political subdivision thereof, or any foreign country or jurisdiction, in law, contract, or in equity, against any or all of the Individual Defendants and any or all of the current or former officers, directors, or employees of any Ambac Entity (i) that were, could have been, might have been, or might be in the future asserted in any of the Securities Actions or any of the Derivative Actions; (ii) in connection with, arising out of, related to, or based upon, in whole or in part, directly or indirectly, any action or omission or failure to act within the Class Period or relevant periods specified in any of the Derivative Actions by any of the Individual Defendants or any of the current or former officers, directors, or employees of any Ambac Entity relating to any Ambac Entity or in his or her capacity as an officer, director, or employee of any Ambac Entity; or (iii) that allege, arise out of, or are based upon or attributable to any fact, action, omission, or failure to act that is alleged in any of the Securities Actions or the Derivative Actions or related to any fact, action, omission, or failure to act alleged in the Securities Actions or the Derivative Actions.

(ii)      On the Effective Date, the Reorganized Debtor, on behalf of itself and (to the fullest extent of its power to do so) all Ambac Entities and (to the fullest extent of their power to do so) any shareholder, creditor, or other Person or Entity purporting to sue on behalf of or in the right of any of the Ambac Entities, shall be deemed to fully release any and all manner of Claims, actions, Causes of Action, suits, controversies, agreements, costs, damages, judgments, and demands whatsoever, known or Unknown (as defined in the Stipulation of Settlement), suspected or unsuspected, accrued or unaccrued, arising under the laws, regulations, or common law of the United States of America, any state or political subdivision thereof, or any foreign country or jurisdiction, in law, contract, or in equity, against any or all of the Individual Defendants and any or all of the current or former officers, directors, or employees of any Ambac Entity (i) that were, could have been, might have been, or might be in the future asserted in any of the Securities Actions or any of the Derivative Actions; (ii) in connection with, arising out of, related to, or based upon, in whole or in part, directly or indirectly, any action or omission or failure to act within the Class Period or relevant periods specified in any of the Derivative Actions by any of the Individual Defendants or any of the current or former officers, directors, or

employees of any Ambac Entity relating to any Ambac Entity or in his or her capacity as an officer, director, or employee of any Ambac Entity; or (iii) that allege, arise out of, or are based upon or attributable to any fact, action, omission, or failure to act that is alleged in any of the Securities Actions or the Derivative Actions or related to any fact, action, omission, or failure to act alleged in the Securities Actions or the Derivative Actions.

(iii)     The injunctions and releases set forth in Article VIII.F of the Plan and in the Stipulation of Settlement 9019 Approval Order do not release and/or bar the ERISA claims at issue in the ERISA Action, provided that nothing in Article VIII.F of the Plan or in the Stipulation of Settlement or the amendments thereto shall be deemed a waiver by the defendants in the ERISA Action of their rights to maintain that any recovery by the Savings Plan pursuant to the Stipulation of Settlement approved hereby shall offset any recovery by the plaintiffs in the ERISA Action.

7.     Release of Liens

Except as otherwise provided in the Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to the Plan, and, in the case of a Class 2 Secured Claim, satisfaction in full of the portion of such Claim that is Allowed as of the Effective Date, all mortgages, deeds, trusts, Liens, pledges, or other security interests against any property of the Estate shall be fully released and discharged, and all of the right, title, and interest of any Holder of such mortgages, deeds, trusts, Liens, pledges, or other security interests shall revert to the Reorganized Debtor.

**H.     Conditions Precedent to Confirmation and Consummation of the Plan**

1.     Conditions Precedent to Confirmation

It shall be a condition to Confirmation of the Plan that the following conditions shall have been satisfied or waived pursuant to Article IX.C of the Plan: (i) the Bankruptcy Court shall have approved the Disclosure Statement with respect to the Plan; and (ii) the proposed Confirmation Order shall be in form and substance reasonably satisfactory to (a) the Debtor and, (b) only to the extent such Confirmation Order relates to the Amended TSA, resolution of the IRS Dispute, the Cost Allocation Agreement or the Cooperation Agreement, AAC.

2.     Conditions Precedent to Consummation

It shall be a condition to Consummation of the Plan that the following conditions shall have been satisfied or waived pursuant to Article IX.C of the Plan: (i) the Confirmation Order shall have become a Final Order; (ii) the Bankruptcy Court shall have approved any plan supplement filed with respect to the Plan; (iii) the New Organizational Documents shall have been effected; (iv) the Debtor or the Reorganized Debtor, as applicable, shall have executed and delivered all documents necessary to effectuate the issuance of the New Common Stock and, if applicable, Warrants; (v) all authorizations, consents, and regulatory approvals required, if any, in connection with the consummation of the Plan shall have been obtained; (vi) the Stipulation of Settlement shall have become effective; (vii) the IRS Dispute shall have been resolved in a manner satisfactory to the Debtor, AAC, OCI, the Rehabilitator and the Committee; (viii) the Bankruptcy Court shall have entered an order finding that neither an Ownership Change with

respect to AAC nor a Deconsolidation Event occurred during the 2010 taxable year, in a form reasonably acceptable to the Rehabilitator with respect to such matters only; (ix) the aggregate face amount of Allowed and Disputed General Unsecured Claims shall be less than $50,000,000.00; (x) the Rehabilitation Court shall have approved the transactions contemplated in the Plan; (xi) the Cash Grant will have been paid or paid into escrow as set forth in the Mediation Agreement; (xii) the Amended TSA, the Cooperation Agreement Amendment and the Cost Allocation Agreement shall have been executed; and (xiii) all other actions, documents, certificates, and agreements necessary to implement the Plan shall have been effected or executed and delivered to the required parties and, to the extent required, filed with the applicable Governmental Units in accordance with applicable laws.

3. Waiver of Conditions

With the consent of AAC, OCI, the Rehabilitator and the Committee, and upon notice to the Informal Group, the Debtor shall have the right to waive one or more of the conditions to Confirmation or Consummation of the Plan set forth in Article IX of the Plan at any time without notice, leave, or order of the Bankruptcy Court or any formal action other than proceeding to confirm or consummate the Plan.

4. Effect of Nonoccurrence of Conditions to Consummation

If each of the conditions to Confirmation and Consummation has not been satisfied or duly waived on or before the date that is 180 days after the Confirmation Date, or by such later date as determined by the Debtor with the consent of the Committee, which shall not be unreasonably withheld, the Confirmation Order may be vacated by the Bankruptcy Court. If the Confirmation Order is vacated pursuant to this provision, the Plan shall be null and void in all respects and nothing contained in the Plan or the Disclosure Statement shall: (i) constitute a waiver or release of any claims by or Claims against or Equity Interests in the Debtor; (ii) prejudice in any manner the rights of the Debtor, any Holders, or any other Entity; or (iii) constitute an admission, acknowledgment, offer, or undertaking by the Debtor, any Holders, or any other Entity in any respect.

## I. Modification, Revocation, or Withdrawal of the Plan

1. Modification and Amendments

The Debtor may amend, modify, or supplement the Plan pursuant to Bankruptcy Code section 1127(a) at any time prior to the Confirmation Date. After the Confirmation Date, but prior to Consummation of the Plan, the Debtor may, with the consent of the Committee, which shall not be unreasonably withheld, and upon consultation with (a) the Informal Group and, (b) only to the extent such amendment, modification, or supplement relates to the Amended TSA, resolution of the IRS Dispute, the Cost Allocation Agreement or the Cooperation Agreement, AAC, OCI and the Rehabilitator, amend, modify, or supplement the Plan without further order of the Bankruptcy Court to remedy any defect or omission or reconcile any inconsistencies in the Plan or the Confirmation Order.

2.      Effect of Confirmation on Modifications

Pursuant to Bankruptcy Code section 1127(a), entry of a Confirmation Order shall mean that all modifications or amendments to the Plan since the solicitation thereof are approved and do not require additional disclosure or re-solicitation under Bankruptcy Rule 3019.

3.      Revocation or Withdrawal of the Plan

The Debtor reserves the right to revoke or withdraw the Plan prior to the Confirmation Date and to File subsequent chapter 11 plans. If the Debtor revokes or withdraws the Plan, or if Confirmation or Consummation does not occur, then: (i) the Plan shall be null and void in all respects; (ii) any settlement or compromise embodied in the Plan, assumption or rejection of executory contracts or unexpired leases effected by the Plan, and any document or agreement executed pursuant to the Plan shall be deemed null and void except as may be set forth in a separate order entered by the Bankruptcy Court; and (iii) nothing contained in the Plan shall constitute a waiver or release of any Claims by or against, or any Equity Interests in, the Debtor or any other Entity, prejudice in any manner the rights of the Debtor or any other Entity, or constitute an admission, acknowledgement, offer, or undertaking of any sort by the Debtor or any other Entity.

## J.      Retention of Jurisdiction

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, except as otherwise provided by the Mediation Agreement, the Amended TSA, the Cost Allocation Agreement or the Cooperation Agreement Amendment, the Bankruptcy Court shall, after the Effective Date, retain such jurisdiction over the Chapter 11 Case and all Entities with respect to all matters related to the Chapter 11 Case, the Debtor, and the Plan as legally permissible, including, without limitation, jurisdiction to:

1.      allow, disallow, determine, liquidate, classify, estimate, or establish the priority, secured, or unsecured status, or amount of any Claim or Equity Interest, including the resolution of any request for payment of any Administrative Claim, including Claims of a Professional for services rendered to the Debtor or any Committee, and the resolution of any and all objections to the secured or unsecured status, priority, amount, or allowance of Claims or Equity Interests;

2.      decide and resolve all matters related to the granting and denying, in whole or in part, any applications for allowance of compensation or reimbursement of expenses to Professionals authorized pursuant to the Bankruptcy Code or the Plan;

3.      decide and resolve all matters related to the reasonableness of the Indenture Trustee Fees and the Informal Group Fees;

4.      resolve any matters related to: (i) the assumption, assumption and assignment, or rejection of any executory contract or unexpired lease to which the Debtor is party or with respect to which the Debtor may be liable, and the hearing, determination, and, if necessary, liquidation of any Claims arising therefrom, including Cure Claims pursuant to Bankruptcy Code section 365; (ii) any potential contractual

obligation under any executory contract or unexpired lease that is assumed; and (iii) any dispute regarding whether a contract or lease is or was executory or expired;

5.      ensure that distributions to Holders of Allowed Claims and Equity Interests are accomplished pursuant to the provisions of the Plan;

6.      adjudicate, decide, or resolve any motions, adversary proceedings, Causes of Action, contested or litigated matters, and any other matters, and grant or deny any applications involving the Debtor that may be pending on the Effective Date;

7.      adjudicate, decide, or resolve any and all matters related to Bankruptcy Code sections 1141 and 1145;

8.      enter and implement such orders as may be necessary or appropriate to execute, implement, or consummate the provisions of the Plan and all contracts, instruments, releases, indentures, and other agreements or documents, including the Cost Allocation Agreement and the Amended TSA, created in connection with the Plan or the Disclosure Statement;

9.      enter and enforce any order pursuant to Bankruptcy Code sections 363, 1123, or 1146(a) for the sale of property;

10.     resolve any cases, controversies, suits, disputes, or Causes of Action that may arise in connection with the Consummation, interpretation, or enforcement of the Plan or any Entity's obligations in connection with the Plan, including, without limitation, any dispute related to the Amended TSA, Cost Allocation Agreement, Cooperation Agreement, or the Amended Plan Settlement;

11.     issue injunctions, enter and implement other orders, or take such other actions as may be necessary or appropriate to restrain interference by any Entity, including, but not limited to, AAC, the Segregated Account or OCI, with Consummation or enforcement of the Plan, including, without limitation, any dispute related to the Amended TSA or the Amended Plan Settlement;

12.     resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the releases, injunctions, and other provisions contained in Article VIII of the Plan and enter such orders as may be necessary or appropriate to implement such releases, injunctions, and other provisions;

13.     enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked, or vacated;

14.     enter an order or final decree concluding or closing the Chapter 11 Case;

15.     adjudicate any and all disputes arising from or relating to distributions under the Plan;

16.     consider any modifications of the Plan, to cure any defect or omission, or reconcile any inconsistency in any Bankruptcy Court order, including the Confirmation Order;

17.     determine requests for the payment of Administrative Claims or Claims entitled to priority pursuant to Bankruptcy Code section 507;

18.     hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of the Plan, or the Confirmation Order, including disputes arising under agreements, securities, instruments, or other documents, including the Mediation Agreement, Cooperation Agreement, Cost Allocation Agreement and the Amended TSA, executed or delivered in connection with the Plan;

19.     hear and determine matters concerning state, local, and federal taxes in accordance with Bankruptcy Code sections 346, 505, and 1146;

20.     hear and determine all disputes involving the existence, nature, or scope of the Debtor's discharge, including any dispute relating to any liability arising out of the termination of employment or the termination of any employee or retiree benefit program, regardless of whether such termination occurred prior to or after the Effective Date;

21.     enforce all orders previously entered by the Bankruptcy Court; and

22.     hear any other matter not inconsistent with the Bankruptcy Code.

## K.    Miscellaneous Provisions

### 1.    Immediate Binding Effect

Subject to Article IX.B of the Plan and notwithstanding Bankruptcy Rules 3020(e), 6004(g), 7062, or otherwise, upon the occurrence of the Effective Date, the terms of the Plan shall be immediately effective and enforceable and deemed binding upon the Debtor, the Reorganized Debtor, and any and all Holders of Claims or Equity Interests (irrespective of whether such Claims or Equity Interests are deemed to have accepted the Plan), all Entities that are parties to or are subject to the settlements, compromises, releases, discharges, and injunctions described in the Plan, each Entity acquiring property under the Plan, and any and all non-Debtor parties to executory contracts and unexpired leases with the Debtor.

### 2.    Additional Documents

On or before the Effective Date, the Debtor may File with the Bankruptcy Court any and all agreements and other documents that may be necessary or appropriate in order to effectuate and further evidence the terms and conditions of the Plan.

3. Payment of Statutory Fees

All fees payable pursuant to 28 U.S.C. § 1930, as determined by the Bankruptcy Court at a hearing pursuant to Bankruptcy Code section 1128, shall be paid for each quarter (including any fraction thereof) until the Chapter 11 Case is converted, dismissed, or closed, whichever occurs first.

4. Dissolution of Committee

On the Effective Date, the Committee shall dissolve automatically, whereupon its members, Professionals, and agents shall be released from any further authority, duties obligations and responsibilities in the Chapter 11 Case and under the Bankruptcy Code; *provided, however*, that, following the Effective Date, the Committee shall: (i) continue to have standing and a right to be heard with respect to (a) Claims and/or applications for compensation by Professionals and requests for allowance of Administrative Expenses, including, but not limited to, filing applications for Accrued Professional Compensation in accordance with Article II.C of the Plan and (b) any appeals of the Confirmation Order that remain pending as of the Effective Date; and (ii) continue to respond to creditor inquiries for one hundred twenty (120) days following the Effective Date.

5. Reservation of Rights

Except as otherwise provided in the Plan, the Plan shall have no force or effect unless the Bankruptcy Court enters the Confirmation Order. None of the Filing of the Plan, any statement or provision contained in the Plan, or the taking of any action by the Debtor with respect to the Plan or the Disclosure Statement shall be or shall be deemed to be an admission or waiver of any rights of the Debtor with respect to the Holders of Claims or Equity Interests prior to the Effective Date.

6. Successors and Assigns

The rights, benefits, and obligations of any Entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of any heir, executor, administrator, successor or assign, Affiliate, officer, director, agent, representative, attorney, beneficiaries, or guardian, if any, of each Entity.

7. Service of Documents

All notices, requests and demands to or upon the Debtor to be effective shall be in writing (including by facsimile transmission) and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when actually delivered or, in the case of notice by facsimile transmission, when received and telephonically confirmed, addressed as follows:

Ambac Financial Group, Inc.
One State Street Plaza
Attn: General Counsel
New York, NY 10004

and

Dewey & LeBoeuf LLP
Counsel for the Debtor
1301 Avenue of the Americas
Attn: Peter A. Ivanick, Esq., and Allison H. Weiss, Esq.
New York, NY 10019

With copies to:

Morrison & Foerster LLP
Counsel for the Committee
1290 Avenue of the Americas
Attn: Anthony Princi, Esq.
New York, NY 10104

and

Akin Gump Strauss Hauer & Feld, LLP
Counsel for the Informal Group
1333 New Hampshire Ave, N.W.
Attn: James R. Savin, Esq.
Washington, D.C. 20036.

After the Effective Date, the Reorganized Debtor has authority to send a notice to Entities that in order to continue to receive documents pursuant to Bankruptcy Rule 2002, they must File a renewed request to receive documents with the Bankruptcy Court. After the Effective Date, the Debtor is authorized to limit the list of Entities receiving documents pursuant to Bankruptcy Rule 2002 to those Entities who have Filed such renewed requests.

8.  Further Assurances

The Debtor or the Reorganized Debtor, as applicable, all Holders of Claims receiving distributions pursuant to the Plan, and all other Entities shall, from time to time, prepare, execute, and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan or the Confirmation Order.

9.  Term of Injunctions or Stays

Unless otherwise provided in the Plan or in the Confirmation Order, all injunctions or stays in effect in the Chapter 11 Case pursuant to Bankruptcy Code sections 105 or 362 or any order of the Bankruptcy Court, and extant on the Confirmation Date (excluding any injunctions or stays contained in the Plan or the Confirmation Order) shall remain in full force and effect until the Effective Date. All injunctions or stays contained in the Plan, the Confirmation Order and the Stipulation of Settlement 9019 Approval Order shall remain in full force and effect in accordance with their terms.

10. <u>Entire Agreement</u>

Except as otherwise indicated, the Plan supersedes all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into the Plan.

11. <u>Exhibits and Related Documents</u>

All exhibits and documents Filed in relation to the Plan are incorporated into and are a part of the Plan as if set forth in full in the Plan. After any exhibits and documents are Filed, copies of such exhibits and documents shall be available upon written request to the Debtor's counsel at the address above or by downloading such exhibits and documents from the Debtor's restructuring website, http://www.kccllc.net/ambac, or the Bankruptcy Court's website, http://www.nys.uscourts.gov (a PACER login and password are required to access documents on the Bankruptcy Court's website).

12. <u>Severability of Plan Provisions</u>

If, before Confirmation of the Plan, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted. Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of the Plan shall remain in full force and effect and shall in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation. The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable.

13. <u>Closing of Chapter 11 Case</u>

Promptly after the full administration of the Chapter 11 Case, the Reorganized Debtor shall File with the Bankruptcy Court all documents required by Bankruptcy Rule 3022 and any applicable order of the Bankruptcy Court to close the Chapter 11 Case.

14. <u>Waiver or Estoppel Conflicts</u>

Each Holder of a Claim or Equity Interest shall be deemed to have waived any right to assert any argument, including the right to argue that its Claim or Equity Interest should be Allowed in a certain amount, in a certain priority, secured, or not subordinated, by virtue of an agreement made with the Debtor or its counsel, the Committee or its counsel, or any other Entity, if such agreement was not disclosed in the Plan, the Disclosure Statement, or papers Filed with the Bankruptcy Court prior to the Confirmation Date.

15.  Conflicts

Except as set forth in the Plan or unless otherwise ordered by the Bankruptcy Court, to the extent that the Disclosure Statement, any order of the Bankruptcy Court (other than the Confirmation Order), or any exhibit to the Plan or document executed or delivered in connection with the Plan is inconsistent with the terms of the Plan, the terms of the Plan shall control; *provided*, *however*, that to the extent the Mediation Agreement, the Amended TSA, the Cost Allocation Agreement, the Cooperation Agreement Amendment, the Stipulation of Settlement or the Stipulation of Settlement 9019 Approval Order may be inconsistent with the Plan, the terms of such document shall control.

### ARTICLE V.
### SOLICITATION AND VOTING PROCEDURES

The following summarizes briefly the procedures to solicit votes to accept or reject the Plan. Holders of Claims and Equity Interests are encouraged to review the relevant provisions of the Bankruptcy Code and/or to consult their own attorneys.

**A.    The Solicitation Package**

The following materials constitute the Solicitation Package: (i) the Disclosure Statement Order (without exhibits), (ii) the Disclosure Statement, which shall include the Plan as an exhibit thereto, (iii) the appropriate Ballot and/or Master Ballot and voting instructions (with a pre-addressed, postage prepaid return envelope) and (iv) the Confirmation Hearing Notice.

Because of significantly reduced costs and environmental benefits, Holders of General Unsecured Claims, Senior Notes Claims and Subordinated Notes Claims shall be served with Solicitation Packages in a CD-ROM format instead of printed copies; *provided*, *however*, that notwithstanding anything herein to the contrary, printed copies of the Ballot shall be distributed to such Holders. Any party who desires a paper copy of the Solicitation Package may request copies from the Balloting Agent by (i) writing to Kurtzman Carson Consultants LLC, at 599 Lexington Avenue, 39th Floor, New York, NY 10022, or 2335 Alaska Avenue El Segundo, CA 90245, or (ii) calling (877) 660-6619. The Solicitation Package (except the Ballots and Master Ballots) can also be obtained by accessing the Debtor's restructuring website, www.kccllc.net/Ambac. All parties entitled to vote to accept or reject the Plan shall receive a paper copy of each appropriate Ballot or Master Ballot.

Holders of Claims in the Non-Voting Classes shall receive a Confirmation Hearing Notice and a notice of non-voting status.

**B.    Voting Deadline**

The period during which Ballots and Master Ballots with respect to the Plan will be accepted by the Debtor will terminate at 5:00 p.m. (prevailing Pacific Time) on November 23, 2011, unless the Debtor, in its sole discretion, extends the date until which Ballots and Master Ballots will be accepted. Except to the extent the Debtor so determines or as permitted by the Bankruptcy Court, Ballots and Master Ballots that are received after the Voting Deadline will not

be counted or otherwise used by the Debtor in connection with the Debtor's request for Confirmation of the Plan (or any permitted modification thereof).

The Debtor reserves the absolute right, from time to time, to extend the period of time (on a daily basis, if necessary) during which Ballots and Master Ballots will be accepted for any reason, including determining whether or not the requisite number of acceptances have been received, by making a public announcement of such extension no later than the first Business Day next succeeding the previously announced Voting Deadline. The Debtor will give notice of any such extension in a manner deemed reasonable to the Debtor in its discretion. There can be no assurance that the Debtor will exercise its right to extend the Voting Deadline.

## C.    Voting Instructions

Only the Holders of General Unsecured Claims, Senior Notes Claims and Subordinated Notes Claims are entitled to vote to accept or reject the Plan, and they may do so by completing the appropriate Ballots and returning them in the envelope provided. The failure of a Holder to deliver a duly executed Ballot will be deemed to constitute an abstention by such Holder with respect to voting on the Plan and such abstentions will not be counted as votes for or against the Plan. Voting instructions are attached to each Ballot.

The Debtor is providing the Solicitation Package to Holders of General Unsecured Claims, Senior Notes Claims and Subordinated Notes Claims whose names (or the names of their Nominees) appear as of October 6, 2011, the Voting Record Date in the records maintained by the Debtor. Nominees will receive a reasonably sufficient number of copies of the Solicitation Packages and should distribute such copies of the Solicitation Package to the beneficial owners of eligible Notes Claims within three (3) days of receipt, with instructions for such beneficial owners to return their Ballots to the Nominee for tabulation on such Nominee's Master Ballot. Any beneficial owner of an eligible Notes Claim that has not received a Ballot should contact its Nominee.

The Debtor has engaged Kurtzman Carson Consulting LLC as the Balloting Agent to assist in the balloting and tabulation process. The Balloting Agent will process and tabulate Ballots and Master Ballots for Class 3, 4 and 5, the sole Classes entitled to vote to accept or reject the Plan, and will file the Voting Report prior to the Confirmation Hearing. The Voting Deadline by which the Balloting Agent must receive your Ballot or Master Ballot is 5:00 p.m. (prevailing Eastern Time), on November 23, 2011.

| BALLOTS AND MASTER BALLOTS |
|:---:|

1. Ballots and Master Ballots must be actually received by the Balloting agent by the Voting Deadline.

2. Please send your completed Ballot in the envelope provided. If you have received a return envelope addressed to your Nominee, please allow additional time for your vote to be included on a Master Ballot and sent to the Balloting Agent by the Voting Deadline.

3. Class 3 Ballots to be returned directly to the Balloting Agent may be sent by First Class Mail, Overnight Courier, or Personal Delivery to:

**Ambac Ballot Processing Center**
**c/o Kurtzman Carson Consultants LLC**
**2335 Alaska Avenue**
**El Segundo, CA 90245**
**Attn: AFG Tabulation**

4. Master Ballots to be returned directly to the Balloting Agent may be sent by First Class Mail, Overnight Courier, or Personal Delivery to:

**Ambac Ballot Processing Center**
**c/o Kurtzman Carson Consulting LLC**
**599 Lexington Avenue, 39th Floor,**
**New York, NY 10022**
**Attn: AFG Tabulation**

If you have any questions on the procedures for voting on the Plan, please call the Balloting Agent at the following telephone number:

**(877) 660-6619**

Any Ballot (or Master Ballot in the case of beneficial Holders of Senior Notes Claims and a Subordinated Notes Claims voting through a Nominee) that is properly executed by the Holder of a Claim (or its Nominee), but which does not clearly indicate an acceptance or rejection of the Plan, or which indicates both an acceptance and a rejection of the Plan, shall not be counted.

All Ballots are accompanied by return envelopes. It is important to follow the specific instructions provided on each Ballot and Master Ballot. If you are returning your

**Ballot to your Nominee, you must return your Ballot with sufficient time for your vote to be included by your Nominee on a Master Ballot and sent to the Balloting Agent by the Voting Deadline.**

By signing and returning a Ballot (or Master Ballot in the case of beneficial Holders of Senior Notes Claims and a Subordinated Notes Claims voting through a Nominee), each Holder of a General Unsecured Claim, Senior Notes Claim and Subordinated Notes Claim (or its Nominee) will be certifying to the Bankruptcy Court and the Debtor that, among other things: (i) the Holder has received and reviewed a copy of the Solicitation Package and acknowledges that the solicitation is being made pursuant to the terms and conditions set forth therein; (ii) the Holder has cast the same vote with respect to all Claims in within the same Class; and (iii) no other Ballot or Master Ballot with respect to the same Claim has been cast, or, if any other Ballots have been cast with respect to such Claim, then any such Ballots or Master Ballots are thereby revoked.

1.     <u>Beneficial Owners</u>

A beneficial owner holding Notes as a record holder in its own name should vote on the Plan by completing and signing the enclosed applicable Ballot and returning it directly to the Balloting Agent on or before the Voting Deadline using the enclosed self-addressed, post pre-paid return envelope.

Any beneficial owner holding Notes in a "street name" through a Nominee should vote on the Plan by completing and signing the enclosed beneficial owner Ballot. Return the Ballot to the Nominee as promptly as possible and in sufficient time to allow such Nominee to process the Ballot and return it to the Balloting Agent on a Master Ballot by the Voting Deadline. If no self-addressed, postage pre-paid envelope was enclosed for this purpose, the Nominee must be contacted for instructions.

Any Ballot returned to a Nominee by a beneficial owner will not be counted for purposes of acceptance or rejection of the Plan until such Nominee properly completes and delivers to the Balloting Agent a Master Ballot that reflects the vote of such beneficial owner.

2.     <u>Nominees</u>

(i)     Master Ballots

A Nominee for a beneficial owner on the Voting Record Date should obtain the vote of such beneficial owner of such notes by forwarding to the beneficial owners the unsigned Ballots, together with the Solicitation Package, a return envelope provided by, and addressed to, the Nominee, and other materials requested to be forwarded. Each such beneficial owner must then indicate its vote on the Ballot, review and complete the information requested in the Ballot, execute the Ballot, and return the Ballot to the Nominee. After collecting the Ballots, the Nominee should, in turn, complete a Master Ballot compiling the votes and other information from the Ballot, execute the Master Ballot, and deliver the Master Ballot to the Balloting Agent so that it is received by the Balloting Agent before the Voting Deadline. All Ballots returned by beneficial owners should either be forwarded to the Balloting Agent (along with the Master Ballot) or be retained by Nominees for inspection for at least one year from the Voting Deadline.

EACH NOMINEE SHOULD ADVISE ITS BENEFICIAL OWNERS TO RETURN THEIR BALLOTS TO THE NOMINEE BY A DATE CALCULATED BY THE NOMINEE TO ALLOW IT TO PREPARE AND RETURN THE MASTER BALLOT TO THE BALLOTING AGENT SO THAT IT IS RECEIVED BY THE BALLOTING AGENT BEFORE THE VOTING DEADLINE.

(ii)    Securities Clearing Agencies

The Debtor expects that The Depository Trust Corporation, as a Nominee Holder of the Notes, will arrange for its participants to vote by executing a letter of authorization in favor of such participants. As a result of such letter, each such participant will be authorized to vote its Voting Record Date positions held in the name of such securities clearing agencies; although the Balloting Agent will in any event rely upon the listing of record date participants.

**D.    Voting Tabulation**

The Ballot or Master Ballot does not constitute, and shall not be deemed to be, a proof of Claim or an assertion or admission of a Claim or Equity Interest. Only Holders of Claims in Classes 3, 4 and 5 shall be entitled to vote with regard to such Claims.

Unless the Debtor decides otherwise, Ballots and Master Ballots received after the Voting Deadline may not be counted. The method of delivery of the Ballots or Master Ballots to be sent to the Balloting Agent is at the election and risk of each Holder or Nominee. Except as otherwise provided in the Solicitation Procedures, a Ballot or Master Ballot will be deemed delivered only when the Balloting Agent actually receives the original executed Ballot or Master Ballot. No Ballot or Master Ballot should be sent to the Debtor, the Debtor's agents (other than the Balloting Agent), or the Debtor's financial or legal advisors. The Debtor expressly reserves the right to amend from time to time the terms of the Plan (subject to compliance with the requirements of Bankruptcy Code section 1127 and the terms of the Plan regarding modifications) upon notice to the Committee and the Informal Group. The Bankruptcy Code may require the Debtor to disseminate additional solicitation materials if the Debtor makes material changes to the terms of the Plan or if the Debtor waives a material condition to Plan confirmation. In that event, the solicitation will be extended to the extent directed by the Bankruptcy Court.

If multiple Ballots are received from the same Holder with respect to the same Claim prior to the Voting Deadline, the last Ballot timely received will be deemed to reflect that voter's intent and will supersede and revoke any prior Ballot. If a Holder holds Claims in more than one Class entitled to vote, such Holder must vote all of its Claim(s) in each class either to accept or reject the Plan and may not split its vote within one voting Class. Accordingly, a Ballot that partially rejects and partially accepts the Plan will not be counted. Further, to the extent there are multiple Claims within Class 3 General Unsecured Claims, Class 4 Senior Notes Claims or Class 5 Subordinated Notes Claims, the Debtor may, in its discretion, and to the extent possible, aggregate the Claims of any particular Holder within the Class for the purpose of counting votes.

In the event a designation of lack of good faith is requested by a party in interest under Bankruptcy Code section 1126(e), the Bankruptcy Court will determine whether any vote to accept and/or reject the Plan cast with respect to that Claim will be counted for purposes of determining whether the Plan has been accepted and/or rejected.

Prior to the Confirmation Hearing, the Debtor will file with the Bankruptcy Court the Voting Report prepared by the Balloting Agent. The Voting Report shall, among other things, delineate every Ballot or Master Ballot that does not conform to the applicable voting instructions or that contains any form of irregularity including, but not limited to, those Ballots or Master Ballots that do not indicate acceptance or rejection of the Plan, are late or (in whole or in material part) illegible, unidentifiable, lacking signatures, or lacking other necessary information, received via facsimile or e-mail or damaged. The Voting Report shall also indicate the Debtor's intentions with regard to such Ballots or Master Ballots that do not conform to the applicable voting instructions or that contains any form of irregularity. Neither the Debtor nor any other Person or Entity will be under any duty to provide notification of defects or irregularities with respect to delivered Ballots or Master Ballots other than as provided in the Voting Report, nor will any of them incur any liability for failure to provide such notification.

## ARTICLE VI.
## VALUATION ANALYSIS AND FINANCIAL PROJECTIONS

### A.      Valuation of the Reorganized Debtor

1.      Introduction

In conjunction with formulating the Plan, the Debtor has determined that it is appropriate to estimate a post-Confirmation going concern value for the Reorganized Debtor (the "Reorganized AFG's Estimated Enterprise Value"). Accordingly, the Debtor has directed Blackstone to prepare such a valuation (the "Valuation Analysis"). The Valuation Analysis was prepared solely by Blackstone at the direction of the Debtor.

Blackstone has prepared this analysis for the purpose of estimating value available for distribution to Creditors pursuant to the Plan and to analyze the relative recoveries to Creditors thereunder. The Valuation Analysis has also been undertaken for the purpose of evaluating whether the Plan meets the so-called "best interests test" under Bankruptcy Code section 1129(a)(7).

The Valuation Analysis should be read in conjunction with the Plan and the Disclosure Statement.

2.      Valuation

Blackstone estimates the Reorganized AFG's Estimated Enterprise Value to be between approximately $145 million to $225 million, with a midpoint of $185 million as of December 31, 2011, which is assumed to be an approximation of emergence from bankruptcy for the purposes of valuation. The valuation range considers the speculative nature of some of the sources of value as described further below. The values are based upon information available to, and analyses undertaken by, Blackstone as of August 21, 2011. Based on gross debt of $0 projected

as of the assumed Effective Date and $0 of cash assumed to be distributed pursuant to the Plan, the value for the new equity of the Reorganized Debtor (the "Reorganized AFG's Estimated Equity Value") approximates the Reorganized AFG's Estimated Enterprise Value of $185 million. Due to the speculative nature of the sources of value and the uncertainty surrounding the outcome of certain value enhancing contingencies, the actual post-Confirmation going concern value for the Reorganized Debtor may be significantly higher or lower than the Reorganized AFG's Estimated Enterprise Value described above.

Reorganized AFG's Estimated Enterprise Value (ascribed as of the date hereof) reflects, among other factors discussed below, current financial market conditions and the inherent uncertainty today as to the achievement of the Debtor's financial projections described below and attached hereto as Exhibit C (the "Financial Projections"). It should be understood that, although subsequent developments may affect Blackstone's conclusions, Blackstone does not have any obligation to update, revise, or reaffirm its estimate.

The foregoing valuation also reflects a number of assumptions, including a successful reorganization of the Debtor's business and finances in a timely manner, achieving the forecasts reflected in the Financial Projections, the amount of available cash, market conditions, and the Plan becoming effective. The estimates of value represent hypothetical enterprise values of the Reorganized Debtor as the continuing operator of its business and assets, and do not purport to reflect or constitute appraisals, liquidation values, or estimates of the actual market value that may be realized through the sale of any securities to be issued pursuant to the Plan, which may be significantly different than the amounts set forth herein. Such estimates were developed solely on behalf of the Debtor's board of directors for purposes of formulation and negotiation of the Plan and analysis of implied relative recoveries to creditors thereunder. The value of a holding company such as the Debtor, particularly as it relates to its operating subsidiary, is subject to uncertainties and contingencies that are difficult to predict and will fluctuate with changes in factors affecting the financial condition and prospects of such a business.

In preparing Reorganized AFG's Estimated Enterprise Value, Blackstone: (i) reviewed certain historical financial information of the Debtor for recent years and interim periods; (ii) reviewed certain internal financial and operating data of the Debtor and its subsidiaries, including the Financial Projections developed by management relating to their business and prospects; (iii) met with certain members of senior management of the Debtor to discuss the Debtor's assets, operations and future prospects; (iv) reviewed the Financial Projections as prepared by the Debtor; (v) reviewed publicly available financial data and considered the market values of public companies deemed generally comparable to the business of the Debtor; (vi) considered certain economic, industry and regulatory information relevant to the Debtor's business; and (vii) conducted such other analyses as Blackstone deemed appropriate. Although Blackstone conducted a review and analysis of the Debtor's business, operating assets and liabilities, and business plans, Blackstone relied upon the accuracy and completeness of all financial and other information furnished to it by the Debtor, including the Financial Projections, and publicly available information. No independent evaluations or appraisals of the Debtor's assets were sought or were obtained in connection therewith.

## B.    Valuation Methodologies

Blackstone performed the following financial analyses to arrive at its range of estimated Reorganized AFG's Estimated Enterprise Value.  Blackstone reviewed three methodologies: comparable company analysis ("Comparable Company Analysis"), precedent transaction analysis ("Precedent Transaction Analysis") and discounted cash flow analysis ("Discounted Cash Flow Analysis" or "DCF").  For reasons discussed in more detail below, Blackstone's valuation analysis relies on the DCF analysis.  While a precedent transaction analysis and comparable company analysis were considered, Blackstone excluded these methodologies due to (i) lack of recent comparable transactions or publicly-traded pure play comparable companies, and (ii) inability for such methodologies to capture timing and amount of (a) cash flows associated with the Amended Plan Settlement, such as the Amended TSA, and (b) the impact of the Rehabilitation Proceedings and CDS Settlement Agreement on Debtor's ability to realize value from AAC vis-à-vis dividends.

### 1.    Comparable Company Analysis

The Comparable Company Analysis estimates the value of a company based on a comparison of such company's financial statistics with the financial statistics of public companies that are similar to the particular company being analyzed.  Criteria for selecting comparable companies for this analysis include, among other relevant characteristics, similar lines of businesses, business risks, growth prospects, maturity of businesses, market presence, size and scale of operations.  The analysis establishes benchmarks for valuation by deriving financial multiples and ratios for the comparable companies, standardized using common variables such as revenue or EBITDA or, in the case of financial guarantee companies, adjusted book value.

Blackstone reviewed publicly available information regarding companies in similar lines of business and identified a potential set of comparable insurance holding companies including Assured Guaranty Ltd. and MBIA Inc.  However, as compared to the set of comparable companies, the Debtor's insurance subsidiary faces significant challenges operationally and financially as it is unable to write new business and is severely constrained in distributing dividends as a result of the Rehabilitation Proceedings and CDS Settlement Agreement.  The Comparable Company Analysis is highly reflective of the market perspective of the operational and financial characteristics of a given set of companies; as such, the multiple used would not appropriately capture the aforementioned constraints.  Additionally, the multiples would not capture the value associated with various settlement terms within the Amended Plan Settlement, such as the Amended TSA.  Blackstone considered this methodology but excluded it for purposes of its valuation analysis.

### 2.    Precedent Transactions Analysis

The Precedent Transaction Analysis is based on the enterprise values of companies involved in public or private merger and acquisition transactions that have operating and financial characteristics similar to the particular company being analyzed.  Under this methodology, the enterprise value of such companies is determined by an analysis of the consideration paid and the debt assumed in the merger or acquisition transaction.  As in the

Comparable Company Analysis, the analysis establishes benchmarks for valuation by deriving financial multiples and ratios, standardized using common variables such as revenue or EBITDA or, in the case of financial guarantee companies, adjusted book value. Blackstone excluded this methodology given the lack of financial guarantee industry transactions that have closed over recent years as well as dramatic changes in market conditions.

3.      Discounted Cash Flow Analysis

The discounted cash flow analysis values a business by determining the current value of estimated future cash flows to be generated by that business. Under this methodology, projected future cash flows are discounted by the business' weighted average cost of capital (the "Discount Rate"). The Discount Rate reflects the estimated blended rate of return debt and equity investors would require to invest in the business based upon its capital structure.

The value of the firm is determined by calculating the present value of the Reorganized Debtor's after-tax free cash flows provided in the Financial Projections 2012 – 2016 plus management's long-term financial projections for the period 2017 through 2045. Given that the Reorganized Debtor is projected to be in run-off, which will be substantially completed by 2045, Blackstone discounted back to December 31, 2011, management's long-term financial projections for the period 2017 through 2045.

Although formulaic methods are used to derive the key estimates for the DCF methodology, their application and interpretation still involve complex considerations and judgments concerning potential variances in the projected financial and operating characteristics of the Reorganized Debtor, which in turn affect its cost of capital. Blackstone calculated its DCF valuation using a range of Discount Rates between 12% and 17%, which was informed by both the cost of capital associated with the set of insurance holding companies previously identified, indicative ranges suggested by third parties during the Debtor's previous capital raise process and discussions with financial professionals knowledgeable about the insurance industry.

In applying the above methodology, Blackstone utilized management's detailed Financial Projections for the years ended 2012 through 2016 to derive after-tax free cash flows. For purposes of the DCF, the Reorganized Debtor is assumed to pay regular cash taxes or AMT on an annual basis. These cash flows, along with management's long-term financial projections for the period 2017 through 2045, are discounted back to December 31, 2011 using the range of Discount Rates described above to arrive at a range of enterprise values.

As highlighted and more fully described in the Financial Projections, the Reorganized Debtor's cash flows include income relating to, but not limited to, dividends from Ambac Bermuda; dividends from AAC; intercompany settlements; interest and principal on Notes Receivable; interest income; reimbursement from AAC for operating expenses; tolling payments; and upfront cash payment. Expenses include operating expenses; intercompany settlements; and tax payments. In addition, the long-term financial projections include value from junior surplus notes, excess NOLs at the Debtor and a residual equity dividend from AAC, if available.

For the purpose of valuation, Blackstone assumed the following with respect to Plan terms: (i) $5 million per annum reimbursement from AAC for AFG operating expenses during

the first five years following the Effective Date; (ii) tolling payments on ordinary and AMT NOLs according to the tranches and tolling rates, as outlined in the Plan; (iii) $30 million in upfront cash, which credits against up to $15 million of tolling payments; (iv) $350 million of junior surplus notes, assumed to accrue interest at a rate of 5.1% per annum and be paid down in 2045; and (v) beginning in the sixth year following the Effective Date, an additional $4 million per annum reimbursement from AAC to the Debtor for operating expenses through 2045 ("Additional Opex Subsidy"). There is uncertainty as to whether or not the Additional Opex Subsidy would be approved by the Rehabilitator and, if approved, for what period of time it would be in effect.

For the purpose of creating a valuation range, Blackstone valued the Reorganized Debtor under a low case and a high case, each with slightly different assumptions. All cash flows in the low case were discounted at 17% and consider the speculative nature of certain Plan terms as described above. All cash flows in the high case were discounted at 12% and include the Plan terms as described above.

4.  NOL Valuation

Blackstone's valuation of excess NOLs ("NOL Valuation") estimates the value of excess NOLs remaining at AFG to be between approximately $10 million to $30 million, with a midpoint of $20 million as of December 31, 2011. The values are based upon information available to, and analyses undertaken by, Blackstone as of August 21, 2011. The NOL Valuation relies on several key assumptions relating to the use of NOLs to shield income of the Debtor or certain Debtor subsidiaries. The NOL Valuation assumes that AFG raises capital post-emergence to acquire additional assets and deploys those assets in an efficient manner that complies with the relevant tax rules related to NOL usage. The required capital is assumed to be raised as equity (while a portion of the proceeds could be in the form of debt capital, debt capital may present several challenges, including: (i) the inherent difficulty in raising substantial capital through a debt issuance, as, typically, insurance businesses are not highly leveraged and (ii) the Debtor intends to avoid issuing securities that might be characterized as equity unless business conditions dictate otherwise, further limiting the maximum amount of leverage available, and thus the amount of capital the Debtor could raise via a debt issuance. The amount of capital assumed to be raised for the new corporate opportunity is assumed to be invested in portfolios similar in nature to AAC.

The following assumptions were used to value the tax savings arising from the newly acquired entity's utilization of the NOLs: (i) compounded annual rate of return on investment of approximately 6% - 8%, based on illustrative returns from the acquired business; (ii) a 25% - 35% discount rate, the assumed equity rate of return an investor would target upon making such an investment; and (iii) an assumed expiration of NOLs in 2030 in accordance with their 20-year life.

Dividends from AAC as well as the cash flows associated with certain term sheet provisions are highly contingent upon the financial performance of AAC. AAC financial performance is sensitive to a number of key variables, including: (i) loss estimates and loss experience; (ii) remediation and recoveries; (iii) the exercise of existing calls on AAC Surplus Notes; (iv) additional value creation initiatives; (v) the form of the Rehabilitation Plan, including

the treatment of Segregated Account claims; (vi) investment portfolio yield and mix, including intercompany loan repayment assumptions; (vii) installment premiums and operating expenses; (viii) contingency reserve assumptions; (ix) treatment of the AAC preferred stock; and (x) value, if any, received by AAC from Ambac UK. Blackstone relied upon the accuracy and completeness of all financial and other information furnished to it by the Debtor with respect to its insurance subsidiary, including any financial projections. No independent evaluations were sought or were obtained in connection therewith.

THE SUMMARY SET FORTH ABOVE DOES NOT PURPORT TO BE A COMPLETE DESCRIPTION OF THE ANALYSES PERFORMED BY BLACKSTONE. THE PREPARATION OF A VALUATION ESTIMATE INVOLVES VARIOUS DETERMINATIONS AS TO THE MOST APPROPRIATE AND RELEVANT METHODS OF FINANCIAL ANALYSIS AND THE APPLICATION OF THESE METHODS IN THE PARTICULAR CIRCUMSTANCES, ALL OF WHICH ARE NOT ABLE TO BE DESCRIBED IN A SUMMARY DESCRIPTION. IN PERFORMING ITS ANALYSES, BLACKSTONE MADE NUMEROUS ASSUMPTIONS WITH RESPECT TO INDUSTRY PERFORMANCE, BUSINESS AND ECONOMIC CONDITIONS AND OTHER MATTERS. THE ANALYSES PERFORMED BY BLACKSTONE ARE NOT NECESSARILY INDICATIVE OF ACTUAL VALUES OR FUTURE RESULTS, WHICH MAY BE SIGNIFICANTLY MORE OR LESS FAVORABLE THAN SUGGESTED BY SUCH ANALYSES.

In addition, Blackstone did not independently verify management's Financial Projections in connection with the estimates of Enterprise Value for the Debtor contained herein, and no independent valuations or appraisals of the Debtor were sought or were obtained in connection herewith. Valuation estimates were developed solely on behalf of the Board of Directors for purposes of formulation and negotiation of the Plan and analysis of implied relative recoveries to creditors thereunder. Such estimates reflect computations of the estimated Valuation through the application of certain valuation techniques, in this case the DCF, and do not purport to reflect or constitute appraisals, liquidation values or estimates of the actual market value that may be realized through the sale of any securities to be issued pursuant to the Plan, which may be significantly different than the amounts set forth herein.

The value of a holding company and its operating business is subject to numerous uncertainties and contingencies that are difficult to predict and will fluctuate with changes in factors affecting the financial condition and prospects of such a business. As a result, the estimated valuations set forth herein are not necessarily indicative of actual outcomes, which may be significantly more or less favorable. Because such estimates are inherently subject to uncertainties, neither the Debtor, Blackstone, nor any other person assumes responsibility for such estimates' accuracy. In addition, the valuation of newly-issued securities is subject to additional uncertainties and contingencies, all of which are difficult to predict. Actual market prices of such securities at issuance will depend upon, among other things, prevailing interest rates, conditions in the financial markets, the anticipated holding period of securities received by pre-petition Creditors, some of whom may prefer to liquidate their investment rather than hold it on a long-term basis, and other factors which generally influence the prices of securities.

Blackstone's valuation represents a hypothetical estimated value of the Debtor derived through the application of certain valuation techniques, in this case the DCF. Such analysis does

not purport to represent valuation levels which would be achieved in, or assigned by, the public or private markets for debt and equity securities. Estimates of value do not purport to be appraisals or necessarily reflect the values which may be realized if assets are sold as a going concern, in liquidation, or otherwise.

This Valuation Analysis was developed solely for purposes of the formulation and negotiation of the Plan and to enable the holders of Claims and Interests entitled to vote under the Plan to make an informed judgment about the Plan and should not be used or relied upon for any other purpose, including the purchase or sale of securities of, or Claims or Interests in, the Debtor.

EVENTS AND CIRCUMSTANCES OCCURRING SUBSEQUENT TO THE DATE ON WHICH THIS VALUATION ANALYSIS WAS PREPARED MAY BE DIFFERENT FROM THOSE ASSUMED, OR, ALTERNATIVELY, MAY HAVE BEEN UNANTICIPATED, AND THUS THE OCCURRENCE OF THESE EVENTS MAY AFFECT THESE ANALYSES IN A MATERIALLY ADVERSE OR MATERIALLY BENEFICIAL MANNER. BLACKSTONE, THE DEBTOR AND THE REORGANIZED DEBTOR DO NOT INTEND AND DO NOT UNDERTAKE ANY OBLIGATION TO UPDATE OR OTHERWISE REVISE THE VALUATION ANALYSIS TO REFLECT EVENTS OR CIRCUMSTANCES EXISTING OR ARISING AFTER THESE ARE INITIALLY FILED OR TO REFLECT THE OCCURRENCE OF UNANTICIPATED EVENTS. THEREFORE, THE VALUATION ANALYSIS MAY NOT BE RELIED UPON AS A GUARANTEE OR OTHER ASSURANCE OF THE ACTUAL RESULTS THAT WILL OCCUR. IN DECIDING WHETHER TO VOTE TO ACCEPT OR REJECT THE PLAN, HOLDERS OF CLAIMS OR INTERESTS MUST MAKE THEIR OWN DETERMINATIONS AS TO THE REASONABLENESS OF SUCH ASSUMPTIONS AND THE RELIABILITY OF THE VALUATION ANALYSIS.

## C. Financial Projections

### 1. Introduction

As a condition to Plan confirmation, the Bankruptcy Code requires, among other things, the Bankruptcy Court to find that confirmation is not likely to be followed by either a liquidation or the need to further reorganize the debtor. In connection with developing the Plan, and for purposes of determining whether the Plan satisfies feasibility standards, the Debtor's management has, through the development of the Financial Projections, analyzed the Reorganized Debtor's ability to meet its obligations under the Plan and to maintain sufficient liquidity and capital resources to conduct its business. The Financial Projections will also assist each holder of a claim entitled to vote on the Plan in determining whether to accept or reject the Plan. The Debtor prepared the Financial Projections in good faith, based upon estimates and assumptions made by the Debtor's management.

Given that the Debtor will deleverage its balance sheet completely pursuant to the Plan and the fact that the Debtor is a holding company, the Debtor has not prepared projected income statements or balance sheet. The Debtor has prepared a projected statement of cash flows to illustrate the Reorganized Debtor's ability to meet its obligations under the Plan and to maintain sufficient liquidity and capital resources to conduct its business.

The estimates and assumptions in the Financial Projections, while considered reasonable by management, may not be realized, and are inherently subject to uncertainties and contingencies including the outcome of outstanding and potential future litigation. They also are based upon factors such as general business, economic, regulatory, market, and financial conditions, all of which are difficult to predict and generally beyond the Debtor's control. Because future events and circumstances may well differ from those assumed and unanticipated events or circumstances may occur, the Debtor expects that the actual and projected results will differ and the actual results may be materially greater or less than those contained in the Financial Projections. No representations can be made as to the accuracy of the Financial Projections or the Reorganized Debtor's ability to achieve the projected results. Therefore, the Financial Projections may not be relied upon as a guaranty or other assurance of the actual results that will occur. The inclusion of the Financial Projections herein should not be regarded as an indication that the Debtor considered or considers the Financial Projections to reliably predict future performance. The Financial Projections are subjective in many respects, and thus are susceptible to interpretations and periodic revisions based upon actual experience and recent developments. The Debtor does not intend to update or otherwise revise the Financial Projections to reflect the occurrence of future events, even in the event that assumptions underlying the Financial Projections are not borne out. The Financial Projections should be read in conjunction with the assumptions and qualifications set forth herein.

The Debtor did not prepare the Financial Projections with a view towards complying with the guidelines for prospective financial statements published by the American Institute of Certified Public Accountants. The Debtor's independent auditor has neither compiled nor examined the accompanying prospective financial information to determine the reasonableness thereof and, accordingly, has not expressed an opinion or any other form of assurance with respect thereto.

The Debtor does not, as a matter of course, publish projections of their anticipated financial position, results of operations or cash flows. Accordingly, neither the Debtor nor the Reorganized Debtor intend to, and each disclaims any obligation to: (i) furnish updated projections to Holders of Allowed Claims and Interests prior to the Effective Date or to Holders of New Common Stock or to any other party after the Effective Date; (ii) include any such updated information in any documents that may be required to be filed with the Securities and Exchange Commission; or (iii) otherwise make such updated information publicly available. The Debtor periodically issues press releases reporting financial results and Holders of Claims and Interests are urged to review any such press releases when, and as, issued.

2.    Significant Assumptions

The Debtor prepared the Financial Projections based upon, among other things, the anticipated future financial condition and results of operations of the Reorganized Debtor. Although the forecasts represent the best estimates of the Debtor, for which the Debtor believes it has a reasonable basis as of the date hereof, of the results of operations and financial position of the Debtor after giving effect to the reorganization contemplated under the Plan, they are only estimates and actual results may vary considerably from forecasts. Consequently, the inclusion of the forecast information herein should not be regarded as a representation by the Debtor, the Debtor's advisors, or any other person that the forecast results will be achieved.

After the Effective Date, the Debtor does not intend to update or otherwise revise the Financial Projections to reflect circumstances existing since their preparation on September 9, 2011, or to reflect the occurrence of unanticipated events, even in the event that any or all of the underlying assumptions are shown to be in error. The Financial Projections were not prepared with a view toward general use, but rather for the limited purpose of providing information in conjunction with the Plan. Also they have been presented in lieu of pro forma historical financial information. Reference should be made to Article VIII, entitled "Plan-Related Risk Factors and Alternatives to Confirming and Consummating the Plan" for a discussion of the risks related to the Plan. It is important to note that the Financial Projections described below may differ from actual performance and are highly dependent on significant assumptions concerning the future operations of the Debtor's business and its operating subsidiaries.

The Financial Projections assume that the Plan will be consummated in accordance with its terms and that all transactions contemplated by the Plan will be consummated by the assumed Effective Date. Any significant delay in the assumed Effective Date of the Plan may have a significant negative impact upon the operations and financial performance of the Debtor including, but not limited to, an increased risk of higher reorganization expenses.

3.    Financial Projections – Statement of Cash Flows

(i)    Sources of Cash

(a)    Tolling payments

Tolling payments reflect payments from AAC, pursuant to the TSA Amendment, for the utilization of the Allocated NOLs, subject to applicable crediting, as described in the Plan. Ultimate timing of tolling payments may vary from that shown depending on the deadline for filing the Debtor's annual tax return and/or mechanics for estimating and remitting tolling payments therein.

(b)    Upfront cash payment

Upfront cash payment reflects receipt of $30 million of upfront cash from AAC as described in the Plan.

(c)    Reimbursement from AAC for operating expenses

Reimbursement from AAC for operating expenses includes reimbursement to the Reorganized Debtor from AAC, pursuant to the Cost Allocation Agreement, of up to $5 million of AFG annual operating expenses as described in the Plan. Ultimate timing of reimbursement may vary from that shown depending on mechanics for estimating expenses and remitting payments therein.

(d)    Dividends from AAC

The estimates of dividend capacity are derived using management's assumptions about the financial condition going forward of its wholly-owned insurance subsidiary, AAC. Because of the deterioration of AAC's financial condition resulting from losses in its insured portfolio

and the resulting downgrades of AAC's financial strength ratings, AAC originated only a *de minimis* amount of new business from November 2007 through the end of 2008 and has been unable to originate any new business since 2008. AAC's ability to pay dividends has been significantly restricted by the deterioration of AAC's financial condition and the rehabilitation of the Segregated Account. In addition, AAC's ability to pay dividends has also been restricted by the terms of the CDS Settlement Agreement with the CDS Counterparties. As such, for purposes of the Financial Projections, the Debtor has assumed no dividends are paid from AAC to the Reorganized Debtor throughout the projection period.

AAC's capacity to pay dividends is sensitive to a number of key variables, including: (i) loss estimates; (ii) remediation and recoveries; (iii) the exercise of existing calls on AAC Surplus Notes; (iv) additional value creation initiatives; (v) the form of the Rehabilitation Plan, including the treatment of Segregated Account claims; (vi) investment portfolio yield and mix, including intercompany loan repayment assumptions; (vii) installment premiums and operating expenses; (viii) contingency reserve assumptions; (ix) treatment of the AAC preferred stock; and (x) value, if any, received by AAC from Ambac UK. Additionally, dividend capacity is affected by the terms of the Plan, including but not limited to taxes and NOL assumptions. Importantly, however, ultimately all dividend payments are subject to approval from the OCI and it is unlikely that OCI will permit any dividends until there is greater clarity with respect to Segregated Account claims and treatment of policyholders therein.

(e)     Bermuda Dividend

The Bermuda dividend includes distribution of remaining funds from Ambac Bermuda, a subsidiary of the Debtor.

(f)     Intercompany Settlement

Intercompany settlement includes reimbursement to AFG from AAC for (i) 85% of legal fees and expenses related to litigation with the IRS and (ii) 50% of professional fees and expenses paid for preparation of fresh start accounting. The actual amounts due to the Debtor from AAC under the Intercompany Settlement are based on the Cost Allocation Agreement and are subject to change.

(g)     Notes Receivable

Notes Receivable includes payment of interest and principal associated with a note acquired by the Debtor in conjunction with the prepetition sale of a former AFG subsidiary. The note matures in December 2013.

(h)     Interest Income

Interest income is calculated using an annual yield of 0.2%.

(ii) Uses of Cash

(a) Operating Expenses

Operating expenses include direct expenses as well as costs associated with D&O insurance.

(b) Intercompany Settlement

Intercompany settlements reflect reimbursements to AAC including for the compensation of AAC employees who allocate a portion of their time to the Debtor.

(c) Advisor Fees

Advisor fees include the payment of financial and legal advisor and accounting fees, including costs directly related to litigation with the IRS and to chapter 11.

(d) Litigation Settlement

The litigation settlement includes $2.0 million expected to be paid out in October 2011 for the NYC Tax Claim Settlement and $2.5 million expected to be paid out in December 2011 for the Stipulation of Settlement, which is currently reserved in escrow.

(e) Chapter 11 Expenses

Chapter 11 expenses includes payment of expenses related to chapter 11 including, but not limited to, certain advisory fees and U.S. Trustee fees.

(f) Net Tax Payments

The Financial Projections include payment of regular income tax and AMT, as applicable. Income tax payments are calculated as the higher of (i) 35% of regular taxable income and (ii) 20% of AMT taxable income, after utilization of available regular NOLs and AMT NOLs, respectively, at the consolidated level. Net Tax Payments reflect the net effect of tax payments received from AAC, excluding tolling payments, and tax payments paid from the Debtor to the IRS. Ultimate timing of Net Tax Payments may vary from that shown depending on the deadline for filing the Debtor's annual tax return.

(g) Credit re: Agreement to Extend Plan Deadline

The Debtor received the $2 million Payment from AAC pursuant to an agreement to extend the Plan Settlement Deadline, as further described in Article III.A.13. In accordance with the parties' agreement, the Payment shall be credited against AAC's future obligations to the Debtor upon agreement to a consensual deal.

(iii) Cash

Beginning cash balance, which includes amounts held in retainers and escrow, is $56.6 million as of September 9, 2011.

# ARTICLE VII.
## CONFIRMATION PROCEDURES

### A.    The Confirmation Hearing

Bankruptcy Code section 1128(a) requires the Bankruptcy Court, after notice, to hold the Confirmation Hearing. Bankruptcy Code section 1128(b) provides that any party in interest may object to confirmation of the Plan. The Debtor is requesting that the Court fix December 8, 2011, at 10:00 a.m. (prevailing Eastern Time), or as soon as practicable thereafter, as the date and time of the Confirmation Hearing. Notice of the Confirmation Hearing will be provided in the manner prescribed by the Bankruptcy Court, and will also be available at the Debtor's restructuring website, http://www.kccllc.net/Ambac. The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice except for an announcement of the adjourned date made at the Confirmation Hearing or any subsequent adjourned Confirmation Hearing.

### B.    Statutory Requirements for Confirmation of the Plan

At the Confirmation Hearing, the Bankruptcy Court shall determine whether the requirements of Bankruptcy Code section 1129 have been satisfied. If so, the Bankruptcy Court shall enter the Confirmation Order. The Debtor believes that the Plan satisfies or will satisfy the applicable requirements, which are, among others, as follows:

- The Plan complies with the applicable provisions of the Bankruptcy Code.

- The Debtor, as Plan proponent, has complied with the provisions of the Bankruptcy Code.

- The Plan has been proposed in good faith and not by any means forbidden by law.

- Any payment made or promised under the Plan for services or for costs and expenses in, or in connection with, the Chapter 11 Case, or in connection with the Plan and incident to the case, has been disclosed to the Bankruptcy Court, and any such payment: (i) made before the Confirmation of the Plan is reasonable; or (ii) subject to the approval of the Bankruptcy Court as reasonable if it is to be fixed after the Confirmation of the Plan.

- Either each Holder of an Impaired Claim or Equity Interest has accepted the Plan, or will receive or retain under the Plan on account of that Claim or Equity Interest, property of a value, as of the Effective Date of the Plan, that is not less than the amount that the Holder would receive or retain if the Debtor were liquidated on that date under chapter 7 of the Bankruptcy Code.

- The Plan provides that the Debtor's New Organizational Documents shall include provisions prohibiting the issuance of non-voting equity securities and setting forth an appropriate distribution of voting power among classes of equity securities possessing voting power pursuant to Bankruptcy Code section

1123(a)(6) for so long as Bankruptcy Code 1123 is in effect and applicable to the Reorganized Debtor.

- Each Class of Claims and Equity Interests that is entitled to vote upon the Plan has either accepted the Plan or is not Impaired under the Plan, or the Plan can be confirmed without the approval of each Class pursuant to Bankruptcy Code section 1129(b).

- Except to the extent that the Holder of a particular Claim agrees to a different treatment of its Claim, the Plan provides that Holders of Administrative Claims will be paid in full, Holders of Priority Non-Tax Claims will receive treatment consistent with Bankruptcy Code section 1129(a)(9)(B), and Holders of Priority Tax Claims will receive treatment consistent with Bankruptcy Code section 1129(a)(9)(C).

- At least one Class of Impaired Claims will accept the Plan, determined without including any acceptance of the Plan by any Insider holding a Claim in such Class.

- Confirmation of the Plan is not likely to be followed by the liquidation or the need for further financial reorganization of the Debtor or any successors thereto under the Plan unless such a liquidation or reorganization is proposed in the Plan.

- All fees of the type described in 28 U.S.C. § 1930, including the fees of the U.S. Trustee, will be paid as of the Effective Date.

The Debtor believes that: (i) the Plan satisfies or will satisfy all of the statutory requirements of chapter 11 of the Bankruptcy Code; (ii) it has complied or will have complied with all of the requirements of chapter 11; and (iii) the Plan has been proposed in good faith. To the extent that the Court does not approve the restructuring steps and transactions described in Article IV of the Plan and Article IV.C hereof, the Debtor does not believe that this will impact the best interests of creditors or the feasibility of the Plan. The proposed restructuring steps and transactions merely serve to further enhance the attributes of the Plan.

    1.    <u>Best Interests of Creditors Test/Liquidation Analysis</u>

Under the Bankruptcy Code, confirmation of a plan also requires a finding that the plan is in the "best interests" of creditors. Under the "best interests" test, the Bankruptcy Court must find (subject to certain exceptions) that the Plan provides, with respect to each Impaired Class, that each Holder of an Allowed Claim or Equity Interest in such Impaired Class has accepted the Plan, or will receive or retain under the Plan property of a value, as of the Effective Date, that is not less than the amount that such Holder would receive or retain if the Debtor were liquidated under chapter 7 of the Bankruptcy Code.

The analysis under the "best interests" test requires that the Bankruptcy Court determine what Holders of Allowed Claims and Equity Interests in each Impaired Class would receive if the Chapter 11 Case were converted to a liquidation case under chapter 7 of the Bankruptcy

Code, and the Bankruptcy Court appointed a chapter 7 trustee to liquidate all of the assets into Cash. The Debtor's "liquidation value" would consist primarily of unencumbered and unrestricted Cash held by the Debtor at the time of the conversion to a chapter 7 case, and the proceeds resulting from the chapter 7 trustee's sale of the Debtor's remaining unencumbered assets. The gross Cash available for distribution would be reduced by the costs and expenses incurred in effectuating the chapter 7 liquidation and any additional Administrative Claims incurred during the chapter 7 case.

The Bankruptcy Court then must compare the value of the distributions from the proceeds of the hypothetical chapter 7 liquidation of the Debtor (after subtracting the chapter 7-specific claims and administrative costs) with the value to be distributed to the Holders of Allowed Claims and Equity Interests under the Plan. It is possible that in a chapter 7 liquidation, Claims and Equity Interests may not be classified in the same manner as set forth in the Plan. In a hypothetical chapter 7 liquidation of the Debtor's assets, the rule of absolute priority of distribution would apply, *i.e.*, no junior creditor would receive any distribution until payment in full of all senior creditors, and no Holder of an Equity Interest would receive any distribution until all creditors have been paid in full. Therefore, in a hypothetical chapter 7 liquidation, the Debtor's available assets generally would be distributed to Holders of Claims and Equity Interests in the following order: Administrative Claims, Accrued Professional Compensation Claims, Priority Tax Claims, Priority Non-Tax Claims, Secured Claims, General Unsecured Claims, Senior Notes Claims, Subordinated Notes Claims, Section 510(b) Claims, Intercompany Claims, and Equity Interests.

Of the foregoing groups of Claims, Administrative Claims, Accrued Professional Compensation Claims, Priority Tax Claims, Priority Non-Tax Claims, and Secured Claims are either unclassified or Unimpaired under the Plan, meaning that the Plan generally leaves their legal, equitable, and contractual rights unaltered. As a result, Holders of such Claims and Equity Interests are deemed to accept the Plan. General Unsecured Claims, Senior Notes Claims and Subordinated Notes Claims are Impaired under the Plan and are entitled to vote on the Plan. Section 510(b) Claims, Intercompany Claims, and Equity Interests are to receive no distribution under the Plan and, therefore, are deemed to reject the Plan. Because the Bankruptcy Code requires that Impaired creditors either accept the Plan or receive at least as much under the Plan as they would in a hypothetical chapter 7 liquidation, the operative "best interests" inquiry in the context of the Plan is whether in a chapter 7 liquidation, after accounting for recoveries by Holders of Administrative Claims, Priority Tax Claims, Priority Non-Tax Claims, and Secured Claims, Impaired Holders of Claims and Equity Interests would receive more or less than under the Plan. If the probable distribution to Impaired Holders of Claims and Equity Interests under a hypothetical chapter 7 liquidation is greater than the distributions to be received by such Holders under the Plan, then the Plan is not in the best interests of such Holders.

As described in more detail in the liquidation analysis attached hereto as <u>Exhibit D</u> (the "<u>Liquidation Analysis</u>"), the Debtor believes that the value of any distributions in a chapter 7 case would be less than the value of distributions under the Plan. In particular, proceeds received in a chapter 7 liquidation are likely to be significantly discounted due to the distressed nature of the sale, and the fees and expenses of a chapter 7 trustee would likely further reduce Cash available for distribution.

2.     Feasibility

Bankruptcy Code section 1129(a)(11) requires the Bankruptcy Court to find, as a condition to confirmation, that confirmation is not likely to be followed by the debtor's liquidation or the need for further financial reorganization, unless that liquidation or reorganization is contemplated by the Plan. The Plan contemplates a material deleveraging of the Debtor's balance sheet. Thus, the Debtor believes that the Plan meets the financial feasibility requirement.

3.     Acceptance by Impaired Classes

As a condition to confirmation, the Bankruptcy Code requires that, except as described in the following section, each class of claims and interests that is impaired under a plan accepts the plan. A class that is Unimpaired under a plan is deemed to have accepted the plan and, therefore, solicitation of acceptances with respect to such class is not required. A class is Impaired unless the plan: (i) leaves unaltered the legal, equitable, and contractual rights to which the claim or interest entitles the holder of such claim or interest; (ii) cures any default and reinstates the original terms of the obligation; or (iii) provides that, on the consummation date, the holder of the claim or interest receives Cash equal to the Allowed amount of that claim or, with respect to any interest, any fixed liquidation preference to which the interest holder is entitled or any fixed price at which the debtor may redeem the security.

Bankruptcy Code section 1126(c) defines acceptance of a plan by a class of Impaired Claims as acceptance by holders of at least two thirds in dollar amount and more than one half in number of claims in that class, but for that purpose counts only those who actually vote to accept or to reject the plan. Thus, a Class of Claims will have voted to accept the Plan only if two thirds in amount and a majority in number actually voting cast their Ballots (or Master Ballots in the case of beneficial Holders of Claims voting through a Nominee) in favor of acceptance of the Plan.

As described above, Holders of Claims in Classes 3, 4 and 5 are the only Holders which are both Impaired and entitled to vote on the Plan. Class 3, 4 and/or 5 will have accepted the Plan if it is accepted by at least two thirds in amount and a majority in number of the Claims of such Class (other than Claims designated under Bankruptcy Code section 1126(e)) that have voted to accept or reject the Plan.

4.     Confirmation Without Acceptance by All Impaired Classes

Bankruptcy Code section 1129(b) allows a Bankruptcy Court to confirm a plan, even if all Impaired classes entitled to vote on the plan have not accepted it, provided that the plan has been accepted by at least one Impaired class. Bankruptcy Code section 1129(b) states that, notwithstanding an Impaired class's failure to accept a plan, the plan shall be confirmed, at the plan proponent's request, in a procedure commonly known as "cram down," so long as the plan does not "discriminate unfairly" and is "fair and equitable" with respect to each class of claims and interests that is Impaired under, and has not accepted, the plan.

In general, a plan does not discriminate unfairly if it treats a class substantially equivalent to the treatment of other classes of equal rank. Courts will take into account a number of factors

in determining whether a plan discriminates unfairly, including whether the discrimination has a reasonable basis, whether the debtor can carry out a plan without such discrimination, whether such discrimination is proposed in good faith, and the treatment of the class discriminated against. Courts have also held that it is appropriate to classify unsecured creditors separately if the differences in classification are in the best interest of the creditors, foster reorganization efforts, do not violate the absolute priority rule, and do not needlessly increase the number of classes.

The condition that a plan be "fair and equitable" to a non-accepting class of secured claims includes the requirements that: (i) the holders of such secured claims retain the liens securing such claims to the extent of the allowed amount of the claims, whether the property subject to the liens is retained by the debtors or transferred to another entity under the plan; and (ii) each holder of a secured claim in the class receives deferred Cash payments totaling at least the Allowed amount of such claim with a present value, as of the effective date of the plan, at least equivalent to the value of the secured claimant's interest in the debtor's property subject to the liens.

The condition that a plan be "fair and equitable" with respect to a non-accepting class of unsecured claims includes the requirement that either: (i) the plan provides that each holder of a claim of such class receive or retain on account of such claim property of a value, as of the effective date of the plan, equal to the Allowed amount of such claim; or (ii) the holder of any claim or interest that is junior to the claims of such class will not receive or retain under the plan on account of such junior claim or interest any property.

The condition that a plan be "fair and equitable" to a non accepting class of equity interests includes the requirements that either: (i) the plan provides that each holder of an interest in that class receives or retains under the plan, on account of that interest, property of a value, as of the effective date of the plan, equal to the greater of the allowed amount of any fixed liquidation preference to which such holder is entitled, any fixed redemption price to which such holder is entitled, or the value of such interest; or (ii) if the class does not receive such an amount as required under (i), no class of equity interests junior to the non-accepting class may receive a distribution.

Because Impaired Classes 6, 7 and 8 are deemed to have rejected the Plan, the Debtor will request Confirmation of the Plan, as it may be modified from time to time, under Bankruptcy Code section 1129(b). The Debtor reserves the right to alter, amend, modify, revoke or withdraw the Plan or any exhibit or schedule to the Plan, including to amend or modify it to satisfy the requirements of Bankruptcy Code section 1129(b), if necessary.

The Debtor submits that, pursuant to Bankruptcy Code section 1129(b), the Plan is structured such that it does not "discriminate unfairly" and satisfies the "fair and equitable" requirement.

## C.  Persons to Contact for More Information

Any interested party desiring further information about the Plan should contact: Counsel for the Debtor:  Peter A. Ivanick and Allison H. Weiss, Dewey & LeBoeuf LLP, 1301 Avenue of

the Americas, New York, New York 10019, via e-mail at pivanick@dl.com or aweiss@dl.com, or by phone at (212) 259-8000.

**D.    Disclaimer**

In formulating the Plan, the Debtor has relied upon financial data derived from its books and records.  The Debtor, therefore, represents that everything stated in this Disclosure Statement is true to the best of its knowledge.  The Debtor nonetheless cannot, and does not, confirm the current accuracy of all statements appearing in this Disclosure Statement.  Moreover, the Bankruptcy Court has not yet determined whether the Plan is confirmable and, therefore, does not recommend whether you should accept or reject the Plan.

The discussion in this Disclosure Statement regarding the Debtor may contain "forward looking statements" within the meaning of the Private Securities Litigation Reform Act of 1995.  Such statements consist of any statement other than a recitation of historical fact and can be identified by the use of forward looking terminology such as "may," "expect," "anticipate," "estimate," or "continue" or the negative thereof or other variations thereon or comparable terminology.  The reader is cautioned that all forward looking statements are necessarily speculative and there are certain risks and uncertainties that could cause actual events or results to differ materially from those referred to in such forward looking statements.  The liquidation analyses, distribution projections, and other information are estimates only, and the timing and amount of actual distributions to creditors may be affected by many factors that cannot be predicted.  Therefore, any analyses, estimates or recovery projections may or may not turn out to be accurate.

**Nothing contained in this Disclosure Statement or the Plan is, or shall be deemed to be, an admission or statement against interest by the Debtor for purposes of any pending or future litigation matter or proceeding.**

**Although the attorneys, accountants, advisors, and other professionals employed by the Debtor have assisted in preparing this Disclosure Statement based upon factual information and assumptions respecting financial, business, and accounting data found in the books and records of the Debtor, they have not independently verified such information and make no representations as to the accuracy thereof.  The attorneys, accountants, advisors, and other professionals employed by the Debtor shall have no liability for the information in this Disclosure Statement.**

**The Debtor and its professionals also have made a diligent effort to identify in this Disclosure Statement pending litigation claims and projected objections to claims. However, no reliance should be placed upon the fact that a particular litigation claim or projected objection to claim is, or is not, identified in this Disclosure Statement.**

**ARTICLE VIII.**
**PLAN-RELATED RISK FACTORS AND**
**ALTERNATIVES TO CONFIRMING THE PLAN**

**Prior to voting to accept or reject the Plan, all Holders of General Unsecured Claims, Senior Notes Claims and Subordinated Notes Claims should read and carefully**

**consider the factors set forth below, as well as all other information set forth or otherwise referenced in this Disclosure Statement.**

The following provides a summary of various important considerations and risk factors associated with the Plan; however, it is not exhaustive. In considering whether to vote for or against the Plan, Holders of General Unsecured Claims, Senior Notes Claims and Subordinated Notes Claims entitled to vote should read and carefully consider the factors set forth below, as well as all other information set forth or otherwise referenced or incorporated by reference in this Disclosure Statement, including the risks and other factors described in the Debtor's various Securities Exchange Commission filings, all of which are incorporated herein.

## A. Certain Bankruptcy Law Considerations

### 1. Parties in Interest May Object to the Debtor's Classification of Claims and Equity Interests

Bankruptcy Code section 1122 provides that a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests in such class. The Debtor believes that the classification of Claims and Equity Interests under the Plan complies with the requirements set forth in the Bankruptcy Code because the Debtor created eight Classes of Claims and Equity Interests, each encompassing Claims or Equity Interests, as applicable, that are substantially similar to the other Claims and Equity Interests in each such Class. Nevertheless, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

### 2. The Debtor May Fail to Satisfy the Vote Requirement

If votes are received in number and amount sufficient to enable the Bankruptcy Court to confirm the Plan, as promptly as practicable thereafter, the Debtor intends to seek Confirmation of the Plan. In the event that sufficient votes are not received, the Debtor may seek to accomplish an alternative chapter 11 plan. There can be no assurance that the terms of any such alternative chapter 11 plan would be similar or as favorable to the Holders of Allowed Claims and Equity Interests as those proposed in the Plan.

### 3. The Debtor May Not Be Able to Secure Confirmation of the Plan

Even if the requisite acceptances are received, there can be no assurance that the Bankruptcy Court will confirm the Plan. A non-accepting Holder of an Allowed Claim might challenge either the adequacy of this Disclosure Statement or whether the balloting procedures and voting results satisfy the requirements of the Bankruptcy Code or Bankruptcy Rules. Even if the Bankruptcy Court determined that this Disclosure Statement, the balloting procedures and the voting results were appropriate, the Bankruptcy Court could still decline to confirm the Plan containing either of the Options if it found that any of the statutory requirements for confirmation had not been met, including the requirements that the terms of the Plan do not "unfairly discriminate" and are "fair and equitable" to non-accepting Classes, confirmation is not likely to be followed by a liquidation or a need for further financial reorganization, and the value of distributions to non-accepting Holders of Claims and Equity Interests within a particular Class under the Plan will not be less than the value of distributions such Holders would receive if the

debtor were liquidated under chapter 7 of the Bankruptcy Code. While the Debtor believes that the Plan complies with Bankruptcy Code section 1129, there can be no assurance that the Bankruptcy Court will find that these requirements are met.

Confirmation of the Plan is also subject to certain conditions as described in Article IX of the Plan. If the Plan is not confirmed, it is unclear what distributions, if any, Holders of Allowed Claims or Equity Interests would receive with respect to their Allowed Claims and Equity Interests.

Subject to the terms and conditions of the Plan, the Debtor reserves the right to modify the terms and conditions of the Plan as necessary for confirmation. Any such modifications could result in less favorable treatment of any non-accepting Class, as well as any Classes junior thereto, than the treatment currently provided in the Plan. Such less favorable treatment could include a distribution of property to the Class affected by the modification of a lesser value than currently provided in the Plan or no distribution of property whatsoever under the Plan.

    4.    <u>The Debtor May Object to the Amount or Classification of a Claim or Interest</u>

Except as otherwise provided in the Plan, the Debtor and the Reorganized Debtor reserve the right to object to the amount or classification of any Claim or Interest under the Plan. Any Holder of a Claim or Interest that is subject to an objection thus may not receive its expected share of the estimated distributions described in this Disclosure Statement.

    5.    <u>Risk of Non-occurrence of the Effective Date</u>

Although the Debtor believes that the Effective Date will occur quickly after the Confirmation Date, there can be no assurance as to such timing, or as to whether the Effective Date will, in fact, occur.

Consummation of the Plan is also subject to certain conditions as described in Article IX of the Plan, which are not certain. For example, the IRS Adversary Proceeding may not be resolved for a significant period of time, thereby delaying consummation. Moreover, the District Court may not approve the Stipulation of Settlement, thereby threatening consummation of the Plan.

    6.    <u>Contingencies Will Not Affect Votes of Impaired Classes to Accept or Reject the Plan</u>

The Distributions available to Holders of Allowed Claims and Equity Interests under the Plan can be affected by a variety of contingencies, including, without limitation, whether the Bankruptcy Court orders certain Allowed Claims to be subordinated to other Allowed Claims. The occurrence of any and all such contingencies, which could affect distributions available to Holders of Allowed Claims and Equity Interests under the Plan, will not affect the validity of the vote taken by the Impaired Class to accept or reject the Plan or require any sort of revote by the Impaired Class.

7.	Liquidation under Chapter 7

If no plan can be confirmed, the Debtor's Chapter 11 Case may be converted to a case under chapter 7 of the Bankruptcy Code, pursuant to which a trustee would be elected or appointed to liquidate the assets of the Debtor for distribution in accordance with the priorities established by the Bankruptcy Code.  Even if a plan is confirmed, under certain specified scenarios, the Debtor may seek to convert the Chapter 11 Case to a case under chapter 7 of the Bankruptcy Code.  A discussion of the effects that a chapter 7 liquidation would have upon the recoveries of Holders of Claims and Equity Interests is set forth in the Debtor's Liquidation Analysis.

**B.	Risks Related to the Plan**

1.	The Reorganized Debtor May Not Be Able to Realize Residual Value in AAC

Given the risks outlined below regarding OCI action with respect to AAC, the Segregated Account and the Rehabilitation Proceedings, the Reorganized Debtor may not be able to realize residual value in its ownership of AAC common equity.

2.	The Rehabilitation Court May Not Approve the Amended Plan Settlement

Because the Amended Plan Settlement contemplates settlement of claims among the Debtor, AAC and the Segregated Account, such settlement will require the approval of the Rehabilitation Court.  Additionally, because the Amended TSA and the Cost Allocation Agreement impact the Segregated Account, Rehabilitation Court approval will be required for these agreements as well.  While the Debtor expects the Rehabilitation Court to approve such settlement and agreements, approval cannot be assured.

3.	Risks Related to U.S. Federal Tax Characterization of NOLs and the Ambac Consolidated Group Specific to the Amended Plan Settlement

(i)	Certain Adverse Tax Consequences Could Result from the Rehabilitation Plan and Possible Substantial Amendments to the Rehabilitation Plan and/or the Initiation of Rehabilitation Proceedings against AAC, Likely Resulting in Adverse Consequences to Holders of Claims against the Debtor

As described elsewhere herein, the issuance of the Surplus Notes as currently contemplated by the Rehabilitation Plan could subject AAC to the risk of deconsolidation from the Ambac Consolidated Group for U.S. federal income tax purposes and of having to recognize significant CODI.  Deconsolidation or the recognition of substantial CODI would likely have a material adverse effect on the financial condition of AAC and the Segregated Account.  As such, the Rehabilitator is considering substantial amendments to the Rehabilitation Plan and/or the initiation of rehabilitation proceedings with respect to AAC.  Such amendments to the Rehabilitation Plan (and, presumably, any rehabilitation plan with respect to AAC) could include the elimination of the issuance of Segregated Account Surplus Notes and/or the imposition of transfer restrictions on any Segregated Account Surplus Notes.

Additionally, notwithstanding that amendments to the Rehabilitation Plan and/or the initiation of rehabilitation proceedings would be designed to preserve tax attributes for the ultimate benefit of AAC policyholders, such amendments might have other adverse impacts on the Debtor's estate.

<blockquote>(ii)    Surplus Notes May Be Characterized as Equity of AAC and, Therefore, AAC May No Longer Be a Member of the Ambac Consolidated Group</blockquote>

It is possible that the AAC Surplus Notes and/or the Segregated Account Surplus Notes may be characterized as equity of AAC for U.S. federal income tax purposes. If the Surplus Notes are characterized as equity of AAC and it is determined the Surplus Notes represented more than twenty (20) percent of the total value of the stock of AAC, issuance of the Surplus Notes may constitute a Deconsolidation Event and AAC and the AAC Subgroup may no longer be characterized as members of the Ambac Consolidated Group.

To the extent AAC is no longer a member of the Ambac Consolidated Group, AAC's NOLs (and certain other available tax attributes) may no longer be available (under certain circumstances) for use by the Ambac Consolidated Group, including the Reorganized Debtor, to reduce their U.S. federal income tax liabilities. This could result in a material increase in the tax liabilities of those Entities remaining in the Ambac Consolidated Group. In addition, certain other benefits resulting from U.S. federal income tax consolidation may no longer be available to the Ambac Consolidated Group such as certain favorable rules relating to transactions occurring between members of the group, including rules that generally should eliminate any income for U.S. federal income tax purposes resulting from payments to the Debtor under the Amended TSA. In such an event, the amount of NOLs available for use by Reorganized Debtor, if any, could be reduced by the amount of any taxable income associated with such payments. If a sufficient amount of NOLs are not available for use by the Reorganized Debtor to offset such taxable income, the Reorganized Debtor may incur U.S. federal income tax as a result of the payments made pursuant to the Amended TSA.

<blockquote>(iii)    The AAC Subgroup May Not Be Permitted to Reconsolidate with the Ambac Consolidated Group for Five Years Following the Issuance of the Surplus Notes and the AAC NOLs May Be Subject to Limitation Following Any Permitted Reconsolidation</blockquote>

To the extent AAC is no longer a member of the Ambac Consolidated Group, the AAC Subgroup may not be able to reconsolidate with the Ambac Consolidated Group for a period of five years following such event even if the Reorganized Debtor were to be treated as reacquiring or owning eighty (80) percent or more of the stock of the AAC Subgroup following any Deconsolidation Event. In addition, depending upon certain facts related to such Deconsolidation Event and any reconsolidation with the Ambac Consolidated Group, the acquisition by the Ambac Consolidated Group of additional value with respect to the stock of the AAC Subgroup may also result in, under certain circumstances, the imposition of an IRC section 382 limitation with respect to NOLs attributable to the AAC Subgroup reducing or eliminating (if there is a second ownership change within two years of the confirmation of a chapter 11 or a rehabilitation plan) the potential tax benefit of the NOLs to the Ambac Consolidated Group. The potential limit on reconsolidation and the potential IRC section 382 limitation with respect to the

AAC NOLs could result in a material increase in the U.S. federal income tax liability of the AAC Subgroup and/or the Ambac Consolidated Group and materially reduce the enterprise value of the Reorganized Debtor.

(iv)     If the Surplus Notes Are Characterized as Equity of AAC, the AAC NOL May Be Subject to Limitation under IRC Section 382

It is possible the Surplus Notes may be characterized as equity of AAC for U.S. federal income tax purposes. As a result, transfers of the Surplus Notes by holders who receive or are characterized as owning Surplus Notes representing more than five (5) percent of the equity of AAC may result in an "ownership change" of AAC for purposes of IRC section 382. If such an ownership change were to occur, the value and amount of the NOLs attributable to AAC would be substantially impaired, increasing the U.S. federal income tax liability of AAC and materially reducing cash available to dividend to the Reorganized Debtor, as well as reducing the value of the AAC's stock owned by the Reorganized Debtor.

(v)      Issuance of the Surplus Notes May Cause AAC to Recognize CODI, which Could Significantly Reduce the AAC NOL

If either the Surplus Notes or the claims for which the Surplus Notes are exchanged are "publicly traded" for purposes of IRC section 1273 and applicable Treasury Regulations thereunder, AAC will be treated as having satisfied the policyholders' claims against AAC for an amount equal to the adjusted issue price of the Surplus Notes (*e.g.*, the ascertainable fair market value of the Surplus Notes), plus any other consideration transferred. In addition, the Surplus Notes may be treated as contingent payment debt instruments under applicable Treasury Regulations. The analysis related to whether the Surplus Notes are contingent payment debt instruments or the Surplus Notes or claims are "publicly traded" is not clear and there is little authority addressing these issues. In addition, the IRS recently proposed new Treasury Regulations that, if adopted prior to issuance of such Surplus Notes, generally would make it more likely that property will be treated as "publicly traded" than under the currently applicable Treasury Regulations. If either the Surplus Notes are contingent payment debt instruments or the Surplus Notes or claims are "publicly traded," AAC could recognize a potentially significant amount of CODI, which could reduce AAC's NOLs, impairing AAC's ability to satisfy claims asserted against the Segregated Account and reducing the NOL by the amount of such CODI. The reduction in AAC's NOLs attributable to AAC could also reduce the NOL available to the Ambac Consolidated Group or reduce the value of the AAC stock owned by the Reorganized Debtor.

(vi)     The Debtor Might Have a Change in Control or Not Qualify for the L5 Exception and be Subject to a Limitation on the Use of its NOLs

The Trading Order implements notice and hearing procedures for transfers of Equity Interests and Claims to improve the likelihood that the Debtor will not be subject to a change of control under IRC Section 382 prior to the Effective Date and should be able to utilize the L5 Exception upon emergence. In addition, the New Charter of Incorporation contains certain trading restrictions to improve the likelihood that the Reorganized Debtor should not be subject to a change of control under IRC section 382 after the Effective Date. The Reorganized Debtor's

and AAC's ability to utilize the NOLs will be substantially impaired or eliminated if the Debtor nonetheless suffers a change of control or does not qualify for the L5 Exception.

> (vii)    The Bankruptcy Court May Not Enter an Order Finding that the Surplus Notes Are Not Equity of AAC and, Therefore, No Ownership Change or Deconsolidation Event Occurred in 2010

It is a condition to effectiveness of the Plan that the Bankruptcy Court enter an order finding that the AAC Surplus Notes and/or the Segregated Account Surplus Notes are not equity of AAC for U.S. federal income tax purposes and, therefore, neither an Ownership Change with respect to AAC nor a Deconsolidation Event occurred during the 2010 taxable year. It is possible that the Bankruptcy Court will not enter such an order and the Plan may not be confirmed.

4.    <u>The Amount of Any Payments by AAC to the Reorganized Debtor pursuant to the Amended TSA Is Uncertain</u>

The amount of any payments by AAC to the Reorganized Debtor pursuant to the Amended TSA is uncertain at this time because the amount of income recognized by AAC (including CODI and investment income) is subject to many variables and cannot be predicted with any precision.

5.    <u>Actions by the Rehabilitator May Affect the Amount of Any Payments by AAC to the Reorganized Debtor pursuant to the Amended TSA</u>

Pursuant to the Amended Plan Settlement, the Rehabilitator has certain consultation and approval rights with respect to tax positions taken by the Ambac Consolidated Group relating to the AAC Subgroup. The exercise or enforcement of such rights by the Rehabilitator may result in the Ambac Consolidated Group adopting tax positions that would reduce the amount of any payments by AAC to the Reorganized Debtor owed pursuant to the Amended TSA on account of the AAC Subgroup's use of NOLs. In addition, the Rehabilitator is considering substantial amendments to the Rehabilitation Plan which could reduce the amount of any payments by AAC to the Reorganized Debtor owed pursuant to the Amended TSA on account of the AAC Subgroup's use of NOLs.

## C.    Additional Factors to Be Considered

1.    <u>Business Factors</u>

> (i)    The Debtor May Be Unable to Attract and Retain Qualified Executives and Employees

The Debtor's ability to effectively implement a reorganization under chapter 11 and to realize residual value in respect of its ownership of AAC's common equity depends on the retention and recruitment of qualified executives and other professionals. The Debtor relies substantially upon the services of Ambac's current executive team. In addition to these officers, the Debtor requires key staff with risk mitigation, structured finance, insurance, credit, investment, accounting and administrative skills. As a result of AFG's filing for chapter 11

bankruptcy protection and the implementation of the Rehabilitation Proceedings, there is an increased risk that executive officers and other key staff will leave the company and replacements may not be incented to join Ambac. The loss of the services of members of Ambac's senior management team, or its inability to hire and retain other talented personnel, could delay or prevent the Debtor from fully implementing the Plan and AAC from implementing its remediation strategies.

      2.      <u>Risks Related to AAC, OCI and the Rehabilitation Proceedings</u>

      (i)      Pursuit of Litigation by Parties in Interest Could Disrupt Confirmation of the Plan and Could Have Material Adverse Effects on the Reorganized Debtor's Financial Condition.

There can be no assurance that any of the parties in interest will not pursue litigation strategies to enforce any Claims against the Debtor or AAC, for example, the IRS motion, filed in the District Court on January 13, 2011, to withdraw the IRS Adversary Proceeding from the Bankruptcy Court to the District Court. Litigation is by its nature uncertain and there can be no assurance of the ultimate resolution of any such proceedings. Any litigation may be expensive, lengthy, and disruptive to the Plan confirmation process. Additionally, a resolution of any such strategies that is unfavorable to the Debtor, especially in respect of the IRS Claims, could have a material adverse affect on Plan confirmation process or the Debtor's business, results of operations, financial condition, liquidity or cash flow.

      (ii)      The Occurrence of Certain Events Could Result in the Initiation of Rehabilitation Proceedings against AAC

The IRS and certain policyholders of the Segregated Account Policies have challenged the establishment of the Segregated Account. If such challenges are successful, OCI may determine that it is in the best interests of policyholders to initiate rehabilitation proceedings with respect to AAC. As such, OCI may determine that it is in the best interests of policyholders to initiate rehabilitation proceedings with respect to AAC, either preemptively or in response to any such action. Finally, the incurrence of large losses in respect of policies in the General Account and other unknown contingencies (including disputes between the Debtor and AAC and/or the Segregated Account) might occur which would prompt OCI to initiate rehabilitation proceedings with respect to AAC.

If, as a result of the occurrence of any such event(s), OCI decides to initiate rehabilitation proceedings with respect to AAC, adverse consequences may result, including, without limitation, the assertion of damages by counterparties (including mark-to-market claims with respect to insured transactions executed in ISDA format) and the acceleration of losses based on early termination triggers and the loss of control rights in insured transactions, thereby reducing the residual value of AAC. Additionally, the Rehabilitator would assume control of all of AAC's assets and management of AAC. In exercising control, the Rehabilitator will act for the benefit of policyholders, and will not take into account the interests of the Reorganized Debtor; such actions may result in material adverse consequences for the Reorganized Debtor. In addition, the initiation of delinquency proceedings against AAC would further decrease the

likelihood that OCI will permit AAC to make future dividend payments to the Reorganized Debtor.

> (iii)    As a Result of the Segregated Account Rehabilitation Proceedings, Various Adverse Events in the Insured Portfolio May Be Triggered. If Injunctions Issued by the Rehabilitation Court Enjoining Such Adverse Effects Are Ineffective, Substantial Adverse Events May Occur

The Temporary Injunction, as amended by the Supplemental Injunction, made permanent by the Segregated Account Rehabilitation Plan, enjoins certain actions by Segregated Account policyholders and other counterparties, including the assertion of damages or acceleration of losses (including mark-to-market claims with respect to insured transactions executed in ISDA format) based on early termination triggers and the loss of control rights in insured transactions. If the challenges to such injunction are successful, losses in the Segregated Account would likely increase substantially.

> (iv)    AAC's Inability to Realize the Remediation Recoveries Included in AAC's Loss Reserves Could Adversely Impact Its Liquidity and Financial Condition and Lead to Delinquency Proceedings.

As of December 31, 2010, AAC has estimated subrogation recoveries of $2,391.3 million (net of reinsurance), which is included in AAC's loss reserves. These recoveries are based principally on contractual claims arising from RMBS transactions which AAC has insured, and represent AAC's estimate of the amount it will ultimately recover. However, AAC's ability to recover these amounts is subject to significant uncertainty, including risks inherent in litigation, collectability of such amounts from counterparties and/or their respective parents and affiliates, timing of receipt of any such recoveries, regulatory intervention which could impede AAC's ability to take the actions required to realize such recoveries and uncertainty inherent in the assumptions used in estimating such recoveries. The amount of these subrogation recoveries is significant and if AAC is unable to recover any amounts, its residual value, if any, to the Debtor would be substantially impaired.

> (v)    Actions of the Rehabilitator Could Adversely Affect the Debtor, Including Impacting AAC's Ability to Realize Remediation Recoveries.

As a consequence of the Segregated Account Rehabilitation Proceedings, the Rehabilitator retains operational control and decision-making authority with respect to all matters related to the Segregated Account, including surveillance, remediation, loss mitigation and efforts to recover losses in the Segregated Account, including recovery efforts in respect of breaches of representations and warranties by sponsors of Ambac-insured RMBS. Similarly, by virtue of the contracts executed between AAC and the Segregated Account in connection with the establishment, and subsequent rehabilitation, of the Segregated Account, the Rehabilitator retains the discretion to oversee and approve certain actions taken by AAC in respect of assets and liabilities which remain in AAC. As a result, any efforts to remediate losses, and any actions taken by AAC, are subject to the approval of the Rehabilitator. In exercising such authority, the Rehabilitator will act for the benefit of policyholders, and will not take into account the interests of the Debtor. Decisions made by the Rehabilitator for the benefit of policyholders may result in

material adverse consequences for the Debtor. In addition, the Debtor is not able to predict the impact such oversight will have on the remediation of losses, and, in particular, on AAC's efforts to recover losses attributable to breaches of representations and warranties by sponsors of Ambac-insured RMBS and AAC's ability to commute outstanding policies and repurchase Surplus Notes, nor whether the Rehabilitator will pursue such remediation as vigorously as AAC has done in the past. In addition, as a result of the Segregated Account Rehabilitation Proceedings, certain key personnel have chosen to leave the Debtor, and additional people may decide to leave. The loss of such personnel could adversely impact remediation efforts, reducing AAC's ability to make future dividend payments to the Reorganized Debtor and possibly impacting the residual value, if any, of AAC to the Reorganized Debtor.

<blockquote>
(vi)     Loss Reserves May Not Be Adequate to Cover Potential Losses; Changes in Loss Reserves May Result in Further Volatility of Net Income and Earnings
</blockquote>

Loss reserves established with respect to AAC's non-derivative financial guarantee insurance business are based upon estimates and judgments by management, including estimates and judgments with respect to the probability of default, the severity of loss upon default, management's ability to execute commutation transactions, and estimated remediation recoveries for, among other things, breaches by the RMBS issuer of representations and warranties. Loss reserves are established when management has observed credit deterioration, in most cases, when the underlying credit is considered below investment grade. Furthermore, the objective of establishing loss reserve estimates is not to reflect the worst possible outcome. As such, there can be no assurance that the actual losses in AAC's financial guarantee insurance portfolio will not exceed AAC's loss reserves.

Additionally, inherent in AAC's estimates of loss severities and remediation recoveries is the assumption that AAC will retain control rights in respect of its insured portfolio. However, AAC is subject to the loss of control rights in many insured transactions, in the event that it is the subject of delinquency proceedings and/or other regulatory actions which could result from AAC's deteriorated financial position. In the event that AAC loses control rights, its ability to mitigate loss severities and realize remediation recoveries will be compromised, and actual ultimate losses in its insured portfolio could exceed AAC's loss reserves. The Temporary Injunction, as amended by the Supplemental Injunction, enjoins certain actions by holders of the Segregated Account Policies and other counterparties, including the loss of control rights. If this injunction were successfully challenged, AAC could lose its control rights with respect to the Segregated Account Policies.

AAC also relies on internally and externally developed complex financial models, including a recently licensed statistical regression model related to RMBS, which were used for the first time in connection with the preparation of AAC's first quarter 2011 results, to project performance of AAC's insured obligations. Differences in the models that we employ, and/or flaws in these financial models and/or faulty assumptions used by these financial models, could lead to increased losses and loss reserves. Uncertainty with respect to the ultimate performance of certain of AAC's insured exposures may result in substantial changes in loss reserves and/or actual losses. Correspondingly, such changes to loss reserves would affect AAC's reported earnings. If AAC does not have sufficient liquidity to meet the increase in actual losses, AAC or

its Affiliates may become subject to delinquency proceedings, reducing the residual value, if any, of AAC to the Reorganized Debtor.

        (vii)    Some of the State and Local Governments and Finance Authorities that Issue AAC-Insured Public Finance Obligations Are Experiencing Unprecedented Budget Shortfalls that Could Result in Increased Credit Losses or Impairments on Those Obligations

AAC has historically experienced low levels of defaults in its U.S. public finance insured portfolio, including during the financial crisis that began in mid-2007. However, recently many state and local governments that issue some of the obligations it insures has reported unprecedented budget shortfalls that will require them to significantly raise taxes and/or cut spending in order to satisfy their obligations. While there has been some support provided by the U.S. federal government designed to provide aid to state and local governments, certain state and local governments remain under extreme financial stress. If the issuers of the obligations in the Debtor's U.S. public finance portfolio are unable to raise taxes, cut spending, or receive federal assistance, AAC may experience losses or impairments on those obligations, which could adversely affect its business, financial condition and results of operations, reducing the probability that AAC will be able to make future dividend payments to the Reorganized Debtor.

        (viii)    Market Risks Could Adversely Impact AAC's Assets Posted as Collateral in Respect of Investment Agreements and Interest Rate Swap and Currency Swap Transactions

As a result of the downgrades of AAC's financial strength rating, it is required to post collateral with respect to certain investment agreements, interest rate swap and currency swap transactions. AAC will be required to post additional collateral if the market value of the assets used to collateralize its obligations declines or if there are changes in the collateral posting obligations under these agreements and transactions.

These collateral-posting obligations could have a material adverse effect on AAC's liquidity. At present, these collateral-posting requirements are being partially satisfied by AAC and by loans from AAC to its financial services Affiliates. As required by Wisconsin law, these transactions were approved by the OCI. To the extent that collateral-posting requirements increase as a result of changes in market conditions, as described above, it is likely that AAC would need to provide increased lending capacity to its financial services Affiliates in order to satisfy these collateral-posting obligations. Any such increases to lending capacity would be subject to the prior consent of the OCI; there can be no assurance that AAC would obtain such consent. OCI would likely consider several factors in determining whether to grant such consent, including its view of AAC's financial condition at the time of such loan or contribution.

If AAC's financial services Affiliates fail to post collateral as required, counterparties may be entitled to terminate the transactions. Upon such terminations, AAC could liquidate securities with unrealized mark-to-market losses which could have a material adverse effect on its liquidity. The termination of such transactions, if unpaid by AAC's financial services Affiliates, would trigger AAC's obligations to make payments under the financial guarantee insurance policies it previously issued, reducing AAC's ability to make future dividend

payments to the Reorganized Debtor. To the extent that the OCI determines that the payment by AAC under such policies could place AAC in a hazardous condition, the OCI could seize AAC and place it into rehabilitation, eliminating the residual value, if any, of AAC to the Reorganized Debtor.

> (ix)     Risks Which Impact Assets in the Debtor's Investment Portfolio Could Adversely Affect the Debtor's Business

The Debtor's investment portfolio may be adversely affected by events and developments in the capital markets, including interest rate movements, credit rating downgrades and foreign exchange movements.

During the course of 2010, management identified and periodically revised certain investment securities in the investment portfolio to potentially sell in connection with plans to reposition the investment portfolio and/or to meet potential liquidity needs. Ambac recorded an impairment charge through income on the portion of those securities which were in an unrealized loss position. Additionally, management determined that certain investments had suffered credit impairments. Credit impaired securities included certain securities that are guaranteed by AAC under policies that are subject to the Rehabilitation Plan. Ambac recorded an impairment charge through income in the amount of the estimated credit impairment on such securities. The impairments in value in the remaining investment portfolio are not deemed other-than-temporary, as such the remaining unrealized losses have been recognized in other comprehensive income.

To the extent AAC liquidates large blocks of investment assets in order to pay claims under financial guarantee insurance policies, to make payments under investment agreements and/or to collateralize AAC's obligations under investment agreements and interest rate swaps, such investment assets could be sold at prices less than fair value as of December 31, 2010.

Prior to the rating agency actions on AAC, AAC managed its investment portfolio in accordance with rating agency standards for a AAA-rated insurance company. As a result of the significant declines in AAC's financial strength ratings, it is no longer necessary to comply with the strict investment portfolio guidelines for an AAA-rated company. Therefore, AAC has decided to maintain a portion of its investment portfolio in lower-rated securities in order to increase the investment return on its portfolio. The investment in lower-rated securities and "alternative assets" could expose AAC to increased losses on its investment portfolio in excess of those described above and/or decrease the liquidity of the insured portfolio. However, AAC's investment policies are subject to certain covenants made for the benefit of the Segregated Account and the CDS Settlement Agreement. Any such changes could adversely impact the performance of the investment portfolio, reducing AAC's ability to make future dividend payments to the Reorganized Debtor and possibly impacting the residual value, if any, of AAC to the Reorganized Debtor.

(x)     The Determination of the Amount of Impairments Taken on the Debtor's Investments Is Highly Subjective and Could Materially Impact the Results of Operations or Financial Position

The determination of the amount of impairments on the Debtor's investments vary by investment type and is based upon the Debtor's periodic evaluation and assessment of known and inherent risks associated with the respective asset class.  Such evaluations and assessments are revised as conditions change and new information becomes available. Management updates its evaluations regularly and reflects changes in impairments in operations as such evaluations are revised.  There can be no assurance that the Debtor's management has accurately assessed the level of impairments taken in the Debtor's financial statements.  Furthermore, additional impairments may need to be taken in the future.  Historical trends may not be indicative of future impairments.  Ambac uses internally and externally developed financial models (including a licensed statistical regression model which was employed for the first time in connection with the preparation of the Debtor's 2011 results) to project impairments with respect to RMBS held in its investment portfolio.  Differences in the models employed and/or flaws in these models and/or faulty assumptions used by these models, could lead to increased impairments with respect to RMBS in the Debtor's investment portfolio, reducing AAC's ability to make future dividend payments to the Reorganized Debtor and possibly impacting the residual value, if any, of AAC to the Reorganized Debtor.

(xi)    Ambac Is Subject to Dispute Risk in Connection with AAC's Reinsurance Agreements

In addition to having credit exposure to AAC's reinsurance counterparties, reinsurance counterparties have disputed their obligations to make payments required by applicable reinsurance agreements, including scheduled payments and payments due in connection with the commutation of financial guarantee insurance policies.  These disputes, and any other similar dispute with other reinsurers, could result in AAC's being unable to collect all amounts due from reinsurers and/or collecting such amounts after potentially lengthy dispute resolution processes, reducing AAC's ability to make future dividend payments to the Reorganized Debtor and possibly impacting the residual value, if any, of AAC to the Reorganized Debtor.

3.      Risk Factors That May Affect the Value of Securities to be Issued Under the Plan and/or Recoveries under the Plan

(i)     The Valuation of the Reorganized Debtor May Not Be Adopted by the Bankruptcy Court

The Debtor's financial projections will provide an approximate midpoint equity value of the Reorganized Debtor.  Parties in interest in this Chapter 11 Case may oppose Confirmation of the Plan by alleging that the midpoint equity value of the Reorganized Debtor is higher or lower than that the Debtor's projections and that the Plan thereby improperly limits or extinguishes their rights to recoveries under the Plan.  At the Confirmation Hearing, the Bankruptcy Court will hear evidence regarding the views of the Debtor and opposing parties, if any, with respect to the valuation of the Reorganized Debtor.  Based upon that evidence, the Bankruptcy Court will determine the appropriate valuation for the Reorganized Debtor for purposes of the Plan.

    (ii)  A Liquid Trading Market for the New Common Stock and Warrants May Not Develop

  The Debtor cannot provide assurances that an active trading market will develop, or if a market develops, what the liquidity or pricing characteristics of that market will be.  The New Common Stock and Warrants will be issued without registration under the Securities Act or any similar federal, state or local law as set forth in greater detail in Article IX hereof, titled "Exemptions from Securities Act Registration."  Additionally, pursuant to the New Certificate of Incorporation, trading in the New Common Stock will be limited to protect the Debtor's eligibility for the L5 Exemption.  Thus, at least in the short-term, a liquid trading market for the New Common Stock and Warrants may not develop.  If a liquid trading market for the New Common Stock and Warrants does develop, the liquidity of any market therefore will depend upon, among other things, the number of Holders of New Common Stock and Warrants, the Reorganized Debtor's financial performance and the market for similar securities, none of which can be determined or predicted.

    (iii)  The Reorganized Debtor May Not Be Able to Achieve Projected Financial Results, Meet its Post-Reorganization Debt Obligations and/or Fund its Operating Expenses, Working Capital Needs and/or Capital Expenditures

  The Reorganized Debtor may not be able to meet its projected financial results or achieve projected revenues and cash flows assumed in projecting future business prospects.  To the extent the Reorganized Debtor does not meet its projected financial results or achieve projected revenues and cash flows, the Reorganized Debtor may lack sufficient liquidity to continue operating as planned after the Effective Date, may be unable to service its debt obligations as they come due or may not be able to meet its operational needs.  Further, a failure of the Reorganized Debtor to meet its projected financial results or achieve projected revenues and cash flows could lead to cash flow and working capital constraints, which constraints may require the Reorganized Debtor to seek additional working capital.  The Reorganized Debtor may not be able to obtain such working capital when it is required.  Further, even if the Reorganized Debtor were able to obtain additional working capital, it may only be available on unreasonable terms.  For example, the Reorganized Debtor may be required to take on additional debt, the interest costs of which could adversely affect the results of operations and the financial condition of the Reorganized Debtor.  If any such required capital is obtained in the form of equity, the equity interests of the Holders of the then-existing New Common Stock could be diluted.  Although the Debtor's Financial Projections represent management's view based upon current known facts and assumptions about the future operations of the Reorganized Debtor, there is no guarantee that the Financial Projections will be realized.

    (iv)  Neither the Estimated Valuation of the Reorganized Debtor and the New Common Stock nor the Estimated Recoveries to Holders of Allowed Claims are Intended to Represent the Private Sale Value of the New Common Stock

  The estimated recoveries to Holders of Allowed Claims and Equity Interests set forth herein are not intended to represent the private sale values of the Reorganized Debtor's securities.  Instead, the estimated recoveries are based upon numerous assumptions (the

realization of many of which is beyond the control of the Reorganized Debtor), including, without limitation: (a) the successful reorganization of the Debtor; (b) an assumed date for the occurrence of the Effective Date; (c) the Debtor's ability to achieve the operating and financial results included in the Financial Projections; (d) the Debtor's ability to maintain adequate liquidity to fund operations; and (e) the assumption that capital and equity markets remain consistent with current conditions.

4. <u>Because of the Limitations on Transfer of New Common Stock in the Amended Certificate of Incorporation, the Reorganized Debtor's Ability to Raise Capital Through Equity Investment Is Limited</u>

If the Reorganized Debtor is unable to meet its projected financial results or achieve projected revenues and cash flows assumed in projecting future business prospects, the Reorganized Debtor may be required to raise additional working capital. Because the Amended Certificate of Incorporation contains provisions to prevent a "change in control" of the Reorganized Debtor and preserve NOLs, the Reorganized Debtor's ability to raise needed capital in the form of equity will be restricted. Consequently, the Reorganized Debtor may only be able to raise capital as debt which may be on unreasonable terms, the interest costs of which could adversely affect the results of operations and the financial condition of the Reorganized Debtor. Although, based upon the Debtor's Financial Projections and current known facts and assumptions about the future operations of the Reorganized Debtor, management believes its working capital will be sufficient, there is no guarantee that the Financial Projections will be realized.

5. <u>Potential Shareholder Action</u>

Certain Holders of Equity Interests in the Debtor may express dissatisfaction with the proposed Plan and the Options contained therein. As of the date hereof, the Debtor does not express any views with respect to the outcome of potential actions of such Holders. It is possible that such actions could lead to modifications to the Plan. It is also possible that such actions could impact the Debtor's business operations.

6. <u>Risks Related to U.S. Federal Tax Characterization of NOLs and the Ambac Consolidated Group</u>

(i) <u>Characterization of Losses on AAC's CDS Portfolio as Capital Losses for Federal Tax Purposes Could Result in a Material Assessment for Federal Income Taxes</u>

AAC's CDS portfolio experienced significant losses. The majority of these CDS contracts are on a "pay as you go" basis, which the Debtor believes are properly characterized as notional principal contracts for U.S. federal income tax purposes. Generally, losses on notional principal contracts are ordinary losses. However, the federal income tax treatment of CDS is an evolving area of tax law. As part of the ongoing audit of Ambac's 2007-2009 federal income tax returns and refund claims, the IRS has recently proposed to disallow AAC's deductions of CDS losses as ordinary losses, effectively taking the position that they were more properly characterized as capital losses. As of June 30, 2011, Ambac had NOLs and capital loss

carryforwards amounting to approximately $7.3 billion for federal income tax purposes. Although Ambac believes these CDS contracts are properly characterized as notional principal contracts, if the IRS were to successfully assert the proposed disallowance resulting from its examination, Ambac would be subject to both a substantial reduction in its NOLs and would suffer a material assessment for federal income taxes of up to $800 million. Such assessments and reductions in NOLs would have a material adverse impact on the financial condition of the Debtor or the Reorganized Debtor, as applicable. Such assessments related to the Tax Refunds, which amount to approximately $700 million, may be made by the IRS at any time, without prior notice to the Debtor or the Reorganized Debtor, as applicable, and without providing an opportunity to dispute the assessment, pursuant to IRC section 6213(b). Subject to applicable law and existing court orders, the IRS may then file a lien that attaches to the property interests of any member of the Ambac Consolidated Group, and may proceed to collect immediately on the assessment in any manner available under applicable law. Moreover, the IRS may be prevented from collecting the Tax Refund Transfers from AAC or the Segregated Account, the liability for which the OCI allocated to the Segregated Account, providing the IRS with a greater incentive to seek such amounts to the extent possible from the Debtor or another member of the Ambac Consolidated Group. If these events occur, the Debtor's ability to shelter CODI and/or reorganize effectively may be seriously jeopardized.

(ii)    The Reorganized Debtor May Be Unable to Make Use of the NOLs

Although NOLs of AAC may be available for use by the Reorganized Debtor if, following a Deconsolidation Event, an election is made under Treasury Regulations section 1.1502-36(d)(6) to reattribute AAC's NOLs to the Reorganized Debtor, the NOLs available to the Reorganized Debtor may be limited under IRC section 382 to the extent the Debtor fails to qualify for the L5 Exception.

Additionally, the NOLs are a notional asset the realization of which is contingent upon uncertain future events. Even if the Plan is confirmed and consummated, the Reorganized Debtor, AAC, AFG Prime or other members of the Ambac Consolidated Group, as applicable, may not be able to utilize such NOLs due to an inability to generate sufficient income or engage in more than an insignificant amount of an active trade or business during and subsequent to the Effective Date of the Plan.

7.    <u>The Outcome of the IRS Adversary Proceeding May Be Unfavorable to the Debtor</u>

Allowance of the IRS Claims as filed would be catastrophic to the value of the Debtor's estate and would likely result in conversion to a chapter 7 case. Although the Debtor believes the IRS Claims should be disallowed in its entirety, there can be no guarantee that the Bankruptcy Court will so find. Additionally, if the IRS Adversary Proceeding cannot be settled through the mediation that began on July 6, 2011, resolution of the IRS Adversary Proceeding, a condition to consummation of the Plan, may take a significant period of time, particularly if any lower court decision with respect to the IRS Adversary Proceeding is appealed by either party, and may cause the Debtor to incur substantial legal fees.

8.    Certain Tax Implications of the Debtor's Reorganization May Increase the Tax Liability of the Reorganized Debtor

Holders of Claims in the Voting Class should carefully review Article X below, entitled "Certain U.S. Federal Income Tax Consequences of the Plan" to determine how the tax implications of the Plan and this Chapter 11 Case may adversely affect the Reorganized Debtor.

9.    Certain Regulatory Implications of the Debtor's Reorganization May Affect Distributions of New Common Stock

(i)    Certain Distributions of New Common Stock May Require the Approval of OCI and May Result in Limitations on the Voting Rights Attached to Such New Common Stock

AAC is a Wisconsin-domiciled insurance company and is subject to the insurance and regulatory laws of the State of Wisconsin.

Under Wisconsin insurance holding company laws, there is a rebuttable presumption of control if a person, directly or indirectly, holds the power to vote or the power to cause the direction of such vote, through proxies or otherwise, of more than 10% of the voting stock of an insurance holding company. Any such acquisition of control requires the prior approval of OCI.

Additionally, Section 4.5 of the Amended Certificate of Incorporation provides that no stockholder may cast votes with respect to 10% or more of the New Common Stock, regardless of the actual number of shares of New Common Stock beneficially held by the stockholder. In addition, New Common Stock held by a stockholder in excess of ten percent (10%) will not count in the calculation of or toward a quorum at any meeting of stockholders.

To ensure compliance with Wisconsin law, if a Holder believes that as of the Distribution Record Date it, along with any of its affiliates, either directly or indirectly will hold in the aggregate Claims that shall receive ten percent (10%) or more of the New Common Stock, such Holder shall be required to request OCI approval of the distribution of such New Common Stock or file a disclaimer of "control" approved by OCI *prior to the distribution of New Common Stock on the Distribution Date*.

Holders may wish to consult a legal advisor admitted in the state of Wisconsin with respect to these requirements.

(ii)    Certain Distributions of New Common Stock May Require the Approval of U.K.'s Financial Services Authority and May Result in Limitations on the Voting Rights Attached to Such New Common Stock

The Debtor is the holding company of Ambac UK and Ambac Credit Products Limited, both regulated entities in the U.K. Consequently, the prior consent of the U.K.'s Financial Services Authority (the "FSA") is required for any individual, group or institution to acquire the power to vote or the power to cause the direction of such vote, through proxies or otherwise, of ten percent (10%) or more of the New Common Stock of the Debtor. Any such acquisition which occurs without first obtaining this consent could lead to criminal sanctions, including, but

126

not limited to, (a) avoidance of the transfer of New Common Stock or the right to be issued new or further shares of New Common Stock, (b) limitation on the exercise of voting rights are exercisable in respect of the New Common Stock acquired without approval; (c) limitation on the further issuance of New Common Stock in respect of the New Common Stock accepted without approval; and (d) except in a liquidation, limitation on payment of any sum due from the Reorganized Debtor on the New Common Stock acquired, whether in respect of capital or otherwise.

A person who is already an approved controller by virtue of holding ten percent (10%) or more of the New Common Stock or being entitled to exercise or control the exercise of ten percent (10%) or more of the voting power of the New Common Stock will nevertheless require the prior approval of the FSA if it wishes to increase its level of control beyond certain specified percentages. These are 20 percent, 33 percent and 50 percent.

To ensure compliance with these requirements, if a Holder believes that as of the Distribution Record Date it, along with any of its affiliates, either directly or indirectly will hold in the aggregate Claims that shall receive ten percent (10%) or more of the New Common Stock, such Holder shall be required to request FSA approval of the distribution of such New Common Stock *prior to the distribution of New Common Stock on the Distribution Date*.

Holders may wish to consult a solicitor admitted in England and Wales with respect to these requirements.

## D.    Disclosure Statement Disclaimer

### 1.    The Information Contained Herein Is for Soliciting Votes Only

The information contained in this Disclosure Statement is for purposes of soliciting acceptances of the Plan and may not be relied upon for any other purposes.

### 2.    The Information in this Disclosure Statement May Be Inaccurate

Unless otherwise specified herein, the statements contained in this Disclosure Statement are made by the Debtor as of the date hereof, and the delivery of this Disclosure Statement after that date does not imply that there has not been a change since that date in the information set forth herein. The Debtor may subsequently update the information in this Disclosure Statement, but it has no duty to update this Disclosure Statement unless ordered to do so by the Court. Further, the performance and prospective financial information contained herein, unless otherwise expressly indicated, is unaudited. Finally, neither the Securities and Exchange Commission nor any other governmental authority has passed upon the accuracy or adequacy of this Disclosure Statement, the Plan, or any Exhibits thereto.

Although the Debtor has used its reasonable best efforts to ensure the accuracy of the financial information provided in this Disclosure Statement, some of the financial information contained in this Disclosure Statement has not been audited and is based upon an analysis of data available at the time of the preparation of the Plan and this Disclosure Statement. While the Debtor believes that such financial information fairly reflects the financial condition of the

Debtor, the Debtor is unable to warrant or represent that the information contained herein and attached hereto is without inaccuracies.

3. **Financial Projections and Other Forward Looking Statements Are Not Assured**

**This Disclosure Statement contains various projections concerning the financial results of the Reorganized Debtor's operations, including the Financial Projections, that are, by their nature, forward looking, and which projections are necessarily based upon certain assumptions and estimates. Should any or all of these assumptions or estimates ultimately prove to be incorrect, the actual future experiences of the Reorganized Debtor may turn out to be different from the Financial Projections.**

**Specifically, the projected financial results contained in this Disclosure Statement reflect numerous assumptions concerning the anticipated future performance of the Reorganized Debtor, some of which may not materialize, including, without limitation, assumptions concerning: (i) the timing of confirmation and consummation of the Plan in accordance with its terms; (ii) the anticipated future performance of the Reorganized Debtor, including, without limitation, the Debtor's ability to maintain or increase revenue and gross margins, control future operating expenses or make necessary capital expenditures; (iii) general business and economic conditions; and (iv) overall industry performance and trends.**

**Due to the inherent uncertainties associated with projecting financial results generally, the projections contained in this Disclosure Statement will not be considered assurances or guarantees of the amount of funds or the amount of Claims that may be Allowed in the various Classes. While the Debtor believes that the Financial Projections contained in this Disclosure Statement are reasonable, there can be no assurance that they will be realized.**

4. This Disclosure Statement Was Not Approved by the Securities and Exchange Commission

This Disclosure Statement has not been filed with the Securities and Exchange Commission or any state regulatory authority. Neither the Securities and Exchange Commission nor any state regulatory authority has passed upon the accuracy or adequacy of this Disclosure Statement, or the exhibits or the statements contained herein, and any representation to the contrary is unlawful.

5. The Debtor Relied upon Certain Exemptions from Registration under the Securities Act

This Disclosure Statement has been prepared pursuant to Bankruptcy Code section 1125 and Bankruptcy Rule 3016(b) and is not necessarily in accordance with the requirements of federal law, Blue Sky Laws or other similar laws. The offer of New Common Stock and Warrants to Holders of Class 3, Class 4 and Class 5 Claims has not been registered under the Securities Act or similar Blue Sky Laws. To the maximum extent permitted by Bankruptcy Code section 1145, the Securities Act and other applicable non-bankruptcy law, the issuance of

the New Common Stock and the Warrants will be exempt from registration under the Securities Act by virtue of Bankruptcy Code section 1145.  If New Common Stock or Warrants are issued to "underwriters," as defined in section 2(a)(11) of the Securities Act, in the Bankruptcy Code and in Article IX.B.2 below, such New Common Stock or Warrants will be issued pursuant to the exemption from registration provided by Section 4(2) of the Securities Act, and such securities will be considered "restricted securities."

6.      This Disclosure Statement Contains Forward Looking Statements

This Disclosure Statement contains "forward looking statements" within the meaning of the Private Securities Litigation Reform Act of 1995.  Such statements consist of any statement other than a recitation of historical fact and can be identified by the use of forward looking terminology such as "may," "expect," "anticipate," "estimate" or "continue" or the negative thereof or other variations thereon or comparable terminology.  The reader is cautioned that all forward looking statements are necessarily speculative and there are certain risks and uncertainties that could cause actual events or results to differ materially from those referred to in such forward looking statements.  The liquidation analysis, distribution projections and other information contained herein and attached hereto are estimates only, and the timing and amount of actual distributions to Holders of Allowed Claims may be affected by many factors that cannot be predicted.  Therefore, any analyses, estimates or recovery projections may or may not turn out to be accurate.

7.      No Legal or Tax Advice Is Provided to You by this Disclosure Statement

**This Disclosure Statement shall not constitute legal or tax advice**.  The contents of this Disclosure Statement should not be construed as legal, business, or tax advice.  Each Holder of a Claim or an Interest should consult his or her own legal counsel and accountant with regard to any legal, tax and other matters concerning his or her Claim or Equity Interest.  This Disclosure Statement may not be relied upon for any purpose other than to determine how to vote on the Plan or object to Confirmation of the Plan.

8.      No Admissions Are Made by this Disclosure Statement

The information and statements contained in this Disclosure Statement will neither (a) constitute an admission of any fact or liability by any entity (including, without limitation, the Debtor) nor (b) be deemed evidence of the tax or other legal effects of the Plan upon the Debtor, the Reorganized Debtor, Holders of Allowed Claims or Equity Interests or any other parties in interest.

9.      No Reliance Should be Placed upon any Failure to Identify Litigation Claims or Projected Objections

No reliance should be placed upon the fact that a particular litigation claim or projected objection to a particular Claim or Interest is, or is not, identified in this Disclosure Statement.  The Debtor or the Reorganized Debtor may seek to investigate, file and prosecute Claims and Equity Interests and may object to Claims after the Confirmation or Effective Date of the Plan irrespective of whether this Disclosure Statement identifies such Claims or Objections to Claims.

10. <u>Nothing Herein Constitutes a Waiver of any Right to Object to Claims or Recover Transfers and Assets</u>

The vote by a Holder of an Allowed Claim for or against the Plan does not constitute a waiver or release of any Claims of the Debtor or the Reorganized Debtor or rights of the Debtor or the Reorganized Debtor (or any party in interest, as the case may be) to object to that Holder's Allowed Claim, or recover any preferential, fraudulent or other voidable transfer or assets, regardless of whether any Claims or Causes of Action of the Debtor or its Estate is specifically or generally identified herein.

11. <u>The Information Used Herein Was Provided by the Debtor and Was Relied Upon by the Debtor's Advisors</u>

Counsel to and other advisors retained by the Debtor have relied upon information provided by the Debtor in connection with the preparation of this Disclosure Statement. Although counsel to and other advisors retained by the Debtor have performed certain limited due diligence in connection with the preparation of this Disclosure Statement, they have not verified independently the information contained herein.

12. <u>The Potential Exists for Inaccuracies, and the Debtor Has No Duty to Update</u>

The statements contained in this Disclosure Statement are made by the Debtor as of the date hereof, unless otherwise specified herein, and the delivery of this Disclosure Statement after that date does not imply that there has not been a change in the information set forth herein since that date. While the Debtor has used its reasonable business judgment to ensure the accuracy of all of the information provided in this Disclosure Statement and in the Plan, the Debtor nonetheless cannot, and do not, confirm the current accuracy of all statements appearing in this Disclosure Statement. Further, although the Debtor may subsequently update the information in this Disclosure Statement, the Debtor has no affirmative duty to do so unless ordered to do so by the Bankruptcy Court.

13. <u>No Representations Made Outside this Disclosure Statement Are Authorized</u>

No representations concerning or relating to the Debtor, the Chapter 11 Case or the Plan are authorized by the Bankruptcy Court or the Bankruptcy Code, other than as set forth in this Disclosure Statement. Any representations or inducements made to secure your acceptance or rejection of the Plan that are other than as contained in, or included with, this Disclosure Statement, should not be relied upon by you in arriving at your decision. You should promptly report unauthorized representations or inducements to the counsel to the Debtor and the U.S. Trustee.

## ARTICLE IX.
## EXEMPTIONS FROM SECURITIES ACT REGISTRATION

**A.    New Common Stock and Warrants**

The Plan provides for the Debtor to issue the New Common Stock and the Warrants. The Debtor believes that each of the New Common Stock and the Warrants constitutes a "security,"

as defined in Section 2(a)(1) of the Securities Act, Bankruptcy Code section 101, and applicable Blue Sky Laws. The Debtor further believes that the offer and sale of the New Common Stock and the Warrants pursuant to the Plan are, and subsequent transfers of the Securities by the Holders thereof that are not "underwriters," as defined in Section 2(a)(11) of the Securities Act and in the Bankruptcy Code, will be, exempt from federal and state securities registration requirements under various provisions of the Securities Act, the Bankruptcy Code and Blue Sky Laws.

**B.      Issuance and Resale of New Common Stock and Warrants under the Plan**

1.      Exemption from Registration

Section 3(a)(7) of the Securities Act provides that, except for securities exchanged in a case under chapter 11 of the Bankruptcy Code, the registration requirements of section 5 of the Securities Act shall not apply to securities exchanged by an issuer with its existing security Holders exclusively where no commission or other remuneration is paid or given directly or indirectly for soliciting such exchange. By virtue of section 18 of the Securities Act, section 3(a)(7) also provides that any Blue Sky Laws requirements shall not apply to such exchange.

Bankruptcy Code section 1145 provides that the registration requirements of section 5 of the Securities Act (and any Blue Sky Laws requirements) shall not apply to the offer or sale of stock, options, warrants, or other securities by a debtor if (i) the offer or sale occurs under a plan of reorganization; (ii) the recipients of the securities hold a claim against, an interest in, or claim for administrative expense against, the debtor; and (iii) the securities are issued in exchange for a claim against or interest in a debtor or are issued principally in such exchange and partly for cash and property. In reliance upon this exemption, the offer and sale of the New Common Stock and Warrants will not be registered under the Securities Act or any Blue Sky Laws.

To the extent that the issuance of the New Common Stock and Warrants is covered by Bankruptcy Code section 1145, such securities may be resold without registration under the Securities Act or other federal securities laws, unless the Holder is an "underwriter" (as discussed below) with respect to such securities, as that term is defined in section 2(a)(11) of the Securities Act and in the Bankruptcy Code. In addition, the New Common Stock and Warrants generally may be able to be resold without registration under Blue Sky Laws pursuant to various exemptions provided by such laws; however, the availability of such exemptions cannot be known unless individual Blue Sky Laws are examined. Therefore, recipients of the New Common Stock and Warrants wishing to resell their securities are advised to consult with their own legal advisors as to the availability of any such exemption from registration under state Blue Sky Laws in any given instance and as to any applicable requirements or conditions to such availability.

If the issuance of the New Common Stock and Warrants is not covered by Bankruptcy Code section 1145, such securities will be considered "restricted securities" as defined by Rule 144 promulgated under the Securities Act ("Rule 144") and may be resold under the Securities Act or applicable Blue Sky Laws only pursuant to an effective registration statement under the Securities Act or an applicable exemption from registration, including Rule 144. Recipients of the New Common Stock and Warrants are advised to consult with their own legal advisors as to

the applicability of Bankruptcy Code section 1145 to the New Common Stock and Warrants and the availability of any exemption from registration under the Securities Act and Blue Sky Laws in the event that Bankruptcy Code section 1145 is not applicable to such recipients' New Common Stock and Warrants.

> 2.      Resale of New Common Stock; Definition of Underwriter

Bankruptcy Code section 1145(b)(1) defines an "underwriter" as one who, except with respect to "ordinary trading transactions" of an entity that is not an "issuer," (i) purchases a claim against, interest in, or claim for an administrative expense in the case concerning, a debtor, if such purchase is with a view to distribution of any security received or to be received in exchange for such claim or interest; or (ii) offers to sell securities offered or sold under a plan for the Holders of such securities; or (iii) offers to buy securities offered or sold under a plan from the Holders of such securities, if such offer to buy is with a view to distribution of such securities and under an agreement made in connection with the plan, with the consummation of the plan, or with the offer or sale of securities under the plan; or (iv) is an "issuer" of the securities within the meaning of section 2(a)(11) of the Securities Act.

The definition of an "issuer" for purposes of whether a Person is an underwriter under Bankruptcy Code section 1145(b)(1)(D), by reference to section 2(a)(11) of the Securities Act, includes

> any person who has purchased from an issuer with a view to, or offers or sells for an issuer in connection with, the distribution of any security, or participates or has a direct or indirect participation in any such undertaking, or participates or has a participation in the direct or indirect underwriting of any such undertaking; but such term shall not include a person whose interest is limited to a commission from an underwriter or dealer not in excess of the usual and customary distributors' or sellers' commission. As used in this paragraph the term "issuer" shall include, in addition to an issuer, any person directly or indirectly controlling or controlled by the issuer, or any person under direct or indirect common control with the issuer.

"Control," as defined in Rule 405 of the Securities Act, means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract, or otherwise. Accordingly, an officer or director of a reorganized debtor or its successor under a plan of reorganization may be deemed to "control" of such debtor or successor, particularly if coupled with ownership of a significant percentage of the reorganized debtor's or its successor's voting securities.

Resales of the New Common Stock by Persons deemed to be "underwriters" (which definition includes "controlling Persons") are not exempted by Bankruptcy Code section 1145 from registration under the Securities Act or other applicable law.  Under certain circumstances, Holders of New Common Stock who are deemed to be "underwriters" may be entitled to resell

their New Common Stock pursuant to the limited safe harbor resale provisions of Rule 144. Generally, Rule 144 would permit the public sale of securities received by persons who are "affiliates" if current information regarding the issuer is publicly available and if volume limitations, manner of sale requirements and certain other conditions are met. For the purpose of Rule 144, an "affiliate of an issuer" is "a person that directly, or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, such issuer." Whether any particular Person would be deemed to be an "affiliate" of the issuer would depend upon various facts and circumstances applicable to that Person. Accordingly, the Debtor expresses no view as to whether any Person would be deemed an "underwriter" or an "affiliate," with respect to the New Common Stock or would be able to utilize the exemption from Securities Act registration provided by Rule 144. In view of the complex nature of the question of whether a particular Person may be an "underwriter," the Debtor makes no representations concerning the right of any Person to freely resell New Common Stock. Accordingly, the Debtor recommends that potential recipients of New Common Stock consult their own counsel concerning their ability to freely trade such securities without compliance with the federal and state securities laws.

## ARTICLE X.
## CERTAIN U.S. FEDERAL INCOME
## TAX CONSEQUENCES OF THE PLAN

The following discussion summarizes certain U.S. federal income tax consequences of the implementation of the Plan to the Debtor and the Reorganized Debtor and certain Holders of Claims and Equity Interests. The discussion does not, however, summarize the U.S. federal income tax consequences to such Holders of the ownership and disposition of the New Common Stock and Warrants. Holders of Claims should consult their own tax advisors regarding the consequences of the ownership and disposition of New Common Stock and Warrants.

This discussion is based on the IRC, Treasury Regulations promulgated thereunder, judicial decisions and published administrative rules, and pronouncements of the IRS, each as in effect on the date hereof. Legislative, judicial, or administrative changes or interpretations enacted or promulgated after the date hereof could alter or modify the discussion set forth below with respect to the U.S. federal income tax consequences of the Plan. Any such changes or interpretations may be retroactive and could significantly affect the U.S. federal income tax consequences described herein.

This discussion does not address the U.S. federal income tax consequences to Holders of Claims who (a) are unimpaired or otherwise entitled to payment in full in Cash on the Effective Date under the Plan or (b) are otherwise not entitled to vote under the Plan. The discussion also assumes that each holder of a Claim holds only Claims in a single class, each Holder of a Claim holds such Claims only as "capital assets" within the meaning of the IRC, none of the Claims has "original issue discount" ("OID") within the meaning of the IRC, and the various debt and other arrangements to which the Debtor and the Reorganized Debtor are or will be parties will be respected for U.S. federal income tax purposes in accordance with their form.

The U.S. federal income tax consequences of the Plan are complex and are subject to substantial uncertainties. The Debtor has not requested and does not expect to request a ruling

from the IRS or an opinion of counsel with respect to any of the tax aspects of the Plan, and the discussion set forth below of certain U.S. federal income tax consequences of the Plan is not binding upon the IRS.  Thus, no assurance can be given that the IRS would not assert, or that a court would not sustain, a position different from any discussed herein, resulting in U.S. federal income tax consequences to the Debtor, the Reorganized Debtor, and/or Holders of Claims that are substantially different from those discussed herein.  The Debtor has not requested, and does not expect to request, an opinion of counsel with respect to any of the tax aspects of the Plan, and no opinion is given by this Disclosure Statement.

This discussion does not apply to a Holder of a Claim that is not a "United States person," as such term is defined in the IRC.  Moreover, this discussion does not address U.S. federal taxes other than income taxes nor any state, local or non-U.S. tax consequences of the Plan, nor does it purport to address all aspects of U.S. federal income taxation that may be relevant to United States persons in light of their individual circumstances or to United States persons that may be subject to special tax rules, such as persons who are related to the Debtor within the meaning of the IRC, broker-dealers, banks, mutual funds, insurance companies, financial institutions, small business investment companies, regulated investment companies, tax-exempt organizations, pass-through entities, beneficial owners of pass-through entities, subchapter S corporations, employees of the Debtor, persons who received their Claims as compensation, persons who hold Claims or Equity Interests or who will hold the New Common Stock or Warrants as part of a straddle, hedge, conversion transaction, or other integrated investment, persons using a mark to market method of accounting, and Holders of Claims who are themselves in bankruptcy.  If a partnership or entity treated as a partnership for U.S. federal income tax purposes holds Claims, the tax treatment of a partner generally will depend on the status of the partner and the activities of the partnership.

THE FOLLOWING SUMMARY OF CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON THE INDIVIDUAL CIRCUMSTANCES PERTAINING TO A HOLDER OF A CLAIM.  ALL HOLDERS OF CLAIMS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS AS TO THE FEDERAL, STATE, LOCAL, NON-U.S. INCOME, ESTATE, GIFT, AND OTHER TAX CONSEQUENCES OF THE PLAN.

**IRS CIRCULAR 230 DISCLOSURE**:  ANY TAX ADVICE CONTAINED IN THIS DISCLOSURE STATEMENT (INCLUDING ANY ATTACHMENTS) IS NOT INTENDED OR WRITTEN TO BE USED, AND CANNOT BE USED, BY ANY TAXPAYER FOR THE PURPOSE OF AVOIDING TAX-RELATED PENALTIES UNDER THE TAX CODE.  TAX ADVICE CONTAINED IN THIS DISCLOSURE STATEMENT (INCLUDING ANY ATTACHMENTS) IS WRITTEN IN CONNECTION WITH THE PROMOTION OR MARKETING OF THE TRANSACTIONS OR MATTERS ADDRESSED BY THIS DISCLOSURE STATEMENT.  EACH TAXPAYER SHOULD SEEK ADVICE BASED ON THE TAXPAYER'S PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR

## A. Certain U.S. Federal Income Tax Consequences to the Debtor

For U.S. federal income tax purposes, the Debtor is the common parent of the Ambac Consolidated Group. For federal income tax purposes, the Ambac Consolidated Group's estimated NOL and capital loss carryforwards as of June 30, 2011, were approximately $7.3 billion. The amount of these NOLs and other losses remains subject to audit and adjustment by the IRS. For a further discussion of the ongoing tax controversy, please see the discussion contained in Article III.

As discussed below, it is anticipated that a substantial portion of the losses and other tax attributes of the Ambac Consolidated Group will be utilized or eliminated in connection with the implementation of the Plan. It is further anticipated that the use of remaining losses by the Ambac Consolidated Group to offset future taxable income may be subject to significant limitation. In addition, the tax basis of the assets and certain other tax attributes held by certain members of the Ambac Consolidated Group may be reduced in connection with implementation of the Plan.

There also may be other U.S. federal income tax consequences to the Reorganized Debtor as a result of certain restructuring transactions.

### 1. Cancellation of Indebtedness Income

As a result of the Plan, the Debtor's existing indebtedness will be eliminated.

Generally, a corporation will recognize CODI upon satisfaction of its outstanding indebtedness for total consideration less than the amount of such indebtedness. A corporation will not, however, be required to include any amount of CODI in gross income if the corporation is a debtor under the jurisdiction of a court in a case under chapter 11 of the Bankruptcy Code and the discharge of debt occurs pursuant to that proceeding (the "108(a) Bankruptcy Exception"). Instead, as a consequence of such exclusion, the debtor must reduce its tax attributes by the amount of CODI excluded from gross income. In general, tax attributes are reduced in the following order: (a) NOLs, (b) general business and minimum tax credit carryforwards, (c) capital loss carryforwards, (d) the basis of the debtor's assets, and (e) foreign tax credit carryforwards.

If a debtor with excluded CODI is a member of a consolidated group, Treasury Regulations address the application of the rules for the reduction of tax attributes (the "Consolidated Attribute Reduction Rules"). The Consolidated Attribute Reduction Rules generally provide that the tax attributes attributable to the member with excluded CODI are reduced first, including the member's tax basis in its assets (which includes the stock of subsidiaries). If the member reduces its basis in the stock of a subsidiary that is a member of the consolidated group, corresponding reductions must be made to the subsidiary's tax attributes, including the subsidiary's basis in its assets. Generally, any required attribute reduction takes place after the consolidated group has determined its taxable income (or loss) for the taxable year in which the CODI is incurred.

The Debtor expects to incur significant CODI as a result of the Plan. The amount of CODI will depend on, among other things, the fair market value of the New Common Stock and

Warrants, which may not be determined until after the Effective Date of the Plan. Pursuant to the 108(a) Bankruptcy Exception, the Debtor will not include its CODI in gross income. Instead, the Debtor will be required to reduce its tax attributes in accordance with the Consolidated Attribute Reduction Rules after determining the taxable income (or loss) of the Ambac Consolidated Group for the taxable year of discharge.

Under the Consolidated Attribute Reduction Rules, the Debtor's excluded CODI will be applied to reduce its NOLs and, if necessary, other tax attributes, including the Debtor's tax basis in its assets. To the extent that the amount of excluded CODI results in a reduction in the basis of the stock of members of the Ambac Consolidated Group, the Consolidated Attribute Reduction Rules require these members to reduce their tax attributes accordingly, including, among other things, such members' NOLs, capital losses, credits, and tax basis in their assets.

The extent to which NOLs and other tax attributes remain following the application of the Consolidated Attribute Reduction Rules will depend on a number of factors, including the amount of CODI.

2. Annual Section 382 Limitation on Use of NOLs and "Built-In" Losses and Deductions

(i) Limitation on NOLs and Other Tax Attributes

Under IRC section 382, if a "loss corporation" (generally, a corporation with NOLs and/or built-in losses) undergoes an "ownership change," the amount of its pre-ownership change NOLs (the "Pre-Change Losses") that may be utilized to offset future taxable income generally is subject to an annual limitation (the "Annual Section 382 Limitation"). Similar rules apply to the corporation's capital loss carryforwards and tax credits.

The Debtor's issuance of New Common Stock pursuant to the Plan is expected to result in an ownership change for purposes of IRC section 382. Accordingly, subject to the discussion below of certain special bankruptcy exceptions, the Ambac Consolidated Group's Pre-Change Losses may be subject to the Annual Section 382 Limitation. This limitation applies in addition to, and not in lieu of, any other limitation that may already or in the future be in effect and the attribute reduction that may result from CODI.

(ii) General Section 382 Limitation

In general, the amount of the Annual Section 382 Limitation is equal to the product of (1) the fair market value of the stock of the loss corporation (or, in the case of a consolidated group, generally the stock of the common parent) immediately before the ownership change (with certain adjustments) and (2) the "long-term tax-exempt rate" in effect for the month in which the ownership change occurs, which is generally defined as the highest rate in effect during the three months prior to and including the month in which the ownership change occurs (for example, 3.82% for an ownership change that occurs during October 2011). For a corporation (or consolidated group) in bankruptcy that undergoes an ownership change pursuant to a confirmed bankruptcy plan of reorganization, the stock value generally is determined immediately after (rather than before) the ownership change.

Any unused portion of the Annual Section 382 Limitation generally may be carried forward, thereby increasing the Annual Section 382 Limitation in the subsequent taxable year. However, unless a corporation qualifies for certain bankruptcy exceptions discussed below, if the corporation (or consolidated group) does not continue its historic business or use a significant portion of its assets in a business for two years after the ownership change, the Annual Section 382 Limitation is reduced to zero. In addition, if a redemption or other corporate contraction occurs in connection with the ownership change of the loss corporation (or consolidated group), or if the loss corporation (or consolidated group) has substantial nonbusiness assets, the Annual Section 382 Limitation is reduced to take the redemption, other corporate contraction, or nonbusiness assets into account. Furthermore, if the corporation (or consolidated group) undergoes a second ownership change, the second ownership change may result in a lesser (but never a greater) Annual Section 382 Limitation with respect to any losses that existed at the time of the first ownership change.

(iii)     Built-in Gains and Losses

If a loss corporation (or consolidated group) has a "net unrealized built-in loss" at the time of the ownership change, then any built-in losses or deductions recognized during the following five years (up to the amount of the original net unrealized built-in loss) generally will be treated as a Pre-Change Loss subject to the Annual Section 382 Limitation. Conversely, if the loss corporation (or consolidated group) has a "net unrealized built-in gain" at the time of the ownership change, then any built-in gains recognized during the following five years (up to the amount of the original net unrealized built-in gain) will increase the Annual Section 382 Limitation in the year recognized.

(iv)     Special Bankruptcy Exceptions

As discussed above in conjunction with the Trading Order, the L5 Exception, pursuant to IRC section 382(l)(5), provides an exception to the application of the Annual Section 382 Limitation when a corporation is under the jurisdiction of a bankruptcy court in a title 11 case. The L5 Exception generally applies where (1) shareholders of a debtor immediately before an ownership change and (2) qualified creditors of a debtor (generally, certain long-term creditors, historic trade creditors or creditors receiving less than 5 percent of the stock of the debtor in the title 11 case), in respect of their interests and claims, receive stock with at least 50 percent of the voting power and value of all the stock of the reorganized debtor.

Under the L5 Exception, a debtor's Pre-Change Losses are not limited on an annual basis but, instead, are required to be reduced by the amount of any interest deductions claimed during the three taxable years preceding the effective date of the reorganization, and during the part of the taxable year before and including the reorganization, in respect of all debt converted into stock in the reorganization. Moreover, if the L5 Exception applies, a second ownership change of the debtor within a two-year period after the bankruptcy plan of reorganization generally will cause the debtor to forfeit all its unused NOLs that were incurred before the second ownership change. If a debtor qualifies for the L5 Exception, the exception applies unless the debtor affirmatively elects for it not to apply.

If a debtor in bankruptcy is not eligible for the L5 Exception or elects out of the exception, a special rule under IRC section 382(l)(6) will apply for purposes of determining the Annual Section 382 Limitation. Under this special rule, the Annual Section 382 Limitation will be calculated by reference to the lesser of (1) the value of the debtor's stock (with certain adjustments) immediately after the ownership change (as opposed to immediately before the ownership change, as described above) or (2) the value of the debtor's assets (determined without regard to liabilities) immediately before the ownership change. Unlike the L5 Exception, there is no reduction for interest deductions claimed under this special rule.

(v)     Application of Section 382 to the Debtor

As discussed above, it is expected that the Debtor will undergo an ownership change as a result of the implementation of the Plan. However, the Debtor intends to qualify for the L5 Exception. In connection with the bankruptcy filing, the Bankruptcy Court entered the Trading Order requiring certain claimholders to sell a sufficient amount of Claims such that the claimholder may be presumed to be characterized as a "qualified creditor" of the Debtor. As a result, it is expected that the Debtor, depending upon Holders of Claims, may qualify for the L5 Exception.

Assuming that the Debtor qualifies for the L5 Exception, Ambac's NOLs and other tax attributes should generally not be subject to an Annual Section 382 Limitation. However, under the rules contained in the L5 Exception, the Debtor's Annual Section 382 Limitation will be zero if an ownership change occurs in the two years following the Effective Date of the Plan. Through the Plan, the Debtor will implement the New Charter of Incorporation, including, among other things, a provision restricting transfers of certain equityholders following the Effective Date of the Plan in order to reduce the risk of an ownership change during such two-year period.

The Debtor's ability to qualify for the L5 Exception is not certain. If the Debtor does not qualify for the L5 Exception or if the Debtor affirmatively elects out of the L5 Exception, its Annual Section 382 Limitation should be calculated under the special rule contained in section 382(l)(6). As a result, there is uncertainty with respect to the Annual Section 382 Limitation of the Debtor, and there can be no assurance that the limitation will not be significantly lower than anticipated.

In addition, most of the losses of the Ambac Consolidated Group's NOLs were generated by AAC, which is not under the jurisdiction of the Bankruptcy Court. As a result, the applicability of the L5 Exception and the special rule under IRC section 382(l)(6) to AAC's losses is unclear, but the Debtor believes either exception should apply to all of the Ambac Consolidated Group's NOLs, including those generated by AAC.

Furthermore, if there were an ownership change prior to the Effective Date, the Annual Section 382 Limitation resulting from the implementation of the Plan might result in a lesser (but not a greater) limitation with respect to losses that existed at the time of the first ownership change. The Debtor obtained Court approval of the Trading Order to restrict transfers of equity in an attempt to avoid the occurrence of an ownership change prior to implementation of the

Plan. It is possible, however, that such an ownership change has nonetheless occurred, in which case the Section 382 Limitation would be significant lower than anticipated.

3.     Alternative Minimum Tax

In general, a federal alternative minimum tax ("AMT") is imposed on a corporation's alternative minimum taxable income ("AMTI") each year at a twenty percent (20%) rate to the extent that such tax exceeds the corporation's regular federal income tax for such year. AMTI is generally equal to regular taxable income with certain adjustments. For purposes of computing AMTI, certain tax deductions and other beneficial allowances are modified or eliminated. In particular, even though a corporation may otherwise be able to offset all of its taxable income for regular tax purposes by available NOLs, only ninety percent (90%) of a corporation's AMTI generally may be offset by available alternative tax NOLs.

In addition, if a corporation or consolidated group undergoes an ownership change within the meaning of IRC section 382 and has a net unrealized built-in loss at the time of such change, the corporation's or consolidated group's aggregate basis in its assets would be reduced for certain AMT purposes to reflect the fair market value of such assets as of the date of the ownership change.

Any AMT that a corporation pays generally will be allowed as a nonrefundable credit against its regular federal income tax liability in future years when the corporation is not subject to the AMT. Any unused credit is carried forward indefinitely.

**B.     Certain U.S. Federal Income Tax Consequences to Holders of General Unsecured Claims, Senior Notes Claims and Subordinated Notes Claims**

Pursuant to the Plan, in full and final satisfaction and discharge of and in exchange for their Claims, (i) Holders of Senior Notes Claims shall receive New Common Stock, (ii) Holders of General Unsecured Claims shall receive New Common Stock, and, provided that the Class of Senior Notes Claims votes to accept the Plan, Warrants, and (iii) provided that the Class of Senior Notes Claims votes to accept the Plan, Holders of Subordinated Notes Claims shall receive New Common Stock and, provided that the Class of Subordinated Notes Claims also votes to accept the Plan, Warrants. For U.S. federal income tax purposes, a Holder should generally realize gain or loss (if any) equal to the difference between such Holder's amount realized with respect to the exchange of its claim and the Holder's adjusted tax basis in its claim. Subject to the discussion of accrued interest in Section X.C.2.b below, a Holder's amount realized should be equal to the fair market value of the New Common Stock and/or Warrants, if any, received by the Holder.

After the Effective Date, certain Holders may receive Cash, New Common Stock and/or Warrants from the Disputed Claims Reserve as a result of determinations with respect to Disputed Claims (a "Disputed Claims Payment"). This discussion generally does not address the U.S. federal income tax consequences of a Disputed Claims Payment (although certain consequences relating to the Disputed Claims Reserve are addressed in Section X.D below). A Holder should consult its tax advisor regarding the tax consequences of such a payment. These tax consequences include the treatment of a Disputed Claims Payment in determining the amount

realized by the holder with respect to its Allowed Claim, as well as the tax consequences related to the right to receive consideration prospectively, including the amount required to be taken into account with respect to the receipt of the right, the consequences of holding the right, the treatment and characterization of payments received after the Effective Date with respect to the right, and the potential deferral of the recognition of any loss realized with respect to an Allowed Claim until all consideration related to the claim is determined and received.

The recognition of gain realized by a Holder may be affected by the installment method of reporting gain. This discussion assumes that such method either is not available with respect to the Holder's exchange of its Claim or, if available, the Holder elects out of such method. Holders should consult their tax advisors regarding the availability and application of (and, if available, the election out of) the installment method of reporting gain that may be recognized with respect to their Claims.

As discussed more fully below, the recognition of gain or loss realized by A Holder also may be affected by whether the holder's Allowed Claim constitutes a "security" for U.S. federal income tax purposes.

1.     Securities for Tax Purposes

Whether a debt instrument constitutes a "security" for U.S. federal income tax purposes is determined based on all of the facts and circumstances. Certain authorities have held that one factor to be considered is the length of the initial term of the debt instrument. These authorities have held that an initial term of less than five years is evidence that the instrument is not a security; whereas, an initial term of ten years or more is evidence that it is a security. Numerous factors other than the term of an instrument could be taken into account in determining whether a debt instrument is a security, including whether repayment is secured, the degree of subordination of the instrument, the creditworthiness of the obligor, whether the holders have the right to vote or otherwise participate in the management of the obligor, whether the instrument is convertible into an equity interest of the obligor, whether payments of interest are fixed, variable, or contingent, and whether such payments are made on a current basis or are accrued.

Each Holder should consult its tax advisor to determine whether the debt underlying its Allowed Claim constitutes a "security" for U.S. federal income tax purposes.

2.     Allowed Claims Constituting Securities

(i)     Holders of Senior Notes Claims

If the debt underlying a Holder's Allowed Senior Notes Claim constitutes a security in the Debtor, the exchange of the Allowed Senior Notes Claim may qualify as a recapitalization or other nonrecognition transaction for U.S. federal income tax purposes and consequently, a Holder of such an Allowed Claim generally should not recognize gain on the exchange of its Claim for New Common Stock. A Holder, however, that realizes loss on the exchange would not be permitted to recognize the loss. For a discussion of potential scenarios where gain but not loss may be required to be recognized, please see the discussion below relating to "accrued interest" and "market discount."

A Holder's tax basis in the New Common Stock received in exchange for an Allowed Senior Notes Claim generally should equal the Holder's tax basis in the Allowed Senior Notes Claim immediately prior to the exchange, and a Holder should have a holding period for the New Common Stock that includes the holding period for the Allowed Senior Notes Claim exchanged therefor.

(ii)     Holders of General Unsecured Claims and Subordinated Notes Claims

If the debt underlying an Allowed General Unsecured Claim or an Allowed Subordinated Notes Claim is a security in the Debtor, the exchange of the Allowed General Unsecured Claim or Allowed Subordinated Notes Claim may qualify as a recapitalization or other nonrecognition transaction for U.S. federal income tax purposes. In such case, a Holder that realizes a loss on the exchange would not be permitted to recognize the loss. Pursuant to the Plan, (i) each Holder of an Allowed General Unsecured Claim will receive New Common Stock and, provided that the Class of Senior Notes Claims votes to accept the Plan, the Warrants and (ii) provided that the Class of Senior Notes Claims votes to accept the Plan, each Holder of an Allowed Subordinated Notes Claim will receive the Warrants and, provided that the Class of Subordinated Notes Claims also votes to accept the Plan, New Common Stock. For U.S. federal income tax purposes, the Warrants should qualify as securities and should be treated as having a "principal amount" of zero. As a result, a Holder of an Allowed General Unsecured Claim or an Allowed Subordinated Notes Claim generally should not recognize any gain or loss on the exchange. For a discussion of potential scenarios where gain but not loss may be required to be recognized, please see the discussion below relating to "accrued interest" and "market discount."

Such Holder should obtain a tax basis in the New Common Stock and Warrants it receives in exchange for such claims generally equal to the Holder's tax basis in the Allowed General Unsecured Claim or Allowed Subordinated Notes Claim, as the case may be, immediately prior to the exchange. This tax basis should be allocated among the New Common Stock and the Warrants in proportion to the relative fair market values of such securities received, and a Holder should have a holding period for the New Common Stock and Warrants that includes the holding period for the Allowed Claims exchanged therefor.

3.     <u>Allowed Claims Not Constituting Securities</u>

If the debt underlying a Holder's Allowed Claim does not constitute a security, the exchange of the Allowed Claim for the New Common Stock (and Warrants, if any) should be treated as a taxable exchange for U.S. federal income tax purposes. The Holder generally should recognize the gain or loss realized on the exchange equal to the difference between (1) the fair market value as of the Effective Date of the New Common Stock (and of the Warrants received) that is not allocable to accrued interest (not previously included in income) with respect to the exchanged Allowed Claim and (2) the Holder's tax basis in the Allowed Claims surrendered by the Holder (other than any tax basis attributable to accrued interest not previously included in income). The character of such recognized gain or loss as capital gain or loss or as ordinary income or loss should depend, among other things, on the application of the market discount rules, and a Holder may recognize ordinary income to the extent that a portion of the consideration received in exchange for an Allowed Claim is treated as received in satisfaction of accrued but untaxed interest on the Allowed Claim. If recognized gain or loss is capital, it

generally would be long-term capital gain or loss if the Holder held its Allowed Claim for more than one year at the time of the exchange. If the Holder is a non-corporate taxpayer, any such long-term capital gain may be taxed at preferential rates. In general, a Holder's basis in the property received (*i.e.*, the New Common Stock and Warrants, if any) should equal the fair market value of such property as of the Effective Date, and a Holder's holding period for the stock or warrants received should begin on the day following the Effective Date. The use of capital losses may be subject to limitation under the IRC.

* * *

Each Holder should consult its tax advisor regarding whether (and the extent to which) the exchange of an Allowed Claim qualifies as a recapitalization or other nonrecognition transaction and, whether or not it so qualifies, the tax consequences to such holder of the exchange of an Allowed Claim for the consideration received by the Holder under the Plan.

## C. Market Discount and Accrued Interest

### 1. Market Discount

The market discount provisions of the IRC may apply to certain Holders. In general, a debt obligation acquired by a Holder in the secondary market is considered to be acquired with market discount as to that holder if its stated redemption price at maturity (or, in the case of a debt obligation having OID, its adjusted issue price) exceeds, by more than a statutory *de minimis* amount, the tax basis of the debt obligation in the holder's hands immediately after its acquisition.

Any gain recognized by a Holder on the exchange of an Allowed Claim that was acquired with market discount should be treated as ordinary income to the extent of the market discount that accrued thereon (unless the holder elected to include market discount in income as it accrued). Holders with accrued market discount with respect to their Allowed Claims should consult their tax advisors as to the application of the market discount rules in view of their specific tax circumstances, particularly in connection with the disposition of any of the New Common Stock or Warrants, if any, received pursuant to the Plan.

### 2. Accrued Interest

A portion of any New Common Stock or Warrants, if any, may be treated as received in exchange for interest accrued but untaxed on the Claim. To the extent that any portion of the consideration received by a Holder is attributable to accrued but untaxed interest, the Holder will recognize ordinary income if the Holder has not previously included the accrued interest in income. Conversely, a Holder generally should recognize a loss to the extent any accrued interest was previously included in income and is not paid in full.

A Holder's tax basis in any New Common Stock or Warrants, if any, treated as received in exchange for accrued but untaxed interest (if any) generally will be equal to the fair market value of such New Common Stock or Warrants, if any, as of the Effective Date. The holding period of such New Common Stock or Warrants generally will begin on the day following the Effective Date.

The Plan provides that all amounts paid on a Claim that includes both principal and accrued but unpaid interest will be allocated first to the principal amount owing and only to interest to the extent the recovery exceeds the principal. There can be no assurance that the IRS will agree with such treatment. Each Holder should consult its tax advisor regarding the proper allocation of the consideration received under the Plan.

## D.    Treatment of the Disputed Claims Reserve

The Disputed Claims Reserve is intended to be treated, for U.S. federal income tax purposes, as a disputed ownership fund within the meaning of Treasury Regulations section 1.468B-9(b)(1). If so treated, any payment made out of the Disputed Claims Reserve should not be deemed to have been made to any recipient until, and to the extent that, the amount to which the recipient is entitled has been determined and distributed. At such time, the recipient will take such amount into account for U.S. federal income tax purposes. Recipients of amounts from the Disputed Claims Reserve should report consistently with the foregoing and should consult their tax advisors concerning the federal, state, local, and other tax consequences of the receipt of amounts from the Disputed Claims Reserve and the consequences of owning and disposing of New Common Stock received from the Disputed Claims Reserve.

The Disputed Claims Reserve generally will treat a distribution of property in respect of Disputed Claims as a sale or exchange of such property for purposes of IRC section 1001(a). Any income realized by the Disputed Claims Reserve (including with respect to any appreciation in the value of New Common Stock while held by the Disputed Claims Reserve) will be reported by the Disbursing Agent as income of and taxable to the Disputed Claims Reserve.

**THE FOREGOING SUMMARY IS PROVIDED FOR GENERAL INFORMATIONAL PURPOSES ONLY. HOLDERS OF CLAIMS ARE STRONGLY URGED TO CONSULT THEIR OWN TAX ADVISORS REGARDING FEDERAL, STATE, LOCAL, AND NON-U.S. TAX CONSEQUENCES OF THE PLAN TO THEM.**

## ARTICLE XI.
### Recommendation

In the opinion of the Debtor, because the Plan provides for a larger distribution to the Debtor's creditors than would otherwise result in a liquidation under chapter 7 of the Bankruptcy Code, the Plan is preferable to the alternatives described in this Disclosure Statement. In addition, any alternative other than Confirmation of the Plan could result in extensive delays and increased administrative expenses resulting in smaller Distributions than that which is proposed under the Plan. Accordingly, the Debtor recommends that parties entitled to vote on the Plan support Confirmation of the Plan and vote to accept the Plan.

Respectfully submitted,

Ambac Financial Group, Inc.

By: Diana Adams
Title: President and CEO
Dated: September 21, 2011

Prepared by:

Peter A. Ivanick
Allison H. Weiss
DEWEY & LEBOEUF LLP
1301 Avenue of the Americas
New York, New York 10019
Tel: (212) 259-8000
Fax: (212) 259-6333

- and -

Todd L. Padnos (admitted *pro hac vice*)
DEWEY & LEBOEUF LLP
1950 University Avenue, Suite 500
East Palo Alto, California 94303
Tel: (650) 845-7000
Fax: (650) 845-7333

*Attorneys for the Debtor and Debtor in Possession*